AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
  bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
  davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
  meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>    Plaintiff,<br><br>    v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>    Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF CARL SZABO IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    June 22, 2023<br>Time:    9:00 A.M.<br>Dept.:   Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

1

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Carl Szabo, declare:

1. **Identity of declarant.** I am the Vice President and General Counsel of Plaintiff NetChoice, LLC d/b/a NetChoice. In addition to providing legal counsel to NetChoice, I coordinate our advocacy before legislative bodies, courts, and government agencies. I make this declaration from personal knowledge and a review of NetChoice's records kept in the ordinary course of business.

2. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. We are dedicated to preserving the internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own content publication, personalization, and moderation decisions, they create diverse experiences and choices. We strongly believe in giving users and online service providers autonomy in how they use the internet.

3. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the internet, while minimizing burdens on businesses, to help make the internet more accessible and useful for both businesses and consumers. Our members include a broad array of online services: Airbnb, Alibaba.com, Amazon.com, AOL, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, Swimply, TikTok, TravelTech, Travelocity, Trivago, Turo, Twitter, Verisign, VRBO, VSBLTY, Waymo, Wing, and Yahoo!.

4. California's new law, AB 2273, implicates several of NetChoice's members because—although the statutory language is vague and ambiguous—those members could be found to "provide[] an online service, product, or feature likely to be accessed by" individuals under age 18.

5. NetChoice is intimately familiar with the content structures and business models that many online businesses—including our members—use and rely on to provide services to users. Our expertise has led us to conclude that AB 2273 would irreparably harm our members

2

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

and is fundamentally inconsistent with their business models. Should it be permitted to go into effect, AB 2273 would have long-term, adverse expressive effects on our members' services by dictating the content they publish, moderate, and tailor to users; coercing them into adopting unworkable, privacy-invasive age verification technology or otherwise redesigning their services to be universally child friendly (however that is defined by the State of California); and negatively affecting our members' reputations with their users, advertisers, investors, and others. AB 2273 would also expose our members to stiff civil penalties and enforcement actions brought by the California Attorney General should they not comply with the law's vague dictates to the State's satisfaction. It is no exaggeration to say that AB 2273 threatens not just our members and their services, but also the internet as we know it.

6. **"Potentially harmful" content.** Particularly onerous is AB 2273's requirement that businesses evaluate and mitigate the risk that any new or existing "potentially harmful content" will reach users under age 18, and deliver those assessments to the California Attorney General on demand. At the outset, this provision requires members to vet almost all content they publish, which could range into millions or even billions of items posted each day. I know of no reliable way to isolate internet content that is "likely to be accessed by" users under 18, particularly as some minor users (such as 17-year-olds) are likely to access much of the same content that adults access. Even if our members could meaningfully isolate such content, they next would have to engage in the impossible task of determining whether that content "could harm" minors, and propose plans to mitigate those risks.

7. These requirements severely impinge on our members' ability to exercise editorial discretion over the content they publish. Instead of speaking freely on their own services—and inviting their users to do the same—our members will now first have to incur significant costs simply to probe if protected exercises of speech will pass muster under the State's murky harms analysis, however that is defined. In short, AB 2273 imposes both a tax and a muzzle on our members—and their users—before either can utter a word online. In practical effect, the vagueness and breadth of these requirements means that NetChoice members will be chilled from freely publishing a diverse and rich range of content, so as to avoid the risk of liability if the State

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

3

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

deems that content "potentially harmful."  Such a requirement injures everyone that benefits from a dynamic internet, including NetChoice's members and their users.

8. **_Enforcement of content policies and community standards._**  AB 2273's requirement that members enforce their own content policies and community standards would severely harm members' ability to exercise editorial discretion over their services.  NetChoice's members have adopted unique-business-specific content policies and guidelines governing the use of their websites, reflecting their different values.  In this way, content moderation reflects a significant means by which online services express themselves and the types of communities they are seeking to create.  Choices about whether to allow or prohibit certain kinds of content involve editorial judgments by our members: what speech they want to foster and what speech they wish to distance themselves from.

9. In accordance with their individual content moderation policies, some of our members already review massive amounts of content—including text, videos, audio, and images—each day to make nuanced judgment calls on the type of content they wish to leave up or remove.  The volume of users and activity on our members' services is enormous.  Some have over a billion users, with an accordingly huge amount of content uploaded daily.  This content is posted from all over the globe and reflects a wide range of perspectives, identities, and norms.  How our members approach content moderation decisions in turn shapes the type of online experience created for their users and advertisers.

10. There is no one-size-fits-all approach to content moderation, nor does it take place in a vacuum. Instead, moderation efforts entail a complex and dynamic set of interactions among a service's own norms, user preferences, and real-world events.  They also involve a range of content moderation tools, including both human review and automated filtering (like algorithms) to handle higher volumes of content.  Our members carefully titrate their content moderation efforts to curate communities and experiences consistent with their subjective values: A member might determine that content should be shown despite its controversial nature; that removal or de-prioritization of content is necessary; or that not only should content be removed but that the posting user should be suspended or banned from the service.  Content moderation also involves

4

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

context and service-specific decisions about how to arrange and display content, recommend content to users, and facilitate access to content. On some services, content moderation can even be user-driven, by granting users the option to decide whether they wish to avoid certain content. For example, some of our members permit users to block or mute other users or content marked with certain hashtags, or create lists containing terms or phrases they wish to avoid seeing on the service.

11. Being able to approach content moderation decisions with flexibility and discretion is essential for our members to strike a balance between addressing potentially objectionable content and preserving open and reliable access for users. NetChoice's members already dedicate substantial personnel, resources, and effort to content moderation. But these efforts are ever-changing and responsive to the often unpredictable content that appears on their services each day. For this reason, our members have developed adaptable policies that simultaneously guide future moderation decisions and provide services with the agility to react to unexpected types of content or changed circumstances.

12. Under AB 2273, however, NetChoice members will have to adopt a rigid, one-size-fits-all approach towards content moderation and would be significantly constrained in their ability to address content in the manner they see fit. Our members would be inclined to drop certain content policies and rules that require significant flexibility to monitor, which in turn would deprive users of notice of the types of content that may be removed and deny our members the ability to fashion the tone and tenor of online discussions on their services. AB 2273 would also undermine our members' ability to modify content moderation rules rapidly in response to new developments, whether online or in the physical world. By eliminating businesses' ability to make these sorts of particularized editorial judgments, AB 2273 would irreparably harm members' ability to moderate, organize, curate, and otherwise prioritize their content within the unique circumstances in which it was posted. Given the risk of civil liability, the law may also discourage our members from having content policies and community standards at all, to avoid the risk of unpredictable and punitive penalties.

13. ***Use of algorithms and content personalization.*** AB 2273's restrictions and

5

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

prohibitions on businesses using algorithms and "personal information" (which includes basic information about a user's interaction with a service), would irreparably harm our members' ability to conduct routine website operations (such as search, newsfeeds, and service improvements), provide tailored content to their users, and maintain the relationships with advertisers that sustain some of their services. For example, AB 2273's prohibitions on "dark patterns" could—depending on how that phrase is interpreted—extend to our members' commonplace use of algorithmic features that order and shape content. Algorithms fundamentally structure our members' websites by permitting them to retrieve and present information responsive to user requests; provide and optimize personalized content recommendations to users; detect bot and spam activity; and serve many other functional purposes. Given the vast amount of user-generated content our members host online, some of our members also use algorithms to make moderation decisions and respond quickly to objectionable content. Accordingly, restricting our members' use of algorithms would significantly impair their ability to flag, remove, and deprioritize content, thereby *undermining* those members' ability to enforce their content policies (as AB 2273 would require). Curtailing online businesses' ability to curate content through these algorithms would lead to irreparable expressive and operational harms for our members.

14.     AB 2273's restrictions on the use of information would also irreparably harm our members by affecting their relationships with third parties, including advertisers. Many online businesses, including our members, rely on advertising to remain in business and offer free or low-cost content to users. Advertisers recognize the value of reaching a specific audience, and thus pay more for targeted advertising. And users benefit from targeted advertising both by receiving subsidized access to our members' services and also by seeing more relevant advertising content. AB 2273 will interfere with our members' ability to sell targeted advertising and thereby jeopardize the foundational business and operational model on which many of our members rely. The restrictions will also interfere with our members' ability to share information with other third parties on whom they rely to support and enrich the services they offer, such as vendors for hosting, data analytics, and other important operational services like spam and fraud detection, technical support, and customer support services. AB 2273 will thus require our members to redesign their

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

6

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

services.

15. **Age verification.** AB 2273 also irreparably harms members by requiring services to "[e]stimate the age of child users with a reasonable level of certainty." Even assuming the technology to age verify accurately were available, this obligation would require many of our members to fundamentally restructure their services by requiring verification of legal identity before the services can be accessed. This would require our members to collect more personal information from users, which many users will not want to provide, either because it is burdensome and inconvenient to do so or because they object to providing such personal information (or both). This will damage our members' relationships with their users, and is nearly certain to decrease the number of users for many services (and thereby damage those services' ability to sell advertising). Many of our members also welcome anonymous users as a matter of principle and as a vital feature of the internet—a feature that AB 2273 will dismantle.

16. ***Impact of AB 2273 on members' reputations.*** For decades, our members have painstakingly built and nurtured relationships with their users, investors, and advertisers. These relationships are based on each member's proven ability to deliver innovative, high-quality services. If AB 2273 is permitted to go into effect, our members will no longer be able to provide the same quality of service that users and others have come to expect. Whether from the law's requirements that members effectively purge their websites of any potentially harmful content, from its restrictions on content personalization, from its prohibitions on our members' use of routine algorithmic operations to enrich users' experiences, or from any number of the law's other burdensome and censorial obligations, the result is clear: AB 2273 will require our members to create, at best, a highly degraded version of their services. In turn, our members' carefully cultivated reputations and user relationships will deteriorate, leading to an inevitable dampening of investor and advertiser support in a time when the technology industry is already suffering economic downturn. Accordingly, AB 2273 will inflict immediate and irreparable long-term, and likely devastating reputational and financial harm on our members.

17. ***Preparing for AB 2273.*** Although NetChoice understands that AB 2273's formal effective date is July 1, 2024, NetChoice's members must start—and are already starting to—

7

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

prepare for compliance now, including by spending significant resources and preparing for fundamental changes to their services. NetChoice's members must decide now whether they want to (a) restrict their services to individuals over 18 (and attempt to develop a reliable way of verifying that users are in fact over 18); or (b) redesign the entirety of their services to comply with AB 2273's child-appropriate requirements. They are already beginning to incur enormous expense and expend vast amounts of time on, among other tasks: consulting experts to determine how to vet and categorize their existing and forthcoming content as "potentially harmful"; engaging in efforts to determine whether they can enforce their content policies to the State's satisfaction; redesigning and finding substitutes for their essential algorithmic services; and reevaluating their relationships with advertisers and other third parties. At minimum, efforts to comply with AB 2273 will require our members to hire an army of additional personnel, including content reviewers, content moderators, compliance officers, children's experts, privacy experts, customer support services, and legal counsel. These compliance efforts will not only impose staggering and unsustainable costs on our services; they will also derail our members from focusing on supporting expressive content online. Moreover, given the vagueness, breadth, and subjectivity of the law's demands, it is highly doubtful that perfect compliance is even possible.

18. Accordingly, compliance with AB 2273 would not only be severely burdensome, but in many instances, may not be technically workable at all. Though the law does not take effect until next year, its expressive harms are enormous, immediate, and irreparable now. Moreover, NetChoice's members' substantial costs in undertaking this enormously burdensome vetting exercise are unrecoverable, and could not be recouped if Plaintiff's challenge to AB 2273 is ultimately successful on the merits. Similarly, the loss of customer trust and loyalty that would result if our members were required to redesign their services as the law requires would take years to build back (to the extent it could be rebuilt at all).

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

8

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  I declare under penalty of perjury that the foregoing is true and correct to the best of my
2  knowledge.
3  Executed at Washington D.C., this 16th day of February 2023.

_____
Carl Szabo

SZABO DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

9

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899