AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
  bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
  davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
  meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>            Plaintiff,<br><br>      v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>            Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     June 22, 2023<br>Time:    9:00 a.m.<br>Dept.:    Courtroom 3 – 5th Floor<br><br>Action Filed:  December 14, 2022 |

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

1

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website Dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles, including as the head of the Trust and Safety team and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. Dreamwidth is an open-source social networking, content management, and personal publishing platform, in operation since 2009. Dreamwidth's registered users can create profiles, post content to their "Journal," comment on content posted by others, search for users with similar interests, and post in community forums. Dreamwidth is committed to open access, personal privacy, transparency, freedom of expression, accessibility, and inclusiveness. It operates according to a set of Guiding Principles and a Diversity Statement. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the privacy and security of everything they post to the site. Dreamwidth prides itself on being a safe space for marginalized communities, queer and transgender people, and individuals who self-identify outside the norm. Dreamwidth has approximately 4 million registered accounts, and has over 1.8 million unique visitors annually.

3. **Business Model and Data Sharing**. Dreamwidth does not serve ads or sell user data, and does not accept payment to promote or otherwise change the order or priority of content or to target content or posts to a subset of users.

4. However, like every small business with limited resources, we employ multiple third-party vendors to provide commercially valuable business services we lack the resources to offer ourselves, including Google Analytics (for website traffic and browser capability analysis) and Stripe (for PCI-compliant payment processing). We also use cloud computing services to host the servers that operate the website and to provide both security defense services (to prevent

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

2

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

cyberattacks from malicious actors) and content delivery services (to speed up access to the site). These services are necessary to the operation of our site, but they are impossible to use without transferring some amount of identifying user information to our vendors.  We do not have the resources to build self-hosted replacements for these systems, and there are no available alternatives that do not involve some transfer of user information.  I understand based on the text of AB 2273 that because we share user information with these outside services to ensure the functionality of our for-profit business, we may be a covered "business" under the law.

5. Dreamwidth's revenue comes entirely from fees from subscriptions for paid accounts, which are eligible for extra services on top of the standard services available to all users. For example, paid accounts can add icons to their profiles, have access to additional custom styles and expanded search functionality, and can create an @dreamwidth.org email address. Dreamwidth operates on a limited budget.  It is staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

6. **Content.**  Content posted to Dreamwidth runs the full gamut of subject matter, reflecting the interests and creative drives of its users.  Users post shortform and longform original content, artwork, photographs, and commentary to their individual journals, and also participate in interest-based community forums.  Many of the most popular Dreamwidth communities are "fan" communities, meaning they are devoted to discussion of one or more fiction books, series, television programs, films, or real life individuals or groups.  Fanfiction and role-playing games ("RPGs") are also popular formats for content on Dreamwidth.  Fanfiction refers to original fictional works featuring the characters of an existing work.  RPGs involve a user taking the identity of another person—generally a fictional character—for purposes of creative writing and/or interactions with other users who may themselves be in character.  For example, someone may wish to roleplay a character who has just received their invitation to a magical boarding school they didn't know existed, a character who serves on the crew of a spaceship dedicated to exploring the galaxy, or a character who hunts and fights supernatural beings.  This content may be sexual in nature, and indeed, fanfiction in general is an extremely popular format for erotic literature. Some of our users' original content may also touch on other extreme or transgressive themes as

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

3

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

well. Dreamwidth believes that users should be able to express themselves fully in a safe environment, and that includes giving them the freedom to explore these themes.

7. Dreamwidth does not "recommend" accounts or content to users. Dreamwidth also does not offer any "algorithmic timeline" that adjusts the display of content based on a prediction that a particular user will be interested in a particular piece of content. Instead, a user's "Reading Page" (our equivalent of a "timeline" or "feed") is populated entirely by content from accounts that user has subscribed to and will always appear in reverse chronological order. The site has rudimentary additional content discovery areas, including a simple keyword search ("Content Search"), a "firehose" feed of public posts that have recently been made to the site ("Latest Things"), and the ability to search for "Interests" other users have added to their profiles. Dreamwidth allows users to opt out of having their posts or accounts included in these additional content discovery areas.

8. ***User Safety***. Dreamwidth provides its users a significant amount of control over who can see their content. Registered users can specify privacy settings for nearly every piece of information they post to the site. Privacy settings can be applied to entire user accounts or community accounts, to individual posts, and even to individual pieces of information users have chosen to add to their profiles such as their email address, their location, or their birthday. For example, posts made to Dreamwidth can be set as "public" (visible to anyone who accesses the user's URL), "access locked" (visible only to other users the poster has affirmatively authorized to see the post), "custom filtered" (visible only to a user-defined subset of the other users the poster has affirmatively authorized to see the post) or "private" (visible only to the user).

9. Users also have the option to add one of two different content restrictions to a post, or to an entire journal or community (in which case each post inherits the same restriction by default). The first form of content restriction, "Viewer Discretion Advised," puts the content behind a click-through warning notice that the poster has advised the content "should be viewed with discretion." Clicking an acknowledgment button will reveal the content. Users who apply this restriction can also enter a specific reason that discretion is advised, which the warning will display. Reasons may include that the content contains "spoilers," may upset or trigger certain

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

4

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

audiences, or may contain adult or "not safe for work" content. The second content restriction, "Adult Content," prevents users who are under eighteen years old (based on the birthdate entered by the user during account set up) from loading the content at all. Users registered as over eighteen will get a click-through warning reading "you are about to view content that [username] marked as inappropriate for anyone under the age of 18," though they can disable these warnings in their account settings. If the content is posted publicly, users who are not logged in to Dreamwidth will receive a click-through warning that the content has been "marked as inappropriate for anyone under the age of 18," and have to click a button reading "Yes, I am at least 18 years old" before viewing.

10. Dreamwidth has decided to treat the un-logged-in general public as over-18, in part because we have seen evidence that blocking access to anyone other than users registered as over-18 results in users under-utilizing the Adult Content flag, making Dreamwidth less safe to its registered under-18 users. Users can avoid this workaround using their privacy settings. For example, they can apply the Adult Content restriction and set their content to only be viewable to registered users who subscribe to their journal, so that only subscribers registered as over-18 will be able to view the content. Dreamwidth relies on its users to apply privacy settings in an appropriate manner to ensure the safety of the community. Dreamwidth does not proactively moderate for adult content. In fact, doing so would be contrary to our belief that our users are entitled to wide discretion in how they choose to express themselves. The exception is when someone reports a journal to us that contains a large percentage of adult content. In that case, we retain the right to set an Adult Content restriction on the journal. We also reserve the right to set the Adult Content restriction on pornographic or violent imagery we encounter in the course of our standard site maintenance, but do not proactively search for such content. We do not apply this practice to all written works that include erotic or other mature content.

11. **User Accounts**. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate." We do not accept registrations from users who identify

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

5

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

themselves as under thirteen years old. A user cannot change the birthdate entered at setup, and this information is not displayed or used for any other purpose.

12.     **Age Verification**.  Despite our efforts to encourage accurate reporting of birthdates at registration, there is no way to verify that the user has entered their real birthdate. Dreamwidth's users are extremely privacy-conscious. We go to great lengths to assure users that the legal birthdates they enter at account registration will be used for no purpose other than legal compliance. We even allow users to specify a separate birthdate to display on their profile. Despite these efforts, our records support the theory that users regularly enter false birthdates when registering their accounts: A review of the legal birthdates supplied at registration indicate over 13,000 registered users reported a legal birthdate of 1923 or earlier, which seems unlikely to be accurate. Additionally, registered users reported a legal birthdate of either 1/1/1990 or 1/1/1980, which I know to be common "dummy" birthdates used by the privacy-conscious, on 87,545 individual accounts—a highly disproportionate 6.7% of our total individual accounts. 1,955 accounts reported a legal birthdate that would make them under 18 years old, but the true number could be higher or lower. It would be contrary to Dreamwidth's principles to demand our users supply proof of legal birthdate, because the only way to do so would be to require identity verification. Dreamwidth's users come to our platform expecting their privacy and anonymity to be respected. Demanding any form of identity verification would alienate our privacy-conscious users. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

13.     I am also not aware of any technology—much less technology available to a site with Dreamwidth's limited resources—that could allow us to verify or even estimate our users' ages with any degree of accuracy. I have looked into several proposals for using algorithmic artificial-intelligence-based analysis to estimate the ages of users. Yet these proposals would apply scientifically unvalidated black box systems to our users. Moreover, they carry significant risks of biased and inaccurate results. For example, one proposal I have seen involves using textual analysis of a person's writing style or reading level to estimate that person's age. I believe that any analysis based on writing style or reading level will result in discrimination against people

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

6

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

with an underprivileged educational background and, given the reality of disparate educational access, that discrimination will inevitably be worse for people who are already marginalized on the basis of race or national origin. This method would also have a disparate impact on those who are writing in a second language and those experiencing temporary or permanent cognitive disabilities.

14. Another proposal I have seen involves employing facial recognition technology to estimate the age of the person being recorded. I consider the privacy violation inherent in biometric software unconscionable. But even putting that aside, studies have shown that facial recognition technology is more likely to class members of certain racial and ethnic backgrounds as younger than they actually are. *See* Dahlan, Hadi A. "A Survey on Deep Learning Face Age Estimation Model: Method and Ethnicity." INTERNATIONAL JOURNAL OF ADVANCED COMPUTER SCIENCE AND APPLICATIONS 12.11 (2021). Accordingly, this method would have a significant disparate impact on those users. It could also have a disparate impact on our users who are less financially stable, since they may be less likely to be able to afford a device capable of capturing and transmitting photo or video. It is also common for disabled people to use older technology, which is less likely to have a webcam, because their accessibility software won't run on newer hardware, or the cost of an updated software license is prohibitively expensive. In fact, our analytics show that at least some of our users access the site using computers that are too old to have webcam technology or devices that don't have the ability to capture images. Blind people in particular also experience significant problems using any software that requires facial recognition technology, because it is difficult for them to determine when the camera's field of vision includes their face.

15. All of these categories of marginalized people are named in our Guiding Principles as groups whose needs we explicitly seek to not only accommodate, but center. Because of our track record in upholding those Guiding Principles and considering the needs of marginalized groups, members of those groups have grown to trust our services and have become loyal users. To provide only a few illustrative examples of the kinds of marginalized groups who have turned to Dreamwidth, our users include large groups of: (a) Russian or Chinese activists protesting their

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

7

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; (d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable. AB 2273 will require us to betray the promises we have made to respect these people's privacy and to refrain from placing unnecessary barriers to their use of the site.

16. **DPIAs**. I understand that AB 2273 requires covered businesses to complete a Data Protection Impact Assessment ("DPIA") for any existing "online service, product, or feature likely to be accessed by children" as well as prior to launching any additional such service, product, or feature. I understand further that these DPIAs must include an assessment of a number of factors, including, for example, an evaluation of whether the service, product, or feature at issue could expose a minor to "harmful, or potentially harmful, content." Finally, I understand that AB 2273 requires covered businesses to mitigate any "risk of material detriment to children" that its services, products, or features could create. Preliminarily, Dreamwidth has limited resources to devote to this requirement. We have only two part-time employees, in addition to myself and my co-owner, and do not have the resources to add more staff. We do not have an in-house lawyer who can advise on whether every new service, product, or feature we offer would be "likely to be accessed by children" in the view of California regulators, nor do we have the resources to keep an outside lawyer on retainer to provide this advice on a continuing basis. In order to produce

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

8

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  DPIAs for every new service, product, or feature we offer, we would need to somehow train our
2  200 volunteers to create DPIAs, when many of those volunteers have limited time to contribute in
3  the first place.  Even the training process alone—not to mention the time required to actually
4  complete DPIAs and staff time required to review them to ensure completeness—would be a huge
5  drain on our resources and divert attention from more critical issues concerning site functionality
6  and/or user trust and safety.  Moreover, our volunteer program is entirely self-directed, with
7  volunteers choosing which tasks to complete.  It would change the face of this program to impose
8  additional mandatory training sessions or other time commitments beyond what volunteers choose
9  to contribute.

10         17.    The definition of "service, product, or feature" is also unworkably vague, and does
11  not correspond to how our business operates.  The nature of our open source development means
12  that very few changes to our site are made by Dreamwidth employees or owners.  Instead, they are
13  made by individual volunteer contributors from around the world.  In accordance with our Guiding
14  Principles, we have focused a significant amount of time in teaching our website users how to
15  program, including many people from underrepresented or marginalized groups who have never
16  been given the opportunity to learn programming before.  In service of this goal, we have done
17  significant work to lower the barrier to entry for contributions, and to make it easy and simple for
18  volunteer programmers to submit proposed changes, from small typo fixes to the addition of
19  entirely new features.  For example, our volunteer programmers developed a feature that made it
20  possible for users to customize the look of their journal any way they would like,  Volunteer
21  programmers also built most of our pre-built journal layouts, improved the accessibility of the site
22  for disabled people by introducing assistive features, modernized the code that generates each of
23  our site's pages for contemporary browsers, and have contributed security fixes that help us protect
24  our users' accounts and personal data.  AB 2273 is vague and uncertain about which of these user-
25  submitted proposed changes would require an accompanying DPIA.  If we are forced to assume,
26  to avoid the risk of fines, that *any* change requires a DPIA, that would place an additional step on
27  the contributing process which would unduly burden our volunteer developers and our limited
28  staff.  We may have to withdraw certain services entirely to comply with AB 2273, and have been

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

9

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

forced to consider whether our site can continue to operate at all given the burdens the law imposes. In addition to significantly slowing our ability to improve the site, completing DPIAs pursuant to AB 2273 would add significant delays to the process of resolving any privacy or security issue or potential improvement that we discover, since it would add a complex additional prerequisite to implementing many of these changes. This is explicitly contrary to the stated purpose of the AB 2273 to ensure "strong privacy protections" for young web users.

18.  I am also very concerned about AB 2273's requirement that we create DPIAs to evaluate, and then mitigate, "the risks of material detriment to children that arise from the data management practices" of our business and the potential that minors could be exposed to "potentially harmful" content on Dreamwidth. These standards of "material detriment" and "potentially harmful" are extremely vague and inherently subjective, and would put us at the whims of whatever a given administration believes at a given time. For example, in the past year, a number of state legislatures have introduced bills that classify providing information about gender-affirming care to any person under age 18 as harmful, with the Texas Attorney General even defining providing gender-affirming care to minors as "child abuse," *see* https://gov.texas.gov/uploads/files/press/O-MastersJaime202202221358.pdf, and the California Attorney General could in theory adopt this definition as well. Yet, at the same time, transgender adolescents are at high risk of suicide: One study found that 86% of transgender adolescents in the study (with a mean age of 16) had experienced suicidal ideation, and 56% had attempted suicide, *see* Austin, Ashley, et al. "Suicidality among transgender youth: elucidating the role of interpersonal risk factors." JOURNAL OF INTERPERSONAL VIOLENCE 37.5-6 (2022): NP2696-NP2718. Another found transgender adolescents had 5 times the risk of suicidal ideation and 7.6 times the risk of attempting suicide. *See* Kingsbury, Mila, et al. "Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada." CMAJ 194.22 (2022): E767-E774. Although it is impossible to quantify the exact number of transgender individuals on Dreamwidth, our site statistics show that at least 3% of Dreamwidth users identify as neither male nor female, and a full 50% choose not to specify their gender. I expect that a significant amount of content on the site touches on transgender issues,

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

10

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

including the process of accessing gender-affirming care. If Dreamwidth restricts access to this content to avoid the specter of huge fines under AB 2273, that could ultimately increase the risk of suicidality among our adolescent transgender users. Thus, under AB 2273, we could be in a scenario where both restricting and not restricting content related to gender-affirming care could be considered "harmful" to adolescents.

19. This is only one of numerous areas where state legislators are waging culture wars by defining certain subject matters as harmful to children. For example, in the past year, a number of state legislatures have introduced or passed bills that target speech about LGBTQ relationships, or speech about structural inequalities experienced by certain marginalized groups. "Potentially harmful" could also arguably be read to encompass original content produced by our users that explores adult themes, since some believe such content could be "detriment[al]" or "harmful" to minors. Dreamwidth operates on a fundamental principle that our users should feel safe to express themselves, and should not be censored even when that expression involves erotic themes. Imposing the government's value judgments on our users' expression would be a knife in the heart of our platform and its community. Dreamwidth is strongly opposed to operating as a proxy for government censorship.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15 day of February, 2023, in Baltimore, MD.

_____
Denise Paolucci

PAOLUCCI DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

11

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899