# EXHIBIT A

KING & SPALDING LLP
Tamra Moore (pro hac vice pending)
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 2006
202.626.5458
tmoore@kslaw.com

Christopher P. Eby (pro hac vice pending)
1180 Peachtree St. NE
Suite 1600
Atlanta, GA 30309
404.572.4616
ceby@kslaw.com

Counsel for *Amici Curiae*
*Chamber of Progress, IP Justice,*
*and LGBT Tech Institute*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE,<br><br>Plaintiff,<br><br>vs.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH INSTITUTE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

1

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 2

ARGUMENT ........................................................................................................ 3

I.     The AADC Violates the First Amendment of the United States Constitution. ........................... 3

II.    The AADC Will Additionally Harm Children in Need. ................................ 6

      A.     Companies will self-censor by withholding content rather than subject themselves to the Act's onerous prior restraints and risk potentially ruinous civil penalties. .................................................................................. 6

      B.     Self-censorship will disproportionately deprive underprivileged children of access to critical online content. .............................................. 9

            1.    *The AADC's chilling effects will deprive at-risk youth of mental-health resources.* ..................................................... 9

            2.    *The AADC's chilling effects will prevent underprivileged children from backfilling their education.* ........................... 10

            3.    *The AADC's chilling effects will deprive LGBTQ+ children of needed resources.* .................................................... 12

            4.    *The AADC's chilling effects will deny pregnant teens access to critical reproductive health information.* ................. 14

CONCLUSION ................................................................................................... 15

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5
*American Booksellers Foundation v. Dean*,
   342 F.3d 96 (2d Cir. 2003) .......................................................................12

6
*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ............................................................................6, 8

7
8
*Boos v. Berry*,
   485 U.S. 312 (1988) ..................................................................................5

9
10
*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ............................................................................14

11
12
*IMDB.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ..............................................................3, 5

13
*NAACP v. Button*,
   371 U.S. 415 (1963) ..................................................................................5

14
15
*Neb. Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ..................................................................................5

16
*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ..................................................................................4

17
18
*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ...................................................3

19
20
*Publius v. Boyer-Vine*,
   237 F. Supp. 3d 997 (E.D. Cal. 2017) .....................................................4

21
22
*Reno v. ACLU*,
   521 U.S. 844 (1997) ..................................................................................8

23
*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) .................................................................................6

24
25
*Smith v. California*,
   361 U.S. 147 (1959) ..............................................................................4, 7

26
*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ..................................................................................5

27
28
*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ..................................................................................5

***AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH**

*United States v. Stevens*,
  559 U.S. 460 (2010) .................................................................... 5

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................... 5

*Washington Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ..................................................... 4

**Statutes**

15 U.S.C. §§ 6501–6506 ................................................................ 5

Cal. Bus. & Prof. Code §§ 22675–22681 ..................................... 9

Cal. Civ. Code § 1798.99.29 .................................................... 2, 5

Cal. Civ. Code §§ 1798.99.30 ...............................................*passim*

Cal. Civ. Code § 1798.99.31 ..................................................*passim*

Cal. Civ. Code § 1798.99.35 ......................................................... 2

Cal. Civ. Code §§ 1798.100, *et seq.* ........................................... 5

Cal. Civ. Code § 1798.140 ...................................................... 8, 13

H. 1570, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) ................ 13

S. 184, 2022 Leg., Reg. Sess. (Ala. 2022) .................................. 13

S. 1138, 55th Leg., Reg. Sess. (Ariz. 2022) ............................... 13

Tex. Health & Safety Code § 171.208 ........................................ 14

**Other Authorities**

AB 2273 California Assembly Floor Analysis (Aug. 22, 2022),
  *available at* https://tinyurl.com/3wfw67hb ................................ 2

*Abortion Access in Georgia*, NARAL PRO-CHOICE AMERICA,
  https://tinyurl.com/36w48bcj..................................................... 14

Sylvia Allegretto et al., *Public education funding in the U.S. needs an overhaul*,
  ECON. POL'Y INST. (July 12, 2022), https://tinyurl.com/bdhb8ete ......................................... 11

Chloe Altieri et al., *Policy Brief: An Analysis of the California Age-Appropriate Design Code*, FUTURE PRIVACY F. (Oct. 2022), https://tinyurl.com/4az4a6y4 ..................................... 9

*An Overview of Consent to Reproductive Health Services by Young People*,
  GUTTMACHER INSTITUTE (Feb. 1, 2023), https://tinyurl.com/2xbuxvbu.................................. 15

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

Shimrit Ben-Yair, *Introducing the newest member of our family, the YouTube Kids app—available on Google Play and the App Store*, YOUTUBE OFFICIAL BLOG (Feb. 23, 2015), https://tinyurl.com/28h4d6v6 ........................................................... 1

*Closing America's Education Funding Gaps*, CENTURY FOUND. (July 22, 2020), https://tinyurl.com/2p8bakmw ........................................................................... 11

Cynthia Daniels, *How Does Your State Compare*, INFORMED CONSENT PROJECT (2016), https://tinyurl.com/kj8cmm3h ........................................................................... 15

Facebook Safety, *Suicide Prevention*, https://tinyurl.com/yt5te8ja ............................. 10

*Gender-Affirming and Transgender Health Care*, AMERICAN C. PHYSICIANS (Nov. 11, 2022), https://tinyurl.com/2p8mudcu ...................................................... 13

*Gender Affirming Care: The Federal and State Policy Landscape*, KAISER FAM. FOUND. (June 1, 2022), https://tinyurl.com/572zz34x ............................................ 13

Tarleton Gillespie, *Do Not Recommend? Reduction as a Form of Content Moderation*, SOC. MEDIA & SOC'Y, July–Sept. 2022 ................................................................. 7

Eric Goldman, *Content Moderation Remedies*, 28 MICH. TECH. L. REV. 1, 34–35 (2021)............. 7

Eric Goldman, *The plan to blow up the Internet, ostensibly to protect kids online*, CAPITOL WKLY. (Aug. 18, 2022), https://tinyurl.com/2s3rjjc5 ........................... 7, 12

Taylor Hatmaker, *Instagram rolls out new safety tools for parents*, TECHCRUNCH (Mar. 16, 2022), https://tinyurl.com/4dpsnfpd ..................................................... 1

Julie Jargon, *When Teens Question Their Gender, Social Media Can Provide Support— and Pressure*, WALL ST. J. (Oct. 23, 2021), *available at* https://tinyurl.com/44sp5rx7 ................................................................. 12

Laura Jimenez, *Preparing American Students for the Workforce of the Future*, CTR. FOR AMERICAN PROGRESS (Sept. 14, 2020) ................................................. 11

Juliana Kim, *Florida says AP class teaches critical race theory. Here's what's really in the course*, N.P.R. (Jan. 22, 2023), https://tinyurl.com/yrrchrt2 ......................... 12

Richard Lakeman et al., *Ethical suicide research: a survey of researchers*, 18 INT'L J. MENTAL HEALTH NURSING 10 (2009) ................................................. 10

*Laws Restricting Teenagers' Access to Abortion*, AM. CIVIL LIBERTIES UNION, https://tinyurl.com/29wv84am........................................................................... 14

Letter from Hayley Tsukayama, Senior Legislative Analyst, Electronic Frontier Found., to Gavin Newsom, Governor of California (Sept. 14, 2022), *available at* https://tinyurl.com/bddtaju6 ............................................................. 5, 13

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

Katharine Miller, *Can't Unsubscribe? Blame Dark Patterns*, STAN. U. INST. FOR HUM.-
    CTR. ARTIFICIAL INTELLIGENCE (Dec. 13, 2021), https://tinyurl.com/3xmfxw8e ................... 8

Note, *Section 230 as First Amendment Rule*, 131 HARV. L. REV. 2027 (2018) ........................... 9

Vikram Patel et al., *Mental health of young people: A global public-health challenge*,
    369 LANCET 1302 (2007) ................................................................................. 10

Lizzie Presser, *She Wasn't Ready for Children.  A Judge Wouldn't Let Her Have an
    Abortion*, N.Y. TIMES MAGAZINE (Nov. 29, 2022),
    *available at* https://tinyurl.com/3492ce7j ......................................................... 14, 15

Simon Rice et al., *Online and Social Media Suicide Prevention Interventions for Young
    People: A Focus on Implementation and Moderation*, 25 J. CAN. ACAD. CHILD &
    ADOLESC. PSYCHIATRY 80 (Spring 2016) ........................................................... 9, 10

*State Policies on Sex Education in Schools*, NAT'L CONF. STATE LEGISLATURES,
    (Oct. 1, 2020), https://tinyurl.com/4cxh5cba ........................................................ 14

Tex. Op. Att'y Gen. No. KP-0401 (Feb. 18, 2022) ...................................................... 13

Maggie Q. Thompson, *The "Aid and Abet" Abortion Era Begins*, AUSTIN CHRONICLE
    (Dec. 16, 2022), https://tinyurl.com/mr8benr2 ...................................................... 14

*Treatment of Gender Dysphoria for Children and Adolescents*, FLA. DEP'T OF HEALTH
    (April 20, 2022), https://tinyurl.com/2p86bm92 ..................................................... 13

Cat Zakrzewski, *South Carolina bill outlaws websites that tell how to get an abortion*,
    WASH. POST (June 22, 2022), https://tinyurl.com/5n6nxnsy ....................................... 14

***AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH**

1

## INTEREST OF *AMICI CURIAE*

2   *Amici* are non-profit organizations dedicated to building a country in which all people benefit

3   from technology and interconnectivity.  Through advocacy and organizing, *amici* act to ensure that all

4   Americans enjoy the speech opportunities available through a safe, open, and equitable internet.

5   Chamber of Progress is a tech industry coalition devoted to a progressive society, economy,

6   workforce, and consumer climate.  It backs public policies that will build a fairer, more inclusive country

7   in which all people benefit from technological advances.  Its work is supported by corporate partners,

8   many of whom will be subject to the law at issue.

9   IP Justice, an international 501(c)(3) nonprofit charitable organization based in the United

10   States, has been operating as an international technology rights and civil liberties organization since

11   2002. It promotes intellectual freedoms and advancement through Internet freedom, innovation policy,

12   and a balance of intellectual property rights between content holders and users.

13   LGBT Tech Institute is a national, nonpartisan group of LGBT organizations, academics, and

14   high technology companies.  It engages with critical technology and public policy leaders about media

15   technology, and telecommunications issues of specific concern to LGBTQ communities.

16   *Amici* encourage service providers to implement features that help keep kids safe online.  *Amici*

17   support efforts to design child-friendly features that facilitate age-appropriate content, such as child-

18   dedicated media applications that exclude content not appropriate for children and features that

19   empower parents to control and supervise what children can see and do across an online service's social

20   platforms.  *See, e.g.*, Shimrit Ben-Yair, *Introducing the newest member of our family, the YouTube Kids*

21   *app—available on Google Play and the App Store*, YOUTUBE OFFICIAL BLOG (Feb. 23, 2015),

22   https://tinyurl.com/28h4d6v6; Taylor Hatmaker, *Instagram rolls out new safety tools for parents*,

23   TECHCRUNCH (Mar. 16, 2022), https://tinyurl.com/4dpsnfpd (summarizing Instagram's "Family

24   Center" suite of tools "allow[ing] parents to monitor how much time a kid spends on the app, be updated

25   about accounts they've followed lately and who has followed them and receive notifications about any

26   accounts they've reported").  However, California's Age-Appropriate Design Code Act (AB 2273,

27   "AADC," or "the Act") imperils healthy and safe online communities by restricting and penalizing

28   online providers' exercise of their First Amendment rights to moderate content on their platforms.  Laws

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

like the AADC that seek to regulate online content moderation are concerning to *amici* because the parties that *amici* advise share the core principle of promoting healthy online communities, which require content moderation. *Amici* oppose the AADC's requirement that online services, subject to prior restraint and under pain of financial penalties, vet staggering quantities of content according to vague and overbroad criteria to try to make decisions best left to parents or guardians regarding minors' online experiences. *Amici* therefore submit this brief in support of Plaintiff NetChoice's Motion for Preliminary Injunction to prevent the destruction of vibrant and diverse speech communities that would follow if the AADC is enforced in accordance with its terms.

No counsel for a party authored this brief in whole or in part, and no person other than *amici* and their counsel made a monetary contribution to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Internet is an indispensable global medium that enables the publication of third-party speech at scale, empowering individuals to reach broad audiences based on the strength of their ideas. But its power and promise are directly proportional to the degree to which online speech platforms must vet the information individual speakers provide. By authorizing crippling financial penalties for online services that fail to adequately ensure that content serves minors' "well-being" and "best interests," California's AADC poses a threat to the Internet's utility. And the harshest consequences are likely to be felt by users who depend more than most on the Internet to advocate, organize, find community, educate themselves, make their voices heard, and access critical personal health resources.

Signed into law on September 15, 2022, the AADC is a self-styled privacy regulation that "elevat[es] child-centered design in online products and services that are likely to be accessed by children." AB 2273 California Assembly Floor Analysis (Aug. 22, 2022), *available at* https://tinyurl.com/3wfw67hb. In reality, the AADC requires covered entities to police and censor speech on the Internet—to "mitigate" speech that is "harmful, or potentially harmful," to children under 18 years of age and "prioritize" speech that promotes their "well-being" and "best interests." Cal. Civ. Code § 1798.99.31(a)(1)(B), (b)(1)–(3), (b)(7) (West, Westlaw through Ch. 997 of 2022 Reg. Sess.); *id.* § 1798.99.29(b). It enables the Attorney General to seek financial penalties from companies that fail to do so or do not adequately enforce their own content and privacy policies. *Id.* § 1798.99.35(a).

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

However well-intentioned, the AADC violates the First Amendment of the United States Constitution by impermissibly interfering with editorial discretion, chilling speech, and granting the State unlimited authority to define and enforce the Act's vague requirements. (*See* Pl.'s Mot. for Prelim. Inj., ECF No. 29, at 7–22.)  The Act's real-world impact is equally significant:  It is likely to harm children around the country as well as the Internet as a whole.  It will likely inhibit websites' content moderation efforts, including efforts to ensure safe and productive online spaces for children.  Fearful that the Attorney General may deem certain content "potentially harmful" to or not in the "best interests" of some or all minors, or find a company's newly required child-centric data protection assessments inadequate, online services will be pressured to identify remote or unlikely harms—and to self-censor accordingly.  The AADC will thus discourage websites from hosting and promoting content—for users under the age of 18 and for adults, due to age-assurance challenges—including critical resources that underprivileged children rely on to deal with familial and personal crises, make choices about their reproductive health, and backfill gaps in their education.  The Court should preliminarily enjoin enforcement of the AADC while it adjudicates Plaintiff's likely successful challenge to the law.

## **ARGUMENT**

**I.    The AADC Violates the First Amendment of the United States Constitution.**

Any entity that hosts the content of another—be it a bookstore, a magazine, or an online platform—engages in core speech activities when it chooses what content to present and how to display it.  Indeed, the publication decisions that Internet services make about the content they choose to host is an expressive activity of the service itself.  For example, by prohibiting odious content discriminating against LGBTQ+ users, an online service conveys to the world that it welcomes and values queer communities.  A service that allows hateful content to proliferate sends a much different message to users and advertisers about its principles, or lack thereof.  In short, the First Amendment protects an online platform's decisions regarding what content to publish and how to curate it.  *See, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–88 (N.D. Cal. 2022) (First Amendment protects expressive activity of Twitter's content moderation decisions by which it seeks to broadly shape tone and substance of dialogue on platform); *see also IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1125–27 (9th Cir. 2020) (statute prohibiting website operator from publishing ages and dates of birth of entertainment industry

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

professionals unconstitutionally abridged operator's First Amendment rights); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) (owner of website has "First Amendment right to distribute and facilitate protected speech on the site").

The corollary is also true:  The First Amendment prohibits States from unduly burdening speech by incentivizing intermediaries to self-censor.  *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 279 (1964) (self-censorship of speech platform affects the entire public by "shut[ting] off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities"); *Smith v. California*, 361 U.S. 147, 153–54 (1959) (an intermediary's "timidity in the face of his . . . liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly").  It does not matter whether the intermediary is a bookstore, periodical, or online service provider—the government cannot indirectly foreclose these channels to protected expression by incentivizing censorship.  *See, e.g.*, *Washington Post v. McManus*, 944 F.3d 506, 517 (4th Cir. 2019) (First Amendment protects against "foreclose[ing] channels" of expression "indirectly" by censoring online speech "platforms").

By regulating and constraining how service providers moderate content, the AADC abridges the rights of NetChoice's member companies to free expression in at least two ways.  *First*, it imposes a system of prior restraints that requires covered entities, among other things, to create Data Protection Impact Assessment ("DPIA") reports for state inspection before publishing any "online service, product, or feature" "likely to be accessed by" a user under the age of 18, as well as "a timed plan to mitigate or eliminate the risk" that the product or feature might harm children.  *See, e.g.*, Cal. Civ. Code § 1798.99.31(a)(1)–(4).  *Second*, the Act vitiates the editorial discretion of online services by restricting speech based on its viewpoint, content, and speaker—including by imposing rules and penalties based on the content of speech, applying to targeted categories of speech, restricting covered entities' ability to consensually collect information from users, and exempting certain speakers (such as non-profit entities). *See, e.g.*, *id.* § 1798.99.30(b)(4)–(5); *see also id.* § 1798.99.31(b)(1), (b)(3)–(4).

Because the AADC imposes prior restraints and discriminates against speech based on viewpoint, content, and speaker, it must overcome a "heavy presumption against its constitutional validity" and also survive strict scrutiny to comply with the First Amendment.  *Neb. Press Ass'n v.*

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

*Stuart*, 427 U.S. 539, 558–59 (1976) (prior restraint on expression is "the most serious and least tolerable infringement on First Amendment rights"); *see, e.g., Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (laws imposing content-based burden on expression demand strict scrutiny).  It fails to do so.  The Act flunks strict scrutiny because it is not narrowly tailored to serve a compelling government interest, and there is a "less restrictive alternative [that] would serve the Government's purpose."  *Boos v. Berry*, 485 U.S. 312, 321–22 (1988); *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).  Although the protection of children is a legitimate government interest, there is a dearth of legislative findings about the specific harms that the AADC seeks to address.  *See generally* Cal. Civ. Code § 1798.99.29.  Nor is the law narrowly tailored, as it applies whether the relevant children are 17 months or 17 years old.  *See id.* § 1798.99.30(b)(1).  And less restrictive alternatives—including federal and State privacy law, 15 U.S.C. §§ 6501–6506, Cal. Civ. Code §§ 1798.100, *et seq.*—are adequate to serve the State's interest in protecting children.  *See IMDB.com*, 962 F.3d at 1125–26.  The AADC is thus an inherently "suspect" "[b]road prophylactic rule [] in the area of free expression" that fails strict scrutiny.  *NAACP v. Button*, 371 U.S. 415, 438 (1963).

Moreover, the AADC is overbroad and vague.  It is overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation omitted).  While the AADC by its terms may forbid, for example, speech intended to lure minors into sex trafficking, its prohibitions on speech that "could harm children" or be deemed not in their "best interests" are broad enough to also capture a large amount of topical educational content.  *See infra* Section II.B.  Equally problematic are the ambiguities created by the AADC's vague and undefined provisions, which make the obligations it imposes not reasonably knowable to covered entities.  *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 304 (2008) (statute is unconstitutionally vague if it does not "provide . . . fair notice of what is prohibited, or is so standardless that it authorizes or encourages serious discriminatory enforcement").  For example, it is unclear what the "best interests of children" means to service providers that operate at scale and lack "a specific case, incident, or set of facts" regarding a particular child or set of children.  *See* Letter from Hayley Tsukayama, Senior Legislative Analyst, Electronic Frontier Found., to Gavin Newsom, Governor of California (Sept. 14, 2022), *available at* https://tinyurl.com/bddtaju6.  Nor is it clear what

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

constitutes a "significant amount" of children in the target audience for purposes of triggering the AADC's requirements.  Cal. Civ. Code § 1798.99.30(b)(4)(F).  And because the Act requires covered entities to "[e]stimate the age of child users with a reasonable level of certainty" without providing guideposts for what is reasonable, *id.* § 1798.99.31(a)(5), (b)(8), companies will be forced to use the most restrictive means available—age verification—to comply.  *Contra Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004) ("universal restrictions" on users to protect minors from obscenity was overbroad, as "parental cooperation" was "less restrictive alternative" to accomplish same).  Because so many of the AADC's applications are unconstitutional, and because one can only guess what the Act practically requires, it unconstitutionally abridges the First Amendment rights of NetChoice's members.

For these reasons, and as set forth more fully in Plaintiff's Motion for a Preliminary Injunction, Plaintiff is highly likely to succeed in showing that the AADC is unconstitutional.

## II.   The AADC Will Additionally Harm Children in Need.

Given Plaintiff's likelihood of success on the merits, the Court should enjoin enforcement of the AADC while this lawsuit is pending because failure to do so would cause irreparable harm.  If the Attorney General is free to enforce the AADC, it will chill service providers' speech by incentivizing them to self-censor rather than undertake the Act's onerous DPIA obligations and risk crippling civil penalties for violating its undefined terms.  *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation omitted)).  On top of these First Amendment harms, providers' self-censorship will disproportionately impair underprivileged children's access to critical information—thus injuring one of the very populations that the AADC is intended to protect.

### A.   Companies will self-censor by withholding content rather than subject themselves to the Act's onerous prior restraints and risk potentially ruinous civil penalties.

Setting aside its overbreadth and vagueness, the Act assumes that online services can readily distinguish supposedly benign material from content that might harm minors as well as ascertain whether content is "likely to be accessed by" a minor user.  But online services, many of which are tasked with moderating vast quantities of speech and data, are the modern-day equivalent of the bookseller in *Smith*.  They necessarily face "limitation[s] in the amount of reading material with which

[t]he[y] c[an] familiarize [themselves]."  361 U.S. at 154.  In other words, service providers often do not and cannot possess actual knowledge of the substance of each piece of speech on their platforms.

Many online platforms are viable only because they use automated processes to promote some speech over other speech to different users—including children—based on third-party signals, such as details concerning the user posting the content, the content's title, or the viewing user's history querying, "liking," or viewing content with similar signals.  *See, e.g.*, Tarleton Gillespie, *Do Not Recommend? Reduction as a Form of Content Moderation*, SOC. MEDIA & SOC'Y, July–Sept. 2022, at 6.  To promote, demote, or remove content, platforms typically use algorithms programmed to reflect their editorial preferences that rank a given piece of user-generated content against all other content, then use the relative positions of all ranked user-generated content to make publication decisions.  *See id.*; Eric Goldman, *Content Moderation Remedies*, 28 MICH. TECH. L. REV. 1, 34–35 (2021) (discussing how promotion of highly ranked content demotes and backfills removal of low-ranked content).  Some online services use "[s]ophisticated recommender systems" to "calculate hundreds of these signals, measure each signal against its own specific threshold, weigh them differently, and adjust dynamically depending on the user, region, situation, genre, or moment," without substantively reviewing each piece of curated content.  Gillespie, *Do Not Recommend?*, *supra*, at 6.  In short, these algorithmic curation methods enhance or reduce the "visibility" of content and, along with automated deletion of content, are the most common ways by which providers are able to moderate speech on their platforms.  *See* Goldman, *Content Moderation Remedies*, *supra*, at 31–36 (reviewing a "taxonomy of remedy options").

The AADC offers no viable framework for online services that engage in such automated curation and moderation of speech.  Like the overtaxed bookseller in *Smith*, online services will be overwhelmed by the sheer volume of content they will need to document and analyze under the Act's undefined standards.  The most likely response of many companies in the face of such staggering costs will be to self-censor by removing entire swaths of valuable content, or to shut down entirely.  As one critic of the Act has noted, "the AADC's overreaching obligations impose extraordinary liability risks on businesses, which businesses can manage only by closing their doors to minors altogether. In other words, the AADC will dramatically shrink the Internet for kids."  Eric Goldman, *The plan to blow up the Internet, ostensibly to protect kids online*, CAPITOL WKLY. (Aug. 18, 2022),

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

https://tinyurl.com/2s3rjjc5.  Even platforms able to holistically evaluate all of their content will be forced to take a drastically overinclusive view of what speech could pose a risk of harm to or conflict with the "best interests" of minors.  Rather than risk draconian sanctions for incorrectly estimating users' ages or attempting to tailor content—including fines up to $7,500 per "affected child," in a State of over 10 million children—such platforms will simply deny content to all users.  *See Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("[T]he Government may not reduce the adult population to only what is fit for children." (quotation and alternations omitted)); *see also Ashcroft v. ACLU*, 542 U.S. at 667–70.

Likewise, the AADC forbids online services from using "dark patterns" to lead or encourage minors to provide personal information beyond what is reasonably expected to deliver the service, or to take any action that the service provider knows, or has reason to know, is materially detrimental to the child's physical or mental health.  Cal. Civ. Code § 1798.99.31(b)(7).  "[D]ark patterns" are "user interface[s] designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice."  *Id.* § 1798.140(l).  "Materially detrimental" is not defined.  But "dark patterns" are often understood to include a host of benign and widely used features based on algorithms and machine learning—including "autoplay" and "newsfeed" functions, recommended articles and social media posts, customized music playlists based on listening history, and the like.  *See* Katharine Miller, *Can't Unsubscribe? Blame Dark Patterns*, STAN. U. INST. FOR HUM.-CTR. ARTIFICIAL INTELLIGENCE (Dec. 13, 2021), https://tinyurl.com/3xmfxw8e.  Indeed, "dark patterns" could also include features that use artificial intelligence to discover whether the user is a child and tailor age-appropriate recommendations.  Forced to guess whether such content-promotion decisions may have a "materially detrimental" effect on a minor, many online services will self-censor by abandoning new user features and interfaces and, indeed, by not promoting high-quality relevant information altogether.

The AADC's provisions requiring online services to consistently enforce their "published terms, policies, and community standards" will have a similarly unsalutary outcome.  Cal. Civ. Code § 1798.99.31(a)(9).  Rather than stamping out harmful speech or enhancing respectful discourse, the AADC will incentivize online services not to have robust community standards at all.  Indeed, according to one analysis, "because this AADC provision creates liability for businesses that fail to enforce published community guidelines, it may unintentionally result in businesses implementing fewer or

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

lower community guideline requirements."   Chloe Altieri et al., *Policy Brief: An Analysis of the California Age-Appropriate Design Code*, FUTURE PRIVACY F. (Oct. 2022), at 5, https://tinyurl.com/4az4a6y4.  The Act likewise encourages companies to write opaque and nondescript guidelines that they cannot be accused of failing to consistently enforce—conflicting with the State's goal of transparent content moderation.  *See* Cal. Bus. & Prof. Code §§ 22675–22681 (requiring social media companies to publicize their content moderation policies and semiannually report data on enforcement of those policies).  In other words, the AADC will not only incentivize service providers to self-censor the content and features they make available to users, but also to refrain from speaking on structural issues that enhance users' experience and increase transparency.

> **B.**   **Self-censorship will disproportionately deprive underprivileged children of access to critical online content.**

The AADC's chilling effects on speech will diminish the utility of online platforms for many, with the worst impacts felt by vulnerable minors.  While collateral censorship often takes its greatest toll on underprivileged communities, the likely outcomes here are especially regressive.  *See* Note, *Section 230 as First Amendment Rule*, 131 HARV. L. REV. 2027, 2046–47 (2018) (citing research indicating that "marginalized communities" are "particularly vulnerable to the collateral censorship" that results from chilling an intermediary's speech).  Teens who rely on online mental-health or anti-suicide resources; underprivileged children who use information from a variety of websites to backfill their academic education and life skills; adolescents struggling with harassment on account of their gender identity or sexual orientation or seeking gender-affirming healthcare and resources; pregnant teens in need of family-planning services—all will be victims of the AADC's self-censorship incentives.

> *1.*   *The AADC's chilling effects will deprive at-risk youth of mental-health resources.*

Online platforms provide distinct challenges and opportunities for suicide prevention and intervention for teens.  "While the applications of online and social media-based interventions raise important practical, ethical, and safety issues, once developed, the reach and relative low cost of these approaches can overcome existing service delivery gaps." Simon Rice et al., *Online and Social Media Suicide Prevention Interventions for Young People: A Focus on Implementation and Moderation*, 25 J. CAN. ACAD. CHILD & ADOLESC. PSYCHIATRY 80, 81 (Spring 2016).  Utilization and availability of

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

1   mental health services fall below those for physical health, especially for adolescents—a period known

2   for the onset of highly prevalent and impairing mental disorders such as depression and anxiety.  Vikram

3   Patel et al., *Mental health of young people: A global public-health challenge*, 369 LANCET 1302 (2007).

4   Given their immediacy, 24-hour accessibility, and geographical scope, online and social media-based

5   interventions have the potential to reach young people who may not be financially able or otherwise

6   inclined to seek help from traditional (*i.e.*, face-to-face) sources.  Rice, *Suicide Prevention*, *supra*, at 81.

7         That said, the safety of suicide interventions is context-specific and subject to enough debate to

8   discourage AADC-subject online services from sponsoring well-meaning anti-suicide content or

9   features.  For example, in a survey of ethics committees (*i.e.*, institutional review boards) about

10   conducting suicide research, the most commonly cited concern was whether asking about suicidality

11   might exacerbate or reinforce such thoughts or behaviors.  *See* Richard Lakeman et al., *Ethical suicide*

12   *research: a survey of researchers*, 18 INT'L J. MENTAL HEALTH NURSING 10 (2009).  Other researchers,

13   however, have concluded that "asking young people about suicide does not increase risk of suicidality."

14   Rice, *Suicide Prevention*, *supra*, at 83 (citing other studies).  Moreover, the Act will require online

15   services to make difficult choices about whether to undertake the expense of preparing a DPIA and

16   risking civil penalties for instituting a feature that could offend the "dark patterns" prohibition by, for

17   example, prompting a user to provide personal information based on certain triggers or proxies for

18   violent or suicidal ideation.  *See, e.g.*, Facebook Safety, *Suicide Prevention*, https://tinyurl.com/yt5te8ja

19   (explaining how Facebook currently "us[es] machine learning" and "pattern-recognition signals" to

20   "identify possible suicide or self-injury content" and recommend "help to people in need").  The AADC

21   thus presents a real risk that online services will self-censor rather than promote certain features or

22   speech that could provide invaluable help to adolescents and teens contemplating suicide or self-harm.

23        2.    *The AADC's chilling effects will prevent underprivileged children from backfilling*

24            *their education.*

25         Online resources also serve a vital role in providing information to children so that they may

26   backfill gaps in their academic education as well as vocational and other life skills.  Many neighborhood

27   schools, both in California and elsewhere, lack the funding needed to educate children on the range of

28   subjects they are likely to encounter in academic and vocational settings as well as in family and

community life.  Almost two-thirds of all public-school districts in the country face a "funding gap"—meaning that lifting students up to average outcomes requires greater investment.  *Closing America's Education Funding Gaps*, CENTURY FOUND. (July 22, 2020), https://tinyurl.com/2p8bakmw.   For example, California public K-12 schools have an aggregate funding gap of more than $10 billion and the third-largest funding gap per pupil among all 50 States.  *Id.*  And education funding is not only inadequate, but inequitable.  Nationally, districts with more than 50 percent Black or Latinx enrollment are nearly twice as likely to have a funding gap than districts with minority enrollment of less than 50 percent.  *Id.*  And per-student spending in high-poverty districts is $1,880 less than in low-poverty districts—an 11.8 percent gap.  Sylvia Allegretto et al., *Public education funding in the U.S. needs an overhaul*, ECON. POL'Y INST. (July 12, 2022), https://tinyurl.com/bdhb8ete ("[R]ather than funding districts to address student needs, we are channeling fewer resources—about 14% less, per student—into districts with greater needs . . . .").  Even aside from funding shortfalls, most school curricula fail to educate children about real-world challenges and teach them important life skills.  Laura Jimenez, *Preparing American Students for the Workforce of the Future*, CTR. FOR AMERICAN PROGRESS (Sept. 14, 2020) ("From early grades, students are not prepared across a wide range of skills; students are not exposed to a rich set of career preparation activities; and school accountability systems are not oriented around successful career and civic outcomes." (collecting papers)).

It is thus highly problematic that the AADC incentivizes online services to self-censor content relating to foundational educational topics in history, literature, art, and science.  Media relating to atrocities such as the Holocaust or terrorist attacks, studies of contemporary school shootings, art or literature once banned as obscene, anatomical depictions of reproductive organs or dissected animal specimens—all are seemingly likely to be accessed by a substantial number of minors and could pose a "risk of harm" to them.  And yet all are legitimate topics for middle-school or high-school students to seek out on the Internet to bolster their understanding of topics taught (or neglected) in school.  Online content on other academic subjects may suffer the same fate if the Attorney General deems it to advance a political agenda.  Florida's department of education, for example, recently rejected an Advanced Placement course on African American studies on the grounds that "the course is a vehicle for a political agenda and leaves large, ambiguous gaps that can be filled with additional ideological material, which

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

we will not allow." Juliana Kim, *Florida says AP class teaches critical race theory. Here's what's really in the course*, N.P.R. (Jan. 22, 2023), https://tinyurl.com/yrrchrt2. The unfortunate reality is that those who will face the greatest barriers to accessing such information offline are children who attend underfunded schools in blighted school districts.

   3.   *The AADC's chilling effects will deprive LGBTQ+ children of needed resources.*

Internet platforms are also critical to informing countless minors about their personal health, gender identity, and sexual orientation, and to affirming their experiences in the face of harassment. Gender-diverse and other LGBTQ+ children are at increased risk of anxiety, depression, bullying and suicidal ideation, according to the Trevor Project, a nonprofit suicide-prevention organization for LGBTQ+ youth. Julie Jargon, *When Teens Question Their Gender, Social Media Can Provide Support—and Pressure*, WALL ST. J. (Oct. 23, 2021), *available at* https://tinyurl.com/44sp5rx7. And social opprobrium comes not just from peers but from parents, who in many cases are not supportive. Online platforms can be an antidote to these toxins. Indeed, the directors of leading gender and sexuality clinics believe that social media and other online fora "can be a lifesaver" for LGBTQ+ children by making "young people comfortable exploring their gender identity" and enabling them to "find[] communities of people who will accept them and not judge them." *Id.* (quoting directors of Gender and Sexuality Service at New York University's Langone Health and Center for Gender Affirming Medicine at Akron Children's Hospital, respectively).

The AADC's requirement that content be age-appropriate and its proscriptions on potentially harmful content likely to be accessed by children will negatively affect LGBTQ+ minors. To begin with, the need for providers to impose "universal identity authentication" "prevents anonymous or pseudonymous browsing—something that's critical to vulnerable communities with sensitive information needs, like LGBTQ+ individuals." Goldman, *The plan to blow up the Internet*, *supra*. Worse, the Act's DPIA prior restraint and threat of civil penalties are sure to chill online speech integral to minors' understanding of their gender identity—including information about transitioning, hormone therapies, sexual exploration, and the like—in view of many States' recent prohibitions on gender-affirming care for minors. After all, State regulations of Internet activity have long been understood to operate extraterritorially. *See American Booksellers Foundation v. Dean*, 342 F.3d 96, 103 (2d Cir.

2003) ("[It is] difficult, if not impossible, for a state to regulate internet activities without 'projecting its legislation into other States.'" (quotation and alteration omitted)).  (*See* Pl.'s Mot. for Prelim. Inj. at 22–25.)  The AADC is no exception.  *See* Cal. Civ. Code §§ 1798.99.30(a), 1798.140(d), (i).

Many right-leaning States are now prohibiting gender-affirming care for minors and even penalizing those who facilitate access to such care.  *See, e.g.*, S. 184, 2022 Leg., Reg. Sess. (Ala. 2022) (making it a felony to "cause" a transgender minor to receive gender-affirming treatments); H. 1570, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021); S. 1138, 55th Leg., Reg. Sess. (Ariz. 2022); Tex. Op. Att'y Gen. No. KP-0401 (Feb. 18, 2022).  More than 15 other States have introduced bills to restrict access to gender-affirming care for youth, some of which would penalize adults for facilitating access.  *See, e.g.*, *Attacks on Gender-Affirming and Transgender Health Care*, AMERICAN C. PHYSICIANS (Nov. 11, 2022), https://tinyurl.com/2p8mudcu.  Further, State legislatures have enacted and are considering anti-LGBTQ+ measures affecting children, including bills that restrict access to bathrooms and locker rooms based on sex assigned at birth, prohibit classroom discussion of sexual orientation and gender identity, and limit transgender students' access to sports.  *See, e.g.*, Lindsey Dawson et al., *Youth Access to Gender Affirming Care: The Federal and State Policy Landscape*, KAISER FAM. FOUND. (June 1, 2022), https://tinyurl.com/572zz34x.  Florida officially recommends against gender-affirming care for youth.  *See Treatment of Gender Dysphoria for Children and Adolescents*, FLA. DEP'T OF HEALTH (April 20, 2022), https://tinyurl.com/2p86bm92.

In the face of these States' condemnations of gender-affirming care for youth, many online services subject to the Act may elect not to make related content available to minors.  Indeed, the increased controversy around these topics is evidence that the line between age-appropriate and inappropriate content is extraordinarily thin.  And the AADC's contrary presumption aside, online services simply cannot determine the "best interests" of a gender-diverse child without input from the child's parents or guardians. *See, e.g.*, Tsukayama Letter, *supra*.  Because it is not technologically or economically practical for online platforms to offer state-specific versions of their services, their denial of gender-affirming and LGBTQ+ content to children in California will necessarily deny it to children in other States, including those that have enacted or proposed the restrictions discussed above.

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

*4.    The AADC's chilling effects will deny pregnant teens access to critical reproductive health information.*

Finally, as legislatures across the country enact total abortion bans and attempt to restrict the availability and provision of reproductive health information, pregnant teens need access to credible health resources now more than ever.  *See, e.g.*, Maggie Q. Thompson, *The "Aid and Abet" Abortion Era Begins*, AUSTIN CHRONICLE (Dec. 16, 2022), https://tinyurl.com/mr8benr2 (threats to enforce Tex. Health & Safety Code § 171.208 have forced speakers to "tiptoe around even providing information on abortion access, lest they be [liable] for 'aiding and abetting' a procedure"); Cat Zakrzewski, *South Carolina bill outlaws websites that tell how to get an abortion*, WASH. POST (June 22, 2022), https://tinyurl.com/5n6nxnsy.

About 350,000 minors become pregnant each year in the United States, and 82 percent of these pregnancies are unintended.  *Laws Restricting Teenagers' Access to Abortion*, AM. CIVIL LIBERTIES UNION, https://tinyurl.com/29wv84am.   A great majority of these youths live in low-income neighborhoods with underperforming schools and low-wage job prospects.  Lizzie Presser, *She Wasn't Ready for Children.  A Judge Wouldn't Let Her Have an Abortion*, N.Y. TIMES MAGAZINE (Nov. 29, 2022), *available at* https://tinyurl.com/3492ce7j ("The consequences ascribed to teenage mothers . . . are a function of growing up in poverty.").  In many States, public schools do not teach all of the sexual health topics recommended by the Centers for Disease Control and Prevention or about the full range of contraception methods.  *See e.g.*, *Abortion Access in Georgia*, NARAL PRO-CHOICE AMERICA, https://tinyurl.com/36w48bcj (reporting that 30 percent of Georgia high schools do not teach about methods of contraception other than condoms).  Others do not require schools to teach sex education at all.  *See State Policies on Sex Education in Schools*, NAT'L CONF. STATE LEGISLATURES, (Oct. 1, 2020), https://tinyurl.com/4cxh5cba (noting that just "[t]hirty states and the District of Columbia require public schools [to] teach sex education").  And the information often required to be provided in advance of an abortion is inadequate.  For example, prior to *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), at least 29 States had informed consent laws mandating that publicly authored materials be provided to pregnant individuals prior to an abortion:  Nearly all of these materials contained medical inaccuracies and, in some States, nearly *half* of the statements in these materials were medically

***AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH**

1   inaccurate.  *See* Cynthia Daniels, *How Does Your State Compare*, INFORMED CONSENT PROJECT (2016),

2   https://tinyurl.com/kj8cmm3h (surveying medically inaccurate statements in such materials and finding

3   overall inaccuracy ranging from 14.71% (Alaska) to 46.15% (North Carolina)).

4         In short, pregnant teens rely on and urgently need high-quality online content concerning

5   contraception, abortion, and other family planning information to make informed choices about their

6   reproductive health.  Online services also help to provide pregnant minors with needed medical and

7   legal information, including the options for terminating a pregnancy in States where abortion is still

8   legal and for traveling to those States from States where abortion is no longer legal.  But the AADC will

9   chill the creation and promotion of this content.  Given the varying legality of abortion throughout the

10   States, it is highly unlikely that an online service could confidently determine that providing such

11   information is in the "best interests" of minors or does not pose a "risk of harm" to them under the Act.

12   Indeed, even in most States where abortion is legal, a pregnant minor must receive parental consent or

13   convince a judge of her maturity before terminating a pregnancy.  *See An Overview of Consent to*

14   *Reproductive Health Services by Young People*, GUTTMACHER INSTITUTE (Feb. 1, 2023),

15   https://tinyurl.com/2xbuxvbu; Presser, *She Wasn't Ready for Children*, *supra* (describing operation of

16   parental consent laws).  Given how difficult it will be for online platforms to tailor reproductive health

17   content based on minors' best interests—with civil penalties lurking if the Attorney General believes

18   they got the calculus wrong or improperly verified users' ages—online services will simply decline to

19   host or promote such content.  The AADC's enervation of the Internet will thus harm pregnant, often

20   underprivileged minors, especially those residing in anti-choice States, in need of information about

21   their reproductive health and choices.

22                                   **CONCLUSION**

23         The AADC violates the First Amendment and, far from protecting children, will

24   disproportionately harm underprivileged and vulnerable minors by denying them access to critical

25   personal resources, educational content, and reproductive health information.  For the reasons stated

26   herein and in Plaintiff's Motion for a Preliminary Injunction, the Court should preliminarily enjoin

27   California's AADC pending resolution of the merits of Plaintiff's challenge to the Act.

28

*AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH

1

2     DATED:  March 1, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KING & SPALDING LLP

*/s/ Christopher P. Eby*

Tamra Moore (pro hac vice pending)
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 2006
202.626.5458
tmoore@kslaw.com

Christopher P. Eby (pro hac vice pending)
1180 Peachtree St. NE
Suite 1600
Atlanta, GA 30309
404.572.4616
ceby@kslaw.com

**Counsel for *Amici Curiae Chamber of Progress, IP Justice, and LGBT Tech Institute***

***AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, IP JUSTICE, AND LGBT TECH**