# EXHIBIT A

LAUREN GALLO WHITE, State Bar No. 309075
CARMEN SOBCZAK, State Bar No. 342569
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
        csobczak@wsgr.com

BRIAN M. WILLEN
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email: bwillen@wsgr.com

STEFFEN N. JOHNSON
KELSEY J. CURTIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8888
Facsimile: (202) 973-8899
Email: sjohnson@wsgr.com
        kcurtis@wsgr.com

*Attorneys for Amicus Curiae*
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**BRIEF OF *AMICUS CURIAE* COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION**<br><br>Judge: Honorable Beth Labson Freeman<br>Action Filed: December 14, 2022 |

1

**TABLE OF CONTENTS**

2  INTRODUCTION ...........................................................................................................1

3  ARGUMENT ................................................................................................................2

4  I.  AB 2273 VIOLATES SERVICE PROVIDERS' CORE FIRST AMENDMENT
    RIGHTS TO DISPLAY AND RECOMMEND CONTENT. ...............................2
5
    A.  The First Amendment Protects The Rights Of Online Services To
6        Distribute And Receive Information, And It Applies Even When
         The Government's Stated Objective Is Protecting Minors. ......................2
7
    B.  AB 2273 Will Infringe Bedrock First Amendment Protections
8        Because It Regulates How A Wide Variety Of Lawful Speech Can
         Be Presented And Disseminated On The Internet....................................6
9
         1.  The "Material Detriment" Provision Broadly Prohibits
10            Dissemination Of Lawful Content To Those Under 18. ................6

11       2.  The "Material Detriment" Provision Violates The First
             Amendment. ...................................................................................9
12
    II.  AB 2273 COMPELS SPEECH IN VIOLATION OF THE FIRST AMENDMENT. ......12
13
    A.  The Data Protection Impact Assessment Requirement Forces Service
14       Providers To Speak In Ways They Would Not Otherwise Speak.......................12

15       B.  The DPIA Requirement Cannot Be Saved As A Routine
             Commercial Disclosure Requirement Under *Zauderer*. .........................16
16
         1.  DPIAs Do Not Regulate Commercial Speech..............................16
17
         2.  DPIAs Do Not Regulate "Purely Factual And
18            Uncontroversial" Information. ......................................................17

19       3.  The DPIA Requirement Is Unjustified And Unduly
             Burdensome...................................................................................19
20
    CONCLUSION ...............................................................................................................20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

<u>Page</u>

3

### CASES

4

*ACLU v. Ashcroft,*

5
    322 F.3d 240 (3d Cir. 2003)..................................................................................6

6
*ACLU v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999)........................................................................5, 6

7

8
*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
    916 F.3d 749 (9th Cir. 2019)..........................................................................16, 19

9
*American Booksellers Foundation v. Dean,*
    342 F.3d 96 (2d. Cir. 2003)..............................................................................5, 6

10

11
*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) ......................................................................................15

12

13
*Ariix, LLC v. NutriSearch Corp.,*
    985 F.3d 1107 (9th Cir. 2021)............................................................................16

14
*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ........................................................................................2, 3

15

16
*Bolger v. Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ..........................................................................................3, 5

17

18
*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ...................................................................................1, 5, 11

19
*Bullfrog Films, Inc. v. Wick,*
    847 F.2d 502 (9th Cir. 1988)...........................................................................9, 12

20

21
*Butcher v. Knudsen,*
    38 F.4th 1163 (9th Cir. 2022)..............................................................................9

22

23
*Butler v. State of Michigan,*
    352 U.S. 380 (1957) ..........................................................................................10

24
*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ..........................................................................................16

25

26
*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ...........................................................................................3

27
*Clement v. Cal. Dep't of Corr.,*
    364 F.3d 1148 (9th Cir. 2004)..............................................................................4

28

*CTIA - The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) .................................................................................17, 18, 19

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ..............................................................................................4, 5, 11

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ....................................................................................................12

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ........................................................................................................9

*Harris v. Quinn*,
    573 U.S. 616 (2014) ......................................................................................................16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995) ...........................................................................................3, 12, 20

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ......................................................................................3, 4, 11, 14

*NAACP v. Button*,
    371 U.S. 415 (1963) ..................................................................................................9, 10

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) .....................................................................................18

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) .................................................................................13, 16, 17, 19

*NetChoice, LLC v. Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) ............................................................................4, 19, 20

*NetChoice, LLC v. Bonta*,
    No. 5:22-cv-08861-BLF (N.D. Cal. Feb. 17, 2023), ECF No. 29........................15

*Nissan Motor Co. v. Nissan Comput. Corp.*,
    378 F.3d 1002 (9th Cir. 2004)......................................................................................16

*O'Handley v. Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022) .........................................................................4

*Powell's Books, Inc. v. Kroger*,
    622 F.3d 1202 (9th Cir. 2010).................................................................................5, 11

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................................ *passim*

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ................................................................................................13, 15

*Sable Communications of California, Inc. v. FCC*,
    492 U.S. 115, 131 (1989) ........................................................................5

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ............................................................................15

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................12

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................3, 11, 20

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ..................................................................3

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) ...................................................................4

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ...........................................................................3, 5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ..............................................................................4

*Volokh v. James*,
    2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) ............................... *passim*

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) .............................................................13, 14

*Zauderer v. Office of Disciplinary Counsel of the Superior Court*,
    471 U.S. 626 (1985) ................................................................16, 17, 18, 19

*Zhang v. Baidu.Com, Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) .......................................................4

**STATUTES**

15 U.S.C. § 6501(1) .......................................................................................9

California Civil Code
    § 1798.140 ...........................................................................................7
    § 1798.99.30(a) ....................................................................................7
    § 1798.99.30(a)(2) ..............................................................................12
    § 1798.99.30(b)(4)(B) ..........................................................................7
    § 1798.99.30(b)(4)(D)-(F) ....................................................................7
    § 1798.99.30(b)(5) ...............................................................................7
    § 1798.99.31(a) ....................................................................................7
    § 1798.99.31(a)(1) ..............................................................................12
    § 1798.99.31(a)(1)(A) .........................................................................12

§ 1798.99.31(a)(1)(b) ..................................................................12, 17
§ 1798.99.31(a)(1)(B)(i) ....................................................................14
§ 1798.99.31(a)(1)(B)(ii) ...................................................................14
§ 1798.99.31(a)(2) .............................................................................13
§ 1798.99.31(a)(4) .............................................................................15
§ 1798.99.31(a)(4)(A) ..................................................................13, 16
§ 1798.99.31(b)(1) .....................................................................6, 7, 8
§ 1798.99.33(a) ..................................................................................12
§ 1798.140(v)(1) ..................................................................................7
§ 1798.140(v)(1)(A) .............................................................................7
§ 1798.140(v)(1)(F) ..............................................................................7

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ......................................................................... *passim*

## MISCELLANEOUS

Daniel Kardefelt Winther, *How Does the Time Children Spend Using Digital Technology Impact Their Mental Well-being, Social Relationships and Physical Activity? An Evidence-focused Literature Review*, Innocenti Discussion Papers, no. 2017-02, UNICEF Office of Research - Innocenti, Florence (2017) .........................................................................................18

Lauren Feiner, *California's New Privacy Law Could Cost Companies a Total of $55 Billion to Get in Compliance*, CNBC (Oct. 5, 2019), https://www.cnbc.com/2019/10/05/california-consumer-privacy-act-ccpa-could-cost-companies-55-billion.html .............................................................20

*Microsoft Edge Browsing Activity for Personalized Advertising and Experiences* (2023), https://support.microsoft.com/en-us/microsoft-edge/microsoft-edge-browsing-activity-for-personalized-advertising-and-experiences-37aa831e-6372-238e-f33f-7cd3f0e53679.....................................................................8

Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022*, Pew Research Center (Nov. 16, 2022), https://www.pewresearch.org/internet/2022/11/16/connection-creativity-and-drama-teen-life-on-social-media-in-2022 ...........................................18

Pew Research Center (Nov. 16, 2022), https://www.pewresearch.org/internet/2022/11/16/connection-creativity-and-drama-teen-life-on-social-media-in-2022 ...........................................18

Rus Shuler, *How Does the Internet Work?* (2002), https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm ..............................................7

*What is an IP Address? A Definition + How to Find It*, NortonLifeLock (July 25, 2022), https://us.norton.com/blog/privacy/what-is-an-ip-address .........................8

# INTRODUCTION

The Computer & Communications Industry Association ("CCIA") submits this amicus brief in support of Plaintiff's motion for a preliminary injunction. Though cloaked in the garb of protecting children's privacy, California's new Assembly Bill 2273 ("AB 2273") is in reality a broad and unconstitutional attempt to restrict speech and control the information that can be provided to minors. In the past, such laws tended to focus on children's "moral development," while today's censorship efforts often speak in terms of "well-being" and mental health. But this is a familiar story. As the Supreme Court explained when it struck down California's previous attempt to proscribe speech in the name of protecting children—a law banning the sale or rental of "violent" video games to minors:

> In the 1800's, dime novels depicting crime and "penny dreadfuls" (named for their price and content) were blamed in some quarters for juvenile delinquency. When motion pictures came along, they became the villains instead. … Radio dramas were next, and then came comic books. Many in the late 1940's and early 1950's blamed comic books for fostering a "preoccupation with violence and horror" among the young, leading to a rising juvenile crime rate. And, of course, after comic books came television and music lyrics.

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797 (2011) (citations omitted). Now California has turned its attention from video games to the Internet, and enacted a vague and sweeping law that prohibits online services from presenting a broad range of lawful speech to minors. The First Amendment invalidates this blunderbuss law, just as it barred similar past efforts to censor online speech. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 870 (1997).

This brief focuses on two central points. *First*, AB 2273 impermissibly restricts online service providers' speech. The statute forbids disseminating amorphous and expansive categories of content—including those that may be "materially detrimental to the physical health, mental health, or well-being of a child" (that is, anyone under 18 years old)—using a child's "personal information" (defined very broadly). To the extent these provisions are even discernable, they unlawfully restrict core publication and editorial choices of online services. They unduly limit how online services ranging from search engines, social media websites, news publishers, and libraries help users quickly find the information most relevant, interesting, or enjoyable to them. And they do so using key terms that are all but impossible to understand, much less apply in any consistent or

predictable way, which will inevitably lead to self-censorship. The First Amendment prohibits California's overbroad effort to limit the dissemination of lawful speech to minors.

*Second*, AB 2273 impermissibly compels speech. The statute requires online services to prepare onerous "Data Protection Impact Assessments" about controversial topics and to disclose those assessments to state law enforcement officials. Nearly every provider of online services is now obligated to speak about how its "algorithms" and "design features" could "expos[e] children to harmful, or potentially harmful, content," "contacts," or "conduct," or otherwise "harm children." And they must do so separately for every existing feature of their services—and every future feature. This wildly burdensome compelled-speech mandate, which effectively requires publishers to condemn their own services and incant the State's preferred dogma about contentious social and scientific questions, cannot be squared with the First Amendment. *See, e.g.*, *Volokh v. James*, 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) (preliminarily enjoining enforcement of state law requiring social media platforms to publish policies detailing their response to "hateful content" as unconstitutional compelled-speech mandate).

## ARGUMENT

**I.    AB 2273 VIOLATES SERVICE PROVIDERS' CORE FIRST AMENDMENT RIGHTS TO DISPLAY AND RECOMMEND CONTENT.**

Although AB 2273 masquerades as a law designed to protect children's privacy, it does far more than regulate how businesses can use children's personal data. With its broad language, undefined provisions, and invocations of ill-defined concepts like "detriment," AB 2273 is in fact an unprecedented, sweeping regulation of core First Amendment activity: the presentation of lawful speech to people who have a protected right to receive information without government restriction.

**A.    The First Amendment Protects The Rights Of Online Services To Distribute And Receive Information, And It Applies Even When The Government's Stated Objective Is Protecting Minors.**

*Protections for Distributing Speech*. The First Amendment protects "the acts of 'disclosing' or 'publishing' information." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). Because "publishing" and "distributing" materials is "*itself* expressive activity," publishers and distributors "have freestanding rights under the First Amendment to communicate with others through such protected

activity." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 688 (9th Cir. 2017). "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011).

As the Supreme Court has explained, therefore, a state's attempt to inhibit "the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki*, 532 U.S. at 527. That includes efforts to target tools used to distribute speech. In *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 61 (1983), for example, the Court held that a law prohibiting advertisements for contraceptives from being sent via U.S. Mail violated the First Amendment. A decade later, the Court struck down a statute prohibiting the distribution of publications through freestanding newsracks on public property as "an impermissible means of responding to the city's admittedly legitimate interests." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424, 431 (1993).

Relatedly, the First Amendment protects "the exercise of editorial control and judgment"— the choices that publishers make about what material to include and how to present it. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) ("'by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats'" and are protected by the First Amendment) (citation omitted). As the Court put it in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 570 (1995), "the presentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security."

***Protections for Online Distribution and Curation of Speech.*** These bedrock protections apply fully to the Internet. As the Supreme Court has explained, "[t]hrough the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox," and "[t]hrough the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Reno*, 521 U.S. at 870. In short, "the content on the Internet is as diverse as human thought," and precedent "provide[s] no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Id.* (citation omitted);

*accord Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1151 (9th Cir. 2004) ("[The] First Amendment … protects material disseminated over the internet.").

Just like newspapers and other publishers, therefore, online services have robust First Amendment rights to make choices "about what content to include, exclude, moderate, filter, label, restrict, or promote." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-87 (N.D. Cal. 2022) (citing *Tornillo*, 418 U.S. at 257-58). These "acts are expressive," and where a law "directly targets the way a content provider chooses to deliver, present, or publish news content on matters of public interest, that action is based on conduct in furtherance of free speech rights." *Id.* (citation omitted); *accord NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022) (online services "are engaged in constitutionally protected expressive activity when they moderate and curate the content that they disseminate on their platforms") (hereinafter "*Moody*"); *Volokh*, 2023 WL 1991435, at *6 (same); *Zhang v. Baidu.Com, Inc.*, 10 F. Supp. 3d 433, 439 (S.D.N.Y. 2014) (search engine's decision to "select and arrange others' materials" protected by First Amendment).

**Protections for Receiving Speech.** The First Amendment protects from government restraint not only the right to share information, but also the right to access or receive it. The "protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976) (collecting cases). As the Supreme Court explained, the choice that the "First Amendment makes for us" is that "information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.* at 770. This "right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) (citation omitted), *cert. denied*, 142 S. Ct. 1674 (2022).

**Protections for Minors' Rights to Receive and Access Speech.** Importantly, the "values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975). "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* Thus, "[e]ven where the protection of children is the object, the

constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804-05; *accord Reno*, 521 U.S. at 875 ("[T]he mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children … does not foreclose inquiry into its validity.").

Applying these principles, the courts have not hesitated to strike down laws enacted to safeguard minors from material that the government believes to be harmful—whether because it is violent, sexually explicit, or otherwise thought to interfere with children's well-being:

- In *Brown*, the Supreme Court held unconstitutional a California law "prohibit[ing] the sale or rental of 'violent video games' to minors." 564 U.S. at 789, 805. To allow a legislature to "create a wholly new category of content-based regulation that is permissible only for speech directed at children" would be "unprecedented and mistaken" because the State does not have "a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794.

- In *Reno*, the Supreme Court struck down a federal statute "enacted to protect minors from 'indecent' and 'patently offensive' communications on the Internet." 521 U.S. at 849. Similar state laws were invalidated in *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d. Cir. 2003), and *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999).

- In *Erznoznik*, the Supreme Court held that the First Amendment barred a law banning the exhibition of movies with nudity in drive-through theaters to "protect[] minors from this type of visual influence." 422 U.S. at 212.

- In *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1207 (9th Cir. 2010), the Ninth Circuit struck down a law that prohibited providing children with sexually explicit material or "visual, verbal, or narrative descriptions of sexual conduct for the purpose of sexually arousing the minor or the furnisher." The court held that "the statutes limit minors' access to expressive material that the state may not legitimately proscribe." *Id.* at 1215.

***Limitations on Government's Ability to Suppress Lawful Adult Speech Through Statutes Aimed at Protecting Minors.*** These cases also recognize that broad government efforts to limit content directed at minors can impermissibly infringe on ***adults'*** First Amendments rights to access and distribute lawful speech. "[T]he government may not 'reduce the adult population ... to reading only what is fit for children.'" *Bolger*, 463 U.S. at 73 (citation omitted). In *Sable Communications of California, Inc. v. FCC*, for example, the Court held that a statute banning indecent commercial telephone communications violated the First Amendment, notwithstanding the government's contention that it was necessary to protect children—an occasion of "burning the house to roast the pig." 492 U.S. 115, 131 (1989) (citation omitted); *accord Powell's Books*, 622 F.3d at 1215 ("the

statutes also restrict adults from providing minors with materials that are entirely anodyne for First Amendment purposes").

These principles have repeatedly been applied to invalidate laws aimed at protecting children from potentially harmful communications on the Internet. In *Reno*, the Supreme Court held that "the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech" because "[i]n order to deny minors access to potentially harmful speech, the CDA effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another." 521 U.S. at 874; *accord ACLU v. Ashcroft*, 322 F.3d 240, 260-61 (3d Cir. 2003) (statute limiting dissemination of "material harmful to minors" was an "unnecessarily broad suppression of speech addressed to adults") (citation omitted); *Dean*, 342 F.3d at 101-02 (state law restricting online "access to material considered harmful to minors" unconstitutionally "burden[ed] adult expression"); *Johnson*, 194 F.3d at 1152, 1160 (statute regulating "[d]issemination of material that is harmful to a minor by computer" unconstitutionally "burden[ed] otherwise protected adult communication on the Internet").

### B. AB 2273 Will Infringe Bedrock First Amendment Protections Because It Regulates How A Wide Variety Of Lawful Speech Can Be Presented And Disseminated On The Internet.

AB 2273 directly encroaches upon these bedrock First Amendment principles. The statute effectively forbids a wide range of protected online communications or makes those communications fraught with legal peril. In the name of children's privacy or protecting minors from an undefined array of supposedly "harmful" content, AB 2273 significantly limits online service providers' editorial judgments when it comes to displaying, disseminating, and recommending speech, which has the effect of censoring lawful speech that minors and adults alike may wish to share and access.

### 1. The "Material Detriment" Provision Broadly Prohibits Dissemination Of Lawful Content To Those Under 18.

We focus here on AB 2273 section 31(b)(1), which forbids providers of any online "service, product or feature" from using "the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or

well-being of a child." Cal. Civ. Code § 1798.99.31(b)(1). When this provision is read together with the statutory definitions, it is plain that it aims at speech.

AB 2273 applies to virtually every online service—including search engines, online publications (including newspapers, magazines, and blogs), social media platforms, and the publishers of books, photographs, videos, music, games, recipes, podcasts, and countless other forms of speech. *Id.* § 1798.99.30(b)(5) (exempting only "broadband internet access service[s]," "telecommunications service[s]," and tangible product delivery services). And though it ostensibly limits its application to services "likely to be accessed by children," *id.* § 1798.99.31(a), that phrase includes services "routinely accessed by a significant number of children," "substantially similar" services, services where children are a "significant amount of the audience," and even services with "design elements ... of interest to children." *Id.* § 1798.99.30(b)(4)(B), (D)-(F). None of these terms are defined, but virtually any website or online service (save for those offering pornography, gambling, or the like) could arguably meet those criteria.

"[P]ersonal information" is likewise capacious, defined as "information that identifies, relates to, describes, ***is reasonably capable of being associated with, or could reasonably be linked***, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1) (emphasis added); *see also id.* § 1798.99.30(a) (incorporating § 1798.140). That includes a person's "[IP] address," "email address," "account name," "online identifier," and "internet or other electronic network activity information," including "browsing history, search history, and information regarding a consumer's interaction with an internet website application." *Id.* § 1798.140(v)(1)(A), (F). This expansive provision does not simply cover the use of a child's private information for targeted advertising or the sale of that information to data aggregators. It sweeps well beyond that to regulate the use of a wide range of information, such as IP address and browsing and search history, to deliver tailored information for almost any purpose.

Displaying content on the Internet necessarily requires the "use" of a person's IP address: any time someone visits a website, their browser uses their IP address to receive and display the content on the website, be it search results, an online newspaper, or a photographer's online portfolio. *See, e.g.*, Rus Shuler, *How Does the Internet Work?* (2002),

1   https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm.

2   Likewise, efforts to tailor information to users based on where they are located—for example, search

3   results for nearby restaurants—typically rely on IP addresses. *See, e.g.*, Dan Rafter, *What Is an IP*

4   *Address? A Definition + How to Find It*, NortonLifeLock (July 25, 2022),

5   https://us.norton.com/blog/privacy/what-is-an-ip-address. Similarly, when someone is logged into

6   their account on a particular online platform—be it a video streaming service, a social media

7   platform, or an online store—the service often uses their email address, account name, or browsing

8   history to show them personalized content, such as content they have saved, content they have

9   searched for in the past, or content similar to other content they have viewed. *See, e.g.*, *Microsoft*

10   *Edge Browsing Activity for Personalized Advertising and Experiences* (2023),

11   https://support.microsoft.com/en-us/microsoft-edge/microsoft-edge-browsing-activity-for-

12   personalized-advertising-and-experiences-37aa831e-6372-238e-f33f-7cd3f0e53679.   In   short,

13   virtually any effort to tailor the delivery or presentation of online content to a given user—whether

14   by a search engine, social media service, website, mobile application, news or entertainment service,

15   or streaming video or music provider—is implicated by this provision.

16        To be sure, the provision applies only where the provider knows "or has reason to know"

17   that the display "is materially detrimental to the physical health, mental health, or well-being of a

18   child." Cal. Civ. Code § 1798.99.31(b)(1). But this is not a meaningful limitation for several reasons.

19   *First*, the language of the statute suggests that the relevant "detriment" is not to the specific child

20   presented with the content, but rather "a child." In other words, this provision may be triggered if

21   the material or display at issue is potentially detrimental to *any* child anywhere. Even setting aside

22   that different parents, guardians, and others have widely varying views on whether and when online

23   content (itself widely varied) is "detrimental" to children, the statute effectively allows the potential

24   that one child might suffer a detriment to set policy and restrict the speech available to all children.

25        *Second*, the statute defines "children" as anyone under 18, so if the material might be deemed

26   detrimental to a 5-year-old, the statute would apply even if the content were displayed to a 17-year-

27   old, based on information associated with that 17-year-old. The generic child referenced in this

28   provision may well be the youngest and most vulnerable minor imaginable, even if the business has

not used any information associated with such a child to display content. That is all the more incongruous, given that AB 2273 departs from the federal definition of "child" as "an individual under the age of 13" in the Children's Online Privacy Protection Act. 15 U.S.C. § 6501(1). That mismatch highlights not only the novelty of California's approach, but also its lack of nuance and the massive new burdens it imposes—both on providers and teenagers, whose right to receive potentially lawful information without government restraint will now be substantially curtailed.

*Third*, the provision is not limited to physical health or even actual diagnosable mental health outcomes. It also extends to the vague and totally undefined concept of "well-being." What material might be considered "detrimental" (also an undefined term) to the "well-being" of a minor is anyone's guess, meaning under AB 2273 "regulated parties [do not] know what is required of them so they may act accordingly." *Butcher v. Knudsen*, 38 F.4th 1163, 1168 (9th Cir. 2022) (citation omitted). And while a service provider "might perhaps make some educated guesses as to the meaning of these regulations, one could never be confident that the [state] would agree." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 513 (9th Cir. 1988). Thus, these "[u]ncertain meanings" will "inevitably lead citizens to 'steer far wide of the unlawful zone,'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972), leading to self-censorship that will suffocate the "delicate," "vulnerable," and "supremely precious" First Amendment freedoms that "need breathing space to survive," *NAACP v. Button*, 371 U.S. 415, 433 (1963). Perhaps the only thing that is clear is that AB 2273 has no exception for material that is newsworthy, culturally or politically relevant, educational, or of artistic or scientific value. So long as a personalized display of information might be deemed contrary to the "well-being" of someone under 18, it is flatly forbidden by California law.

### 2.   The "Material Detriment" Provision Violates The First Amendment.

To put it mildly, the reach of this restriction is immense, potentially proscribing the display to any minor of all manner of entirely lawful—and indeed socially valuable—speech. *Cf. Grayned*, 408 U.S. at 115 (a statute is unconstitutionally overbroad if it "sweeps within its prohibitions what may not be punished under the First … Amendment[]"). Examples abound:

- An online news service displays articles to minors, similar to stories they have previously viewed, about recent school shootings, leading some minors to feel anxious, depressed, and afraid.

- An Internet search engine provides search results, based in part on a minor user's IP address, about local skate parks where children frequently get injured.

- An online newsletter uses a minor's email to send articles about the existence of God that certain religious or secular parents or their children consider to be harmful to their well-being because they cause minors to question their beliefs.

- A photography-sharing website uses a minor's account name to display images from users that minor has chosen to follow, which include photographs of skinny models that might encourage minors to have unhealthy body images.

- A music streaming service suggests, based on other music a 17-year-old has streamed on the service, a playlist including songs with profanity or references to violence.

- An online educational platform offers a high-school student content about the transatlantic slave trade that causes some students to feel traumatized.

- Yelp uses IP address information to display to teenagers favorable reviews of fast food restaurants notorious for deep-fried foods and heavy use of saturated fats.

- Based on the user's prior interactions with the service, a podcasting platform suggests that a 16-year-old listen to a podcast in which survivors of sexual or violent assaults tell their stories, which might be traumatizing for some listeners.

- Based on other videos they had watched about global affairs, YouTube recommends videos about the war in Ukraine to a 17-year-old, but those videos include depictions of bombings and death that could negatively affect an 8-year-old.

- A popular online video game service displays lists of games that 14-year-old users have requested through their accounts, but the service might have reason to know that playing those games could arguably be detrimental to the health or well-being of a child who should be doing their homework or getting more exercise.

As these examples confirm, AB 2273 strikes at the heart of the First Amendment, with none of the "narrow specificity" or "[p]recision of regulation" that is required "in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 433, 438. A statute that prohibited knowingly distributing to minors material that the government deemed "detrimental" to their well-being would plainly be unconstitutional. In *Butler v. State of Michigan*, 352 U.S. 380, 383 (1957), for example, the Supreme Court struck down a law banning distribution of materials found "to have a potentially deleterious influence upon youth." Likewise, the government could not bar magazines aimed at teenagers (say, *Teen Vogue*) from putting articles on the cover that they have reason to

know could be harmful to minors, or prohibit bookstores or libraries from recommending "harmful" books to minors. Though cloaked in the language of "personal information" and privacy, AB 2273 effectively does the same thing. The statute sweeps in large swaths of lawful speech that could not be directly forbidden by the government, that minors have every right to view, and that publishers equally have a right to make available to them.

Couching such a law as a regulation of how "personal information" can be used makes no difference; the State cannot use formal labels to circumvent the First Amendment's prohibitions on proscribing protected speech. While California may safeguard children's privacy through an appropriately tailored law, it cannot use privacy as a stalking horse to prohibit core acts of speech—disseminating and presenting lawful information to the public, including minors, who want it or may find it useful. *Cf. Sorrell*, 564 U.S. at 580 ("Privacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers."); *Tornillo*, 418 U.S. at 256 ("Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers.").

AB 2273's coverage plainly is not limited to material that is "obscene as to youths" or "subject to some other legitimate proscription." *Erznoznik*, 422 U.S. at 213; *accord Brown*, 564 U.S. at 794-95. Instead, California apparently "wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children" (*Brown*, 564 U.S. at 794)—speech that someone may deem "detrimental" to the "well-being" of children. That is just as "unprecedented and mistaken" as it was in *Brown*, which reaffirmed that, outside narrow categories, "speech … cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-14); *accord Powell's Books*, 622 F.3d at 1213-15 (statutes restricting minors from accessing material not legally "obscene" or designed to "predominantly appeal[] to minors' prurient interest" violated First Amendment because they "limit minors' access to expressive material that the state may not legitimately proscribe").

In short, the government does not have "a free-floating power to restrict the ideas to which children may be exposed," *Brown*, 564 U.S. at 794—and using the vague language of "detriment" cannot change that. In fact, it makes it worse. By offering no clear or fixed notion of what material

1  might be "detrimental" to minors, the statute exposes virtually all online content to potential

2  proscription. Such vagueness "raises special First Amendment concerns because of its obvious

3  chilling effect on free speech," *Reno*, 521 U.S. at 871-72 (citing *Gentile v. State Bar of Nev.*, 501

4  U.S. 1030, 1048-51 (1991)), as it "enable[s] … officials to 'act in an arbitrary and discriminatory

5  manner' … and still be completely within the scope of" the law. *Bullfrog Films*, 847 F.2d at 514.

6  The State also overlooks that the basic "point of all speech protection" is to "shield just those choices

7  of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574; *accord*

8  *Snyder v. Phelps*, 562 U.S. 443, 461 (2011) ("even hurtful speech on public issues to ensure that we

9  do not stifle public debate" is protected). The First Amendment does not countenance California's

10  latest effort to suppress legitimate speech in the name of protecting children.

11  **II.    AB 2273 COMPELS SPEECH IN VIOLATION OF THE FIRST AMENDMENT.**

12       In addition to provisions that operate as unconstitutional *restrictions* on protected speech,

13  AB 2273 also *compels* speech in violation of the First Amendment.

14       **A.    The Data Protection Impact Assessment Requirement Forces Service
         Providers To Speak In Ways They Would Not Otherwise Speak.**

15

16       AB 2273 imposes a new compelled speech regime: the statute mandates that online service

17  providers "complete a Data Protection Impact Assessment [(DPIA)] for any online service, product,

18  or feature likely to be accessed by children." Cal. Civ. Code § 1798.99.31(a)(1). A DPIA is "a

19  systematic survey to assess and mitigate risks that arise from the data management practices of the

20  business to children." *Id.* § 1798.99.30(a)(2). Service providers must complete a DPIA for both *any*

21  *existing* service, product, or feature, *id.* § 1798.99.33(a), and *any new* service, product, or feature,

22  before launching it to the public, *id.* § 1798.99.31(a)(1)(A) (emphases added). DPIAs must address

23  numerous topics, including whether the design of the service, product, or feature "could harm

24  children, including by exposing children to harmful, or potentially harmful, content," "contacts," or

25  "conduct"; whether the service, product, or feature uses "algorithms" that could harm children; and

26  "[w]hether and how" the service, product, or feature "uses system design features to increase,

27  sustain, or extend" children's "use of" the service, product, or feature. *Id.* § 1798.99.31(a)(1)(B).

28  And confirming that AB 2273 is a serious attack on dissemination of speech, the DPIA provisions

1    further require each provider to "[d]ocument any risk of material detriment to children" that their

2    services or features may entail and "create a timed plan to mitigate or eliminate the risk" before the

3    feature can be accessed by anyone under 18. *Id.* § 1798.99.31(a)(2). Service providers must make

4    DPIAs available to the Attorney General within five days upon request. *Id.* § 1798.99.31(a)(4)(A).

5           The DPIA requirement plainly "force[s] elements of civil society to speak when they

6    otherwise would have refrained." *Wash. Post v. McManus*, 944 F.3d 506, 514 (4th Cir. 2019). That

7    triggers constitutional scrutiny, as the First Amendment covers "the decision of both what to say

8    and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988).

9    "By compelling [individuals] to speak a particular message," the state necessarily "alters the content

10   of [their] speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2377 (2018)

11   (hereinafter "*NIFLA*") (quoting *Riley*, 487 U.S. at 795). Compelled speech requirements are

12   therefore "content-based regulation[s] of speech" that are "subject to exacting First Amendment

13   scrutiny." *Riley*, 487 U.S. at 795, 798. Whether they involve "compelled statements of opinion" or

14   "compelled statements of 'fact,'" such regulations are "presumptively unconstitutional," *NIFLA*,

15   138 S. Ct. at 2371, as both "form[s] of compulsion burden[] protected speech," *Riley*, 487 U.S. at

16   797-98. Either way, the First Amendment directs that "government not dictate the content of speech

17   absent compelling necessity, and then, only by means precisely tailored." *Id.* at 800.

18          A recent case applied these principles in preliminarily enjoining a state law similarly

19   compelling the speech of online services. *See Volokh*, 2023 WL 1991435. In *Volokh*, the court

20   considered a New York law that "compel[led] social media networks to speak about the contours of

21   hate speech," specifically by "requir[ing] that social media networks devise and implement a written

22   policy—*i.e.*, speech" that "detail[ed] how the network w[ould] respond to a complaint of hateful

23   content." *Id.* at *1, *5. In crafting their policies, the online services were "force[d] … to weigh in

24   on the debate about the contours of hate speech when they may otherwise choose not to speak." *Id.*

25   at *6. "Even though the Hateful Conduct Law ostensibly does not dictate what a social media

26   website's response to a complaint must be and does not even require that the networks respond to

27   any complaints or take down offensive material, the dissemination of a policy about 'hateful

28   conduct' forces Plaintiffs to publish a message with which they disagree." *Id*. at *7. That speech

1   mandate triggered strict scrutiny, which the law failed. *Id.* at *8; *see also, e.g.*, *McManus*, 944 F.3d

2   at 510 (invalidating Virginia law that required online platforms "to publish on their websites, as well

3   as retain for state inspection, certain information about the political ads they decide to carry").

4        The DPIA requirement suffers from similar First Amendment problems. Any entity offering

5   an online service, product, or feature must now prepare an onerous written account of how it "could

6   harm children including by exposing children to harmful, or potentially harmful, content." Cal. Civ.

7   Code § 1798.99.31(a)(1)(B)(i). The law thus requires that online service providers "devise and

8   implement a written policy—*i.e.*, speech." *Volokh*, 2023 WL 1991435, at *5. And they must do so

9   even if the provider believes that its service actually *benefits* children or *protects* them from harm—

10  and even if it fundamentally disagrees with the idea that exposing children to a wide variety of

11  lawful speech is harmful. Like the Hateful Conduct Law in *Volokh*, therefore, AB 2273 requires

12  services "to endorse the state's message" about "harmful content"; a service that "devises its own

13  definition of ['harmful content'] would risk being in violation of the law and thus subject to its

14  enforcement provision." *Volokh*, 2023 WL 1991436, at *5. "Clearly, the law, at a minimum,

15  compels Plaintiffs to speak" about harmful content, and thereby "forces them to weigh in on the

16  debate about the contours of [harmful] speech when they may otherwise choose not to speak. In

17  other words, the law deprives Plaintiffs of their right to communicate freely on matters of public

18  concern without state coercion." *Id*. at *6 (citation and internal quotation marks omitted).

19       It is actually worse than that. Service providers here are effectively forced by the State to

20  confess their alleged and potential sins, to effectively endorse the State's underlying assumption that

21  lurking everywhere is "harmful, or potentially harmful, content" and "conduct" that children might

22  be allowed to "witness, participate in, or be subject to." Cal. Civ. Code § 1798.99.31(a)(1)(B)(i),

23  (ii). This mandate is no less an impermissible compelled-speech provision than a requirement that

24  newspapers or television news networks prepare regular written statements describing what

25  information that they disseminate might be harmful or potentially harmful to minors and what efforts

26  they are making to mitigate those harms in the way they publish or broadcast content. *Cf. Tornillo*,

27  418 U.S. at 256 (any "compulsion" on newspapers "to publish that which reason tells them should

28  not be published is unconstitutional").

To be sure, providers required to create DPIAs are not obligated to post them to the world at large. But that does not save the statute, because AB 2273 requires covered entities to "make the [DPIA] available, within five business days, to the Attorney General pursuant to a written request." Cal. Civ. Code § 1798.99.31(a)(4). The law thus compels entities to speak and then to disseminate that speech to the state's chief law enforcement officer. In the related context of compelled disclosure laws (which compel private entities to reveal information about their members or donors), the Supreme Court has made clear that such "requirements can chill association 'even if there is no disclosure to the general public.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021) (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)).

One reason is that, in reality, it is highly likely that the DPIAs will at some point become public. For one thing, as the Supreme Court noted in *Americans for Prosperity*, California's assurances of confidentiality "are not worth much." 141 S. Ct. at 2381 n.*; *see also id.* at 2381 ("During the course of litigation, the Foundation identified nearly 2,000 confidential Schedule Bs that had been inadvertently posted to the Attorney General's website … 'the amount of careless mistakes made by the Attorney General's Registry is shocking.'"). For another, even assuming no fault by California, there is no protection against producing the DPIAs in litigation; Congress could demand them; other states (or countries) could decide that they are not confidential. Even though this law does not explicitly require that online services post the DPIAs publicly, by commanding their creation, it effectuates their exposure.

As in *Volokh*, therefore, the DPIA provisions are content-based regulations that trigger, and cannot survive, strict scrutiny. 2023 WL 1991435, at *8-9; *accord Riley*, 487 U.S. at 795, 798-800; Notice of Motion and Motion for Preliminary Injunction, *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861-BLF (N.D. Cal. Feb. 17, 2023), ECF No. 29. And because even trying to comply with these requirements would necessitate immediate action by providers to assess their services along the lines demanded by the statute, the Court should not hesitate to act now, especially when the law targets such an important set of First Amendment protections.

**B.     The DPIA Requirement Cannot Be Saved As A Routine Commercial Disclosure Requirement Under *Zauderer*.**

It is no answer for the State to rely on *Zauderer v. Office of Disciplinary Counsel of the Superior Court*, 471 U.S. 626 (1985), to argue that the DPIA requirements are subject to something less than strict scrutiny. "*Zauderer* provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech" where the required "notice is (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc); *accord NIFLA*, 138 S. Ct. at 237 (explaining that *Zauderer* applied more deferential review to compelled-speech requirements that "governed only 'commercial advertising' and required the disclosure of 'purely factual and uncontroversial information'"). That standard does not apply here, for a host of reasons.

### 1.     DPIAs Do Not Regulate Commercial Speech.

First, and most importantly, the DPIAs do not regulate purely "commercial speech," which the Supreme Court has defined as "speech that does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citation omitted). "If speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection." *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004). The DPIAs do not propose a commercial transaction—indeed, they are not even designed to be seen by the purchasing public. Cal. Civ. Code § 1798.99.31(a)(4)(A).

In some instances, "speech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). But that is true at most where the speech is "related solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)—which is not the situation here. Describing whether an online service, product, or feature may expose "children to harmful, or potentially harmful, content" is not purely, or even predominantly, an economic issue. It is a matter that involves subjective moral, cultural, social, psychological, political, and religious considerations. It can cover matters of pure political speech and judgment—such as whether 16-year-olds would be harmed by seeing information about the

Holocaust, or the 9/11 attacks, or school shootings. And it may often have nothing to do with commercial consideration at all. The DPIA requirements, after all, apply to services and features that are provided for free or with no financial motivation, such as by non-profits like Wikipedia.

Here too, *Volokh* is illustrative. The court there held that compelling online service providers to prepare a written hate speech policy was not commercial speech because it compelled them "to speak about the range of protected speech it will allow its users to engage (or not engage) in." *Volokh*, 2023 WL 1991435, at *7. Similarly here, service providers that must prepare a DPIA are compelled to speak about what speech (including all manner of protected, lawful speech) their services allow users to access, how those services control or regulate access to such speech, and how that speech might affect users. "This is different in character and kind from commercial speech and amounts to more than mere disclosure of factual information." *Id.* at *8.

### 2. DPIAs Do Not Regulate "Purely Factual And Uncontroversial" Information.

Second, *Zauderer* does not save AB 2273, because even if the compelled speech were *commercial* speech, it is far from "factual and uncontroversial." The Supreme Court considered the "compelled disclosure of commercial speech" in *NIFLA*, and its decision there "stands for the proposition that the *Zauderer* standard applies only if the compelled disclosure involves 'purely factual and uncontroversial' information." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019). In *NIFLA*, the Court held that a law requiring clinics to state that California "has public programs that provide immediate free or low-cost access to comprehensive family planning services (including … contraception), prenatal care, and abortion for eligible women" did not meet that requirement. 138 S. Ct. at 2369, 2372 (observing that abortion is "anything but an uncontroversial topic"); *accord Volokh*, 2023 WL 1991435, at *7 (disclosure of social media services' hate speech policies "conveys more than a 'purely factual and uncontroversial' message").

The same is true here. A DPIA requires a business to evaluate and disclose a highly subjective, controversial, and contentious set of issues—including whether particular product features, designs, or algorithms may be "harmful, or potentially harmful" to children or whether they might expose them to harmful or potentially harmful content. Cal. Civ. Code

§ 1798.99.31(a)(1)(b). Even beginning to make such assessments requires complex and nuanced judgments about matters of psychology, medical science, and cultural politics. Reasonable people can disagree about whether all manner of content—*e.g.*, political rhetoric, images of skinny fashion models, violent video games, material about the LGBTQ community, critical race theory, material about firearms or drug use, and information about obtaining contraception and abortion services— is harmful to children. There are also ongoing debates about whether various techniques for curating, recommending, and presenting such lawful speech to minors are beneficial or detrimental. *See, e.g.*, Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022*, Pew Research Center (Nov. 16, 2022), https://www.pewresearch.org/internet/2022/11/16/connection-creativity-and-drama-teen-life-on-social-media-in-2022 (the majority of teens say social media use has a "mostly positive" impact on them); Daniel Kardefelt Winther, *How Does the Time Children Spend Using Digital Technology Impact Their Mental Well-being, Social Relationships and Physical Activity? An Evidence-focused Literature Review*, Innocenti Discussion Papers, no. 2017-02, UNICEF Office of Research - Innocenti, Florence (2017) (evidence suggests digital technology is beneficial for children's social relationships and moderate use has a positive impact on their mental well-being).

But what the State is now attempting is to force online service providers to wade into those controversies and to repeatedly voice their view on these highly fraught issues. The DPIA requirements compel online service providers to take sides in a "heated political controversy." *CTIA*, 928 F.3d at 848. Not only that, providers must state that their own "products are ethically tainted"— even when they heatedly dispute that idea. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (hereinafter "*NAM*") (striking down SEC regulation requiring companies to state that their products are "not 'DRC conflict free'"). This is worlds apart from *Zauderer*. Indeed, what the D.C. Circuit said in *NAM* applies equally here: "requiring a company to publicly condemn itself is undoubtedly a more effective way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Id*. at 530. In short, by "compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment." *Id*.

3.   The DPIA Requirement Is Unjustified And Unduly Burdensome.

Finally, the DPIA requirement would be unconstitutional even if *Zauderer* did apply. For a compelled speech requirement to survive scrutiny under *Zauderer*, the State must prove that the requirement "is neither unjustified nor unduly burdensome"—*i.e.*, that it remedies "a harm that is potentially real not purely hypothetical" and extends "no broader than reasonably necessary." *NIFLA*, 138 S. Ct. at 2377. Indeed, the "Supreme Court made clear in *NIFLA* that a government-compelled disclosure that imposes an undue burden fails for that reason alone." *Am. Beverage Ass'n*, 916 F.3d at 757. In *NIFLA*, the Court held that a requirement that unlicensed clinics post a notice "that California has not licensed the clinics to provide medical services" failed this standard. 138 S. Ct. at 2368. California failed to show that its concern was "more than 'purely hypothetical,'" and "[e]ven if [California] had presented a nonhypothetical justification," its law "targets speakers, not speech, and imposes an unduly burdensome disclosure requirement that will chill their protected speech." *Id.* at 2377, 2378.

Similarly, in *American Beverage*, the Ninth Circuit invalidated as unduly burdensome a San Francisco ordinance that "require[d] health warnings on advertisements for certain sugar-sweetened beverages." 916 F.3d at 753. The court considered the size of the required warnings and found that the city had not shown that a smaller warning would not "accomplish [d]efendant's stated goals." *Id.* at 757. And in *Moody*, the Eleventh Circuit held that Florida's requirement that large social media platforms "provide notice and a detailed justification for every content-moderation action" is likely "unconstitutional under *Zauderer* because it is unduly burdensome and likely to chill platforms' protected speech." 34 F.4th at 1230. The court especially noted the "potentially significant implementation costs" and threat of liability "if a Florida court were to determine that [a platform] didn't provide sufficiently 'thorough' explanations when removing posts." *Id.* at 1230-31.

The DPIA requirements at issue here are no less burdensome. AB 2273 mandates a detailed assessment, with at least eight broad and vaguely defined categories of mandated evaluations, ***for every single service, product, or feature*** that the business has introduced—or wishes to introduce. Preparing such detailed evaluations is entirely different from posting a simple notice drafted by the state. *Cf. CTIA*, 928 F.3d at 845-49. It will require teams of lawyers, product managers,

psychologists, and other experts. The implementation costs of these DPIAs are staggering. *Cf.* Lauren Feiner, *California's New Privacy Law Could Cost Companies a Total of $55 Billion to Get in Compliance*, CNBC (Oct. 5, 2019), https://www.cnbc.com/2019/10/05/california-consumer-privacy-act-ccpa-could-cost-companies-55-billion.html (discussing report commissioned by California Attorney General estimating that initial compliance with the 2018 California Consumer Privacy Act would cost $55 billion).

Moreover, these requirements are likely to deter the development of new features that facilitate the publication, curation, creation, and distribution of speech—further chilling online services' First Amendment rights. *See, e.g.*, *Moody*, 34 F.4th at 1230-31. Indeed, that would appear to be the point of the requirements: to make it so cumbersome and expensive to launch new features that may appeal to minors that most service providers will simply give up and take steps to avoid allowing anyone under 18 to use or receive information through their services. The First Amendment does not allow the State to deter protected expression in this way. "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566.

That rule is especially apt here, because there is no apparent justification for imposing these massive burdens. The statute's stated goal of "[e]nsuring robust privacy protections for children" (AB 2273, Ch. 320, § 1(9) (legislative findings)) cannot carry this much weight. Much of the DPIA requirements have little to do with actual privacy, but instead seem crafted to limit the amount and kind of speech that is presented or made available to minors. This backhanded way of second-guessing or restricting the publication and editorial choices of private online services simply is not the kind of legitimate state objective that warrants imposing an unprecedentedly onerous set of compelled speech requirements on online publishers. "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

## CONCLUSION

For these reasons, the Court should grant Plaintiff's motion for a preliminary injunction enjoining enforcement of AB 2273 in its entirety.

1

2   Dated:  March 3, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: */s/ Lauren Gallo White*
        Lauren Gallo White

*Attorneys for Amicus Curiae*
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION