# EXHIBIT A

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Information Commissioner's Office

# Age appropriate design:

## a code of practice for online services

**ico.**
Information Commissioner's Office

**children's code**

Information Commissioner's foreword                          3
Executive summary                                           5
Additional resources                                        6
Code standards                                              7
About this code                                             9
Services covered by this code                              15
Transitional arrangements                                  21
Standards of age appropriate design                        23
1. Best interests of the child                             24
2. Data protection impact assessments                      27
3. Age appropriate application                             32
4. Transparency                                            37
5. Detrimental use of data                                 43

# Information Commissioner's foreword

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The Secretary of State laid the Age Appropriate Design Code to Parliament under section 125(1)(b) of the Data Protection Act 2018 (the Act) on 11 June 2020. The ICO issued the code on 12 August 2020 and it will come into force on 2 September 2020 with a 12 month transition period.

There is more information in the [Explanatory Memorandum ⧉](#).

## Information Commissioner's foreword

Data sits at the heart of the digital services children use every day. From the moment a young person opens an app, plays a game or loads a website, data begins to be gathered. Who's using the service? How are they using it? How frequently? Where from? On what device?

That information may then inform techniques used to persuade young people to spend more time using services, to shape the content they are encouraged to engage with, and to tailor the advertisements they see.

For all the benefits the digital economy can offer children, we are not currently creating a safe space for them to learn, explore and play.

This statutory code of practice looks to change that, not by seeking to protect children from the digital world, but by protecting them within it.

**This code is necessary.**

This code will lead to changes that will help empower both adults and children.

One in five UK internet users are children, but they are using an internet that was not designed for them. In our own research conducted to inform the direction of the code, we heard children describing data practices as "nosy", "rude" and a "bit freaky".

Our recent national survey into people's biggest data protection concerns ranked children's privacy second only to cyber security. This mirrors similar sentiments in research by Ofcom and the London School of Economics.

This code will lead to changes in practices that other countries are considering too.

It is rooted in the United Nations Convention on the Rights of the Child (UNCRC) that recognises the special safeguards children need in all aspects of their life. Data protection law at the European level reflects this and provides its own additional safeguards for children.

The code is the first of its kind, but it reflects the global direction of travel with similar reform being considered in the USA, Europe and globally by the Organisation for Economic Co-operation and Development (OECD).

This code will lead to changes that UK Parliament wants.

Parliament and government ensured UK data protection laws will truly transform the way we look after children online by requiring my office to introduce this statutory code of practice.

The code delivers on that mandate and requires information society services to put the best interests of the child first when they are designing and developing apps, games, connected toys and websites that are likely to be accessed by them.

**This code is achievable.**

The code is not a new law but it sets standards and explains how the General Data Protection Regulation applies in the context of children using digital services. It follows a thorough consultation process that included speaking with parents, children, schools, children's campaign groups, developers, tech and gaming companies and online service providers.

Such conversations helped shape our code into effective, proportionate and achievable provisions.

Organisations should conform to the code and demonstrate that their services use children's data fairly and in compliance with data protection law.

The code is a set of 15 flexible standards – they do not ban or specifically prescribe – that provides built-in protection to allow children to explore, learn and play online by ensuring that the best interests of the child are the primary consideration when designing and developing online services.

Settings must be "high privacy" by default (unless there's a compelling reason not to); only the minimum amount of personal data should be collected and retained; children's data should not usually be shared; geolocation services should be switched off by default. Nudge techniques should not be used to encourage children to provide unnecessary personal data, weaken or turn off their privacy settings. The code also addresses issues of parental control and profiling.

**This code will make a difference.**

Developers and those in the digital sector must act. We have allowed the maximum transition period of 12 months and will continue working with the industry.

We want coders, UX designers and system engineers to engage with these standards in their day-to-day to work and we're setting up a package of support to help.

But the next step must be a period of action and preparation. I believe companies will want to conform with the standards because they will want to demonstrate their commitment to always acting in the best interests of the child. Those companies that do not make the required changes risk regulatory action.

What's more, they risk being left behind by those organisations that are keen to conform.

A generation from now, I believe we will look back and find it peculiar that online services weren't always designed with children in mind.

When my grandchildren are grown and have children of their own, the need to keep children safer online will be as second nature as the need to ensure they eat healthily, get a good education or buckle up in the back of a car.

And while our code will never replace parental control and guidance, it will help people have greater confidence that their children can safely learn, explore and play online.

There is no doubt that change is needed. The code is an important and significant part of that change.

**Elizabeth Denham CBE**

# Executive summary

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Children are being 'datafied' with companies and organisations recording many thousands of data points about them as they grow up. These can range from details about their mood and their friendships to what time they woke up and when they went to bed.

Conforming to this statutory code of practice will ensure that as an organisation providing online services likely to be accessed by children in the UK, you take into account the best interests of the child. It will help you to develop services that recognise and cater for the fact that children warrant special protection in how their personal data is used, whilst also offering plenty of opportunity to explore and develop online.

You have 12 months to implement the necessary changes from the date that the code takes effect following the Parliamentary approval process. The ICO approach to enforcement as set out in our Regulatory Action Policy will apply. That policy and this code both apply a proportionate and risk-based approach.

The United Nations Convention on the Rights of the Child (UNCRC) recognises that children need special safeguards and care in all aspects of their life. There is agreement at international level and within the UK that much more needs to be done to create a safer online space for them to learn, explore and play.

In the UK, Parliament and government have acted to ensure that our domestic data protection laws truly transform the way we safeguard our children when they access online services by requiring the Commissioner to produce this statutory code of practice. This code seeks to protect children **within** the digital world, not protect them from it.

The code sets out 15 standards of age appropriate design reflecting a risk-based approach. The focus is on providing default settings which ensures that children have the best possible access to online services whilst minimising data collection and use, by default.

It also ensures that children who choose to change their default settings get the right information, guidance and advice before they do so, and proper protection in how their data is used afterwards.

You should follow the standards as part of your approach to complying with data protection law. If you can show us that you conform to these standards then you will conform to the code. The standards are cumulative and interlinked and you must implement them all, to the extent they are relevant to your service, in order to demonstrate your conformity.

The detail below the standards provides further explanation to help you understand and implement them in practice. It is designed to help you if you aren't sure what to do, but it is not prescriptive. This should give you enough flexibility to develop services which conform to the standards in your own way, taking a proportionate and risk-based approach. It will help you to design services that comply with the General Data Protection Regulation (GDPR) and the Privacy and Electronic Communications Regulations (PECR).

# Additional resources

Age appropriate design code

# Code standards

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The standards are:

1. **Best interests of the child:** The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child.

2. **Data protection impact assessments:** Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.

3. **Age appropriate application:** Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead.

4. **Transparency:** The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated.

5. **Detrimental use of data:** Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions or Government advice.

6. **Policies and community standards:** Uphold your own published terms, policies and community standards (including but not limited to privacy policies, age restriction, behaviour rules and content policies).

7. **Default settings:** Settings must be 'high privacy' by default (unless you can demonstrate a compelling reason for a different default setting, taking account of the best interests of the child).

8. **Data minimisation:** Collect and retain only the minimum amount of personal data you need to provide the elements of your service in which a child is actively and knowingly engaged. Give children separate choices over which elements they wish to activate.

9. **Data sharing:** Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child.

10. **Geolocation:** Switch geolocation options off by default (unless you can demonstrate a compelling reason for geolocation to be switched on by default, taking account of the best interests of the child). Provide an obvious sign for children when location tracking is active. Options which make a child's location visible to others must default back to 'off' at the end of each session.

11. **Parental controls:** If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored.

12. **Profiling:** Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing).

.3. **Nudge techniques:** Do not use nudge techniques to lead or encourage children to provide unnecessary personal data or weaken or turn off their privacy protections.

.4. **Connected toys and devices:** If you provide a connected toy or device ensure you include effective tools to enable conformance to this code.

.5. **Online tools:** Provide prominent and accessible tools to help children exercise their data protection rights and report concerns.

# About this code

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

This code explains how to ensure your online services appropriately safeguard children's personal data. You should follow the code to help you process children's data fairly. It will also enable you to design services that comply, and demonstrate you comply, with the GDPR and PECR. If you do not follow this code, you are likely to find it more difficult to demonstrate your compliance with the law, should we take regulatory action against you.

- Who is this code for?
- What is the purpose of this code?
- What is the status of this code?
- How should we use the code?

## Who is this code for?

This code is for providers of information society services (ISS). It applies to you if you provide online products or services (including apps, programs, websites, games or community environments, and connected toys or devices with or without a screen) that process personal data and are likely to be accessed by children in the UK. It is not only for services aimed at children. In this code 'online service' means a relevant ISS. For more information, see the separate section on services covered by this code.

## What is the purpose of this code?

This code addresses how to design data protection safeguards into online services to ensure they are appropriate for use by, and meet the development needs of, children.

It reflects the increasing concern about the position of children in society and the modern digital world in particular. There is agreement at international level and within the UK that much more needs to be done to create a safe online space for them to learn, explore and play. This code achieves this not by seeking to protect children from the digital world, but by protecting them within it.

The UNCRC recognises that children need special safeguards and care in all aspects of their life and requires that these should be guaranteed by appropriate legal protections. European level data protection law reflects this and provides its own additional safeguards for children.

In the UK, Parliament and government have acted to ensure that our domestic data protection laws do truly transform the way we safeguard our children when they access online services by requiring the Commissioner to produce this statutory code of practice. This code delivers on Parliament and the government's intent to use data protection law to make a profound and lasting change to how we look after our children when they access online services.

It takes account of the standards and principles set out in the UNCRC, and sets out specific protections for

children's personal data in compliance with the provisions of the GDPR.

If you provide relevant online services, this code will help you to comply, and demonstrate that you comply, with your data protection obligations. Conforming to the standards in this code will be a key measure of your compliance with data protection laws. Following this code will also show parents and other users of your services that you take children's privacy seriously, you can be trusted with children's data, and your services are appropriate for children to use.

**How does this code take account of the rights of the child?**

In preparing this code, the Commissioner is required to consider the UK's obligations under the UNCRC, and the fact that children have different needs at different ages.

The code incorporates the key principle from the UNCRC that the best interests of the child should be a primary consideration in all actions concerning children. It also aims to respect the rights and duties of parents, and the child's evolving capacity to make their own choices.

In particular, this code aims to ensure that online services use children's data in ways that support the rights of the child to:

- freedom of expression;
- freedom of thought, conscience and religion;
- freedom of association;
- privacy;
- access information from the media (with appropriate protection from information and material injurious to their well-being);
- play and engage in recreational activities appropriate to their age; and
- protection from economic, sexual or other forms of exploitation.

**How does this code support parents?**

Parents (or guardians) play a key role in protecting their children and deciding what is in their best interests. However, in the context of online services, parents and children may find it difficult to make informed choices or exercise any control over the way those services use children's data. Often the only choice in practice is to avoid online services altogether, which means the child loses the benefits of online play, interaction and development. This code therefore expects providers of these services to take responsibility for ensuring that the way their services use personal data is appropriate to the child's age, takes account of their best interests, and respects their rights; as well as supporting parents or older children in making choices (where appropriate) in the child's best interests.

**How does this code support data protection compliance?**

The UK data protection regime is set out in the Data Protection Act 2018 (DPA 2018) and the GDPR. This regime requires you to take a risk-based approach when you use people's data, based on certain key principles, rights and obligations.

This code supports compliance with those general principles by setting out specific protections you need to build in when designing online services likely to be accessed by children, in line with Recital 38 of the GDPR:

> **"**
>
> "Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing of personal data. Such specific protection should, in particular, apply to the use of personal data of children for the purposes of marketing or creating personality or user profiles and the collection of personal data with regard to children when using services offered directly to a child…"

In particular, this code sets out practical measures and safeguards to ensure processing under the GDPR can be considered 'fair' in the context of online risks to children, and will help you comply with:

- Article 5(1)(a): the fairness, lawfulness and transparency principle;
- Article 5(1)(b): the purpose limitation principle;
- Article 5(1)(c): the data minimisation principle;
- Article 5(1)(e): the storage limitation principle;
- Article 5(2): the accountability principle;
- Article 6: lawfulness of processing;
- Articles 12, 13 and 14: the right to be informed;
- Articles 15 to 20: the rights of data subjects;
- Article 22: profiling and automated decision-making;
- Article 25: data protection by design and by default; and
- Article 35: data protection impact assessments (DPIAs).

It covers your use of 'inferred data' (information about a child that you don't collect directly, but that you infer from other information or from their behaviours online) as well as data you collect directly from the child.

Annex C also includes some guidance on identifying your lawful basis for processing in the context of an online service. If you rely on consent, it explains the Article 8 rule on parental consent for children under 13.

PECR also set some specific rules on the use of cookies and other technologies which rely on access to user devices, and on electronic marketing messages. This code refers to those requirements where relevant, but for full details on how to comply you should read our separate Guide to PECR.

If you need to process personal data in order to protect children from online harms, such as child sexual exploitation and abuse, then this code shouldn't prevent you from doing so. However, you need to satisfy all the usual data protection requirements before you proceed, such as ensuring that the processing is fair and proportionate to the harm you are seeking to prevent, identifying a lawful basis for processing and providing transparency information.

## What is the status of this code?

**What is the legal status of the code?**

This is a statutory code of practice prepared under section 123 of the DPA 2018:

---

> 
>
> "The Commissioner must prepare a code of practice which contains such guidance as the Commissioner considers appropriate on standards of age appropriate design of relevant information society services which are likely to be accessed by children."

It was laid before Parliament on 11 June 2020 and issued on 12 August 2020 under section 125 of the DPA 2018. It comes into force on 2 September 2020.

As was made clear in the Parliamentary debates when the Data Protection Bill passed through Parliament, if your online service fails to conform to a provision of this code you may find it difficult to demonstrate compliance with the law and you may invite regulatory action.

In accordance with section 127 of the DPA 2018, the Commissioner must take the code into account when considering whether an online service has complied with its data protection obligations under the GDPR or PECR. In particular, the Commissioner will take the code into account when considering questions of fairness, lawfulness, transparency and accountability under the GDPR, and in the use of her enforcement powers.

The code can also be used in evidence in court proceedings, and the courts must take its provisions into account wherever relevant.

**What happens if we don't conform to the standards in this code?**

If you don't conform to the standards in this code, you are likely to find it more difficult to demonstrate that your processing is fair and complies with the GDPR and PECR. If you process a child's personal data in breach of the GDPR or PECR, we can take action against you.

Tools at our disposal include assessment notices, warnings, reprimands, enforcement notices and penalty notices (administrative fines). For serious breaches of the data protection principles, we have the power to issue fines of up to €20 million (£17.5 million when the UK GDPR comes into effect) or 4% of your annual worldwide turnover, whichever is higher.

Our approach to using these powers will take account of the risks to children that arise from your data processing, and the efforts you have made to conform to the standards in this code. In cases where we find against you, we are more likely to allow you time to bring your service into compliance if you have a well-documented and reasoned case to support the approach you have taken.

Conversely, if you have not taken proper steps to conform despite clear evidence or constructive knowledge that children are likely to access your service, and clear evidence of significant risk arising from the use of children's data, we are more likely to take formal regulatory action. The established ICO approach to enforcement as set out in our Regulatory Action Policy will apply to use of children's personal data under the GDPR and consideration of this code.

For more information, see the separate section on enforcement of this code.

**How is this code affected when the UK leaves the EU?**

This code is based on and refers to the relevant provisions of the DPA 2018 and GDPR as they apply in the UK in November 2019, before exit day.

If the UK leaves the EU with no deal, the EU version of the GDPR will no longer be law in the UK. However, a UK version of the GDPR will be written into UK law (UK GDPR). The UK GDPR will sit alongside an amended version of the DPA 2018. Although this code is based on the provisions of the DPA 2018 and EU GDPR in effect before exit day, the key data protection principles, rights and obligations underlying this code will remain the same under the UK GDPR.

The standards in this code will therefore still apply. The Commissioner will continue to take the code into account. However, after exit day, you should read references in this code to the GDPR as references to the equivalent provision in the UK GDPR. We have also highlighted a few specific changes throughout this code where directly relevant.

If the UK agrees to leave the EU with a deal, there will be an implementation period during which the GDPR – and this code – will continue to apply in the UK in the same way as before exit day. At the end of the implementation period, the default position is the same as for a no-deal exit, and we expect this code to remain in effect.

If there are any further changes to the details of the future UK regime, the Commissioner will review the standards in this code to ensure they remain relevant and appropriate to support compliance with UK law.

**What is the status of 'further reading' or other linked resources?**

Any further reading or other resources which are mentioned in or linked from this code do not form part of the code. We provide links to give you helpful context and further guidance on specific issues, but there is no statutory obligation under the DPA 2018 for the Commissioner or courts to take it into account (unless it is another separate statutory code of practice).

Where we link to other ICO guidance, that guidance will inevitably reflect the Commissioner's views and inform our general approach to interpretation, compliance and enforcement.

We may also link to relevant guidance provided by the European Data Protection Board (EDPB), which is the independent body established to ensure consistency within the EU when interpreting the GDPR and taking regulatory action.

## How should we use the code?

The standards at the start of this code are the 15 headline 'standards of age appropriate design' that you need to implement. The main body of this code is then divided into 15 sections, each giving more detail on what the standard means, why it is important, and how you can implement it. This further explanation is designed to help you if you aren't sure what to do, but it is not prescriptive. It should give you enough flexibility to develop services which conform to the standards in your own way, taking a proportionate and risk-based approach. It will help you to design services that comply with the GDPR and PECR.

Your conformity to the code will be assessed against the 15 headline standards. However, we recommend that you read the code in full as it will help you understand how you can implement each standard properly. These standards are cumulative and interdependent - you must implement all of them, to the extent they are relevant to your service, in order to demonstrate your conformance to the code.

This code assumes familiarity with key data protection terms and concepts. We have included a glossary at the end of this code as a quick reference point for common concepts and abbreviations, but if you need an introduction to data protection – or more context and guidance on key concepts – you should refer to our separate Guide to Data Protection.

This code focuses on specific safeguards to ensure your data regime is appropriate for children who are

likely to access your service, so that you process their data fairly. It is not intended as an exhaustive guide to data protection compliance. For example, it does not elaborate on your obligations on security, processors or breach reporting. You need to make sure you are aware of all of your obligations, and you should read this code alongside our other guidance. Your DPIA process should incorporate measures to comply with your data protection obligations generally, as well as conform to the specific standards in this code.

**Further reading outside this code**

United Nations Convention on the Rights of the Child 🗗
Guide to Data Protection 🗗
Guide to PECR 🗗
ICO Regulatory Action Policy 🗗
DP and Brexit 🗗

# Services covered by this code

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

This code applies to "information society services likely to be accessed by children" in the UK. This includes many apps, programs, connected toys and devices, search engines, social media platforms, streaming services, online games, news or educational websites and websites offering other goods or services to users over the internet. It is not restricted to services specifically directed at children.

## In more detail

- What services does this code apply to?
- What do you mean by an 'information society service'?
- What types of online services are not 'relevant ISS'?
- When are services 'likely to be accessed by children'?
- Does it apply to services based outside the UK?
- What about the eCommerce Regulations 2002?

## What services does this code apply to?

Section 123 of the DPA 2018 says that this code applies to:



"relevant information society services which are likely to be accessed by children."

It says that 'information society services' has the same meaning as it has in the GDPR except that it does not include 'preventive or counselling services', and that 'relevant ISS' are those which involve the processing of personal data to which the GDPR applies.

The vast majority of online services used by children are covered, although there are some limited exceptions that are discussed in more detail below. Annex A to this code provides a flowchart setting out the questions you will need to answer if you are uncertain whether your service is covered.

## What do you mean by an 'information society service'?

The definition is broad and the majority of online services that children use are covered.

'Information society service' is defined as:

> "any service normally provided for remuneration, at a distance, by electronic means and at the individual request of a recipient of services.

For the purposes of this definition:

> (i) 'at a distance' means that the service is provided without the parties being simultaneously present;
>
> (ii) 'by electronic means' means that the service is sent initially and received at its destination by means of electronic equipment for the processing (including digital compression) and storage of data, and entirely transmitted, conveyed and received by wire, by radio, by optical means or by other electromagnetic means;
>
> (iii) 'at the individual request of a recipient of services' means that the service is provided through the transmission of data on individual request."

Essentially this means that most online services are ISS, including apps, programs and many websites including search engines, social media platforms, online messaging or internet based voice telephony services, online marketplaces, content streaming services (eg video, music or gaming services), online games, news or educational websites, and any websites offering other goods or services to users over the internet. Electronic services for controlling connected toys and other connected devices are also ISS.

These services are covered even if the 'remuneration' or funding of the service doesn't come directly from the end user. For example, an online gaming app or search engine that is provided free to the end user but funded via advertising still comes within the definition of an ISS. This code also covers not-for-profit apps, games and educational sites, as long as those services can be considered as 'economic activity' in a more general sense. For example, they are types of services which are typically provided on a commercial basis.

If you are a small business with a website, your website is an ISS if you sell your products online, or offer a type of service which is transacted solely or mainly via your website without you needing to spend time with the customer in person.

## What types of online services are not 'relevant ISS'?

**Some services provided by public authorities**

If you are a public authority which provides an online public service then, as long as the type of service you offer is not typically provided on a commercial basis your service is not a relevant ISS. This is because it is not a service 'normally provided for remuneration'.

If you are a police force or other competent authority with an online service which processes personal data for law enforcement purposes, then your service isn't a relevant ISS. This is because relevant ISS are those which involve the processing of personal data 'to which the GDPR applies'. The GDPR does not apply to processing by competent law enforcement authorities for law enforcement purposes. For further information about the scope of the GDPR and how data protection law applies to processing for law

enforcement purposes see our Guide to data protection.

**Websites which just provide information about a real-world business or service**

If your website just provides information about your real-world business, but does not allow customers to buy products online or access a specific online service, it is not an ISS. This is because the service being offered is not provided 'at a distance'. An online booking service for an in-person appointment does not qualify as an ISS.

**Traditional voice telephony services**

Traditional voice telephony services are not relevant ISS. This is because they are not considered to be 'delivered by electronic means'. This differs from internet based voice calling services (VOIP) which are within scope as they are delivered over the internet by electronic means.

**General broadcast services**

The definition of an ISS does not include broadcast services such as scheduled television or radio transmissions that are broadcast to a general audience, rather than at the request of the individual (even if the channel is broadcast over the internet).

This differs from 'on demand' services which are, by their nature, provided 'at the individual request of a recipient'.

If you provide both a general broadcast and an on demand service, then the on demand element of your service will be covered by the code.

**Preventive or counselling services**

This code does not apply to websites or apps specifically offering online counselling or other preventive services (such as health screenings or check-ups) to children. This is because s123 scopes out 'preventive or counselling services'. However, more general health, fitness or wellbeing apps or services are covered.

## When are services 'likely to be accessed by children'?

This code applies if children are likely to use your service. A child is defined in the UNCRC and for the purposes of this code as a person under 18.

If your service is designed for and aimed specifically at under-18s then the code applies. However, the provision in section 123 of the DPA is wider than this. It also applies to services that aren't specifically aimed or targeted at children, but are nonetheless likely to be used by under-18s.

It is important to recognise that Parliament sought to use the wording 'likely to be accessed by' rather than narrower terms, to ensure that the application of the code did not exclude services that children were using in reality. This drew on experience of other online child protection regimes internationally, that only focused on services designed for children and therefore left a gap in coverage and greater risk.

We consider that for a service to be 'likely' to be accessed, the possibility of this happening needs to be more probable than not. This recognises the intention of Parliament to cover services that children use in reality, but does not extend the definition to cover all services that children could possibly access.

In practice, whether your service is likely to be accessed by children or not is likely to depend on:

- the nature and content of the service and whether that has particular appeal for children; and

- the way in which the service is accessed and any measures you put in place to prevent children gaining access.

You should take a common sense approach to this question. If your service is the kind of service that you would not want children to use in any case, then your focus should be on how you prevent access (in which case this code does not apply), rather than on making it child-friendly. For example, if it is an adult only, restricted, or otherwise child-inappropriate service. This code should not lead to the perverse outcome of providers of restricted services having to make their services child-friendly.

If your service is not aimed at children but is not inappropriate for them to use either, then your focus should be on assessing how appealing your service will be to them. If the nature, content or presentation of your service makes you think that children will want to use it, then you should conform to the standards in this code.

If you have an existing service and children form a substantive and identifiable user group, the 'likely to be accessed by' definition will apply.

Given the breadth of application, the ICO recognises that it will be possible to conform to this code in a risk-based and proportionate manner.

If you decide that your service is not likely to be accessed by children and that you are therefore not going to implement the code then you should document and support your reasons for your decision. You may wish to refer to market research, current evidence on user behaviour, the user base of similar or existing services and service types and testing of access restriction measures.

If you initially judge that the service is not likely to be accessed by children, but evidence later emerges that a significant number of children are in fact accessing your service, you will need to conform to the standards in this code or review your access restrictions if you do not think it is appropriate for children to use your service.

## Does it apply to services based outside the UK?

This code is issued under the DPA 2018. The DPA 2018 applies to online services based in the UK.

It also applies to online services based outside the UK that have a branch, office or other 'establishment' in the UK, and process personal data in the context of the activities of that establishment.

The DPA 2018 may also apply to some other services based outside the UK even if they don't have an establishment in the UK. If the relevant establishment is outside the European Economic Area (EEA), the DPA 2018 still applies if you offer your service to users in the UK, or monitor the behaviour of users in the UK. The code applies if that service is likely to be accessed by children.

If you don't have a UK establishment, but do have an establishment elsewhere in the EEA this code does not apply (even if you offer your service to UK users, or monitor the behaviour of users in the UK).

If the code applies to your processing but, under the GDPR 'one-stop-shop' arrangements you have a lead supervisory authority other than the ICO, then we may ask them to take the code into account when considering your compliance with the GDPR and PECR. Alternatively, if we consider the case to be a 'local' case (affecting UK users only), we may take action ourselves and take the code into account.

**How will this change when the UK leaves the EU?**

When the UK leaves the EU (or at the end of the implementation period, if the UK leaves the EU with a

deal), the UK regime will apply to services established in the EEA who are targeting UK users in the same way as to services established outside the EEA. The UK will no longer be part of the GDPR one-stop-shop system.

If you are established in the EEA and offer your service to UK users, or monitor the behaviour of users in the UK, this code will apply to you from exit day (or from the end of the implementation period if a deal is agreed).

## What about the eCommerce Regulations 2002?

The eCommerce Regulations 2002 (ECR) do not exempt you from compliance with your data protection obligations. Regulation 3(1)(b) of the ECR, as amended by Schedule 19 Part 2 paragraph 288 of the DPA 2018, states that:

> 66
>
> 'Nothing in these Regulations shall apply in respect of –
>
> (b) questions relating to information society services covered by the GDPR and Directive 2002/58/EC of the European Parliament and of the Council of 12th July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications)'

Whilst the ECR includes a 'safe harbour' regime for certain activities that you may carry out as an 'intermediary' service provider, it is important to note that:

- this does not remove your responsibility for data protection compliance, either in general or in relation to those activities; and
- the provisions of the GDPR are without prejudice to this regime.

The ICO will take the safe harbour regime into account, particularly in cases of complaints and potential regulatory action arising from activities relating to those that the safe harbour regime covers.

You should assess how the legal framework applies to activities you perform in your own right, and those which you perform as an intermediary. For example, an Internet Service Provider (ISP) or Mobile Network Operator (MNO) might provide core connectivity services as an intermediary service provider whilst also providing services such as customer service Apps or corporate websites in their own right. If necessary you may need to obtain specialist legal advice.

For more information, see the section on 'Enforcement of this Code'.

> **Further reading outside this code**
>
> For further information on the definition of an ISS see:
>
> Article 1(1) and Annex 1 of Directive (EU) 2015/1535 (Article 4(25) of the GDPR incorporates this definition into the GDPR) 🡵 Ker-Optika v ANTSZ (CJEU case C-108/09, 2 December 2010) 🡵 McFadden v Sony (CJEU case C-484/14, 15 September 2016) 🡵 Elite Taxi v Uber (Opinion of the AG in case C-434/15, 11 May 2017) 🡵

For more information on whether the GDPR applies, see our guidance:

Introduction to Data Protection - Which regime? ⧉

For more information on the GDPR one-stop-shop principle, see the EDPB guidelines on the lead supervisory authority ⧉.

The ICO has launched a consultation on a package of support for the providers of online services likely to be accessed by children.

# Transitional arrangements

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

Providers of ISS likely to be accessed by children should bring their processing in line with the standards in this code by 2 September 2021.

## In more detail

- [When will the code take effect?](#)
- [What should we do about our existing services?](#)

## When will the code take effect?

The code was issued on 12 August 2020.

It comes into force on 2 September 2020.

From 2 September 2021 the Commissioner must take the code into account when considering whether an online service has complied with its data protection obligations under the GDPR and PECR. The courts must also take the provision of the code into account, when relevant, from this date.

Our approach is to encourage conformance and we would encourage you to start preparing for the code taking effect sooner rather than later. In accordance with our Regulatory Action Policy, when considering any enforcement action we will take into account the efforts you have made towards conformance during the transition period, as well as the size and resources of your organisation, and the risks to children inherent in your data processing.

The code will apply to both new and existing services.

## What should we do about our existing services?

We recommend that you start by reviewing your existing services to establish whether they are covered.

For services that are covered, you should already have a DPIA – but you should now review it (or conduct a new one) as soon as possible. This will give you the maximum amount of time available to you to bring your processing into line with the standards in the code. You should focus on assessing conformance with the standards in this code and identifying any additional measures necessary to conform.

You should make changes to your service as soon as possible, and in any event by 2 September 2021.

Where changes include changes to physical rather than purely online products, then you should ensure that the necessary changes are incorporated into manufacturing cycles schedules commencing after 2 September 2021. For example, if you are making changes to packaging, printed information or the physical component of a connected toy or device. You will not be required to recall or amend existing stock, or to

amend manufacturing cycles that were already scheduled to commence before 2 September 2021 when this code came into force.

You should also consider how to manage any changes to the way in which your service operates with your existing users. You should think about how their online experience might change and how best to communicate and prepare them for these changes so that any impact is properly managed.

# Standards of age appropriate design

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Section 123 of the DPA 2018 says this code must contain:



"such guidance as the Commissioner considers appropriate on standards of age-appropriate design of relevant information society services which are likely to be accessed by children."

It defines 'standards of age-appropriate design' as:



"such standards of age-appropriate design of such services as appear to the Commissioner to be desirable having regard to the best interests of children."

The standards are not intended as technical standards, but as a set of technology-neutral design principles and practical privacy features. The focus of the code is to set a benchmark for the appropriate protection of children's personal data. Different services will require different technical solutions.

You must build the standards set out in this code into your design processes from the start, into subsequent upgrade and service development processes and into your DPIA process.

For more information on how we enforce these standards, see the separate section on enforcement of this code.

# 1. Best interests of the child

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

> The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child.

## What do you mean by 'the best interests of the child'?

The concept of the best interests of the child comes from Article 3 of the United Nations Convention on the Rights of the Child (UNCRC):



> "In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration."

The UNCRC incorporates provisions aimed at supporting the child's needs for safety, health, wellbeing, family relationships, physical, psychological and emotional development, identity, freedom of expression, privacy and agency to form their own views and have them heard. Put simply, the best interests of the child are whatever is best for that individual child.

The UNCRC expressly recognises the role of parents and carers (including extended family, guardians and others with legal responsibility) in protecting and promoting the best interests of the child.

It also recognises the child's right to privacy and freedom from economic exploitation. The importance of access to information, association with others, and play in supporting the child's development. And the child's right, in line with their evolving capacities, to have a voice in matters that affect them.

The UNCRC provides a framework which balances a number of different interests and concerns, with the intention of providing whatever is best for each individual child.

The placing of the best interests of the child as a 'primary consideration' recognises that the best interests of the child have to be balanced against other interests. For example the best interests of two individual children might be in conflict, or acting solely in the best interests of one child might prejudice the rights of others. It is unlikely however that the commercial interests of an organisation will outweigh a child's right to privacy.

## Why is this important?

This is important because the Information Commissioner is required to have regard to the United Kingdom's obligations under the UNCRC in drafting this code.

It is also important because it provides a framework to help you understand the needs of children and the

rights that you have to take into account when designing online services.

Article 5(1)(a) of the GDPR says personal data shall be:

> "
>
> "processed lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency)"

And recital 38 to the GDPR says:

> "
>
> "Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing…"

If you consider the best interests of child users in all aspects of your design of online services, then you should be well placed to comply with the 'lawfulness, fairness and transparency' principle, and to take proper account of Recital 38.

The principle of 'the best interests of the child' is therefore both something that you specifically need to consider when designing your online service, and a theme that runs throughout the provisions of this code.

## How can we make sure that we meet this standard?

**Consider and support the rights of children**

In order to implement this standard you need to consider the needs of child users and work out how you can best support those needs in the design of your online service, when you process their personal data. In doing this you should take into account the age of the user. You may need to use evidence and advice from expert third parties to help you do this.

In particular you should consider how, in your use of personal data, you can:

- keep them safe from exploitation risks, including the risks of commercial or sexual exploitation and sexual abuse;
- protect and support their health and wellbeing;
- protect and support their physical, psychological and emotional development;
- protect and support their need to develop their own views and identity;
- protect and support their right to freedom of association and play;
- support the needs of children with disabilities in line with your obligations under the relevant equality legislation for England, Scotland, Wales and Northern Ireland;
- recognise the role of parents in protecting and promoting the best interests of the child and support them in this task; and
- recognise the evolving capacity of the child to form their own view, and give due weight to that view.

Taking account of the best interests of the child does not mean that you cannot pursue your own commercial or other interests. Your commercial interests may not be incompatible with the best interests of the child, but you need to account for the best interests of the child as a primary consideration where any conflict arises.

**Further reading outside this code**

United Nations Convention of Rights of the Child ⬈

# 2. Data protection impact assessments

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.

## What do you mean by a 'DPIA'?

A DPIA is a defined process to help you identify and minimise the data protection risks of your service – and in particular the specific risks to children who are likely to access your service which arise from your processing of their personal data.

You should begin a DPIA early in the design of your service, before you start your processing. It should include these steps:

- Step 1: identify the need for a DPIA
- Step 2: describe the processing
- Step 3: consider consultation
- Step 4: assess necessity and proportionality
- Step 5: identify and assess risks arising from your processing
- Step 6: identify measures to mitigate the risks
- Step 7: sign off, record and integrate outcomes

The DPIA process is designed to be flexible and scalable. You can design a process that fits with your existing approach to design and development, as long as it contains these key elements, and the outcomes influence the design of your service. It does not need to be a time-consuming process in every case.

**Further reading outside this code**

See our detailed guidance on DPIAs ⧉

## Why are DPIAs important?

DPIAs are a key part of your accountability obligations under the GDPR, and help you adopt a 'data protection by design' approach. A good DPIA is also an effective way to assess and document your compliance with all of your data protection obligations and the provisions of this code.

The GDPR says you must do a DPIA before you begin any **type of processing** that is **likely to result in a high risk** to the rights and freedoms of individuals.

This is not about whether your service is actually high risk, but about screening for potential indicators of

high risk. The nature and context of online services within the scope of this code mean they inevitably involve a type of processing likely to result in a high risk to the rights and freedoms of children.

The ICO is required by Article 35(4) of the GDPR to publish a list of processing operations that require a DPIA. This list supplements GDPR criteria and relevant European guidelines, and includes:

> 66
>
> "the use of the personal data of children or other vulnerable individuals for marketing purposes, profiling or other automated decision-making, or if you intend to offer online services directly to children."

Online services may also trigger several other criteria indicating the need for a DPIA, including innovative technology, large-scale profiling, biometric data, and online tracking. In practice, this means that if you offer an online service likely to be accessed by children, you must do a DPIA.

However, DPIAs are not just a compliance exercise. Your DPIA should consider compliance risks, but also broader risks to the rights and freedoms of children that might arise from your processing, including the potential for any significant material, physical, psychological or social harm.

An effective DPIA allows you to identify and fix problems at an early stage, designing data protection in from the start. This can bring cost savings and broader benefits for both children and your organisation. It can reassure parents that you protect their children's interests and your service is appropriate for children to use. The consultation phase of a DPIA can also give children and parents the chance to have a say in how their data is used, help you build trust, and improve your understanding of child-specific needs, concerns and expectations. It may also help you avoid reputational damage later on.

## How can we make sure that we meet this standard?

There is no definitive DPIA template, but you can use or adapt the template included as an annex to this code if you wish.

You must consult your Data Protection Officer (DPO) (if you have one) and, where appropriate, individuals and relevant experts. Any processors may also need to assist you.

Your DPIA must have a particular focus on the specific rights of and risks to children using your service that arise from your data processing. It should also assess and document your compliance with this code. You should build these additional elements into each stage of your DPIA, not bolt them on the end.

You need to follow the usual DPIA process set out in our separate guidance on how to conduct a DPIA ⧉, but you should build in the following specific issues at each stage.

**Step 1: Identify when to do your DPIA**

You must embed a DPIA into the design of any new online service that is likely to be accessed by children. You must complete your DPIA before the service is launched, and ensure the outcomes can influence your design. You should not treat a DPIA as a rubber stamp or tick-box exercise at the end of the design process.

You must also do a DPIA if you are planning to make any significant changes to the processing operations

of an existing online service likely to be accessed by children.

An external change to the wider context of your service may also prompt you to review your DPIA. For example, if a new security flaw is identified, or a new public concern is raised over specific features of your service or particular risks to children.

**Further reading outside this code**

[ICO list of processing operations that require a DPIA](#) ⬈
[European guidelines on DPIAs](#) ⬈

**Step 2: Describe the processing**

You need to describe the nature, scope, context and purposes of the processing. In particular, you should include:

- whether you are designing your service for children;
- if not, whether children are nevertheless likely to access your service;
- the age range of those children;
- your plans, if any, for parental controls;
- your plans, if any, for establishing the age of your individual users;
- the intended benefits for children;
- the commercial interests (of yourself or third parties) that you have taken into account
- any profiling or automated decision-making involved;
- any geolocation elements;
- the use of any nudge techniques;
- any processing of special category data;
- any processing of inferred data;
- any current issues of public concern over online risks to children;
- any relevant industry standards or codes of practice;
- your responsibilities under the applicable equality legislation for England, Scotland, Wales and Northern Ireland; and
- any relevant guidance or research on the development needs, wellbeing or capacity of children in the relevant age range.

**Step 3: Consult with children and parents**

Depending on the size of your organisation, resources and the risks you have identified, you can seek and document the views of children and parents (or their representatives), and take them into account in your design.

We will expect larger organisations to do some form of consultation in most cases. For example, you could choose to get feedback from existing users, carry out a general public consultation, conduct market research, conduct user testing, or contact relevant children's rights groups for their views. This should

include feedback on the child's ability to understand the ways you use their data and the information you provide. If you consider that it is not possible to do any form of consultation, or it is unnecessary or wholly disproportionate, you should record that decision in your DPIA, and be prepared to justify it to us. However, it is usually possible to carry out some form of market research or user feedback.

You should also consider seeking independent advice from experts in children's rights and developmental needs as part of this stage. This is especially important for services which:

- are specifically designed for children;
- are designed for general use but known to be widely used by children (such as games or social media sites); or
- use children's data in novel or unanticipated ways.

## Step 4: Assess necessity, proportionality and compliance

You need to explain why your processing is necessary and proportionate for your service. You must also include information about how you comply with the GDPR, including:

- your lawful basis for processing (see Annex C);
- your condition for processing any special category data;
- measures to ensure accuracy, avoid bias and explain use of AI; and
- specific details of your technological security measures (eg hashing or encryption standards).

In addition, at this stage you should include an explanation of how you conform to each of the standards set out in this code.

## Step 5: Identify and assess risks

You must consider the potential impact on children and any harm or damage your data processing may cause – whether physical, emotional, developmental or material. You should also specifically look at whether the processing could cause, permit or contribute to the risk of:

- physical harm;
- online grooming or other sexual exploitation;
- social anxiety, self-esteem issues, bullying or peer pressure;
- access to harmful or inappropriate content;
- misinformation or undue restriction on information;
- encouraging excessive risk-taking or unhealthy behaviour;
- undermining parental authority or responsibility;
- loss of autonomy or rights (including control over data);
- compulsive use or attention deficit disorders;
- excessive screen time;
- interrupted or inadequate sleep patterns;
- economic exploitation or unfair commercial pressure; or
- any other significant economic, social or developmental disadvantage.

You should bear in mind children's needs and maturity will differ according to their age and development

stage. Annex B should help you to consider this.

To assess the level of risk, you must consider both the likelihood and the severity of any impact on children. High risk could result from either a high probability of some harm, or a lower possibility of serious harm. You should bear in mind that some children will be less resilient than others, so you should always take a precautionary approach to assessing the potential severity of harm. You may find that there is a high risk for some age ranges, even if the risk for other age ranges is lower.

### Step 6: Identify measures to mitigate those risks

You must consider whether you could make any changes to your service to reduce or avoid each of the risks you have identified. As a minimum, you should implement the measures set out in this code, but you should also consider whether you can put any additional safeguards in place as part of your service design.

Transparency is important. However, you should also identify and consider measures that do not rely on children's ability or willingness to engage with your privacy information.

### Step 7: Record the conclusion

If you have a DPO, you must record their independent advice on the outcome of the DPIA before making any final decisions.

You should record any additional measures you plan to take, and integrate them into the design of your service. If you identify a high risk that you are not mitigating, you must consult the ICO before you can go ahead.

It is good practice to publish your DPIA.

**Further reading outside this code**

See our detailed guidance on DPIAs ⧉

# 3. Age appropriate application

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead.

## What do you mean by 'age appropriate application'?

This means that the age range of your audience and the different needs of children at different ages and stages of development should be at the heart of how you design your service and apply this code.

It also means you must apply this code so that all children are given an appropriate level of protection in how their personal data is used. There is flexibility for you to decide how to apply this standard in the context and circumstances of your online service. It will usually mean establishing (with a level of certainty that is appropriate to the risks to the rights and freedoms that arise from your data processing ) what age range your individual users fall into, so that you can tailor the protections and safeguards you give to their personal data accordingly, by applying the standards in this code. You should use your DPIA to help you assess this.

Alternatively, if you can't or don't wish to do this, you could choose to apply the standards to all your users instead. This is so that children are afforded some protection against the risks that arise from how their personal data is used, even if you aren't sufficiently certain whether they are children or not.

## Why is this important?

The ultimate aim of this code is to ensure that online services likely to be accessed by children are appropriate for their use and meet their development needs.

Understanding the age range of children likely to access the service – and the different needs of children at different ages and stages of development – is fundamental to the whole concept of 'age-appropriate design'.

Children are individuals, and age ranges are not a perfect guide to the interests, needs and evolving capacity of each child. However, to help you assess what is appropriate for children broadly of that age, you can use age ranges as a guide to the capacity, skills and behaviours a child might be expected to display at each stage of their development. For the purposes of this code, we have used the following age ranges and developmental stages as a guide:

- 0 - 5: pre-literate and early literacy
- 6 - 9: core primary school years
- 10-12: transition years
- 13-15: early teens

- 16-17: approaching adulthood

There is no requirement for you to design services for development stages that aren't likely to access your service, or to use these exact age ranges if you can justify why slightly different age groupings are more appropriate for your particular service.

Further information about relevant capacities, needs, skills and behaviours at each stage is set out at Annex B of this code for reference purposes, and where relevant throughout these standards.

You should also consider the needs of disabled children in line with any obligations you may have under the relevant equality legislation for England, Scotland, Wales and Northern Ireland.

The GDPR and DPA 2018 also specify that if you rely on consent for any aspects of your online service, you need to get parental authorisation for children under 13. If you do rely on consent as your lawful basis for processing personal data then these provisions have significant practical implications for you. Meeting the standards in this code should allow you to comply with these GDPR requirements in a proportionate way. See Annex C for full details.

## How can we make sure that we meet this standard?

**Consider the risks to children that arise from your data processing, and the level of certainty you have that you know the age of your users**

You can implement this standard by following these steps:

- Think about the risks to children that would arise from your processing of their personal data. Your DPIA will help you to do this. You may wish to take into account factors such as: the types of data collected; the volume of data; the intrusiveness of any profiling; whether decision making or other actions follow from profiling; and whether the data is being shared with third parties. Both the ICO and the European Data Protection Board have also provided guidance on DPIAs which consider assessing risk in more detail.
- Consider how well you know your users. How certain are you that an individual user is an adult or a child? How confident are you about the age range your individual child users fall into.
- Decide whether the level of certainty you have about the age of your individual users is appropriate to the risks that arise from your data processing.
- If it is, then you can apply the rest of the standards in this code to your child users only.
- If it isn't, then decide whether you prefer to:
  - reduce the data risks inherent in your service;
  - put additional measures in place to increase your level of age confidence; or
  - apply the standards in this code to all users of your service (regardless of whether they have self-declared as an adult or a child).

## How can we establish age with an appropriate level of certainty?

This code is not prescriptive about exactly what methods you should use to establish age, or what level of certainty different methods provide. This is because this will vary depending on the specifics of the techniques you use. We want to allow enough flexibility for you to use measures that suit the specifics of your individual service and that can develop over time. However you should always use a method that is appropriate to the risks that arise from your data processing.

Some of the methods you may wish to consider are listed below. This list is not exhaustive. Other measures may exist or emerge over time. In assessing whether you have chosen an appropriate method, we will take into account the products currently available in the marketplace, particularly for small businesses which don't have the resources to develop their own solutions.

- **Self-declaration** – This is where a user simply states their age but does not provide any evidence to confirm it. It may be suitable for low risk processing or when used in conjunction with other techniques. Even if you prefer to apply the standards in the code to all your users, self-declaration of age can provide a useful starting point when providing privacy information and age appropriate explanations of processing (see 'What does applying the standards to all users mean in practice?' for more detail).

- **Artificial intelligence** – It may be possible to make an estimate of a user's age by using artificial intelligence to analyse the way in which the user interacts with your service. Similarly you could use this type of profiling to check that the way a user interacts with your service is consistent with their self-declared age. This technique will typically provide a greater level of certainty about the age of users with increased use of your service. If you choose to use this technique then you need to:

  - tell users that you are going to do this upfront;

  - only collect the minimum amount of personal data that you need for this purpose; and

  - don't use any personal data you collect for this purpose for other purposes.

- **Third party age verification services** – You may choose to use a third party service to provide you with an assurance of the age of your users. Such services typically work on an 'attribute' system where you request confirmation of a particular user attribute (in this case age or age range) and the service provides you with a 'yes' or 'no' answer. This method reduces the amount of personal data you need to collect yourself and may allow you to take advantage of technological expertise and latest developments in the field. If you use a third party service you will need to carry out some due diligence checks to satisfy yourself that the level of certainty with which it confirms age is sufficient (PAS standard 1296 'Online age checking' may help you with this), and that it is compliant with data protection requirements. You should also provide your users with clear information about the service you use.

- **Account holder confirmation** - You may be able to rely upon confirmation of user age from an existing account holder who you know to be an adult. For example, if you provide a logged-in or subscription based service, you may allow the main (confirmed adult) account holder to set up child profiles, restrict further access with a password or PIN, or simply confirm the agerange of additional account users.

- **Technical measures** – Technical measures which discourage false declarations of age, or identify and close under age accounts, may be useful to support or strengthen self-declaration mechanisms. Examples include neutral presentation of age declaration screens (rather than nudging towards the selection of certain ages), or preventing users from immediately resubmitting a new age if they are denied access to your service when they first self-declare their age.

- **Hard identifiers** – You can confirm age using solutions which link back to formal identify documents or 'hard identifiers' such as a passport. However, we recommend that you avoid giving users no choice but to provide hard identifiers unless the risks inherent in your processing really warrant such an approach. This is because some children do not have access to formal identity documents and may have limited parental support, making it difficult for them to access age verified services at all, even if they are age appropriate. Requiring hard identifiers may also have a disproportionate impact on the privacy of adults.

We recognise that methods of age assurance will vary depending on whether the service is used by authenticated or non-authenticated users (eg whether users are logged in) and that the risks may also vary

in this context.

## What if we need to collect personal data in order to establish age?

You may be able to collect and record personal data which provides an assurance of age yourself. If so, remember that you need to comply with data protection obligations for your collection and retention of that data, including data minimisation, purpose limitation, storage limitation and security obligations.

The key to this is making sure that you only collect the minimum amount of personal data you need to give you an appropriate level of certainty about the age of your individual users, and making sure you don't use personal data collected for the purposes of establishing or estimating age in order to conform to this code for other purposes.

For example, if you use profiling to help you estimate the age of individual users so that you can apply the standards in this code, then you can use that profile information to ensure that you:

- provide age appropriate privacy information and nudges;
- provide high privacy settings for child users by default; and
- don't serve children content deemed detrimental to their health and wellbeing.

You can't however simply re-purpose that information for other purposes, such as targeting children with advertising for products you think they might like, or sending them details of 'birthday offers'. If you want to profile children for this purpose then you need their consent. See the section of this code on profiling for further detail.

We recognise there is a tension between age assurance and compliance with GDPR, as the implementation of age assurance could increase the risk of intrusive data collection. We do not require organisations to create these counter risks. However, age assurance and GDPR are compatible if privacy by design solutions are used.

Age-assurance tools are still a developing area. The Commissioner will support work to establish clear industry standards and certification schemes to assist children, parents and online services in identifying age-assurance services which comply with data protection standards.

## What does applying the standards to all users mean in practice?

If you don't have a level of certainty about the age of your users that is appropriate to the risks to children arising from your data processing, then your alternative is to apply the standards in the code to all users. This should mean that even if you don't really know how old a user is, or if a child has lied about their age, children will still receive some important protections in how their personal data is used.

However, it doesn't mean that you have to ignore any information you do have about the user's age, or that adult users have to be infantilised. It just means that all users will receive some basic protections in how their personal data is used by default.

You should apply the standards in the code in a way that recognises both the information you do have about the users age and the fact that your level of confidence in this information is inadequate to the risks inherent in your processing. For example, providing privacy information that is appropriate to the self-declared age of the user, but giving them the option to access versions written for different age groups as well.

**Further reading outside this code**

ICO detailed guidance on DPIAs ↗
European guidelines on DPIAs ↗
PAS standard 1296 Online Age Checking- code of practice ↗

# 4. Transparency

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent, and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated.

## What do you mean by 'transparency'?

Transparency is about being clear, open and honest with your users about what they can expect when they access your online service.

## Why is it important?

Transparency is key to the requirement under Article 5(1) of the GDPR to process personal data:



"lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency')"

The GDPR also contains more specific provisions about the information that you must give to data subjects when you process their personal data. These are set out at Article 13 (when you have obtained the personal data directly from the data subject) and Article 14 (when you have not obtained the personal data directly from the data subject).

Article 12 of the GDPR requires you to provide children with this information in a way in which they can access and understand it:



"The controller shall take appropriate measures to provide any information referred to in Article 13 and 14 and any communication under Articles 15 to 22 and 34 relating to processing to the data subject in a concise, transparent, intelligible and easily accessible form,  using clear and plain language, in particular for any information addressed specifically to a child. The information shall be provided in writing, or by other means, including, where appropriate, by electronic means. When requested by the data subject the information may be provided orally, provided that the identity of the data subject is proven by other means."

On a wider level transparency is also intrinsic to the fairness element of Article 5(1). If you aren't clear,

open and honest about the service that you provide and the rules that govern that service, then your original collection and ongoing use of the child's personal data is unlikely to be fair.

## How can we make sure that we meet this standard?

**Provide clear privacy information**

Firstly you need to provide the privacy information set out in Articles 13 and 14 in a clear and prominent place on your online service. You should make this information easy to find and accessible for children and parents who seek out privacy information.

However, it is not sufficient to rely on children or their parents seeking out this privacy information.

**Provide 'bite-sized' explanations at the point at which use of personal data is activated**

In order to provide children with the specific protection envisaged by Recital 38 you should also provide clear information about what you do with children's personal data in more specific, 'bite-size' explanations, at the point at which the use of the personal data is activated. This is sometimes referred to as a 'just in time notice'. Depending on the age of the child and the risks inherent in the processing, you should also prompt them to speak to an adult before they activate any new use of their data, and not to proceed if they are uncertain.

You should also consider if there are any other points in your user journey when it might be appropriate to provide bite-sized explanations to aid the child's understanding of how their personal data is being used.

**Provide clear terms, policies and community standards**

All other information you provide for users about your service should also be clear and accessible. This includes terms and conditions, policies and community standards.

In every case you should provide information that is accurate and does not promise protections or standards that are not routinely upheld.

This should help children or their parents make properly informed decisions about whether to provide the information required to access or sign up to your service in the first place, and to continue to use it.

If you believe that you need to draft your terms and conditions in a certain way in order to make them legally robust, then you can provide child-friendly explanations to sit alongside the legal drafting.

**Present information in a child friendly way**

You should present all this information in a way that is likely to appeal to the age of the child who is accessing your online service.

This may include using diagrams, cartoons, graphics, video and audio content, and gamified or interactive content that will attract and interest children, rather than relying solely on written communications.

You may use tools such as privacy dashboards, layered information, icons and symbols to aid children's understanding and to present the information in a child-friendly way. You should consider the modality of your service, and take into account user interaction patterns that do not take place in screen-based environments, as appropriate.

Dashboards should be displayed in a way that clearly identifies and differentiates between processing that is essential to the provision of your service and non-essential or optional processing that the child can choose whether to activate.

**Tailor your information to the age of the child**

You need to consider how you can tailor the content and presentation of the information you provide depending on the age of the user.

There may be some scenarios in which providing one, simplified, accessible to all, set of information may work. For example, if you are an online retailer which only collects the personal data needed to complete online transactions and deliver goods.

However, in many cases a-one-size-fits-all approach does not recognise that children have different needs at different stages of their development. For example, a pre-literate or primary school child might need to be actively deterred from changing privacy settings without parental input, whereas a teenager might be better supported by clear and neutral information which helps them make their own informed decision.

For more information about the developmental needs of children at different ages please see Annex B to this code.

For younger children, with more limited levels of understanding, you may need to provide less detailed information for the child themselves and rely more on parental involvement and understanding. However you should never use simplification with the aim of hiding what you are doing with the child's personal data and you should considerproviding detailed information for parents, to sit alongside your child directed

information.

You should make all versions of resources (including versions for parents) easily accessible and incorporate mechanisms to allow children or parents to choose which version they see, or to down-scale or up-scale the information depending on their individual level of understanding.



I don't get this – can you make it a bit easier for me?



This is a bit basic for me – can you give me some more detail?

The following table provides some recommendations. However, they are only a starting point and you are free to develop your own service specific information and user journeys which take account of the risks inherent in your service.

Depending on the size of your organisation, your number of users, and your assessment of risk you may decide to carry out user testing to make sure that the information you provide is sufficiently clear and accessible for the age range in question. You should document the results of any user testing in your DPIA to support your final conclusions and justify the presentation and content of your final resources. If you decide that user testing isn't warranted, then you should document the reasons why in your DPIA.

You should also consider any additional responsibilities you may have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland.

| Age range | Recommendations |
| --- | --- |
| 0-5<br>Pre-literate & early literacy | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide audio or video prompts telling children to |

|  | leave things as they are or get help from a parent or trusted adult if they try and change any high privacy default settings. |
|---|---|
| 6-9<br>Core primary school years | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide cartoon, video or audio materials to sit alongside parental resources. Explain the basic concepts of online privacy within your service, the privacy settings you offer, who can see what, their information rights, how to be in control of their own information, and respecting other people's privacy. Explain the basics of your service and how it works, what they can expect from you and what you expect from them.<br><br>Provide resources for parents to use with their children to explain privacy concepts and risks within your service. Provide resources for parents to use with their children to explain the basics of your service and how it works, what they can expect from you and what you expect from them.<br><br>If a child attempts to change a default high privacy setting provide cartoon, video or audio materials to explain what will happen to their information and any associated risks. Tell them to leave things as they are or get help from a parent or trusted adult before they change the setting. |
| 10-12<br>Transition years | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for children within this age group. Allow children to choose between written and video/audio options. Give children the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.<br><br>If a child attempts to change a default high privacy setting provide written, cartoon, video or audio materials to explain what will happen to their information and any associated risks. Tell them to leave things as they are or get help from a parent or trusted adult before they change the setting. |
| 13 -15<br>Early teens | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for this age group. Allow them to choose between written and |

video/audio options. Give them the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.

If a child attempts to change a default high privacy setting provide written, video or audio materials to explain what will happen to their information and any associated risks. Prompt them to ask for help from a parent or trusted adult and not change the setting if they have any concerns or don't understand what you have told them.

Provide full information in a format suitable for parents to sit alongside the child focused information.

| | |
|---|---|
| 16-17<br>Approaching adulthood | Provide full information in a format suitable for this age group. Allow them to choose between written and video/audio options. Give them the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.<br><br>If a child in this age group attempts to change a default high privacy setting provide written, video or audio materials to explain what will happen to their information and any associated risks. Prompt them to check with an adult or other source of trusted information and not change the setting if they have any concerns or don't understand what you have told them.<br><br>Provide full information in a format suitable for parents to sit alongside the child focused information. |

**Further reading outside this code**

Guide to the GDPR – lawfulness, fairness and transparency ⧉
Guide to the GDPR – the right to be informed ⧉

# 5. Detrimental use of data

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions, or Government advice.

## What do you mean by 'the detrimental use of data'?

We mean any use of data that is obviously detrimental to children's physical or mental health and wellbeing or that goes against industry codes of practice, other regulatory provisions or Government advice on the welfare of children.

## Why is this important?

Article 5(1)(a) of the GDPR says that personal data must be processed lawfully, fairly and in a transparent manner in relation to the data subject, and Recital 38 that children merit specific protection with regard to the use of their personal data.

Recital 2 to the GDPR states (emphasis added):

> 66
>
> "The principles of, and rules on the protection of natural persons with regard to the processing of their personal data should, whatever their nationality or residence, respect their fundamental rights and freedoms, in particular their right to the protection of personal data. **This Regulation is intended to contribute to ... the well-being of natural persons.**"

Recital 75 to the GDPR says that:

> 66
>
> "The risk to the rights and freedoms of natural persons, or varying likelihood and severity may result from personal data processing which could lead to physical, material or non-material damage, in particular:....where personal data of vulnerable natural persons, in particular children, are processed...."

This means that you should not process children's personal data in ways that are obviously, or have been shown to be, detrimental to their health or wellbeing. To do so would not be fair.

## How can we make sure that we meet this standard?

**Keep up date with relevant recommendations and advice**

As a provider of an online service likely to be accessed by children you should be aware of relevant standards and codes of practice within your industry or sector, and any provisions within them that relate to children. You should also keep up to date with Government advice on the welfare of children in the context of digital or online services. The ICO does not regulate content and is not an expert on matters of children's health and wellbeing. We will however refer to other codes of practice or regulatory advice where relevant to help us assess your conformance to this standard.

**Do not process children's personal data in ways that are obviously detrimental or run counter to such advice**

You should not process children's personal data in ways that run contrary to those standards, codes or advice and should take account of any age specific advice to tailor your online service to the age of the child. You should take particular care when profiling children, including making inferences based on their personal data, or processing geo-location data.

You should apply a pre-cautionary approach where this has been formally recommended despite evidence being under debate. This means you should not process children's personal data in ways that have been formally identified as requiring further research or evidence to establish whether or not they are detrimental to the health and wellbeing of children.

## What codes or advice are likely to be relevant?

Some specific areas where there is relevant guidance, and that are likely to arise in the context of providing your online service are given below.

However, this is not an exhaustive list and you need to identify and consider anything that is relevant to your specific data processing scenario in your DPIA.

**Marketing and behavioural advertising**

The Committee of Advertising Practice (CAP) publishes guidance about online behavioural advertising which, in addition to providing rules applicable to all advertising, specifically covers advertising to children.

It includes rules which address:

- physical, mental or moral harm to children;
- exploiting children's credulity and applying unfair pressure;
- direct exhortation of children and undermining parental authority; and
- promotions.

It also has rules which govern or prohibit the marketing of certain products, such as high fat, salt and sugar food and drinks and alcohol, to children, and general guidance on transparency of paid-for content and product placement.

**Broadcasting**

Ofcom has published a code practice for broadcasters which covers the protection of under-18s in the following areas:

- the coverage of sexual and other offences in the UK involving under-18s;
- drugs, smoking, solvents and alcohol;

- violence and dangerous behaviour;
- offensive language;
- sexual material;
- nudity;
- exorcism, the occult and the paranormal; and
- the involvement of people under 18 in programmes.

**The press**

The Independent Press Standards Organisation (Ipso) has published The Editors' Code of Practice which includes provisions about reporting and children.

**Online games**

The Office for Fair Trading (OFT) has published principles for online and app-based games which includes provisions about:

- exploiting children's inexperience, vulnerability and credulity, including by aggressive commercial practices; and
- including direct exhortations to children to buy advertised products or persuade their parents or other adults to buy advertised products for them.

**Strategies used to extend user engagement**

Strategies used to extend user engagement, sometimes referred to as 'sticky' features can include mechanisms such as reward loops, continuous scrolling, notifications and auto-play features which encourage users to continue playing a game, watching video content or otherwise staying online.

Although there is currently no formal Government position on the effect of these mechanisms on the health and wellbeing of children, the UK Chief Medical Officers have issued a 'commentary on screen-based activities on children and young people'. This identifies a need for further research and in the meantime recommends that technology companies 'recognise a precautionary approach in developing structures and remove addictive capabilities.'

## Does this mean we can't use features such as rewards, notifications and 'likes' within our service?

No, not all such features rely on the use of personal data and you may have designed your feature taking into account the needs of children and in a way that makes it easy for them to disengage without feeling pressurised or disadvantaged if they do so. However, it does mean that you need to carefully consider the impact on children if you use their personal data to support such features. You should consider both intended and unintended consequences of the data use as part of your DPIA.

Given the precautionary advice from the Chief Medical Officers, designing in data-driven features which make it difficult for children to disengage with your service is likely to breach the Article 5(1)(a) fairness principle of the GDPR. For example, features which use personal data to exploit human susceptibility to reward, anticipatory and pleasure seeking behaviours, or peer pressure.

You should:

- avoid using personal data in a way that incentivises children to stay engaged, such as offering children personalised in-game advantages (based upon your use of the individual user's personal data) in

return for extended play;

- present options to continue playing or otherwise engaging with your service neutrally without suggesting that children will lose out if they don't;

- avoid features which use personal data to automatically extend use instead of requiring children to make an active choice about whether they want to spend their time in this way (data-driven autoplay features); and

- introduce mechanisms such as pause buttons which allow children to take a break at any time without losing their progress in a game, or provide age appropriate content to support conscious choices about taking breaks, such as that provided in the Chief Medical Officers' advice.

---

**Further reading outside the code**

Committee on Advertising Practice guidance 🗗

The Ofcom Broadcasting Code (with the Cross-Promotion Code and the On Demand Programme Service Rules) 🗗

The Editors' Code of Practice

OFT principles for online and app-based games 🗗

UK Chief Medical Officers' commentary on 'screen based activities and children and young people's mental health and psychosocial wellbeing: a systematic map of reviews' 🗗

# EXHIBIT B-1

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Introduction                                                      2
Step 1: Identify the need for a DPIA                              3
Step 2: Describe the processing                                   4
Step 3: Consultation process                                     14
Step 4: Assess necessity and proportionality                     15
Step 5: Identify and assess risks                                19
Step 6: Identify measures to reduce risk                         21
Step 7: Sign off and record outcomes                             23

# Introduction

This document is intended as an example of good practice to help companies creating mobile gaming apps for use by children in the UK. It will help you to understand and apply the ICO's Children's code, formally known as the Age-appropriate design code. It specifically applies to Standard 2 of the code, which relates to the need for Data Protection Impact Assessments (DPIAs) for Information Society Services (ISS) likely to be accessed by children (under age 18) in the UK. Before starting to review the DPIA sample, you might find it helpful to read the code's DPIA standard.

The product used in this sample is imaginary, and is not intended to represent an actual product. The product specification developed by Fundamentally Games, from which the DPIA was developed.

You can access the product specification for the fictional online, mobile app-based game here ⧉.

This sample DPIA is adapted from the ICO's DPIA template, and follows the process set out in our DPIA guidance and the code. You should read it alongside the code's DPIA guidance, and the Criteria for an acceptable DPIA set out in European guidelines.

We welcome recommendations for improvements or other feedback on this sample DPIA. Please email your comments to [email protected].

**Guidance:** You may find it helpful to use the ICO's design guidance, which includes gaming worked examples of the data privacy moments and age-appropriate mindsets. These worked examples are based on the product specification developed by Fundamentally Games and can help you identify what data you are processing and any risks associated with the processing.

**Name of controller:** The Mobile Game Company

**Subject/title of DPIA:** Cooking Numbers mobile app

# Step 1: Identify the need for a DPIA

Explain broadly the nature of your online service, and the current stage of design or development. You may find it helpful to refer or link to other documents. Summarise when and how you identified the need for a DPIA.

**Guidance:** Standard 2 of the Children's code requires Information Society Services (ISS)* to undertake a DPIA if they are processing children's data. Therefore, it may be useful to reference the Children's code requirement in step 1. See Standard 2 of the Children's code - DPIAs:

"Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.

*An Information Society Service is defined as "any services normally provided for remuneration, at a distance, by electronic means and at the individual request of a recipient of services." You can see the Services covered by this code for more information on whether you may be in scope of the Children's code.

We are launching a mobile app game called Cooking Numbers aimed at children between the ages of five and eight. It has a PEGI rating of three meaning that it is suitable for all age groups. It will be available from the iOS App Store, Android App Store and Amazon App Store in English, French, Italian, German and Spanish. The game is monetised through a combination of in-app purchases, advertisements and subscription.

Development of the game is complete. We will be launching the game on platforms within six weeks.

No personal data is captured by this game, however we have drafted this DPIA to explain:

- how game play data is used to support monetisation;
- how data is anonymised to ensure no personal data is retained;
- why the game is not collecting personal data; and
- the wider ecosystem (eg app stores) may be collecting personal data that is not shared with us.

**Helpful hint:** You can see the ICO's guidance on what activities are considered likely to result in a high risk and need a DPIA. You should also review the Children's code harms framework. The framework is a flexible tool for identifying data-related risks to children that you need to consider when completing your DPIA. Its aim is to support online services to place children's best interests at the heart of their services.

# Step 2: Describe the processing

**Describe the nature of the processing**: how will you collect, use, store and delete data? What are the sources of the data? Will you be sharing data with anyone? You might find it useful to refer to a flow diagram or other way of describing data flows. What types of processing identified as likely high risk are involved? Does your service involve any profiling, automated decision-making, or geolocation elements? What are your plans (if any) for age-assurance? What are your plans (if any) for parental controls?

> **Helpful hint:** You may find it helpful to consult your privacy notice or Record of Processing Activities (ROPA) which may contain some of the information required for this section. You might also find it helpful to see the ICO's guidance on ROPAs.

## What data we collect and how

In the game, children act as 'chefs' and have to pull together ingredients from two conveyor belts. Each ingredient is assigned a number, and children have to select the ingredients that will make the value shown on the empty plate of the customer they are serving. For example, the customer's plate says five and the player is told the function is addition, so they have to select two ingredients with values that add up to five (ie two and three). The numbers may be positive or negative and some ingredients can also be maths functions such as multipliers or dividers. If children miss ingredients they fall into the trash and too many lost ingredients trigger a fail condition.

Throughout the game, the player competes against a non-player character (NPC) rival. The NPC animation shows them working off-screen and gaining a score through those unseen actions. The NPC's score is based on weighted average data from other players.

The theme of the restaurant will change every month. For example, dinosaur theme with characters, background and ingredients being dinosaur related; farm animal theme with the player as a farmer, the customers as pigs, cows etc.

Players build up scores per scheme based on accuracy, speed and numbers of orders fulfilled. When the gameplay ends, the player is shown:

- their score;
- comparison against the NPC score;
- highlighted information if they have beaten their previous score for that theme or across all themes; and
- their rewards which are the option to share their success with friends or achievement badges.

The app includes social features that allow players to share their progress; a three second animation of their gameplay; their score (against the NPC); achievement badge(s) unlocked; and emoticons. The emoticons that players can access are a fixed selection by the game but will include variations and unique options tied into each theme the player has access to.

This share will go out only to the player's 'family circle', who are specific players that have been approved by the parents. This parental lock will use the device requirements. For example on iOS it will use Game

Centre, where parents can lock controls so that only they can approve users for their child to interact with. Note that we do not collect personal data related to family circle. The app store will have personal data on the parent and the people that they accept linking to (this is the existing data they would have on any user on their platform, plus their standard parental controls). Therefore, we do not collect any specific or additional data.

Note: if the device does not have a similar system, then the social features will not be enabled in the game. Although in future we may look to build our own parental lock system within the game and then consider expanding social features within this.

Players have the option to opt-in to notifications which inform them regularly about daily challenges, events, promotions, new content and features and new themes. The controls for the notifications feature is within the platform level parent control function. This option is set as off-by-default when a user first starts using the app, and can be easily changed in the settings should the player choose to opt-in.

The game has been designed with the age of users in mind. We have been careful to employ privacy by design features when considering the use of personal data in the advertising and monetisation ecosystem for online gaming. For Cooking Numbers, we have selected appropriately controlled forms of monetisation that protect the personal data of the children using the game:

- Rewarded video ads
  - Children have the option to watch ads to get temporary access to another theme (a theme which is not the theme of the current month).
  - We use an ad provider that specialises in serving ads which are suitable for children.
  - Ads are limited, so once a player has used an ad, they will not see another one for a fixed time period.
  - Ads clearly differentiate end of play and start of advertising.
  - Only ads and brands suitable for five to eight year olds are served.
  - The ads shown request or require no direct action from the player.
  - Ads are only served based on game-play. They are not contextual or triggered by specific user behaviour. The ad company knows the game where it is posting ads. The ads are not based on user behaviour, but are instead triggered by game-play data. Age appropriate ads are delivered in collaboration with SuperAwesome.

- In-app purchases
  - In-app purchases are for one purpose only – to purchase permanent access to a theme. This enables the player to have permanent access to that theme, regardless of whether it is the current theme of the month.
  - Each theme can be purchased for a one-time cost, which may vary per theme.
  - At certain times, promotions will be offered to encourage purchases (eg 50% off, as a limited-time offer).

- Subscriptions
  - A subscription option is available to enable subscribers access to new themes before other players and to allow access to all released themes permanently (whilst they continue to be subscribed).
  - The subscription is a monthly fee.

Payments for subscriptions and in-app purchases are managed through the relevant app store payment system and are therefore subject to the parental controls of the relevant device being used.

We collect the following data from children's use of the game:

- Performance or game-play data (eg when the app is launched or closed; time zone in which player located; when play starts or finishes; actions whilst playing; how or if ads are watched; how much of tutorials are watched, details of purchases from the shop; scores achieved; choices made within the game).
- Device data (eg device type, version number).
- Date and time of presentation of privacy pop-up notices clicked off by children.
- History of gameplay, including social interactions.

The above data is anonymised so that it is no longer personal data relating to the children players. Limited access to the anonymised data, and the limited nature of the game-play data, results in a very low risk of potential re-identification.

We process the following data relating to parents or guardians:

- Date and time of presentation of privacy and terms.
- Names and contact details, if parents contact us to ask questions or raise issues.
- Details of questions or concerns, if parents contact us.

> **Guidance:** Data minimisation helps you protect your users by collecting only the minimum amount of personal data you need to provide your services. See Standard 8 of the code – Data minimisation for help in how to meet this standard and give children choices over which elements of their data they wish to activate.

## How we use data

- To make available to parents or guardians the history of their child's game play, including social interactions.
- Apart from the above point, all data generated from game play is anonymised. It is used for:
- the purposes of analytics;
- making changes to the game;
- making changes to the ads in the game;
- making changes to the types of ads served in the game (eg game-play data identifies when a level is achieved or failed to trigger the delivery of an ad); and
- improving the game and user experience.
- To administer and protect our business and app, eg system maintenance and support, fixing problems, hosting of data.
- To deliver app content.

> **Guidance:** Data sharing usually means disclosing personal data to third parties outside your organisation. This DPIA outlines how children's and parents' data may be shared with external third parties. Standard 9 of the code – Data sharing advises:
>
> "Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child."

## Data sharing

The following third party providers are used:

- Storage and analytics provider – a third party platform is used to store performance data.
- Storage provider – a third party platform is used to store game data such as server-side held variables.
- Ad mediation provider – a third party service provider is used for user acquisition and advertising attribution. We have chosen an ad mediation partner that does not gather device ID data.
- AWS – hosts content from the game (eg character assets) that download into the game.

The above third parties act as processors of any personal data they process in their provision of their services to us. We have entered into Article 28(3) terms with these third parties. Third parties may also collect additional data that we do not have access to through the delivery of the service. For this data, the third-party organisations are also controllers of the personal data they collect.

> **Helpful hint:** Indicate in your DPIA which third parties are also independent controllers. Insert a link to their privacy notices signposting readers to relevant further information.
>
> You might find it helpful to review our guidance on controllers and processors.

We may also share data with our auditors and other professional advisors that act as independent controllers.

When users make in-app purchases or purchase subscriptions, this is handled by the relevant app store that will act as an independent controller. We do not share personal data with the app stores. Our privacy notice makes clear that the relevant app store (eg Google or Apple) is a separate data controller.

## Profiling

We do not carry out any profiling.

## Parental controls

### Parent overlay screen

On the first play of the game there will be a parent overlay screen that gives parents key information including:

---

- explaining that the game is gathering performance data for the purposes of making sure the game is working properly and to understand how users engage with the contextual advertising, and that this data is completely anonymised;
- explaining that the game doesn't gather any other information on the player and that all billing, subscription information is held by the device platforms, not us;
- explaining the monetisation methods in the game and how they work;
- contact information to enable parents to contact us about any concerns or report any issues including accidental payments;
- easy access to device notifications;
- terms of use and privacy notice, with a full version for parents and a simpler, age-appropriate version aimed at children five to eight years of age (which are presented as pop-ups at appropriate places for children); and
- history of gameplay to date (importantly including social interactions).

The start screen of the game contains a 'parent' button which takes them to the Parent section, thereby encouraging children to involve parents in their use of the game. The information presented in the parent overlay screen is available in this section.

**Payments**

All payments are managed through the relevant app store payment system and are therefore subject to the parental controls of the relevant device being used.

**Social interactions**

Parents are able to control who children share their progress with in the game. The only social feature in the game is that players can share their progress (ie a three second animation of their gameplay, along with their score (against the NPC), achievement badge(s) unlocked and emoticons). Children can only share this with their family circle (ie specific players who have been approved by their parents). There is no opportunity for social interaction with user generated content.

The emoticons players can access are a fixed selection by the game but will include variations and unique options tied into each theme the player has access to.

The parental control and lock uses the device requirements. For example, on iOS it uses Game Centre, where parents can lock controls so that only they can approve users for their child to interact with. If the device does not have a similar system, then the social features will not be enabled in the game.

Sharing history for the family circle is stored and accessible to the parent.

**Guidance:** For the purposes of the Children's code, Standard 11 refers to how you make it clear to the child if parental controls are in place and if they are being tracked or monitored:

"If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored."

Gaming companies might conform to Standard 11 by using child-friendly and age-appropriate

avatars, symbols or pop-up messages (audio or written) to notify children when parental controls are monitoring their online behaviour.

## Age assurance

We have taken the approach of applying standards for the target age group (five to eight) to all users. They will all receive basic protections in how their data is used by default. Therefore, we do not seek to determine the age of users or carry out any age assurance. This approach follows the  principles outlined in the ICO's Children's code:

- provide high privacy settings for child users by default; and
- don't serve children content deemed detrimental to their health and wellbeing.

**Guidance:** The Children's code offers guidance to ISS on how to offer age-appropriate online services to children. See Standard 3 of the AADC – Age appropriate application for further information:

"Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead."

You might also find it helpful to review Annex B of the AADC -  Age and developmental  stages.

## Security measures

- We use the following security measures on our app:
- We undertake an analysis of the risks presented by our processing and use this to assess the appropriate level of security we need to put in place.
- We use trusted, robust third-party platforms to support the game.
- We do not store credit card or personal information in human readable forms.
- We separate personal data from gameplay or operational data.
- We keep our third-party software up to date. Patches will be tested and checked before deployment.
- We use encryption, pseudonymisation or anonymisation, where it is appropriate to do so.
- We ensure that any data processor we use also implements appropriate technical and organisational measures.
- All data is regularly backed up.
- We conduct regular testing and reviews of our measures to ensure they remain effective, and act on the results of those tests where they highlight areas for improvement.

**Helpful hint:** You might find it helpful to consult your information or data security policy to assist you in providing information about security measures. You can see more information in our guidance on

security.

## Geolocation

We do not process geolocation data. This is switched off within the game with no option to turn on.

## Automated decision-making

We do not carry out any automated decision-making.

---

**Describe the scope of the processing:** what is the nature of the data, and does it include special category or criminal offence data? How much data will you be collecting and using? How often? How long will you keep it? How many individuals are affected? What geographical area does it cover?

## Data processed

The nature of the data is as described above under the heading 'What data we collect and how'. We do not process any other personal data. Nor do we process any special category or criminal offence data.

## Volume of data

We have yet to launch the app but envisage between three and five million users in the first year.

## Retention of data

We have a retention schedule which specifies storage periods for the limited categories of personal data which we process. These periods reflect relevant legal requirements and limitation periods applicable to contractual claims. Once retention periods have expired, we securely delete data and log deletions. The majority of data obtained from game play is anonymised so that it is no longer personal data and not subject to the limits on retention set out in the UK GDPR.

**Helpful hint:** You might find it helpful to consult your data retention policy or schedule to assist you in describing how you retain data.

## Geographical area

The data subjects whose data we process are located in the UK and worldwide.

---

**Describe the context of the processing**: what is the nature of your service? Are you designing it for children? If not, are children under 18 likely to access it anyway? What is the likely age range of your

users? How much control will they have? Would they understand and expect you to use their data in this way? Does your service use any nudge techniques? Are there prior concerns over similar services or particular security flaws? Is your service novel in any way? What is the current state of technology in this area? Are there any current issues of public concern that you should factor in, particularly over online risks to children? Are there any relevant industry standards, codes of practice or public guidance in this area? What responsibilities do you have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland? Is there any relevant guidance or research on the development needs, wellbeing or capacity of children in the relevant age range? Are you signed up to any approved code of conduct or certification scheme (once any have been approved)?

## Nature of service and users

Our service is a mobile app game aimed at children between five to eight years of age. It has therefore been designed with these age users in mind, in particular collecting minimum amounts of personal data. It is a new game which has not yet been launched.

## Parental controls

The game features a settings overlay screen that has the elements needed to manage game-play and debugging and testing. This includes access to the parents screen and any relevant game specific settings (eg sound and music levels). The terms of use and privacy notice can be accessed from this screen, as well as a button to easily report any issues in the game.

No nudge techniques are used to encourage children to change privacy settings, make in-app purchases or sign up to subscriptions. The game features a pause button which enables children to pause game-play at any time and not lose their place in the game.

> **Guidance:** Nudge techniques are design features which lead or encourage users to follow the designer's preferred paths in the user's decision-making. The code states that ISS should not use nudge techniques to lead or encourage children to provide unnecessary personal data or turn off privacy protections. See Standard 13 of the code – Nudge techniques.

## Users' expectations

The personal data we process relating to child users is very limited, as described above. The performance data we collect is immediately anonymised, apart from the data about a child's playing history, which is available to parents. We only use it to analyse, develop and improve game or advertisement effectiveness.

We consider that the very limited processing will be in line with users' expectations. We have clearly explained it in the parental information and our privacy notice which is available when first accessing the app. It is also accessible from within the game through the settings, in versions appropriate for both adults and children aged five to eight. A child-friendly version of the privacy notice is also offered using an avatar to guide the child through a series of just-in-time notices in appropriate places (eg at first use of the game or the family circle features). The privacy notice features an avatar speaking the privacy notice sections,

with the words also displayed for older children to read.

Mobile gaming apps of this type are not novel and ours uses data in a similar, if not more limited way, than is common in this market place.

We are aware of several codes and other pieces of guidance which we have taken into account when designing our game and uses of personal data:

- The ICO's Age appropriate design code.
- The Chief Medical Officer's Commentary on screen based activities.
- The OFT's Principles for online and app based games.
- The CAP code on non-broadcast advertising.

---

**Describe the purposes of the processing**: what do you want to achieve with your service? What is the intended effect on individuals? What are the benefits of the processing – for you, and more broadly?  What are the specific intended benefits for children?

> **Guidance:** The Information Commissioner is required to take into account the UK's obligations under the UNCRC in drafting this code. All the standards of the code relate to the best interest standard. See Standard 1 Best interest of the child, which states:
>
> "The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child."
>
> In order to implement this standard you need to consider the needs of child users and work out how you can best support those needs in the design of your online service, when you process their personal data.

## Aim of our service

Our aim is to offer a game for five to eight year olds which is both fun to play and educational. It provides an age-appropriate game which has been specifically designed with this age group in mind, either free of charge or at limited cost, if they choose to subscribe or make purchases. It also helps children engage with numbers and practice maths skills whilst playing.

## Intended effect on individuals

It enables parents and educators to provide their children with, and to enable children to enjoy, an age-appropriate game which helps children engage with numbers and improve their mental arithmetic in a fun environment.

## Benefits of the processing

The benefits of the processing are (for us) that it enables us to run our business, improve awareness of our

brand in the market place, and increase our market share and revenue. The processing benefits children and parents or educators in the ways described above.

# Step 3: Consultation process

**Consider how to consult with relevant stakeholders**: describe when and how you will seek individuals' views - and specifically how you will seek the views of children and parents – or justify why it's not possible to do so. Who else do you need to involve within your organisation? Do you need to ask your processors to assist? Do you plan to consult experts in children's rights and developmental needs? If not, why not? Do you plan to consult any other experts?

We have conducted product testing of the app in consultation with a children's panel to help in the product development process.

We also consulted with parents and guardians through a feedback questionnaire which includes questions on the game's functionality, usability and privacy.

As the game does not use novel technology, and the use of personal data is limited, we have not consulted any experts during the development of this specific game. However, we do keep up-to-date with expert opinions and advice provided through our representative body, UKIE.

We note that where we have identified residual risks, we are satisfied that they are limited and appropriate measures are in place to mitigate potential harm (see step 5).

# Step 4: Assess necessity and proportionality

**Describe compliance and proportionality measures, in particular:** what is your lawful basis for processing? Does the processing actually achieve your purpose? Is there another way to achieve the same outcome? How will you prevent function creep? How will you ensure data quality and data minimisation? If you use AI, how will you avoid bias and explain its use? What information will you give individuals? How will you help to support their rights? What measures do you take to ensure processors comply? How do you safeguard any international transfers?

> **Guidance:** See [Annex C of the code– Lawful basis for processing](#) for guidance on how to determine the lawful basis you can use when processing personal data.

## Lawful bases for processing

- Performance of a contract with the data subject (Article 6(1)(b)GDPR): making available to parents or guardians the history of their child's game play; delivering app content.
- Legitimate interests (Article 6(1)(f)GDPR): collection of game play data for analytics purposes (this data is anonymised immediately); administering and protecting our business and app (eg system maintenance and support, fixing problems, hosting of data). We have carried out legitimate interests assessments for all processing activities carried out on this basis.

## Necessity and proportionality

We consider that our processing achieves the purposes set out in step 3 and does not go beyond what is reasonably necessary to achieve these purposes.

To ensure there is no function creep we only use data for the limited purposes explained in this DPIA.

We ensure data minimisation and proportionality by only collecting data that we need for a current specified purpose.

> **Guidance:** You should be clear, open and honest with your users about what they can expect when they access your online service.  [Standard 4 of the code – Transparency](#) sets out what the ICO is looking for:
>
> "The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent, and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated."

We will publish good practice examples of transparency notices during the transition period of the code.

## Transparency and data subject rights

---

When parents first access the app they are shown a screen asking them to confirm they have read the terms of use and privacy notice which are linked from the screen. These are written in language that is clear for the player.

In addition to the privacy notice which is aimed at adults, pop-up privacy information is also provided to children. This is in both age-appropriate text and video formats, including what data related to them is collected and processed.

We explain about individuals' rights in our privacy notice and include an email address that individuals can use to contact us with any questions about their rights and to exercise their rights. There is also a contact button within the app itself. Our team members who deal with queries on data protection matters and requests to exercise data subject rights have received basic training on dealing with requests and are familiar with the guidance produced by the ICO and the FTC.

## Processors

We use third-party processors, that provide us with services relating to storage, analytics and the serving and attribution of advertisements. We have entered into Article 28(3) GDPR terms with each of these third parties and also carried out appropriate security risk assessments.

## International transfers

We do not make any international transfers of personal data.

**Describe how you comply with the age-appropriate design code**: what specific measures have you taken to meet each of the standards in the code?

**Best interests of the child:** We have taken into account the interests and rights of the children that use our app, including the relevant codes and guidance mentioned in step 2. These interests and rights are reflected in the:

- very limited collection and processing of personal data carried out;
- safe and controlled monetisation methods (described above);
- limited social features (sharing with parent-approved members and turned off by default); and
- parental controls described in this DPIA.

All content the children see in our game is age-appropriate and is designed to support their learning, development and leisure in a safe environment.

Our retention strategy is focused on long-term retention, whilst encouraging players to leave the game regularly, including:

- the player being able to pause or exit the game at any point without losing progress;
- play sessions being designed to be around 90 seconds long after which the player has a clear option to exit; and
- the release of new themes being spread out over time.

The role of parents in protecting their children is recognised and supported through the parent screen.

**Data protection impact assessments:** We have carried out this DPIA which covers all processing activities carried out in connection with the app (both adult and child data). We keep this DPIA under review and are aware of the need to update it if we make any changes to our processing of personal data. We make the up-to-date version of this DPIA available on our website and refer to it in our privacy notice.

**Age-appropriate application:** The key aim of our app it is that it is age-appropriate, and we have focussed on this throughout the design process. We apply a high privacy approach suitable for our target age group to all players.  We do not try to determine the age of our players and apply a different approach depending on age.

**Transparency:** Information is given in a number of ways. For example,  using a parent overlay screen which provides key information to parents when the app is first used, and a dedicated parent screen containing the same information which they can always access. A terms of use and privacy notice acknowledgement screen highlights these documents when the app is first used, and these can also be accessed at any point via the settings. Our privacy notice and terms and conditions are written in clear and easy to understand language. As noted above, we also provide a version aimed at five to eight year olds in text and short video format.

**Detrimental use of data:** We do not use personal data in any way that could be detrimental to a child's or any other person's well-being. The app follows gaming guidelines and codes set out by PEGI and the Office of Fair Trading.

**Policies and community standards**: We follow our terms and conditions and privacy notice and only use data in accordance with these documents.

> **Guidance:** When you set community rules and conditions of use for users of your service, you need to actively uphold or enforce those rules and conditions. Standard 6 of the code – Policies and community standards confirms that your own published terms, policies and community standards includes, but is not limited to, privacy policies, age restriction, behaviour rules and content policies or standards you adhere to (eg PEGI ratings).

**Default settings:**  Privacy settings for the app are at high-by-default. There are no options for these to be changed by players. The social feature is by default disabled, and can only be used if the parent sets up an approved group of people with whom the child can share game progress, achievements etc.

**Data minimisation:** We only collect and process the minimum amount of personal data we need for particular activities. Data about game-play, choices in the game etc is anonymised as soon as it is collected.

**Data sharing:** Data is shared with the third parties described under the heading 'Data sharing' in step 2.

**Geolocation:** We do not collect or use any geolocation data. This function is turned off with no option to turn on.

**Parental controls:** These are explained in detail under the heading 'Parental controls' in step 2 above. A parental overlay enables adults to set up the system. Additional parental controls are provided by platform level.

**Profiling:** We do not carry out any profiling.

**Guidance:** Profiling is defined under Article 4 UK GDPR as: "any form of automated processing of personal data consisting of the use of personal data to evaluate certain aspects relating to a natural person, in particular to analyse or predict aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour location or movements."

The Guidelines on automated individual decision-making and profiling for the purposes of Regulation 2016/679 state:

"Broadly speaking, profiling means gathering information about an individual (or group of individuals) and evaluating their characteristics or behaviour patterns in order to place them into a certain category or group, in particular to analyse and/or make predictions about, for example, their:

- ability to perform a task;
- interests; or
- likely behaviour."

See Standard 12 of the code – Profiling for guidance on what you should do if you include profiling of children as part of your service:

"Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing)."

**Nudge techniques:** We do not use nudge techniques (eg to encourage children to keep playing, make purchases or buy subscriptions).

**Connected toys and devices:** Not applicable.

**Online tools:** Users and their parents can report concerns or ask questions easily from within the game. This function is available from the parents overlay screen and settings overlay screen.

**Guidance:** Online tools are mechanisms to help children exercise their rights simply and easily when they are online, such as complaints buttons. Standard 15 of the code – Online tools states that you should provide prominent and accessible tools to help children exercise their data protection rights and report concerns

# Step 5: Identify and assess risks

**Guidance:** You must consider the potential impact on children and any harm or damage your data processing may cause – whether physical, emotional, developmental or material.

When completing this section, if may be helpful for you to refer to  Standard 5 of the code – Detrimental use of data and the Children's code harms framework.

| Describe source of risk and nature of potential impact on individuals.<br><br>Include as a minimum an assessment of particular risks to children as listed in the DPIA standard in the Children's Code. You may need to consider separately for different age groups. | Likelihood of harm | Severity of harm | Overall risk |
|---|---|---|---|
| | Remote, possible or probable | Minimal, significant or severe | Low, medium or high |
| 1. Use of (game play) data that contravenes health standards and guidelines (for example issues by the Chief Medical Officer or Public Health England). Risk that data-enabled service personalisation leads to excessive engagement, that risks children's right to access health services. | possible | significant | medium |
| 2. Personalised targeting of service features that generate revenue (for example in-game perks or purchases) that are set without adequate transparency and safeguards, risking children's right to protection from economic exploitation. | possible | significant | medium |
| 3. Parental controls for monitoring children's activities are used without adequate transparency for children, risking children's rights to protection from other forms of exploitation. | possible | significant | medium |
| 4. Personalised advertising of fraudulent or age-inappropriate products that risks children's right to protection from economic exploitation. | possible | significant | medium |
| 5. Failure to uphold community standards exposes children to harms that have a chilling effect (for example leaving online communities – family circle | remote | minimal | low |

- as the result of abuse) risks children's right to freedom of association.

| | | | |
|---|---|---|---|
| 6. Online tools for children (and parents, for younger children) to exercise their data rights that are untransparent, not specific to the rights they support, or not provided, risking children's right to knowledge of their rights. | possible | significant | medium |

# Step 6: Identify measures to reduce risk

Identify additional measures you could take to reduce or eliminate risks identified as medium or high risk in step 5.

To assess the level of risk, you must consider both the likelihood and the severity of any impact on children. High risk could result from either a high probability of some harm, or a lower possibility of serious harm. You should bear in mind that some children will be less resilient than others, so you should always take a precautionary approach to assessing the potential severity of harm.

| Risk | Options to reduce or eliminate risk | Effect on risk | Residual | Measure approved |
|---|---|---|---|---|
| | | Eliminated/ reduced/ accepted | Low/ medium/ high | Yes/no |
| Use of (game play) data that contravenes health standards and guidelines (for example issues by the Chief Medical Officer or Public Health England). Risk that data-enabled service personalisation leads to excessive engagement, that risks children's right to access health services. | Game-play sessions are designed to be short (90 secs), the game can be paused or exited without losing place in the game, release of new themes is spaced out.<br><br>We keep up to date with government advice on the welfare of children in the context of digital services through updates from our representative body. | reduced | low | yes |
| Personalised targeting of service features that generate revenue (for example in-game perks or purchases) that are set without adequate transparency and safeguards, risking children's right to protection from economic exploitation. | All in-app purchases or subscriptions require parental authorisation. There is a contact function for parents to contact us for accidental purchases. | reduced | low | yes |
| Parental controls for monitoring children's activities are used without adequate transparency for children, risking children's rights to protection from | A parental overlay enables adults to set up the system. Additional parental controls are provided by platform level. | accepted | medium | yes |

other forms of exploitation.

| | | | | |
|---|---|---|---|---|
| Personalised advertising of fraudulent or age-inappropriate products that risks children's right to protection from economic exploitation. | All ads are age-appropriate. We use an ad provider specialising in children's ads.  There is no targeted or contextual advertising. Ads are clearly distinguished from game-play and do not request or require direct action from the children. | eliminated | low | yes |
| Failure to uphold community standards exposes children to harms that have a chilling effect (for example leaving online communities – family circle - as the result of abuse) risks children's right to freedom of association. | Sharing features in family circle allow limited content to be shared, such as game scores and emoticons that do not share user personal data with others. No opportunity for negative messages to be created and shared through family circle | eliminated | low | yes |
| Online tools for children (and parents, for younger children) to exercise their data rights that are untransparent, not specific to the rights they support, or not provided, risking children's right to knowledge of their rights. | Data rights explained in adult and children's privacy notices. An email address is available for individuals to contact us with any questions about their rights and to exercise their rights. There is also a contact button within the app itself to help children contact us to exercise their rights. | reduced | low | yes |

# Step 7: Sign off and record outcomes

| Item | Name/position/date | Notes |
|---|---|---|
| Measures approved by: | | Integrate actions back into project plan, with date and responsibility for completion. |
| Residual risks approved by: | | If accepting any residual high risk, consult the ICO before going ahead. |
| DPO advice provided: | | DPO should advise on compliance, step 6 measures and whether processing can proceed. |
| Summary of DPO advice: | | |
| DPO advice accepted or overruled by: | | If overruled, you must explain your reasons. |
| Comments: | | |
| Consultation responses reviewed by: | | If your decision departs from individuals' views, you must explain your reasons. |
| Comments: | | |
| This DPIA will be kept under review by: | | The DPO should also review ongoing compliance with DPIA. |

This document is made available on the basis that the user understands that:

- they remain fully liable for their own legal and regulatory obligations;

- the ICO does not accept any liability for any reliance that might be placed on any feedback, comments or other input it might provide; and

- providing this sample DPIA does not prevent or limit the ICO's ability to take any enforcement action or other regulatory action against companies that might use the sample as the basis for their own DPIA, if the ICO deems such action is appropriate.

# EXHIBIT B-2

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Introduction                                                      2
Step 1: Identify the need for a DPIA                              3
Step 2: Describe the processing                                   5
Step 3: Consultation process                                     16
Step 4: Assess necessity and proportionality                     17
Step 5: Identify and assess risks                                23
Step 6: Identify measures to reduce risk                         25
Step 7: Sign off and record outcomes                             27

# Introduction

This document is intended as an example of good practice to help small to medium sized enterprises operating an online retail service. It will help you to understand and apply the ICO's Children code, formally known as the Age appropriate design code. It specifically applies to Standard 2 of the code, which relates to the need for Data Protection Impact Assessments (DPIAs) for Information Society Services (ISS) likely to be accessed by children (under age 18) in the UK. Before starting to review the DPIA sample, you might find it helpful to read the code standards.

The service outlined in this sample is imaginary, and is not intended to represent an actual online retailer.

This sample DPIA is adapted from the ICO's DPIA template, and follows the process set out in our DPIA guidance and the code. You should read it alongside the code's DPIA guidance, and the Criteria for an acceptable DPIA set out in European guidelines.

Standard one of the Children's code requires ISS treat the best interests of the child as a primary consideration in their processing of children's data. Assessing children's best interests is an important part of the DPIA process. The ICO's best interest self-assessment can help you with this.

The ICO's design guidance has tools that can help you apply some of the standards in practice, in order to create an open, transparent and safe place for children online.

We welcome recommendations for improvements or other feedback. Please email your comments to [email protected].

---

**Name of controller:** The Toy Shop

**Subject/title of DPIA:** Online toyshop

---

# Step 1: Identify the need for a DPIA

## Step 1: Identify the need for a DPIA

Explain broadly the nature of your online service, and the current stage of design or development. You may find it helpful to refer or link to other documents. Summarise when and how you identified the need for a DPIA.

**Guidance**: Before starting this DPIA, you may find it helpful to read the ICO's guidance on DPIAs.

Standard 2 of the Children's code requires Information Society Services* to undertake a DPIA if they are processing children's data. Therefore, it may be useful to reference the Children's code requirement in Step 1. See Standard 2 of the Children's code - DPIAs:

"Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code."

For further information, see the ICO's guidance on what activities are considered likely to result in a high risk and need a DPIA

* An Information Society Service is defined as "any service normally provided for remuneration, at a distance, by electronic means and at the individual request of a recipient of services." You can find more information on whether you may be in scope in the Children's code.

The Toy Shop is a new online website selling products for children normally six years and older, supporting children's rights to play and development. Our website is currently active. It uses a commercially available e-commerce platform.

On the website users can search for and learn about our range of products. All users have access to the toy information pages.

Our main use of personal data is to process and fulfil orders made on the website, and deal with customer enquiries. In addition, we undertake limited profiling activities using order history data and the analytics data obtained from our use of these cookies. We do this to recommend similar products to these users. We only carry out profiling for users over the age of 13 since our processing requires the user to have consented to the use of analytics cookies.

Users can sign up for generic newsletters with their email address.

This is consent-based so only available to those over 13. We also use the "soft opt-in" exception to send generic newsletters to existing customers, both children and adults. New users can sign up to the newsletter using a tick box to self-declare themselves as 13 or above. All email newsletters have an unsubscribe link and all opt-outs are actioned and respected.

**Guidance**: The Children's code applies to "information society services likely to be accessed by children" in the UK. This includes many apps, programs, connected toys and devices, search engines, social media platforms, streaming services, online games, news or educational websites and websites offering other goods or services to users over the internet. It is not restricted to services specifically directed at children. You can find more information on 'likely to be accessed' in the code.

Market research conducted by similar websites suggests that up to a third of users of the service are likely to be children under the age of 13, about 10% will be children 13-17, with the remaining 55% likely to be adults.

**Helpful hint**: You might find it helpful to conduct research into the users of your service (eg user online surveys, forums), or draw on research undertaken by similar sites, commercial research companies or representative bodies.

We have identified the need for a DPIA because we will be collecting and processing children's personal data through the platform, including contact details (eg email address), financial data, and purchasing history. This processing is included in the list published by the ICO under Article 35(4) of the UK GDPR.

# Step 2: Describe the processing

## Step 2: Describe the processing

**Describe the nature of the processing:** how will you collect, use, store and delete data? What are the sources of the data? Will you be sharing data with anyone? You might find it useful to refer to a flow diagram or other way of describing data flows. What types of processing identified as likely high risk are involved? Does your service involve any profiling, automated decision-making, or geolocation elements? What are your plans (if any) for age-assurance? What are your plans (if any) for parental controls?

> **Helpful hint:** You may find it helpful to consult your privacy notice or talk with your Data Protection Officer (DPO) about creating a Record of processing activities (ROPA) which may contain some of the information required for this section. You can see the **ICO's guidance on ROPAs.**

## How we collect data/sources of data

We collect data in the following ways:

- Direct interactions with users eg when users create an account, purchase a product either as an account holder or guest, sign up to receive newsletters, contact us with a question or issue.
- Using automated technologies ie cookies or similar technologies when visitors use the website.
- From third parties ie from our third-party analytics cookie provider, and from our third-party fraud prevention service providers.

> **Guidance**: Data minimisation helps you protect your users by collecting the minimum amount of personal data you need to provide your services. See Standard 8 of the code – Data minimisation for help in how to meet this standard and give children choices over which elements of their data they wish to activate.

## How we use data

Our main use of personal data is to process and fulfil orders made on the website and to deal with customer enquiries. In addition, we carry out limited marketing activity through an email newsletter which users over 13 may sign up for. All email newsletters have an unsubscribe link and all opt-outs are actioned and respected. We do not carry out any behavioural advertising.

We use data for the following purposes:

- To register users who choose to create an account with us.

- For financial administration, invoicing, and to process and deliver orders.
- To manage our relationship with customers (eg responding to questions, complaints, asking users to take a survey).
- To enable users to participate in competitions, prize draws etc.
- To administer and protect our business and website (eg system maintenance and support, fixing problems, hosting of data).
- To deliver website content and contextual advertisements and measure and understand the effectiveness of these.
- To carry out data analytics to improve our website, products, marketing and customer experience on our website.
- To recommend products that may be of interest to users by email and contextual advertising.
- To provide email newsletters to users who have subscribed to this service.
- To detect and prevent fraudulent transactions (see further information below under the heading "Data sharing").
- To verify user identity and provide a secure platform.
- To comply with regulatory or legal obligations.
- To enable users to share details of purchases on social media sites.

## Cookies

**Helpful hint:** You might find it helpful to consult your cookies policy or the cookies section of your privacy notice to assist you in completing information about cookies. You can see further information in the **ICO's guidance on cookies**. **Attach a copy of your cookies policy with the DPIA.**

Our website uses cookies for a range of functions outlined below.

We use essential cookies, which are not subject to the consent requirement, for the following purposes:

- Account authentication.
- Tracking user input for functions of the service (eg shopping cart).
- Security and fraud prevention.
- Load balancing.
- Preference cookies for the cookie consent tool.

These are first party cookies set within individual apps and the cookies' access is restricted by the corresponding app only.

The website also uses cookies or similar technologies for analytics and contextual advertising.

We have put in place a cookie consent tool which explains the cookies we use and requests consent to these. We also have a cookie policy which explains in more detail the types of cookies we use and the purposes we use them for. The consent tool is available at the point of website entry.

Note: Wikipedia defines load balancing as the process of distributing a set of tasks over a set of resources (computing units), with the aim of making their overall processing more efficient. Load balancing can optimize the response time and avoid unevenly overloading some compute nodes while other compute nodes are left idle.

The website contains links to our social media pages and includes functionality which enables users who have external social media accounts to share details of purchases they make on their social media pages. Visiting the page with the relevant social media plugins on it may result in users' data being collected by the social media company (depending on the user's browser's configuration). This includes data such as IP address and a record of which pages users were visiting at the time. The social media features may also set third-party cookies (or other equivalent technologies such as tracking pixels). Social media providers linked to by the site are joint controllers for the processing of this personal data.

The privacy notice on our website states: "We receive information via third parties when you visit our page on social media sites or channels (eg Facebook, Twitter, YouTube, Instagram)."

When a user clicks on a social media link, a pop-up warns that they are leaving the toy shop website. It states: "Your personal data will be processed by the third-party site according to their own privacy policies." A link to the appropriate social media privacy notice is included in the pop-up.

**For information**: Article 26 of the UK GDPR states: "Where two or more controllers jointly determine the purposes and means of processing, they shall be joint controllers. They shall in a transparent manner determine their responsibilities for compliance with the obligations under this Regulation".

This sample DPIA does not go into detail on the measures The Toy Shop should take to determine the purpose and means of processing for any joint controllers (eg social media sites, data analytics providers). If you are using third-party services that are likely to process personal data, you should talk with them about whether the processing relationship is joint controllership or a controller – processor relationship.

The ICO recommends that ISS consult with their Data Protection Officer, ecommerce site provider, and any joint controllers for details of how to explain joint controller processing in their DPIA.

## Storage and deletion

The website is hosted in the UK and all data is stored in the UK.

The business has a retention schedule which specifies storage periods for categories of data which reflect relevant legal requirements and limitation periods applicable to contractual claims. Once retention periods have expired we securely delete data and keep a log of deletions.

**Helpful hint:** For further information, you can see the ICO's guidance on storage limitation and data retention. Attach a copy of your records management policies with the DPIA.

## Data sharing

Data is shared for routine data processing necessary to safely deliver the service.

> **Guidance**: Data sharing usually means disclosing personal data to third parties outside your organisation. This DPIA outlines how children's and parents' data may be shared within the Toy Company, and with external third parties. Standard 9 of the code – Data sharing advises:
>
> "Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child."

Data is shared for routine data processing necessary to safely deliver the service.

A third party **payment services provider** is used to provide the payment function on the website. This payment services provider acts as a separate data controller, and we do not store payment card data. We make clear in our privacy notice that the payment service provider operates subject to its own privacy notice and tell users to refer to this for details of its processing.

We make use of an **e-commerce platform** to provide our website. The provider acts as our processor and we have entered into Article 28(3) terms with them. We make use of the e-commerce platform's fraud prevention service which provides us with risk scores to help us avoid fraudulent transactions. This service is provided by a third party which acts as an independent controller. To make use of this service, certain personal data is transferred to the provider (ie name, phone number, billing and delivery addresses, email address, IP address). This processing is explained in our privacy notice with a link to the provider's own policy.

> **Note**: The UK GDPR applies to "controllers" and "processors". A controller determines the purposes and means of processing personal data, while a processor is a third-party company that a controller contracts to process their data.
>
> This paragraph is based on a commercially available e-commerce platform. Such platforms will often list a significant number of processors, and transfers personal data to several countries worldwide. In this simplified sample, we have not included the list of potential processors and joint controllers for the personal data, nor have we included the data processing that is likely to be undertaken. You should consult with your e-commerce platform for more information on the joint controllers and processors of data that you will need to include in your DPIA.

We use a third-party analytics provider to measure user interactions with our website. This is so that we can check the quality and effectiveness of our service and ensure it meets the needs of the user. Our analytics provider uses cookies and similar technologies to collect information about user interactions when they visit the site. This includes data about the user's device or browser, their on-site activities, and a portion of the user IP address. The provider processes this information on our behalf and uses it to prepare reports for us about how our visitors engage with our website. These reports don't identify the users - they are aggregated information about all our users.

Our analytics provider doesn't use any of this information for their own purposes - they act as our processor and only operate on our instructions. This processing is carried out in the EU.

**Note**: Some data analytics providers may function as processors and fall within scope of Article 28(3) of the UK GDPR. However, some analytics providers will be joint controllers as a result of the way in which personal data is processed. Where this is the case, the ISS should enter Article 26 terms with them as joint controllers. It is for the ISS to determine the nature of the relationship between it and analytics provider.

**Guidance**: For further information, see the ICO's guidance on [controllers and processors](controllers and processors).

Our cookies policy provides more information about our use of cookies for analytics purposes. Users can opt-in using our cookie control (see cookies section above), and can change their mind at any time.

We use a **Captcha** provided by a third party which involves the transfer of data about a user's device to/from the third-party provider. The provider acts as our processor and we have entered into Article 28(3) terms with them.

We share limited data with **couriers** to enable our products to be delivered to customers. All boxing and labelling of products are done by our company. The courier's role is only to deliver packages; it does not exercise any control over the purpose for which the personal data in the packages entrusted to it is used and has no control over the personal data entrusted to it. The delivery courier does not operate as a processor.

## Profiling

**Guidance**: Profiling is defined under Art 4 UK GDPR as: "any form of automated processing of personal data consisting of the use of personal data to evaluate certain aspects relating to a natural person, in particular to analyse or predict aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour location or movements"

The Guidelines on automated individual decision-making and profiling for the purposes of Regulation 2016/679 state:

"Broadly speaking, profiling means gathering information about an individual (or group of individuals) and evaluating their characteristics or behaviour patterns in order to place them into a certain category or group, in particular to analyse and/or make predictions about, for example, their:

- ability to perform a task;

- interests; or
- likely behaviour."

See Standard 12 of the Code – Profiling for guidance on what you should do if you include profiling of children as part of your service:

"Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing)."

Profiling is switched off by default for all users. For users consenting to receive our enewsletters, we carry out limited profiling activities to email recommendations of similar products to users based on their order history and browsing activities. We only carry out profiling on users who have consented to the relevant cookies. We only send these emails to users who have opted-in to marketing, or who have not opted-out of marketing when making a previous purchase.

Children under 13 years of age are not given the option to opt into marketing emails, so profiling remains switched off for under 13 users.

No external advertising is offered to users of the service.

## Age assurance

**Guidance**: The Children's code offers guidance to ISS on how to offer age appropriate online services to children. See Standard 3 of the AADC – Age appropriate application for further information:

"Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead."

You might also find it helpful to review Annex B of the AADC - Age and developmental stages.

We ask users for their year of birth to verify age where we process personal data based on consent. If it is not clear from year of birth if a user is 12 or 13, they are asked for their date of birth. A user cannot make changes to their initial response to the year of birth question from the same IP address. This is relevant to our use of non-strictly necessary cookies and our email newsletter sign up. To sign up to the newsletter, users are first asked to enter their year or birth (and if required, date of birth) as described above, then only able to proceed to signing up if the response to these questions shows they are over 13. Our privacy notice and terms and conditions documents are written in a transparent and easy to understand form so that children can easily understand our age assurance policies. This includes brief pop-up messages at the point when the child answers the age questions and shows that they are under 13 years of age.

All cookies, apart from strictly necessary cookies, are set to off when a user first arrives at the website. On entering the website all users are presented with a cookies consent tool banner written in easy to understand, plain English set at a reading age of 13. When users enter this, they are asked for their year of birth (and if required, date of birth) as explained above.

- If they are 13 or over, they are presented with the full list of cookies used, grouped by category (strictly necessary, functional, analytical, and marketing) and can consent to the functional, analytical and marketing cookies. Users who are under 13 are presented with the information about the strictly necessary cookies (which are always set to "on") with a message saying that the other cookies are not used.

- For these users the sliders for the analytical, functional and marketing cookies are fixed in the "off position" and cannot be changed. Our privacy notice contains details of an email address parents can contact if they become aware that their child has given consent under the age of 13 and we will delete this child's data.

We have analysed the processing we carry out and do not think that any of our processing presents a risk which would require us to offer parental controls. Online tools such as icons and help buttons enable children to exercise their data protection rights and report concerns. However, as we anticipate young children will use our site, we also allow parents or guardians to contact us with any queries they have about our processing of their child's personal data, ask us to delete the personal data we have collected in connection with their child's account from our records, and exercise rights on behalf of their child. We confirm the identity of the adult as the parent or guardian of the child before carrying out any of the above. Our online tools support older children to exercise their rights and contact us independently of their parents.

> **Helpful hint**: You might find it helpful to consult your information/data security policy to assist you in providing information about security measures. For further information, see the ICO's guidance on security.

## Security measures

We use the following security measures on our website:

- We keep our e-commerce software subscription up to date.

- We require users who create an account to use a strong password with numbers, capital letters and other characters, and which must be at least 10 characters long.

- We use SSL protection on our login pages.

- We use a Captcha function on our "contact us" page.

- We use a market-leading, reputable web hosting company.

- We have a policy of regularly deleting any files, databases, or applications from our website that are no longer in use.

- All data is regularly backed up.

- We run regular web security scans to check for website and server vulnerabilities.

- We use a fraud prevention service for purchases made on our site.

**Describe the scope of the processing**: what is the nature of the data, and does it include special category or criminal offence data? How much data will you be collecting and using? How often? How long will you keep it? How many individuals are affected? What geographical area does it cover?

## Data processed

- Identity data: name, username, title, date of birth.
- Contact data: billing and delivery address, email address, phone number.
- Financial data: payment card details (processed by a third-party payment services provider and not stored by us/ our website).
- Transaction data: details of products purchased, amounts, dates etc.
- Technical data: IP address, login data, browser type and version, time zone setting and location, browser plug-in types and versions, operating system and platform.
- Profile data: username and password, purchases or orders made by users, and their preferences, interests, feedback, and questions as collected through survey responses.
- Usage data: information about how users use our website, products and services.
- Marketing and communications data: record of users' preferences in receiving marketing from us about the products we sell.

## Special categories of personal data

We do not process any special category personal data.

## Volume of personal data

We anticipate that the website will have around 100,000 users, of which 45% will be children (under 18), and 55% adults using this service.

## Retention of data

We have a retention schedule which specifies storage periods for categories of data which reflect relevant legal requirements and limitation periods applicable to contractual claims. Once retention periods have expired we securely delete data and log deletions.

> **Helpful hint**: You might find it helpful to consult your data retention policy or schedule to assist you in describing how you retain data.

## Geographical area

The data subjects whose data we process are located in the UK. The website and all personal data is hosted in the UK. The website does not use location services such as IP address geolocation to alter currency for the shopping cart. The site language is UK English and there are no options to change language for visitors from outside the UK.

---

**Describe the context of the processing:** what is the nature of your service? Are you designing it for children? If not, are children under 18 likely to access it anyway? What is the likely age range of your users? How much control will they have? Would they understand and expect you to use their data in this way? Does your service use any nudge techniques? Are there prior concerns over similar services or particular security flaws? Is your service novel in any way? What is the current state of technology in this area? Are there any current issues of public concern that you should factor in, particularly over online risks to children? Are there any relevant industry standards, codes of practice or public guidance in this area? What responsibilities do you have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland? Is there any relevant guidance or research on the development needs, wellbeing or capacity of children in the relevant age range? Are you signed up to any approved code of conduct or certification scheme (once any have been approved)?

The Toy Shop is a new online website selling products for children normally six years and above, supporting children's rights to play and development. Our website is currently active. It uses a commercially available e-commerce platform.

## Nature of service and users

On the website users can search for and learn about our range of products. All users have access to the toy information pages.

The website enables adults and children over 13 with debit cards in their own name to order products. Users aged 13 and above can sign up for newsletters with their email address via an age self-declaration tick box. We use the "soft opt-in" exception to send newsletters to existing customers with user accounts. Users have the option of creating an account or purchasing without registration as a guest.

The website includes a "contact us" function which includes a contact form where users provide name, email, subject and message. This aspect of the service is protected by a third-party's Captcha service, which involves the use of cookies or similar technologies. Further details of security measures applied to our processing are provided in Step 2 above.

The website retains order history and we undertake limited profiling activities of users based on activity they undertake when logged in to customer accounts. We use this data and data from analytics cookies, to recommend similar products to these users. The website does not feature external advertisements – all adverts are contextual and feature products within our catalogue.

The website contains links to our social media pages and includes functionality which enables users who have external social media accounts to share details of purchases they make on their social media pages. Social media providers linked to by the site are joint controllers for the processing of this personal data.

> **Helpful hint**: You might find it helpful to consult our guidance on [Marketing and consent](#) for more information on when soft opt-ins are allowed under data protection.

## Users' expectations

We consider that the above processing will be in-line with users' expectations. It is clearly explained in our privacy notice, which is written in basic, easy to understand language, and available as an audio file. We carried out readability testing of our privacy notice to confirm that it should be understood by most people over the age of nine.

Most processing outside the core activity of selling products is optional. For example, processing for marketing purposes, processing for the purposes of responding to enquiries, sharing purchases on social media. We do not use data in any unusual ways which we would consider to be outside the expectations of users.

> **Helpful hint**: You should attach copies of all relevant privacy notices and terms and conditions documents for your website with the DPIA. For further information, you can see the [ICO's guidance on privacy notices and access templates](#).

---

**Describe the purposes of the processing:** what do you want to achieve with your service? What is the intended effect on individuals? What are the benefits of the processing – for you, and more broadly? What are the specific intended benefits for children?

> **Guidance**: The ICO is required to reflect the UK's obligations under the UNCRC in drafting this code. All the standards of the code relate to the best interest standard See [Standard 1 Best interest of the child](#), which states:
>
> "The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child."
> In order to implement this standard you need to consider the needs of child users and work out how you can best support those needs in the design of your online service, when you process their personal data.

## Aim of our service

Our aim is to offer an online toyshop which enables us to sell, and customers to buy, toys in an online environment, and to grow our business and customer base. We believe that toys help support children's right to freedom of association and play. Through providing access to safe and educational toys, we also

help protect and support their physical, psychological and emotional development

The specific purposes for which we process personal data are set out in Step 2 under the heading "How we use data".

## Intended effect on individuals

The intended effect on individuals is that they trust our brand and shop in our online store.

## Benefits of the processing

The benefits to us of the processing are that it enables us to run our business, market our products and increase our sales. The processing benefits customers, including children, because it enables them to shop for products online, often at cheaper prices that in a physical shop, and be informed via contextual advertising and enewsletter (subject to consent or soft opt-in) about products that they may be interested in.

# Step 3: Consultation process

## Consultation process

**Consider how to consult with relevant stakeholders**: describe when and how you will seek individuals' views - and specifically how you will seek the views of children and parents – or justify why it's not possible to do so. Who else do you need to involve within your organisation? Do you need to ask your processors to assist? Do you plan to consult experts in children's rights and developmental needs? If not, why not? Do you plan to consult any other experts?

We have conducted website user-testing and consultation with adults and a children's group to help develop our website.

We also consult with users, parents and guardians through a feedback questionnaire which includes questions on website usability and services, feedback on the toys we sell, and privacy. The consultation is conducted online with users, parents or guardians who have a user account.

All the toys sold through our shop need to meet toy safety standard EN-71. We only buy from companies that are members of the British Toy and Hobby Association and that adhere to the BTHA's code of practice. We have not consulted with experts in children's rights as we do not feel that the site represents a significant risk to children. We keep up to date with regulations related to online retail services, age assurance techniques and wider data processing issues through our representative bodies (eg CBI, FSB and BTHA).

We note that where residual risks have been identified, we are satisfied that they are limited and appropriate measures are in place to mitigate potential harm (see Step 5).

# Step 4: Assess necessity and proportionality

## Step 4: Assess necessity and proportionality

**Describe compliance and proportionality measures, in particular**: what is your lawful basis for processing? Does the processing achieve your purpose? Is there another way to achieve the same outcome? How will you prevent function creep? How will you ensure data quality and data minimisation? If you use AI, how will you avoid bias and explain its use? What information will you give individuals? How will you help to support their rights? What measures do you take to ensure processors comply? How do you safeguard any international transfers?

## Lawful bases for processing

> **Guidance**: See [Annex C of the code– Lawful basis for processing](#) - for guidance on how to determine the lawful basis you can use when processing personal data.

- Performance of a contract with the data subject (Article 6(1)(b)UK GDPR): where processing is necessary to fulfil a product order (including creating an account, selecting and paying for products, sending products to customers, sharing data with couriers); processing in connection with a competition or prize draw subject to terms governing it.
- Legitimate interests (Article 6(1)(f)UK GDPR): sending enewsletters based on the soft opt-in exception; processing of personal data connected with strictly necessary cookies (security cookies and functionality to enable a service requested by the user); corresponding with customers in response to enquiries; processing of data for fraud prevention purposes; carrying out customer surveys; to administer and protect our business and website; processing to enable sharing of purchase on social media sites. We have completed legitimate interests assessments for all processing activities we carry out on this basis.

**Note**: Article 6(1)(f) gives you legitimate interest as lawful basis for processing where: "processing is necessary for the purposes of the legitimate interests pursued by the controller or by a third party except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data, in particular where the data subject is a child."

This can be broken down into a three-part test:

1. **Purpose test**: are you pursuing a legitimate interest?
2. **Necessity test**: is the processing necessary for that purpose?
3. **Balancing test**: do the individual's interests override the legitimate interest?

- Consent (Article 6(1)(a)GDPR): processing connected with the sending of enewsletters where a person

has opted-in to receiving them; marketing activities or profiling based on analytics data derived from cookies and order history, processing of personal data in connection with functional/analytics/marketing cookies.

## Necessity and proportionality

We consider that our processing achieves the purposes set out in step 2 and does not go beyond what is reasonably necessary to achieve these purposes.

To ensure there is no function creep we only use data for the limited purposes explained in this DPIA.

We ensure data minimisation and proportionality by only asking for data that we need for a current specified purpose.

## Transparency and data subject rights

**Guidance**: Transparency is about being clear, open and honest with your users about what they can expect when they access your online service, see Standard 4 of the AADC – Transparency.

"The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent, and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated."

Examples of good practice in transparency notices can be found on the ICO's Children's code Additional resources page pages ⧉.

Individuals are given information about our processing through our online privacy notice which they are asked to review when they create an account or purchase a product or both. It is also accessible from our website footer. Our cookie policy contains information about cookies used on our website. This is accessible through our cookie consent tool and from our website footer. We carried out readability testing of our privacy notice and cookies policy to confirm that they should be understood by most people over the age of six.

We explain about individuals' rights in our privacy notice and include an email address which individuals can use to contact us with any questions about their rights and to exercise their rights. Our team members who deal with queries on data protection matters and requests to exercise data subject rights have received basic training on dealing with requests and are familiar with the guidance produced by the ICO.

## Processors

We use an e-commerce platform, a cookie analytics provider, and a Captcha provider, all of which act as processors. We have entered into Article 28(3) UK GDPR terms with each of these third parties and carried out appropriate security risk assessments.

The Article 28 agreements include a contractual obligation for the processor to use EU SCCs and undertake

a risk assessment if or when engaging the services of a sub-processor who is transferring data to a third country.

## International transfers

Transfers of data are made in connection with the sharing of personal data with our third-party analytics cookie provider and e-commerce provider. The analytics provider is based and Europe, and the e-commerce provider is based in Canada. In both cases, the data transfers are covered by adequacy agreements in place with the UK.

> **Helpful hint**: You might find it helpful to consult our guidance on international data transfers from the UK. You should also consult the privacy notices and terms and conditions documents from your e-commerce provider for more details on how they manage international transfers.

---

**Describe how you comply with the Age-Appropriate Design Code**: what specific measures have you taken to meet each of the standards in the code?

## Best interests of the child

We have considered the interests and rights of the children that use our website, and these interests and rights are reflected in our limited collection and use of their personal data. Users are also able to search for toys based on age (ie through filtering) to ensure that they are presented with products which are age appropriate. Our online shop does not sell any products which we consider could be harmful, nor any age-restricted items.

Data protection impact assessments: We have completed this DPIA which covers all customer data processing activities carried out. We keep this DPIA under review and are aware of the need to update it if we make any changes to our processing of customer personal data. We make the up-to-date version of this DPIA available on our website and refer to it in our privacy notice.

## Age-appropriate application

We use a self-declaration process to establish user age. We consider this process to be appropriate in the circumstances. This is because we only collect and process limited personal data from all users, and our use of data is limited to what people would expect in the context of an online toyshop. We apply the same standards and carry out the same processing activities in relation to all users (subject to not carrying out consent-based processing activities for users under 13). We have carried out readability testing of our privacy notice and cookie policy to confirm that they are capable of being understood by most people over six years old. Where processing is based on consent (non-strictly necessary cookies and email newsletter sign up) we only carry out these processing activities in relation to data subjects who have confirmed that they are over 13 years of age using a self-assessment tick box.

## Transparency

We provide a privacy notice and cookie policy explaining how we use personal data and how cookies are used on our website. In addition, we provide additional specific bite-sized explanations about how we use personal data at the point at which we collect it. Our terms and conditions and privacy notice are also written in clear and easy to understand language.

## Detrimental use of data

We do not use personal data in any way which could be detrimental to a child's or any other person's well-being. Our marketing enewlsetter follows the principles in Committee of Advertising Practice guidance.

## Policies and community standards

We follow our terms and conditions and privacy notice and only use data in accordance with these documents. We will delete the accounts of users that do not follow our standards, or are proven to have not been truthful about their age when registering for a user account. We will also delete any data collected against their account.

> **Guidance**: When you set community rules and conditions of use for users of your service, you need to actively uphold or enforce those rules and conditions. Standard 6 of the Code – Policies and community standards confirms that your own published terms, policies and community standards includes, but is not limited to, privacy policies, age restriction, behaviour rules and content policies or standards you adhere to.

## Default settings

As our website only has basic functionality, we do not use privacy settings unless the user creates an account. Account holders privacy is set as high by default. This means we do not collect more data than is necessary to provide the online purchasing and enewsletter services that come with a user account. User account holder data is not visible to other users or services, and there is no access to the users data from third parties for behavioural advertising.

No cookies (apart from strictly essential cookies) are placed before a user consents to such cookies. All other cookies are set as default to "off" and users over the age of 13 are asked to review and consent or not consent to these cookies at the point of entering the website.

> **Guidance**: Privacy settings are a practical way for you to offer children a choice over how their personal data is used and protected. For advice on how to set privacy settings as high by default, see Standard 7 of the Code – Default settings.

## Data minimisation

We only collect and process the minimum amount of personal data we need for particular activities. Users have a choice over whether to accept cookies and whether to sign up for our newsletter or indicate that they do not want to receive newsletters where we send these to account holders based on the soft opt-in exception.

## Data sharing

Data is shared with the third parties described under the heading "Data sharing" in Step 2.

## Geolocation

We do not collect or otherwise process geolocation data.

## Parental controls

We have analysed the processing we carry out and do not think that any of our it presents a risk which would require us to offer parental controls. Parents or guardians can contact us with any queries they have about our processing of their child's personal data, ask us to delete the personal information we have collected in connection with their child's account from our records, and exercise rights on behalf of their child. We confirm the identity of the adult as the parent or guardian of the child before carrying out any of the above.

> **Guidance**: For the purposes of the Children's Code, Standard 11 refers to how you make it clear to the child if parental controls are in place and if they are being tracked or monitored:
>
> "If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored."
>
> Companies might conform to Standard 11 by using child-friendly and age-appropriate avatars, symbols or pop-up messages (audio or written) to notify children when parental controls are monitoring their online behaviour.

## Profiling

We carry out limited profiling activities to email recommendations of similar products to users based on their order history and browsing activities. We only carry out profiling of users who have consented to the relevant cookies, and only send these emails to users who have opted-in to marketing, or who have not opted-out of marketing when making a previous purchase. Children under 13 years of age are not given the option to opt-in to marketing emails.

We do not offer external advertising to users of the service.

## Nudge techniques

We do not use nudge techniques to encourage children to provide more data or consent to the processing of their personal data. We encourage children to talk to their parents about using our website, and to discuss with them anything in our privacy or cookies policies which they do not understand.

> **Guidance**: Nudge techniques are design features which lead or encourage users to follow the designer's preferred paths in the user's decision-making. The code states that ISS should not use nudge techniques to lead or encourage children to provide unnecessary personal data or turn off privacy protections See Standard 13 of the Code – Nudge techniques.

## Connected toys and devices

This is not relevant to our processing.

## Online tools

All marketing emails and our generic enewsletter contain an unsubscribe link. Users who have registered for an account also have the option to delete their account at any time (subject to limited data retention in line with our retention policy).

An "I'm not happy" link is available at the bottom of each web page that links to a video with information on what children should do if they encounter problems on the site, including prompt to get help from trusted adult.

> **Guidance**: Online tools are mechanisms to help children exercise their rights simply and easily when they are online, such as complaints buttons. Standard 15 of the code – Online tools – states that you should provide prominent and accessible tools to help children exercise their data protection rights and report concerns.

> **Helpful hint**: You should review the Children's code harms framework. The framework is a flexible tool for identifying data-related risks to children that you need to consider when completing your DPIA. It aims to support online services to place children's best interests at the heart of their services.

# Step 5: Identify and assess risks

## Step 5: Identify and assess risks

We have carefully reviewed our processing and do not think that we carry out any activities that are likely to pose a significant risk to users. Specifically, we are satisfied, that the processing is not likely to give rise to any of the following harms:

- access to websites offering age-inappropriate content or activities;
- financial harm (eg advertising encouraging inappropriate or excessive spending online);
- grooming or abuse;
- inappropriate sharing of personal information, including via uploading content containing children's personal data;
- access to inappropriate goods;
- discrimination (around price of products);
- harassment, bullying, loss of social standing leading to self-esteem and mental health issues;
- intrusion into private spaces and associated loss of privacy for the child;
- inaccessibility of services or discrimination due to a disability; or
- service lock-in ie unfair contractual terms.

| Describe source of risk and nature of potential impact on individuals. Include as a minimum an assessment of particular risks to children as listed in the DPIA standard in the Children's Code. You may need to consider separately for different age groups. | Likelihood of harm | Severity of harm | Overall risk |
|---|---|---|---|
| | Remote, possible or probable | Minimal, significant or severe | Low, medium or high |
| 1. Personalised advertising that is set to on-by-default, done without adequate transparency and safeguards, or is against the best interests of the child (for example against the CAP code or Advertising Standards Agency standards) risking children's right to protection from economic exploitation. | possible | significant | medium |
| 2. Personalised advertising of age-inappropriate products that risks children's right to protection from economic exploitation. Likely to be higher risk | possible | minimal | low |

for younger children.

| | | | |
|---|---|---|---|
| 3. On-by-default data sharing with other service users that exposes children to risk of physical or emotional harm (for example through stalking, bullying or harrassment) that risks children's right to life, survival and development. | possible | minimal | low |
| 4. Sharing of children's data with third parties for commercial gain, against the best interests of the child or without adequate transparency and due diligence risking children's right to protection from economic exploitation. | possible | minimal | low |
| 5. Online tools for children (and parents, for younger children) to exercise their data rights that are not transparent, not specific to the rights they support, or not provided, and that risk the children's right to respect for their views. | remote | minimal | low |

# Step 6: Identify measures to reduce risk

## Step 6: Identify measures to reduce risk

Identify additional measures you could take to reduce or eliminate risks identified as medium or high risk in step 5

| Risk | Options to reduce or eliminate risk | Effect on risk | Residual | Measure approved |
|------|-------------------------------------|----------------|----------|------------------|
|  |  | Eliminated/ reduced/ accepted | Low/ medium/ high | Yes/no |
| Personalised advertising that is set to on-by-default, done without adequate transparency and safeguards, or is against the best interests of the child (for example against the CAP code or Advertising Standards Agency standards) risking children's right to protection from economic exploitation. | Profiling activities limited to email recommendations of similar products to users based on user order history and browsing activities on our site only. Marketing newsletters only accessible to children over 13. No links to external marketing. | reduced | low | yes |
| Personalised advertising of age-inappropriate products that risks children's right to protection from economic exploitation.  Likely to be higher risk for younger children. | Ensure all marketing is of age-appropriate products, allow products to be searched by age range. Website only sells products from reputable and vetted suppliers. | reduced | low | yes |
| On-by-default data sharing with other service users that exposes children to risk of physical or emotional harm (for example through stalking, bullying or harrassment) that risks children's right to life, survival and development. | Cookies set to off by default for under 13s, no geolocation data collected, privacy high be default.  e-commerce site regularly updates security. | reduced | low | yes |
| Sharing of children's data with third parties for commercial gain, against the best interests of the child or without adequate | We only collected the minimum amount of data needed for process and fulfil orders, and for limited internal contextual | reduced | low | yes |

| | | | | |
|---|---|---|---|---|
| transparency and due diligence risking children's right to protection from economic exploitation. | marketing only.<br>Data shared with trusted and vetted third parties for payments, shipping orders, analytics, and with our e-commerce site processor. A cookie consent tool if offered to users. | | | |
| Online tools for children (and parents, for younger children) to exercise their data rights that are not transparent, not specific to the rights they support, or not provided, and that risk the children's right to respect for their views. | There is an unsubscribe button on all newsletters. "I'm not happy" link is available at the bottom of each web page that links to a video with information on what users, including children, should do if they encounter problems on the site, including a prompt to get help from trusted adult. | reduced | low | yes |

# Step 7: Sign off and record outcomes

## Step 7: Sign off and record outcomes

| Item | Name/position/date | Notes |
|---|---|---|
| Measures approved by: | | Integrate actions back into project plan, with date and responsibility for completion. |
| Residual risks approved by: | | If accepting any residual high risk, consult the ICO before going ahead. |
| DPO advice provided:<br><br>1. The level of risk is acceptable - subject to controls identified<br><br>2. Confirm accepted controls have been deployed or will be prior to processing<br><br>3. Prior consultation with the ICO not required. | A Person | DPO should advise on compliance, step 6 measures and whether processing can proceed. |
| Summary of DPO advice: | | |
| DPO advice accepted or overruled by: | | If overruled, you must explain your reasons. |
| Comments: | | |
| Consultation responses reviewed by: | | If your decision departs from individuals' views, you must explain your reasons. |
| Comments: | | |
| This DPIA will be kept under review by: | | The DPO should also review ongoing compliance with DPIA. |

This document is made available on the basis that the user understands that:

- they remain fully liable for their own legal and regulatory obligations;
- the ICO does not accept any liability for any reliance that might be placed on any feedback, comments or other input it might provide; and

- providing this sample DPIA does not prevent or limit the ICO's ability to take any enforcement action or other regulatory action against companies that might use the sample as the basis for their own DPIA, if the ICO deems such action is appropriate.

# EXHIBIT B-3

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Introduction                                                             2
Step 1: Identify the need for a DPIA                                     3
Step 2: Describe the processing                                          6
Step 3: Consultation process                                            19
Step 4: Assess necessity and proportionality                           20
Step 5: Identify and assess risks                                      25
Step 6: Identify measures to reduce risk                               27

# Introduction

This document is intended as an example of good practice to help companies creating connected toys for use by children in the UK. It will help you to understand and apply the ICO's Children's code, formally known as the Age-appropriate design code. It specifically applies to Standard 2 of the code, which relates to the need for Data Protection Impact Assessments (DPIAs) for Information Society Services (ISS) likely to be accessed by children (under age 18) in the UK, and Standard 14: Connected toys and tablets. Before starting to review the DPIA sample, you might find it helpful to read the two standards mentioned above.

The ICO has worked with a connected toy manufacturer to produce the sample, and with the law firm DLA Piper to draft the text for the DPIA. The product used in this sample is imaginary, and is not intended to represent an actual product.

This sample DPIA is adapted from the ICO's DPIA template, and follows the process set out in our DPIA guidance and the code. You should read it alongside the code and DPIA guidance, and the Criteria for an acceptable DPIA set out in European guidelines.

The sample DPIA below is a beta version, and is still being reviewed by the ICO for further development. We welcome recommendations for improvements or other feedback. Please email your comments to [email protected].

| | |
|---|---|
| **Name of controller:** The Toy Company | |
| **Subject/title of DPIA:** Connected toy | |

# Step 1: Identify the need for a DPIA

Explain broadly the nature of your online service, and the current stage of design or development. You may find it helpful to refer or link to other documents. Summarise when and how you identified the need for a DPIA.

**Guidance:** Standard 2 of the Children's code requires Information Society Services* to undertake a DPIA if they are processing children's data. Therefore, it may be useful to reference the Children's code requirement in step 1. See Standard 2 of the Children's code  - DPIAs:

"Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code."

Similarly, as this DPIA focuses on a connected toy, it would be useful to reference in this section how you will conform with Standard 14 of the code - Connected toys and tablets:

"If you provide a connected toy or tablet, ensure you include effective tools to enable conformance to this code".

*An Information Society Service is defined as "any services normally provided for remuneration, at a distance, by electronic means and at the individual request of a recipient of services." You can see the Services covered by this code for more information on whether you may be in scope of the Children's code.

We are launching a connected tablet aimed at children between the ages of four and 12. This is a new version of an established tablet originally launched in 2018 with updated app features. Over 500,000 copies of the original tablet have been sold in markets in the USA, Europe and Middle East (including the UK), and Asia.

It is an educational product which enables children to learn how to operate a tablet and develop skills such as cognitive development, problem solving, creative play, basic maths, reading comprehension, hand eye coordination and language development. It allows children to take and store photos and videos, browse the internet, listen to music and watch shows.

The tablet uses the Google Android OS 10 operating system.

In conjunction with the tablet, we offer our own secure app store to which tablet users can connect and download age-appropriate apps, games, e-books and other products from a server operated by The Toy Company. These products are in age appropriate bands of four to five, six to nine, and 10-12 years old. Children are given a username by their parents at tablet set-up. They connect to the app store through their tablet using a tab, and are only able to see the products appropriate to their age bracket (with ages

input by parents through the parental control screens). Children select the items that they want. If the item is free, they can download the app immediately to the tablet. If the app has a fee, their request triggers an email to their parents, who either confirm or reject the purchase. In the event of rejection, the children are shown an age-appropriate message advising them that the download has been rejected and to discuss their download request with their parents.

Parents are required to accept terms and conditions for the app store before it can be used by their children, and create an account for themselves and their children to use. Parents need to provide first name, last name, email address, username and password to create an account. They are able to associate a separate username and password to each child that they want to access the app store through the tablet.

> **Helpful hint:** attach copies of all relevant privacy notices and terms and conditions documents for your tablet and any core applications that may have separate policies or terms to the core devise.

Use of the app store is restricted to The Toy Company products only.

Our website does not feature content aimed at children above the age of 12.

Access to Google Play store is turned off-by-default.  Access may be enabled through the parental control screen. When parents set up the system they have the option of changing these settings permanently or enabling on a case-by-case basis.

> **Guidance:** The Children's code offers guidance to ISS on how to offer age appropriate online services to children. See Standard 3 of the AADC – Age appropriate application for further information:
>
> "Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead."
>
> You might also find it helpful to review Annex B of the AADC -  Age and developmental stages.

Key features of the tablet include:

- a touchable interactive screen, microphone, camera with funny filters, MP3 player, web browser, calendar, clock and alarm;
- a series of built-in age-appropriate apps for gaming and learning, video recording, playback and editing;
- the ability to add apps, e-books, videos and music from our own website or the Google App Store. (Where a fee is charged for content, only parents may purchase apps etc. Purchases are made through the parental control dashboard);
- the ability to take and store photographs using a proprietary app with the photo stored on the tablet only. (Access to cloud based storage is turned off-by-default. Parents may turn on when they set up the

system for their child);

- the ability to create and store artwork using a proprietary app with the work stored on the tablet only; and

- the ability to browse the web.

> **Helpful hint:** Provide further details on each pre-installed app that provides core functionality for the tablet (ie is used by default) within the DPIA. Include details for each app in each section of the DPIA below.

The toy is sold through online and in-shop retailers. We do not sell or deliver the tablets directly to customers. Although, we do sell downloadable content (eg apps, videos and music) for the tablet through our app store website. Apps may also be purchased through Google App Store if parents enable this feature through the product set-up stage.

We collect and process children's personal data through in-house platform analytics and technical monitoring of children's use of the toy. The tablet collects the game-play data from the children. We use this to provide the appropriate game level and challenges for children of different ages, and to guide the development of new features and services. We anonymise the data we collect for research and development purposes before use, and we analyse it to identify improvements to the apps and tablet. We do not share this data beyond the company.

Our tablet and apps support different age ranges: four to five, six to nine and 10 to 12. There are different settings available to different age groups if the tablet has multiple users. Games, music, and videos that feature a seven plus PEGI rating are only available to the 10 to 12 age groups.

When the tablet is launched, it asks parents to enter the date of birth for their children. Subsequent tablet launches asks children to log into their profile to ensure that the correct content is available for each individual child. In this way, each user of the tablet can only access their own content and data.

Users can access content from multiple curriculums and levels appropriate for the various age ranges. As the child plays one of our apps, the age range selection and details of the content and curriculum previously accessed are sent to our server. The server can then guide the child to the correct level based on previous progress. We do not retain or analyse data on external apps downloaded to the tablet.

We have identified the need for a DPIA because we will be collecting and processing children's personal data through platform analytics and technical monitoring of children's use of the toy. This processing is included in the list published by the UK Information Commissioner's Office under Article 35(4) of the GDPR.

> **Helpful hint:** You can see the ICO's guidance on what activities are considered likely to result in a high risk and need a DPIA. You should also review the Children's code harms framework. The framework is a flexible tool for identifying data-related risks to children that you need to consider when completing your DPIA. Its aim is to support online services to place children's best interests at the heart of their services.

# Step 2: Describe the processing

**Describe the nature of the processing**: how will you collect, use, store and delete data? What are the sources of the data? Will you be sharing data with anyone? You might find it useful to refer to a flow diagram or other way of describing data flows. What types of processing identified as likely high risk are involved? Does your service involve any profiling, automated decision-making, or geolocation elements? What are your plans (if any) for age-assurance? What are your plans (if any) for parental controls?

## How we collect data and sources of data

> **Helpful hint:** You may find it helpful to consult your privacy notice or Record of Processing Activities (ROPA) which may contain some of the information required for this section. You might also find it helpful to see the ICO's guidance on ROPAs.

For completeness, we have summarised below all (ie children and adults') personal data collection and usage. However, the personal data we process relating to children specifically is generally:

- photographs and videos taken by child users;
- game playing telemetry (see below for more information);
- IP address for the tablet;
- child's date of birth;
- browsing history and tablet identifiers; and
- a Google account, which parents need to create if Google Play is used. This involves creating a user name, and providing first and last name, birthday (for age verification), gender, and phone number.

> **Guidance:** Data minimisation helps you protect your users by collecting only the minimum amount of personal data you need to provide your services. See Standard 8 of the Code – Data minimisation for help in how to meet this standard and give children  choices over which elements of their data they wish to activate.

We collect personal data in the following ways:

- Direct interactions with users. For example, when:
- purchases are made of apps or content through our website or online app store;
- parents register and create profiles for their children;
- parents create a parental control dashboard;
- customers contact us with a question or issue;

- parents sign up for marketing emails;
- we carry out market research with customers.
- Users interacting with our apps and tablet. For example, when:
- age ranges are selected and content accessed and games played;
- through platform analytics tools;
- through game-play data.
- From third parties, ie from our third party analytics service provider (see details below).

## How we use data

- For sales of apps, content etc through our proprietary app store, and to provide our services including sending service emails.
- For financial administration and invoicing.
- To provide customer accounts to enable the use of our services.
- To manage our relationship with customers (eg responding to questions, complaints, asking users to take a survey).
- To monitor children's use of the tablet and apps and to produce reports for parents to give parents visibility over their children's use.
- To send e-newsletters to customers (parents only) who have opted in to receive.
- To administer and protect our business and website and platform (eg system maintenance and support, fixing problems, hosting of data).
- To deliver website and platform content.
- To carry out data analytics to improve our website and platform, products, customer experience on our website and platform.
- To carry out market research.
- To verify user identify and provide a secure platform.
- To comply with regulatory or legal obligations.

Our main use of personal data is to process and fulfil orders made on the website or app store, provide the apps, and deal with customer enquiries. In addition, we carry out limited marketing activity by an e-newsletter which parents (not children) may sign up for. All our e-newsletters have an unsubscribe link and we action all opt-outs. We do not carry out any behavioural or targeted advertising.

We also carry out platform analytics and technical monitoring of children's use of the tablet. We collect and analyse user-generated game playing relating to game development and research. The data we collect includes user interactions with games, location within the game and physical movements, in game purchases, and player interaction with other users. We use this data to provide the appropriate game level and challenges for children of different ages and to develop new features and services. Where we collect analytics data through cookies or similar technologies, this is subject to obtaining the prior consent of parents by a pop-up when they carry out the initial product set-up.

We process children's game playing and tablet use telemetry data for use with the parental dashboard that monitors children's tablet use. The data used to inform the parental dashboards and controls is processed on the device, and not shared with the company.

Cookies

**Helpful hint:** You might find it helpful to consult your cookies policy or the cookies section of your privacy policy to assist you in completing information about cookies. See our guidance on cookies. Attach a copy of your cookies policy with the DPIA.

Our website and apps use cookies if enabled through the parental control settings.

We have put in place a cookie consent tool which explains the cookies used and requests consent to these. We also have a cookie policy which explains in more detail the types of cookies used and the purposes for which they are used. The consent tool is available at the point of website entry and when configuring the tablet and downloading apps. It collects consent from adult, not child, users.

We use essential cookies, which are not subject to the consent requirement, for the following purposes. These are first party cookies set within individual apps and the cookies' access is restricted by the corresponding app only.

The website uses basic cookies or similar technologies for:

- account authentication;
- tracking user input for functions of the service (eg shopping cart);
- security and fraud prevention;
- load balancing;
- preference cookies for the cookie consent tool; and
- analytics (as described above).

We use third party cookies, subject to consent being given, for the following purposes:

- distinguishing between humans and bots;
- identifying tablet and app used to access YouTube Kids and Google App Store. This includes IP address, unique application numbers, unique identifiers for language and other settings;
- registering unique IDs to track returning tablets;
- tracking what YouTube Kids videos have been watched to inform content recommendations; and
- storing video player preferences for YouTube Kids videos.

We do not use the geolocation data gathered by third-party cookies. However, for some products, we select some YouTube Kids videos and embed the links into apps available on the toy. Activation of YouTube Kids requires parental consent and parents may add more YouTube Kids videos through the parental control features. Children are not able to independently upload YouTube videos.

When a user clicks on an external link (eg You Tube Kids), a pop-up warns that they are leaving our service. It states: "Your personal data will be processed by the third-party site according to their own privacy policies." A link to the appropriate social media privacy notice is included in the pop-up.

Parents are able to use the controls to enable cookies for all websites accessed on the browser (this is

available on an all-websites basis only, not on a per-website basis). Parents must enter a passcode to access the mode which enables them to manage cookies.

**For information:**  Article 26 of the UK GDPR states: "Where two or more controllers jointly determine the purposes and mean of processing, they shall be joint controllers. They shall in a transparent manner determine their responsibilities for compliance with the obligations under this Regulation."

This sample DPIA does not go into detail on the measures The Toy Company should take to determine the purpose and means of processing for any joint controllers. For example, social media sites, data analytics providers. If you are using third party services that are likely to process personal data, you should talk with them about whether the processing relationship is joint controllership or a controller–processor relationship.

In this sample DPIA, for apps that are pre-installed on the tablet, joint controllership would likely depend on whether the user has a choice around using that app or not. With Google Play and  YouTube Kids and the bundled services, the processing is defined partly by the manufacturer choosing that model for the core functioning of the tablet. They have also enabled the processing of personal data by Google.

It is recommended that ISS consult with their Data Protection Officer and any joint controllers for details of how to explain joint controller processing in their DPIA.

## Storage and deletion

We are based in the UK and customer data is stored in the UK. The website which supports the tablet makes use of Amazon Web Services and is hosted in the USA (see International Transfers section below on how EU SCCs are used). We have a retention schedule which specifies storage periods for the various processing activities and data categories listed in this DPIA. These reflect relevant legal requirements and limitation periods applicable to contractual claims. Once retention periods have expired, we securely delete data and keep a log of deletions.

**Helpful hint:** See our guidance on storage limitation and data retention. Attach a copy of your records management policies with the DPIA.

## Data sharing

**Guidance:** Data sharing usually means disclosing personal data to third parties outside your organisation, or to different parts of the same organisation. This DPIA outlines how children's and parents' data may be shared within the Toy Company and with external third parties. Standard 9 of the code – Data sharing advises:

> "Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child."

When parents set up an account, they are informed about how data is shared within the wider company group through the privacy notice.

We use a third party **payment services provider** to provide the payment function for parents on the website and our app store. This payment services provider acts as a separate data controller and we do not store payment card data. We make clear in our privacy policy that the payment service provider operates subject to its own privacy policy and we tell users to refer to this for details of its processing. We provide a link to the provider's privacy notice.

> **Helpful hint:** You should attach details of the due diligence you carry out when appointing your payment service provider with the DPIA. See our guidance on processor due diligence checks.

We use a **hosting provider** to host our website. The provider acts as our processor and we have entered into Article 28(3) terms with them.

We use a **fraud prevention service** which provides us with risk scores to help us avoid fraudulent transactions.  This service is provided by a third party which acts as an independent controller. To make use of this service, we transfer certain personal data to the provider (ie names, phone number, billing and delivery addresses, email address, IP address of parents). This processing is explained in our privacy policy with a link to the provider's own policy.

We use a third party **analytics provider** on our website and platform. This is so that we can check the quality and effectiveness of our service and ensure it meets the needs of the user. Our analytics provider collects data related to the user's tablet or browser, a portion of IP address, and on-site activities to measure and report statistics about user interactions on our website and platform. It uses cookies to measure user interactions with our website and  platform, and IP addresses  to provide and protect the security of the service. The provider processes this information on our behalf and uses it to prepare reports for us about how our visitors engage with our website. These reports don't identify the users - they are aggregated information about all our users.

We may share users data with regulatory or law enforcement agencies to meet our **legal or regulatory obligations**.

Our analytics provider doesn't use any of this information for their own purposes - they act as our processor and only operate on our instruction. This processing is carried out in the EU.

Our cookies policy provides more information about our use of cookies for analytics purposes. Users can opt-in using our cookie control (see cookies section below), and can change their mind at any time.

> **For information:** Some data analytics providers may function as processors and fall within scope of Article 28(3) of the UK GDPR. However, some analytics providers will be joint controllers as a result of

the way in which personal data is processed. Where this is the case, the service provider should enter Article 26 terms with them as joint controllers. It is for the service provider to determine the nature of the relationship between it and analytics provider.

**Helpful hint:** Indicate in your DPIA which third parties are also independent controllers. Insert a link to their privacy notices signposting readers to relevant further information.

We use a third-party **call centre** to provide our customer helpline (for UK and Rep of Ireland users, the call centre is based in the UK). We also use a **direct marketing agency** and **email services agency** (both UK based) that send out emails on our behalf and manage our CRM.  All three act as processors and we have entered into Article 28(3) terms with them.

We also share data with our **auditors and other professional advisors** that act as independent controllers.

## Profiling

We collect and analyse user-generated game playing relating to game development and research.

Data we collect includes user interactions with games, location within the game and physical movements, in-game purchases, and player interaction with other users. We use this data to adjust the overall difficulty of the game to provide the appropriate game level and challenges for children of different ages, and to develop new features and services.

**Guidance:** Profiling is defined under Article 4 UK GDPR as: "any form of automated processing of personal data consisting of the use of personal data to evaluate certain aspects relating to a natural person, in particular to analyse or predict aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour location or movements"

The Guidelines on Automated individual decision-making and Profiling for the purposes of Regulation 2016/679 state:

"Broadly speaking, profiling means gathering information about an individual (or group of individuals) and evaluating their characteristics or behaviour patterns in order to place them into a certain category or group, in particular to analyse and/or make predictions about, for example, their:

- ability to perform a task;
- interests; or
- likely behaviour."

See Standard 12 of the code – Profiling for guidance on what you should do if you include profiling

of children as part of your service:

"Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing)."

**Guidance:** For the purposes of the Children's Code, Standard 11 refers to how you make it clear to the child if parental controls are in place and if they are being tracked or monitored:

"If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored."

We recognise that profiling is taking place when game-play data is collected from a child and an automated decision is made about which level should be served to the child based upon this game-play analysis. Where this type of profiling occurs, the profiling relates to the child's ability to perform a task. In this case and when the game does not relate to improving the educational development of the child, profiling is switched off-by-default. Parents receive a message during account setup explaining the use of profiling for game-play analysis and are given the option to turn profiling on for this use only.

Where the purpose is to increase the knowledge of the child, the game requires this profiling in order to both place the child at the right level and to ensure the child continues in their educational journey. This type of profiling is core to the purposes of the educational game, so profiling is not turned off by default in these circumstances.

We do not profile users for marketing purposes.

## Parental controls

The tablet features a number of parental controls. There is a parent's dashboard that allows parents to set controls on their children's use of the system and monitor use. The dashboard allows parents to:

- monitor which games, videos, music and books children are downloading;
- manage app settings, add or remove apps, and set restrictions on children's access to the play store;
- set time usage limits;
- control content and access to the web browser; and
- manage tablet settings.

Key use statistics are collected with weekly and monthly reports available to show parents how the tablet is being used, and the time spent on the tablet against the different apps.

When parents create their parental control dashboard, they are required to tick a box showing that they have read a message concerning children's rights to privacy under the UNCRC, UK GDPR and DPA. A downloadable resource is also available to help parents explain the service to their child and discuss privacy with them.

The system allows children to actively see when parental controls are in place. Age-appropriate messages are delivered to the child through a pop-up window to let the child know when parental time control limits have been activated or limits reached. A pop-up is shown which reads "Parent time controls are active," or "Sorry, you can't play just now. You have reached your parental time control limit." Further messages are displayed when parental controls are used to restrict access to apps, with a pop up showing "Sorry, you can't play just now. Parent app controls are active." Similar reminder messages are shown when the tablet is switched on if controls are active, along with a  link to more detailed information. All pop-up messages are displayed in writing and using audio messages.

Where the initial product set up identifies that the child is aged 10 plus, a short film is launched as a pop-up when they first engage the service. A text download is also available for the child to use independently. These explain the service and discuss privacy rights.

Non-essential cookies are disabled on the tablet. Parents are able to use the controls to enable cookies for all websites accessed on the browser (this is available on an all-websites basis only, not on a per-website basis). Parents must enter a passcode to access the mode which enables them to manage cookies.

Privacy settings are set at high-by-default, within the apps themselves, for curated content available on the tablet, and on the browser which children may use to access websites. If a parent makes any changes to the settings, the settings revert to high-by-default at the next use unless the parents confirm that they want the settings to remain at lower privacy settings.  An age-appropriate explanation of the parental control features is provided when the child first uses the system, or when they turn 10.This encourages discussion with parents about a child's right to be informed and contributes to decisions on their online privacy

> **Guidance:** Privacy settings are a practical way for you to offer children a choice over how their personal data is used and protected. For advice on how to set privacy settings as high-by-default, see Standard 7 of the code – Default settings.

## Age assurance

All apps available on our website and app store and all content on our website are designed for children aged 12 and under. As the toy is designed for children's use only, all users receive basic protections in how their personal data is used by default.

The system follows the principles outlined in the ICO's Age appropriate design code:

- Provide high privacy settings for child users by default.

- Geolocation and profiling should be off-by-default.

- Don't serve children content deemed detrimental to their health and wellbeing.

Parents are required to set up and configure the tablet as explained in the section above, including inputting the age of the children using the tablet. Parents are also required to provide their own name and email address. Children are unable to change the age information or privacy settings once set by their parents. Children are only able to access app download content appropriate for their age.

Information collected during the set up for age assurance is not used for targeting advertising at children. We may, however, use age information to ensure that content in our e-newsletters for parents are appropriate for their children's age. This includes contextual advertising for other toys we may offer. E-newsletters are not sent to children, and are only sent to parents if they have given their consent.

Parents confirm the age of their children at account set-up and provide a child username and password. As the content available to children is appropriate for their age, we are confident in the age assurance measures we use and do not seek additional age information.

## Security measures

> **Helpful hint:** You might find it helpful to consult your information or data security policy to assist you in providing information about security measures. You can see more information in our guidance on security

We use the following security measures on our website and apps:

- We undertake an analysis of the risks presented by our processing, and use this to assess the appropriate level of security we need to put in place.
- We keep our software up-to-date.
- We require users who create an account to use a strong password with numbers, capital letters and other characters, and which must be at least 10 characters long.
- We use encryption or pseudonymisation or both where it is appropriate to do so.
- We use SSL protection on our login pages.
- We use a Captcha function on our "contact us" page.
- We use a market-leading, reputable web hosting company.
- We ensure that any data processor we use also implements appropriate technical and organisational measures.
- We have a policy of regularly deleting any files, databases, or applications from our website that are no longer in use.
- We regularly back up all data.
- We run regular web security scans to check for website and server vulnerabilities.
- We use a fraud prevention service for purchases made on our website and app store.
- We conduct regular testing and reviews of our measures to ensure they remain effective, and act on the results if they highlight areas for improvement.

**Describe the scope of the processing:** what is the nature of the data, and does it include special category or criminal offence data? How much data will you be collecting and using? How often? How long will you keep it? How many individuals are affected? What geographical area does it cover?

## Data processed

- Identity data: names, username and password, title, year of birth (for children), age, gender (not mandatory), country of residence.
- Contact data: billing address, email address, phone number.
- Financial data: payment card details (processed by a third party payment services provider and not stored by us or our website and app store).
- Transaction data: details of apps purchased, amounts, dates etc.
- Technical data: IP address, login data, browser type and version, time zone setting and location, browser plug-in types and versions, operating system and platform, user agent string, browser type, monitor size, surfing behaviour, location, browser language, name and URL of the requested file, the website through which access is granted (referrer URL).
- Usage data: information about how users use our website, products and services.
- Marketing and communications data: record of users' preferences in receiving marketing from us, delivery dates and notion of connected tablet, feedback, questions, complaints and survey responses.

## Special categories of personal data

We do not process any special category personal data.

## Volume of personal data

We currently have around one million children using this service globally.

## Retention of data

We have a retention schedule which specifies storage periods for categories of data which reflect relevant legal requirements and limitation periods applicable to contractual claims. Once retention periods have expired, we securely delete data and log deletions.

## Geographical area

The data subjects whose data we process are located in the UK and worldwide.

---

**Describe the context of the processing**: what is the nature of your service? Are you designing it for children? If not, are children under 18 likely to access it anyway? What is the likely age range of your

users? How much control will they have? Would they understand and expect you to use their data in this way? Does your service use any nudge techniques? Are there prior concerns over similar services or particular security flaws? Is your service novel in any way? What is the current state of technology in this area? Are there any current issues of public concern that you should factor in, particularly over online risks to children? Are there any relevant industry standards, codes of practice or public guidance in this area? What responsibilities do you have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland? Is there any relevant guidance or research on the development needs, wellbeing or capacity of children in the relevant age range? Are you signed up to any approved code of conduct or certification scheme (once any have been approved)?

## Nature of service and users

Our service is a connected tablet aimed at children between the ages of four and 12. This is a new version of an established tablet with updated app features. The tablet is an educational product which enables children to take and store photos and videos, browse the internet, listen to music and watch shows. The tablet uses the Google Android OS 10 operating system.

In conjunction with the tablet, we offer a secure app store to which tablet users can connect and download age-appropriate apps, games, e-books and other products.

## User or parental control

The apps and content that children can access is controlled by their parents and simple age-appropriate information is provided to the child users to let them know about this. Pop-ups are shown if time controls are active, as well as if access to certain apps is restricted. All pop-up messages are displayed in writing and using audio messages.

See the 'Parental controls' section for more information.

## Users' expectations

Our main uses of personal data are to process and fulfil orders made on the website and app store, provide the apps, and deal with customer enquiries. In addition, we carry out limited marketing activity by e-newsletter which parents (not children) may sign up for. E-newsletters share contextual advertisements about new or popular products with parents. All e-newsletters have an unsubscribe link and all opt-outs are actioned and respected. We have a policy of never contacting the children themselves.

We also carry out platform analytics and technical monitoring of children's use of the tablet. We use this data to provide the appropriate game levels and challenges for children of different ages and to develop new features and services. Where we collect analytics data through cookies or similar technologies, this is subject to obtaining the prior consent of parents through a pop-up when they carry out the initial product set-up.

We consider that the above processing will be in line with users' expectations.  We have clearly explained it in our privacy policy which is available at all relevant touchpoints (on our website, on our app store and when purchasing or downloading apps and other content). We provide privacy information to children in both age-appropriate text and video formats.

Our service is not novel and is in line with the current state of technology within the relevant market place. The only code of practice we are aware of which is applicable to our product is the ICO's Age-appropriate design code. We have taken this into account in the design of our product and processes which involve the use of personal data.

---

**Describe the purposes of the processing**: what do you want to achieve with your service? What is the intended effect on individuals? What are the benefits of the processing – for you, and more broadly? What are the specific intended benefits for children?

> **Guidance:** The Information Commissioner is required to take into account the UK's obligations under the UNCRC in drafting this code. All the standards of the code relate to the best interest standard. See Standard 1 - Best interest of the child, which states:
>
> "The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child."
>
> In order to implement this standard you need to consider the needs of child users and work out how you can best support those needs in the design of your online service, when you process their personal data.

## Aim of our service

Our aim is to offer a connected tablet for children between the ages of four and 12, which is educational. The tablet enables customers to provide their children with a safe and age-appropriate way to use technology and explore the internet. The specific purposes for which we process personal data are set out in step 2 under the heading 'How we use data'.

## Intended effect on individuals

The intended effect on individuals is to enable parents to provide their children with, and to enable children to enjoy, an age-appropriate tablet. The features and controls make the tablet safe for children to use, rather than having to use a tablet designed for adults. We aim to create trust in our brand to increase our market share and drive sales of apps and content through our website and app store.

## Benefits of the processing

The benefits of the processing are (for us) that it enables us to run our business, market our products and increase our sales. The processing benefits customers in that it enables children to access online content in a safe and controlled way, and to enjoy educational apps and content specifically designed for their age group. Adults can also benefit from e-newsletters (subject to consent) which inform them about our products and services that they may be interested in.

# Step 3: Consultation process

**Consider how to consult with relevant stakeholders:** describe when and how you will seek individuals' views - and specifically how you will seek the views of children and parents – or justify why it's not possible to do so. Who else do you need to involve within your organisation? Do you need to ask your processors to assist? Do you plan to consult experts in children's rights and developmental needs? If not, why not? Do you plan to consult any other experts?

We have conducted product testing of the tablet and consultation with a children's panel group to help in the product development process.

We also consulted with parents and guardians through a feedback questionnaire which included questions on product functionality, website usability and services, and privacy. The consultation was conducted online with parents or guardians whose children are registered to use our products.

We have not consulted directly with experts on children's rights, but keep up-to-date on policy in their area through briefings delivered by our representative bodies, including the British Toy and Hobby Association.

We note that where we have identified residual risks, we are satisfied that they are limited and appropriate measures are in place to mitigate potential harm (see step 5).

# Step 4: Assess necessity and proportionality

**Describe compliance and proportionality measures, in particular:** what is your lawful basis for processing? Does the processing actually achieve your purpose? Is there another way to achieve the same outcome? How will you prevent function creep? How will you ensure data quality and data minimisation? If you use AI, how will you avoid bias and explain its use? What information will you give individuals? How will you help to support their rights? What measures do you take to ensure processors comply? How do you safeguard any international transfers?

## Lawful bases for processing

> **Guidance:** See Annex C of the code – Lawful basis for processing for guidance on how to determine the lawful basis you can use when processing personal data.

- Performance of a contract with the data subject (Article 6(1)(b)UK GDPR): where processing is necessary to fulfil a product order (including creating an account, selecting and paying for products, sending products to customers online); provision of after-sales service; and sending service emails.
- Legitimate interests (Article 6(1)(f) UK GDPR): processing of personal data connected with strictly necessary cookies (security cookies and functionality to enable a service requested by the user); corresponding with customers in response to enquiries; processing of data for fraud prevention and data security purposes; carrying out customer consultations, surveys or market research; administration and protection of the business and website; and platform analytics and monitoring where data is not derived from cookies or similar technologies. We have carried out legitimate interests assessments for all processing activities carried out on this basis.
- Consent (Article 6(1)(a) UK GDPR: processing connected with sending e-newsletters where a person has opted in to receiving them; and processing personal data in connection with functional, analytics or marketing cookies.

## Necessity and proportionality

We consider that our processing achieves the purposes set out in step 3 and does not go beyond what is reasonably necessary to achieve these purposes.

To ensure there is no function creep, we only use data for the limited purposes explained in this DPIA.

We ensure data minimisation and proportionality by only asking for data that we need for a current specified purpose.

> **Guidance:** You should be clear, open and honest with your users about what they can expect when they access your online service. Standard 4 of the code – Transparency – sets out what the ICO will be looking for:
>
> "The privacy information you provide to users, and other published terms, policies and community

standards, must be concise, prominent, and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated."

See the Children's code design guidance  for support and good practice examples on how to incorporate transparency by design.

## Transparency and data subject rights

Adults are given information about our processing through our privacy policy which they are asked to review when they create an account, download apps, and when they configure the tablet for first use. The privacy policy is also accessible from our website footer. Our cookie policy contains information about cookies used on our website and apps. This is accessible through our cookie consent tool and from our website footer.

In addition to the privacy policy which is aimed at adults, we also provide privacy information to children in both age-appropriate text and video formats.

We explain about individuals' rights in our privacy policy and include an email address which individuals can use to contact us with any questions about their rights and how to exercise them. Our team members that deal with queries on data protection matters and requests to exercise data subject rights have received basic training on dealing with requests, including data protection and child safety training. From 2021 staff will also receive training in child data protection guidance produced by the ICO and the FTC.

## Processors

We use a web hosting service, an analytics service provider, an outsourced call centre, a direct marketing agency and an email services agency/ CRM provider. They all act as processors. We have entered into Article 28(3) GDPR terms with each of these third parties and also carried out appropriate security risk assessments. The Article 28 agreements include a contractual obligation for the processor to use EU SCCs and undertake a risk assessment if or when they engage the services of a sub-processor who is transferring data to a third country.

## International transfers

Transfers of data are made in connection with sharing personal data with our hosting provider and analytics service provider described in step 2. We have entered into EU Standard Contractual Clauses with these third parties. We also transfer personal data to our group companies, including those in the US, Hong Kong and China. These transfers are made subject to an intra-group agreement which incorporates the EU Standard Contractual Clauses. We have carried out appropriate transfer impact assessments to ensure  that the level of protection of personal data when transferred internationally is essentially equivalent to the GDPR or equivalent appropriate safeguards existing in the relevant third countries. In situations where the level of protection is not essentially equivalent, we have put in place effective supplementary measures, to ensure an essentially equivalent level of protection.

**Describe how you comply with the Age-appropriate design code**: what specific measures have you taken to meet each of the standards in the code?

**Best interests of the child:** We have taken into account the interests and rights of the children that use our tablet. These are reflected in the various controls with have put in place which are described in this DPIA; the age appropriate privacy explanations; our policy of never contacting children; and our limited collection and use of their personal data.  All the content available to children is age-appropriate and is designed to support their learning, development and leisure in a safe environment. The role of parents in protecting their children is recognised and supported through the parental dashboard.

**Data protection impact assessments:** We have completed this DPIA which covers all processing activities carried out in connection with our processing of customer (both adult and child) data. We keep this DPIA under review and are aware of the need to update it if we make any changes to our processing of customer personal data. We make the up-to-date version of this DPIA available on our website and refer to it in our privacy policy.

**Age-appropriate application:** The key aim of our tablet and the games and content we offer in connection with it is that it is age-appropriate, and we have focussed on this throughout the design process. The tablet and apps support different age ranges: three to four, five to seven, and eight to 11. When the app is launched, the tablet asks the parent to select the age ranges for their children. Subsequent tablet launches asks the child to log into their profile to ensure the correct content is available for that particular child.

Users can access content from multiple curriculums and levels appropriate for their age range. As the child plays one of our apps the age range selection and details of the content and curriculum previously accessed are sent to our server.  The server can then guide the child to the correct level based on previous progress.

Privacy information is provided to children in age-appropriate text and video formats. This includes if a child is using the tablet when parental controls are in effect, and the child tries to do something which has not been permitted by the parent. For example.  access content and apps, or exceed time limits . In these cases the children see and hear a simple message explaining that they cannot do that particular thing because parental controls are active.

**Transparency:** We provide a privacy policy and cookie policy explaining how we use personal data and how cookies are used on our website and apps. As set out above, we provide separate age-appropriate privacy information for children. Our terms and conditions are also written in clear and easy to understand language.

**Detrimental use of data***: We do not use personal data in any way which could be detrimental to a child's or any other person's well-being.

**Policies and community standards:** We follow our terms and conditions and privacy policy and only use data in accordance with these documents.

**Guidance:** When you set community rules and conditions of use for users of your service, you need to actively uphold or enforce those rules and conditions. Standard 6 of the code – Policies and community standards confirms that your own published terms, policies and community standards

include, but are not limited to, privacy policies, age restriction, behaviour rules and content policies or standards you adhere to (eg PEGI ratings).

**Default settings:**  Privacy settings for our tablet and apps are at high-by-default. We do not use profiling with our core services. Geolocation is set as off-by-default. Changes to the settings can only be made through the parental controls.

**Data minimisation**: We only collect and process the minimum amount of personal data we need for the purposes for which we are processing the personal data. Parents have the choice about whether to allow access to Google Play and YouTube Kids. Data can only be collected and shared by these third-party apps if parents allow access through the parental control screens. Users have a choice over whether to accept cookies and to sign up for our e-newsletter. Privacy settings on the tablet and our apps are set at high-by-default.

**Data sharing**: Data we share with the third parties is described under the heading 'Data sharing' in step 2. Privacy is set as high-by-default, which limits the amount of children's data that we collect. Parents can choose not to allow third-party apps such as Google App Store and YouTube Kids.

Some data is shared with other parts of the company to support business purposes, research purposes and legal and regulatory obligations.

**Geolocation:** We do not collect or use any geolocation data.

**Parental controls:** The tablet features a number of parental controls. These are explained in detail under the heading 'Parental controls' in step 2.

**Profiling:** Profiling is off-by-default except where analysis of game-play data in educational games serves the purpose of increasing the knowledge of the child. We believe that educational games require  profiling in order to both place the child at the right level and to ensure the child continues in their educational journey. Parents are offered the option of turning game-play profiling for non-educational games on at the set-up stage. We provide an explanation of the profiling to parents at this stage to support their choice.

We do not profile for marketing purposes.

**Nudge techniques:** We do not use nudge techniques to encourage children to change privacy settings, download content or make purchases.

**Guidance:** Nudge techniques are design features which lead or encourage users to follow the designer's preferred paths in the user's decision-making. The code states that ISS should not use nudge techniques to lead or encourage children to provide unnecessary personal data or turn off privacy protections. See Standard 13 of the code – Nudge techniques

**Connected toys and tablets:** We make clear in our privacy policy who is collecting and processing

personal data. We provide clear information about our use of personal data at the point of purchase of apps and content and when parents first set up the tablet. We also make use of "just-in-time" information (eg when informing children that parental controls are active). We have designed our product around the potential for use by different aged children (see the section 'Age appropriate application').  Each child who uses the tablet has their own profile which ensures that they are presented with the current content when using the tablet. Our passive collection of personal data is limited to game-play information which we use for the purposes of providing the appropriate game level and challenges for children of different ages and to develop new features and services. Where our apps allow children to take and store photographs or videos, these are stored on the tablet only.

We provide clear information on the product packaging and in the set up instruction booklet indicating that the product processes personal data at the point of sale and during the tablet set-up stage. The tablet features a clear icon that the product is 'connected'.

Privacy notices, terms and conditions and the operating manual are available through our website without having to purchase and set up the tablet first. This allows parents to make an informed decision about whether or not to buy the tablet.

**Online tools:** All marketing emails contain an unsubscribe link. Users who have registered for an account also have the option to delete their account at any time (subject to limited data retention in line with our retention policy). Icons are used to guide children who need help with any content they find online. Clicking the link will report the issue to the company and the parents for resolution.

**Guidance:** Online tools are mechanisms to help children exercise their rights simply and easily when they are online, such as complaints buttons. Standard 15 of the code – Online tools states that you should provide prominent and accessible tools to help children exercise their data protection rights and report concerns.

# Step 5: Identify and assess risks

| Describe source of risk and nature of potential impact on individuals. | Likelihood of harm | Severity of harm | Overall risk |
|---|---|---|---|
| Include as a minimum an assessment of particular risks to children as listed in the DPIA standard in the Age appropriate design code. You may need to consider separately for different age groups. | | | |
| | Remote, possible or probable | Minimal, significant or severe | Low, medium or high |
| 1. Profiling that infers children's personal information is done without adequate transparency or safeguards, or is not in the best interests of the child risking children's right to development and preservation of identity. | possible | significant | medium |
| 2. Personalised targeting of service features that generate revenue (targeted ads or the availability of apps to download from the app store) that are set to on-by-default, or without adequate transparency and safeguards that risks children's right to protection from economic exploitation. | possible | severe | high |
| 3. Use of (game-play) data that contravenes health standards and guidelines (eg issues by the Chief Medical Officer or Public Health England). Risk that data-enabled service personalisation leads to excessive engagement that impacts on the child's right to health. | possible | significant | medium |
| 4. Personalised content that exposes children to content that is damaging to health (for example age-inappropriate products, suicide and self-harm content or inaccurate health information) that risks children's right to life, survival and development. | possible | severe | high |
| 5. On-by-default data sharing with other service users exposes children to risks of violence or abuse (for example through stalking or harrasment). | possible | severe | high |

| | | | |
|---|---|---|---|
| 6. Data relating to identity is shared with other service users through on-by-default settings, or without adequate transparency and safeguards, risking children's right to development and preservation of identity. | remote | significant | medium |
| 7. Lack of age assurance measures on services that allow children to access or create unlawful sexual content, and risks children's right to protection from sexual exploitation. | remote | severe | medium |
| 8. Connected devices gathering data within private spaces (eg a child's home), without adequate transparency or safeguards (eg passive listening), risking children's right to protection of privacy. | possible | severe | high |

# Step 6: Identify measures to reduce risk

Identify additional measures you could take to reduce or eliminate risks identified as medium or high risk in step 5.

| Risk | Options to reduce or eliminate risk | Effect on risk | Residual | Measure approved |
|---|---|---|---|---|
| | | Eliminated/ reduced/ accepted | Low/ medium/ high | Yes/no |
| Profiling that infers children's personal information is done without adequate transparency or safeguards, or is not in the best interests of the child risking children's right to development and preservation of identity. | Profiling off-by-default, except for game play data. | reduced | low | yes |
| Personalised targeting of service features that generate revenue (targeted ads or the availability of apps to download from the app store) that are set to on-by-default, or without adequate transparency and safeguards that risks children's right to protection from economic exploitation. | There is no profiling for marketing purposes.<br><br>Privacy set at high-by-default, with change only possible through parental controls. | reduced | low | yes |
| Use of (game-play) data that contravenes health standards and guidelines (eg issues by the Chief Medical Officer or Public Health England). Risk that data-enabled service personalisation leads to excessive engagement that impacts on the child's right to health. | Parental controls are included in the product which allow parents to limit the time the tablet is used for. Prompts are issued to parents where controls are not used. | reduced | low | yes |
| Personalised content that exposes children to content that is damaging to health (for example | All apps available from our own app store are designed for children of under 11 years of age and do not | reduced | low | yes |

| | | | | |
|---|---|---|---|---|
| age-inappropriate products, suicide and self-harm content or inaccurate health information) that risks children's right to life, survival and development. | contain any content which could cause harm to children. Parental control features allow parents to determine what apps or websites their children may access generally.  Parents may report apps of concern. | | | |
| On-by-default data sharing with other service users exposes children to risks of violence or abuse (for example through stalking or harrasment). | Photos or video recordings are stored on the tablet only. The tablet does not have functionality which would enable sharing of photos or videos. Security measures in place to guard against third party access to photos etc stored on the tablet. | reduced | low | yes |
| Data relating to identity is shared with other service users through on-by-default settings, or without adequate transparency and safeguards, risking children's right to development and preservation of identity. | The tablet uses the most up to date version of Android with regular security updates. No email or messaging function to allow actors to send tracking downloads or malware. We provide parental controls allowing choice not to link the tablet to web, YouTube Kids and Google App Store. We maintain strong security for our proprietary app store. All apps available for download are tested for malware and tracking cookies. | reduced | low | yes |
| Lack of age assurance measures on services that allow children to access or create unlawful sexual content, and risks children's right to protection from | The tablet and apps support different age ranges: three to four, five to seven and eight to 11. No apps are available on the app store | reduced | low | yes |

| | | | | |
|---|---|---|---|---|
| sexual exploitation. | that feature a PEGI rating of 12 or above, or feature adult content. When the app is launched, the tablet asks the parent to select the age ranges for their children. Subsequent tablet launches asks the child to log into their profile to ensure the correct content is available for that particular child.<br><br>Parental controls allow parents to monitor use of the tablet by children. | | | |
| Connected devices gathering data within private spaces (eg a child's home), without adequate transparency or safeguards (eg passive listening), risking children's right to protection of privacy. | Clear privacy information provided in privacy notice and just-in-time notices.<br><br>Passive collection of personal data is limited to game-play information.<br><br>Clear icon that shows when device is connected | reduced | medium | yes |

This document is made available on the basis that the user understands that:

- they remain fully liable for their own legal and regulatory obligations;

- the ICO does not accept any liability for any reliance that might be placed on any feedback, comments or other input it might provide; and

- providing this sample DPIA does not prevent or limit the ICO's ability to take any enforcement action or other regulatory action against companies that might use the sample as the basis for their own DPIA, if the ICO deems such action is appropriate.

# EXHIBIT C

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**



# Evaluating the Children's code – An Industry Perspective

**January 2023**



## Contents

| 1 | Executive summary | 3 |
|---|---|---|
| 2 | Background and method | 7 |
| 3 | Awareness and Understanding | 11 |
| 4 | Assessment of Delivery | 19 |
| 5 | Impact of the Children's code | 35 |
| 6 | Conclusions | 48 |
| 7 | Appendix | 49 |

**IFF Research**

# 1      Executive summary

## Background

1.1   Following a two-wave project to measure initial awareness and impact among businesses and industry bodies of the Information Commissioner's Office's (ICO) introduction of the Children's code in September 2020, IFF were commissioned to undertake a third wave in 2022 with two primary objectives:

- To develop a quantitative evidence-base around Information Society Services' (ISS) awareness and understanding of the code, and their views on its high-level business impacts, at a set point in time (September-October 2022).

- To identify case studies that demonstrate the impact of the code on how ISS services are designed and on user experience of these services.

1.2   A mixed methodology was adopted, with a quantitative online survey and telephone interviews followed by qualitative in-depth interviews. The quantitative research was completed between 31 August 2022 and 5 October 2022 (407 interviews: 305 online, 102 telephone).

1.3   The qualitative interviews took place between 11 October and 9 November. Five of these interviews were recruited through businesses that agreed to partake in follow-up research from the telephone strand. There were challenges in recruiting this audience and the sample was therefore boosted through a free find approach that resulted in a further 4 interviews.

## Awareness and Understanding

1.4   Familiarity with the ICO is broadly the same (69% in 2022 compared to 73% in 2021). However, a smaller proportion are very familiar (25%) in 2022 compared to 2021 (38%).

1.5   More businesses had some awareness of the code in 2022 than 2021 (68% compared to 59%) This was driven by increases in awareness among micro (1-9 employees) and small (10-49 employees) businesses. However, more in-depth knowledge of the Children's code has not increased and businesses often see it as part of general GDPR compliance. Given the small level of change in awareness since 2021, where the introduction of the code was more recent, this suggests a 'levelling off' effect now it's been two years since its introduction.

1.6   Despite in-depth knowledge not increasing, overall awareness of features of the code improved although only two businesses (<1%) gave all the correct answers and no incorrect answers when asked to identify features of the code. There are still many misconceptions about features not covered by the code.

1.7   Businesses are less likely to have learned about the code from the ICO website than in 2021 (a drop of 12 percentage points), but more likely to have learned about it from a child advocacy group (an increase of 4 percentage points). The lower levels of engagement with the ICO website could also point towards issues relating to the Children's code specifically not being as 'top of mind' as previously.

1.8   Larger businesses were generally more likely to find out about the code from the ICO website or direct communications while smaller businesses were more likely to hear about it from social media, the news or their training providers.



## Assessment of delivery

1.9   As in autumn 2021, businesses were more likely to think that they were in scope prior to hearing a definition of the code, something that was consistent in 2022. Although fewer businesses thought they were in scope in 2022 than in 2021 (81% vs 84%) and slightly more thought they were after the definition (73% vs 68%) these differences were fairly minor.

1.10  Between 2021 and 2022 there was no significant change in the proportion of businesses that consider themselves fully conformant with the code: 44% of businesses reported this in 2021 and 46% in 2022.

1.11  Ease of being conformant remains consistent with 2021, with just over a fifth (21%) of businesses finding it difficult to be conformant with the code, but micro business were far less likely to find this (9%) and medium sized businesses were more likely to find it difficult (42% reported this).

1.12  Fewer businesses had recently made changes to their practices relating to their uses of children's data in 2022 than in 2021. Just over a quarter of businesses (27%) reported this in 2022 compared with 41% in 2021. Again lending itself to slowed momentum of the influence of the code over time.

1.13  Businesses were generally more likely to have made these changes regardless of the code. For example, 52% made changes in designing and implementing changes to aspects of the service's user experience independently of the code compared with 35% who made the change as a direct result of the code.

## Impact of the Children's code

1.14  When asked if the code would provide opportunities to their business, fewer businesses thought it would in 2022 than in 2021 (27% compared with 42%).

1.15  Overall, businesses felt the overall impact of the code would be positive for wider stakeholders, with figures very similar to those in 2021. Around three quarters (77%) of businesses thought there would be a positive impact on parents/guardians and 71% thought it would be beneficial for children. Two thirds (66%) thought it would be positive for their organisation and 63% felt it would have a positive impact on their sector (there was no notable difference in this figure across sectors).

1.16  Qualitatively, respondents reported anecdotally that one of the main positive impacts would be peace of mind being given to parents. It can be hard to monitor children's online access and so knowing that the Children's code was in place would give them reassurance.

1.17  One of the areas of concern for two of the qualitative respondents was around the area of fraud, and while they spoke specifically about credit card fraud which may not apply to children, there was wider concern about personal data being stolen. One respondent in particular felt that this risk was greatest when staff are complicit with other criminals, and they collude to defraud the company. They have moved to mitigate this by having tighter control over who has access to data, making it strictly need to know rather than offering wider access to all staff.

1.18  Large and medium businesses were more likely to make changes to their practices because of the news articles they had seen (74% and 63%) relative to micro and small businesses (17% and 33%) although this was not something that was evident with the qualitative respondents.


IFF Research

Conversely, micro and small businesses were more likely to make changes to business practices based on their experiences of their own children or those of friends and family (66% and 73%).

1.19 Fewer businesses reported that they incurred costs because of the Children's code in 2022 than in 2021 (29% compared with 35%). As in previous years, smaller companies were less likely to have incurred costs from the code (6% sole trader, 14% micro, 19% small, 45% medium, 33% large), which was driven by a lower proportion thinking that they are in scope.

1.20 The proportion of businesses that recently incurred costs has also fallen because changes had already been made as businesses move towards conformance over time.

## Conclusions

1.21 Most of the differences by type of business observed in this data are driven by business size, and there were very few differences by sector and other demographic groupings. This suggests future guidance and communications should be targeted primarily by size of business.

1.22 Overall, it appears that the momentum perhaps seen in 2021 regarding the Children's code has levelled off in 2022. There have been some, but only small, changes in awareness of the code and not a great deal of change in terms of actions and costs relating to the code.

1.23 Many businesses perceive the code as something which has now passed, which may explain the levelling off of awareness and limited changes made as a result of the code. There was a wider sense that the code is something that has been subsumed into wider GDPR compliance.

1.24 Although most businesses do not necessarily perceive the code to offer commercial opportunities for their business, there is a general consensus that the impact of the code will be beneficial for wider stakeholders, in particular parents, guardians and ultimately children themselves.  The code was seen to offer reassurance to parents/guardians who are likely to find it increasingly difficult to monitor children's online activity.

1.25 More businesses now felt that enforcement or penalties were the best way to encourage compliance, again suggesting a plateauing of awareness and that hearing about action being taken may be the best way to impress urgency.

1.26 Very few businesses find it difficult to conform with the code, it tends to be perceived as integrated into the general conformance of the business. Challenges were more often faced by smaller businesses than large businesses.

1.27 While more businesses reported incurring costs in the highest bracket compared to 2021, only a minority stated the costs were directly related to the code. In general, the number of businesses experiencing costs had fallen, showing no detrimental impact to businesses.

## Caveats and limitations

1.28 There are some limitations and caveats associated with this research:

- There is no definitive data source or way of defining the population likely to be in scope of the code and the sample composition might not reflect the population of all businesses in scope of the code.



- A mixed method approach to sampling and interviewing was required (drawing on free find telephone interviews and online panel sample).

  *To address these potential limitations the data in 2021 and 2022 were weighted by business size and survey mode to ensure a 'like for like' comparison could be made.*

- While base sizes are robust at an overall level, when data is broken down by size and sector, some bases are lower than 100, meaning the confidence intervals are higher and fewer differences can be marked as statistically significant despite relatively large changes between waves.

*All charts showing significant differences are labelled. Any commentary that references differences between years or type of business is statistically significant at 95% level using t-tests.*



# 2     Background and method

## Background

2.1   The age appropriate design code or 'the children's code' is a statutory code of practice that mandates organisations make changes to online products and services to include enhanced privacy protections for children. It came into force in September 2020 and businesses were provided 12 months to conform with the code in their products and services.

2.2   The code applies to businesses that are deemed 'Information Society Services' (ISS) that are likely to be accessed by children in the UK. For the purposes of the code, a child is defined as a person under 18. If the service is designed for and aimed specifically at under-18s then the code applies, however, the provision is wider than this. It also applies to services that are not specifically aimed or targeted at children but are nonetheless 'likely' to be used by under-18s. This is intentionally broad so as to not exclude services that children are using in reality.

2.3   Fifteen standards of age-appropriate design are set out within the code, focusing on the provision of default settings which ensure children have the best possible access to online services whilst protecting their personal data, such as through minimising data collection and use.

2.4   Following a two-wave research project undertaken between 2020 and 2021 to measure awareness and impact of the code at the point of introduction and through the 12-month grace period for conformance, IFF Research were commissioned to undertake a third wave of research in 2022 with the following aims:

- To develop a quantitative evidence-base around ISS' awareness and understanding of the code, and their views on its high-level business impacts, at a set point in time (September-October 2022).

- To identify case studies that demonstrate the impact of the code on how ISS services are designed and on user experience of these services.

## Methodology

2.5   A mixed methodology was adopted, with quantitative research comprising of online surveys and telephone interviews, and qualitative research using in-depth interviews.

2.6   A total of 407 quantitative interviews were completed between 31 August 2022 and 5 October 2022 (305 online, 102 telephone).

2.7   A breakdown of the completed interviews by mode and size of business is shown in table 2.1 below. Further breakdown of the sample by online products and services provided can be found in the appendix.

2.8   As the population was difficult to reach, the sample needed to be split between online and telephone completes in favour of online completes. Weighting was applied to ensure that comparisons between 2022 results and those from the last wave in 2021 were comparable with the baseline wave in early 2021. To do this the sample was weighted by size and survey method.

 IFF Research

**Table 2.1 Unweighted achieved interviews profile**

|  | Jan/Feb 2021 | | Aug/Sep 2021 | | 2022 | |
|---|---|---|---|---|---|---|
|  | (n) | % | (n) | % | (n) | % |
| **TOTAL** | **511** | **100%** | **432** | **100%** | **407** | **100%** |
|  |  |  |  |  |  |  |
| Telephone | 161 | 32% | 205 | 47% | 102 | 25% |
| Online | 350 | 68% | 227 | 53% | 305 | 75% |
|  |  |  |  |  |  |  |
| Sole Trader | 50 | 10% | 70 | 16% | 63 | 16% |
| Micro (1-9) | 124 | 24% | 141 | 33% | 70 | 17% |
| Small (10-49) | 66 | 13% | 45 | 10% | 53 | 13% |
| Medium (50-249) | 167 | 33% | 103 | 24% | 92 | 23% |
| Large 250+ | 99 | 19% | 73 | 17% | 105 | 26% |
| Don't Know[1] | 0 | 0% | 0 | 0% | 24 | 6% |

2.9    The online quantitative surveys were taken from panel provider completions from three different panels. Sample for the telephone interviews was purchased from a provider and interviews were conducted in-house by IFF's telephone interviewing team.

2.10    To qualify for the survey all businesses were screened to ensure they:

- provided an online or internet enabled service;

- generated revenue from the delivery of online, or internet-enabled, products/services; and

- their products/services were aimed at under 18s, or it was deemed possible that under 18s could access or be attracted by their products/ services.

2.11    A total of nine follow-up qualitative interviews were undertaken to get a more detailed view on how ISS services are designed and on user experience of these services.

2.12    The qualitative interviews took place between 11 October and 9 November. Five of these interviews were recruited through quantitative telephone survey businesses who agreed to partake in this research. There were challenges in recruiting this audience and the sample was therefore boosted through a free find approach that resulted in a further four interviews.

---

[1] Don't know was an option in all three years but wasn't selected in early or late 2021

 IFF Research

2.13   Copies of both the quantitative survey and qualitative discussion guide can be found in the appendix.

## Limitations and caveats

2.14   There are some limitations and caveats associated with this research:

- There is no definitive data source / or way of defining the population likely to be in scope of the code. Therefore, results have not been weighted to a specific business population and the sample composition might not reflect the population of all businesses in scope of the code. In order to achieve a robust sample overall no quotas were set by size or sector at any of the three waves.

- As there is not a definitive data source, a mixed method approach to sampling and interviewing was required (drawing on free find telephone interviews and online panel sample). While steps were taken to ensure the online survey was comparable to the telephone survey (i.e. reading out answer codes to mirror reading online) there will always be some mode effect in survey response.

  *To address these potential limitations the data was weighted by business size and survey mode to ensure a 'like for like' comparison could be made between each wave of the survey.*

- While base sizes are robust at an overall level, when data is broken down by size and sector, some bases are lower than 100, meaning the confidence intervals are higher and fewer differences can be marked as statistically significant despite relatively large changes between years.

  *Only statistically significant findings are included in the commentary.*

- The screening process involved businesses self-determining whether it was unlikely their product or service appeals to children under the age of 18 (if so, they screened out). Given the lack of clarity from some over whether they were in scope for the code, it is possible that some businesses would screen out mistakenly.

## Note on an analysis

2.15   Figures in tables and charts may not add to a total of 100% where businesses were allowed to select more than one answer to a question or, due to rounding of values.

2.16   Significance testing to a 95% confidence level was carried out on the survey data. This is in order to establish whether differences between sub-groups are statistically significant or not. In other words, whether we can be 95% certain that a difference is sufficiently large to be considered a genuine difference and not just due to chance. Where findings are on the cusp of being significant and highlight a 'direction of travel', these have been reported but clearly caveated they are not significant.

2.17   Where there is a significant increase between years, this is denoted by these arrows:



 Statistically higher than previous wave

 Statistically lower than previous wave

2.18   The same arrows are used to denoted significant differences between subgroups and the total.

2.19   Comparative data with the September 2021 wave is shown where appropriate. While not charted, any notable differences from the January 2021 baseline or where a significant longer term trend occurs, this is mentioned in the commentary.

2.20   Business sizes are defined as having the following number of employees:

- Sole trader: 0
- Micro business: 1-9
- Small business: 10-49
- Medium business: 50-249
- Large business: 250+

# 3      Awareness and Understanding

Chapter 3 looks at awareness levels of the ICO and the Children's code and the sources from which businesses learned about the code. It also examines how well businesses understand the code and its main principles.

## Awareness and familiarity with the ICO

3.1     There was no large change in overall awareness of the ICO between this year and last year with at least some form of familiarity in 2021 (73%) and in 2022 (69%). However, there has been a decrease in the proportion of businesses being very familiar with the ICO (25% in 2022 vs. 38% in 2021), as shown in figure 3.1. This suggests that familiarity with the ICO spiked when the code launched initially but has now sunk back to previous levels now the code is in place.

**Figure 3.1 Awareness of the ICO**



*QA1 How familiar are you with the Information Commissioners Office, also known as the ICO? Base: 2021 (n=432), 2022 (n=407)*

3.2     Familiarity with the ICO was greater among medium sized businesses than both smaller and larger businesses. In 2022, the rates of familiarity were: 41% for sole traders, 66% for micro businesses, 70% for small, 87% for medium and 63% for large businesses. This trend was consistent across early 2021 and autumn 2021, however familiarity among micro businesses has increased from 56% in 2021 to 66% in 2022.

## Awareness of the Code

3.3     In terms of business's awareness of the ICO having recently launched a new Children's code, this showed an increase between 2021 and 2022 with 59% reporting some awareness in 2021 and 68% in 2022.

3.4    Further to this, in terms of businesses having heard of the Children's code, this showed no notable change between 2021 and 2022 with 72% reporting having heard of the code in 2021 and 75% in 2022. Levels of awareness differed by business size with the larger organisations being more likely to be aware.

**Figure 3.2 Awareness of the Children's code**



*QA3  Have you heard of the Children's code? Base: 2021 (n=432), 2022 (n= 407)*

3.5    As in 2021, awareness levels were higher among medium and large sized businesses which is potentially due to an increased capacity to be able to monitor policy changes such as this, while smaller businesses have less resource available for such strategic and forward planning work. However, there were increases in awareness for both micro businesses and small businesses from 2021 to 2022; with a 20 percentage point increase for micro businesses and a 12 percentage point increase for small businesses. This is likely to be due to improved messaging to these groups from the ICO, and also because there has been more time for businesses to familiarise themselves. Without specialised officers, smaller businesses have found it hard to make the time to learn about the code, but two years hence have been able to catch up.

3.6    Figure 3.3 shows where businesses who had heard about the code learned about it. As per the previous wave, the ICO website was the most common place businesses learned about the code, however the use of the ICO website as a source of information saw a sizeable decrease from 28% in 2021 to 16% in 2022. Additionally, a decrease was seen in the proportion of businesses learning about the code from newspapers or news websites (13% in 2021 to 7% in 2022) and a small increase for those who heard about the code from child advocacy groups such as the NSPCC (4% in 2021 to 8% in 2022).

**Figure 3.3 Information source for learning about the code**



*QA4 Where did you first hear about the Children's code?. Base: 2021 (n=288), 2022 (n=336)*

3.7   Larger businesses were more likely to find out about the code from the ICO website or direct communications while smaller businesses were more likely to hear about it from the social media, the news or their training providers.

## Theory of the Code and required actions

3.8   As shown in figure 3.4, among businesses aware of the code, there has been no large changes in the proportion of businesses that agree or strongly agree they have a good understanding of the theory within the Children's code (77% vs. 73%) in 2021 and 2022. However, there was a decrease in the number of businesses who strongly agree they have a good understanding, with less than a fifth (19%) reporting this in 2022 compared with 32% in 2021.

**Figure 3.4 Understanding of the theory within the Children's code**



*QA6 Agree/Disagree that ... I have a good understanding of the theory within the Children's code/I have a good understanding of the actions needed to comply with the Children's code. Base: 2021 (n=288), 2022 (n=336).*

3.9    Showing a similar trend to overall awareness of the code, larger and medium sized businesses were more likely to agree that they have a good understanding of the theory of the Children's code than smaller businesses. The other notable subgroup difference was that businesses that provide both products and services (83%) were more likely to agree with this statement than businesses that only provided products (63%).

3.10    Similarly, there were large changes in the proportion of businesses aware of the code, that agreed or strongly agreed that they had a good understanding of the actions needed to comply with the code between 2021 and 2022 (74% agreeing in both 2021 and 2022).

**Figure 3.5 Have a good understanding of the actions required to be conformant with the code**



QA6 Agree/Disagree that ... I have a good understanding of the theory within the Children's code/I have a good understanding of the actions needed to comply with the Children's code. Base: 2021 (n=288), 2022 (n=336).

3.11 Following the trend of understanding, larger and medium sized businesses were more likely to agree to having a good understanding of the actions required to be conformant with the code than micro businesses or sole traders (large 76%, medium 84%, small 84%, micro 59%, sole trader 43%).

## Features of the code including age impacted

3.12 Businesses aware of the code were asked to identify correct statements regarding the code as shown in figure 3.6. 'Perfect' answers in which businesses identified the two correct statements and did not identify any of the incorrect ones were still rare with <1% of businesses getting this in all waves. There was also an increase in the proportion of businesses that gave only incorrect answers in 2022 (18%) compared with 14% in 2021. This means that fewer businesses selected one correct answer.

3.13 Additionally, another positive shift seen in 2022 is that there has been an increase in the proportion of businesses aware that the code is grounded upon the UN Convention on the Rights of the Child from 47% of businesses agreeing in 2021 compared with 57% in 2022.

**Figure 3.6 Awareness of features of the Children's code**



*QA7 Which of the following do you think are features of the Children's code? Base: 2021 (n=288), 2022 (n=336)*

3.14   Figure 3.7 shows aggregated scores of answers given. The two correct responses gave a score of 1 each while not selecting these options gave a score of -1 as did selecting any of the incorrect answers. 2 businesses gave perfect answers and ended up with 2 points while 86% of businesses ended up with a net negative score

**Figure 3.7 Net scores of awareness of features of the Children's code**



*QA7 Which of the following do you think are features of the Children's code? Base: 2021 (n=288), 2022 (n=336)*



3.15   Businesses were also asked for unprompted responses asking what they felt were key standards of the code and these were consistent across 2021 and 2022. The three most common responses were: compliance with data protection laws (20%), maintaining children's privacy/ safeguarding / maintaining children's safety online (14%), and ensuring content or products are suitable and appropriately marketed (11%).

## Awareness of related legislation

3.16   As shown in figure 3.8 businesses had a very high awareness of the GDPR and/or Data Protection Act 2018. 97% were aware of it, 42% felt they had an ok understanding and 47% felt they had a detailed understanding, all of which are not very different to the autumn 2021 wave results.

3.17   Awareness of the Online Safety Bill was lower where 72% of businesses had heard of it and only 22% felt they had a detailed understanding of it. Larger and medium sized businesses were more likely to be aware and have a detailed understanding of both the act and the bill.

3.18   For the GDPR and/or Data Protection Act 2018, 47% of large businesses had detailed awareness, 57% of medium companies, 46% of small companies, 45% of micro companies and 26% of sole traders reported the same – a notable difference between medium businesses and sole traders. Sole traders again reported not having enough time to develop this awareness given their holistic responsibilities over the business

**3.19**   For the Online Safety Bill, 25% of large businesses, 33% of medium businesses, 24% of small businesses, 10% of micro businesses and 12% of sole traders had detailed understanding following the same trend as highlighted above.

**Figure 3.8 Awareness of the GDPR and Data Protection act and the Online Safety Bill**



*QE7 Have you heard of the data protection laws that apply in the UK: the GDPR and Data Protection Act? Base: 2022 (n=407)*
*QE7a Have you heard of the online safety bill? Base: 2022 (n=407)*



3.20   56% of businesses were paid data protection fees[2]. 31% of sole traders did so, which was lower than the average. 65% of micro businesses were registered as were 58% of small businesses, 59% of medium businesses and 51% of large businesses,

3.21   Those that did pay data protection fees were more likely to be aware of the Children's code than those who didn't (59% vs 26%)

**Figure 3.9 Registration with ICO or payment of protection fees[3].**



*QE8 Are you registered with the ICO or do you pay data protection fee? Base: 2022 (n=407)*

---

[2] This was previously known as registering with the ICO under the Data Protection Act 1998.
[3] Question not asked in 2021



# 4      Assessment of Delivery

Chapter 4 examines businesses' responses to the code looking at whether they feel they are in scope of the code, what changes they have made in relation to the code, any challenges in doing so and which methods of support they have used.

## Perceptions of whether in scope

4.1     Businesses that were aware of the code indicated whether they felt that they were in its scope before being shown a full definition and again after being prompted with a definition of the code. The data is summarised in figure 4.1 below

**Figure 4.1 Self-identification of whether in scope of the code**



QA5 Do you think that your organisation will have to conform with the Children's code? Base: 2021 (n=288), 2022 (336)
QA10  Based on what you have just read, do you think your organisation will need to conform with the Children's code> Base: 2021 (n=432), 2022 (n=407)

4.2     As in 2021, businesses were more likely to think that they were in scope prior to hearing a definition of the code, something that was consistent in 2022. Slightly fewer businesses thought they were in scope in 2022 than in 2021 before the definition (81% vs 84%) and slightly more thought they were after the definition (73% vs 68%). The 19% who answered no were the same businesses both pre and post definition with very minor exceptions moving from yes to no or vice versa.

4.3     Larger businesses were generally more likely to consider themselves in scope of the code before a definition as was the case in previous years. In 2022, 60% of sole traders and 63% of micro businesses thought they were in scope compared with 89% of medium companies and 87% of large businesses before hearing a definition. The same trend occurred following the definition. There were no noticeable subgroup differences among sectors that differed with the overall trends.

4.4     Companies with a detailed understanding of the Online Safety Bill were more likely to think they were in scope compared with those who had never heard of it (89% vs 74%). They were also more likely to have detailed understanding of the code, suggesting that businesses with better understanding of the code were more likely to find the ways in which it related to them.

4.5    Figure 4.2 shows that after being given a definition of the code, the most common reasons for not being in scope were businesses thinking their services were not likely to be accessed by children under 18 or because they are not aimed at them. Fewer businesses reported both of these reasons in 2022 than in 2021 with 38% (compared with 57%) and 48% (compared with 66%) stating these reasons. There were no notable deviations to the above results when analysing by subgroups such as sector.

4.6    Businesses that had low awareness of the code were more likely to think that their services would not be accessed by children than those with good awareness (58% compared with 26%) or that they didn't handle any personal data, but these figures come from small bases.

4.7    The ability of businesses to correctly identify features of the Children's code showed no clear bearing on whether or not they considered themselves in scope or the reasons why.

**Figure 4.2 Reasons for not being in scope.**



*QA11 Why do you think that your organisation will not need to conform with the code? Base: 2021 (n=130), 2022 (n=77)*

## Conformance with the code

4.8    Between 2021 and 2022 there was no large change in the proportion of businesses that consider themselves fully conformant with the code as 46% of businesses reported this in 2021 and 44% in 2022. This similarity extended to all businesses that felt they were at least partially conformant and those who thought they weren't conformant at all. The latter was a very small percentage of just 3% in 2021 and 4% this year. This can be seen in figure 4.3.

**Figure 4.3 Conformance with the code**



QA12 *Based on what you now know about the Children's code, to what extent do you think your organisation currently conforms with the standards in the code? Base:, 2021 (n=432), 2022 (n=407)*

4.9     The levels of conformance were broadly similar across business size with around two fifths being conformant as was the case in 2021 The notable differences between business size was that 61% of small sized businesses reported that they were fully conformant compared to 34% of sole traders There were no notable differences by sector.

4.10    In the qualitative interviews, sole traders and micro businesses differed from larger businesses in how they dealt with the Children's code. For example, one two-person business owned a franchise and was dependent on the mother company for making sure they were conformant as shown in case study #1 below.

| **Case Study #1** | **Private Tutor** |
|---|---|
| **Context** | Joe is the co-director of a small tutoring company. As well as running the company, he tutors online and in person, storing information about his pupils. He works through a franchise and is reliant on their website and GDPR processes.<br><br>*"They control everything and manage what happens on the website. They told us about all the GDPR stuff and what they do, so thankfully I don't need to."* |
| **Awareness** | Joe has reasonable awareness of the code. He has received training from the mother company that controls his franchise and this covered a lot of aspects. He has heard of the Children's code and knows that it is designed to keep children's data safe but isn't aware of the specifics. |

| | |
|---|---|
| **Actions taken**<br> | The company is quite new and he has inherited the website and processes from the mother company. He is trusting that they have done their due diligence when it comes to being compliant but also is trying to understand the various policies himself.<br><br>*"I'm confident we're doing everything we're meant to but I want to go away and know all of this stuff for myself."* |
| **Impact**<br> | The training has been time consuming and there is a lot to understand. Joe finds it difficult to differentiate between different aspects of data compliance, and while he has heard of the Children's code, he is unable to differentiate between that and wider GDPR and safeguarding policy that he is still getting to grips with.<br><br>*"There's so much to do, GDPR, health and safety, finance stuff. I'm trying to understand it all and it takes time but sometimes I don't know where one thing ends and another starts."*<br><br>He finds it hard to talk in detail about costs and effects of the Children's code and compliance. He has paid fees to buy the franchise and that covers everything. He's also not aware of any changes in traffic or reputation but feels that users like the convenience of online and thinks that they trust the security of the digital data rather than hard copies of information like he had used in the past.<br><br>So far Joe has been reliant on the mother company but wants to have a handle on all of these issues himself. He likes the ICO website and tools and intends to use these so that he can have autonomy over his compliance, even though it is handled centrally. |

4.11   In contrast, larger companies had dedicated compliant officers who made sure everything was up to date.

> *"It's literally their job so we would have been on top of all of this ahead of time"*
>
> Large online retailer

4.12   While there had been an increase in the number of businesses that felt they would need to make changes to become conformant between the first and second waves in 2021 (from 53% to 58%), this dropped back to 52% in 2022, although these were small shifts.

4.13   Business that were not fully conformant indicated when they expected they were going to make changes and the most common answer was by the end of 2022 (44%) as shown in figure 4.4. The timeframes were different from when this question was asked in previous years but the percentage that said they would never be conformant was very similar (2% in 2022 and 1% in 2021). There were however more businesses who said that they didn't know in 2022 (18% compared with 9%).

4.14   Businesses that don't intend to be conformant by the end of 2022 suggested a lack of urgency. There were no plans for specific actions from those in interviews who were not yet compliant suggesting they were happy to defer these responsibilities, perhaps with a sense that two years into the launch of the code, they have seen no ill-effects of their lack of conformance so far.

**Figure 4.4.4 Plans for being conformant**



*QB9 When do you anticipate that your organisation will have made the changes necessary to fully conform with the Children's code? Base: All those who don't fully conform with the code and those expecting to make changes (n=155)*

4.15   Businesses that said they didn't intend to become conformant most commonly said they would prefer not to say why but they tended not to pay DP fees. Answers that were given from this small base included the time and work that would be required and a lack of information or guidance and suggested they felt no urgency.

4.16   How difficult businesses found the code to understand and conform to was a new question in 2022. Just over a fifth (21%) of businesses found this to be difficult, but micro business were far less likely to find this (9%) and medium sized businesses were more likely to find it difficult (42% reported this). A full breakdown of this can be seen in figure 4.5. There were no notable trends by subgroups other than business size.

**Figure 4.5 Ease of understanding and complying with the code**



*QA1a: Are there any standards or areas of the code you find particularly hard to understand? Base 2022 (n=401)*

4.17    When asked (unprompted) for reasons why the code can be difficult to understand or comply with, 54% answered that they didn't know. The most common responses were that it was too complicated (11%), was unclear or hard to implement (12%), hard to keep up with (3%), or hard to remember (2%).

## Activities undertaken to be conformant with the code

4.18    As shown in figure 4.6, self-declarations (such as entering a date of birth) were the most common form of age verifications that businesses used. Three in ten (30%) of all businesses reported doing this, with large businesses (42%) the most likely and micro businesses (22%) the least. Smaller businesses were more likely to not have some form of age verification; 31% of micro businesses and 22% of small businesses stated this compared with 2% of medium businesses and 1% of large.

4.19    Self-declarations were most likely to be used by health and fitness services (49%), Online marketplace for third party goods or services (44%) and online gaming or streaming sites (44%). Proof of age was most common among music and video streaming (54%) Phones and communication devices (46%) and online messaging or voice telephony service (45%)

**Figure 4.6 Age verification methods used**



*S7c What steps do you take to verify the age of your users? Base: all (n=407)*

4.20    These results were broadly reflected in the qualitative interviews, although a couple reported that they had different rules for different parts of their site. For example, a box office or shop aspect might require an account linked to a credit card to access, or a resource-based members area might require an account, although this was open to all ages.

4.21    One theatre-based company reported that they had no verification and were reliant on users not accessing potentially inappropriate pages.

> *"We don't have anything stopping people use that bit of the site but it's shows and art and I suppose some of the titles and things might not be suitable for children"*
>
> Medium arts company

| Case Study #2 | Arts and Education Organisation |
|---|---|
| **Context** | Rachel works as a project manager for an arts organisation that stages shows and also has an education wing. The business therefore has an online box office function and also a members area for resources. Rachel works regularly with the head of safeguarding and attends regular training around safeguarding, compliance and other regulatory responsibilities such as health and safety etc. |
| **Awareness** | Rachel is familiar with the Children's code but remembers it as something she received training on a couple of years ago. She attends regular training and receives updates from the head of safeguarding (also responsible for wider data compliance). She considers the contents of the code to be integral to the work that they do. |

| | |
|---|---|
| | *"I've heard of the Children's code but to be honest we're always reviewing and checking safeguarding and data security anyway."* |
| **Actions taken** | Rachel feels like they have become compliant with the code independently as part of their ongoing practice and regular reviews. They have somebody in charge of safeguarding and data who provides regular updates and runs training so it feels like an ongoing evolution. There have been changes as a result of this, but she attributes them to wider compliance rather than the Children's code.<br><br>In the past year, they have moved to a different database system to provide improved security for the data that they hold on members (many of which are children). The system they were using allowed universal access to all data stored, so they moved to a new piece of software that could restrict access to only those who needed it. It also included an added level of encryption to the data.<br><br>*"We obviously want to keep everyone's data safe and things like making the language suitable for children. It's for them so we obviously do that and are always looking to improve."* |
| **Impact** | It's hard for them to measure the impact of the Children's code and compliance more widely because they have a specified safeguarding role and it's inbuilt into their work systems.<br><br>They don't measure the cost of changes such as this, and because it's part of full time role, the changes have been absorbed as part of that.<br><br>*"Our safeguarding officer will have looked at the code to check but she's doing this stuff every day so it doesn't feel like an additional cost."* |

4.22   Fewer businesses had recently made changes in 2022 than in 2021. Figure 4.7 shows that 27% reported this in 2022 compared with 41% last year. This appeared to be a mixture of businesses having already made changes, and those who hadn't made changes not feeling a sense of urgency. Particularly among those businesses (typically smaller) that relied on third parties to ensure they are conformant or tell them which actions they need to take, they were happy to wait until told explicitly what to do. With no penalisations so far, some businesses may not feel that all changes are urgent or necessary.

**Figure 4.7 Recently made changes to practices relating the use of children's data**



*QB4 Has your organisation recently made any changes to their practices relating to the use of children's (under 18's) data?*
*Base: 2021 (n=171), 2022 (n=407)*

4.23   Larger companies were more likely to have made changes than smaller ones as was the case in previous years, but the drop in the percentage that had done so in 2022 compared to 2021 was consistent across business sizes.

4.24   Businesses who had good awareness of the code in interviews felt that the Children's code was something from a couple of years ago. They said they were fully conformant and spoke about the code in the past tense, suggesting that maybe fewer businesses are making recent changes because they've already been made.

*I remember it but it was something we had training on a while ago. We've been doing that stuff for years.*

University

4.25   The changes that had been made are shown in figure 4.8. There was a decrease across all measures apart from 'developing approaches or estimating the age of users' since 2021.

4.26   In the qualitative interviews, those that had made changes in relation to the code spoke of them as a one-off past tense exercise. This was either because of a change to the software or processes that they use, that they considered to be conformant for the foreseeable future, or because they felt that the Children's code was something they had completed.

4.27   Businesses considered GDPR compliance to be important and something they would continue to keep abreast of, or trust agents to do on their behalf, but they didn't speak about the Children's code in the same way, feeding further into the idea that it was a subset of GDPR rather than its own ongoing piece of legislation.

4.28   One business reported that they assumed they were compliant because they hadn't heard anything otherwise.

**Figure 4.8 Changes made in relation to children's data**



*QB7 What changes have you or your organisation made n relation to the use of children's (under 18s) data? Base: all who have made recent changes (n=112)*

4.29  As shown in table 4.1, businesses were generally more likely to have made changes regardless of the code. For example 52% made changes in designing and implementing changes to aspects of the service's user experience independently of the code compared with 35% who did it as a direct result of the code.

**Table 4.1 Changes made and reasons for doing so**

| Change | % changed because of the code | % changed independent of the code (base = those who made this change) | % not made that change | % don't know |
|---|---|---|---|---|
| Dedicated resources to reviewing the code and understanding its implications for your organisation | 42% | 48% | 4% | 6% |
| Designing and implementing changes to aspects of your service's user experience | 35% | 52% | 6% | 7% |
| Developing approaches for estimating the age of users | 47% | 45% | 3% | 6% |
| Reviewing risks to children arising from how your products or services process their data | 44% | 51% | 2% | 3% |
| Reviewing and redrafting privacy information, community standards and policies | 45% | 46% | 2% | 7% |

| | | | |
|---|---|---|---|
| Developing or reviewing your data protection impact assessment | 38% | 48% | 5% | 9% |
| Researching whether children are likely to access your service/ how they use your service | 43% | 44% | 8% | 5% |
| Engaging with children, parents/guardians or schools | 31% | 37% | 22% | 15% |

QB7 What changes have you or your organisation made in relation to use of children's (under 18) data Base n=111

4.30   Businesses were less likely to think that further guidance would be the most effective way to encourage compliance in 2022 than in 2021 (21% vs 31%) and were more likely to think fines would be effective (16% vs 8%). This perhaps suggests that two years on from the introduction of the code, enforcement rather than encouragement is a necessary course of action. This contributes to the idea that people have made changes already and see this as something from the past. If changes haven't already been made, then encouragement may not be sufficient.

**Figure 4.9 Effective tools in encouraging compliance**



QB11 Which of the following do you think would be most effective in encouraging and supervising industry conformance with the code in your sector? Base (n=407)

## Issues in the delivery of the code

4.31   Similar proportions of businesses anticipated future external barriers in conforming with the code in 2022 as in 2021 (18% and 17%). There was, however, an increase in the number that didn't know (22% vs 11%) and a decrease in those that didn't see any barriers (61% vs 73%). There were no major differences across businesses of different sizes in either year.

**Figure 4.10 Anticipation of future external barriers to conformance**



QC9a Do you foresee any external barriers relating to your organisation conforming with the Children's code? Base: All those who don't fully conform with the code and those expecting to make changes, (n=163).

4.32   When asked (unprompted) for what these barriers might be, most businesses said they didn't know while a handful of others predicted difficulties in implementing or a lack of guidance. Some also mentioned time factors although these were all from small bases. In the qualitative interviews the smaller businesses that showed less knowledge about the code perceived it as being difficult and time consuming but when pressed could not give examples, suggesting the concept of the code as an unknown entity sounded more difficult to them than perhaps it is.

## Assessment of Outcomes

4.33   Two fifths of businesses envisioned making changes in-house (42%), around a fifth would use a third party (18%) and a little over a third (36%) said a mix of the two. This shows an increase in the proportion using a third party since last year (10% in 2021) and decrease in those using a mixture (47% in 2021).

4.34   Small businesses were the most likely to expect to use a third party (46%) and micro businesses were the most likely to do this in-house (77%). The most common reason given for this in qualitative interviews was time constraints. Smaller businesses either did not have the time to engineer these changes or, more commonly, to spend the time acquiring the knowledge and skills to do so.

**Figure 4.11 Who made the changes to be conformant**



*QC1 You mentioned earlier that your organisation would need to make changes to conform with the Children's code. Do you envisage the necessary changes will be done…? Base: Those who need to make changes (n=115)*

4.35   The ICO was the most common source of support for businesses, accessed by just under half (47%) of people who sought help. This was followed by membership organisations (30%) and other forms of external support (28%). Smaller and micro businesses were in general less likely to use any form of support but those that did, were most likely to use the ICO.

**Figure 4.12 Sources of Support**



*QD5 Where do you go for support in complying with, or more information about, the Children's code? Base: those aware of the code (n=330)*

4.36   The majority (81%) of businesses that used ICO support were overall satisfied with it, a slight drop from 2021 (89%). The same proportion were fairly satisfied, with a drop in the proportion that were very satisfied (37% in 2022 compared with 45% in 2021).

4.37   Businesses indicated what further guidance or support they would like from the ICO, and the most common answer was none (14%, the same as in 2021), which is in line with the positive feedback as to the ICO's support: 81% of businesses that used it were satisfied. The same percentage would like more or better information and updates.

**Figure 4.13 Desired future support**



*QD10 If there any further guidance / support you would want to see from the ICO what would it be? Base: 2021 (n=288) 2022 (n=320).*

| Case Study #3 | University |
|---|---|
| **Context** | David works at a very large university with 40,000 students and 3,000 staff. They most commonly use children's data when processing university applications from children as young as 16. Also their schools and outreach team does work with children under the age of 16. |
| **Awareness** | He has good knowledge of the Children's code. They do horizon scanning of new legislation and changes to legislation so studied the code when it was first announced. Their main takeaway from this was that they were already doing the vast majority what the code sets out.<br><br>They handle GDPR responsibilities through both external and internal audits and when they looked at the code, although it frequently referenced children, for example data minimization of children, it felt like it wasn't something that they would have to make big changes around. |

| Actions taken<br /> | As head of governance for data protection, David chairs an information compliance group which has representatives from across university. This includes IT and other professional services from across the faculties. They are then nominated data champions for their business area, which they use to both disseminate information and how it applies to the organisation but also bring in any concerns.<br /><br />They reviewed their existing GDPR arrangements and concluded that the 15 standards were broadly met, i.e., is it clear for individuals to understand how their data is being used? Privacy notices were written in plain English, and it was also clear that there were mechanisms in place so young people could have their data removed from their system and also reviewed data retention periods.<br /><br />They conducted a full Data Protection Impact Assessment (DPIA), using the ICO tools, and brought in a new customer records management system as part of that and a wider aim of improving GDPR policies.<br /><br />*"These are things that we are doing anyways as part of our GDPR commitments, but clearly there was value in us doing this again for the Children's code."* |
| --- | --- |
| Impact<br /> | Although they have not made any changes specifically in relation to the code, this is because they had already conducted DPIAs and were in a strong position to meet the standards of the code when the time came. As a result of this approach, they haven't felt any additional costs.<br /><br />*"We would always as part of any project do DPIAs, reviewing our requirements with consultant specialists for any new software to ensure that it met the general requirements of any relevant legislation…so there haven't been any additional costs."* |

sign

# 5      Impact of the Children's code

Chapter 5 explores what the impact of the Children's code has been on businesses, and the perceived effect it has on users and general risk in terms of data. It also assesses the financial costs incurred and any anticipated costs and any potential opportunities that it's created or may create for businesses.

## Effect on data protection

5.1     In 2022, businesses indicated whether their work for the Children's code had improved data protection generally. The vast majority (87%) of businesses said that it had, 47% said it did so fully and 40% said to a large extent.

**Figure 5.1 The extent that work towards Children' Code conformance has improved data protection compliance generally**



*B8a To what extent has the Children's code and your work to conform with it, enabled you to improve data protection compliance more generally?, Base: those who have made recent changes (n=111).*

5.2     Some businesses recognise that ensuring their online provision follows GDPR leads to being conformant with the code. If business knew they had child users, making sure their online provision was suitable for them was a natural part of their business model and wider GDPR compliance.

> *"We have a risk and governance team that looks at these issues holistically. With regards to risk around IT and data processing this would be handled by IT and the data protection officer."*
>
> Medium Online Retailer

> *"We got somebody to sort out our site. We know GDPR is super important and it's part of what we pay them for"*
>
> Small Online Retailer



## Opportunities and non-financial impacts

5.3    When asked if the code would provide opportunities to their business, fewer businesses thought it would in 2022 than in 2021 (27% compared with 42%). When asked in interviews, businesses felt that if there were going to be opportunities they would have already materialised by now.

**Figure 5.2 Opportunities arising from the code**



*Do you envisage any opportunity for your organisation as a result of implementing the Children's code? Base: All, 2022 (n=407), 2021 (n=432)*

5.4    Figure 5.3, shows that the two main areas that businesses no longer felt were likely opportunities, were knowledge that they were providing a safe space (down to 10% from 13%) making money (1% compared with 11%) and better processes, policies and procedures (0% compared with 9%). As mentioned above this was likely to be because opportunities had not been realised yet.

5.5    In contrast, businesses in 2022 were more likely to think there would be more general opportunities (11% in 2022 compared with 1% in 2021) and opportunities to do with marketing and branding (10% compared with 7%).

5.6    Those who understood the code better, targeted under 18s or who were largely compliant were more likely to see opportunities. The nature of envisaged opportunities varied and were most commonly thought to be general.

**Figure 5.3 Opportunities envisioned from the code**



*QC13 What opportunities do you envisage? Answers given by less than 2% at 2022 and less than 4% in other waves not shown. Base: those who perceive opportunities, 2022 (100), 2021 (n=154).*

5.7    Overall, businesses felt the overall impact of the code would be positive, with figures very similar to those in 2021. Around three quarters (77%) of businesses thought there would be a positive impact on parents/guardians and 71% thought it would be beneficial for children. Two thirds (66%) thought it would be positive for their organisation and 63% felt it would have a positive impact on their sector (there was no notable difference in this figure across sectors).

**Figure 5.4 Impact of the code on different groups**



QC14. Overall, what do you think the code's impact will be for the following groups?  Base: all 2022 (n=407)

5.8    In general, larger and medium sized businesses were more likely to think that there would be a positive impact across all of these groups. For example, 40% of large businesses and 39% of medium businesses thought it would be very positive for their organisation compared with 11% of sole traders and 27% of micro businesses. With greater capacity, larger businesses seemed more inclined to think at a strategic level of these benefits while smaller companies perhaps see them more in light of their time and financial cost rather than the longer term benefits. 58% of larger businesses thought it would be very positive for parents/guardians as did 51% of medium sized businesses compared with 32% of sole traders, 44% of micro companies and 34% of small businesses.

5.9    In the qualitative interviews, businesses didn't report any noticeable changes to reputation or use of their services. They felt there was an assumption from users that the business would be compliant and protecting their data. This was seen as an expected baseline rather than something to add value or improve an opinion of a business.

| Case Study #4 | Online Quiz Company |
|---|---|
| **Context** | Louise is one of three people running a microbusiness creating quiz content for TV shows, corporate events, hosting online quiz events and games manufacturers. They also host events in schools and hold online quiz events plus an online subscription service for one of their quizzes, where children could potentially sign up to their service and they could unknowingly be storing e-mail addresses of children. |
| **Awareness** | She first became aware of the code when the school that was hosting online quiz events asked their company about their own privacy policy. At this point, the respondents did some research online via Google search and found out about the Children's code. |
| | Louise commented that this was almost inadvertent and wasn't sure how she would have known about the code if the school hadn't asked. Policies like this are harder to keep track of in a smaller company. |
| | *"It is more likely that a business like mine would need that support in the form of a nice, easy to find, clear document because I would imagine a larger organisation would have somebody whose job this was."* |
| **Actions taken** | They undertook their own risk assessment and found they didn't need to take action but wanted to ensure that they had fully explored all of the safeguarding aspects of holding an event online. The greatest risks to children's data was through partners (primarily the schools) so they met to make sure that together all parts of the 15 standards were covered. One thing that came to their attention that they hadn't considered was children signing up to their online subscriptions. This led to a risk assessment and a review of the website and data storage processes but they were satisfied that no further changes were needed. |
| | Seeing as they work with schools, they felt there was an onus and expectation for them to be keeping children's data safe already. |
| **Impact** | There were definitely time implications. Louise spends roughly 20% of her time on the administrative side of the business but that was increased over the course of a couple of weeks to research the Children's code and have conversations with schools. There were no major changes needed though so she feels the incurred financial costs was minimal. |
| | Having spent time reading and researching the code, she was confident that it fitted within their existing work on GDPR and safeguarding. |
| | *"It's just something that we know about [GDPR], we've taken steps so that we are confident that what we are doing is right…something that we're mindful of so that if we do change our activities we can revisit and make sure we're in line with."* |

5.10  There were also no reported changes in website traffic or feedback from users about website functionality when considering the Children's code. In most cases these were not things that were measured and there were no specific feedback activities undertaken as part of the



changes. Compliance again was felt to be part of a natural evolution of the business model and there was therefore no reason to measure a before and after. There were also no reports of unprompted feedback from users, nor any real sense that change had occurred.

5.11   As shown in figure 5.5 businesses felt that the greatest risk to children in terms of their online data were sharing data with third parties (47%), sharing data between users (40%), and tracking children's location (41%).

5.12   Smaller businesses (sole traders and micro) were more likely to think that there were risks to children in their sector. For example, 61% thought sharing data was a risk compared with 39% of small, medium or large businesses.

5.13   One measure had the opposite trend where small, medium and large businesses were more likely (42%) to consider age estimation and account verification to be a risk than sole traders or micro businesses (28%).

**Figure 0.1 Perceived Risks to children**



| | | Sole trader/micro (0 to 9 employees) | Small, medium, large (10+ employees) |
|---|---|---|---|
| Sharing children's data with third parties | 47% | 61%* | 39% |
| Enabling data to be shared between users | 42% | 52%* | 35% |
| Tracking children's location | 41% | 57* | 31% |
| Personalised or 'targeted' adverts | 39% | 50%* | 32% |
| Age estimation and account verification | 37% | 28% | 42* |
| Personalised or 'targeted' content recommendations | 31% | 45%* | 23% |
| The design of privacy information and settings | 30% | 38%* | 26% |
| Approaches to enforcing online policies and community standards | 26% | 32% | 24% |
| Parental controls for tracking children's online activity | 16% | 22%* | 11% |
| Don't know | 11% | | |

*QC15 Which of the following data-related activities do you think pose the greatest risks to children in your sector? Base: all 2022 (n=407)*

5.14   As shown in figure 5.6, businesses were most likely to make changes in response to news articles (56%), followed by their own children (51%) and to pre-empt the online safety bill (37%).

5.15   Large and medium businesses were more likely to make changes because of news articles (74% and 63%) than micro and small businesses (17% and 33%). Conversely, micro and small

businesses were more likely to make changes driven by their own children or those of friends and family (66% and 73%) than large and medium businesses (48% and 50%).[4]

**Figure 0.2 Other factors driving change in practice**

| Factor | Percentage |
|---|---|
| News articles | 56% |
| Own children / children of relatives / friends | 51% |
| Pre-empting Online Safety Bill | 37% |
| Internal requirements | 2% |
| No other factors | 16% |

*Are there any other factors that have led you to make changes to your practices relating to the use of children's data within the last year? Base: who made recent changes 2022 (n=111)*

## Financial Impact

5.16   Fewer businesses reported that they incurred costs because of the Children's code in 2022 than in 2021 (29% compared with 35%). As in previous years, smaller companies were less likely to have incurred costs from the code (6% sole trader, 14% micro, 19% small, 45% medium, 33% large).

---

[4] This is from a relatively small base so should be viewed indicatively.



**Figure 0.3 Incurring of costs because of the code**



*QC2 Has your organisation incurred any financial costs to date, as a result of the Children's code? Base: those aware of the code, 2022 (n= 330), 2021 (n=288).*

5.17   Businesses shared how much their organisation has spent on making changes, and in 2022 the most common amount was £1000 or less, as in 2021. There was an increase in the number of businesses that reported spending more than £100,000, with 17% reporting this in 2022 compared with 5% in autumn 2021. That increase puts the figure more in line with the early 2021 wave where 14% reported as spending in that top bracket. Only large or medium businesses reported spending this amount both times. There were no trends in terms of the types of changes that businesses who spent more made. One potential inference was the costs were reflective of the larger scale, i.e. needing to make changes across difference subdivisions or branches of the business, and needing to train a greater number of staff.

**Figure 0.4 Costs incurred from the Children's code**



QC4/5  How much your organisation has spent on making changes? Base: those who incurred financial costs, 2021 (n=91), 2022 (n=92).

5.18   As may be expected, the larger the business, the larger the amount spent although this was mostly consistent across sectors. The qualitative interviews suggested that businesses tend not to measure these costs accurately. In the survey, few businesses were able to give an unprompted figure, instead making use of suggested bands.

5.19   Two main reasons arose in the interviews as to why they found it difficult to provide an accurate figure. One was that the sort of work required to be conformant was seen as an integral part of the business and was therefore not measured or considered a cost in reference to the Children's code. They instead counted only ad hoc costs. For example, one respondent was a compliance officer whose fulltime job was to monitor and enact requisite changes in these areas.

*"Our head of safeguarding is always checking something or doing training. It will have been this for a while but if not then she'll just be working on something else.'*

Medium Arts Company

5.20   Another reason was that it was difficult to unpack work done for the Children's code from other wider GDPR compliance. Businesses that employed web developers trusted them to make things compliant but were unable to attribute cost specifically to the aspects related to the code.

'*We paid them to do everything so we pay for their time but I don't know how that breaks down.'*

Small Games Company

5.21   In contrast, just over a quarter (27%) of businesses that responded to the survey felt that the costs incurred were fully attributed to the code and 58% felt that they were mostly because of the code, as shown in figure 5.9. There were small bases for sole trader, micro and small businesses so these numbers were driven by medium businesses where 40% reported their

costs were fully attributable to the code and 50% felt they were mostly driven by it. For large companies, 14% reported fully and 75% said mostly.

**Figure 0.5 Extent to which Children's code is driving these costs**



*C2a. To what extent is the Children's code driving these costs? Base: those who envisage incurring financial costs in future, 2022 (n=129).*

5.22  Across the prompted areas of what these costs were attributed to, responses were lower than in 2021 with fewer businesses choosing to answer. Fewer businesses reported incurring cost on training and development (51% compared with 58%), developing internal data plans/procedures (41% compared with 54%), third party/consultancy costs (33% compared with 43%) and reviewing risks to children from how their data is processed (30% compared with 47%). However, there was an increased incurred cost in 2022 regarding staff time researching requirement (52% compared with 42% in 2021)., suggesting reactive ad hoc work as opposed to knowledge building.

5.23  There were no notable trends among businesses of different sizes when it came to areas of incurred cost, nor their level of compliance nor when they've made changes.

**Figure 0.6 Areas of incurred cost**



QC3.*What have these costs related to? Base: those who incurred financial costs, 2022 (n=92), 2021 (n=91).*

## Anticipated financial impact

5.24   Slightly fewer businesses anticipated future costs than in 2021 and a greater proportion did not know. A third (33%) thought there would be costs to come while just under a half (47%) did not expect to incur any costs. Medium companies were most likely to anticipate costs moving forward (58%), and sole traders the least likely (11%).

**Figure 0.7 Expectations of future costs**



QC6 *Do you envisage that your organisation will incur costs in the future as a result of the Children's code? Base: all, 2022 (n=407), 2021 (n=432),*

IFF Research

5.25   The amount of cost that businesses who either planned to be compliant by the end of 2022 or 2023 expected to incur were broadly similar to 2021 with the exception that more businesses (12%) anticipated spending over £100,000 in the same pattern as with incurred cost. This was again driven entirely by large businesses.

**Figure 0.8 Amount of expected cost**



QC8/9. *How much your organisation envisages spending on making changes? Base: those who envisage incurring financial costs in future, 2022 (n=129) 2021 (n=134).*

5.26   As with incurred costs, there were drops in the percentage of businesses who expected to incur cost on training and development (48% compared with 63%) and third party consultancy costs (33% compared to 43%). There were, however, no notable increases in areas of expected cost.

**Figure 0.9 Expected areas of future cost**



QC7 What do you envisage these costs will relate to? Base: those who envisage incurring financial costs in future, 2022 (n=129) 2021 (n=134).



# 6    Conclusions

6.1    Most of the differences by type of business observed in this data are driven by business size, and there were very few differences by sector and other demographic groupings. This shows future guidance and communications should be targeted primarily by size of business.

6.2    Awareness of the Children's code has increased overall, driven by increases in awareness among micro (1-9 employees) and small (10-49 employees) businesses. However, more in-depth knowledge of the Children's code has not increased and businesses often see it as part of general GDPR compliance.

6.3    Many businesses perceive the code as something which has now passed, which may explain the levelling off of awareness and changes made as a result of the code. There was a wider sense that the code is something that has been subsumed into wider GDPR compliance

6.4    Businesses did not give a sense that they consider the Children's code to be a current issue and assumed that their current practice must be in line with conformance or else they would have heard from the ICO.

6.5    More businesses now felt that enforcement or penalties were the best way to encourage compliance, again suggesting a plateauing of awareness and that hearing about action being taken may be the best way to impress urgency.

6.6    Businesses generally did not find the code difficult to understand or conform with, in many cases feeling that doing so was naturally part of their business model and approach. Among those that faced barriers, time was most often mentioned. While some businesses assume the code to be complex, this was more often the result of not fully engaging with the communications around it, rather than the code itself.

6.7    Larger or medium sized businesses that have compliance specialists tend to find that the code is straightforward. The smallest businesses can still find the code daunting as part of a wider world of compliance that can seem intimidating and hard to break down into relevant and pertinent sections.

6.8    Businesses did not report notable reputational changes or user changes as a result of the code and in general were unable to discern its impact or cost from wider GDPR compliance. It was also not something they measured regularly.

6.9    Although most businesses do not necessarily perceive the code to offer commercial opportunities for their business, there is a general consensus that the impact of the code will be beneficial for wider stakeholders, in particular parents, guardians and ultimately children themselves.  The code was seen to offer reassurance to parents/guardians who are likely to find it increasingly difficult to monitor children's online activity.

6.10   While more businesses reported incurring costs in the highest bracket compared to 2021, only a minority stated the costs were directly related to the code. In general, the number of businesses experiencing costs had fallen.

# 7    Appendix

## 7.1 Business profiles

**Figure 7.1 Business deliverables and sources of income by size**



QS4. Does your organisation provide an online or internet enabled service? QS5. And is the revenue you generate from the delivery of online, or internet-enabled, products/services received through…? Base: All 2022 (n=407).

**Figure 7.2 Age of target customers and areas of business for those targeting adults**



QS7A. Are any of the online, or internet-enabled, products or services that you deliver aimed at specific age groups?. Base: All 2022 (n=407). S7b. What are these products or services? Base: Those who specifically target over 18s 2022 (n=125).

7.1    A quarter of businesses proactively targeted adults, slightly more targeted children. The largest business, and sole traders, were particularly likely not to target specific ages. Games with an adult rating were the most common type of product marketed specifically at adults.

**Figure 7.3 Types of products offered**



*S10. And which of the following products do you provide online in the UK?  Base: Those who sell products online 2022 (n=306).*

**Figure 7.4 Types of products offered**



*S11. And which of the following services do you provide online in the UK? Base: Those who provide services online 2022 (n=263).*

Quantitative Survey

# Children's code research - Questionnaire    J11024          Date

18/4/23

Online and Telephone

---

ASK ALL

S1   **The research involves a short survey that will take no longer than 15 minutes to complete.**

**The Information Commissioners Office also known as the ICO, is the UK's independent authority set up to uphold information rights in the public interest. They are seeking to explore organisations' awareness of recent changes to regulation.**

**By participating in this research, you will provide valuable insight, helping the ICO to better understand the support and guidance that organisations will need to respond to the upcoming changes.**

CATI ONLY: **The ICO and IFF hold joint responsibility for the use of data until this research, and we can provide more information on this should you need it.**

---

**Privacy reassurances to read if necessary**

**IFF research and ICO hold joint responsibility for the processing of data under this research. For more information on the ICO's privacy policy, please visit: https://ico.org.uk/global/privacy-notice and particularly the section on responding to consultations and surveys. For more information on IFF's privacy policy please visit:** https://www.iffresearch.com/privacy-policy/

**Under data protection law, you have the right to have a copy of your data, change your data, or withdraw from the research at any point. If you'd like to do this, or find out more, you can visit our IFF GDPR policy page: http://www.iffresearch.com/iff-research-gdpr-policy/**

**Your responses will be anonymous, with all data reported in aggregate form. Participating in this survey does not affect any obligations you might have to comply with under the Data Protection Act 2018, or any other applicable laws or regulations.**

If you wish to confirm the authenticity of this research or get more information about the research, you can contact IFF Research at **ICOChildrensCode@iffresearch.com** or the Market Research Society by calling 0800 975 9596.

Please be assured that any information you share with IFF will be used for research purposes only and will not be passed to the ICO in any way that would allow you or your organisation to be identified, or effect your dealings with ICO in anyway unless you explicitly agree to this

SHOW THIS SENTENCE ONLY TO THOSE FROM A MEMBERSHIP OR TRADE BODY:
If you are participating through membership of a trade or professional body, your responses will be shared in anonymous and aggregated form with that trade body only.

When completing the survey, please only use the 'next' button on the page rather than the 'back' and 'forward' buttons in your browser. You can pause the survey at any time by clicking on the pause symbol at the bottom of the screen and can re-enter by clicking on the link again.

To begin, please click on the 'next' button below.

Your views are important to us and we are very grateful for your help.

SINGLE CODE

| Yes | 1 | CONTINUE |
| No | 2 | THANK AND CLOSE |

ASK ALL
S2  **Please could you confirm that you have some level of awareness on matters concerning information rights and data security compliance within your organisation including GDPR, that means you feel able to answer questions on these matters?**

This may not necessarily mean that you have formal responsibilities for data protection compliance within your organisation, but data protection should have some impact on your work.

SINGLE CODE

| Yes | 1 | |
| No | 2 | |

ASK IF NOT BEST PERSON (S2=1) AND NOT SAMPLE SOURCE 3,4,5
S3  **We would be grateful if you could forward this link to someone at your organisation who is in a position to answers questions concerning information rights regulation such as GDPR.**

Thank you for your time.



| THANK AND CLOSE |
|---|

ASK ALL

**S4**  **We'd now like to take you through a few questions relating to your organisation.**

**Does your organisation provide an online or internet enabled service?**

SINGLE CODE

| Yes – products | 1 | CONTINUE |
|---|---|---|
| Yes - services | 2 | CONTINUE |
| Yes – both products and services | 3 | CONTINUE |
| No | 4 | THANK AND CLOSE |

ASK ALL

**S5**  **And is the revenue you generate from the delivery of online, or internet-enabled, products/services received through…?**

SINGLE CODE

| Direct payment or subscription from customers | 1 | |
|---|---|---|
| Generating money from user's data (e.g. through advertising) | 2 | |
| Both | 3 | |
| We don't generate revenue | 4 | GO TO S6 |

ASK THOSE WHO DO NOT GENERATE REVENUE (S5 = 4)

**S6**  **Do other organisations that provide the same types of products or services as you, typically generate revenue from them?**

**For example, you provide a charitable service that others providing similar services typically charge for.**

SINGLE CODE

| Yes | 1 | CONTINUE |
|---|---|---|
| No | 2 | THANK AND CLOSE |

**S7 DELETED**

ASK ALL

**S7a**  **Are any of the online, or internet-enabled, products or services that you deliver aimed at specific age groups?**

We understand services may attract a wider audience but we are interested in which age groups you actively target.

SINGLE CODE

| Targeted at people under 18 | 1 | |
| Targeted at people over 18 | 2 | |
| Not targeted at a specific age group | 3 | |

ASK IF PRODUCTS OR SERVICES AIMED AT OVER 18S (S7A=2)

S7b   **What are these products or services?**

SINGLE CODE

| Pornography | 1 | |
| Online dating | 2 | |
| Games with a PEGI rating or equivalent of 18+ | 3 | |
| Gambling | 4 | |
| Alcohol | 5 | |
| Other WRITE IN | 6 | |

ASK ALL
S7c   **What steps do you take to verify the age of your users?**

| Self-declaration (e.g. typing in date of birth or ticking a box) | 1 | |
| Require proof of age (e.g. driving licence, passport) | 2 | |
| require credit card information | 4 | |
| Other WRITE IN | 5 | |

ASK IF NOT AIMED AT CHILDREN (S7A=2/3)
S8   **How likely are those under the age of 18 in the UK to access any of the products or services that you offer online?**

SINGLE CODE



| Very unlikely | 1 | |
|---|---|---|
| Fairly unlikely | 2 | |
| Neither likely nor unlikely | 3 | |
| Fairly likely | 4 | |
| Very likely | 5 | |
| Don't know | 6 | |

ASK IF VERY UNLIKELY OR FAIRLY UNLIKELY (S8=1/2)

**S8a   Why do you think people under the aged 18 are unlikely to access any of the products or services that you offer online?**

MULTI CODE

| Products and/or services are not marketed at U18s | 1 | |
|---|---|---|
| Use age verification | 2 | |
| Website requires information (e.g. a tick box or credit card details) | 3 | |
| U18s wouldn't be interested in products and/or services | 4 | |
| Have undertaken research that shows under 18s do not use this or similar services | 5 | |
| Other WRITE IN | 6 | |
| Don't know | 7 | |

SHOW IF VERY UNLIKELY THAT UNDER 18S ARE ACCESSING PRODUCTS OR SERVICES (S8=1)

**S8b   Thank you for your help today. We're seeking to speak in more detail to those who have under 18s accessing their products and services.**

ASK IF FAIRLY UNLIKELY OR DK HOW LIKELY TO BE ACCESS BY CHILDREN (S8=2 OR 6)

**S9   How likely is it that products or services like yours appeal to children under the age of 18 in the UK?**

SINGLE CODE

| Very unlikely | 1 | THANK AND CLOSE |
|---|---|---|
| Fairly unlikely | 2 | THANK AND CLOSE |
| Neither likely nor unlikely | 3 | CONTINUE |
| Fairly likely | 4 | CONTINUE |
| Very likely | 5 | CONTINUE |

SHOW IF VERY OR FAIRLY UNLIKELY THAT PRODUCT WOULD APPEAL TO UNDER 18S (S9=1-2)

**S8b   Thank you for your help today. We're seeking to speak in more detail to those who have under 18s accessing their products and services.**

ASK IF SELL PRODUCTS ONLINE (S4=1 OR 3)

**S10   And which of the following products do you provide online in the UK?**

MULTICODE

| | | |
|---|---|---|
| Games devices (including consoles) | 1 | |
| Connected toys (internet enabled devices with Wi-Fi, Bluetooth, or other capabilities build in) | 2 | |
| Educational products and online learning materials | 3 | |
| Magazines, books, and media | 4 | |
| Live events and sports tickets | 5 | |
| Computer software | 6 | |
| Phones and communication devices | 7 | |
| Food and consumer goods | 8 | |
| Health and fitness services | 9 | |
| Other (Please write in) | 10 | |

ASK IF PROVIDE SERVICES ONLINE (S4=2 OR 3)

**S11   And which of the following services do you provide online in the UK?**

MULTICODE

| | | |
|---|---|---|
| Online marketplace for third party goods/services | 1 | |
| Online gaming / streaming | 2 | |
| Music and video streaming | 3 | |
| Social media services | 4 | |
| Online messaging or voice telephony service | 5 | |
| News / education websites / subscription services | 6 | |
| Educational Technology | 7 | |
| Electronic services controlling connected toys and other connected devices | 8 | |

| Preventative / counselling services | 9 | |
| Other WRITE IN | 1o | |
| None of these services | 11 | THANK AND CLOSE |

SHOW IF S11 = 11 (AND NO OTHER OPTION CHOSEN)
**Thank you for your participation. Preventative and counselling services are not in scope for this research and so we will not be needing anymore of your time. Thank you.**

**S12 DELETED**

ASK ALL
S13   **Roughly, how many employees does your organisation currently employ across all sites, in the UK?**

SINGLE CODE

| None – Sole Trader | 1 | |
| 1-9 | 2 | |
| 10-49 | 3 | |
| 50-99 | 4 | |
| 100-249 | 5 | |
| 250+ | 6 | |
| Don't know | 7 | |

## A. Awareness of the code

ASK ALL

A1   **How familiar are you with the Information Commissioners Office, also known as the ICO?**

SINGLE CODE

| Very familiar | 1 |
|---|---|
| Fairly familiar | 2 |
| Not very familiar | 3 |
| Was not aware of the ICO before this survey | 4 |

ASK ALL

A2   **Are you aware that the Information Commissioner's Office launched a code that sets out a number of standards to ensure that ISS providers' services appropriately safeguard children's personal data and process children's data fairly?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |

ASK ALL

A3   **Have you heard of the Children's code? This is also known as the Age Appropriate Design Code.**

SINGLE CODE

| Heard of it and have a detailed understanding of what it entails | 1 |
|---|---|
| Heard of it and have an ok understanding of what it entails | 2 |
| Heard of it but do not have a good understanding of what it entails | 3 |
| Never heard of it | 4 |

IF HAVE HEARD OF THE CHANGES (A2 = 1)
**From now on we will refer to this code as the Children's code.**

| V1 – AWARENESS DUMMY VARIABLE, DO NOT ASK | | |
|---|---|---|
| Aware of Code or the concept | 1 | A2 = 1 OR (A3 = 1 OR 2 OR 3) |
| Unaware of Code or the concept | 2 | A2 = 2 AND A3 = 4 |

ASK IF AWARE OF THE CODE (V1 = 1)

**A4** **Where did you first hear about the Children's code?**

SINGLE CODE

| Direct communication from ICO | 1 |
|---|---|
| ICO website | 2 |
| Membership or trade body | 3 |
| Newspaper or news website | 4 |
| Compliance officer | 5 |
| Social media platform | 6 |
| Child advocacy group (e.g. NSPCC) | 7 |
| Internet forum | 8 |
| Family or friends | 9 |
| Other (please write in) | 10 |
| Don't know | 11 |

ASK IF AWARE OF THE CODE (V1 = 1)

**A5** **Do you think that your organisation has to conform with the Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |

ASK IF AWARE OF THE CODE (V1 = 1)

**A6** **To what extent do you agree or disagree with the following statements…?**

SINGLE CODE



| | Strongly agree | Agree | Neither agree nor disagree | Disagree | Strongly disagree | Don't know |
|---|---|---|---|---|---|---|
| I have a good understanding of the theoretical concepts and principles within the Children's code | 1 | 2 | 3 | 4 | 5 | 6 |
| I have a good understanding of the practical actions our organisation needs to take in order to conform with the principles within The Children's code | 1 | 2 | 3 | 4 | 5 | 6 |

ASK IF AWARE OF THE CODE (V1 = 1)

A7 **Which of the following do you think are features of the Children's code?**

MULTICODE (ROTATE LIST)

| | | |
|---|---|---|
| The code applies to online and offline businesses that use children's data | 1 | |
| The code is designed to ensure that organisations appropriately safeguard children's personal data and process it fairly | 2 | |
| The code ensures that organisations in its scope have a duty of care to protect children from all possible harms when using their products and services | 3 | |
| The code only applies to businesses that have offices in the UK | 4 | |
| The code requires all organisations in its scope to verify the specific age of all of their child users | 5 | |
| The code supports organisations to meet the best interests of the child | 6 | |
| The code will expect all organisations in scope of the code to conform in the same way, regardless of their sector or size | 7 | |
| None of the above | 8 | DO NOT MULTICODE |
| Don't know | 9 | DO NOT MULTICODE |

**A8 DELETED**

ASK IF AWARE OF THE CODE (V1 = 1)

A9 **What do you think are the key standards of the Children's code, as it relates to your organisation?**

| | | |
|---|---|---|
| Write in | 1 | |

ASK ALL

A10 **We'd now like to give you a brief summary of what the Children's code is.**

**The code sets out 15 standards of age appropriate design that certain organisations need to implement to ensure their services appropriately safeguard children's personal data and process it fairly.**

**Organisations that need to conform with the code include all organisations that provide an electronic service that is likely to be accessed by children under 18. This includes apps, programs, connected toys and devices, search engines, social media platforms, streaming services, online games, news or educational websites and websites offering other goods or services to users over the internet. It is not restricted to services specifically directed at children and includes those where it is more probable than not that children could access the service.**

**Based on what you have just read, do you think your organisation (or parts of your organisation) needs to conform with the Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK ALL WHO SAY THEY DON'T THINK THEY WILL HAVE TO CONFORM (A10 = 2)

A11 **Why do you think that your organisation does not need to conform with the code?**

MULTICODE

| | | |
|---|---|---|
| Our services are not aimed at children | 1 | |
| Our services are not likely to be accessed by children under 18 | 2 | |
| We do not handle any personal data | 3 | |
| Other (please write in) | 4 | |
| We already meet the requirements of the code | 5 | DO NOT MULTICODE |

ASK ALL

A12 **Based on what you now know about the Children's code, to what extent do you think your organisation currently conforms with the standards in the code?**

SINGLE CODE



| Fully | 1 |
|---|---|
| To large extent, but not fully | 2 |
| To some extent | 3 |
| Not at all | 4 |
| Don't know | 5 |

ASK ALL WHO DO NOT THINK THEY FULLY CONFORM (A12 = 2-5)

A13  **Do you envisage your organisation will make any changes in order to better conform with Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK ALL

A14  **Are there any standards or areas of the code you find it particularly difficult to understand or comply with?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK IF AREAS OF THE CODE THEY FOUND

A15  **Why do you find these standards or areas of the code difficult to understand or comply with?**

| PLEASE WRITE IN | |
|---|---|
| Don't know | 1 |

# B.   Implementation

B1 DELETED
B2 DELETED
B3 DELETED

ASK ALL

B4 **Has your organisation made any changes to their practices relating to the use of children's (under 18's) data within the last year?**
SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

**B5 DELETED**

ASK IF THEY HAVE MADE RECENT CHANGES TO PRACTICES (B4 = 1)

B7 **What changes have you or your organisation made in relation to the use of children's (under 18) data, and were they made in response to the Children's code?**
MULTICODE

| | Made in response to the Children's code | We had started making changes independent of the Children's code | Don't know |
|---|---|---|---|
| Dedicated resources to reviewing the code and understanding its implications for your organisation | 1 | 2 | 3 |
| Designing and implementing changes to aspects of your service's user experience | 1 | 2 | 3 |
| Developing approaches for assessing the age of users | 1 | 2 | 3 |
| Reviewing risks to children arising from how your products or services process their data | 1 | 2 | 3 |
| Reviewing and redrafting privacy information, community standards and policies | 1 | 2 | 3 |
| Developing or reviewing your data protection impact assessment | 1 | 2 | 3 |
| Researching whether children are likely to access your service/ how they use your service | 1 | 2 | 3 |

| | | | |
|---|---|---|---|
| Engaging with children, parents/guardians or schools | 1 | 2 | 3 |
| Other change (please write in) | 1 | 2 | 3 |

ASK IF THEY HAVE MADE RECENT CHANGES TO PRACTICES (B4 = 1)

B8   **Are there any other factors that have led you to make changes to your practices relating to the use of children's data within the last year?**

SINGLE CODE

| | |
|---|---|
| News articles about children's privacy or online harms to children | 1 |
| Having children or child relatives/friends yourself | 2 |
| Pre-empting requirements from the upcoming Online Safety Bill | 3 |
| Other WRITE IN | 4 |

ASK IF MADE CHANGES IN THE PAST YEAR (B4=1)

B8a   **To what extent has the Children's code and your work to conform with it, enabled you to improve data protection compliance more generally?**

ADD IF NEC: **For example around the use of non-child customer's data or staff data.**

SINGLE CODE

| | |
|---|---|
| Fully | 1 |
| To large extent, but not fully | 2 |
| To some extent | 3 |
| Not at all | 4 |
| Don't know | 5 |

ASK ALL EXCEPT THOSE WHO ALREADY FULLY CONFORM OR SAID THEY DO NOT NEED TO MAKE ANY CHANGES (A12 IS NOT 1) OR (A13 IS NOT 2)

B9   **When do you anticipate that your organisation will have made the changes necessary to fully conform with the Children's code?**

SINGLE CODE

| | |
|---|---|
| We already fully conform | 1 |
| By the end of 2022 | 2 |
| By the end of 2023 | 3 |

| From 2023 onwards | 4 |
|---|---|
| Never | 5 |
| Don't know | 6 |

ASK IF don't already conform (B9 = 2,3, 4 OR 5)

B10  **Why do you say that?**

| PLEASE WRITE IN | |
|---|---|
| Prefer not to say | 1 |

B11  **Which of the following do you think would be most effective in encouraging and supervising industry conformance with the code in your sector?**

SINGLE CODE

| Issuing fines | 1 |
|---|---|
| Publishing good practice case studies | 2 |
| Further guidance | 3 |
| Increased collaboration with other UK regulators and government | 4 |
| Increased collaboration on development of international standards relating to children's data | 5 |
| Convening industry engagement for peer-to-peer learning | 6 |
| Other WRITE IN | 7 |
| Don't know | 8 |

# C   Impact of the code

**ASK IF NEED TO MAKE CHANGES (A13=1)**

C1   **You mentioned earlier that your organisation needed to make changes to conform with the Children's code. Were the necessary changes done…?**

SINGLE CODE

| | | |
|---|---|---|
| In-house | 1 | |
| By a third party | 2 | |
| By a mixture of in-house and third parties | 3 | |
| Don't know | 4 | |

**ASK IF AWARE OF THE CODE (V1 = 1)**

C2   **Has your organisation incurred any financial costs, including staff time or loss of revenue, to date, as a result of the Children's code?**

SINGLE CODE

| | |
|---|---|
| Yes | 1 |
| No | 2 |
| Don't know | 3 |

ASK IF HAVE INCURRED FINANCIAL COSTS (C2=1)

C2a   **To what extent is the Children's code driving these costs?**

SINGLE CODE

| | | |
|---|---|---|
| Costs are fully driven by the Children's code | 1 | |
| Costs are mostly driven by the Children's code but partly other factors too | 2 | |
| Costs are only partly driven by the Children's code but mostly other factors | 3 | |
| Don't Know | 4 | |

**ASK IF INCURRED FINANCIAL COSTS (C2 = 1)**

C3   **What have these costs related to?**

MULTI CODE

| | | |
|---|---|---|
| Staff time investigating/researching what is required | 1 | |

| | | |
|---|---|---|
| Training and development | 2 | |
| Developing internal data plans/procedures | 3 | |
| Third party/consultancy costs | 4 | |
| Business model changes | 5 | |
| Having to change or redesign existing products / services | 6 | |
| Reviewing risks to children arising from how your products or services process their data | 7 | |
| Reviewing and redrafting privacy information, community standards and policies | 8 | |
| Developing or reviewing your data protection impact assessment | 9 | |
| Loss of revenue | 10 | |
| Other (please write in) | 11 | |
| Don't know | 12 | DO NOT MULTICODE |

ASK IF INCURRED FINANCIAL COSTS (C2 = 1)

**C4** **Are you able to provide an estimate, in pounds sterling, and including staff time, of how much your organisation has spent so far on making changes in relation to the Children's code?**

| | |
|---|---|
| Please enter £ | |
| Don't know | 1 |

IF DON'T KNOW COST (C4 = 1)

**C5** **Are you able to provide an estimate using the ranges below?**

SINGLE CODE

| | |
|---|---|
| £1,000 or less | 1 |
| £1,001 to £2,000 | 2 |
| £2,001 to £3,000 | 3 |
| £3,001 to £5,000 | 4 |
| £5,001 to £10,000 | 5 |
| £10,001 to £20,000 | 6 |
| £20,001 to £50,000 | 7 |
| £50,001 to £100,000 | 8 |
| £100,000 to £500,000 | 9 |
| More than £500,000 | 10 |
| Don't know | 11 |
| Prefer not to say | 12 |

ASK ALL

**C6  Do you envisage that your organisation will incur costs *in the future* as a result of the Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK IF ENVISAGE INCURRING FINANCIAL COSTS IN THE FUTURE (C6 = 1)

**C7   What do you envisage these costs will relate to (IF more than one listed) and which of the costs you have listed will be the most costly?**

MULTI CODE

| | | |
|---|---|---|
| Staff time investigating/researching what is required | 1 | |
| Training and development | 2 | |
| Developing internal data plans/procedures | 3 | |
| Third party/consultancy costs | 4 | |
| Business model changes | 5 | |
| Having to change or redesign existing products / services | 6 | |
| Reviewing risks to children arising from how your products or services process their data | 7 | |
| Reviewing and redrafting privacy information, community standards and policies | 8 | |
| Developing or reviewing your data protection impact assessment | 9 | |
| Other (please write in) | 10 | |
| Don't know | 11 | DO NOT MULTICODE |

ASK IF ENVISAGE INCURRING FINANCIAL COSTS IN THE FUTURE (C6 = 1)

**C8   Are you able to provide an estimate, in pounds sterling and including staff time, of how much you envisage spending on making changes in relation to the Children's code?**

| Please enter £ | |
|---|---|
| Don't know | 1 |

IF DON'T KNOW COST (C8 = 1)

C9 **Are you able to provide an estimate using the ranges below?**

SINGLE CODE

| £1,000 or less | 1 |
|---|---|
| £1,001 to £2,000 | 2 |
| £2,001 to £3,000 | 3 |
| £3,001 to £5,000 | 4 |
| £5,001 to £10,000 | 5 |
| £10,001 to £20,000 | 6 |
| £20,001 to £50,000 | 7 |
| £50,001 to £100,000 | 8 |
| £100,000 to £500,000 | 9 |
| More than £500,000 | 10 |
| Don't know | 11 |
| Prefer not to say | 12 |

ASK ALL EXCEPT THOSE WHO ALREADY FULLY CONFORM OR SAID THEY DO NOT NEED TO MAKE ANY CHANGES (A12 IS NOT 1) OR (A13 IS NOT 2)

C9a **Are there any internal or external barriers, relating to your organisation conforming with the Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK THOSE WHO PERCEIVE BARRIERS (NEWC10a = 1)

**C**9b **What are these barriers?**

| PLEASE WRITE IN | |
|---|---|
| Don't know | 1 |

**C10 DELETED**
**C11 DELETED**

ASK ALL

**C12  Have you realised, or do you envisage, any opportunities for your organisation as a result of implementing the Children's code?**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK THOSE WHO PERCEIVE OPPORTUNITIES (C12 =1)

**C13  What opportunities do you envisage?**

| PLEASE WRITE IN | |
|---|---|
| Don't know | 1 |

**C14  Overall, what do you think the code's impact will be for the following groups?**

SINGLE CODE

| | Very positive | Somewhat positive | Neither positive nor negative | Somewhat negative | Very negative |
|---|---|---|---|---|---|
| Your organisation | 1 | 2 | 3 | 4 | 5 |
| Your sector | 1 | 2 | 3 | 4 | 5 |
| Your child users | 1 | 2 | 3 | 4 | 5 |
| Your general users | 1 | 2 | 3 | 4 | 5 |
| Parents/guardians | 1 | 2 | 3 | 4 | 5 |

ASK ALL

**C15  Which of the following data-related activities do you think pose the greatest risks to children, in your sector**

MULTICODE

| | High Risk | Medium Risk | Low Risk |
|---|---|---|---|
| Age estimation and account verification | 1 | 2 | 3 |
| Enabling data to be shared between users | 1 | 2 | 3 |
| Approaches to enforcing online policies and community standards | 1 | 2 | 3 |

| | | | |
|---|---|---|---|
| The design of privacy information and settings | 1 | 2 | 3 |
| Sharing children's data with third parties | 1 | 2 | 3 |
| Personalised or "targeted" adverts | 1 | 2 | 3 |
| Personalised or "targeted" content recommendations | 1 | 2 | 3 |
| Tracking children's location | 1 | 2 | 3 |
| Parental controls for tracking children's online activity | 1 | 2 | 3 |
| Don't know | 1 | 2 | 3 |

## D.  Support

D

**D1 DELETED**
**D2 DELETED**
**D3 DELETED**
**D4 DELETED**

ASK IF AWARE OF THE CODE (V1 = 1)
D5   **Where do you go for support in complying with, or more information about, the Children's code?**

MULTI CODE

| | | |
|---|---|---|
| ICO | 1 | |
| Membership organisation (eg. chambers of commerce) | 2 | |
| External support (eg. Consultants or law firms) | 3 | |
| I don't seek support | 4 | DO NOT MULTICODE |
| - Other (please specify) | 5 | |

ASK IF GO TO ICO FOR SUPPORT (D5 =1)
D8   **How satisfied or dissatisfied are you with the ICO's support and engagement?**

SINGLE CODE

| | | |
|---|---|---|
| Very satisfied | 1 | |
| Fairly satisfied | 2 | |
| Neither satisfied nor dissatisfied | 3 | |
| Fairly dissatisfied | 4 | |

| Very dissatisfied | 5 | |
| Don't know | 6 | |

**D9 DELETED**

ASK ALL
D10 **If there any further guidance/support you would want to see from the ICO, what would it be?**

SINGLE CODE

| Write in | 1 | |

# E.   Demographics

E1   **DELETED**

ASK ALL
E2   **Finally, we'd just like to ask you a few questions to build up a bit more detail about your organisation.**

**What, approximately, was the income of your organisation in your last financial year?**

**Please include turnover and investment.**

SINGLE CODE

| £1-£49,999 | 1 | |
| £50,000-£84,999 | 2 | |
| £85,000-£99,999 | 3 | |
| £100,000-£249,999 | 4 | |
| £250,000-£499,999 | 5 | |
| £500,000-£999,999 | 6 | |
| £1,000,000-£1,999,999 | 7 | |
| £2,000,000-£4,999,999 | 8 | |
| £5,000,000-£9,999,999 | 9 | |
| £10,000,000-£24,999,999 | 10 | |
| £25,000,0000+ | 11 | |
| Don't know | 12 | |
| Prefer not to say | 13 | |

ASK ALL
**E2a   What is the main activity of your business?**

SINGLE CODE

| Write in | 1 | |
|---|---|---|

ASK ALL
**E3   Where is your organisation's head office based?**

SINGLE CODE

| England | 1 |
|---|---|
| Wales | 2 |
| Scotland | 3 |
| Northern Ireland | 4 |
| Outside of the UK | 5 |
| Don't Know | 6 |
| Prefer not to say | 7 |

**E4   DELETED**

ASK ALL EXCEPT THOSE WITH A HEAD OFFICE OUTSIDE OF THE UK (E3 IS NOT 5)
**E5   Does your organisation operate outside of the UK? By which we mean that staff are employed by your organisation in areas other than the UK.**

SINGLE CODE

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

ASK ORGANISATIONS WHO HAVE AN OPERATION OUTSIDE OF THE UK (E3 = 5 OR E5 = 1)
**E6   Roughly, how many employees does your organisation currently employ globally, across all sites in the UK and outside of the UK?**

SINGLE CODE

| None – Sole Trader | 1 | |
|---|---|---|
| 1-9 | 2 | |
| 10-49 | 3 | |
| 50-99 | 4 | |

| 100-249 | 5 | |
|---|---|---|
| 250+ | 6 | |
| Don't know | 7 | |

ASK ALL

**E7  Have you heard of the data protection laws that apply in the UK: the GDPR and Data Protection Act?**

SINGLE CODE

| Heard of them and have a detailed understanding of what they entail | 1 | |
|---|---|---|
| Heard of them and have an ok understanding of what they entail | 2 | |
| Heard of them but do not have a good understanding of what they entail | 3 | |
| Never heard of them | 4 | |

ASK ALL

**E7a  Have you heard of the online safety bill?**

SINGLE CODE

| Heard of it and have a detailed understanding of what it entails | 1 | |
|---|---|---|
| Heard of it and have an ok understanding of what it entails | 2 | |
| Heard of it but do not have a good understanding of what it entails | 3 | |
| Never heard of them | 4 | |

ASK ALL

**E8  Are you registered with the ICO or do you pay data protection fee?**

SINGLE CODE

| Yes | 1 | |
|---|---|---|
| No | 2 | |
| Don't know | 3 | |

# F.  Thank and close



ASK ALL

F1   **Thank you very much for your time, that is now the end of the survey. Would you be willing for the Information Commissioners Office to re-contact you for further research into your experiences of the Children's code? Note: this will involve passing on your contact details to the Information Commissioners Office**

SINGLE CODE

| Yes | 1 |
|-----|---|
| No  | 2 |

ASK IF WILLING TO BE RE-CONTACTED (F1 = 1)

F2   **Please can you write in below the best telephone number and email address to contact you on for future research?**

**These details will only be used to contact you in relation to further research studies for the Information Commissioners Office.**

| WRITE IN EMAIL ADDRESS | 1 | ALLOW REFUSAL |
|------------------------|---|---------------|
| WRITE IN TELEPHONE NUMBER | 2 | ALLOW REFUSAL |

SHOW FOR ALL

**Thank you – on behalf of IFF Research and the Information Commissioners Office, for your invaluable feedback, your time and input is much appreciated. We would just like to confirm, your responses to this survey are anonymised: all names and contact details are deleted at the earliest opportunity – and no more than 12 months from now.**

**If you would like more information about the legal basis for you taking part, what we do with your data, and the rights that you have, you can visit our IFF GDPR policy page: http://www.iffresearch.com/iff-research-gdpr-policy**

### 7.3 Quantitative Survey

## ICO Children's code Research: Qualitative Topic Guide

J11985                Date 18/4/23

Zoom / Teams / Tel – 60 minutes

---

# A Introduction (2 minutes)

| | PROCESS NOTES: |
|---|---|
| • **Interviewer and IFF introduction and background:** Thank you for agreeing to take part in this interview.  I'm [name] from IFF Research. We're a completely independent research organisation. | *The purpose of this section is to thank the participant for agreeing to participate in the research and introduce them to its aims and objectives. It is also to obtain permissions for recording / sharing recording.* |
| • **MRS Code of Conduct:** IFF Research operates under the strict guidelines of the Market Research Society's Code of Conduct.  We will not pass any of your details on to any other companies. | |
| • **Confidentiality:** Your participation in this research is strictly anonymous. ICO will not know which individuals or businesses IFF have spoken to, unless you give us express permission to do so.  All the information we collect will be kept in the strictest confidence and used for research purposes only. | |
| • **Reporting findings:** Our report will use anonymised quotes but won't mention anything that could identify you or your business. | |
| • **Incentive:** As a thank you for your time we will make a £40 donation to a charity of your choice from a shortlist of five. I will say more about this at the end of the interview. | |
| • **This interview:** The interview will take around 50 – 60 minutes to complete, depending on how much you have to say. I'd be very grateful if you could answer all of my questions today, but participation is of course completely voluntary, so if there is something you don't wish to answer, it's fine just to say so. | |
| • **Data use:** Under UK General Data Protection Regulations (UK GDPR) you have the right to have a copy of your data, change your data or withdraw from the research at any point. | |
| **Based on this information, are you happy to continue?** | |

| Yes | 1 |
|---|---|
| No | 2 |

• **Permission to record:**  Are you happy for me to record the interview. This is just to save me having to write down today everything you say.



The recording will be stored on an encrypted area of our server at IFF and only the IFF researchers will have access to it. It will be destroyed at the end of the research.

| Yes | 1 |
|-----|---|
| No | 2 |

● **Permission to share recording with ICO:**  And would you be happy for us to share the recording of the interview with ICO? This is just so they can see how the first few interviews are working and whether they need to ask any further questions to capture the information they need. Your answer to this question will not affect your ability to take part in anyway.

| Yes | 1 |
|-----|---|
| No | 2 |

● **Permission to share transcript with ICO:**  Finally, would you be happy for us to share an anonymised transcript of the interview with ICO? Anything that would identify you or your organisation would be removed so they would not know who had completed the interview.

| Yes | 1 |
|-----|---|
| No | 2 |

# B Background (5 minutes)

| | PROCESS NOTES: This section is part warm up, part context. |
|---|---|
| ASK ALL<br><br>**I'd like to start the interview by getting to know a little bit more about your organisation and the type of work you do…**<br><br>S8 **Firstly, could you give me a very brief overview of your organisation?**<br><br>*PROBE IN TERMS OF:*<br><br>• Main activity where they are likely to use children's data<br><br>• Size / scale<br><br>• Sector / specialisms<br><br><br>S9 **And what is your role within the organisation?**<br><br>*PROBE IN TERMS OF:*<br><br>• Job title<br><br>• Main role / responsibilities<br><br>• How much time spent dealing with regulation/compliance?<br><br><br>FOR THOSE WITH DESIGN FOCUSSED ROLE (FROM SCREENER) IF NOT ALREADY COVERED:<br><br>• Could you tell me a bit more about the design elements of your role and what they entail | |

# C   IMPLICATIONS OF THE CHILDRENS CODE (20 mins)

| | |
|---|---|
| ASK ALL<br><br>C1   **Thanks for that.  I would now like to talk a bit about the Children's code**<br><br>**Although this was covered in the initial interview you did a couple of months ago, I would just like to refresh your memory of what the Children's code sets out.**<br><br>*The code sets out 15 standards of age appropriate design that certain organisations need to implement to ensure their services appropriately safeguard children's personal data and process it fairly.*<br><br>*Organisations that need to conform with the code include all organisations that provide an electronic service that is likely to be accessed by children under 18. It is not restricted to services specifically directed at children and includes those where it is more probable than not that children could access the service.*<br><br>*It came into force on 2nd September 2020 and relevant organisations had until September 2021 to show they conform with the Code.*<br><br>**I understand some of this was covered by the initial interview, but it would be great if you could just give a brief overview of the extent to which your organisation has engaged with the Children's code so far, and your personal understanding of it?**<br><br>PROBE:<br><br>• Were you aware of it before the initial interview?<br><br>• How would you rate your understanding of it now? (Tick option selected below) | *PROCESS NOTES: This section explores some discussion of the organisations engagement with the Children's code and then looks at how the effect its had on businesses* |

| | |
|---|---|
| Heard of it and have a detailed understanding of what it entails | |
| Heard of it and have an ok understanding of what it entails | |
| Heard of it but do not have a good understanding of what it entails | |
| Never heard of it | |

| C2 | **What steps has your organisation taken to comply with it so far?** | |
|---|---|---|
| C3 | **Do you use age assurance technologies?** | |
| | • If yes, which? | |
| | • What has your experience of them been? | |
| | • What impact has the code had on your use of them? | |
| | • To what extent did they help with the changes you made to the code? | |
| C4 | **What changes have applying the standards of the code made to your services?** | |
| | • How large are these changes? | |
| | • How difficult have they been to make? | |
| C5 | **What has been the effect of these changes?** | |
| | • Is there any change to what services they offer? | |
| | • Have they seen any positive or negative reactions from users? | |
| C6 | **Have these changes had an impact on number of users/amount of revenue?** | |
| | • Does the website see more or less traffic? | |
| | • Is there a change in the demographic of users (i.e. more or fewer children) | |
| C7 | **Have there been any changes to user satisfaction of the website?** | |
| | • What are these changes? Positive or negative? | |
| | • How do they measure these? (feedback form? or unprompted comments?) | |
| C8 | **What effect has making these changes had on your reputation?** | |
| | • Do users feel safer? | |
| | • Has making the changes helped to generate more trust from users? | |
| C9 | **Have they had an effect on the user's experience?** | |
| | • Has it affected how easy or quick the website is to use? | |
| | • Have you had any direct feedback on this? | |
| C10 | **Do you have any other evidence of impact that making these changes has had on your reputation and user satisfaction?** | |
| C11 | **To what extent has making these changes been a burden?** | |
| | • What burdens have there been? Financial? Logistical? Managing information gaps? | |
| | • How have they been negated? | |
| | • Is there anything that could have helped ease these burdens? | |
| C12 | **What were the financial implications of the code?** | |
| | • Staff time? Needing to outsource work e.g. to a web designer | |

**IFF** Research

| | |
|---|---|
|     ● To what extent have you been able to measure these?<br><br>    ● How have the costs incurred compared with what you expected?<br><br>**C13**  **To what extent has the Children's code contributed to these changes/impacts?**<br><br>**C14**  **What other factors have contributed to these changes?** | |

# D  Information and guidance – the Code Hub (20 mins)

| | | |
|---|---|---|
| D1 | **Thanks for that.  I would now like to move on to talk about the role of support and guidance in engaging with regulations.**<br><br>**When looking for support to engage with regulation, what needs do you have?**<br><br>PROBE:<br>• Guidance on how to comply with rules<br>• Information on the consequences of not complying with the rules, and/or benefits of complying<br>• Resources that support you to tell colleagues about regulation<br>• Resources that support you to tell customers about regulation | *PROCESS NOTES:* This section aims to gather insights that inform the content for code guidance under development. It will also help to better understand how to frame, sequence and present guidance supporting organisations to conform with the Children's code. |
| D2 | **And now thinking about support and guidance around the Children's code, to date have you sought any support on the Children's code? And if so, where did you seek support?**<br><br>PROBE:<br>• The ICO website<br>• The Children's code Hub<br>• Children's code best interests guidance<br>• ICO Helplines<br>• ICO email<br>• ICO social media accounts<br>• External sources such as government websites | ***PLEASE ACCESS Code Hub webpage here:***<br><br>[Children's code hub \| ICO](#) |
| | ONLY ASK OF THOSE WHO DID SEEK GUIDANCE | |
| D3 | **How useful you find the information?**<br><br>• Why? Why not useful?<br>• What makes information/guidance useful for you? | |
| | ASK ALL | |
| D4 | IF MENTION LOOKING AT THE CODE HUB:<br><br>**You mentioned that you've already looked the Children's code Hub on the ICO's website, I'd like you to look at the Hub again, with me, so that I can ask you some questions about it.**<br><br>IF HAVEN'T LOOKED AT THE CODE HUB:<br><br>**Now I would like to show you some information on the ICO's website and in particular their Children's code Hub.** | |



IFF Research

**INTERVIEWER TO SEND LINK TO CODE HUB OVER ZOOM CHAT.**

**I'm going to send you a link to a website, and if possible I'd like you to follow the link and then share your screen. [IF NOT POSSIBLE / NOT WILLING, INTERVIEWER TO SHARE SCREEN AND RESPONDENT TO TALK THROUGH WHAT THEY WOULD DO]**

**I'll give you a few minutes to have a look through the webpage, and if you could just imagine you have come to the page for guidance, please follow the steps you think you'd take in that event. Talk me through our experience of the webpage – there are no right or wrong answers and your honest views are really important to us.**

**INTERVIEWER TO NOTE DOWN WHERE RESPONDENT CLICKS / EXPLORES**

**What information or guidance would you seek out first on this site?**

D5 **Is there any information you think is particularly useful?**

PROBE:

- Would you/did you use the DIPA template?

- The FAQ's – did they have the right level of depth / content?

- Were there any FAQ's you thought were missing?

- What did you think about the best interest self-assessment? Could it be improved?

D6 **Is there any information you think is not useful or is missing?**

D7 **How could the Hub content be improved?**

PROBE:

- Could the structure be changed?

- The inclusion of self-assessment tools? What should they assess? How would they help?

- A sequential/modular approach rather than all resources available on one landing page?

- What formants for content would be useful? (Video, slide decks, infographics)

# E   Approaches to managing risks (15 mins)

| | PROCESS NOTES: This section aims to gather insight to inform the development of risk assessment guidance. |
|---|---|
| ASK ALL | |
| E1   **I'd now like to turn to risk management and ask you some questions about your approach to it.**<br><br>**How do you currently approach risk management for your products / services?**<br><br>PROBE:<br>• Who is involved in the decision making?<br>• Does this risk management approach change for your child users, or potential child users?<br>• If so, how does it change?<br>• Or does it remain the same for all users? | |
| E2   **What are the biggest challenges for you going through this process?** | **PLEASE ACCESS Children's code Self-Assessment Risk Tool:** |
| E3   **I would like to show you some information again, this time a risk management tool that the ICO have put together to help organisations in managing risk.**<br><br>**INTERVIEWER TO SHARE SCREEN SHOWING CHILDREN'S CODE RISK MANAGEMENT TOOL.**<br><br>**I'm just going to give you a quick tour of the tool – I don't expect you to read the information but just to get a sense of the type of information that it contains.**<br><br>**INTERVIEWER TO SCROLL THROUGH THE TOOL POINTING OUT WHAT THE COLUMN HEADINGS ARE AND SOME EXAMPLES OF WHAT SOME OF THE ROWS CONTAIN**<br><br>**Do you think a tool such as this is something that you would use?** | https://ico.org.uk/media/for-organisations/documents/4020178/childrens-code-self-assessment-risk-tool.xlsx |
| E4   **What parts of it would be useful?** | |
| E5   **Is there any information you think is not useful or is missing?** | |
| E6   **Could the structure of the tool be modified to further meet your needs?**<br><br>PROBE:<br>• If so, how?<br>• Could it be formatted differently?<br>• Could it be framed differently? | |
| E7   **How could the ICO communicate such a tool to you / encourage you to use it?** | |



IFF Research

# F   How designers engage with the Code (10 mins)

ASK THIS SECTION OF THOSE IN A DESIGN ROLE ONLY (B3 = 1)

F1   **Finally, I'd just like to ask you some questions focussing on the design elements of your role.**

**How do you feel the Code has or will impact your design work?**

PROBE:

- Scale                                      of                                      impact

F2   **What standards or codes do you use as benchmarks in your design work?**
PROBE:

- How do you ensure your design work conforms to these?

- How confident do you / would you feel about ensuring your designs conform with the Code?

F3   **What are the main factors you consider when it comes to design?**

- Is it user experience? Functionality? User safety? Reputation?

F4   **What impact has the interests of children had on your design work?**

- How important are the interests of children as part of design?

- What aspects of their user experience do they consider?

- What design considerations have they made for the safety and protection of child users?

F5   **Where do you see the biggest challenges to implement the Code from a design perspective?**

PROBE:

- Understanding who is responsible for what aspects of compliance – and having personal agency to make changes

- Understanding how regulations translate into design principles/obligations/success metrics

- Specific code design challenges (e.g. providing child-friendly privacy information/choices, understanding/mitigating design-related risks to children, designing effective online tools for children)

F6   **Have you encountered challenges when creating digital services for young people?**

PROBE:

- If so, has the Code helped you or clarified best practice in this instance?

- Has it played any other role when encountering these challenges?


IFF Research

| F7 | **How could the ICO provide better support to help you understand and implement the Code?**<br><br>PROBE:<br><br>● Would it be helpful to have guidance specifically aimed at designers?<br><br>● Forming peer-to-peer communities of designers<br><br>● Setting design challenges | |
|----|----|----|

# G Summary and wrap-up (2 min)

| | | PROCESS NOTES: The purpose of this section is to thank the respondent and close the interview. |
|---|---|---|
| F8 | **Is there anything else that you think would be useful for the ICO to know on the topics discussed today?** | |
| | ASK IF SAID YES TO SHARING RECORDING OR TRANSCRIPT WITH ICO | |
| F9 | **Thank you. And just to confirm, are you still happy for us to share [INSERT AS APPROPRIATE: The recording of this interview / an anonymised transcript of this interview] with ICO?** | |

| Yes | |
|---|---|
| No | IF NO – which part is there no longer permission for? |

F10 **As you know, IFF Research would like to make a £40 donation to a charity on your behalf as a thank you for taking the time to participate in this research.**
**Which of the following charities would you like to donate to?**

| British Heart Foundation | |
|---|---|
| MacMillan Cancer Support | |
| Shelter | |
| Great Ormond Street Hospital | |
| Celia Hammond Animal Trust | |

**On behalf of the ICO and IFF Research, thanks very much for taking the time to take part in this research.**

**Just to confirm, we'll be keeping your anonymised responses to the interview for analysis purposes and if you'd like a copy of your data, to change your data or for your data to be deleted then please get in contact with Luke Catterson at luke.catterson@iffresearch.com.**

*IF NECESSARY:*

**You also have a right to lodge a complaint with the Information Commissioners Office (ICO) and you can do so by calling their helpline on 0303 123 1113.**

---

| I declare that this survey has been carried out under IFF instructions and within the rules of the MRS Code of Conduct. |
|---|
| Interviewer signature: |
| Finish time: |



"

## IFF Research illuminates the world for organisations businesses and individuals helping them to make better-informed decisions."

Our Values:

### 1. Being human first:

Whether employer or employee, client or collaborator, we are all humans first and foremost. Recognising this essential humanity is central to how we conduct our business, and how we lead our lives. We respect and accommodate each individual's way of thinking, working and communicating, mindful of the fact that each has their own story and means of telling it.

### 2. Impartiality and independence:

IFF is a research-led organisation which believes in letting the evidence do the talking. We don't undertake projects with a preconception of what "the answer" is, and we don't hide from the truths that research reveals. We are independent, in the research we conduct, of political flavour or dogma. We are open-minded, imaginative and intellectually rigorous.

### 3. Making a difference:

At IFF, we want to make a difference to the clients we work with, and we work with clients who share our ambition for positive change. We expect all IFF staff to take personal responsibility for everything they do at work, which should always be the best they can deliver.



5th Floor
St. Magnus House
3 Lower Thames Street
London
EC3R 6HD
Tel: +44(0)20 7250 3035
Website: iffresearch.com

Contact details: