# Exhibit A

1  LAURA MARQUEZ-GARRETT (SBN 221542)
   laura@socialmediavictims.org
2  SOCIAL MEDIA VICTIMS LAW CENTER
   821 Second Avenue, Suite 2100
3  Seattle, WA 98104
   T: (206) 741-4862
4
5  *Attorney for Amici Curiae*
6
7                **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
8                     **SAN JOSE DIVISION**
9
10 NETCHOICE, LLC d/b/a NetChoice,           )    Case No. 5:22-cv-08861-BLF
                                             )
11              *Plaintiff*,                 )    **BRIEF OF FAIRPLAY AND THE**
                                             )    **PUBLIC HEALTH ADVOCACY**
12         v.                                )    **INSTITUTE AS AMICI CURIAE IN**
                                             )    **SUPPORT OF DEFENDANT**
13 ROB BONTA, ATTORNEY GENERAL OF            )
   THE STATE OF CALIFORNIA, in his official  )    Judge: Honorable Beth Labson Freeman
14 capacity,                                 )
                                             )
15              *Defendant*.                 )
                                             )
16

17
18
19
20
21
22
23
24
25
26
27
28

                                    i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Table of Contents ---------------------------------------------------------------------------- ii

Table of Authorities---------------------------------------------------------------------------- iii

Statement of Interest of the Amici Curiae ----------------------------------------------------1

Introduction and Summary Of argument------------------------------------------------------2

   I.    Enjoining the CADC Would Harm Young People in California --------------------------3

      A.   The Legislature's Purpose in Enacting the CADC Was to Protect Children from Manipulative Design Practices and Prevent the Use of Their Data in Ways Detrimental to Their Wellbeing Because Existing State and Federal Laws Have Proven Insufficient. ----3

      B.   The CADC Was Adopted Against the Backdrop of a Crisis in Youth Mental Health to Which Social Media Has Been a Major Contributor --------------------------------------7

   II.   COPPA Does Not Preempt the CADC --------------------------------------------- 12

Conclusion --------------------------------------------------------------------------------- 15

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) ................................................. 15

*Fraley v. Facebook*, 9th Cir. No. 13-16819 (Mar. 20, 2014) ...................................... 15

*Jones v. Google LLC*, 56 F.4th 735, 740-41 (9th Cir. 2022) ....................................... 12

*Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 291-92 (3d Cir. 2016) ...................... 12

<u>Statutes</u>

15 U.S.C. § 6502 ..................................................................................... 13, 14

2022 Cal ALS 320 § 1 ................................................................................. 3, 4

Cal Civ Code § 1798.99.31 .............................................................................. 14

Cal Civ Code § 1798.99.32 .............................................................................. 11

<u>Other Authorities</u>

144 Cong. Rec. S11657 (Oct. 7, 1998) ................................................................... 14

16 C.F.R. § 312.2 ...................................................................................... 15

*AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health*, Am. Acad. Pediatrics (Oct. 19, 2021) ................................................................. 8

Accountable Tech, *Prevalence of design harms among young people* (March 29, 2023) ........... 11

Anna Hartford & Dan J. Stein, *Attentional Harms and Digital Inequalities*, 9 JMIR Mental Health 2 (Feb. 11, 2022), ................................................................................ 10

Cal Civ Code § 1789.99.30 .............................................................................. 15

Center for Digital Democracy and the Campaign for a Commercial Free Childhood, Comment Letter on Competition and Consumer Protection in the 21st Century, Hearing #12: The FTC's Approach to Consumer Privacy (May 31, 2019) .......................................................... 14

Comm. Rep., Assembly Comm. on Privacy and Consumer Protection (Ca. Apr. 19, 2022) ......................................................................................... 4, 5, 6, 7

Emily Vogels et al., *Teens, Social Media and Technology 2022*, PEW RSCH. CTR. (Aug. 10, 2022) ....................................................................... 13

Hearing Before the Senate Subcomm. on Communications, 105th S. 1068 (1998) .................... 12

Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychol. Q. 311 (2019) ......................................... 10

Amici Curiae Brief of Fairplay, PHAI and Others (5:22-cv-08861-BLF)

K.E. Riehm et al., *Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth*, 76 JAMA Psychiatry 1266 (2019)....................... 10

Meta, *Growth, Friending + PYMK, and downstream integrity problems* .................................... 11

Meta, *Integrity Glossary* ................................................................................................................ 11

Mike Allen, *Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains"*, Axios (Nov. 9, 2017) .................................................................................... 9

Nir Eyal, *The Hook Model: How to Manufacture Desire in 4 Steps*, Nir and Far ......................... 9

Petition for Rulemaking to Prohibit the Use on Children of Design Features that Maximize for Engagement, FTC-2022-0073-0002 (Nov. 17, 2022) ............................................................. 8, 9

Radesky, Jenny, et al, *Young Kids and YouTube: How Ads, Toys, and Games Dominate Viewing*, COMMON SENSE MEDIA (2020). ............................................................................................... 5

*Social Media and Depressive Symptoms in Childhood and Adolescence: A Systematic Review*, 2 Adolescent Res. Rev. 315 (2017) ........................................................................................... 10

*Social Media and Teens*, Am. Acad. Child & Adolescent Psychiatry (Mar. 2018) ..................... 12

U.S. SURGEON GEN., ADVISORY: PROTECTING YOUTH MENTAL HEALTH  (2021)..................... 7, 8

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens, 2021*, COMMON SENSE MEDIA (2022) ................................................................................................ 13

Regulations

16 C.F.R. § 312.4 ........................................................................................................................... 13

## STATEMENT OF INTEREST OF THE AMICI CURIAE

Fairplay, a fiscally-sponsored organization of Third Sector New England, Inc., a 501(c)(3) non-profit, is the leading independent watchdog of the children's media and marketing industries.  It has filed numerous comments and enforcement actions at the FTC regarding COPPA and has advocated for more comprehensive privacy and safety protections for children and teens at the federal level.  Fairplay's advocacy is grounded in the overwhelming evidence that child-targeted online marketing—and the excessive screen time it encourages—undermines healthy child development.  Fairplay has a strong interest in having states such as California pioneering new laws to protect children's online privacy and safety.

The Public Health Advocacy Institute (PHAI) is a nonprofit organization incorporated in Massachusetts in 1979 and headquartered in Boston. PHAI is a legal research and advocacy center whose mission is to support and enhance policies aimed at improving public health outcomes.  PHAI recognizes that the design of online products has profound implications for the mental health of their users, especially for children and teenagers. PHAI has a strong interest in supporting states like California in addressing this pressing public health issue.

Other Amici (listed in Appendix) consist of civil society organizations, including several youth-led organizations, which have long been advocating for sensible legislation that requires tech companies to implement strong protections that address the issues children confront online today.  Amici acknowledge the intentional design features of the digital world and their correlation to the unprecedented mental health crisis faced by children across the US.  While COPPA was an important step in this direction, it has not been adequately enforced, tech companies have exploited loopholes, and it fails to address the issues confronting youth today. Other Amici support the CADC as a legally sound approach to addressing the pervasive risks to children arising from the data management practices of online services, including social media.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amici Curiae agree with the arguments set forth in California's opposition to the motion for a preliminary injunction. Amici write to elaborate on the significant harms to young people in California that would result if the law were to be enjoined before it even has a chance to be implemented. The Age-Appropriate Design Code (CADC) was specifically intended to protect children in ways not currently provided for under the existing federal children's privacy law, Children's Online Privacy Protection Act (COPPA). At the same time, because the CADC is not inconsistent with COPPA, it is not preempted by COPPA.

When the California legislature unanimously passed the CADC in 2022, it sought to address today's problems associated with children and teenagers' interactions online. It was introduced soon after the Surgeon General's advisory about the mental health crisis among young people, to which digital technologies, particularly social media, are major contributors. No such crisis existed when COPPA was passed in 1998, nor could it have, because the products and technologies that are instrumental in causing these harms had yet to be developed. In 1998, children and teenagers were not spending 6 to 8 or more hours each day on mobile, internet-accessible devices because those devices did not exist. Likewise, there was no Instagram, Snapchat, TikTok, YouTube, Facebook or other social media platforms keeping them constantly engaged with addictive product features and never-ending streams of content.

The bill's sponsors and many supporters showed how design choices made by social media companies to maximize engagement have detrimentally affected children's well-being. Many companies use sophisticated algorithms and manipulative techniques that promote compulsive and problematic use of their products, as well as enabling and encouraging young people to share personal information and communicate with strangers. The CADC does not regulate online content, but rather, employs a new approach pioneered in the UK. It requires

2

companies with products likely to be used by children to assess and mitigate the risks posed by their product, as well as prohibits the use of certain specific manipulative practices such as "dark patterns."

Most significantly, the CADC differs from COPPA in that it protects the data privacy and wellbeing of children up until age 18, whereas COPPA applies only to children under age 13. Were the Court to enjoin the CADC, teenagers would continue to lack any protections and would continue to suffer significant harms.

By design, the CADC will apply to many more companies, services, and products than COPPA because COPPA's limits on data collection apply primarily to online services directed to children. The CADC recognizes the reality that when young persons are online, they more often than not use the same products and services as adults, rather than ones specifically designed for children. Enjoining the CADC would mean that children would continue to lack any protection on a wide range of products they use on a daily basis.

## I.   ENJOINING THE CADC WOULD HARM YOUNG PEOPLE IN CALIFORNIA

### A.   The Legislature's Purpose in Enacting the CADC Was to Protect Children from Manipulative Design Practices and Prevent the Use of Their Data in Ways Detrimental to Their Wellbeing Because Existing State and Federal Laws Have Proven Insufficient.

The CADC explicitly sets forth the legislature's findings. Sec. 1(c) states:

It is the intent of the Legislature that the California Age-Appropriate Design Code promote innovation by businesses whose online products, services, or features are likely to be accessed by children by ensuring that those online products, services, or features are designed in a manner that recognizes the distinct needs of children at different age ranges.

2022 Cal ALS 320 § 1(c). Recognizing that the same data protection regime may not be appropriate for children of all ages, it found that "online products and services should adopt data protection regimes appropriate for children of the ages likely to access those products and

3

services." *Id.* at 1(a)(7).  It further declared that "Online services, products, or features that are likely to be accessed by children should offer strong privacy protections by design and by default, including by disabling features that profile children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material." *Id.* at 1(a)(8).  It found that the CADC was consistent with the intent of the legislature in passing both the CCPA of 2018 and the CPRA of 2020, which found that children are particularly vulnerable from a negotiating perspective with respect to their privacy rights.  *Id.*

The sponsor of the CADC, 5Rights Foundation, supplied an extensive explanation of its purpose.  Comm. Rep., Assembly Comm. on Privacy and Consumer Protection 4-13 (Ca. Apr. 19, 2022) https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id= 202120220AB2273.  It explained that:

> While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principles that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

*Id.* at 5. 5Rights highlighted the inadequacy of existing privacy protections for children:

> Notably, the protections for children online largely focus on regulating the collection and sale of children's PI, rather than ensuring that children are protected from manipulative design (dark patterns), adult content, or other potentially harmful design features. In addition, for the most part, the existing laws protecting minors online are only triggered when an online platform has actual knowledge that children are accessing their website. This has incentivized many social media platforms and other online services to ignore the age of their consumers, so that they do not have to adhere to the standards set out in the laws described above.

*Id.* at 6.  5Rights explicitly acknowledged that "AB 2273 seeks to shift the paradigm for protecting children online."

This bill would take a different approach to protecting children online than the state and federal laws described in Comment 3, above, in two distinct ways.  First, the bill would require online platforms likely to be accessed by children to turn privacy and safety settings up to a level that is protective of children's mental and physical health and well-being unless the online platform can, with an appropriate level of certainty, determine the age of the consumer.  In other words, existing law generally permits online platforms to treat all consumers as adults unless there is actual knowledge that the consumer is under 13 years of age.  This bill would instead require that websites and other online services likely to be accessed by children offer privacy and safety protections by default, unless there is reasonable certainty that the consumer is an adult.

*Id.* at 7-8.

The Assembly's Committee on Privacy and Consumer Protection addressed the need for the CADC's approach at the hearing on March 29, 2022.  Dr. Jenny Radesky, a developmental behavioral pediatrician and researcher, described some of her relevant research.

In mobile apps, my research has focused on where digital design is crossing the line in terms of manipulating children into watching more ads, playing for longer, making more purchases – also known as 'dark patterns'.  In the sample of 154 apps we analyzed, 80% contained at least one type of manipulative design – in the form of pressure from trusted characters, navigation constraints, fabricated time pressure, promises of virtual currencies or gameplay objects, or rewards for watching ads (Radesky et al., in press).  It appears that adult design norms are being copied and pasted sloppily into children's products, and this is not good design.

*Id.* at 7. She also discussed research conducted with Common Sense Media analyzing children's viewing on YouTube.  They found that while positive content is available on YouTube, its recommendation algorithms tended to elevate outrageous content created to get more clicks and engagement.  *Id.* (citing Radesky, Jenny, et al, *Young Kids and YouTube: How Ads, Toys, and Games Dominate Viewing*, COMMON SENSE MEDIA (2020) https://www.commonsensemedia.org /sites/default/files/research/report/2020_youngkidsyoutube-report_final-release_forweb_1.pdf).

In conclusion, Dr. Radesky noted that some apps are designed with children in mind.

These apps don't collect private identifiers, they contain developmentally meaningful content with stoppage cues and nudges to apply their knowledge to social and physical spaces around them, they don't have distracting ads, don't

5

pressure children to make purchases, and give children the autonomy to choose what to do next. They continuously evaluate their products with child-centered standards. We need more companies that show a duty of care that they understand the responsibility inherent in creating the images and stories that children consume.

*Id.*

A large number of diverse organizations supported passage of the CADC.  Supporters included children's advocacy groups such as Fairplay, Common Sense, and Children and Screens;  parent groups such as Parents Together Action; consumer groups such as Consumer Federation of California and California Public Interest Research Groups: public health organizations including the American Academy of Pediatrics, California, Public Health Advocates, and the Eating Disorders Coalition; leading privacy advocates such as the Center for Digital Democracy and Electronic Privacy Information Center; organizations that advocate for more responsible use of technology such as the Center for Humane Technology and Accountable Tech, and civil rights organizations such as National Hispanic Media Coalition.  Cal. Senate Floor Analyses, AB 2273, 5-6 (Aug. 23, 2022) https://leginfo.legislature.ca.gov/faces/bill AnalysisClient.xhtml?bill_id=202120220AB2273#.

A letter from many of these organizations argued that action was needed because:

Children across the globe are facing an unprecedented mental health crisis. Even before the onset of COVID-19 and subsequent social distancing and isolation, teen suicide was on the rise; in the US the CDC found that between 2007 to 2017 the suicide rate among people aged 10 to 24 increased by 56%. And in the year between spring of 2020 and 2021 emergency room visits for girls ages 12 to 17 increased by 50%.

In 2020, 81% of 14 to 22-year-olds said they used social media either "daily" or "almost constantly." This is by design. As private companies beholden to shareholders, performance incentives for product developers and executives are tied to profit and therefore time spent on their platform. Social media platforms and tech companies do not design these services with their youngest and most vulnerable users in mind.

> Ensuring the safety of tech products is long overdue. We have nutrition labels on food packaging, rigorous testing for cribs and car seats, and yet the technology children use daily from the youngest of ages have little to no safeguards.

Comm. Rep., Assembly Comm. on Privacy and Consumer Protection 4-13 (Ca. Apr. 19, 2022)

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2273#.  In

addition to organizations, the bill was supported in his individual capacity by Tim Kendall,

Facebook's first Director of Monetization, who wrote:

> I know from experience that tech workers want to innovate and design products differently to prioritize well-being over profit. But until the profit motive changes, design will be at the expense of our collective well-being, especially our kids'. To change the incentives, we need our political leaders to act. And we need solutions that work.

*Id.* at 6-7.

### B.  The CADC Was Adopted Against the Backdrop of a Crisis in Youth Mental Health to Which Social Media Has Been a Major Contributor

California adopted the CADC against the backdrop of increasing recognition about the

role social media has played in the youth mental health crisis.  AB 2273 was introduced on

February 16, 2022, just a few months after the United States Surgeon General Vivek Murthy

issued an advisory, Protecting Youth Mental Health on December 6, 2021.  The advisory warned

of a mental health crisis among children and young adults caused in part by their overuse of

social media.

> From 2009 to 2019, the proportion of high school students reporting persistent feelings of sadness or hopelessness increased by 40%; the share seriously considering attempting suicide increased by 36%; and the share creating a suicide plan increased by 44%. Between 2011 and 2015, youth psychiatric visits to emergency departments for depression, anxiety, and behavioral challenges increased by 28%. Between 2007 and 2018, suicide rates among youth ages 10-24 in the US increased by 57%.

U.S. SURGEON GEN., ADVISORY: PROTECTING YOUTH MENTAL HEALTH 8 (2021) https://www.

hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf. In explaining the

crisis' origins, Dr. Murthy noted a "growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of children and young people" and called for greater accountability from social media companies.  *Id*. at 25.

> Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. **This translates to technology companies focusing on maximizing time spent, not time well spent.**

*Id.* (emphasis in original).

In addition to the alarm sounded by the Surgeon General, the youth mental health crisis has also led the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, and the Children's Hospital Association to declare a national emergency. *AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health*, Am. Acad. Pediatrics (Oct. 19, 2021), https://www.aap.org/en/advocacy/child-and-adolescent-healthy-mental-development/aap-aacap-cha-declaration-of-a-national-emergency-in-child-and-adolescent-mental-health/.

In November 2022, Fairplay and 19 other organizations, many of whom also supported the CADC, filed a Petition for Rulemaking with the FTC, calling on the FTC to promulgate a rule prohibiting the use of certain types of engagement-optimizing design practices on individuals under the age of 18.  Center for Digital Democracy and Fairplay et al., Petition for Rulemaking to Prohibit the Use on Children of Design Features that Maximize for Engagement, FTC-2022-0073-0002 (Nov. 17, 2022) https://www.regulations.gov/document/FTC-2022-0073-0002.  This Petition documented three major categories of design practices that social media companies use to maximize the engagement of users, and that are harmful to minors:

1. **Low-friction variable rewards design features.** These design features encourage compulsive behavior by rewarding minors unpredictably for merely scrolling, tapping, and/or logging onto a website or service in order to maximize a minor's time on the service;
2. **Design features that manipulate navigation.** These design features make it difficult for minors to freely navigate or cease use of a website or service; and
3. **Social manipulation design features.** These design features leverage a minor's desire for social relationships to encourage greater time spent and/or activities performed on a website or service.

*Id.* at 3.

Key figures in the tech industry have acknowledged how the design of social media has harmed children.  For example, Facebook's founding President, Sean Parker, observed:

> God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them, . . . was all about:  "How do we consume as much of your time and conscious attention as possible?"   And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you . . . more likes and comments. It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators . . . under- stood this consciously. And we did it anyway.

Mike Allen, *Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains"*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

Social media companies have refined and incorporated psychological manipulation techniques such as variable reward designs to drive engagement.  As noted psychology expert Nir Eyal has explained, "[v]ariable schedules of reward are one of the most powerful tools that companies use to hook users."  Nir Eyal, *The Hook Model: How to Manufacture Desire in 4 Steps*, Nir and Far, https://www.nirandfar.com/how-to-manufacture-desire/ (last visited Apr. 18, 2023).  This technique works because, in short, the brain generates more dopamine in response to an uncertain reward than in response to an expected and reliable one.  Anna Hartford & Dan J.

Stein, *Attentional Harms and Digital Inequalities*, 9 JMIR Mental Health 2, 3 (Feb. 11, 2022), https://pubmed.ncbi.nlm.nih.gov/35147504/.  Further, these platforms use machine learning to create these results in a way that is powerfully optimized to manipulate each user.  *Id.*

These design practices aimed at maximizing the time that users spend on social media platforms are inherently in tension with the mental health and overall wellbeing of youth users. Research associates longer and more frequent social media use with depression, anxiety, and suicide risk factors.  *See, e.g.*, Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychol. Q. 311 (2019) (heavy users of digital media are more likely to be unhappy, to be depressed, or to have attempted suicide); K.E. Riehm et al., *Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth*, 76 JAMA Psychiatry 1266 (2019), https://doi. org/10.1001/jamapsychiatry.2019.2325; N. McCrae et al., *Social Media and Depressive Symptoms in Childhood and Adolescence: A Systematic Review*, 2 Adolescent Res. Rev. 315 (2017), https:// doi.org/10.1007/s40894-017-0053-4.

This research comports with teens' own professed experiences using these platforms.  A recent survey, which was conducted by YouGov and polled 912 American teenagers in March 2023, found that:

- **59%** get pulled back into apps after they log off by push notifications every day.

- **66%** feel they are losing track of time on social media, with Black and Hispanic teenagers being disproportionately affected.

- **Almost 50%** lose sleep because they feel 'stuck' on social media.

  Accountable Tech, *Prevalence of design harms among young people* (March 29, 2023) https://accountabletech.org/wp-content/uploads/Prevalence-of-design-harms-in-young-

people.pdf.

In addition to keeping children online, recommendation algorithms are often designed in ways that cause other harms to children.  Internal Meta documents show that Meta's algorithmic "friend recommendation" features "People You May Know" and "Suggestions for You" contribute to up to 75% of all inappropriate adult-minor contact on Facebook and Instagram. *See, e.g.* Meta, *Growth, Friending + PYMK, and downstream integrity problems*, 4 https://s3. Documentcloud.org/documents/23322845/friending-and-pymk-downstream-in tegrity-problems.pdf; *see also* Meta, *Integrity Glossary*, 39 ("PYMK") https://s3.documentcloud. org/documents/23323294/glossary-of-integrity-terms.pdf.

The cumulative effect of these social media design practices has been to cause a widespread and profound mental health crisis experienced by children and teenagers today in California and throughout the country.  It is not the content, *per se*, of social media or online games that causes the harms but product design features that foster and encourage problematic use, algorithms programmed to keep children online for as long as possible, and lack of privacy and other protections that encourage and facilitate young people interacting with strangers. Given that this mental health crisis developed under existing privacy laws, the California legislature has wisely attempted a new and different approach.  And the law has mechanisms that allow for fine-tuning based on experience.  Section 1798.99.32, for example, sets up a working group to report to the legislature on best practices for implementing the law.  Cal Civ Code § 1798.99.32(d).  The working group is charged with taking input from a broad range of stakeholders and addressing a broad range of topics.  *Id.*

In sum, because the CADC will help to mitigate the serious youth mental health crisis, the public interest is served here by allowing it to take effect.

11

## II.  COPPA DOES NOT PREEMPT THE CADC

Amici agree with California that the CADC does not—and cannot—replace any of COPPA's requirements, which apply regardless of the CADC, and moreover, that *Jones v. Google LLC*, 56 F.4th 735, 740-41 (9th Cir. 2022), *pet'n for rehear'g filed January 25, 2023,* has already settled the issue of COPPA preemption.  *See also Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 291-92 (3d Cir. 2016) (claim under state common law not precluded by COPPA where it rests on duties compatible with COPPA obligations).  However, Amici—as strong supporters of COPPA that also recognize its shortfalls—will elaborate on why COPPA does not preempt the CADC.

COPPA was adopted in 1998, when children did not rely on the internet to the extent they do today for education, entertainment, and social interaction.  There were no smart phones or tablets, computers were considerably more expensive and less accessible, and the internet was generally accessed for limited periods of time using dial-up access.  Social media platforms such as YouTube, Facebook, Instagram, and TikTok did not exist.  Nor had the system of commercial surveillance, algorithms, and sophisticated advertising technologies been developed to allow different content and marketing to be served to users based on inferences drawn from thousands of data points about each user.

In fact, at that time, less than one quarter of children under 18 in the US (about 16 million out of 68.9 million) were even online. Children's Online Privacy Protection Act: Hearing Before the Senate Subcomm. on Communications, 105th S. 1068, at 9 (1998) (Statement of FTC Chair Pitofsky).  While today, almost all Americans under age 18 are online.  *Social Media and Teens*, Am. Acad. Child & Adolescent Psychiatry (Mar. 2018), https://www.aacap.org/AACAP/ Families_and_Youth/Facts_for_Families/FFF-Guide/Social-Media-and-Teens-100.aspx (Ninety percent of children ages 13–17 use social media); Victoria Rideout et al., *The Common Sense*

*Census: Media Use by Tweens and Teens, 2021*, at 5, C{ommon} S{ense} M{edia} (2022) (study reporting 38% of children ages 8-12 used social media in 2021).

Americans under 18 also now spend much more of their time online and, in particular, on social media platforms.  Nearly 20 percent of teens use YouTube almost constantly, with TikTok and Snapchat close behind (with near constant use rates among teens at 16 percent and 15 percent respectively), and 10 percent of teens users on Instagram almost constantly.  Emily Vogels et al., *Teens, Social Media and Technology 2022*, P{ew} R{sch}. C{tr}. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/. There also is vastly more content available online today and, importantly, social media companies are designing and distributing products and mechanisms to addict and exploit the vulnerabilities of young users – including the targeting of children with harmful connections and content as a means of increasing user engagement.  Radesky Decl. ¶¶ 41-63.

In 1998, Congress thought the best way to protect children's privacy and safety online was to give parents control over the collection, use and disclosure of their children's data.  Thus, COPPA required the FTC to establish rules prohibiting the collection, use or disclosure of children's personal information unless the operator provided notice to parents about their data collection and obtained verifiable parental consent in advance of collecting any data from a child.  15 U.S.C. § 6502(b)(1)(A).  The FTC's rule implementing COPPA specifies that operators "must post a prominent and clearly labeled link" to its online privacy policy on its home page and at any area where personal information is collected from children, and must also make reasonable efforts to ensure parents receive direct notice of the privacy practices.  16 C.F.R. § 312.4.  The COPPA Rule requires that all notices be "clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." *Id.*  In

13

that way, COPPA is similar to the CADC's requirement that companies provide privacy and other policies "concisely, prominently, and using clear language suited to the age of children likely to access" that service.  Cal Civ Code § 1798.99.31(a)(7).

But COPPA did not rely exclusively on parental involvement to protect children's privacy.  NetChoice cites a nonbinding FTC guidance document, *Complying with COPPA: Frequently Asked Questions*, for its claim that the "primary goal of COPPA is to place parents in control" over information collected from their children.  Mot. at 26.  But in determining whether federal law preempts a state law, courts look to the text of the statute. *Jones*, 56 F.4th at 739-40. Nothing in the text of COPPA states that the primary goal of COPPA is to place parents in control.  Indeed, other sections of COPPA apply regardless of parental consent.  For example, COPPA prohibits online services from conditioning a child's use on disclosing more personal information than necessary, much like the CADC prohibits collection and use of personal information not necessary to provide the online product or service.  *Compare* 15 U.S.C. § 6502(b)(1)(C) *with* Cal Civ Code § 1798.99.31(b)(3).  Further, COPPA's legislative history shows Congress saw parental involvement as the means to protect children's privacy, not the ends.  144 Cong. Rec. S11657 (Oct. 7, 1998) (statement of Sen. Bryan) ("The goals of this legislation are: (1) to enhance parental involvement in a child's online activities *in order to protect the privacy of children* in the online environment" (emphasis added)).

Unfortunately, experience over the last twenty years demonstrates that placing so much reliance on the vigilance of parents is ineffective and unduly burdensome for parents.  *See* Egelman Decl. at 17-23; Radesky Decl. at ¶ 95; Center for Digital Democracy et al., Comment on Competition and Consumer Protection in the 21st Century, Hearing #12: The FTC's Approach to Consumer Privacy (May 31, 2019) https://www.regulations.gov/comment/FTC-

14

<u>2018-0098-0087</u>.  By requiring companies to assess and mitigate risks to children arising from their own design, programming, and operational practices, the CADC secures the ability of parents to keep their children's information private rather than interfering with parent control.

The CADC also provide protections for children in circumstances where COPPA does not and was never intended to apply.  It expands protections for services and products used by children even if not specifically directed to children.  It requires companies to determine whether their services are "likely to be accessed by children" as defined in the CADC.  Cal Civ Code § 1789.99.30(b)(4).  The definition identifies six relevant indications, including part (A), whether the service or product is directed to children as defined by COPPA.  The other factors are similar to the multifactor test used by the FTC to determine whether a website or online service is directed to children.  16 C.F.R. § 312.2 (definition of Web site or online service directed to children), which has not proven to be unduly vague.

Significantly, the CADC provides privacy and safety protections for teens, who are not covered at all by COPPA.  The FTC, the primary agency charged with enforcing COPPA, has found that "Nothing in COPPA's language, structure, or legislative history indicates that Congress intended for that law to preempt state law privacy protections for people outside of COPPA's coverage, including teenagers."  FTC amicus brief, *Fraley v. Facebook*, 9th Cir. No. 13-16819 (Mar. 20, 2014).  The court approved a settlement in this case without deciding the preemption claim.  *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).  For these reasons, NetChoice is unlikely to prevail on the merits on its COPPA preemption claim.

**<u>CONCLUSION</u>**

In conclusion, the Court should deny NetChoice's motion for a preliminary injunction.

15

Amici Curiae Brief of Fairplay, PHAI and Others (5:22-cv-08861-BLF)

DATED: April 28, 2023.

COUNSEL FOR AMICI CURIAE,

*/s/ Laura Marquez-Garrett*
Laura Marquez-Garrett (SBN 221542)
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
T: (206) 741-4862

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

DATED: April 28, 2023.

*/s/ Laura Marquez-Garrett*
Laura Marquez-Garrett

## **APPENDIX**

List of Organizations Joining as Amici Curiae

Fairplay
- Fairplay is committed to helping children thrive in an increasingly commercialized, screen-obsessed culture, and the only organization dedicated to ending marketing to children.

The Public Health Advocacy Institute (PHAI)
- The Public Health Advocacy Institute (PHAI) is a legal research center at Northeastern University School of Law focused on public health law.

Children's Advocacy Institute
- The Children's Advocacy Institute is an academic, research, and advocacy organization at the University of San Diego School of Law seeking to improve the lives of children and youth.

Center for Humane Technology
- The Center for Humane Technology is dedicated to leading a comprehensive shift toward technology that strengthens our well-being, global democratic functioning, and shared information environment.

Spark and Stitch
- Spark and Stitch serves parents and educators by translating research in the fields of child and adolescent development, digital media, and youth thriving.

Accountable Tech
- Accountable Tech is working to bring about long-term structural reform to tackle the existential threat Big Tech companies pose to our information ecosystem and democracy.

Center for Digital Democracy
- The Center for Digital Democracy's mission is to ensure that digital technologies serve and strengthen democratic values, institutions and processes.

Design It For Us
- Design It For Us is a youth-led coalition to advocate for safer online platforms and social media.

North Carolina Young Peoples' Alliance
- North Carolina Young People's Alliance is a coalition of students who are changing the way that young people participate in politics.

Encode Justice
- Encode Justice is building a global, youth-powered movement for human-centered artificial intelligence.

Civics Unplugged
- Civics Unplugged has built an ecosystem dedicated to training, funding and connecting young people who are using new approaches to solving issues in democracy, climate, our lives online, and so much more.

Archewell Foundation
- The Archewell Foundation is an impact-driven non-profit created by Prince Harry and Meghan, The Duke and Duchess of Sussex. With wellbeing and mental health at the forefront of its primary pillars of focus, the Foundation's core work supports bettering the world online, restoring trust in information and uplifting communities.

5 Rights Foundation
- 5Rights Foundation develops new policy, creates innovative frameworks, develops technical standards, publishes research, challenges received narratives and ensures that children's rights and needs are recognized and prioritized in the digital world.

Ekō
- Ekō is a community of over 22 million people from around the world committed to curbing the growing power of corporations.

Common Sense Media
- Common Sense Media is dedicated to improving the lives of all kids and families by providing the trustworthy information, education, and independent voice they need to thrive in the 21st century.

Ultraviolet
- Ultraviolet is a community of one million people that works to improve the lives of women and girls of all identities and backgrounds, and all people impacted by sexism, by dismantling discrimination and creating a cost for sexism.