# EXHIBIT A

Tanya Forsheit (State Bar No. 192472)
Dana R. Green (*pro hac vice* pending)
Samantha C. Hamilton (*pro hac vice* pending)
THE NEW YORK TIMES COMPANY
620 Eighth Avenue, 13th Floor
New York, NY 10018
Phone: (212) 556-4031
tanya.forsheit@nytimes.com
dana.green@nytimes.com
samantha.hamilton@nytimes.com

*Attorneys for Amici Curiae*
THE NEW YORK TIMES COMPANY
and STUDENT PRESS LAW CENTER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a/ NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**BRIEF OF THE NEW YORK TIMES COMPANY AND STUDENT PRESS LAW CENTER AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF**<br><br>Judge: Honorable Beth Labson Freeman<br>Action Filed: December 14, 2022<br><br>Date: May 15, 2023 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ........................................... 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I.     THE ACT APPLIES TO ONLINE NEWS PUBLISHERS AND IMPOSES
       CONTENT-BASED RESTRICTIONS .................................................... 2

       A.     The AADC Applies to Most Online News Publishers ................. 2

       B.     The Act Subjects News Organizations to Content-Based Regulation ........ 3

II.    THE ACT VIOLATES MINORS' FIRST AMENDMENT RIGHTS TO
       ACCESS INFORMATION AND ENGAGE WITH PUBLIC DISCOURSE ........ 6

       A.     Minors Have First Amendment Rights ....................................... 6

       B.     The First Amendment Grants Minors the Right to Access
              Information and Engage with Public Discourse ......................... 7

       C.     The AADC Impermissibly Restricts Minors' First Amendment
              Rights ......................................................................................... 8

III.   THERE IS A COMPELLING PUBLIC INTEREST IN MINORS'
       EXPRESSIVE ACTIVITIES ONLINE AND THEIR ACCESS TO
       ONLINE NEWS CONTENT ................................................................. 10

       A.     Young People Have an Important Role in Public Life ............. 10

       B.     Access to Online News Content is Essential to Participation in
              Public Life ................................................................................. 12

CONCLUSION ................................................................................................. 14

i

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ............................................................................................ 4

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ............................................................................................ 4

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982) .................................................................................. 7, 8, 12

*Bethel Sch. Dist. v. Fraser*,
478 U.S. 675 (1986) ............................................................................................ 6

*Bigelow v. Virginia*,
421 U.S. 809 (1975) ............................................................................................ 4

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ................................................................................... passim

*Cohen v. California*,
403 U.S. 15 (1971) .............................................................................................. 4

*Ginsberg v. New York*,
390 U.S. 629 (1968) ............................................................................................ 7

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................................ 5

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ............................................................................................ 8

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ............................................................................................ 6

*Hodgkins v. Peterson*,
355 F.3d 1048 (7th Cir. 2004) ........................................................................... 7

*Mahanoy Area Sch. Dist. v. B.L.*,
141 S.Ct. 2038 (2021) .................................................................................. 7, 12

*Martin v. Struthers*,
319 U.S. 141 (1943) ............................................................................................ 8

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................................................ 4

*Morse v. Frederick*,
551 U.S. 393 (2007) ............................................................................................ 6

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................................... 5

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ............................................................................................... 9

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ........................................................................... 2, 8

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................................... 4

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ............................................................................................... 8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ............................................................................................... 6

*Virginia v. Black*,
    538 U.S. 343 (2003) ............................................................................................... 4

**Statutes**

105 Ill. Comp. Stat. An. 5/27-20.08 ........................................................................... 13

Cal. Civ. Code § 1798.140(c) ...................................................................................... 2

Cal. Civ. Code § 1798.99.29 ........................................................................................ 6

Cal. Civ. Code § 1798.99.30(b)(1) ............................................................................... 3

Cal. Civ. Code § 1798.99.30(b)(4) ........................................................................... 2, 3

Cal. Civ. Code § 1798.99.30(b)(5)(C) .......................................................................... 9

Cal. Civ. Code § 1798.99.31(a)(1)(A) .......................................................................... 3

Cal. Civ. Code § 1798.99.31(a)(1)(B) ....................................................................... 3, 6

Cal. Civ. Code § 1798.99.31(a)(2) ............................................................................ 3, 6

Cal. Ed. Code § 51206.4 ............................................................................................. 12

**Other Authorities**

*Core Principles*, NAMLE ........................................................................................... 13

Elisa Shearer, *More than eight-in-ten Americans get news from digital devices*,
    Pew Research Center (Jan. 12, 2021) .................................................................... 9

Erin McNeill, et al., *U.S. Media Literacy Policy Report 2022*, Media Literacy Now
    (Feb. 2023) ........................................................................................................... 13

Frank D. LoMonte, *Student Journalism and Civic Education*, American Bar Ass'n
    (Jan. 4, 2022) ....................................................................................................... 11

Amicus Brief of The New York Times Company and Student Press Law Center,
Case No. 5:22-cv-08861-BLF

Jean Twenge, et al., *Trends in U.S. Adolescents' Media Use, 1976-2016: The Rise of Digital Media, the Decline of TV, and the (Near) Demise of Print*, Psychology of Popular Media (Aug. 20, 2018) ............................................................ 9

Jenny Gross, *How Finland Is Teaching a Generation to Spot Misinformation*, N.Y. Times (Jan. 10, 2023) ............................................................................................ 13

Julie Johnson, *Sonoma Media Investments, owner of The Press Democrat, pays off debt*, Press Democrat (Apr. 17, 2019) ........................................................................ 2

*Lifelong Readers: Driving Civic Engagement*, Newspaper Ass'n of Am. Found. (Mar. 14, 2008) ............................................................................................................ 13

*Mary Beth Tinker Describes Her Experiences Participating in a Student Protest in 1965*, Iowa PBS (Feb. 21, 2019) ................................................................................ 10

Mike Hiestand, *California student free expression law (1977)* Student Press L. Ctr. .................. 12

*New Kids Section*, L.A. Times (Mar. 6, 2007) .............................................................. 3

*New Voices*, Student Press L. Ctr. .................................................................................. 12

Sara Pepitone, *10 images from the Newseum's Pulitzer Prize photo gallery*, The Pulitzer Prizes (2017) ................................................................................................ 5

Satchel Walton and Cooper Walton, *KSP training slideshow quotes Hitler, advocates 'ruthless' violence*, Manual RedEye (Oct. 30, 2020) ...................................... 11

*Student Journalists from Marjory Stoneman Douglas High School Recognized at Pulitzer Ceremony*, The Pulitzer Prizes (May 28, 2019) ............................................ 11

*We Want Change*, Puma Prensa (April 10, 2023) ........................................................ 11

Wikipedia, *Pulitzer Prize for Breaking News Photography* .......................................... 5

### IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The New York Times Company ("The Times") publishes *The New York Times* and the website www.nytimes.com. The Times is dedicated to helping people understand the world through on-the-ground, expert, and deeply reported independent journalism.

Student Press Law Center ("SPLC") is a national, non-profit, non-partisan organization established in 1974 that works to promote, support, and defend the press freedom and freedom of information rights of high school and college journalists.

The Times and SPLC submit this *amicus* brief to explain how the California Age-Appropriate Design Code Act unconstitutionally infringes news organizations' and minors' First Amendment Rights.

### INTRODUCTION

The California Age-Appropriate Design Code Act ("the AADC" or "the Act") was introduced to address public concerns regarding young people's data privacy online. However, as enacted, the Act goes well beyond regulating data to also regulate online speech and expressive conduct. The AADC requires, among other things, that websites identify and "mitigate" or "eliminate" risks that users under age 18 will encounter "content," "conduct," or advertising that may be "harmful or potentially harmful," even if that content or conduct is entirely lawful. Should websites fail to adequately identify and mitigate any such risks to children, they may be subject to very significant financial penalties.

The clear and natural effect of the Act is that online publishers, including mainstream news websites, either must submit to content-based regulation, or they must substantially curtail

---

[1] Amici curiae certify that this brief was authored entirely by counsel for amici curiae and not by counsel for any party, in whole or part; no party or counsel for any party contributed money to fund preparing or submitting this brief; and apart from amici curiae and their counsel, no other person contributed money to fund preparing or submitting this brief.

young people's access. Consequently, the Act has the effect of limiting news organizations' ability to make their news content available to minors online *and* limits young people's access to lawful content and fully participate in public life. While the Act's stated aim—to advance the welfare of children—is a laudable one, the Act does so in ways that are unconstitutional. The Act would do real harm to the First Amendment rights of minors and to news organizations and should be enjoined.

## ARGUMENT

I.   **THE ACT APPLIES TO ONLINE NEWS PUBLISHERS AND IMPOSES CONTENT-BASED RESTRICTIONS**

A.   **The AADC Applies to Most Online News Publishers**

The AADC is drafted in expansive language that will affect almost all online services and products, including news organizations. The Act applies to any for-profit business that "collects consumers' personal information" and earns more than $25,000,000 in gross annual revenues. Cal. Civ. Code § 1798.140(c).[2] This low revenue threshold subjects even local and regional news publishers to the Act. *See, e.g.*, Julie Johnson, *Sonoma Media Investments, owner of The Press Democrat, pays off debt*, Press Democrat (Apr. 17, 2019), tinyurl.com/38yc6f94 (reporting that *The Press Democrat* in Sonoma County, a mid-sized California paper, reportedly generated $40 million in annual revenue).

Among subject businesses, any that offer services or products (such as news content) that are "likely to be accessed by children" must come into compliance with the Act. Cal. Civ. Code § 1798.99.30(b)(4). Those terms are themselves defined expansively. "Children" is defined as

---

[2] The Act's discrimination between for-profit entities and non-profit entities itself raises constitutional issues because it favors particular speakers (non-profit news organizations) over others (for-profit news organizations) even though the collection of personal data, content, and risk of harm may be the same. *See, e.g.*, *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1071-73 (9th Cir. 2020).

anyone under the age of 18 years old. *Id.* § 1798.99.30(b)(1). And "likely to be accessed" is variously defined to include, among other things, a service or product that contains design elements known to be of interest to children (including, but not limited to, games) or a service or product where a significant amount of the audience is determined to be children. *Id.* § 1798.99.30(b)(4)(A)-(F).

Most news websites are likely to fall within these expansive definitions. Almost all news organizations offer content that could be deemed of interest to children. Among the obvious examples: syndicated comic strips and games are a typical feature of American newspapers. Many news publishers offer sections tailored to younger readers. *See, e.g.*, *New Kids Section*, L.A. Times (Mar. 6, 2007), https://tinyurl.com/3jr9cjva. And almost all mainstream news organizations report on "music and celebrities"—subjects the Act specifically identifies as "of interest" to children. Cal. Civ. Code § 1798.99.30(b)(4)(E).

### B.      The Act Subjects News Organizations to Content-Based Regulation

News organizations subject to the Act must prepare a Data Protection Impact Assessment ("DPIA") for each "online service, product, or feature." *Id.* § 1798.99.31(a)(1)(A). As part of the DPIA, news organizations must detail whether their online services could "expos[e] children to harmful, or potentially harmful, *content*," or allow them to "witness" "harmful, or potentially harmful, *conduct*" or advertising. *Id.* § 1798.99.31(a)(1)(B)(i), (iii), & (vi) (emphasis added). News organizations must then "create a timed plan to mitigate or eliminate the risk before the online service, product, or feature is accessed by children." *Id.* § 1798.99.31(a)(2). By the Act's own terms, this apparently would include mitigating or eliminating the harm or potential harm of children viewing *content*. *See id.* § 1798.99.31(a)(1)(B)(i).

California has asserted that the Act "does not penalize providing any particular content" but only "prevents business from . . . using children's data to deliver them things they do not want

---

3

and have not asked for, such as ads for weight loss supplements." Def.'s Opp. 16. But this assertion appears at odds with the text of the Act. And California's own argument rather proves the point. Advertisements are expressive content that is not without First Amendment protection, *see, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *Bigelow v. Virginia*, 421 U.S. 809 (1975), and the State's selection of that particular example demonstrates that the State *does* seek to restrict access to particular content.

As applied to online news publications, the Act is unconstitutional for multiple reasons. For example, as set out above, the text of the Act requires that online publishers modify their services to mitigate or avoid the risk that children encounter potentially harmful content—even if the content is entirely lawful. But the Supreme Court has made abundantly clear that outside of narrow categories like incitement to violence or obscenity, generally "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU,* 535 U.S. 564, 573 (2002) (internal quotation marks omitted). As the Supreme Court repeatedly has reaffirmed, the publication of even hateful, violent, and profane speech is protected by the First Amendment. *See, e.g.*, *Matal v. Tam,* 582 U.S. 218 (2017); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011); *Virginia v. Black*, 538 U.S. 343 (2003); *Cohen v. California*, 403 U.S. 15 (1971). This is so even when the speech is accessible to minors—as it was in most of those cases.

Indeed, in *Brown* the Court specifically rejected what California apparently again seeks to do here—limit minors' access to lawful speech. 564 U.S. at 794-95. As the Court cautioned in that case, "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Id.* at 794 (citation omitted). The State's interest in "protect[ing] children from harm does not include a free-floating power to restrict the ideas to which children may be exposed. Speech that is neither obscene as to youths nor subject to

some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 794-95 (cleaned up).

Similarly, the Act also is unconstitutional because its vaguely defined terms do not enable online publishers to anticipate what speech or services may or may not be penalized by the Act. The Act repeatedly instructs that organizations must identify and mitigate or eliminate "harms or potential harms" to those under the age of 18. What content or conduct might be "harmful" or "potentially harmful," however, is left to the State to determine. The opportunity for abuse is obvious here. One regulator may consider "potentially harmful" editorial content that questions the efficacy of vaccines or that asserts "conversion therapy" is a legitimate psychological treatment. Another may consider "potentially harmful" editorial content that describes abortion services or that celebrates a same-sex marriage. And even a cursory review of the winners of the Pulitzer Prize for photography demonstrates that much of the most important, influential and celebrated news reporting conveys violence, suffering, or nudity that an overly-sensitive regulator could deem unsuitable. *See, e.g.*, Sara Pepitone, *10 images from the Newseum's Pulitzer Prize photo gallery*, The Pulitzer Prizes (2017), https://tinyurl.com/29bh5x9z; Wikipedia, *Pulitzer Prize for Breaking News Photography*, https://tinyurl.com/a87r6j6e.

When it comes to speech, the Supreme Court has made clear that statutory vagueness is subject to the most exacting scrutiny. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression." (collecting cases)). This is because vague laws work three distinct harms: they may trap the innocent by not providing fair warning; they may lead to arbitrary and discriminatory enforcement; and they may operate "to inhibit the exercise" of First Amendment freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972). The AADC delegates extremely broad and subjective authority to regulators, including: whether news organizations' online features and

content consider the "best interests of children" and sufficiently prioritize the "well-being of children over commercial interests," Cal. Civ. Code § 1798.99.29; whether any service or feature "could . . . expose[ ] children to harmful, or potentially harmful, content," *id.* § 1798.99.31(a)(1)(B)(i); and whether an organizations' DPIA and mitigation plans are sufficiently protective of children, *id.* § 1798.99.31(a)(2).

These vague and undefined statutory provisions are likely to lead to precisely the harms the Court identified in *Grayned*. Most predictably, in the face of these requirements, it is almost certain that news organizations and others will take steps to prevent those under the age of 18 from accessing online news content, features, or services. As set out above, this constitutes a violation of the news organizations' First Amendment rights and, as set out below, a violation of minors' First Amendment rights.

## II.  THE ACT VIOLATES MINORS' FIRST AMENDMENT RIGHTS TO ACCESS INFORMATION AND ENGAGE WITH PUBLIC DISCOURSE

Because the Act has the intended and actual effect of limiting young people's access to lawful content protected by the First Amendment, it also violates their constitutional rights.

### A.  Minors Have First Amendment Rights

The Supreme Court repeatedly has affirmed that individuals under the age of 18 have First Amendment rights. *See, e.g.*, *Brown*, 564 U. S. at 794 ("[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar dissemination of protected materials to them."); *Morse v. Frederick*, 551 U.S. 393, 405 (2007) (noting that a student's speech would have been protected by the First Amendment outside the school context); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S., 503, 506 (1969) (Students do not "shed their constitutional rights to freedom of speech or expression," even "at the school house gate."); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (same); *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 688 (1986) (Brennan, J.,

concurring) (noting that if the student plaintiff "had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate"); *Hodgkins v. Peterson*, 355 F.3d 1048, 1063-65 (7th Cir. 2004) (finding a youth curfew unconstitutional because it would substantially infringe on young people's First Amendment rights to, for example, attend political rallies, vigils, protests, and religious services). Although the Court has permitted some First Amendment restrictions for children that would not otherwise be permissible for adults, these are in specific circumstances, such as disruption of school activities or access to pornographic materials, that are not implicated by online news websites. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 637 (1968).

Only two years ago, the Supreme Court reaffirmed these principles, in the context of a high school freshman who was punished by her school for vulgar speech on social media. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2044-45 (2021). The Court found that the school infringed the teenager's rights. The Court re-emphasized that minors have substantial First Amendment rights and that their speech cannot be curtailed—even in the context of the school environment—absent specific circumstances. *Id.* at 2048. As Justice Alito noted in concurrence, when a student engages in off-campus speech, "the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public." *Id.* at 2056.

### B. The First Amendment Grants Minors the Right to Access Information and Engage with Public Discourse

The First Amendment guarantees not only freedom of expression but also the concomitant right to *access* information, ideas, and public forums for debate. *See, e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("Our precedents have focused not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas." (quotation

omitted)); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas" and "this right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society."); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . . ."); *Martin v. Struthers*, 319 U.S. 141, 142 (1943) (The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it." (citation omitted)); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) ("[S]tate restrictions of the right to receive information produce actual injury under the First Amendment.")

The right to receive information is an "inherent corollary of the rights of free speech and press," in that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Pico*, 457 at 867. As the Court's decision in *Brown* clearly set out, outside of specific contexts like pornographic materials, young people also are entitled to these First Amendment rights of access, even though they may consequently be exposed to offensive content. *Brown*, 564 U.S. at 794-99.

## C.     The AADC Impermissibly Restricts Minors' First Amendment Rights

Multiple provisions of the AADC have the effect of limiting young people's expressive conduct online and their access to otherwise lawful information and content—including news content. Some curtailment is direct: the Act requires that websites take steps to limit young people from witnessing content, conduct, or advertising that may be "harmful," however the regulator defines that term. Others are more indirect: by imposing burdensome and impractical obligations on news publishers, the Act has the natural and foreseeable result that news

organizations will limit access to only users aged 18 or over. The fact that the Act achieves these

curtailments of minors' rights through non-state actors does not alter their First Amendment

impact. As courts have repeatedly made clear in multiple constitutional contexts, "it is axiomatic

that a state may not induce, encourage or promote private persons to accomplish what it is

constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

In addition, the Act exclusively concerns online services, products, and features. "The

delivery or use of a physical product"—such as a newspaper or magazine—is excluded from

regulation. Cal. Civ. Code § 1798.99.30(b)(5)(C). But when it comes to news and information, it

is well-established that young people almost exclusively access and engage with that content

online. Among those under age 29, research indicates they obtain more than 70% of news via

digital devices and the younger the user, the more likely they are to do so. Elisa Shearer, *More

than eight-in-ten Americans get news from digital devices*, Pew Research Center (Jan. 12, 2021),

https://tinyurl.com/yvxben9m. *See also* Jean Twenge, et al., *Trends in U.S. Adolescents' Media

Use, 1976-2016: The Rise of Digital Media, the Decline of TV, and the (Near) Demise of Print*,

Psychology of Popular Media (Aug. 20, 2018) (finding that in the early 1990s, 33 percent of 10th-

graders said they read a print newspaper almost every day; by 2016, that number was only 2

percent). Restricting content that is available online—while permitting the same content to be

accessed in print—has a disproportionate impact on minors' First Amendment rights.

Because the Act restricts minors' First Amendment rights, the State must demonstrate that

it passes strict scrutiny: it must be "justified by a compelling government interest and [be]

narrowly drawn to serve that interest. The State must specifically identify an 'actual problem' in

need of solving and the curtailment of free speech must be actually necessary to the solution."

*Brown*, 564 U.S. at 799 (quotations and citations omitted). Here, as in *Brown*, California fails to

do so. Indeed, as set out below, there is a substantial and demonstrated public interest in favor of

young people *accessing* online news content—not curtailing it.

## III.   THERE IS A COMPELLING PUBLIC INTEREST IN MINORS' EXPRESSIVE ACTIVITIES ONLINE AND THEIR ACCESS TO ONLINE NEWS CONTENT

California asserts that even if the AADC restricts First Amendment rights, the Act nevertheless survives strict scrutiny because it serves "the State's compelling interest in children's welfare." Def.'s Opp. 1. *See also id*. at 19-22. But the State does not acknowledge the *harm* the Act does to other compelling interests. Among those is the substantial public interest in minors' exercise of their First Amendment rights, including their involvement in public affairs, their civic development, and their participation in online discourse. Access to online news content—including even to upsetting and controversial content—is a legitimate and inseparable part of the exercise of those rights.

### A.   Young People Have an Important Role in Public Life

As the Supreme Court's own jurisprudence in this area makes clear, people under the age of 18 are active and influential participants in public life. Almost sixty years ago, 13-year-old Mary Beth Tinker watched nightly broadcasts about the Vietnam War. "Every night Walter Cronkite would give the body count," Tinker said in a 2019 interview. "We would see these horrific stories of children running from their burning huts and the world looked like [it] was on fire.… I just felt awful." *Mary Beth Tinker Describes Her Experiences Participating in a Student Protest in 1965*, Iowa PBS (Feb. 21, 2019), https://tinyurl.com/2d9j4je6. That horrifying reporting on the Vietnam War inspired Tinker to go to her middle school in Des Moines, Iowa one day in December 1965 wearing a black armband in protest, a protest that led to a landmark Supreme Court case cementing the First Amendment rights of young people in public schools. Over 50 years later, she credited the access she had to graphic news reporting for moving her to act. *Id*. ("Really it's a story of journalism also, because without the journalists that were there and reporting on all of this, we wouldn't have known about it.").

Today's Mary Beth Tinkers are not hard to find. Minors like Greta Thunberg, Malala Yousafzai, and Lauren Hogg launched and led international movements in their mid-teens, reaching millions largely via online services. They and other young people routinely and necessarily engage with controversial and disturbing content as part of those expressive activities, including news content, and there is a substantial public interest in their doing so.

Rarely is this more apparent than in student journalism, which the Student Press Law Center is dedicated to supporting. For example, in Louisville, Kentucky, high school reporters from *Manual RedEye*, the student news publication for duPont Manual High School, broke the story that local police trainers were quoting Adolf Hitler and advocating for "ruthless violence." Satchel Walton and Cooper Walton, *KSP training slideshow quotes Hitler, advocates 'ruthless' violence*, Manual RedEye (Oct. 30, 2020), https://tinyurl.com/24rezkum. In Santa Rosa, California, when a 16-year-old student at Maria Carrillo High School was stabbed to death in March 2023, reporters from *The Puma Prensa*, the independent school newspaper, produced a documentary about the murder. *We Want Change*, Puma Prensa (April 10, 2023), https://tinyurl.com/za5a9nbt. And after the 2018 mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, student journalists with the *Eagle Eye* student paper were recognized at the 2019 Pulitzer Prize ceremony for their coverage of the shooting. *Student Journalists from Marjory Stoneman Douglas High School Recognized at Pulitzer Ceremony*, The Pulitzer Prizes (May 28, 2019), https://tinyurl.com/4fvtpa5e. Today's student-run newsrooms are creating sophisticated content rivaling that of professional local news. Frank D. LoMonte, *Student Journalism and Civic Education*, American Bar Ass'n (Jan. 4, 2022), https://tinyurl.com/4hczaxk4. This would not be possible without equally sophisticated access to the means of obtaining and disseminating information online.

In recognition of the substantial public interest in such activities, states across the country

have adopted legislation to protect student journalists in K-12 schools from censorship by school administrators. *See New Voices*, Student Press L. Ctr., https://splc.org/new-voices/. California itself led this movement: in 1977, the state became the first in the country to protect student media from censorship. *See. e.g.*, Mike Hiestand, *California student free expression law (1977)* Student Press L. Ctr. https://tinyurl.com/mvkyhjby. Seventeen states have adopted legislation modeled on California's and five more introduced bills during the 2023 legislative session. *Id.*

### B.  Access to Online News Content is Essential to Participation in Public Life

Courts repeatedly have emphasized the importance of access to information to public participation and civic engagement—including for young people. This is because "just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868. For example, in *Mahanoy*, the Court asserted that the state has an *interest* in students being exposed to even offensive, unpopular, and controversial speech:

> America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it."

141 S.Ct. at 2046.

The public interest and importance of young people accessing and engaging with news content also is well demonstrated by states' educational choices. For at least twenty years, "news literacy" has been an important component of public education. In California, the Department of Education is required to produce instructional materials in the subject. *See, e.g.*, Cal. Ed. Code § 51206.4 (requiring a model curriculum to instruct students in how to access, consume, and

analyze news media). And currently-pending legislation would strengthen those obligations. *See* A.B. 787 (Ca. 2023), https://tinyurl.com/yj5dhzmv. Other states have similar or more extensive requirements. *See, e.g.*, 105 Ill. Comp. Stat. An. 5/27-20.08 (mandating that in Illinois "every public high school shall include in its curriculum a unit on media literacy"). As of April 2023, 18 states had enacted or were considering legislation requiring news literacy education in K-12 schools. Erin McNeill, et al., *U.S. Media Literacy Policy Report 2022*, Media Literacy Now (Feb. 2023), https://tinyurl.com/2s6pvxws.

As the National Association for Media Literacy Education ("NAMLE") explains, "The purpose of media literacy education is to help individuals of all ages develop the habits of inquiry and skills of expression that they need to be critical thinkers, effective communicators, and active citizens in today's world." *Core Principles*, NAMLE, (last visited May 14, 2023), https://namle.net/resources/core-principles/. Research has shown that developing news literacy skills and engaging with newspapers at an early age is significantly associated with civic engagement. *Lifelong Readers: Driving Civic Engagement*, Newspaper Ass'n of Am. Found. (Mar. 14, 2008), https://tinyurl.com/fu2538zd. And news literacy has been shown to be a core tool of inoculation against misinformation. According to a 2022 study of 41 European nations, Finland ranked the highest in minors' "potential to withstand the negative impact of fake news and misinformation" due in large part to its inclusion of media literacy in the national core curriculum as early as preschool. Jenny Gross, *How Finland Is Teaching a Generation to Spot Misinformation*, N.Y. Times (Jan. 10, 2023), https://tinyurl.com/329ancvn.

Because the Act has the effect of limiting news organizations' ability to make their news content available to minors online *and* limits young people's ability to access lawful news content and fully participate in public life, it represents a substantial infringement of First Amendment rights. While the Act's stated aim—to protect the welfare of children—is a laudable one, the Act

does so in ways that are unconstitutional: the Act is overbroad, underinclusive, and impermissibly vague. The Act would do real harm to the rights of minors and to news organizations and should not be permitted to go into effect.

## **CONCLUSION**

For the foregoing reasons, *amici curiae* respectfully request that this Court grant Plaintiff's motion for preliminary injunction.


Dated: May 15, 2023                    Respectfully submitted,


                                       */s/ Dana R. Green*
                                       Tanya Forsheit (State Bar No. 192472)
                                       Dana R. Green (*pro hac vice* pending)
                                       Samantha C. Hamilton (*pro hac vice* pending)
                                       THE NEW YORK TIMES COMPANY
                                       620 Eighth Avenue, 13th Floor
                                       New York, NY 10018
                                       Phone: (212) 556-4031
                                       tanya.forsheit@nytimes.com
                                       dana.green@nytimes.com
                                       samantha.hamilton@nytimes.com

                                       *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2023, I filed the foregoing document via the Court's CM/ECF system. The document will be served electronically on counsel of record for the parties.

/s/ *Dana R. Green*
Dana R. Green