AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
  davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>　　　　　Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**NOTICE OF MOTION AND MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Date:　　　January 23, 2025<br>Time:　　　9:00 AM<br>Dept.:　　　Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

1    **TO THE COURT, THE PARTIES AND ALL ATTORNEYS OF RECORD:**

2         PLAINTIFF NETCHOICE, LLC d/b/a NetChoice moves for a preliminary injunction

3    under Fed. R. Civ. P. 65 before the Honorable Beth Labson Freeman sitting in Courtroom 3 of the

4    United States District Court for the Northern District of California located at San Jose, California,

5    at the date and time stated above, or as soon as the matter may be heard.

6

7     DATED: November 1, 2024                    DAVIS WRIGHT TREMAINE LLP

8

9                                                By: */s/ Ambika Kumar*_____
                                                     Ambika Kumar

10                                               Attorneys for Plaintiff
                                                 NetChoice LLC, d/b/a NetChoice

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND ..................................................................................................... 3

     A.      The Internet Is A Vibrant Forum For Speech .......................................... 3

     B.      California Internet Users, Including Children, Have Long Been Protected
            By State And Federal Privacy Laws ......................................................... 4

     C.      AB 2273 Attempts To Censor The Internet Under The Guise Of Privacy. ............ 5

     D.      The First Preliminary Injunction ............................................................. 8

     E.      The Amended Complaint .......................................................................... 9

III.    LEGAL STANDARDS ......................................................................................... 10

     A.      Preliminary Injunction Standard ............................................................ 10

     B.      Standard Governing Facial Relief .......................................................... 10

IV.     NETCHOICE IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST
        AMENDMENT CLAIMS ..................................................................................... 11

     A.      The Act's Regulations Are Facially Invalid Because They
            Unconstitutionally Burden Online Services Based On The Content They
            Publish. .................................................................................................. 11

     B.      The Individual Provisions Are Each Independently Facially
            Unconstitutional To The Extent NetChoice Challenges Them. ............................ 14

           1.      Policy-enforcement mandate (challenged as to specific applications) ........ 14

           2.      Information-use restrictions (challenged as to specific applications) .......... 15

           3.      "Dark pattern" restriction (challenged as to specific applications) .............. 17

           4.      Age-estimation mandate (challenged as to all applications) ....................... 19

     C.      The Individual Provisions Are Vague. ................................................... 20

     D.      The Individual Provisions Violate The First Amendment As Applied To
            NetChoice's Members. ........................................................................... 23

V.      THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT
        SEVERABLE FROM THE REGULATORY PROVISIONS OF THE ACT. ................. 23

     A.      The DPIA Provisions Are Not Volitionally Severable Because They Were
            Critical To The Act's Passage. ............................................................... 24

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

B.    The DPIA Provisions Are Not Functionally Severable Because They Effect The Act's Focus On Compliance.................................................. 25

VI.    NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS. ........................... 27

A.    Section 230 Preemption ....................................................................... 27

B.    COPPA Preemption............................................................................... 28

C.    The Dormant Commerce Clause. ......................................................... 28

VII.    THE OTHER PRELIMINARY INJUNCTION FACTORS ARE MET. ........................ 29

VIII.    CONCLUSION .................................................................................................. 30

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ..................................................................... 20, 22, 23

5

6

*Acosta v. City of Costa Mesa,*
    718 F.3d 800 (9th Cir. 2013) ......................................................................... 23, 24

7

8

*Airbnb, Inc. v. City of Boston,*
    386 F. Supp. 3d 113 (D. Mass. 2019) ................................................................. 27

9

*Am. Trucking Ass'n v. City of L.A.,*
    559 F.3d 1046 (9th Cir. 2009) ............................................................................. 29

10

11

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2024) ................................................................... 10, 11, 18, 20

12

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ............................................................................................. 20

13

14

*Ass'n for Accessible Meds. v. Ellison,*
    704 F. Supp. 3d 947 (D. Minn. 2023) ................................................................. 29

15

16

*Backpage.com, LLC v. Hoffman,*
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ......................................................... 27

17

*Backpage.com, LLC v. McKenna,*
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) .......................................................... 27

18

19

*Barlow v. Davis,*
    72 Cal. App. 4th 1258 (1999) .............................................................................. 25

20

21

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) ....................................................................... 27, 28

22

*Barr v. Am. Ass'n of Pol. Consultants,*
    591 U.S. 610 (2020) ............................................................................................. 11

23

24

*Bd. of Osteopathic Exam'rs v. Bd. of Med. Exam'rs,*
    53 Cal. App. 3d 78 (1975) ................................................................................... 26

25

26

*Boos v. Barry,*
    485 U.S. 312 (1988) ..................................................................................... 12, 18

27

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................................................... 10, 17, 19, 22

28

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Bullfrog Films, Inc. v. Wick,*
    847 F.2d 502 (9th Cir. 1988) ............................................................................ 21

*Butcher v. Knudsen,*
    38 F.4th 1163 (9th Cir. 2022) ........................................................................... 21

*Cal. Teachers Ass'n v. State Bd. of Educ.,*
    271 F.3d 1141 (9th Cir. 2001) ........................................................................... 20

*CCIA v. Paxton,*
    2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ........................................ 23, 27, 28

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .................................................................................... 14, 16

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022) ...................................................................................... 11, 12

*City of L.A. v. Patel,*
    576 U.S. 409 (2015) .................................................................................... 16, 18

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................... 29

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ........................................................................................... 22

*Crosby v. NFTC,*
    530 U.S. 363 (2000) ......................................................................................... 27

*CTIA v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019) ........................................................................... 29

*Cultiva La Salud v. California,*
    89 Cal. App. 5th 868 (2023) ............................................................................. 25

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019) ........................................................................... 29

*DoorDash, Inc. v. City of N.Y.,*
    --- F. Supp. 3d ----, 2024 WL 4276245 (S.D.N.Y. Sept. 24, 2024) ...................... 16

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) ......................................................................................... 28

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................................................... 29

*Fair Hous. Council of San Fernando Valley v. Roommates.com LLC,*
    521 F.3d 1157 (9th Cir. 2008) (en banc) ............................................................ 27

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Family PAC v. McKenna*,
   685 F.3d 800 (9th Cir. 2012).............................................................................................. 14

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998).............................................................................................. 22

*Free Speech Coal. v. Reno*,
   198 F.3d 1083 (9th Cir. 1999), *aff'd*, 535 U.S. 234 (2002) .................................................. 22

*Garcia v. City of L.A.*,
   11 F.4th 1113 (9th Cir. 2021)................................................................................ 16, 17, 18

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) .......................................................................................................... 23

*H.K. ex rel. Farwell v. Google LLC*,
   595 F. Supp. 3d 702 (C.D. Ill. 2022).................................................................................. 28

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ........................................................................................................ 21, 23

*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*,
   21 Cal. 4th 585 (1999)............................................................................................ 23, 24, 25

*Hunt v. City of L.A.*,
   601 F. Supp. 2d 1158 (C.D. Cal. 2009), *aff'd*, 638 F.3d 703 (9th Cir. 2011) ........................ 21

*In re Reyes*,
   910 F.2d 611 (9th Cir. 1990).............................................................................................. 24

*Isaacson v. Horne*,
   716 F.3d 1213 (9th Cir. 2013)............................................................................................ 14

*Jevne v. Superior Ct.*,
   35 Cal. 4th 935 (2005)....................................................................................................... 24

*John Doe #1 v. Reed*,
   561 U.S. 186 (2010) ............................................................................................ 14, 15, 16, 18

*Jones v. Google LLC*,
   73 F.4th 636 (9th Cir. 2023)............................................................................................... 28

*McCoy v. Alphabet, Inc.*,
   2021 WL 405816 (N.D. Cal. Feb. 2, 2021)........................................................................... 5

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012).............................................................................................. 30

*Mendoza v. California*,
   149 Cal. App. 4th 1034 (2007)........................................................................................... 25

v

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Metromedia, Inc. v. City of San Diego*,
    32 Cal. 3d 180 (1982)..................................................................................... 26

*Montana PIRG v. Jacobsen*,
    2024 WL 4023781 (9th Cir. Sept. 3, 2024).......................................................... 10

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) ...........................................................................*passim*

*NAACP v. Button*,
    371 U.S. 415 (1963) ..................................................................................... 21

*Nat'l Pork Prods. Council v. Ross*,
    598 U.S. 356 (2023) .................................................................................. 28, 29

*Nat'l Shooting Sports Found. v. Bonta*,
    718 F. Supp. 3d 1244 (S.D. Cal. 2024) .............................................................. 29

*NetChoice LLC v. Fitch*,
    2024 WL 3276409 (S.D. Miss. July 1, 2024) ...................................................... 13

*NetChoice LLC v. Reyes*,
    2024 WL 4135626 (D. Utah Sept. 10, 2024) .......................................... 13, 18, 19

*NetChoice LLC v. Yost*,
    2024 WL 555904 (S.D. Ohio Feb. 12, 2024)...................................................... 13

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024).................................................................*passim*

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
    457 F. Supp. 3d 1103 (D.N.M. 2020) .............................................................. 28

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) .................................................................................. 3, 10

*People v. Library One, Inc.*,
    229 Cal. App. 3d 973 (1991).......................................................................... 23

*People v. Nguyen*,
    222 Cal. App. 4th 1168 (2014)....................................................................... 24

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .............................................................................. 11, 12

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................ 3, 20

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020).......................................................................... 30

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Sam Francis Found. v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) (en banc) .................................................. 28, 29

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................................ 16, 18, 20

*United States v. Eichman*,
   496 U.S. 310 (1990) ............................................................................ 11, 12, 18

*United States v. Hall*,
   912 F.3d 1224 (9th Cir. 2019) ............................................................................ 23

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000) ...................................................................................... 11, 12

*United States v. Stevens*,
   559 U.S. 460 (2010) ...................................................................................... 10

*United States v. Williams*,
   553 U.S. 285 (2008) ...................................................................................... 21

*Wash. State Grange v. Wash. State Repub. Party*,
   552 U.S. 442 (2008) ...................................................................................... 13

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
   32 F.4th 852 (9th Cir. 2022) ...................................................................................... 10

*Zepeda v. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983) ...................................................................................... 30

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ...................................................................................... 27

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ............................................................ 2, 9, 10, 28, 29

U.S. Const. amend. I ....................................................................................... *passim*

**Statutes**

Children's Online Privacy Protection Act (COPPA),
   15 U.S.C. §§ 6501-05 ................................................................ 2, 4, 9, 16, 28
   § 6501 ......................................................................................... 2, 4, 16, 28
   § 6502 ......................................................................................... 4, 28

47 U.S.C. § 230 ...................................................................... 2, 3, 9, 27, 28

Cal. Bus. & Profs. Code § 17200 ...................................................................... 18

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Cal. Civil Code
 § 1770 ............................................................................................................ 18
 § 1798.99.30 ......................................................................................... *passim*
 § 1798.99.31 ......................................................................................... *passim*
 § 1798.99.32 .................................................................................................. 10
 § 1798.100 ...................................................................................................... 4
 § 1798.120 ...................................................................................................... 4
 § 1798.140 .............................................................................. 5, 6, 7, 12, 18
 § 1798.145 .................................................................................................... 29

**Regulations**

16 C.F.R. § 312.3 ............................................................................................. 4

11 Cal. Code Regs. § 7004 ........................................................................... 18

**Other Authorities**

144 Cong. Rec. 23926 (1998) ....................................................................... 4

WARD FARNSWORTH, THE LEGAL ANALYST (2007) ................................... 4

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## I.   INTRODUCTION

Without dissent, the Ninth Circuit held that the State's attempt to require online businesses to report and mitigate any risks of "detriment to children" posed by content those businesses publish would have "deputize[d] private actors into censoring speech." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). The court affirmed this Court's preliminary injunction of that requirement, and remanded for this Court to address whether other aspects of AB 2273 should be similarly enjoined under the standards articulated in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). The answer is yes.

*First,* all the Act's regulatory mandates violate the First Amendment. *See* § IV.

The Act's regulatory provisions are all facially invalid because they unconstitutionally burden online services based on the content they publish. The Act defines its scope of coverage by expressly targeting businesses for regulation based on specific content (e.g., "cartoons," "music," "celebrities," and content or "design elements" directed to minors) and those businesses' "audience." The coverage definition also expressly exempts online businesses with predominantly non-expressive appeal (e.g., e-commerce). By so targeting the Act's regulatory burdens, the legislature made clear that the Act's applications—intended and actual—would be censorship. The record confirms that is the State's primary objective. The State has not identified any legitimate application of the Act's content-based burdens, and any such applications would be dwarfed by the unconstitutional suppression of speech across the internet. Facial relief is thus warranted from each of the Act's regulatory provisions in §§ 31(a) and (b). *See* § IV.A.

Several individual provisions of the Act—those addressing content-policy enforcement (§ 31(a)(9)); information use (§ 31(b)(1)-(4)); "dark patterns" (§ 31(b)(7)); and age estimation (§ 31(a)(5)) (collectively, the "Individual Provisions")—independently violate the First Amendment. This Court already held that each of these provisions likely violates the First Amendment in its core application. And as discussed below, these provisions' unconstitutional applications, to the extent challenged in the Amended Complaint, are "substantial" compared to any "legitimate sweep" under *Moody*, 144 S. Ct. at 2397-98. Facial relief is therefore independently warranted as to each Individual Provision. *See* § IV.B.

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Each of the Individual Provisions is also unconstitutionally vague under the First Amendment because each turns on undefined terms such as "reasonable level of certainty appropriate to the risks," the "best interests" of minors, and whether something is "materially detrimental," and thus provides businesses inadequate notice of their requirements. *See* § IV.C.

The Individual Provisions are also unconstitutional as applied to NetChoice's covered members who engage in expressive activities for essentially the same reasons they are facially invalid. *See* § IV.D.

***Second***, the Act's regulatory provisions in §§ 31(a) and (b) are not severable from the self-assessment and "cure" provisions, which remain enjoined. *See* § V. These mechanisms would have provided businesses opportunities to avoid liability by identifying and "mitigating" content that might later be deemed to violate the Act, and absent that, by curing any violations before enforcement. The text and legislative history show the State would not have adopted the Act without these provisions. *See* § V.A. And these mechanisms, albeit unconstitutional, were central to the Act's standards- and compliance-oriented functional approach, which would have permitted covered businesses to avoid crippling penalties arising from surprise enforcement. *See* § V.B.

***Third***, the Individual Provisions are invalid on three alternative grounds the Ninth Circuit did not reach—Section 230 of the Communications Decency Act, 47 U.S.C. § 230; the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. §§ 6501-05; and the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. *See* § VI. Section 230 preempts these provisions to the extent they would hold online services liable for the way they publish, moderate, or block third-party content. *See* § VI.A. COPPA preempts these provisions with respect to minors under thirteen because the California legislature deliberately imposed obligations inconsistent with COPPA. *See* § VI.B. And the provisions violate the Commerce Clause by regulating conduct wholly outside California. *See* § VI.C.

***Finally,*** NetChoice members and online publishers everywhere will suffer irreparable injuries if forced to comply with or face liability under a regime that violates their constitutional rights. An order preliminary enjoining each of the Act's mandates and prohibitions on its face, or as applied to NetChoice's covered members, is needed to avert these impending harms. *See* § VII.

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## II.     BACKGROUND

### A.     The Internet Is A Vibrant Forum For Speech.

The internet is a medium "as diverse as human thought," *Reno v. ACLU*, 521 U.S. 844, 870, (1997) (citation omitted), which in the brief span of a generation has become indispensable to the exchange of information. "[W]ebsites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and to connect citizens with "principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Online services "publish diverse material on countless websites that inform, entertain, and connect society in vital ways." Compl. ¶ 1, *United States v. Google LLC*, No. 23-108 (E.D. Va. Jan. 24, 2023), ECF No. 1 (Google Compl.) (California is a named plaintiff). This "extraordinary advance in the availability of educational and informational resources" has "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(1), (4). And it has been made possible by an internet that is open and accessible to all.

Online providers interact with users in different ways. Most have areas where all users can view content without creating an account. *See, e.g.*, Cairella Decl. (ECF 29-22) ¶ 7; Masnick Decl. (ECF 29-29) ¶ 5; Roin Decl. (ECF 29-25) ¶ 7-9. Many have features available only to users who create an account. *See, e.g.*, Cairella Decl. ¶ 8; Masnick Decl. ¶ 6; Roin Decl. ¶¶ 7-9; Paolucci Decl. (ECF 29-28) ¶ 5. Some provide services and content without charge, relying on advertisements to support the content and services they provide. *See, e.g.*, Cairella Decl. ¶¶ 4, 7, 21; Masnick Decl. ¶ 5; Roin Decl. ¶¶ 7, 9, 10. Others require users to pay subscription fees for extra services. *See, e.g.*, Cairella Decl. ¶ 4; Paolucci Decl. ¶ 5. At any rate, as California has conceded, "today's internet would not exist without the digital advertising revenue that, as a practical matter, funds its creation and expansion." Google Compl. ¶ 1.

A hallmark of modern-day online services is the ability to tailor content to individual users. Suggesting a book or film based on a user's browsing, reading, or listening, for example, creates value by personalizing the service to the user's interests, and connects content creators with an

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

Davis Wright Tremaine LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

audience. *See, e.g.,* Roin Decl. ¶¶ 2-6; Cairella Decl. ¶¶ 8, 20; Szabo Decl. (ECF 29-21) ¶ 13. This is true across online media—including music, video, and social networks.

The vast majority of online providers have adopted policies and community standards governing content shared through their services (collectively, "content policies"). These content policies can serve many purposes—including fostering a particular type of community, encouraging debate, setting the tenor of discussion, maintaining a welcoming and respectful environment, and notifying users of the types of conduct that might result in a loss of access. *See* Kumar Decl. (ECF 29-1) Exs. 3-6 (sample content policies); Szabo Decl. ¶¶ 8-12.

**B.    California Internet Users, Including Children, Have Long Been Protected By State And Federal Privacy Laws.**

Federal child privacy law, codified in COPPA and its regulations, has long "limit[ed] the collection of personal information from children without parental consent." 144 Cong. Rec. 23926 (1998). COPPA defines a child as anyone under 13 and applies to websites that are "directed to children" or have "actual knowledge" they are collecting personal information from a child. 15 U.S.C. §§ 6501(1), 6502. These websites must "provide notice" of information collection, use, and disclosure practices; obtain parental consent before collecting, using, or disclosing a child's personal information; provide parents "reasonable means" to review and refuse consent to the use of a child's personal information; and not condition a child's participation in certain activities on excessive disclosure of personal information. 16 C.F.R. §§ 312.3(a)-(d). COPPA expressly preempts inconsistent child-focused state privacy rules. 15 U.S.C. § 6502(d).

Californians are also protected by a comprehensive state data privacy regime, the 2018 California Consumer Privacy Act (CCPA), which "give[s] consumers of all ages 'an effective way to control their personal information.'" *NetChoice*, 113 F.4th at 1109 (citing 2018 Cal. Legis. Serv. Ch. 55, § 2(i) (A.B. 375)). Under the CCPA, as amended by the 2020 California Privacy Rights Act (CPRA), users have extensive rights to control the data collected about them. *See* Cal. Civ. Code §§ 1798.100 *et seq.* Online services must "inform consumers as to the categories of" and "purposes for which" personal information is being collected, *id.* § 1798.100(b); not collect more information absent notice, *id.* § 1798.100(a)(2); provide notice of any sale or sharing of personal information, *id.* §1798.120(b); honor requests not to do so, *id.* § 1798.120(d); and not sell or share

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

the personal information of a consumer the service knows is younger than 16, absent authorization from that user (or if the user is under 13, their parent or guardian), *id.* § 1798.120(c). Online services have spent significant resources to comply with these requirements. Indeed, a report commissioned by the California Attorney General estimated that initial compliance with the 2018 CCPA would cost $55 billion, with ongoing costs thereafter. *See* Kumar Decl. Ex. 1, at 11. These statutory protections bolster California's long-established common-law privacy rights. *See, e.g.*, *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *7-8 (N.D. Cal. Feb. 2, 2021).

### C.  AB 2273 Attempts To Censor The Internet Under The Guise Of Privacy.

California enacted AB 2273 in 2022. *See generally* Cal. Civ. Code §§ 1798.99.28 *et seq.* The Act applies to any "business" that "provides an online service, product, or feature likely to be accessed by children," § 31(a), (b), and defines a "child" as anyone "under 18 years of age." § 30(b)(1). A "[b]usiness" is any for-profit entity that meets certain criteria, including if it earns more than $25M in gross annual revenue or shares at least 100,000 customers' information annually. *Id.* § 1798.140(d). The Act expressly exempts non-profits, government entities, medical providers, and online services that provide the "delivery or use of a physical product." *See id.* §§ 30(5), 1798.99.40, 1798.140(d).

Whether a service is "likely to be accessed by children" depends on the content published by the business. Factors include, for example, whether the service, product, or feature is "directed to children," § 30(b)(4)(A); offers "advertisements marketed to children," § 30(b)(4)(C); has "design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children," § 30(b)(4)(E); or has an "audience" routinely or largely composed of children (as indicated by specific sources), § 30(b)(4)(B), (F).

The legislature structured the Act around a central but now-enjoined set of provisions that would have required covered businesses to prepare "data protection impact assessments" (DPIAs) and share those DPIAs with the Attorney General on demand. Despite the reference to "data protection," these requirements had little to do with how entities protect data. *See NetChoice*, 113 F.4th at 1118 (interpreting Act's references to "data management" and data protection as "proxies for content"). They instead were oriented around the premise that online services must redesign

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

their content to be "appropriate for children." AB 2273, Findings and Decls. § 1(a)(7). DPIAs would have addressed whether a provider's features and services "could harm" minors by exposing them to "potentially harmful" content, contacts, or communications; permitting them to "witness" any "potentially harmful, conduct"; or using "algorithms" or "automated processing" to deliver "targeted" content and ads that "could harm" them. § 31(a)(1)(B)(i)-(vii). The provider would have been required to "[d]ocument any risk of material detriment to" minors arising from each service, product, or feature, and "create a timed plan to mitigate or eliminate" those risks "before" minors access it. § 31(a)(2). "Harm" and "material detriment" are undefined. As further discussed below, this Court enjoined the DPIA requirements, and the injunction was affirmed by the Ninth Circuit.

The Act also includes several requirements and prohibitions that rest on the same censorship objectives as the enjoined DPIA provisions. These are as follows.

***Policy-Enforcement Mandate***: ***§ 31(a)(9).*** Online services must "enforce" their policies, including content policies, to the State's satisfaction. § 31(a)(9). The government may thus supervise and second-guess a provider's discretionary decisions about what speech to permit and whether content is inflammatory, threatening, or otherwise contrary to the provider's standards.

***Information-Use Restrictions: § 31(b)(1)-(4).*** The Act contains a series of interrelated restrictions on how a covered service may use "personal information" of minors to organize or deliver content. The definition of "personal information" extends far beyond traditional conceptions of personally identifiable information (like birthdates) to any information "reasonably capable of being associated with, or [that] could reasonably be linked, directly *or indirectly,* with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1) (emphasis added). This definition encompasses a range of data that is critical to organizing and delivering online content and maintaining useful services. This includes general information about how users interact with a website, and basic device identifiers linked to a machine, not a specific user.

- Delivering Content: § 31(b)(1). The Act prohibits covered providers from using a minor's personal information (including an IP address and browsing history) to deliver content the provider "knows, or has reason to know, is materially detrimental" to the minor's "well-being."

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

- <u>Automated Processing of Personal Information (so-called "Profiling"): § 31(b)(2)</u>. The Act restricts covered services from using "automated processing" of a minor's personal information to evaluate "aspects relating to" the user—which the Act brands with the pejorative term "profiling"—unless the Attorney General agrees that the processing is "necessary" to the specific feature with which a [minor] is actively and knowingly engaged," or agrees that a "compelling reason" proves that the processing "is in the best interests of children." *Id.* (incorporating § 30(b)(6)). In practical terms, this ends content personalization for minors based, for example, on "analyzing or predicting" the user's "personal preferences [or] interests," § 30(b)(6).

- <u>Sharing or Retaining Personal Information: § 31(b)(3)</u>. The Act prohibits services from sharing or retaining "personal information" unless "necessary" to provide the service "with which a child is actively and knowingly engaged" or there is a "compelling reason" that doing so "is in the best interests of" minors likely to access the service.

- <u>Use of Personal Information for Additional Reasons: § 31(b)(4)</u>. The Act forbids providers from using a minor's "personal information" for "any reason other than a reason it was originally collected" unless providers present a "compelling reason" the use is in children's "best interests." *Id*. Again, the Act invites government censors to evaluate whether content is in "the best interests of children" to determine whether businesses have properly "used," "shared," or "processed" information in providing the content. Parents have no way to opt out of this restriction.

***"Dark Pattern" Restriction: § 31(b)(7).*** The Act prohibits covered providers from using so-called "dark patterns" to "lead or encourage" minors to provide more information than "reasonably expected" or "take any action" the provider should know "is materially detrimental" to the minor's "physical health, mental health, or well-being." § 31(b)(7). The State defines a "dark pattern" as any user "interface" that "subverts or impairs user autonomy, decisionmaking, or choice." § 1798.99.140(l). Despite the ominous label and description, the State interprets the term to reach commonplace publishing features that simplify and improve the user experience, such as "autoplay" and "newsfeed" functions that recommend personalized content. Radesky Decl. (ECF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

51-5) ¶¶ 49, 55; *see NetChoice*, 113 F.4th at 1123 n.8 ("dark patterns may include the 'infinite scroll' feature on X (formerly Twitter), 'autoplay' on YouTube and TikTok, and 'streaks' on Snapchat").

*Age-Estimation Mandate*: *§ 31(a)(5)*. Online services must estimate the age of their users with "a reasonable level of certainty appropriate to the risks" that could arise from their services, or else apply the "protections afforded to children to all consumers." § 31(a)(5). Covered businesses must therefore choose between equally unattractive options: either perform a subjective, abstract, content-based assessment about the "risks" of their content and require users to disclose age-related information as "appropriate" to those risks; or apply the Act's censorious requirements to "all users," including adults. Adults may not opt themselves out of these restrictions, much less their children. *Id.*

The Act authorizes the Attorney General to obtain penalties for noncompliance of up to $7,500 per "affected child," and injunctive relief. *Id.* § 1798.99.35(a). As originally enacted, the Attorney General could not have sought penalties without first engaging in a notice-and-cure process through which covered providers could avoid penalties by complying with the DPIA requirements and curing noncompliance within 90 days. *Id.* § 1798.99.35(c). That process, however, has been preliminarily enjoined as a result of the constitutional infirmities in the DPIA requirements. *See NetChoice*, 113 F.4th at 1124. As a result, the cure process is no longer available.

## D.     The First Preliminary Injunction

This Court granted NetChoice's first motion for a preliminary injunction. *See* ECF 74. The Court considered evidence and submissions of amici curiae showing that the Act broadly censored all sorts of online expression, "including search engines, online publications (including newspapers, magazines, and blogs), social media platforms, and the publishers of books, photographs, videos, music, games, recipes, podcasts, and countless other forms of speech." CCIA Br. (ECF 45-1) at 7; *see also* Roin Decl. (reading app Goodreads); Cairella Decl. (online entertainment encyclopedia IMDb); Masnick Decl. (Techdirt blog); Paolucci Decl. (Dreamwidth, a social media service); NYT Br. (ECF 56-1) at 2-3 (variety of news services, including the *New York Times*). The Court determined that the Act's challenged mandates and prohibitions regulate

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

Davis Wright Tremaine LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the "distribution of speech," impede the "availability and use of information" for publication, and compel speech in ways that fail First Amendment scrutiny, and enjoined the entirety of the law. ECF 74 at 13. The State appealed.

The Supreme Court decided *Moody* between this Court's decision to enjoin the Act and the Ninth Circuit's oral arguments in this case. The *Moody* Court took great pains to explain that the First Amendment protects an online service's "editorial judgments" to publish and arrange content "in the way it wants"—including "how to display" it to the public—while remanding to the lower courts to further assess "[w]hat activities, by what actors" the laws challenged there regulate, and whether "a substantial number of [the laws'] applications are unconstitutional, judged in relation to [any] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2394-95, 2397-98 (citation omitted).

The Ninth Circuit thereafter unanimously affirmed this Court's preliminary injunction as to the DPIA regime, which it held "deputiz[ed]" services to act as "censors for the State" in all applications and thus required strict scrutiny that the State fell "well short of satisfying." *NetChoice*, 113 F.4th at 1108, 1113, 1116-22. As to the remainder of the law, the Ninth Circuit remanded for this Court to perform the facial analysis required by *Moody* by clarifying which provisions are being challenged, the principal applications of those provisions to covered services, and how the unconstitutional applications compare to any "legitimate sweep." *Id.* (citing *Moody*, 144 S. Ct. at 2397). The panel did not disturb the Court's reasoning that specific applications of the challenged provisions are likely unconstitutional, nor did it reach NetChoice's other claims under Section 230, COPPA, and the Commerce Clause. *Id.* at 1126 n.9. The panel also concluded that, before undertaking the *Moody* analysis, it would be premature to consider the severability of other provisions from the DPIA requirements. *Id.* at 1124-25.

### E.     The Amended Complaint

On November 1, 2024, NetChoice filed an Amended Complaint (ECF 100) clarifying the scope of its challenges and specific relief sought. Am. Compl. ¶¶ 84-90, Prayer ¶¶ 1-13. Specifically, NetChoice brings First Amendment challenges to §§ 31(a) and 31(b) (collectively, the "Regulatory Provisions") on their face because the Act's content-based coverage definition infects all aspects of these provisions, rendering them unconstitutional in every application. *See*

*id.*, Prayer ¶ 2; *infra* § IV.A. Alternatively, NetChoice seeks facial relief against the Individual Provisions for violating the First Amendment in some or all applications (*infra* § IV.B), and in the alternative, for relief as applied to NetChoice's members (*infra* § IV.D). *See* Am. Compl., Prayer ¶¶ 4-8. NetChoice also seeks facial relief from all the Regulatory Provisions because they are not severable from the already-enjoined DPIA provisions, *see* Am. Compl. ¶ 9; *infra* § V; and facial and as-applied relief from various provisions under its Commerce Clause and preemption theories, *see* Am. Compl., Prayer ¶¶ 10-12; *infra* § VI.

NetChoice does not challenge § 1798.99.32, which creates a working group to "deliver a report to the Legislature" regarding best practices for implementing the Act.

## III.   LEGAL STANDARDS

### A.   Preliminary Injunction Standard

A preliminary injunction should issue when a plaintiff (1) is likely to prevail on the merits and (2) will suffer irreparable harm absent an injunction, and where (3) equity and (4) the public interest support relief. *See Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). These factors are balanced on a sliding scale. *Id.*

### B.   Standard Governing Facial Relief

A law is facially invalid under the First Amendment when "a substantial number" of the law's principal applications "are unconstitutional, judged in relation to [any] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). To apply this standard, a court must first determine the law's potential scope, by evaluating "[w]hat activities, by what actors" the law regulates. *Id.* at 2398. The court then evaluates "which of the law['s] applications violate[s] the First Amendment," and "measure[s] them against the rest." *Id.*; *see Montana PIRG v. Jacobsen*, 2024 WL 4023781, at *2 n.2 (9th Cir. Sept. 3, 2024). When a challenged law regulates protected speech in ways that do not survive scrutiny in a substantial number of its applications, the law is facially invalid. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2024); *see also Packingham v. North Carolina,* 582 U.S. 98, 110 (2017); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804-05 (2011); *United States v. Stevens*, 559 U.S. 460, 482 (2010).

IV.   **NETCHOICE IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIMS.**

A.   **The Act's Regulations Are Facially Invalid Because They Unconstitutionally Burden Online Services Based On The Content They Publish.**

Every application of the Regulatory Provisions regulates speech on the basis of its content and thus triggers strict scrutiny. This is because whether the Act applies to a business depends on the types of content the business publishes. Because the State cannot show these content-based burdens are the least restrictive means to achieve a compelling state interest, the Act's regulatory provisions are unconstitutional "in every case," and thus facially invalid. *Ams. for Prosperity*, 594 U.S. at 618.

Content-based laws are presumptively unconstitutional and valid only when the government meets the heavy burden of strict scrutiny. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). A regulation "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A regulation is also content based when it "cannot be justified without reference to the content of the regulated speech," *id.* at 164 (citation omitted), or it regulates "function or purpose" as a "proxy" for content. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (citing *Reed*, 576 U.S. at 163). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus' toward the ideas contained in the regulated speech." *Reed*, 576 U.S. at 156 (cleaned up). And even if the law "contains no explicit content-based limitation on the scope of prohibited conduct," it is still subject to strict scrutiny if it is "clear that the Government's asserted interest is related to the suppression of free expression." *United States v. Eichman*, 496 U.S. 310, 315 (1990) (cleaned up).

The Act's Regulatory Provisions are content-based across all their principal applications. Because of the Act's coverage definitions under § 30(b)(4)—the "likely to be accessed" or "coverage" standard—the Regulatory Provisions target businesses for "differential treatment" based on the "subject matter" they publish. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 618-21 (2020) (plurality op.) (citing *Reed*, 576 U.S. at 163-64, 169). If a business publishes content

---

11

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"directed to" minors, such as "games," "cartoons," "music," "celebrities," "advertisements," or "design elements" that "appeal to" minors, that business must comply with the Regulatory Provisions. § 30(b)(4)(B)-(F); Cal. Civil Code § 1798.140(d). If the business has a "significant audience" or "audience composition" of minors, it too is regulated. *Id.* By contrast, if a provider publishes content that has no appeal to minors and caters to an "audience" that does not include a significant number of minors, it is not subject to the Regulatory Provisions. The Act's focus on "audience" underscores its content basis because it treats a service's "function or purpose" as a "proxy" for the content the service publishes. *City of Austin*, 596 U.S. at 78 (quoting *Reed*, 576 U.S. at 163). Regulating speakers based on "concern for [their] effect" on a particular audience— i.e., children—is "the essence of content-based regulation." *Playboy Ent. Grp., Inc*., 529 U.S. at 811-12; *see also Boos v. Barry*, 485 U.S. 312, 321 (1988) (regulations "focus[ed] on the direct impact of speech on its audience" are content based).

Content regulation is also the Act's professed objective. By its own terms, the Act seeks to create "safer" online content for children by disabling features that "offer detrimental material" to children, AB 2273, Findings and Decls. § 1(a)(3), (8), and requiring businesses to identify and mitigate "potentially harmful" "content." § 31(a)(1)(B)(i). The Act also incorporates guidance from a U.K. code that overtly regulates on the basis of content. *See* AB 2273, Findings and Decls. § 1(d), (e); Gossett Decl. Exs. 1-4 (guidance for identical provisions require regulation of content, including "detrimental use[s] of data" to promote "offensive language," "sexual material," or "nudity"). California lawmakers advocated for this U.K. model because it would shield children from "adult content," Sieff Decl. (ECF 60-1) Ex. 1 at 1, 3, and "harmful material" inappropriate for their "minds, abilities, and sensibilities." *Id.* Ex. 2 at 16-17. The Attorney General likewise praised the law for "address[ing] … dangerous online *content*," *id.* Ex. 3 at 2, and the Governor vowed to defend it to "shield[]" youth from harmful "content." *Id.* Ex. 4. The State's defense of the Act also repeatedly references purportedly harmful "content." *See, e.g.*, Radesky Decl. ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98 (mentioning "content" more than 70 times). In other words, the evidence is "clear that the Government's asserted interest is related to the suppression of free expression." *Eichman*, 496 U.S. at 315. This wolf comes as a wolf.

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

The Act's universal content-based coverage triggers strict scrutiny across all the Regulatory Provisions, not just those that directly regulate expression. Indeed, three federal courts have recently enjoined laws on this basis. *See NetChoice LLC v. Reyes*, 2024 WL 4135626, at *8 (D. Utah Sept. 10, 2024) (facially enjoining Utah law because the "operative provisions each rely on [a] Central Coverage Definition [that] imposes unjustified, content-based restrictions"); *NetChoice LLC v. Fitch*, 2024 WL 3276409, at *8-9, *14 (S.D. Miss. July 1, 2024) (facially enjoining Mississippi law because of the "content-based distinction … inherent in the definition of a [covered] 'digital services provider'"); *NetChoice LLC v. Yost*, 2024 WL 555904, at *11 (S.D. Ohio Feb. 12, 2024) (pre-*Moody*, facially enjoining Ohio law that drew content-based distinctions among online services based on their "engagement with certain topics"). Here too, the coverage definition means that online businesses are always regulated based on content, requiring the uniform application of strict scrutiny that the State falls "well short of satisfying." *NetChoice*, 113 F.4th at 1122; *see also* ECF 74 at 18-37 (challenged provisions fail even intermediate scrutiny).

That is enough to hold all of the Act's Regulatory Provisions facially invalid under the First Amendment. The Act's content-based and "audience"-based coverage definitions and exemptions mean that the Regulatory Provisions are targeted to and will virtually always apply to speech. The Act expressly excludes non-expressive services likely to be accessed by minors, such as e-commerce, telecommunications services, and healthcare portals. *See* § 30(b)(5). Any remaining hypothetical applications that do not involve protected expression—perhaps use of ride-sharing apps or banking services—are not "directed to children," § 30(b)(4)(A), and any minors who use these services would not comprise an "audience," §§ 30(b)(4)(B), (F)—a term denoting persons who receive expression. *See Audience*, Merriam-Webster, https://www.merriam-webster.com/dictionary/audience (last visited Nov. 1, 2024) ("a reading, viewing, or listening public"). Any such hypothetical applications are manifestly insubstantial when compared to the Act's unconstitutional applications. *Cf. Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) (facial analysis should not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases").

The State has also failed to cite any meaningful non-expressive applications of the

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Regulatory Provisions. Its expert predominantly cites content-based applications of the Act to videos, gaming, music, educational content, and social media. *See* Radesky Decl. ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98; *see also* Gossett Decl. Ex. 11 at 2-4, 9, 11 (discussing popularity of such services among minors). And the "speed filter" on Snapchat—the one *putative* example the State raised, *see* ECF 70 at 2—was eliminated years ago, before the Act was passed. *See* Gossett Decl. Ex. 5. Any imaginable non-speech application of the Act's mandates and prohibitions simply cannot compare to the real-world speech-related applications NetChoice and its amici have identified. *See generally* Cairella Decl.; Roin Decl.; Masnick Decl.; Paolucci Decl.; Rumenap Decl. (ECF 29- 30); Szabo Decl.; Masnick Supp. Decl.; Paolucci Supp. Decl.; *see also* NYT Br. 2-3; Chamber of Progress Br. (ECF 42-1) at 9-15.

### B.    The Individual Provisions Are Each Independently Facially Unconstitutional To The Extent NetChoice Challenges Them.

Each Individual Provision also should be enjoined on its face on independent grounds, either in its entirety or as to certain applications.

A facial challenge can be asserted to challenge a law's application to certain *categories* of activities untied to any particular plaintiff. *See John Doe #1 v. Reed*, 561 U.S. 186, 194 (2010) (entertaining facial challenge that was "not limited to plaintiffs' particular case" but did "not seek to strike the [law] in all its applications"); *Family PAC v. McKenna*, 685 F.3d 800, 808 n.5 (9th Cir. 2012) (considering a facial challenge to campaign disclosure rules "as applied to ballot measure committees" without addressing the rules' application to other scenarios). This reflects the principle that the showing required in a facial challenge is derived from the "breadth of the remedy" sought. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010); *see also Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013) ("extent to which the invalidity of a statute need be demonstrated" is a function of "the remedy" provided).

Under this rule, the Individual Provisions are facially invalid within the range of applications that NetChoice challenges here.

### 1.    Policy-enforcement mandate (challenged as to specific applications)

Under § 31(a)(9), online services must "enforce" to the State's satisfaction their "published terms, policies, and community standards." The Court already concluded this provision is facially

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

invalid under the First Amendment to the extent applied to content policies. *See* ECF 74 at 26-27. It reasoned that § 31(a)(9) regulates speech in these applications by "press[ing] private companies into service as government censors," ECF 74 at 14, and burdening services' rights "to exercise their editorial judgment in permitting or prohibiting content." *Id.* at 27. And it held the provision unconstitutional because "the State fail[ed] to establish a concrete harm" justifying the regulation, failed to present "a causal link between" any "harm to children's well-being," and had not limited this requirement to "policies related to children." *Id.* at 26-27.

The Ninth Circuit vacated the injunction on this provision because it might be constitutional as applied to *other* types of policies, such as privacy policies or garden variety "terms and conditions." *See NetChoice*, 113 F.4th at 1123-24. But to the extent this provision survives NetChoice's facial challenge in Part § IV.A, NetChoice does not challenge its application to such policies. *See* Am. Compl. ¶ 85, Prayer ¶ 5. NetChoice's facial challenge to § 31(a)(9) is limited to content policies, and the provision is facially invalid "to the extent of that reach." *John Doe #1*, 561 U.S. at 194. Since all of the applications within this range are unconstitutional, the provision has no legitimate sweep and is thus facially invalid as challenged. *Moody*, 144 S. Ct. at 2397.

### 2. Information-use restrictions (challenged as to specific applications)

These four provisions each restrict how and for what purposes an online service may use "personal information" they lawfully receive from users under eighteen, *see* §§ 31(b)(1)-(4), and each is unconstitutional to the extent they "apply to covered services' use of personal information," including the retention and sharing of such information, "to publish content or to make information available." Am. Compl., Prayer ¶¶ 6-7.

Section 31(b)(1) restricts covered services' use of this information—including to deliver content—that the provider "knows, or has reason to know, is materially detrimental" to the minor's "well-being." § 31(b)(1). Section 31(b)(2) restricts covered services from using this information to "evaluate" a minor's interests, including to present them personalized content, unless they can show a "compelling reason" that doing so "is in the best interests of children." § 31(b)(2) (incorporating § 30(b)(6)). Section 31(b)(3) prohibits covered services from sharing or retaining this information—including to publish or use it to personalize content—unless doing so is

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"necessary" to provide the service, or there is a "compelling reason" that doing so "is in the best interests of" minors likely to access the service. *Id.* § 31(b)(3). And section 31(b)(4) forbids covered providers from using a minor's "personal information" for "any reason other than a reason it was originally collected" unless the use is in children's "best interests." *Id.* § 31(b)(4).

The Court previously held these provisions facially unconstitutional, focusing on precisely the range of applications that NetChoice challenges. *See* ECF 74 at 28-32. Specifically, the Court found these provisions regulate speech by restricting the availability and use of information on a content- and speaker-basis. *Id.* at 11-13. It held Section 31(b)(1) was not narrowly tailored and would force services to make subjective assessments as to minors of different ages with the predictable tendency of "burdening substantially more speech than necessary." *Id.* at 28-29. It further held section 31(b)(2) and (b)(3) failed narrow tailoring because they are not limited to preventing minors from receiving "information deemed harmful" (even if that were regulable) but also apply to beneficial targeted content. *Id.* at 29-31. Nor was the Court persuaded the State had a legitimate interest in preventing the dissemination of protected but "unsolicited content." *Id.* at 30-31. And section 31(b)(4) failed scrutiny, the Court held, because the State presented no evidence that it materially alleviated any real harm. *Id.* at 31-32; *see also, e.g.*, *DoorDash, Inc. v. City of N.Y.*, --- F. Supp. 3d ----, 2024 WL 4276245, at *8-9, *13-15 (S.D.N.Y. Sept. 24, 2024) (enjoining ordinance on its face under *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) that similarly "restricts how [delivery apps] can use the customer data they collect").

Any hypothetical application of these provisions to *other* business activities—including the restriction on collecting or selling personal information for other purposes—is beyond the "reach" of NetChoice's facial challenge, *John Doe #1*, 561 U.S. at 194, and NetChoice does not seek relief from these applications. *See Citizens United*, 558 U.S. at 331. Moreover, such applications are immaterial to the facial analysis because they duplicate obligations imposed by the CPRA, CCPA, and COPPA. *See supra*, p. 4-5; *see Garcia v. City of L.A.*, 11 F.4th 1113, 1119 n.7 (9th Cir. 2021) (a mandate or prohibition "that is independently authorized by a legal provision or doctrine other than the challenged law is thus not relevant to that law's facial constitutionality") (citing *City of L.A. v. Patel*, 576 U.S. 409, 418-19 (2015)). Excluding these hypotheticals and

16

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

considering only the challenged prohibitions that these provisions "independently authorize[]," *Garcia*, 11 F.4th at 1119 n.7, the law's effect is to regulate the use of data to deliver content.

Since these provisions have no legitimate sweep within this range, they are facially invalid to the extent NetChoice challenges them. *Moody*, 144 S. Ct. at 2397.

### 3. "Dark pattern" restriction (challenged as to specific applications)

The "dark pattern" restriction prohibits services from using so-called "dark patterns" to "lead" minors to provide more data than "reasonably expected," or to "take any action" the provider should know "is materially detrimental" to the minor's "well-being." § 31(b)(7). NetChoice seeks facial relief from this restriction only insofar as it "applies to covered services' use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize content." Am. Compl., Prayer ¶ 8. The unconstitutional applications of this requirement within that scope vastly outweigh any legitimate sweep, and so the requirement is facially invalid.

This Court previously found that the "dark pattern" provision regulates speech by restricting how covered services "design" the interfaces they use—like alerts, pop-ups, autoplay thumbnails, and unpaginated continuous content feeds—to present and organize information. ECF 74 at 11-13, 32; *see NetChoice*, 113 F.4th at 1123 n.8 (noting these examples). It then held each of the provision's specific prohibitions invalid under even intermediate scrutiny—finding vague and overbroad the prohibition on design choices that "lead or encourage" minors to "take any action that the business knows, or has reason to know, is materially detrimental" to their well-being. *Id.* at 34; *see also id.* (noting chilling effect arising from the "lack of objective standard" as to what constitutes "materially detrimental" content and the imposition of constructive knowledge ("has reason to know") that could be used to impose retroactive liability). *Id.*

This holding was manifestly correct, and the Ninth Circuit has not disturbed it. Any application of § 31(b)(7) restricts speech by regulating how content may be displayed "through features distinctive to the medium." *Brown*, 564 U.S. at 790 (speech protections "do not vary" despite changes in "ever-advancing" technology). Despite the label "dark patterns," this term encompasses commonplace publishing features that simplify and improve user experience, such as "autoplay" and "newsfeed" functions that recommend personalized content. *See* Radesky Decl.

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

¶¶ 49, 55; Egelman Decl. (ECF ¶ 51-1) n.81; *see also NetChoice*, 113 F.4th at 1123 n.8 (same). *Moody* reaffirmed that the First Amendment protects such "expressive choices" about "how the display" of content "will be ordered and organized." 144 S. Ct. at 2394-95, 2397-98, 2406. And a Utah federal court considering analogous restrictions found no evidence that designs like "seamless pagination, autoplay, and push notification[s]" "'foster 'over-indulgence' and 'user addiction'" harmful to minors' well-being, nor any evidence that restricting these design choices "will meaningfully reduce the amount of time" young people spend online or "alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease." *Reyes*, 2024 WL 4135626, at *15 (restriction facially invalid under *Moody*).

NetChoice does not seek relief from aspects of this restriction that prohibit "dark patterns" used to deceive minors into providing personal information or forgo privacy protections. *See* Am. Compl., Prayer ¶ 8; *John Doe #1*, 561 U.S. at 194; *cf. NetChoice*, 113 F.4th at 1123 (positing applications to *unprotected* deceptive speech). These other applications are in any event "irrelevant" to any facial challenge under *Garcia*, 11 F.4th at 1119 n.7, and *Patel*, 576 U.S. at 418-19, because California law already prohibits such deceptive conduct. *See* Cal. Civil Code § 1798.140(h) (prohibiting using deceptive dark patterns to obtain waiver of privacy protections); *id.* § 1798.185(a)(20)(C)(iii) (to obtain consent to data collection); 11 Cal. Code Regs. §§ 7004(b)-(c) (to obtain consent to share personal information); *see also* Cal. Bus. & Profs. Code § 17200 (prohibiting unfair or deceptive business practices); Cal. Civil Code § 1770 (prohibiting use of deceptive practice in the offer of services). The "dark pattern" restriction is thus facially invalid under the First Amendment to the extent NetChoice challenges it because—in "every case," *Ams. for Prosperity*, 594 U.S. at 618—it "suppresses expression out of concern for its likely communicative impact" upon a particular audience. *Eichman*, 496 U.S. at 317-18 (flag-burning law subject to and failed strict scrutiny for this reason) (citing *Boos*, 485 U.S. at 321).

The State's claimed interest in young people's well-being does not give it license to restrict "catchy," attention-grabbing designs because they are "too persuasive." *Sorrell*, 564 U.S. at 578 (no grounds "to quiet the speech or to burden its messengers" on this basis). All speech "invites" an audience to engage, and "[t]he better it is, the more interactive" and engaging it becomes.

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Brown*, 564 U.S. at 798. The State can no more regulate authors of young-adult novels for organizing their works into punchy chapters, showrunners of teen dramas for ending episodes with cliffhangers, or magazine publishers for placing teasers on the front page, than they can restrict online services from presenting information in ways designed to promote engagement through the distinctive features of online media. *Id.* at 790, 798. Nor has the State presented evidence that restricting "materially detrimental" design choices is narrowly tailored to actually advance an interest in youth well-being. *See also Reyes*, 2024 WL 4135626, at *15; Ferguson Decl. ¶¶ 10-40. As the Court found, ECF 74 at 32-34, the predictable result of this restriction will be broad self-censorship. *See also, e.g.*, Roin Decl. ¶¶ 11-16; Cairella Decl. ¶¶ 2, 6, 11; Masnick Decl. ¶¶ 2, 8, 15; Paolucci Decl. ¶ 6.

Since application of § 31(b)(7) to the organization of protected content is unconstitutional in every case, the provision has no legitimate sweep as to such design choices and is thus facially invalid to the extent of that reach. *Moody*, 144 S. Ct. at 2397.

### 4. Age-estimation mandate (challenged as to all applications)

The age-estimation mandate requires covered services to "estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." § 31(a)(5). The application of this mandate is unconstitutional in virtually every application, rendering it facially invalid under *Moody*.

Critically, the age-estimation requirement would effectively "prevent both children and adults from accessing" content protected by the First Amendment. ECF 74 at 15; *see also* Goldman Br. (ECF 34-1) at 2-10. This is the case because: *First*, many online services regulated by the Act provide access to information. *See* Cal. Civil Code §§ 1798.99.30(b)(4), (5). *Second,* an overwhelming amount of that information is protected by the First Amendment. *See, e.g.*, Gossett Decl. Exs. 6, 7, 8 (less than 1% of content on some large services visited by minors is unprotected or harmful); *see also* CCIA Br. 7; NYT Br. 2-3. *Third,* adjusting "data protections," as the term is used in the age-estimation mandate, requires addressing "risks that arise from the data management practices" of a covered service, which in turn "require[s] consideration of content or proxies for

content." *NetChoice*, 113 F.4th at 1118 (interpreting § 30(b)(2), which uses the same term as § 31(a)(5), by reference to § 31(a)(1)(B)). *Fourth*, the law would require these services *either* to estimate users' ages and to modify practices based on the user's age, *or* to adjust the content and protections available for *all* users.

Either option would necessarily place "restrictions on the availability" of information, and thus regulates speech. *Sorrell*, 564 U.S. at 571; *see also, e.g.*, Paolucci Supp. Decl. ¶¶ 6-8; Masnick Supp. Decl. ¶¶ 7-8 (describing continuing burdens of age estimation).

Services that respond to the age-estimation requirement by estimating their users' ages—requiring even adults to relinquish personal information—would create an unjustified barrier to all users' protected speech. *See Ashcroft v. ACLU,* 542 U.S. 656, 667, 673 (2004) (affirming on facial challenge injunction of statute that required services to block content or verify user's age); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008) (permanent injunction of same). The alternative—applying the Regulatory Provisions "to all consumers"—would have "the inevitable effect" of "reduc[ing] the adult population … to reading only what is fit for children," suppressing excessive amounts of speech. ECF 74 at 24 (citation omitted); *see Moody*, 144 S. Ct. at 2403 (strict scrutiny is triggered when a provider is forced to "alter … the mix of speech it wants to convey").

This choice between unconstitutional content-based limitations on speech mars almost *any* possible application of § 31(a)(5), rendering it unconstitutional "in every case." *Ams. for Prosperity*, 594 U.S. at 618. California may not "torch a large segment of the Internet" to prevent discrete potential risks to children. *Reno*, 521 U.S. 882.

### C. The Individual Provisions Are Vague.

On top of being facially invalid on overbreadth grounds, *see supra* § IV.B, each of the challenged provisions is unconstitutionally vague under the First Amendment.

Vague laws "trap the innocent by not providing fair warning" of proscribed conduct, and invite "arbitrary and discriminatory application" by placing compliance at the whim of "ad hoc and subjective" regulators. *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) (citations omitted). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Laws regulating expression face an even "more stringent" test, *Holder v. Humanitarian L. Project,* 561 U.S. 1, 19 (2010) (citation omitted), because they cause speakers "to steer far wider of the unlawful zone," *Butcher v. Knudsen,* 38 F.4th 1163, 1169 (9th Cir. 2022) (citation omitted). Such laws must be drawn with "[p]recision," *NAACP v. Button*, 371 U.S. 415, 433, 438 (1963), and courts should "not hesitate[]" to invalidate them if they are not. *Butcher,* 38 F.4th at 1169.

Here, each of the Individual Provisions—and others that are similar to them, *see, e.g.*, § 31(a)(6)—is impermissibly vague.

**Policy enforcement.** This mandate requires covered services to enforce their own policies, *see* § 31(a)(9), but content policies are "necessarily subjective." *Hunt v. City of L.A.,* 601 F. Supp. 2d 1158, 1172 (C.D. Cal. 2009), *aff'd*, 638 F.3d 703 (9th Cir. 2011). Reddit's Content Policy states that Reddit "is a place for creating community and belonging, not for attacking marginalized or vulnerable groups of people" and so users who "promote hate based on identity of vulnerability will be banned." Kumar Decl. Ex. 3. Truth Social, in contrast, allows users to report certain types of content—such as "content that depicts violence or threat of violence"—but expresses a "preference" that "the removal of users or user-provided content be kept to the absolute minimum." *Id.* Ex. 4. The *New York Times* requires the "use [of] respectful language" and tells users (among other things) to "[d]ebate, but don't attack." *Id.* Ex. 5. The *Washington Post* prohibits content that is "hateful," "contains advertising," is "in poor taste," or "is otherwise objectionable." *Id.* Ex. 6. Section 31(a)(9) co-opts these private policies and imbues their open-ended subjective terms with the force of law. Who is to say that what Reddit deems an "attack" on a "marginalized" person is the same as some government regulator? If the *New York Times* publishes content criticizing the California Attorney General for draconian censorship, will the California Attorney General deem that "respectful"? Will his successor? Services cannot know, and the State will have discretion "to act in an arbitrary and discriminatory manner … and still be completely within the scope of" the law. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988) (cleaned up).

**Information-use restrictions.** These provisions rely on the phrases "material detriment," "best interests," and "physical health, mental health, and well-being," which are open-ended and

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

subjective, particularly because they apply to any single minor. *See* § 31 (applying standards to "a child"); *NetChoice*, 113 F.4th at 1120 (noting vagueness of "material detriment to children"). Reasonable minds can disagree as to what types of information and ideas are detrimental to a young person's "best interests" or "well-being," and under our Constitution's system of ordered liberty, those judgments belong to individual families according to their values. *See Brown*, 564 U.S. at 794-95. Bestowing them on the government or intermediaries invites haphazard and discriminatory "ad hoc" enforcement, *Foti v. City of Menlo Park,* 146 F.3d 629, 638-39 (9th Cir. 1998), leaving covered services no way to ensure that they are complying with the law. *See Mukasey*, 534 F.3d at 205 (services "forced to guess" what "harmful to minors" means); *Free Speech Coal. v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999) (similar), *aff'd*, 535 U.S. 234 (2002). Unrebutted evidence illustrates the "predictable tendency" for such uncertainty to generate broad chilling effects. *Counterman v. Colorado,* 600 U.S. 66, 77-78 (2023); *see* Roin Decl. ¶¶ 11-17; Cairella Decl. ¶¶ 18-19; Masnick Decl. ¶ 15; Paolucci Decl. ¶¶ 16-19; Szabo Decl. ¶¶ 6-7.

> *Dark patterns.* The focus of NetChoice's challenge to § 31(b)(7) is its prohibition of design choices that "lead or encourage" minors to "take any action that the business knows, or has reason to know, is materially detrimental" to their well-being. This Court previously stressed how vague this requirement is—though without using that magic word, as the Court enjoined the provision on other grounds. *See* ECF 74 at 34. The Court specifically noted that it was "troubled by the 'has reason to know' language in the Act, given the lack of objective standard regarding what content is materially detrimental to a child's well-being," and credited evidence of the predictable chilling effect caused by those "uncertainties." *Id.* To the extent this provision is not enjoined on different grounds, it should be enjoined on vagueness grounds. *See Counterman*, 600 U.S. at 77-78 (similar absence of scienter amplified vague statute's unconstitutionality).

> *Age estimation.* Businesses must estimate age with a "reasonable level of certainty appropriate to the risks." § 31(a)(5). This is impermissibly vague. How does a service assess the risk that its content will "potentially" cause some kind of risk to some user under 18? *Cf.* Roin Decl. ¶¶ 11-17; Cairella Decl. ¶¶ 18-19; Masnick Decl. ¶ 15; Paolucci Decl. ¶¶ 16-19; Szabo Decl. ¶¶ 6-7; *see NetChoice*, 113 F.4th at 1120 (Act's phrase "material detriment to children" is vague).

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

What is a "reasonable" level of certainty "appropriate" to that risk? Services cannot know. Some will err on the side of stricter screening. *See* Cairella Decl. ¶ 12. Others will consider barring access to minors altogether. *See* NYT Br. 8-9 (law may limit minors' access to *New York Times*). The First Amendment holds that such vague mandates, "susceptible to many different interpretations," *United States v. Hall,* 912 F.3d 1224, 1227 (9th Cir. 2019), are facially invalid because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). *See, e.g.*, *Mukasey,* 534 F.3d at 205 (COPA facially invalid in part because "publisher[s] will be forced to guess" what content is "harmful to minors").

### D. The Individual Provisions Violate The First Amendment As Applied To NetChoice's Members.

For the same reasons the challenged provisions are facially invalid, they are also invalid as applied to NetChoice's members. *See, e.g.*, Roin Decl. ¶¶ 6-22, 24-25 (describing how challenged provisions will interfere with Goodreads' speech); Cairella Decl. ¶¶ 4-22 (same for IMDb). The Court may award such relief. *See Holder*, 561 U.S. at 15-16 (pre-enforcement as-applied First Amendment challenges are justiciable); *e.g.*, *CCIA v. Paxton*, 2024 WL 4051786, at *9 (W.D. Tex. Aug. 30, 2024) (NetChoice has associational standing to pursue such challenges in the alternative).

## V. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE FROM THE REGULATORY PROVISIONS OF THE ACT.

Irrespective of the Court's views about the validity of NetChoice's substantive challenges to the Regulatory Provisions, the Court should hold them invalid because the now-enjoined DPIA provisions, § 35(c), cannot be severed from any portion of the Act except § 32, which created the Working Group but imposes no substantive obligations on regulated entities.

An invalid provision can be severed "if, and only if, it is 'grammatically, functionally and volitionally separable'" from the statute's valid remainder. *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal. 4th 585, 613 (1999) (citation omitted). All three severability criteria must be met. *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 819 (9th Cir. 2013); *People v. Library One, Inc.*, 229 Cal. App. 3d 973, 988 (1991). Here, the Act's invalidated DPIA provisions are neither volitionally nor functionally severable from the Regulatory Provisions.

### A. The DPIA Provisions Are Not Volitionally Severable Because They Were Critical To The Act's Passage.

The invalidated DPIA provisions are not volitionally severable. Invalid language is volitionally severable only if it was "not of critical importance to the measure's enactment." *Jevne v. Superior Ct.*, 35 Cal. 4th 935, 961 (2005) (quoting *Hotel Emps.*, 21 Cal. 4th at 613). Courts ask whether the valid portion "would have been adopted by the legislative body had [it] foreseen" the statute's partial invalidation. *People v. Nguyen*, 222 Cal. App. 4th 1168, 1192 (2014). The court must rule "with confidence" that the legislature was "sufficiently focused" on the valid parts that it would have "separately considered and adopted them in absence of the invalid provisions." *Acosta*, 718 F.3d at 817-18 (citation omitted). Any doubt precludes severance. *Id.* at 819.

Here, the DPIA provisions fail the volitional-severability test for two reasons.

*First*, the plain text of the Act counsels against severance. The legislature's decision not to adopt a severability clause demonstrates that the legislature intended the Act's components to "operate together or not at all." *In re Reyes*, 910 F.2d 611, 613 (9th Cir. 1990). The plain text also directs regulators to look to guidance in the U.K. for interpretive assistance. *See* AB 2273, Findings and Decls. §§ 1(d)-(e). That guidance contemplates self-evaluation and compliance-focused enforcement efforts in which monetary penalties are a last resort. *See supra* p. 12. Nothing in the Act's language or history suggests that the legislature "would have" preferred instead to enact a "truncated version" of AB 2273 that could never operate as intended. *Acosta*, 718 F.3d at 818-19. Indeed, the State's decision to import integrated statutory language from the U.K. in bulk—despite the First Amendment, no less—underscores its intent to have these provisions operate together as part of a comprehensive regulatory regime.

*Second*, legislative history shows that the legislature would not have passed the law without the DPIA safe harbor. After an earlier version of the Act was shelved in a "suspense file" (where legislation dies without a vote), *see* Cal. State Senate Comm. on Appropriations, Analysis Addendum: Suspense File, AB 2273 (Aug. 11, 2022), its sponsors tried to resuscitate it by amending it to include a 45-day cure provision to ensure that the bill's provisions shoved online services into proactively censoring content, not by imposing strict liability. *Id.* When that amendment failed to win over the opposition, the bill was further amended on the Senate floor to

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

enlarge the cure period to the 90-day period that the legislature approved. *See* Cal. State Senate, Floor Analysis on Third Reading, AB 2273 (Aug. 22, 2022). The fact that the legislature actually considered—but did not adopt—the bill without the cure provision demonstrates that the legislature *would not* have adopted that version. *See Mendoza v. California*, 149 Cal. App. 4th 1034, 1064 (2007) (holding unconstitutional provisions not severable where legislature considered but declined to adopt alternative version of bill).

Statements in floor debates and by the bill's author confirm the safe harbor provision was crucial to the Act's ultimate passage. Assemblymember Wicks highlighted the cure provision's safe harbor when presenting the final version of the bill for a vote. *See* Transcript, Assembly Floor Session, AB 2273 (Aug. 30, 2022) (calling attention to amendments that "ensure businesses in substantial compliance with the Age-Appropriate Design Code have an opportunity to remedy violations prior to being subject to civil penalties") (attached as Gossett Decl. Ex. 9). Severability is not justified in these circumstances. *See Cultiva La Salud v. California*, 89 Cal. App. 5th 868, 886 (2023) (declining to sever unconstitutional portion of penalty provision where the remaining portions would penalize conduct the legislature never intended to punish).

### B. The DPIA Provisions Are Not Functionally Severable Because They Effect The Act's Focus On Compliance.

The DPIA provisions are also not functionally severable. An invalid provision is "functionally" severable only when it is "not necessary to the measure's operation and purpose." *Hotel Emps.*, 21 Cal. 4th at 613. That analysis turns on "the intended function of [the] particular statutory scheme." *Barlow v. Davis*, 72 Cal. App. 4th 1258, 1267 (1999). Removing the unconstitutional DPIA provisions forecloses the Act's surviving operative language from operating as the legislature intended.

The legislature intended to create a compliance-based regime enforced primarily through internal compliance bureaucracies, not strict liability. The Act thus would have required companies not only to perform a self-analysis, but to "create a timed plan to mitigate or eliminate" any identified risks. § 31(a)(2). And it would have created a safe-harbor, insulating companies from liability if they cure any noticed violations. § 35(c).

It is indisputable that this is the Act's central method of operation. Before the Ninth Circuit,

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the State explained that "[t]he role of the DPIA provision is to incentivize businesses to be *proactive* about their management of children's data by offering businesses that complete the DPIA a 90-day period to cure violations of the Act without penalty." State's App. Br. at 34 (emphasis added); *see also* First PI Opp. (ECF 51) at 14, 22, 25 (similarly underscoring the centrality of the cure provision's incentive structure). The Act's co-author emphasized that the purpose of the DPIA provision is to "bring[] [covered services] into the fold of self-regulation, right? Of them thinking through, okay, how am I as a company going to be a good actor in this space when we know we have these challenges. And I think that's also a *different way of thinking about the regulation*." Transcript, *Conversation with California Assemblymember Buffy Wicks*, Husch Blackwell, at 8 (Mar. 7, 2023) (emphasis added) (attached as Gossett Decl. Ex. 10). She explained that the Act is not intended to catch and penalize violations, but to bring businesses that violate the Act into compliance: "[T]he goal of this provision is compliance. You know, we want companies to do the right thing and to adhere to the law. Because that's how we actually protect kids online …. [I]t's not punitive." *Id.* at 8-9. "[I]f [companies] *continue* to fail, … there are penalties and the attorney general has the ability to administer those and go after them. *But that's not the goal of the bill, the goal of the bill is to get … companies, to comply* and to keep our kids safe online." *Id.* at 9 (emphasis added). And the Act relies on the U.K. regulator's application of the U.K. Age-Appropriate Design Code, a standard the U.K. government wields to pressure businesses into changing their practices, not a rule whose violation triggers liability. *See* Keaney Decl. (ECF 51-3) ¶¶ 27, 30, 67; *id.* Ex. A at 13 (describing U.K. regulatory enforcement environment generally); *see also* WARD FARNSWORTH, THE LEGAL ANALYST 164 (2007) (contrasting rules and standards).

Stripping these provisions out would mark a foundational shift in the Act's function and focus. Severance is thus improper. *See Bd. of Osteopathic Exam'rs v. Bd. of Med. Exam'rs*, 53 Cal. App. 3d 78, 85 (1975) (severance may not "accomplish a purpose which the lawmaking power never intended") (citation omitted); *Metromedia, Inc. v. City of San Diego*, 32 Cal. 3d 180, 191 (1982) (severance inappropriate where it would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals").

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

## VI.    NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS.

### A.    Section 230 Preemption

Enacted to bolster First Amendment protections, Section 230 exists to encourage online services to exercise editorial rights over the third-party content they publish without fear they will face liability for moderating content imperfectly. *See Fair Hous. Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (Section 230 seeks "to spare interactive computer services … grim choice" "between taking responsibility for all messages and deleting no messages at all"). Section 230(c)(1) thus preempts state laws that impose liability on (1) an interactive computer service (2) in a way that treats it as the publisher or speaker (3) of information provided by a third-party. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009). Section 230 authorizes pre-enforcement relief. *See, e.g.*, *CCIA*, 2024 WL 4051786, at \*19; *Airbnb, Inc. v. City of Boston,* 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at \*6 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1274 (W.D. Wash. 2012).

Section 230 facially preempts portions of the challenged provisions. Section 230(c)(1) preempts the policy-enforcement mandate, § 31(a)(9), to the extent it applies to content policies because any such applications would necessarily impose liability on interactive computer services based on their decisions to publish or not publish third-party content. *See, e.g.*, *CCIA*, 2024 WL 4051786, at \*19 (Section 230 preempted Texas law regulating "decisions relating to the monitoring, screening, and deletion of content"); *Airbnb*, 386 F. Supp. 3d at 123 n.11 (Section 230 preempted law requiring services "to enforce local laws" regulating user content). Section 31(a)(9) thus "stands as an obstacle," *Crosby v. NFTC*, 530 U.S. 363, 373 (2000), to congressional policy simultaneously encouraging the widest possible dissemination of online content and active enforcement of private editorial standards. "Congress sought to … allow[]" interactive computer services "to perform some editing on user-generated content without … becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Roommates.com*, 521 F.3d at 1163. It thus enacted Section 230 precisely "to remove the disincentives to self regulation" posed by § 31(a)(9). *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

Section 230(c)(1) likewise facially preempts §§ 31(b)(1), (3), (4), and (7) to the extent those prohibitions impose liability upon the publication of third-party content that is "materially detrimental to" or not "in the best interest" of minors. *See CCIA*, 2024 WL 4051786, at *19 (preempting law that imposed liability based on "the type of content a site displays"). Any such application imposes liability on interactive computer services for their decisions to publish third-party content and is thus preempted. *See Barnes*, 570 F.3d at 1101-02.

**B.     COPPA Preemption.**

The Individual Provisions are also invalid with respect to minors under 13 because they conflict with, and therefore are preempted by, COPPA. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1120-21 (D.N.M. 2020); *H.K. ex rel. Farwell v. Google LLC*, 595 F. Supp. 3d 702, 711 (C.D. Ill. 2022). Though the Court (ECF 74 at 39-40) questioned whether the Act is truly "inconsistent with" COPPA, a comparison of the requirements in the Individual Provisions and COPPA proves it is with respect to minors under 13.

COPPA preempts state laws that impose "contradictory … requirements" or "stand as obstacles to federal objectives." *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023). Central to COPPA's operation is the requirement that a covered service actually know or intend to reach a user under 13 before its regulations apply to their discrete interactions. *See* 15 U.S.C. § 6502(a)(1). The Act expressly eschews that standard, § 29, categorically applying the Individual Provisions more broadly to any service "likely to be accessed by children." §§ 30(b)(4), 31(a)-(b). COPPA also empowers parents to decide what their children can access online; the Individual Provisions strip parents of that power. The Individual Provisions are thus not "parallel to" and do not "proscribe the same conduct" as COPPA. *Jones*, 73 F.4th at 644.

**C.     The Dormant Commerce Clause.**

The Commerce Clause denies states power to "directly control[]" interstate commerce. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (citations omitted). As the Supreme Court recently explained a regulation violates the Constitution's "horizontal separation of powers" if its practical effect reaches activities "wholly outside" the State's borders. *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v.*

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*MITE Corp.*, 457 U.S. 624, 641-43 (1982)). The Individual Provisions do exactly that.

The law's application to "residents of California" underscores the issue: Before a covered provider offers service, it must discern if a user is a California resident and restrict its services accordingly, even if that user is out of state. Indeed, this Court observed during the first preliminary injunction hearing that the Act thus "may cause … providers to change their practices nationwide." ECF 66 at 90. That is unconstitutional. *See Christies*, 784 F.3d at 1323 (law invalid for regulating conduct with "no necessary connection with the state other than the residency of the seller"); *cf.* Cal. Civ. Code § 1798.145(a)(7) (CCPA exempts activity "wholly outside of California").

Courts since *Ross* have continued to apply this rule in facial challenges. *See, e.g.*, *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1256 (S.D. Cal. 2024) (state law "directly affecting commercial transactions that take place entirely outside of the state's borders plainly contravenes the dormant Commerce Clause") (cleaned up); *Ass'n for Accessible Meds. v. Ellison*, 704 F. Supp. 3d 947, 953 (D. Minn. 2023) ("[*Ross*] did not change the rule that a state may not directly regulate transactions that take place wholly outside the state and have no connection to it."). It applies here.

## VII.   THE OTHER PRELIMINARY INJUNCTION FACTORS ARE MET.

The remaining preliminary injunction factors are also satisfied.

*First*, there is "no difficulty finding that NetChoice" will suffer irreparable harm absent injunctive relief. ECF 74 at 41-42. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Even the "threat of enforcement" that results in a "chill on . . . free speech rights … constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Because NetChoice has "demonstrat[ed] the existence of a colorable First Amendment claim," *CTIA v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019), it has established irreparable injury.

NetChoice members also face irreparable harm from "being forced to comply with an unconstitutional law or else face financial injury or enforcement action." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017); *Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1058-59 (9th Cir. 2009). NetChoice "presents evidence that businesses already are

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

expending time and funds preparing for enforcement of the [Act]," and requiring them "to proceed with such preparations without knowing whether [the Challenged Provisions are] valid 'would impose a palpable and considerable hardship' on them." ECF 74 at 41 (citing declarations).

*Second*, the equities and the public interest support an injunction. When the government is a party, the "balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020). NetChoice has shown the Act violates the First Amendment, so equity and the public interest support an injunction. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (equity and the public interest support constitutional rights); *Zepeda v. I.N.S.,* 753 F.2d 719, 727 (9th Cir. 1983) (no interest in enforcement of unconstitutional laws).

## VIII.   CONCLUSION

NetChoice respectfully requests an order enjoining the Regulatory Provisions, and any other provisions the Court deems inseverable from the invalid portions of the Act.

DATED: November 1, 2024                   DAVIS WRIGHT TREMAINE LLP

By: */s/ Ambika Kumar*
         Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice

NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899