AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
  davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
  meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>             Plaintiff,<br><br>        v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>             Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Date:     January 23, 2025<br>Time:    9:00 AM<br>Dept.:    Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

1

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Bartlett Cleland, declare:

1. **Identity of declarant.** I am General Counsel and Director of Strategic Initiatives of Plaintiff NetChoice, LLC d/b/a NetChoice. In addition to providing legal counsel to NetChoice, I coordinate our public policy efforts before legislative bodies, courts, and government agencies. I make this declaration from personal knowledge and a review of NetChoice's records kept in the ordinary course of business.

2. Carl Szabo, my predecessor as General Counsel of NetChoice, provided a declaration in support of NetChoice's first motion to enjoin the California Age-Appropriate Design Code ("Act"), filed on February 17, 2023. Declaration of Carl Szabo ("Szabo Decl."), ECF 29-21. I understand that, in response to that motion, this Court enjoined the entirety of the Act, and that the Ninth Circuit affirmed that injunction with respect to the Act's Data Protection Impact Assessment (DPIA) requirements, Cal. Civil Code §§ 1798.99.31(a)(1)-(4) and "other provisions that were not grammatically severable from" those requirements. I provide this declaration in support of NetChoice's concurrently-filed motion for second preliminary injunction, which challenges Cal. Civil Code §§ 1798.99.31(a)(5), .31(a)(9), .31(b)(1)-(4), and .31(b)(7) (the "Challenged Provisions").

3. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. We are dedicated to preserving the internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own content publication, personalization, and moderation decisions, they create diverse experiences and choices. We strongly believe in giving users and online service providers autonomy in how they use the internet.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the internet, while minimizing burdens on businesses, to help make the internet more accessible and useful for both businesses and consumers. Our members include a broad array of online services: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway,

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

2

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1   Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop,
2   Pinterest, PrizePicks, Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, X,
3   VRBO, VSBLTY, Waymo, Wing, and Yahoo!.

4         5.   The Act implicates several of NetChoice's members because—although the statutory language is vague and ambiguous—those members provide services, products, or features likely to be accessed by individuals under age 18. And by singling out such providers, the entire Act—including the Challenged Provisions—operates much like a tax that punishes our members for publishing a particular mix of content the State considers attractive to young people.

      6.   NetChoice is intimately familiar with the content structures and business models that many online businesses—including our members—use and rely on. This familiarity has led us to conclude that the Act would irreparably harm our members and is fundamentally inconsistent with their business models. Should it be permitted to take effect, the Act would have long-term, adverse expressive effects on our members' services by dictating the content they publish, moderate, and tailor to users; coercing them into adopting privacy-invasive age verification technology that would in any event largely be unworkable, or otherwise redesigning their services to be universally child friendly (however that is defined by the State of California); and negatively affecting our members' reputations with their users, advertisers, investors, and others. The Act would also expose our members to stiff civil penalties and enforcement actions brought by the California Attorney General should they not comply with the law's vague dictates to the State's satisfaction. It is no exaggeration to say that the Act threatens not just our members and their services, but also the internet as we know it.

      7.   ***"Potentially harmful" content.*** Particularly onerous are the Act's now-enjoined DPIA provisions, which require businesses to evaluate and mitigate the risk that any new or existing "potentially harmful content" will reach users under age 18, and deliver those assessments to the California Attorney General on demand. If they had been permitted to stand, the DPIA requirements would have required members to vet almost all content they publish, which could range into millions or even billions of items posted each day. As the Court recognized, these requirements severely impinge on our members' ability to exercise editorial discretion over the

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

3

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  content they publish.  In practical effect, the vagueness and breadth of these requirements means
2  that NetChoice members would have been chilled from freely publishing a diverse and rich range
3  of content, so as to avoid the risk of liability if the State deems that content "potentially harmful."
4  While the DPIA requirements have been enjoined, the Challenged Provisions remain in effect, and
5  those too injure everyone that benefits from a dynamic internet, including NetChoice's members
6  and those members' users.

7  8. ***Content policy enforcement mandate.***  As Mr. Szabo explained in his declaration,
8  NetChoice's members maintain unique, business-specific content policies and guidelines
9  governing the type of content they allow users to post to their websites, reflecting those businesses'
10 different values.  *See* Szabo Decl. ¶¶ 8-12.  In this way, content moderation reflects a significant
11 means by which online services express themselves and the types of communities they are seeking
12 to create.  I understand that § 1798.99.31(a)(9) of the Act applies to these content policies by
13 requiring members to enforce these content polices, and by permitting the California Attorney
14 General to bring an enforcement action against NetChoice's members if he decides they have not
15 done so.  I also understand the Attorney General is in this lawsuit defending his power to bring
16 such actions against NetChoice's members.

17 9. This requirement would severely harm members' ability to exercise editorial
18 discretion over their services.  Determining whether user-posted content violates a company's rules
19 is a nuanced and subjective task for NetChoice's members, and users often disagree with how
20 companies choose to exercise editorial discretion.  Section .31(a)(9) would allow the Attorney
21 General to transform any such disagreement from users into a basis to seek civil penalties against
22 NetChoice's members.

23 10. Choices about whether to allow certain kinds of content involve editorial judgments
24 by our members—what speech they want to foster and what speech they wish to distance
25 themselves from.  In accordance with their individual content moderation policies, some of our
26 members already review massive amounts of content—including text, videos, audio, and images—
27 each day to make nuanced judgment calls on the type of content they wish to leave up or remove.
28 The volume of users and activity on our members' services is enormous.  Some have over a billion

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

4

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

users, with an accordingly huge amount of content uploaded daily. This content is posted from all over the globe and reflects a wide range of perspectives, identities, and norms. How our members approach content moderation decisions in turn shapes the type of online experience created for their users and advertisers.

11. There is no one-size-fits-all approach to content moderation, nor does it take place in a vacuum. Instead, moderation efforts entail a complex and dynamic set of interactions among a service's own norms, user preferences, and real-world events. They also involve a range of content moderation tools, including both human review and automated filtering (like algorithms) to handle higher volumes of content. Our members carefully titrate their content moderation efforts to curate communities and experiences consistent with their subjective values: A member might determine that content should be shown despite its controversial nature; that removal or de-prioritization of content is necessary; or that not only should content be removed but that the posting user should be suspended or banned from the service. Content moderation also involves context and service-specific decisions about how to arrange and display content, recommend content to users, and facilitate access to content. On some services, content moderation can even be user-driven, by granting users the option to decide whether they wish to avoid certain content. For example, some of our members permit users to block or mute other users or content marked with certain hashtags, or create lists containing terms or phrases they wish to avoid seeing on the service.

12. Being able to approach content moderation decisions with flexibility and discretion is essential for our members to strike a balance between addressing potentially objectionable content and preserving open and reliable access for users. NetChoice's members already dedicate substantial personnel, resources, and effort to content moderation. But these efforts are ever-changing and responsive to the often-unpredictable content that appears on their services each day. For this reason, our members have developed adaptable policies that simultaneously guide future moderation decisions and provide services with the agility to react to unexpected types of content or changed circumstances.

13. Under the Act, however, NetChoice members would be significantly constrained

5

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

in their ability to address content in the manner they see fit.  Our members would be inclined to drop certain content policies and rules that require significant flexibility to monitor, which in turn would deprive users of notice of the types of content that may be removed and deny our members the ability to fashion the tone and tenor of online discussions on their services.  The Act would also undermine our members' ability to modify content moderation rules rapidly in response to new developments, whether online or in the physical world.  By eliminating businesses' ability to make these sorts of particularized editorial judgments, the Act would irreparably harm members' ability to moderate, organize, curate, and otherwise prioritize their content within the unique circumstances in which it was posted.  Given the risk of civil liability, the law may also lead to our members abandoning content policies and community standards altogether, to avoid the risk of unpredictable and punitive penalties.

14.     While our members intend to continue moderating content as they currently do—case-by-case, without consideration of external pressures or what the State thinks their editorial policies should allow—section .31(a)(9) makes this risky.  If the Attorney General is allowed to enforce this provision against NetChoice's members, members will have to modify or second-guess their current approach to content moderation, and even consider abandoning posted content policies altogether, to avoid the risk of liability.

15.     *Use of algorithms and content personalization.*  As discussed in Mr. Szabo's declaration, the Act's restrictions and prohibitions on businesses using algorithms and "personal information" (which includes basic information about a user's interaction with a service), §§ 1798.99.31(b)(1)-(4) and (7), would irreparably harm our members' ability to conduct routine website operations (such as search, newsfeeds, and service improvements), provide tailored content to their users, and maintain the relationships with advertisers that sustain some of their services.  Our members routinely use algorithms that take into account users' preferences, website interaction history, and other information to provide personalized content recommendations, as well as personalized ads that allow many of our members to offer their services for free.  These recommendations are often a core feature of our members' services.

16.     These provisions of the Act empower the Attorney General to bring enforcement

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

6

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  actions against NetChoice's members if those companies continue to use this information to
2  recommend content to their users, or to advertise an opportunity to a minor user that, in the
3  Attorney General's view, is materially detrimental to the minor's well-being or not in the minor's
4  best interest—whatever that means and however the State defines it. This would fundamentally
5  undermine NetChoice's members' operations.

6  17. For example, the Act's prohibitions on "dark patterns" could—depending on how
7  that phrase is interpreted—extend to our members' commonplace use of algorithmic features that
8  order and shape content. Algorithms fundamentally structure our members' websites by
9  permitting them to retrieve and present information responsive to user requests; provide and
10 optimize personalized content recommendations to users; detect bot and spam activity; and serve
11 many other functional purposes. Given the vast amount of user-generated content our members
12 host online, some of our members also use algorithms to make moderation decisions and respond
13 quickly to objectionable content. Accordingly, restricting our members' use of algorithms would
14 significantly impair their ability to flag, remove, and deprioritize content, thereby *undermining*
15 those members' ability to enforce their content policies (as the Act would require). Curtailing
16 online businesses' ability to curate content through these algorithms would lead to irreparable
17 expressive and operational harms for our members.

18 18. The Act's restrictions on the use of information would also irreparably harm our
19 members by affecting their relationships with third parties, including advertisers. Many online
20 businesses, including our members, rely on advertising to survive and offer free or low-cost
21 content to users. Advertisers recognize the value of reaching a specific audience, and thus pay
22 more for targeted advertising. And users benefit from targeted advertising both by receiving
23 subsidized access to our members' services and by seeing more relevant advertising content. The
24 Act will interfere with our members' ability to sell targeted advertising and thereby jeopardize the
25 foundational business and operational model on which many of them rely. The restrictions will
26 also interfere with our members' ability to share information with other third parties on whom they
27 rely to support and enrich the services they offer, such as vendors for hosting, data analytics, and
28 other important operational services like spam and fraud detection, technical support, and customer

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

7

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  support services. The Act will thus require our members to redesign their services.

2        19.    While our members intend to continue offering the personalized content and
3  experiences that make their services valuable to their users, sections .31(b)(1)-(4) and (7) make
4  that risky. If the Attorney General is allowed to enforce these sections of the Act against our
5  members, those companies will have to consider altering the way they suggest and display content
6  to their users.

7        20.    ***Age estimation.*** In Mr. Szabo's declaration, he explained how the Act also
8  irreparably harms members by requiring services to "[e]stimate the age of child users with a
9  reasonable level of certainty" (§ 1798.99.31(a)(5))). Szabo Decl. ¶ 15. Even assuming the
10 technology to age verify accurately were available, this obligation would require many of our
11 members to fundamentally restructure their services by requiring verification of legal identity
12 before the services can be accessed. This would require our members to collect more personal
13 information from users, which many users will not want to provide, either because it is burdensome
14 and inconvenient to do so or because they object to providing such personal information (or both).
15 This will damage our members' relationships with their users, and is nearly certain to decrease the
16 number of users for many services (and thereby damage those services' ability to sell advertising).
17 Many of our members also welcome anonymous users as a matter of principle and as a vital feature
18 of the internet—a feature that the Act will dismantle.

19       21.    I want to clarify that the same problems with § 1798.99.31(a)(5) permeate across
20 many of the Act's other mandates and prohibitions. Specifically here, sections 1798.99.31(b)(1)-
21 (4) restrict how NetChoice's members may use or disseminate information received from their
22 users to provide their services, if those users are under the age of 18. Section 1798.99.31(b)(7)
23 likewise restricts how NetChoice's members may display content to their users under the age of
24 18. These restrictions apply whether or not members actually know a user is a minor. Accordingly,
25 no matter how those provisions are applied to our members, the only way members can be sure to
26 comply with these prohibitions without applying California's burdensome safe-for-minors
27 restrictions to all users is to somehow definitively identify which of their users are under 18—in
28 other words, these provisions effectively requires NetChoice's members to verify the ages of their

8

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

entire user base with perfect accuracy before allowing users to access their services. This is not something that our members can realistically achieve, and it is not something our members would even wish to do because it would invade all of their users' privacy and burden those users' access to our members' services.

22. **Effect of the Act on members' reputations.** For decades, our members have painstakingly built and nurtured relationships with their users, investors, and advertisers. These relationships are based on each member's proven ability to deliver innovative, high-quality services. If the Act is permitted to go into effect, our members will no longer be able to provide the same quality of service that users and others have come to expect. Whether from the law's requirements that members effectively purge their websites of any potentially harmful content, from its restrictions on content personalization, from its prohibitions on our members' use of routine algorithmic operations to enrich users' experiences, or from any number of the law's other burdensome and censorial obligations, the result is clear: The Act will require our members to create, at best, a highly degraded version of their services. In turn, our members' carefully cultivated reputations and user relationships will deteriorate, leading to an inevitable dampening of investor and advertiser support in a time when the technology industry is already suffering economic downturn. Accordingly, the Act will inflict immediate and irreparable long-term, and likely devastating reputational and financial harm on our members.

23. **Absence of cure provision.** I understand that, because of this Court's prior preliminary injunction, the State no longer may enforce the DPIA provisions, including the provision that gave regulated services a chance to cure any alleged violations of the law's other provisions if those services maintained a compliant DPIA report. Eliminating the cure option changes the Act's functional effect on NetChoice's members. Whereas before the Act conscripted our members into working closely with government regulators to censor content *proactively* (albeit in violation of the First Amendment), the Act will now primarily operate *retroactively* to punish regulated services for conduct that the Attorney General believes violates the Act. Although I believe the law violates NetChoice's members' constitutional rights whether it operates proactively or retroactively, the cure provision at least gave these companies a route to avoid the

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

9

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

law's severe financial penalties. Now, even if members surrender their rights and self-censor, they may still be subject to enforcement actions and the potential of catastrophic penalty awards without warning or any grace period. This amplifies the Act's chilling effects and further alters the way members will have to address the law's obligations.

24. ***Preparing for the Act.*** Although the State has stayed enforcement of the Act's non-enjoined provisions until March 6, 2025, NetChoice's members have already started preparing for compliance with those provisions, including by spending significant resources and preparing for fundamental changes to their services. NetChoice's members must decide whether they want to (a) restrict their services to individuals over 18 (and attempt to develop a reliable way of verifying that users are in fact over 18); or (b) redesign the entirety of their services to comply with the Act's child-appropriate requirements. They are already beginning to incur enormous expense and expend vast amounts of time on, among other tasks: consulting experts to determine how to vet and categorize their existing and forthcoming content as "potentially harmful"; engaging in efforts to determine whether they can enforce their content policies to the State's satisfaction; redesigning and finding substitutes for their essential algorithmic services; and reevaluating their relationships with advertisers and other third parties. At minimum, efforts to comply with the Act will require our members to hire an army of additional personnel, including content reviewers, content moderators, compliance officers, children's experts, privacy experts, customer support services, and legal counsel. These compliance efforts will not only impose staggering and unsustainable costs on our services; they will also derail our members from focusing on supporting expressive content online. Moreover, given the vagueness, breadth, and subjectivity of the law's demands, it is highly doubtful that perfect compliance is even possible.

25. Accordingly, compliance with the Act would not only be severely burdensome, but in many instances, may not be technically workable at all. Though the State will not begin enforcement of the Act until March 6, 2025, the expressive harms caused by the Act are enormous, immediate, and irreparable now. Moreover, NetChoice's members' substantial costs in undertaking this enormously burdensome vetting exercise are unrecoverable, and could not be recouped if Plaintiff's arguments against the Challenged Provisions are ultimately successful on

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

10

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the merits.  Similarly, the loss of customer trust and loyalty that would result if our members were required to redesign their services as the law requires would take years to build back (to the extent it could be rebuilt at all).

     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

     Executed at Washington, D.C., this 1st day of November, 2024.

_____

Bartlett Cleland

CLELAND DECL. ISO MOT. FOR PRELIM. INJ.
Case No. 5:22-cv-08861-BLF

11

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899