IAN ADAMS, State Bar No. 31300

INTERNATIONAL CENTER FOR LAW & ECONOMICS
1104 NW 15th Ave., Suite 300
Portland, Oregon 97209
Telephone:  (503) 770-0076
Email: iadams@laweconcenter.org

*Attorney for Amicus Curiae*
INTERNATIONAL CENTER FOR LAW &
ECONOMICS

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>                    Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**AMICUS BRIEF OF THE INTERNATIONAL CENTER FOR LAW & ECONOMICS (ICLE) IN SUPPORT OF PLAINTIFF'S MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Judge: Honorable Beth Labson Freeman<br>Action Filed:  December 14, 2022 |

## **CORPORATE DISCLOSURE STATEMENTS**

Pursuant to Federal Rule of Appellate Procedure 26.1, the International Center for Law and Economics ("ICLE") hereby states as follows:

ICLE is registered as a 501(c)(3) nonprofit in the United States of America. ICLE does not have a parent corporation and no entity or individuals own any stock in ICLE.

In accordance with Federal Rule of Appellate Procedure 29(c)(5), *amicus* states that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money to fund the preparation or submission of this brief, and that no person other than *amicus* and its counsel contributed money to fund the preparation or submission of this brief.

Dated this 8th day of November, 2024.

/s/ Ian Adams
*Attorney for Amicus Curiae*
*International Center for Law & Economics*

i

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**CORPORATE DISCLOSURE STATEMENTS** ....................................................................i

**INTEREST OF AMICUS CURIAE** ....................................................................1

**SUMMARY OF ARGUMENT** ....................................................................1

**ARGUMENT** ....................................................................5

**I. GATHERING DATA FOR THE CURATION OF SPEECH AND TARGETED ADVERTISING IS PROTECTED BY THE FIRST AMENDMENT** ....................................6

**II. STRICT SCRUTINY SHOULD APPLY TO THE AADC'S RESTRICTIONS ON DATA COLLECTION FOR THE CURATION OF SPEECH AND TARGETED ADVERTISING** ....................................................................7

**III. THE AADC FAILS STRICT SCRUTINY** ....................................................................9

    **A.**    **There is No Compelling Government Interest** ....................................9

    **B.**    **The AADC is Not Narrowly Tailored** ....................................11

**CONCLUSION** ....................................................................14

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page(s)**</u>

**CASES**

3

4    *303 Creative LLC v. Elenis*,
      600 U.S. 570, 143 S. Ct. 2298, 2311 (2023) ......................................................... 1, 2

5

6    *Aschroft v. ACLU*,
      542 U.S. 656 (2004) ....................................................................................... 4, 12, 13

7

8    *Brown v. Ent. Merchs. Ass'n*,
      564 U.S. 786 (2011) .................................................................... 2, 4, 8, 9, 10, 11, 16

9

10   *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
      412 U.S. 94 (1973) .................................................................................................... 6

11   *Dex Media West, Inc. v. City of Seattle*,
      696 F.3d 952, 958 (9th Cir. 2012) .................................................................... 4, 7, 8

12

13   *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
      515 U.S. 557 (1995) .................................................................................................. 2

14

15   *McCullen* v. *Coakley*,
      573 U.S. 464 (2014) .................................................................................................. 1

16   *Miami Herald Pub. Co. v. Tornillo*,
      418 U.S. 241 (1974) ....................................................................................... 6, 7, 8, 14

17

18   *NetChoice v. Yost*,
      2024 WL 555904 (S.D. Ohio, Feb. 12, 2024) ........................................................ 12

19

20   *NetChoice, LLC v. Bonta*,
      113 F.4th 1101 (9th Cir. 2024)................................................................ 1, 5, 7, 9

21

22   *NetChoice, LLC v. Bonta*,
      692 F.Supp.3d 924 (N.D. Cal. Sept. 18, 2023)..............................12, 13, 14

23   *NetChoice, LLC v. Griffin*,
      2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ................................................. 2, 12

24

25   *NetChoice, LLC v. Moody*,
      34 F.4th 1196 (11th Cir. 2022)................................................................................. 2

26

27   *Ohio v. American Express*,
      138 S. Ct. 2274 (2018) ............................................................................................. 7

28

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ........................................................................................................ 2

*Project Veritas v. Schmidt*,
    72 F.4th 1043 (9th Cir. 2023) .......................................................................... 3, 6, 7, 12

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................................................ 2

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988) .................................................................................................... 3, 4

*Snyder* v. *Phelps*,
    562 U.S. 443 (2011) ........................................................................................................ 2

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) .................................................................................................. 3, 6, 7

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) .............................................................................................. 4, 9, 15

*West Virginia Bd. of Ed.* v. *Barnette*,
    319 U.S. 624, 642 (1943) ................................................................................................ 1

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, First Amendment ................................................................*passim*

**STATUTES**

Cal. Civ. Code § 1798.99.30 (b)(4) ............................................................................ 10

Cal. Civ. Code § 1798.99.30 (b)(7) .............................................................................. 7,

Cal. Civ. Code § 1798.99.31(a)(5) .............................................................................. 11

Cal. Civ. Code § 1798.99.31(a)(6); (b)(2)-(4) ...................................................... 11, 12

Cal. Civ. Code § 1798.99.35(a) .................................................................................. 13

**OTHER AUTHORITIES**

Ben Sperry, *A Coasean Analysis of Online Age-Verification and Parental-Consent Regimes*
    (ICLE Issue Brief 2023-11-09) ................................................................................... 13

David Evans & Richard Schmalensee, *Matchmakers: The New Economics of Multisided
    Platforms* (2016) ........................................................................................................ 2, 3

Holly Shannon, et al., *Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis*, 9 JMIR MENTAL HEALTH 1 (2022)……….…...9, 10

Juan M. Machimbarrena et al., *Profiles of Problematic Internet Use and Its Impact on Adolescents' Health-Related Quality of Life*, 16 INT'L J. EVIRON. RES. PUBLIC HEALTH 1 (2019)………………………………………………………………………………………10

*Minimum age appeals on TikTok*, TIKTOK, https://support.tiktok.com/en/safety-hc/account-and-user-safety/minimum-age-appeals-on-tiktok............................................................12

Nat'l Acad. Sci. Engineering & Med., *Social Media and Adolescent Health* (2023).....4, 9, 10, 13

Scott Babwah Brennen & Matt Perault, *Keeping Kids Safe Online: How Should Policymakers Approach Age Verification?* (The Ctr. for Growth and Opportunity at Utah State University and University of North Carolina Ctr. on Tech. Pol'y Paper, Jun. 2023) ..........................11, 12

**INTEREST OF AMICUS CURIAE**

The International Center for Law & Economics ("ICLE") is a nonprofit, non-partisan global research and policy center that builds intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise evaluating law and policy.

ICLE has an interest in ensuring that First Amendment law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. ICLE scholars have written extensively on issues related to Internet regulation and free speech, including the interaction of privacy rules and the First Amendment. ICLE filed a version of this amicus brief in the Ninth Circuit Court of Appeals.

**SUMMARY OF ARGUMENT**

The Ninth Circuit Court of Appeals correctly applied strict scrutiny to the Data Protection Impact Assessment mandates of the Age-Appropriate Design Code (AADC), *see NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119-21 (9th Cir. 2024), including finding they would likely fail under strict scrutiny. *See id.* at 1121-22. The court affirmed the preliminary injunction as to those provisions, but vacated the remainder of the preliminary injunction. This court is now asked, among other things, to consider whether the other challenged provisions should be subject to strict scrutiny. Below we argue that, regardless of whether this action is construed as a facial challenge or as an as-applied challenge, the AADC rules have the effect of restricting the access of minors to lawful speech and should be subject to strict scrutiny. Under strict scrutiny, these limitations on the collection and use of data for the purposes of curation and targeted advertising fail due to the lack of a compelling state interest or narrow tailoring.

The First Amendment protects an open marketplace of ideas. *303 Creative LLC v. Elenis*, 600 U.S. 570, 143 S. Ct. 2298, 2311 (2023) ("'[I]f there is any fixed star in our constitutional constellation,' it is the principle that the government may not interfere with 'an uninhibited marketplace of ideas.'") (quoting *West Virginia Bd. of Ed*. v. *Barnette*, 319 U.S. 624, 642 (1943) and *McCullen* v. *Coakley*, 573 U.S. 464, 476 (2014)). In fact, the First Amendment protects speech in this marketplace whether the "government considers… speech sensible and well

intentioned or deeply 'misguided,' and likely to cause 'anguish' or 'incalculable grief.'" *303 Creative*, 143 S. Ct. at 2312 (quoting *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557, 574 (1995) and *Snyder* v. *Phelps*, 562 U.S. 443, 456 (2011)).

The protection of the marketplace of ideas necessarily includes the creation, distribution, purchasing, and receiving of speech. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating distributing or consuming speech makes no difference" for First Amendment purposes). In other words, it protects both the suppliers in the marketplace of ideas (creators and distributors), and the consumers (purchasers and receivers).

No less than other speakers, profit-driven firms involved in the creation or distribution of speech are protected by the First Amendment. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit."). This includes Internet firms that provide speech platforms. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997); *NetChoice, LLC v. Moody*, 34 F.4th 1196, 1213 (11th Cir. 2022).

Even minors have a right to participate in the marketplace of ideas, including as purchasers and receivers. *See Brown*, 564 U.S. at 794-95 (government has no "free-floating power to restrict ideas to which children may be exposed"). This includes the use of online speech platforms. *See NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (finding Arkansas's Act 689 "obviously burdens minors' First amendment rights" by "bar[ring] minors from opening accounts on a variety of social media platforms").

This is important because online firms, especially those primarily involved in curating and creating content, are central to the modern marketplace of ideas. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (describing the Internet as "the modern public square" where citizens can "explor[e] the vast realms of human thought and knowledge").

Online firms primarily operate as what economists call "matchmakers" or "multisided platforms." *See* David Evans & Richard Schmalensee, *Matchmakers: The New Economics of*

2

*Multisided Platforms* 10 (2016).  "[M]atchmakers' raw materials are the different groups of customers that they help bring together.  And part of the stuff they sell to members of each group is access to members of the other groups.  All of them operate physical or virtual places where members of these different groups get together.  For this reason, they are often called multisided platforms."  *Id*.  In this sense, they are very similar to newspapers and cable operators in attempting to attract attention through interesting content so that advertisers can reach them.

Online platforms bring together advertisers and users—including both speakers and listeners—by curating third-party speech as well as by producing their own content. The goal is to keep users engaged so advertisers can reach them. For many online platforms, advertisers cross-subsidize access to content for users, to the point that it is often free. Online platforms are in this sense "attention platforms" which supply content to its users while collecting data for targeted advertisements for businesses who then pay for access to those users. To be successful, online platforms must keep enough—and the right type of—users engaged so as to maintain demand for advertising. But if platforms fail to curate and produce interesting content, it will lead to users using them less or even leaving altogether, making it less likely that advertisers will invest in these platforms.

The First Amendment protects this business model because it allows entities that have legally obtained data to use it for both for the curation of speech for its users and targeted advertising. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570-71 (2011) (finding that there is a "strong argument" that "information is speech for First Amendment purposes" and striking down a law limiting the ability of marketers to use prescriber-identifying information for pharmaceutical sales). The First Amendment also protects the gathering of information when it is "inherently expressive." *Cf. Project Veritas v. Schmidt*, 72 F.4th 1043, 1055 (9th Cir. 2023) (citing cases that have found the act of filming or recording are inherently expressive activity). Gathering of online data for targeted advertising makes it as inherently expressive as the act of filming or recording is for creating media.

Moreover, due to the nature of online speech platforms, the collection and use of data is "inextricably intertwined" with the curation of protected, non-commercial speech. *Cf. Riley v.*

3

1   *Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988); *Dex Media West, Inc. v. City of*

2   *Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

3          By restricting use of data, the AADC will prevent online platforms from being able to

4   tailor their products to their users, resulting in less relevant—and in the case of minors, less

5   appropriate—content. Online platforms may also be less likely to effectively monetize through

6   targeted advertisements. Both situations will place platforms in a situation that may require a

7   change in business model, either by switching to subscriptions or by excluding minors. Thus,

8   restrictions on the collection and use of data for the curation of content and targeted advertising

9   should be subject to strict scrutiny, as the result of such restrictions will be to restrict minors'

10  access to lawful online speech.

11         Under strict scrutiny, California bears the burden of showing it has a compelling

12  governmental interest and that the restriction on speech is narrowly tailored to that interest. It can

13  do neither.

14         First, California fails to establish a compelling government interest because it has failed

15  to "identify an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799 (quoting *United*

16  *States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822-23 (2000)). There is no more

17  evidence of a direct causal link between the use of online platforms subject to the AADC and

18  harm to minors than there was from the video games at issue in *Brown*. *Cf. id.* at 799-801. In

19  fact, the best available data does "not support the conclusion that social media causes changes in

20  adolescent health at the population level." *See* Nat'l Acad. Sci. Engineering & Med., *Social*

21  *Media and Adolescent Health* at 92 (2023). There is even less evidence that the Internet content

22  as a whole is harmful to minors.

23         Second, California's law is not narrowly tailored because the requirements that restrict

24  minors' access to lawful content are not the least restrictive means for protecting minors from

25  potentially harmful content. *Cf. Playboy*, 529 U.S. at 823-25 (finding the voluntary use of

26  blocking devices to restrict access to adult channels is less restricting than mandating the times

27  such content may be made available); *Ashcroft v. ACLU*, 542 U.S. 656, 667-70 (2004) (finding

28  filtering software a less restrictive alternative than age verification). Parents and minors have

4

1  technological and practical means available to them that could allow them to avoid the putative

2  harms of Internet use without restricting the access of others to lawful speech. Government

3  efforts to promote the creation and use of such tools is a less restrictive way to promote the

4  safety of minors online.

5      In sum, the AADC is unconstitutional because it would restrict the ability of minors to

6  participate in the marketplace of ideas. The likely effects of the AADC on covered businesses

7  will be to bar or severely restrict minors' access to lawful content.

8                          **<u>ARGUMENT</u>**

9      The Ninth Circuit found that it could reach the facial challenge of the DPIA report

10  requirements because "every application… raises the same First Amendment issues." *NetChoice*

11  *v. Bonta*, 113 F.4th at 1122. The court did not believe a facial challenge was appropriate to the

12  rest of the challenged provisions, noting that "most of those provisions, by their plain language,

13  do not necessarily impact protected speech in all or even most applications. *Id.* The court also

14  noted, regarding the "dark patterns" prohibition, that "it is far from certain that such a ban should

15  be scrutinized as a content-based restriction, as opposed to a content-neutral regulation of

16  expression." *Id.* at 1123. Below, we argue that AADC's restrictions on data gathering for

17  curation of speech and targeted advertising will inevitably lead to less access to lawful online

18  speech platforms for minors. As such, they should be subject to strict scrutiny, whether the court

19  ultimately analyzes the challenged provisions facially or as-applied to NetChoice's members.

20      In Part I we argue that gathering data for the curation of speech and targeted advertising

21  is protected by the First Amendment. In Part II we argue that the collection of data for those

22  purposes is inextricably linked, and thus the AADC's restrictions on the collection of data for

23  those purposes should be subject to strict scrutiny. In Part III we argue that the AADC fails strict

24  scrutiny, both for a lack of a compelling government interest and because its restrictions are not

25  narrowly tailored.

26

27

28

## I.  GATHERING DATA FOR THE CURATION OF SPEECH AND TARGETED ADVERTISING IS PROTECTED BY THE FIRST AMENDMENT

Online platforms attract users by curating content and presenting it in an engaging way. To do this effectively requires data. Moreover, that same data is useful for targeted advertising, which is the primary revenue source for most online platforms, which are multisided platforms. This is a protected business model under First Amendment principles.

First, display decisions by communications platforms on how best to present information to its users is protected by the First Amendment. *Cf. Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment."). Limitations on the right of a communications platform to curate its own content come only from the marketplace of ideas itself: "The power of a privately owned newspaper to advance its own political, social, and economic views is bounded by… the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success." *Id.* at 255 (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 117 (1973) (plurality)).

Second, the use of data for commercial purposes is protected by the First Amendment. *See Sorrell*, 564 U.S. at 567 ("While the burdened speech results from an economic motive, so too does a great deal of vital expression."). No matter how much California wishes it were so, the AADC's restrictions on the "sales, transfer, and use of" information is not simply regulation of economic activity. *Cf. id.* at 750. On the contrary, the Supreme Court "has held the creation and dissemination of information are speech within the meaning of the First Amendment." *Id.* Among the protected uses of data is creating tailored content, including marketing. *See id.* at 557-58 (describing the use of "detailing" where drug salespersons use prescribing history of doctors to present a particular sales message.).

Third, even the collection of information can be protected First Amendment activity. For instance, in *Project Veritas*, this court found that an audio or video recording "qualifies as speech entitled to the protection of the First Amendment." *See* 72 F.4th at 1054. This is because the act

of recording itself is "inherently expressive." *Id.* at 1055. Recording is necessary to create the speech at issue.

Applying these principles here leads to the conclusion that the targeted advertising-supported business model of online platforms is protected by the First Amendment. Online platforms have a right to determine what to curate and how to display that content on its platform, as they seek to discover whether it serves its users and advertisers in the marketplace of ideas, much like the newspaper in *Tornillo*. Using data to better curate content to users and to offer them more relevant advertisements is protected, as in *Sorrell*. And the collection of data to curate speech and offer them targeted advertisements is as "inherently expressive" as the act of recording is for making a video in *Project Veritas*.

## II.    STRICT SCRUTINY SHOULD APPLY TO THE AADC'S RESTRICTIONS ON DATA COLLECTION FOR THE CURATION OF SPEECH AND TARGETED ADVERTISING

The question remains what level of scrutiny the AADC's restrictions on data collection for curation and targeted advertising should face. The Ninth Circuit only considered the standard of scrutiny in dicta about the "dark patterns" prohibition of Cal. Civ. Code § 1798.99.31(b)(7), stating that it was not certain whether it would be subject to strict scrutiny because it is content-based or intermediate scrutiny because it is content-neutral. *See NetChoice v. Bonta*, 113 F.th at 1123. The Ninth Circuit did not consider the argument that the collection of data that is restricted by the AADC is inextricably intertwined with minors' free access to protected speech. Here, online multisided platforms must have data both to effectively curate content and to offer targeted advertisements which subsidize users' access. Targeted advertising is inextricably intertwined with the free or reduced-price access of users to these online platforms.

Over time, courts have gained more knowledge of how multisided platforms work, specifically in the antitrust context. *See Ohio v. American Express*, 138 S. Ct. 2274, 2280-81 (2018) (describing how credit card networks work). But this also has important relevance in the First Amendment context where advertisements often fund the curation of content.

For instance, in *Dex Media West*, this court considered yellow page directories and found that the protected speech of the phonebooks (i.e. telephone numbers) was inextricably

ICLE Amicus Supporting the Motion for Preliminary Injunction
Case No. 5:22-cv-08861-BLF

intertwined with the advertisements that help fund it. *See* 696 F.3d at 956-65. The court found the "[e]conomic reality" that "yellow pages directories depend financially upon advertising does not make them any less entitled to protection under the First Amendment." *Id.* at 963-64. The court rejected the district court's conclusion that "economic dependence was not sufficient to intertwine commercial and noncommercial elements of the publication," *id.* at 964, as the same could be said of television stations or newspapers as well, but they clearly receive full First Amendment protection for their speech. The court concluded that:

> Ultimately, we do not see a principled reason to treat telephone directories differently from newspapers, magazines, television programs, radio shows, and similar media that does not turn on an evaluation of their contents. A profit motive and the inclusion or creation of noncommercial content in order to reach a broader audience and attract more advertising is present across all of them. We conclude, therefore, that the yellow pages directories are entitled to full First Amendment protection. *Id.* at 965.

Here, this means the court should consider the interconnected nature of the free or reduced-price access to online content and targeted advertising that is empowered by data collection. Online platforms are, in this sense, indistinguishable "from newspapers, magazines, television programs, radio shows, and similar media…" that curate "noncommercial content in order to reach a broader audience and attract more advertising." *Id.* The only constitutional limits on platforms' editorial discretion arise from the marketplace of ideas itself. *Cf. Tornillo*, 418 U.S. at 255.

To find otherwise will lead to detrimental effects on this business model. Without data collection, not only will online platforms serve less relevant content to users but also less relevant advertising. This will make the platforms less lucrative for advertisers and lead to upward pricing pressure on the user-side of online platforms. Online platforms will be forced to change their business models by either charging fees (or raising them) for access or excluding those users subject to the regulation. Excluding minors from accessing lawful speech clearly implicates the First Amendment and is subject to strict scrutiny. *Cf. Brown*, 564 U.S. at 794-95, 799 (the Act "is invalid unless California can demonstrate that it passes strict scrutiny").

ICLE Amicus Supporting the Motion for Preliminary Injunction
Case No. 5:22-cv-08861-BLF

III.    **THE AADC FAILS STRICT SCRUTINY**

The Ninth Circuit rightfully applied strict scrutiny to the DPIA report provisions of the AADC. The same level of scrutiny should apply to the rest of the challenged restrictions on the collection of data for curation and targeted advertising. Those restrictions fail strict scrutiny much like the DPIA report requirement. There is no compelling state interest due a lack of an actual problem in need of solving. *Cf. Brown*, U.S. at 799. But even assuming a compelling interest in protecting minors from harms related to data collection for curation and targeted advertising, California "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing … laws that prohibit related unlawful conduct." *Cf. NetChoice v. Bonta*, 113 F.4th at 1121.

A.    **There is No Compelling Government Interest**

Under strict scrutiny, the government must "specifically identify an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799 (quoting *Playboy*, 529 U.S. at 822-23).

In *Brown*, the Supreme Court found that California's evidence linking exposure to violent video games and harmful effects on children was "not compelling" because it did "not prove that violent video games *cause* minors to *act* aggressively." *Id.* at 800 (emphasis in original). At best, there was a limited correlation that was "indistinguishable from effects produced by other media" not subject to the rules. *Id.* at 800-01.

The same is true here. The literature on the relationship between Internet use and harm to minors simply does not establish causation.

For instance, the National Academies of Science, Engineering, and Medicine has noted that there are both benefits and harms from social media use for adolescents. Nat'l Acad. Sci. Engineering & Med., *Social Media and Adolescent Health* at 4 (2023) ("[T]he use of social media, like many things in life, may be a constantly shifting calculus of the risky, the beneficial, and the mundane."). There are some studies that show a very slight correlation between "problematic social media use" and mental health harms for adolescents. *See* Holly Shannon, et

9

1   al., *Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and*

2   *Meta-analysis*, 9 JMIR MENTAL HEALTH 1, 2 (2022) (noting "problematic use characterizes

3   individuals who experience addiction-like symptoms as a result of their social media use"). But

4   the "links between social media and health are complex." *Social Media and Adolescent Health* at

5   89.

6          The reasons for this complexity include the direction of the relationship (i.e., is it because

7   of social media usage that a person is depressed or does someone use social media because they

8   are depressed?), and whether both social media usage and mental health issues are possibly

9   influenced by another variable(s). Moreover, it is nearly impossible to find a control group that

10  has not been exposed to social media. As a result, the National Academies' extensive review of

11  the literature "did not support the conclusion that social media causes changes in adolescent

12  health at the population level." *Id.* at 92.

13         The AADC applies to far more than just social media, however, extending to any "online

14  service, product, or feature" that is "likely to be accessed by children." *See* Cal. Civ. Code §

15  1798.99.30 (b)(4). There is little evidence that general Internet usage is correlated with harm to

16  minors. According to one survey of the international literature, the prevalence of "Problematic

17  Internet Use" among adolescents ranges anywhere from 4% to 20%. *See* Juan M.

18  Machimbarrena et al., *Profiles of Problematic Internet Use and Its Impact on Adolescents'*

19  *Health-Related Quality of Life*, 16 INT'L J. EVIRON. RES. PUBLIC HEALTH 1, 2 (2019). This level

20  of harmful use suggests the AADC's reach is overinclusive. *Cf. Brown*, 564 U.S. at 805 (Even

21  when government ends are legitimate, if "they affect First Amendment rights they must be

22  pursued by means that are neither seriously underinclusive nor seriously overinclusive.").

23         Moreover, the rules at issue are also underinclusive, even assuming a causal link. The

24  AADC does not extend to the same content *offline* and also likely to be accessed by children,

25  even if also supported by advertising, would not be subject to those regulations. California has

26  offered no reason to think that accessing the same content while receiving advertising offline

27  would be less harmful to minors. *Cf. Brown*, 564 U.S. at 801-02 ("California has (wisely)

28  declined to restrict Saturday morning cartoons, the sale of games rated for young children, or the

10

1  distribution of guns. The consequence is that its regulation is wildly underinclusive when judged

2  against its asserted justification, which in our view is alone enough to defeat it.").

3     In sum, California has not established a compelling state interest in protecting minors

4  from harm allegedly associated with Internet usage.

5     **B.     The AADC is Not Narrowly Tailored**

6     Even assuming there is a compelling state interest in protecting minors from harms

7  online, the AADC's provisions restricting the collection and use of data for curating speech and

8  targeted advertising are *not* narrowly tailored to that end. They are much more likely to lead to

9  the complete exclusion of minors from online platforms, foregoing the many benefits of Internet

10  usage. *See Social Media and Adolescent Health* at 4-5 (listing benefits of social media usage for

11  adolescents). A less restrictive alternative would be promoting the use of practical and

12  technological means by parents and minors to avoid the harms associated with Internet usage, or

13  to avoid specifically harmful forms of Internet use.

14     For instance, the AADC requires covered online platforms to "[e]stimate the age of child

15  users with a reasonable level of certainty appropriate to the risks" or "apply the privacy and data

16  protections afforded to children" under the Act to "all consumers." Cal. Civ. Code §

17  1798.99.31(a)(5). These privacy and data protections would severely limit by default the curation

18  of speech and targeted advertising. *See* Cal. Civ. Code § 1798.99.31(a)(6); (b)(2)-(4). This would

19  reduce the value of the online platforms to all users, who would receive less relevant content and

20  advertisements.

21     Rather than leading to more privacy protection for minors, such a provision could result

22  in more privacy-invasive practices or the exclusion of minors from the benefits of online

23  platforms altogether. There is simply no foolproof method for estimating a user's age.

24     Platforms typically use one of four methods: self-declaration, user-submitted hard

25  identifiers, third-party attestation, and inferential age assurance. *See* Scott Babwah Brennen &

26  Matt Perault, *Keeping Kids Safe Online: How Should Policymakers Approach Age Verification?*,

27  at 4 (The Ctr. for Growth and Opportunity at Utah State University and University of North

28  Carolina Ctr. on Tech. Pol'y Paper, Jun. 2023), https://www.thecgo.org/wp-

11

content/uploads/2023/06/Age-Assurance_03.pdf. Each method comes with tradeoffs. While self-declaration allows users to simply lie about their age, other methods can be quite privacy-invasive. For instance, requiring users to submit hard identifiers, like a driver's license or passport, may enable platforms to more accurately assess age in some circumstances and may make it more difficult for minors to fabricate their age, but it also poses privacy and security risks. It requires platforms to collect and process sensitive data, requires platforms to develop expertise in ID verification, and may create barriers to access for non-minor users who lack an acceptable form of identification. Courts have consistently found age verification requirements to be an unconstitutional barrier to access to online content. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004); *NetChoice v. Yost*, 2024 WL 555904 (S.D. Ohio, Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

But even age assurance or age estimation comes with downsides. For instance, an online platform could use AI systems to estimate age based on an assessment of the content and behavior associated with a user. But to develop this estimate, platforms must implement technical systems to collect, review, and process user data, including minors' data. These methods may also result in false positives, where a platform reaches an inaccurate determination that a user is underage, which would result in a different set of privacy defaults under the AADC. *See* Cal. Civ. Code § 1798.99.31(a)(6); (b)(2)-(4). Errors are sufficiently common that some platforms have instituted appeals mechanisms so that users can contest an age-related barrier. *See, e.g.*, *Minimum age appeals on TikTok*, TικTοκ, https://support.tiktok.com/en/safety-hc/account-and-user-safety/minimum-age-appeals-on-tiktok (last accessed Nov. 4, 2024). Not only is the development of such mechanisms costly to online platforms, but is potentially very costly to those mislabeled as well.

Another possibility previously noted by this court is that online platforms may restrict access by users who they have any reason to believe to be minors to avoid significantly changing their business models predicated on curation and targeted advertising. *Cf. NetChoice, LLC v. Bonta*, 692 F.Supp.3d 924, 945-46 (N.D. Cal. Sept. 18, 2023) (noting evidence that "age-based regulations would 'almost certain[ly] [cause] news organizations and others [to] take steps to

1    prevent those under 18 from accessing online news content, features, or services.'") (quoting

2    Amicus Curiae Br. of New York Times Co. & Student Press Law Ctr. at 6).

3        The reason why this is likely flows from an understanding of the economics of multisided

4    markets mentioned above. Restricting the already limited expected revenue from minors through

5    limits on the ability to do targeted advertising, combined with strong civil penalties for failure to

6    live up to the provisions of the AADC with respect to minors, will encourage online platforms to

7    simply exclude them altogether. *See* Cal. Civ. Code § 1798.99.35(a) (authorizing penalties of up

8    to $7,500 per "affected child").

9        Much less restrictive alternatives are possible. California could promote online education

10   for both minors and parents which would allow them to take advantage of widely available

11   technological and practical means to avoid online harms. *Cf. Ashcroft*, 542 U.S. at 666-68

12   (finding filtering software is a less restrictive alternative than age verification to protect minors

13   from inappropriate content). Investing in educating the youth in media literacy could be

14   beneficial for avoiding harms associated with problematic Internet use. *See Social Media and*

15   *Adolescent Health* at 8-10 (arguing for training and education so young people can be

16   empowered to protect themselves).

17       If anything, there are more technological ways for parents and minors to work together to

18   avoid online harms today. For instance, there are already tools to monitor and limit how minors

19   use the Internet available from cell carriers and broadband providers, on routers and devices,

20   from third-party applications, and even from online platforms themselves. *See* Ben Sperry, *A*

21   *Coasean Analysis of Online Age-Verification and Parental-Consent Regimes*, at 20-21 (ICLE

22   Issue Brief 2023-11-09), https://laweconcenter.org/wp-content/uploads/2023/11/Issue-Brief-

23   Transaction-Costs-of-Protecting-Children-Under-the-First-Amendment-.pdf. Even when it

24   comes to privacy, educating parents and minors on how to protect their information when online

25   would be a less restrictive alternative than restricting the use of data collection for targeted

26   advertising.

27

28

                                        13

## <u>CONCLUSION</u>

The free marketplace of ideas is too important to be restricted, even in the name of protecting children. Minors must be able to benefit from the modern public square that is the Internet. This court rightly concluded that the AADC's restrictions on collecting, selling, and sharing children's data would "throw[] the baby out with the bathwater." *NetChoice, LLC v. Bonta*, 692 F.Supp.3d at 957. The court should grant a preliminary injunction against the provisions restricting the collection of data for the purposes of curation and targeted advertising.

DATED: November 8, 2024November 8, 2024

By:   /s/ Ian Adams

*Attorney for Amicus Curiae*
*International Center for Law & Economics*

By:   /s/ Ben Sperry

*Senior Scholar*
*International Center for Law & Economics*

By:   /s/ Geoffrey A. Manne

*President & Founder*
*International Center for Law & Economics*

By:   /s/ Kristian Stout

*Director of Innovation Policy*
*International Center for Law & Economics*

## <u>CERTIFICATE OF COMPLIANCE</u>

**Case Number(s)** 5:22-cv-08861-BLF _____

      I am the attorney or self-represented party.

      **This brief contains 4,848 words,** excluding the items exempted by Fed. R. App. P. 32(f).

The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/    Ian Adams _____ **Date:** November 8, 2024

ICLE Amicus Supporting the Motion for Preliminary Injunction
Case No. 5:22-cv-08861-BLF

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on November 8, 2024, I electronically filed the foregoing with the Clerk of the Court of the U.S. District Court for the Northern District of California by using the Court's electronic filing system (ECF).

Participants in the case who are registered ECF users will be served by the ECF system.

Respectfully submitted,

/s/ Ian Adams

*Attorney for Amicus Curiae*
*International Center for Law & Economics*

ICLE Amicus Supporting the Motion for Preliminary Injunction
Case No. 5:22-cv-08861-BLF