# EXHIBIT A

**HOGAN LOVELLS US LLP**
Trenton H. Norris (Bar No. 164781)
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone:    (415) 374-2300
Facsimile:    (415) 374-2499
trenton.norris@hoganlovells.com

**HOGAN LOVELLS US LLP**
Mark W. Brennan *(Pending Pro Hac Vice)*
J. Ryan Thompson *(Pending Pro Hac Vice)*
Thomas Veitch *(Pending Pro Hac Vice)*
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
mark.brennan@hoganlovells.com
ryan.thompson@hoganlovells.com
thomas.veitch@hoganlovells.com

Attorneys for Chamber of Progress, LGBT Tech,
The Information Technology and Innovation
Foundation, and the Woodhull Freedom Foundation

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No.  5:22-cv-08861-BLF<br><br>***AMICI CURIAE* BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF NETCHOICE**<br><br>Judge: Hon. Beth Labson Freeman<br><br>Action Filed: December 14, 2022 |

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY
AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF
NETCHOICE BEFORE THE NORTHERN DISTRICT OF CALIFORNIA
AMICI CURIAE BRIEF IN SUPPORT OF NETCHOICE -- CASE NO.  5:22-CV-08861-BLF

# TABLE OF CONTENTS

**Page**

Interest of Amici Curiae ............................................................................................... 1

Introduction and Summary of Argument ...................................................................... 2

    I.     Section 230 preempts the Policy Enforcement Provision. ..................................... 4

         A.     Section 230 expressly preempts the Policy Enforcement Provision. ........... 4

         B.     Section 230 also preempts the Policy Enforcement Provision because the provision interferes with congressional purposes and objectives ................................................................................................ 8

    II.    This Court can and should grant a preliminary injunction based on a facial Section 230 preemption challenge. ......................................................... 10

    III.   If allowed to subvert Congress, the Policy Enforcement Provision would harm marginalized users and chill innovation in content moderation. .................. 10

         A.     Content moderation is inevitably imperfect. ............................................. 11

         B.     The Policy Enforcement Provision will disproportionately harm marginalized users ................................................................................... 12

         C.     The Policy Enforcement Provision could chill innovation in content moderation ................................................................................................. 16

Conclusion .................................................................................................................. 17

i

Hogan Lovells US
LLP
Attorneys At Law

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of Bos.*,
  386 F. Supp.3d 113 (D. Mass. 2019) ...................................................................10

*Arizona v. United States*,
  567 U.S. 387 (2012) ...................................................................................4, 8, 9

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...............................................................10

*Backpage.com, LLC v. Hoffman*,
  No. 13-CV-03952 (DMC) (JAD), 2013 WL 4502097 (D.N.J. Aug. 20, 2013)......................10

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...................................................6, 8, 9, 10

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) .....................................................................5, 7, 8

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) ...........................................................................6

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
  No. 1:24-CV-849-RP, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024)..............................10

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ...................................................................................4, 8

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008)....................................................................5, 6, 8

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..............................................................7, 8

*Gonzalez v. Google LLC*,
  598 U.S. 617 (2023) .......................................................................................8

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ...................................................................................3, 4, 8

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) .........................................................................4, 5

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2023) ...................................................................................11

ii

Hogan Lovells US
LLP
Attorneys At Law

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*NetChoice, LLC v. Bonta*,
    692 F. Supp. 3d 924 (N.D. Cal. 2023) ............................................................5, 7, 10

*NetChoice, LLC v. Reyes*,
    No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626 (D. Utah Sept. 10, 2024).....................15

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ...........................................................................................2

*Savage v. Jones*,
    225 U.S. 501 (1912)..........................................................................................8

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
    1995 WL 323710 (N.Y.S.2d May 24, 1995) ...........................................................8, 9

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997)...............................................................................9

**Statutes**

47 U.S.C. § 230(b) .................................................................................................3

47 U.S.C. § 230(c) ..................................................................................... *passim*

47 U.S.C. § 230(c)(1) ...........................................................................................3, 6

47 U.S.C. § 230(c)(2) ..............................................................................................4

47 U.S.C. § 230(c)(2)(A) .........................................................................................7

47 U.S.C. § 230(e)(3) ...........................................................................................3, 6

CAADCA § 31(a)(9)................................................................................................3

Cal. Civ. Code § 1798.99.35 ...................................................................................12

**Other Authorities**

141 CONG. REC., 22046 (1995) ..................................................................................9

Abdul Rahman Al Jaloud et al., *Caught in the Net: The Impact of "Extremist"
    Speech Regulations on Human Rights Content*, ELECTR. FRONTIER FOUND.
    (May 30, 2019), https://www.eff.org/wp/caught-net-impact-extremist-speech-
    regulations-human-rights-content ........................................................................6

Alexander Monea, THE DIGITAL CLOSET: HOW THE INTERNET BECAME STRAIGHT
    179 (2022) ....................................................................................................15

iii

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Ashley Austin et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, INT'L J. TRANSGENDER HEALTH 33 (2020) ................................................................................................15

Christopher Cox, *The Origin and Original Intent of Section 230 of the Communications Decency Act*, RICHMOND J.L. & TECH. BLOG ¶ 2 (Aug. 27, 2020), https://jolt.richmond.edu/2020/08/27/the-origins-and-original-intent-of-section-230-of-the-communications-decency-act/ ................................................9

Daphne Keller, *Internet Platforms: Observations on Speech, Danger*, HOOVER INST. 1, 7 (2018) ................................................................................................12

Eric Goldman and Jess Miers, *Online Account Terminations/Content Removals and the Benefits of Internet Services Enforcing Their House Rules*, 1 J. FREE SPEECH L. 191, 205 (2021) ...........................................................................12

Eric Goldman, *Content Moderation Remedies*, 28 MICH. TECH. L. REV. 1, 43 (2021) ...........................................................................................................12

Eric Goldman, *Why Section 230 is Better Than the First Amendment*, 95 NOTRE DAME L. REV. 33, 41 (2019) ..............................................................................10

https://transparency.meta.com/policies/community-standards/ ......................................5

Jared Eckert & Makenna McCoy, *Young Children Are Being Targeted With Sexual Content. The Equality Act Would Make It Worse*, HERITAGE FOUND. (June 11, 2021), https://herit.ag/49v3aD7 ......................................................................15

Jess Miers, *Five Section 230 Cases That Made Online Communities Better*, Chamber of Progress, MEDIUM (May 21, 2024), https://medium.com/chamber-of-progress/five-section-230-cases-that-made-online-communities-better-92ccba6a8a7b ...........................................................................................13

Julie Jargon, *When Teens Question Their Gender, Social Media Can Provide Support–and Pressure*, WALL ST. J. (Oct 23, 2021) ......................................15

Kate Klonick, *Facebook Under Pressure*, SLATE (Sept. 12, 2016), https://slate.com/technology/2016/09/facebook-erred-by-taking-down-the-napalm-girl-photo-what-happens-next.html ......................................................6

Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 HARV. L. REV. 1598, 1642-1643 n.308 (2017) ..........................13

Maarten Sap et al., *The Risk of Racial Bias in Hate Speech Detection, Proceedings of the 57th Annual Meeting of the Association for Computational Linguistics* (2019), https://bit.ly/3ODPs8S ......................................................................14

iv

AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF NETCHOICE BEFORE THE NORTHERN DISTRICT OF CALIFORNIA
AMICUS CURAIE BRIEF IN SUPPORT OF NETCHOICE -- CASE NO. 5:22-CV-08861-BLF

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Mike Masnick, Masnick's Impossibility Theorem,* TECHDIRT (Nov. 20, 2019),
https://www.techdirt.com/2019/11/20/masnicks-impossibility-theorem-
content-moderation-scale-is-impossible-to-do-well/ ...................................................11

Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social
Media in 2022,* PEW RSCH. CTR. (Nov. 16, 2022), https://pewrsr.ch/3whSY2z......................14

Reddit, *Quarantined Communities,* https://support.reddithelp.com/hc/en-
us/articles/360043069012-Quarantined-Communities ............................................16

Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After
Harassment Scandals,* GUARDIAN (Dec. 5, 2017), https://bit.ly/49sRWio...............................14

Sarita Schoenebeck et al., *Drawing from Justice Theories to Support Targets of
Online Harassment* .......................................................................16

Savannah Kuchar, *When social media censorship gets it wrong: The struggle of
breast cancer content creators,* USA TODAY (Sept. 12, 2023)............................................14

*Social Media Content Moderation,* BRENNAN CTR. JUSTICE (2021),
https://www.brennancenter.org/sites/default/files/2021-
08/Double_Standards_Content_Moderation.pdf ........................................13

Tom Tapp, *GOP Senators Call For Warning Label On "Disturbing" LGBTQ
Content In Kids' TV Shows,* DEADLINE (Mar. 6, 2022), https://bit.ly/3wk58Yu......................15

U.S. Const. art. VI, cl. 2 ............................................................................4

U.S. Constitution Supremacy Clause .......................................................4

United States Surgeon General Advisory, *Social Media and Youth Mental Health,*
U.S. DEP'T HEALTH AND HUM. SERVS. (2023),
https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-
advisory.pdf) ....................................................................15

Vijaya Gadde, *Twitter executive: Here's how we're trying to stop abuse while
preserving free speech,* WASH. POST (Apr. 16, 2015)..........................................13

Hogan Lovells US
LLP
ATTORNEYS AT LAW

AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY
AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF
NETCHOICE BEFORE THE NORTHERN DISTRICT OF CALIFORNIA
AMICUS CURAIE BRIEF IN SUPPORT OF NETCHOICE -- CASE NO. 5:22-CV-08861-BLF

**Interest of Amici Curiae**

Amici are nonprofit organizations committed to promoting a society in which all people benefit from technology and interconnectivity and all people enjoy the speech opportunities available through a safe, open, and equitable internet.

**Chamber of Progress** is a tech industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It backs public policies that will build a fairer, more inclusive country in which all people benefit from technological advances. Its work is supported by corporate partners, many of whom will be subject to the law at issue.

**LGBT Tech** encourages the continued early adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic 3outreach for LGBTQ+ communities. LGBT Tech empowers LGBTQ+ communities and individuals, and ensures that media, telecom, and high technology issues of specific concern to LGBTQ+ communities are addressed in public policy conversations and engages in research, education, volunteerism, and partnerships to provide cutting-edge technology and resources to improve the lives of LGBTQ+ individuals. LGBT Tech strives to ensure that LGBTQ+ communities have safe and affirming spaces online. This law poses significant challenges and unintended consequences for LGBTQ+ individuals seeking crucial support and community online.

**The Information Technology and Innovation Foundation** is an independent 501(c)(3) nonprofit, nonpartisan research and educational institute that has been recognized repeatedly as the world's leading think tank for science and technology policy. Its mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth, opportunity, and progress.

**The Woodhull Freedom Foundation** is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull is particularly concerned with governmental attempts to censor or burden access to online speech, as sexual expression is often a target of such efforts. Woodhull believes that if this Court upholds the constitutionality of the challenged law, other jurisdictions will be incentivized to pass similar

Hogan Lovells US
LLP
Attorneys At Law

statutes threatening the ability of its members to effectively advocate for sexual freedom and communicate about sexually oriented topics online.

Amici therefore submit this brief in support of Plaintiff NetChoice. No counsel for a party authored this brief in whole or in part, and no person other than amici and their counsel made a monetary contribution to fund the preparation or submission of this brief.

### Introduction and Summary of Argument

User-generated content platforms are central to the Internet as we know it. From Wikipedia to YouTube, Reddit to Yelp!, these platforms are where we go to learn, access resources, be entertained, form and share ideas and opinions about everything from politics to religion to restaurants, and "explor[e] the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 99 (2017). People of all ages rely on these platforms to find and build community and connect with others who share common interests, life stages, or struggles, despite geographical distance.

Because these platforms are generally open forums, content moderation is essential to users' ability both to speak and listen, for example without being shouted down by another user, subjected to harassment by another user, or forced to view content posted by another user that impedes their speaking or listening on topics that interest them. Because platforms have different purposes and communities of users, they adopt different practices for content moderation; indeed, these practices are at the core of users' experiences with each platform.

The existence of online platforms would be untenable absent the protections of Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Congress foresaw the need to protect platforms' content moderation decisions in order for the Internet to flourish. It therefore codified protections from liability for user-generated content and content moderation, seeking to encourage "good faith" content moderation and protect Internet platforms who choose to moderate content from the impossible burden of screening all content shared through their platforms. *See id.* § 230(c). And to be certain that its aims would be achieved, Congress also preempted any state laws inconsistent with these protections—both explicitly and as made known

Hogan Lovells US LLP
Attorneys At Law

by the law's purposes and objectives. *See id.* § 230(b) and (e)(3).

The Policy Enforcement Provision in California's Age Appropriate Design Code Act (CAADCA) would entirely subvert Section 230. This provision requires covered Internet services to "[e]nforce [their] published terms, policies, and community standards," terms that encompass content moderation policies. CAADCA § 31(a)(9).  It thus effectively imposes liability on Internet platforms for any policy-violating content that is not removed or otherwise subject to enforcement. Section 230(c)(1) and (e)(3) preempt laws imposing such liability expressly. Even absent express preemption, Section 230 preempts the Policy Enforcement Provision under the doctrine of conflict preemption because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" to encourage "good faith" content moderation and protect Internet platforms who choose to moderate content from the impossible burden of screening all content shared through their platforms. *Hines v. Davidowitz*, 312 U.S. 52, 61 (1941).

Allowing the Policy Enforcement Provision to take effect would introduce grave harms that Congress sought to prevent. It will incentivize risk-averse platforms to take one of two actions—abandon robust content policies and moderation in favor of vague standards or no standards at all, or aggressively over-enforce their existing content policies, diminishing the Internet as we know it in the process. Both strategies will harm marginalized communities already vulnerable to harassment and censorship, marginalized youth most of all. And by leaving undefined what it means for a platform to "enforce" its terms and policies, the CAADCA will deter platforms from experimenting with novel solutions to address problematic content, chilling innovation and discouraging the adoption of practices that could better support users.

Because the Policy Enforcement Provision is expressly preempted by Section 230 and stands in the way of Section 230's objectives and purposes—and to prevent the harms that Section 230 is meant to guard against—the Court should grant NetChoice's motion to

Hogan Lovells US LLP
Attorneys At Law

preliminarily enjoin this provision.[1]

## I.    Section 230 preempts the Policy Enforcement Provision.

The Supremacy Clause of the U.S. Constitution "provides a clear rule that federal law 'shall be the supreme Law of the Land[.]" *Arizona v. United States*, 567 U.S. 387, 398–99 (2012) (quoting U.S. Const. art. VI, cl. 2). Congress may preempt state laws using "by enacting a statute containing an express preemption provision." *Id.* (internal citations removed). And even absent express preemption, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines*, 312 U.S. at 67 (1941)). The Policy Enforcement Provision is preempted under both standards.

### A.    Section 230 expressly preempts the Policy Enforcement Provision.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" or be "held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." § 230(c)(1), (c)(2). Section 230 further explicitly preempts state laws inconsistent with these provisions, stating that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." § 230(e)(3). Because the Policy Enforcement Provision treats platforms as engaging in the kind of speech and publication activities protected by Section 230, it is expressly preempted. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681–82 (9th Cir. 2019).

In interpreting Section 230, the Ninth Circuit has defined "publication" within the meaning of the statute to include "reviewing, editing, and deciding whether to publish or to

---

[1] This brief focuses on the Section 230 issues raised in NetChoice's motion with respect to the Policy Enforcement Provision, but Amici also support NetChoice's challenges to this and other provisions of the CAADCA on other grounds as well, consistent with the briefs Amici have previously filed in this litigation before this Court and the Ninth Circuit.

Hogan Lovells US LLP
Attorneys At Law

withdraw from publication third-party content." *Id.* (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)). In evaluating whether a law is preempted by Section 230, the Ninth Circuit asks "whether the duty would necessarily require an internet company to monitor third-party content." *Id.* at 682.

By mandating that platforms enforce "published terms, policies and community standards,"[2] the Policy Enforcement Provision does just that. To comply, platforms must necessarily monitor all user-generated content shared through their sites to avoid liability for failing to take action against policy violating content. *HomeAway.com*, 918 F.3d at 682. California itself has conceded that the Policy Enforcement Provision applies to a platform's content moderation activities, stating in its opposition to NetChoice's first motion for a preliminary injunction that the provision applies to a platform's decision "*to remove or allow content*." Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction at 14, *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023) (No. 5:22-cv-08861).

The Ninth Circuit Court of Appeals has repeatedly held that Section 230 precludes the imposition of liability for an online service provider's failure to review or exclude user-generated content. "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under [S]ection 230." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008). That includes a platform's failure to remove user generated content. *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1103 (9th Cir. 2009), *as amended* (Sept. 28, 2009). "[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Id.* Critically, platforms are also

---

[2] The words "terms" and "policies" are broad and undefined, sweeping into scope any covered platforms' content moderation policies, and the use of the term "community standards" makes clear the State's intent to target platforms' content moderation activities - Facebook calls its content moderation policies "community standards." https://transparency.meta.com/policies/community-standards/. Other platforms use similar terms: Instagram calls its content policies "Community Guidelines," as do Goodreads, Twitch, and Discord.

Hogan Lovells US LLP
Attorneys At Law

immune under Section 230 even when they fail to remove content that is "contrary to the website's express policies." *Roommates*, 521 F.3d at 1171–72.

Thus, by treating platforms as publishers on "the basis of content [they] fail[] to remove," the Policy Enforcement Provision imposes liability on "precisely the kind of activity for which Congress intended to grant absolution with the passage of Section 230." *Roommates*, 521 F.3d at 1172. The provision treats platforms "as the publisher or speaker of [] information provided by another information content provider," and is thus expressly preempted by Section 230. *See* 47 U.S.C. § 230(c)(1) and (e)(3); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *Roommates*, 521 F.3d at 1171–72; *see also Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012).

Imagine a platform that employs thousands of professionals to apply its content moderation guidelines to millions of pieces of content posted each day. Although these professional moderators often undergo months of training to learn how to enforce detailed policies in practice, it is often still exceedingly unclear whether a given piece of content violates a platform's policy. Take, for example, Nick Ut's famous Pulitzer prize winning photograph of a young, naked girl running from a napalm attack during the Vietnam war. If that photograph is uploaded to an Internet platform whose content policies prohibit nudity, should the photograph be removed? Facebook dealt with just that situation in 2016, initially removing a post by the then Norwegian prime minister sharing the photograph, but ultimately restoring it after public outcry.[3] Likewise, how should a moderator treat a video depicting violence in Syria? Should they remove the content for violating policies against extremist content, as YouTube did with thousands of videos of the Syrian conflict?[4] What if those videos provide vitally important evidence of human rights abuses and are of immense public interest? Moderators typically only have a matter of

---

[3] *See* Kate Klonick, *Facebook Under Pressure*, SLATE (Sept. 12, 2016), https://slate.com/technology/2016/09/facebook-erred-by-taking-down-the-napalm-girl-photo-what-happens-next.html.

[4] *See* Abdul Rahman Al Jaloud et al., *Caught in the Net: The Impact of "Extremist" Speech Regulations on Human Rights Content*, ELECTR. FRONTIER FOUND. (May 30, 2019), https://www.eff.org/wp/caught-net-impact-extremist-speech-regulations-human-rights-content.

6

Hogan Lovells US LLP
ATTORNEYS AT LAW

1    seconds to make these sorts of judgment calls as they remove hundreds of millions of policy-

2    violating content items each year. But CAADC's Policy Enforcement Provision would punish

3    platforms for whatever content slips through the cracks, a penalty that contravenes the express

4    goal of Section 230 to promote "good faith" efforts to "restrict access to or availability of"

5    objectionable content. 47 U.S.C. § 230(c)(2)(A). Therefore, what the Policy Enforcement

6    Provision asks of platforms is not just impossible, it is preempted.

7        *Barnes* is of no help to California and in fact underscores this conclusion. California has

8    used *Barnes* to support its argument that the Policy Enforcement Provision "permissibly holds

9    online businesses accountable for doing what they say they are going to do" is misplaced.

10   Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction at 14, *NetChoice, LLC v.

11   Bonta*, 692 F. Supp. 3d 924 (N.D. Cal. 2023) (No. 5:22-cv-08861). *Barnes* found that a

12   promissory estoppel claim "d[id] not seek to hold Yahoo liable as a publisher or speaker of third-

13   party content, but rather as the counter-party to a contract, as a promisor who has breached." 570

14   F.3d at 1107. The promise at issue in *Barnes* was "Yahoo's manifest intention to be legally

15   obligated to do something, which happen[ed] to be removal of material from publication." *Id.*

16   Yahoo's Director of Communications directly conveyed to the plaintiff that "she would

17   'personally walk the statements over to the division responsible for stopping unauthorized

18   profiles [on Yahoo] and they would take care of it," a statement on which the plaintiff "claim[ed]

19   to have relied." *Id.* at 1099.

20       Significantly, *Barnes* did *not* imply that a general statement of policy would be sufficient

21   to support a promissory estoppel claim. On the contrary, the court expressly stated that "a general

22   monitoring policy, or even an attempt to help a particular person, on the part of an interactive

23   computer service such as Yahoo does not suffice for contract liability." *Id.* at 1108.

24   Unsurprisingly, applying *Barnes*, other judges on this Court have since held that a platform's

25   content policies do not give rise to "any promise . . . to enforce its terms." *Goddard v. Google,

26   Inc.*, 640 F. Supp. 2d 1193, 1201 (N.D. Cal. 2009). Accordingly, as in *Goddard*, California's past

27   argument "rests not on any promise, but on a 'general [content] policy . . . on the part of" an

28

AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY
AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF
NETCHOICE BEFORE THE NORTHERN DISTRICT OF CALIFORNIA
AMICUS CURAIE BRIEF IN SUPPORT OF NETCHOICE -- CASE NO.  5:22-CV-08861-BLF

online platform . . . , a theory of liability that *Barnes* expressly precludes." *Goddard*, 640 F. Supp. 2d at 1201 (quoting *Barnes*, 570 F.3d at 1108).

> **B.** **Section 230 also preempts the Policy Enforcement Provision because the provision interferes with congressional purposes and objectives.**

Even absent express preemption, the Policy Enforcement Provision is preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 406 (2012) (quoting *Hines*, 312 U.S. at 67 (1941)); *see also Backpage*, 881 F. Supp.2d at 1273.

To determine when a state law presents a "sufficient obstacle," courts look to "the federal statute as a whole" and "identify[] its purpose and intended effects." *Crosby*, 530 U.S. at 373. "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

Enforcement of the Policy Enforcement Provision impermissibly frustrates Section 230's purposes and objectives, as made plain by the context for its passage. Section 230 was "prompted" by a New York Supreme Court decision. *See Roommates*, 521 F.3d at 1163 (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y.S.2d May 24, 1995)). In that case, Internet platform Prodigy was held liable as the "publisher" of libelous content posted by a user "because it voluntarily deleted some messages on its message boards . . . and was therefore legally responsible for the content of defamatory messages that it failed to delete." *Id.* In making that determination, the court specifically cited the fact that Prodigy had adopted "content guidelines." *Stratton Oakmont*, 1995 WL 323710, at *4.

According to Section 230's original authors, "[t]he *Stratton Oakmont* decision . . . penalized an Internet platform for engaging in less-than-perfect content moderation—that is, for failing in its attempt to remove every piece of potentially unlawful content from its site."[5]

---

[5] Brief Senator Ron Wyden and Former Representative Christopher Cox as Amici Curiae in Support of Respondent at 7, *Gonzalez v. Google LLC*, 598 U.S. 617, 620 (2023) (No. 21-1333).

Hogan Lovells US LLP
Attorneys At Law

*Stratton Oakmont* thus "created a perverse incentive" for Internet platforms to "avoid open-ended liability" by "adopt[ing] . . . the 'anything goes' model for user-created content."[6] Congress therefore adopted Section 230 to encourage "good faith content moderation" and immunize Internet platforms "for whom the burden of screening billions of digital messages, documents, images, and sounds would be unreasonable."[7]

Damningly, the Policy Enforcement Provision would reinstate precisely the same perverse incentive that Congress sought to eradicate with Section 230, imposing liability like in *Stratton Oakmont* on platforms that enforce content policies and moderate user-generated content but do so imperfectly. Consequently, the Policy Enforcement Provision would frustrate Congress's goal of "establish[ing] a uniform federal policy, applicable across the internet, that avoids such results as the state court decision in [*Stratton Oakmont*]."[8]

Following this same reasoning, in *Backpage.com*, Section 230 was found to preempt a proposed state law criminalizing the "knowing" distribution of certain sexually explicit content. In addition to finding that Section 230 expressly preempted the law, the Court found that the state law also presented an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 881 F. Supp. 2d at 1273 (quoting *Arizona,* 567 U.S. at 406). Specifically, by requiring that online service providers have knowledge of a violation, the law "reinforce[d] [providers'] incentives to restrict speech and abstain from self-regulation." *Id.* (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997)). Consequently, the law impermissibly sought to "drastically shift[] the unique balance that Congress created [in Section

---

[6] Christopher Cox, *The Origin and Original Intent of Section 230 of the Communications Decency Act*, RICHMOND J.L. & TECH. BLOG ¶ 2 (Aug. 27, 2020), https://jolt.richmond.edu/2020/08/27/the-origins-and-original-intent-of-section-230-of-the-communications-decency-act/.

[7] *Id.* ¶28; *see also* 141 CONG. REC., 22046 (1995) (Remarks of Rep. Goodlatte) ("We have the opportunity for every household in America, every family in America, soon to be able to have access to places like the Library of Congress, to have access to other major libraries of the world, universities, major publishers of information, news sources. There is no way . . . that any of those entities, like Prodigy, can take responsibility to edit out information that is going to be coming in to them from all manner of sources.").

[8] Cox *supra* note7, ¶48.

230] with respect to the liability of online service providers that host third party content." *Id.* at 1274.

## II.    This Court can and should grant a preliminary injunction based on a facial Section 230 preemption challenge.

Although this Court previously concluded that "a facial challenge to the CAADCA is not the appropriate context in which to consider the applicability of § 230," *see NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 963 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024)), doing so would promote judicial economy and be consistent with the decisions of numerous other courts. In many other cases, courts have found Section 230 to preempt inconsistent state laws at the preliminary injunction stage based on facial arguments. *See, e.g.*, *Backpage.com*, 881 F. Supp.2d; *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 (DMC) (JAD), 2013 WL 4502097, at *5 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013); *Airbnb, Inc. v. City of Bos.*, 386 F. Supp.3d 113, 123-24 (D. Mass. 2019); *Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *19 (W.D. Tex. Aug. 30, 2024). A determination that the Policy Enforcement Provision is facially preempted by Section 230 would not only spare future defendants from litigating costly enforcement actions, but it would also serve the interests of judicial economy, "saving both parties from wasting valuable resources on doomed litigation" and "freeing up the courts to handle other cases more carefully or quickly."[9]

## III.    If allowed to subvert Congress, the Policy Enforcement Provision would harm marginalized users and chill innovation in content moderation.

For major online platforms with billions of users, perfect enforcement of content policies is impossible. Therefore, in contrast to the goals envisioned by Section 230, the Policy Enforcement Provision will incentivize platforms to either aggressively overpolice or altogether abandon existing efforts to moderate content hosted on their sites. This outcome will disproportionately harm marginalized groups and create a disincentive against further experimentation and innovation in approaches to content moderation.

---

[9] Eric Goldman, *Why Section 230 is Better Than the First Amendment,* 95 NOTRE DAME L. REV. 33, 41 (2019).

10

Hogan Lovells US LLP
Attorneys At Law

### A.    Content moderation is inevitably imperfect.

The ability to set and implement content policies for user-generated content is key to platforms' abilities to establish competitive identities, respond to harmful content, ensure financial viability, and meet evolving needs and changing norms of their user communities. But even for platforms with extensive resources devoted to enforcement of their content policies, mistakes and omissions are inevitable. If it was unreasonable to require the Internet platforms of the 1990s to assess every piece of user-generated content, "when internet traffic was measured in the tens of millions,"[10] it is even more unreasonable now. 100 billion messages and 350 million photos[11] are shared across Facebook every day. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2395 (2023). "In the face of that deluge," the Supreme Court has observed, "major platforms cull and organize uploaded posts in a variety of ways . . . . remov[ing] some content entirely; rank[ing] or otherwise prioritiz[ing] what remains; and sometimes add[ing] warnings or labels." *Id.* at 2395. Even if Facebook's content policy enforcement had a 99.9% accuracy rate, "it's still going to make 'mistakes' on 350,000 images. Every. Single. Day. So, add another 350,000 mistakes the next day. And the next. And the next. And so on."[12] At the scale at which Internet platforms operate, perfect enforcement of content policies is impossible.

Whether or not a particular piece of content violates a platform's content policies is moreover a matter of interpretation, and one that is inherently subjective and often dependent on context and culture.[13] In many cases, it may not be easily ascertainable based on the face of a

---

[10] Cox, *supra* note 7, ¶61.

[11] Mike Masnick, *Masnick's Impossibility Theorem,* TECHDIRT (Nov. 20, 2019), https://www.techdirt.com/2019/11/20/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well/.

[12] Masnick, *supra* note 12.

[13] Masnick, *supra* note 12 ("By definition, content moderation is always going to rely on judgment calls, and many of the judgment calls will end up in gray areas where lots of people's opinions may differ greatly. Indeed, one of the problems of content moderation that we've highlighted over the years is that to make good decisions you often need a tremendous amount of context, and there's simply no way to adequately provide that at scale in a manner that actually works.").

AMICI CURIAE BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION, AND THE WOODHULL FREEDOM FOUNDATION IN SUPPORT OF NETCHOICE BEFORE THE NORTHERN DISTRICT OF CALIFORNIA
AMICUS CURIAE BRIEF IN SUPPORT OF NETCHOICE -- CASE NO. 5:22-CV-08861-BLF

Hogan Lovells US LLP
ATTORNEYS AT LAW

piece of content whether it violates an applicable content policy.[14] In such cases, an understanding of the content's context may be necessary to make an appropriate determination. Platforms must make quick decisions about potential content violations, and often "without fully understanding the factual and social context."[15] Automated systems fare no better than human moderators at this task.[16]

However, under the Policy Enforcement Provision, each mistake could give rise to a penalty of $2,500 per affected child—or $7,500 based on a theory that a mistake was intentional.[17] Using the previous example of 350,000 mistakes out of 350 million photos, at the lower "negligence" threshold, liability could ratchet up to over 8 trillion dollars—and that's assuming there is just one "affected child" per mistake.

**B.      The Policy Enforcement Provision will disproportionately harm marginalized users.**

Faced with the risk of punishing fines for errors in content policy enforcement or interpretations that differ from the state attorney general, platforms will be pressed to adopt one of two strategies, both of which will have a significant negative impact on speech online and disproportionately harm marginalized groups.

First, platforms will be incentivized to abandon robust content moderation policies, leading to lower standards for online content or vague or opaque standards that they cannot be accused of failing to enforce. Research on early content moderation practices, which took the form of generalized "standards" as opposed to detailed "rules," shows that vague content policy increases the risk of arbitrary enforcement based on cultural or personal biases. For example, in the early days of Facebook's community standards development, "a group of [content

---

[14] Eric Goldman, *Content Moderation Remedies*, 28 MICH. TECH. L. REV. 1, 43 (2021) ("It will not always be clear that a rule violation occurred. [Child sexual abuse material] is comparatively unique in this regard; violations usually can be confirmed by reference to the content item. In contrast, in many circumstances, a rule violation cannot be definitively determined.").

[15] Eric Goldman and Jess Miers, *Online Account Terminations/Content Removals and the Benefits of Internet Services Enforcing Their House Rules*, 1 J. FREE SPEECH L. 191, 205 (2021).

[16] Daphne Keller, *Internet Platforms: Observations on Speech, Danger*, HOOVER INST. 1, 7 (2018).

[17] Cal. Civ. Code § 1798.99.35.

Hogan Lovells US LLP
ATTORNEYS AT LAW

moderation] workers [in India] were given a list of observable rules about a picture that made it impermissibly sexual, but at the bottom of the rules there was a general 'Feel Bad' standard: if you feel like something is otherwise sexual or pornographic, take it down. That standard when applied to global content by a small group of moderators was predictably overrestrictive" leading to takedowns of "content that portrayed open-mouthed kissing."[18]

The Policy Enforcement Provision would encourage platforms to return to these sorts of "[i]mprecise and broad" content policies. Not only do such policies give enforcers considerable discretion, but they are especially harmful to marginalized groups because "platforms regularly use this discretion to delay action against powerful figures, whereas they seem to apply a trigger-happy approach to speech from marginalized groups using aggravated language to speak out against injustice."[19]

As Twitter's previous General Counsel has explained, a lack of robust content moderation can also allow abusive content to flourish, to the detriment of marginalized voices:

> "I've also been seriously troubled by the plight of some of our users who are completely overwhelmed by those who are trying to silence healthy discourse in the name of free expression. At times, this takes the form of hateful speech in tweets directed at women or minority groups; at others, it takes the form of threats aimed to intimidate those who take a stand on issues."[20]

For many users, content moderation is what makes the Internet a tolerable space, and when platforms are protected from liability for their enforcement decisions, they have a greater incentive to take action against harmful content.[21]

---

[18] Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 HARV. L. REV. 1598, 1642-1643 n.308 (2017).

[19] Ángel Díaz & Laura Hecht-Felella, *Double Standards in Social Media Content Moderation*, BRENNAN CTR. JUSTICE, 3 (2021), https://www.brennancenter.org/sites/default/files/2021-08/Double_Standards_Content_Moderation.pdf.

[20] Vijaya Gadde, *Twitter executive: Here's how we're trying to stop abuse while preserving free speech*, WASH. POST (Apr. 16, 2015), https://www.washingtonpost.com/posteverything/wp/2015/04/16/twitter-executive-heres-how-were-trying-to-stop-abuse-while-preserving-free-speech.

[21] Jess Miers, *Five Section 230 Cases That Made Online Communities Better*, Chamber of Progress, MEDIUM (May 21, 2024), https://medium.com/chamber-of-progress/five-section-230-cases-that-made-online-communities-better-92ccba6a8a7b.

Hogan Lovells US LLP
Attorneys At Law

Second, platforms may also respond to the Policy Enforcement Provision by aggressively overenforcing their content policies, increasing the use of automated detection tools and removing any content flagged, increasing the risk of "collateral censorship" of marginalized voices.[22] For example, racial minorities may find that their speech is quashed because it is deemed hate speech, harassment, or abuse.[23] Girls and young women may struggle to access information about sexual assault, reproductive healthcare, and other issues due to how their bodies have been sexualized.[24] Women may find themselves banned from social media for sharing their stories about workplace sexual harassment and abuse.[25] Aggressive overenforcement also poses a risk to vitally important documentation of human rights abuses as platforms' incentive to broaden policing of "extremist" content may inadvertently result in the mass removal of activist counterspeech against human rights violations.[26]

These real-world effects will be particularly harmful to the very youth California seeks to protect. Many teens rely on user-generated content platforms, like social media, to connect with friends, share creative content, get support in difficult times, and find communities that help them feel accepted.[27] Such platforms also "provide access to important information" and "promot[e]

---

[22] *See* Note, *Section 230 as First Amendment Rule*, 131 HARV. L. REV. 2027, 2046–47 (2018) (citing research indicating that "marginalized communities" are "particularly vulnerable to the collateral censorship" that results from chilling an intermediary's speech).

[23] *See* Maarten Sap et al., *The Risk of Racial Bias in Hate Speech Detection, Proceedings of the 57th Annual Meeting of the Association for Computational Linguistics*, 1668, 1671 (2019), https://bit.ly/3ODPs8S.

[24] *See* Savannah Kuchar, *When social media censorship gets it wrong: The struggle of breast cancer content creators*, USA TODAY (Sept. 12, 2023), https://bit.ly/49sRReA.

[25] Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After Harassment Scandals*, GUARDIAN (Dec. 5, 2017), https://bit.ly/49sRWio.

[26] *See* Abdul Rahman Al Jaloud et al., *supra* note 5.

[27] Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022,* PEW RSCH. CTR. (Nov. 16, 2022), https://pewrsr.ch/3whSY2z ("Eight-in-ten teens say that what they see on social media makes them feel more connected to what's going on in their friends' lives[;] . . . 71% say it makes them feel like they have a place where they can show their creative side[;] . . . 67% say these platforms make them feel as if they have people who can support them through tough times[;] . . . a majority [] say the same for feeling more accepted. These positive sentiments are expressed by teens across demographic groups.").

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

help seeking behaviors . . . serving as a gateway to initiating mental health care."[28] Marginalized youth often rely on online platforms to find communities where they can engage in open dialogue in ways that may not be possible offline. For example, LGBTQ+ youth find solace in online spaces, reducing feelings of isolation, anxiety, and suicidal ideation.[29] Recent studies show that transgender and gender diverse youth increasingly depend on online communities to access key resources that help them explore, develop, and affirm their identities, including during times of crisis.[30] The directors of leading gender and sexuality clinics believe that online platforms "can be a lifesaver" for LGBTQ+ youth by enabling them to "find[] communities of people who will accept them and not judge them."[31]

Over-enforcement will likely chill online speech that is crucial to LGBTQ+ youth, especially in light of political efforts to limit access to such information. Indeed, LGBTQ+ content is already under attack by those who would paint even the most innocuous LGBTQ+ positive content as "highly sexualized" and age-inappropriate.[32] "[I]t is inordinately LGBTQIA+ community resources, activist groups, and sex educators that are getting censored by the overbroad content moderation algorithms and human reviewers."[33] Aggressive overenforcement

---

[28] *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *12 (D. Utah Sept. 10, 2024) (quoting United States Surgeon General Advisory, *Social Media and Youth Mental Health,* U.S. DEP'T HEALTH AND HUM. SERVS. (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf).

[29] Ashley Austin et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L J. TRANSGENDER HEALTH 33 (2020); *see also* Human Rights Campaign Foundation, *2023 LGBTQ+ Youth Report*, (Aug. 2023), https://bit.ly/3UCHIYO ("Over 8 in 10 . . . LGBTQ+ youth have ever used the internet to seek out LGBTQ+ specific sexual health and behavior information, and well over 9 in 10 . . . have used the internet to seek out information about LGBTQ+ identities, and their own identity as an LGBTQ+ person . . . .").

[30] Austin et al., *supra* note 30.

[31] Julie Jargon, *When Teens Question Their Gender, Social Media Can Provide Support–and Pressure*, WALL ST. J. (Oct 23, 2021), https://tinyurl.com/44sp5rx7.

[32] *See, e.g.*, Jared Eckert & Makenna McCoy, *Young Children Are Being Targeted With Sexual Content. The Equality Act Would Make It Worse*, HERITAGE FOUND. (June 11, 2021), https://herit.ag/49v3aD7; Tom Tapp, *GOP Senators Call For Warning Label On "Disturbing" LGBTQ Content In Kids' TV Shows*, DEADLINE (Mar. 6, 2022), https://bit.ly/3wk58Yu.

[33] Alexander Monea, THE DIGITAL CLOSET: HOW THE INTERNET BECAME STRAIGHT 179 (2022).

by platforms looking to limit their potential liability for failing to enforce their content policies will only exacerbate these harms.

### C.  The Policy Enforcement Provision could chill innovation in content moderation.

Where the CAADC fails to define "enforce" in the Policy Enforcement Provision, it may also chill platforms' ability to innovate and tailor their remedial actions to current events and evolving community norms. It is often assumed that "enforcement" requires platforms to remove or block access to content. In reality, absent liability for publishing user generated content, platforms have a near-infinite range of actions they can employ, depending on the unique circumstances of each platform and the user communities they support.[34] Common alternative actions include reducing visibility through automated ranking and recommendations systems, adding interstitial warnings, blocking or adding friction to content sharing, removal from search indexes, demonetization, banning certain hashtags, and adding additional context or information.[35] Platforms with unique infrastructure can implement remedial actions specific to their products. Reddit, for example, places communities containing "highly offensive or upsetting" content and those "dedicated to promoting hoaxes" into "quarantine"—requiring users to opt in to view the community's content, deindexing the community from search results, and restricting monetization and visibility.[36] Alternative remedial actions may help platforms better balance their users' competing interests[37] or tailor their responses to harms faced by marginalized communities.[38] The Policy Enforcement Provision risks undermining these efforts and chilling future experimentation.

---

[34] Eric Goldman, *supra* note 15, at 6.

[35] *Id.* at 24-39.

[36] Reddit, *Quarantined Communities*, https://support.reddithelp.com/hc/en-us/articles/360043069012-Quarantined-Communities.

[37] Goldman, *supra* note 15.

[38] *See* generally, Sarita Schoenebeck et al., *Drawing from Justice Theories to Support Targets of Online Harassment*, 23 NEW MEDIA & SOC'Y 1278 (2020) (discussing different marginalized user communities' preferences regarding remedial actions for online harassment.)

16

Hogan Lovells US LLP
ATTORNEYS AT LAW

**Conclusion**

For the foregoing reasons, Amici urge the Court to grant NetChoice's motion for a preliminary injunction.

Date: November 15, 2024

Respectfully submitted,

HOGAN LOVELLS US LLP

By:  */s/ Trenton H. Norris*

Trenton H. Norris (Bar No. 164781)
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
trenton.norris@hoganlovells.com

Mark W. Brennan *(Pending Pro Hac Vice)*
J. Ryan Thompson *(Pending Pro Hac Vice)*
Thomas Veitch *(Pending Pro Hac Vice)*
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
mark.brennan@hoganlovells.com
ryan.thompson@hoganlovells.com
thomas.veitch@hoganlovells.com

Attorneys for Chamber of Progress, LGBT Tech, the Information Technology and Innovation Foundation, and the Woodhull Freedom Foundation

Hogan Lovells US LLP
Attorneys At Law