1   ROB BONTA
    Attorney General of California
2   ANYA M. BINSACCA
    Supervising Deputy Attorney General
3   KRISTIN A. LISKA
    Deputy Attorney General
4   State Bar No. 315994
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3916
6     Fax:  (415) 703-5480
      E-mail:  Kristin.Liska@doj.ca.gov
7   *Attorneys for Defendant*

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12

13   **NetChoice, LLC,**                    Case No. 5:22-cv-08861-BLF

14                          Plaintiff,      **OPPOSITION TO PLAINTIFF'S
                                            MOTION FOR A SECOND
15        **v.**                            PRELIMINARY INJUNCTION**

16                                          Date:        January 23, 2025
                                            Time:        9:00 a.m.
17   **Rob Bonta, in his official capacity as**   Dept:        3
     **Attorney General of the State of California,**   Judge:       The Honorable Beth Labson
18                                                       Freeman
                           Defendant.      Trial Date:  Not scheduled
19                                          Action Filed: 12/14/2022

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Background .................................................................................................................. 2

    A.    Children and the Internet ......................................................................... 2

    B.    The California Age-Appropriate Design Code Act ................................. 4

    C.    Procedural History ................................................................................... 6

Legal Standards ........................................................................................................... 7

    I.    Preliminary Injunction Standard .............................................................. 7

    II.    First Amendment Principles ..................................................................... 7

    III.    Vagueness Principles ............................................................................... 9

Argument .................................................................................................................. 10

    I.    Plaintiff Has Not Shown a Likelihood of Success on Its First Amendment
Claim ..................................................................................................... 11

        A.    Strict Scrutiny Does Not Apply to the Act as a Whole ............................ 11

        B.    Plaintiff Has Not Shown Any Individual Provision Likely Violates
the First Amendment .............................................................. 13

            1.    Requirement to enforce published terms, policies, and
community standards (§ 31(a)(9)) ................................. 13

                a.    First Amendment facial challenge ................................... 14

                b.    Vagueness challenge ....................................................... 15

            2.    Restrictions on the use of childrens' personal information
(§ 31(b)(1)-(b)(4)) ................................................ 15

                a.    First Amendment facial challenge ................................... 15

                b.    Vagueness challenge ....................................................... 20

            3.    Restriction on the use of dark patterns (§ 31(b)(7)) ..................... 21

                a.    First Amendment challenge ............................................. 21

                b.    Vagueness challenge ....................................................... 23

            4.    Requirement to estimate age (§ 31(a)(5)) ................................. 23

                a.    First Amendment challenge ............................................. 23

                b.    Vagueness challenge ....................................................... 25

    II.    Plaintiff Has Not Shown a Likelihood of Success on Its Other Claims ............... 25

        A.    Preemption ............................................................................. 25

            1.    Section 230 .......................................................................... 25

            2.    COPPA ................................................................................ 26

        B.    Dormant Commerce Clause .................................................... 27

    III.    The Remainder of the Statute Is Severable from Any Invalid Provisions ........... 27

i

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

Conclusion ................................................................................................................ 30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Plaintiff's Motion for a Second Preliminary Injunction (5:22-cv-08861-BLF)

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbot Lab'ys v. Franchise Tax Bd.*
175 Cal. App. 4th 1346 (2009)...................................................................... 28, 30

*Am. Beverage Ass'n v. City of San Francisco*
916 F.3d 749 (9th Cir. 2019).............................................................................. 7

*Arcara v. Cloud Books, Inc.*
478 U.S. 697 (1986) ........................................................................................ 7, 8

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015).............................................................................. 9

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
729 F.3d 937 (9th Cir. 2013)............................................................................ 27

*Barnes v. Yahoo!, Inc.*
570 F.3d 1096 (9th Cir. 2009)..................................................................... 25, 26

*Belgau v. Inslee*
975 F.3d 940 (9th Cir. 2020)............................................................................ 14

*California Redevelopment Ass'n v. Matosantos*
53 Cal. 4th 231 (2011) ........................................................................ 28, 29, 30

*Calise v. Meta Platforms, Inc.*
103 F.4th 732 (9th Cir. 2024)...................................................................... 25, 26

*Chinatown Neighborhood Ass'n v. Harris*
794 F.3d 1136 (9th Cir. 2015).......................................................................... 27

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*
596 U.S. 61 (2022)............................................................................... 8, 11, 12

*Cohen v. Cowles Media Co.*
501 U.S. 663 (1991).......................................................................................... 14

*County of Sonoma v. Superior Court*
173 Cal. App. 4th 322 (2009)........................................................................... 28

*Cultiva La Salud v. California*
89 Cal. App. 5th 868 (2023)............................................................................. 30

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*
112 F.4th 1168 (9th Cir. 2024)......................................................................... 25

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network*
  742 F.3d 414 (9th Cir. 2014).......................................................................... 27

*Hill v. Colorado*
  530 U.S. 703 (2000) ....................................................................................... 10

*HomeAway.com, Inc. v. City of Santa Monica*
  918 F.3d 676 (9th Cir. 2019)............................................................................. 8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*
  515 U.S. 557 (1995)........................................................................................ 17

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*
  538 U.S. 600 (2003)........................................................................................ 22

*In re Jonathan C.M.*
  91 Cal. App. 5th 1039 (2023).......................................................................... 21

*In re Marriage of Vargas & Ross*
  17 Cal. App. 5th 1235 (2017)........................................................................... 21

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*
  702 F. Supp. 3d 809 (N.D. Cal. 2023) ............................................................ 26

*Jones v. Google LLC*
  73 F.4th 636 (9th Cir. 2023)............................................................................ 26

*Legislature v. Eu*
  54 Cal. 3d 492 (1991) ............................................................................... 28, 29

*Lemmon v. Snap, Inc.*
  995 F.3d 1085 (9th Cir. 2021).......................................................................... 26

*Moody v. NetChoice, LLC*
  144 S. Ct. 2838 (2024) ............................................................................. *passim*

*Nat'l Pork Producers Council v. Ross*
  598 U.S. 356 (2023)........................................................................................ 27

*NetChoice, LLC v. Bonta*
  113 F.4th 1101 (9th Cir. 2024).................................................................. *passim*

*NetChoice, LLC v. Bonta*
  692 F. Supp. 3d 924 (N.D. Cal. 2023) .............................................................. 6

iv

# TABLE OF AUTHORITIES
### (continued)

Page

*NetChoice, LLC v. Fitch*
   -- F. Supp. 3d --, 2024 WL 3276409 (S.D. Miss. July 1, 2024) ............................................ 13

*NetChoice, LLC v. Reyes*
   -- F. Supp. 3d --, 2024 WL 4135626 (D. Utah Sept. 10, 2024) ........................................... 13

*NetChoice, LLC v. Yost*
   716 F. Supp. 3d 539 (S.D. Ohio 2024).......................................................................... 12, 13

*New York v. Ferber*
   458 U.S. 747 (1982) ....................................................................................................... 19

*Petition of Daniels*
   177 Cal. App. 2d 376 (1960) .......................................................................................... 21

*Porter v. Martinez*
   68 F.4th 429 (9th Cir. 2023).............................................................................. 8, 12, 13

*Quintano v. Mercury Cas. Co.*
   11 Cal. 4th 1049 (1995) ................................................................................................. 29

*Sorrell v. IMS Health, Inc.*
   564 U.S. 552 (2011) ............................................................................................ 8, 16, 17

*Twitter, Inc. v. Garland*
   61 F.4th 686 (9th Cir. 2023)........................................................................................... 8

*United States v. Jae Gab Kim*
   449 F.3d 933 (9th Cir. 2006).......................................................................................... 23

*United States v. Swisher*
   811 F.3d 299 (9th Cir. 2016)........................................................................................... 8

*United States v. Yazzie*
   743 F.3d 1278 (9th Cir. 2014)......................................................................................... 19

*Valle del Sol, Inc. v. Whiting*
   709 F.3d 808 (9th Cir. 2013)....................................................................................... 8, 9

*Vivid Ent., LLC v. Fielding*
   774 F.3d 566 (9th Cir. 2014).......................................................................................... 28

*Wine & Spirit Retailers, Inc. v. Rhode Island*
   418 F.3d 36 (1st Cir. 2005) ............................................................................................ 13

v

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ................................................................................ 7

4

5

*Young v. Am. Mini Theaters, Inc.*
    427 U.S. 50 (1976) .......................................................................... 13

6

**STATUTES**

7

California Civil Code
    § 1798.99.29 ................................................................................ 4

8

    § 1798.99.30(a) ......................................................................... 4,11
    § 1798.99.30(a)(1) ...................................................................... 27

9

    § 1798.99.30(b)(4) ............................................................... 5, 11, 12

10

    § 1798.99.31(a) ........................................................................ 4, 11

11

    § 1798.99.31(a)(1)(A) .................................................................. 5
    § 1798.99.31(a)(5) ................................................................ 5, 23, 24

12

    § 1798.99.31(a)(9) ................................................................ 5, 13, 14
    § 1798.99.31(b) ........................................................................ 4, 11

13

    § 1798.99.31(b)(1) ................................................................ 5, 15, 26
    § 1798.99.31(b)(2) ................................................................ 5, 15, 16

14

    § 1798.99.31(b)(3) ............................................................ 5, 15, 16, 26

15

    § 1798.99.31(b)(4) ................................................................ 5, 15, 26
    § 1798.99.31(b)(7) ................................................................ 5, 21, 26

16

    § 1798.99.31(b)(8) ...................................................................... 25
    § 1798.99.35(a) ........................................................................... 6

17

    § 1798.120(c) ............................................................................. 4

18

    § 1798.140(d) ...................................................................... 4, 11, 27
    § 1798.140(i) .............................................................................. 27

19

    § 1798.140(*l*) ............................................................................ 22

20

2022 Cal. Stat., Chapter 320 (AB 2273) ........................................... *passim*

21

    § 1(a)(2) ................................................................................... 13
    § 1(a)(4) ................................................................................... 13

22

    § 1(a)(6) ................................................................................... 13
    § 1(a)(7) ................................................................................... 13

23

    § 1(a)(8) ................................................................................... 13
    § 1(a)(9) ................................................................................... 13

24

United States Code, Title 15
    §§ 6501–6506 ............................................................................ 26

25

    § 6502 ...................................................................................... 4
    § 6502(d) ................................................................................. 26

26

27

28

### TABLE OF AUTHORITIES
(continued)

**Page**

United States Code, Title 47
§ 230(c)(1)................................................................................................ 25
§ 230(e)(3)............................................................................................... 25

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment............................................................................ *passim*
Fourth Amendment ............................................................................ 6
Fourteenth Amendment.................................................................... 6

### INTRODUCTION

For a second time in this case, plaintiff NetChoice, LLC is before this Court seeking a preliminary injunction of the California Age-Appropriate Design Code Act.  Plaintiff previously obtained an injunction of the entire Act by contending that the Act will impact its members' content and information use and was likely to violate the First Amendment.  But the Ninth Circuit in large part disagreed.  It held that plaintiff had failed to meet the standard for a facial First Amendment challenge as to all but one provision of the Act.  As the Ninth Circuit explained, most of the challenged provisions, "by their plain language, do not necessarily impact protected speech in all or even most applications," *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024).  It found that the record was insufficient to establish that the unconstitutional applications of the all but one of the challenged provisions substantially outweighed the constitutional ones.

Plaintiff has now returned to this Court seeking a second injunction.  But rather than build the factual record the Ninth Circuit found lacking, plaintiff takes a different tack.  Instead, plaintiff now seeks to enjoin only an unspecific "range of applications" of the challenged provisions that involve "content."  As to this amorphous range of applications, plaintiff argues that this Court's prior ruling already properly held these applications were likely to violate the First Amendment.  In other words, plaintiff seeks to simply reinstate this Court's prior ruling by narrowing its request to only some applications of the challenged provisions.

This approach flies in the face of the Ninth Circuit's ruling.  Plaintiff's attempt to resurrect this Court's prior ruling without first building a further factual record fails to remedy the shortfalls that the Ninth Circuit found in vacating most of the prior injunction.  As that court's ruling made clear, it is plaintiff's burden to establish a factual record demonstrating: (1) how the challenged provisions will tangibly affect its members, (2) how that effect will impact the members' *expressive activity*, (3) what standard applies to any applications that impact expressive activity, and (4) whether those applications meet the requisite First Amendment standard. Without such a factual record, neither defendant nor this Court can "explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Moody v. NetChoice, LLC*, 144 S. Ct. 2838, 2398 (2024).

Nor can plaintiff escape this burden by a talismanic invocation of "content."  Plaintiff nowhere explains what "content" it is referring to: content generated by users, content created by its members, content of a webpage layout, content of members' editorial choices?  And how does a law that regulates *privacy and data policies* even impact "content"?  And how does any impact on "content" translate into an impact on *expressive activity*—for it is expressive activity, not "content" in the abstract, that the First Amendment protects.  Plaintiff has wholly failed to build a record showing that the challenged subsections, even if limited to unspecified applications, impact expressive activities, let alone in an unconstitutional way.  It thus has failed to carry its burden for a facial challenge, and this Court should deny its motion.

## BACKGROUND

### A.    Children and the Internet

Children's internet use has exploded in the last decade.  In today's connected world, up to 92% of children have used a mobile device in their first year of life.  First Radesky Decl. [ECF No. 51-5] ¶ 21.  As of 2021, 32% of 7-9 year olds and 49% of 10-12 year olds in the United States were reported to be using social media platforms, even though most platforms restrict use to those over 13 years of age.  *Id.* ¶ 23.  Almost half of adolescents report using social media "almost constantly"; 85% report spending more time online than they intended.  *Id.*  According to data from 2020-2021, children ages 2-4 years average around a two and a half hours online each day, those 5-8 average over three hours daily, those 6-12 average over five and a half hours daily, and those 13-17 average over eight and a half hours daily.  *Id.* ¶ 25.

At the same time, children are uniquely vulnerable online.  Children are curious, impulsive thinkers with still-developing brains.  Second Radesky Decl. ¶ 56.  Their immature brains have less impulse control, less critical thinking, and less abstract reasoning about complicated concepts like privacy.  *Id.*  Children are also more receptive to parasocial relationships and more attracted to novelty and rewards.  *Id.* ¶¶ 56, 58-59.  While these characteristics are developmentally adaptive for children to help them learn and build social relationships, they also make children more vulnerable to being manipulated or taken advantage of.  *Id.* ¶ 56.

This vulnerability online also flows in part from the existing incentive structure of the

internet.  The collection, sharing, selling, and similar uses of a users' personal information provides substantial revenue for online businesses.  Egelman Decl. ¶ 11.  Internet companies consistently collect data from children online, including what services they use, how they use them, and from where they use them.  *Id.* ¶¶ 11, 14.  According to one estimate, advertising technology companies collect an average of 72 million data points about a child before they turn 13.  Second Radesky Decl. ¶ 42.  Businesses are able to link this data to a unique child through persistent identifiers, like the identification number for the device a child uses to access the internet.  Egelman Decl. ¶ 18.  Once data is linked to a unique child, businesses are able to create a thorough individual profile of that child and make predictions and inferences based on that data.  *Id.* ¶¶ 15,18.  Businesses can even infer or learn highly personal details such as a child's religion, health conditions, sexual orientation, or socioeconomic status.  *Id.* ¶¶ 14-17, 19.  A child's profile can also be used by or sold to third parties, such as for targeted advertising.  *Id.* ¶ 11.  Businesses thus have an economic incentive to maximize the "engagement"—the amount of time and activity online—and data collected from users, whether child or adult.  *Id.* ¶¶ 12-13.

Given this incentive, it is no surprise that businesses design their services to optimize revenue generation, including by using tactics that children are more susceptible to.  These include tactics to maximize the time that a child spends online, such as autoplay, endless scroll, and predictive algorithms.  Second Radesky Decl. ¶¶ 78, 92, 93, 97.  They also include manipulative dark patterns that work through parasocial relationship pressure, fabricated time pressure, and navigation constraints. *Id.* ¶¶ 84-98, 98-99, 104.  And there is evidence that such tactics work: multiple interview studies show that children feel like they spend too much time online, feel pressure to engage, and find it hard to stop using platforms.  *Id.* ¶ 78.  This pressure to engage brings with it tangible harms: too much time online is associated with less sleep, poor educational attainment, and other mental and physical health issues for children.  *Id.* ¶ 79.

Despite the ubiquitous presence of the internet in children's lives, specific legal protections for children are limited.  At the federal level, the Children's Online Privacy Protection Act (COPPA) requires that online businesses protect the personal information of children under 13, but only where the platform is "directed towards" such children or has actual knowledge that its

3

users are children.  15 U.S.C. § 6502.  At the state level, California law provides that businesses may not sell or share the personal information of a child without consent, but only if they have actual knowledge the user is under 16.  Cal. Civ. Code § 1798.120(c).

These existing privacy regulations have inadvertently created a culture of agnosticism as to whether a business's users are children.  Egelman Decl. ¶ 48.  Businesses are disincentivized from identifying their services as "child-directed" or from obtaining knowledge about whether a user is a child—which would make them subject to existing laws—because doing so limits the businesses' ability to monetize their products by collecting, selling, or using a child's data.  *Id.* As a result, it is fairly common for apps that were almost certainly intended for children to avoid restrictions by claiming that the app is intended for users over 13 or that the company has no actual knowledge of child users.  *Id.* ¶ 49.  Even apps that are subject to COPPA or state law often fail to comply with these existing laws.  *Id.* ¶¶ 40-44, 47-49.

### B.    The California Age-Appropriate Design Code Act

Out of concern for the well-being and privacy of children online, the California Legislature unanimously passed AB 2273, the California Age-Appropriate Design Code Act.  The Act declares that "children should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access"; that regulated businesses "should consider the best interest of children when designing, developing and providing" services; and that "[i]f a conflict arises between commercial interest and best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests."  Cal. Civ. Code § 1798.99.29.

The Act applies to large companies that trade in personal information.  *See* Cal. Civ. Code §§ 1798.99.30(a), 1798.99.31(a), (b), 1798.140(d).  Within that group of business, the Act regulates only those that provide an online service, product, or function likely to be accessed by children.  *Id.* § 1798.99.31(a), (b). "Likely to be accessed by children" means that the businesses' offering: (1) is directed to children, as defined by COPPA; (2) is determined to be routinely accessed by a significant number of children; (3) contains advertisements marketed to children;

(4) has design elements that are known to be of interest to children; or (5) is determined to have an audience that contains a significant amount of children. *Id.* § 1798.99.30(b)(4).

For each service likely to be accessed by children, a business must identify the service's purpose, "how it uses children's personal information, and the risks of material detriment to children that arise from" the business's data management practice in a Data Protection Impact Assessment ("DPIA"). Cal Civ. Code § 1798.99.31(a)(1)(A). This requirement is currently enjoined following the Ninth Circuit's affirmance of that part of the preliminary injunction previously issued by this Court. *NetChoice*, 113 F.4th at 1126. As relevant here, the Act also requires a business to: (1) estimate the age of a child user with a reasonable level of certainty or apply the privacy and data protection afforded to children to all users and (2) enforce published terms, policies, and community standards, including but not limited to, privacy policies and those concerning children. Cal. Civ. Code § 1798.99.31(a)(5), (a)(9).

Regulated businesses are also prohibited from engaging in certain business practices that implicate children's privacy. As relevant here, regulated businesses cannot: (1) use the personal information of a child in a way that the business knows or has reason to know is materially detrimental to the physical health, mental health, or well-being of the child; (2) profile a child by default except when it is necessary to provide the requested service or there is a compelling reason it is in the best interest of children; (3) collect, sell, share, or retain any personal information not necessary to provide a service absent a demonstrated compelling reason that the practice is in the best interest of children likely to access the product, service or feature; (4) if the end user is a child, use personal information for any reason other than the reason for which it was collected absent a demonstrated compelling reason it is in the best interest of children; or (5) use dark patterns—user interfaces designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice—to lead or encourage children to provide additional personal information, to forgo privacy protections, or to take any action that the business knows or has reason to know is materially detrimental to the child's physical health, mental health, or well-being. Cal. Civ. Code § 1798.99.31(b)(1)-(4), (7).

5

The Attorney General has sole authority to enforce the Act, and violators face injunctions and civil penalties. Cal. Civ. Code § 1798.99.35(a). The statute provides that businesses in substantial compliance with the DPIA requirements will receive written notice from the Attorney General of any alleged violations before the Attorney General initiates a suit, though this provision is now enjoined under the prior injunction order. *See NetChoice*, 113 F.4th at 1126.

### C.   Procedural History

Plaintiff NetChoice, LLC is a membership group composed of large tech companies. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 936 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024). It filed this suit against the Attorney General alleging that the Act violates the First, Fourth, and Fourteenth Amendments and the dormant Commerce Clause and is preempted by federal law. *Id.* at 938. Shortly thereafter, plaintiff filed a motion for a preliminary injunction. This Court granted the motion. *Id.* at 966. It held that the Act was subject to heightened First Amendment scrutiny because it infringed on businesses' right to collect and use children's data and compelled speech. *Id.* at 944, 946. And the Act did not survive intermediate scrutiny because, this Court held, the Act's requirements were not properly tailored to advance a substantial state interest. *Id.* at 959.

Defendant appealed. While the appeal was pending, the U.S. Supreme Court decided *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), which addressed the proper standard for a facial First Amendment challenge. Citing the standard laid out in *Moody*, the Ninth Circuit affirmed in part and reversed in part. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1108 (9th Cir. 2024). The Ninth Circuit stated that "[j]ust like the parties and lower courts in *Moody*, 'no one has paid much attention to' the requirements for a facial challenge so far in this case.'" *Id.* at 1116 (quoting *Moody*, 144 S. Ct. at 2398). It held, however, that "this oversight did not cause any error" in this Court's analysis of the DPIA reporting requirement because "in every application to a covered businesses," that requirement "raises the same First Amendment issues." *Id.* The Ninth Circuit thus affirmed this Court's injunction of that requirement and related provisions such as the notice and cure provision. *Id.* at 1122, 1125.

The Ninth Circuit then vacated the remainder of the injunction.  It held that it could not "say, on this record, that a substantial majority of [the Act's] applications are likely to fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123.  "[M]ost of [the Act's] provisions, by their plain language, do not necessarily impact protected speech in all or even most applications," the Ninth Circuit explained, explicitly citing to the sections challenged here. *Id.* at 1122.  For example, "[b]ased on the record developed so far in this litigation, it is unclear whether a 'dark pattern' itself constitutes protected speech and whether a ban on using 'dark patterns' should always trigger First Amendment scrutiny," let alone the proper level of scrutiny for any applications that do trigger First Amendment scrutiny. *Id.* at 1123. The Ninth Circuit ultimately held that the remainder of the injunction order "fail[ed] to properly consider the facial nature of NetChoice's challenges" and vacated it. *Id.* at 1124.  Following remand, plaintiff filed an amended complaint and the current motion for a second preliminary injunction.

## LEGAL STANDARDS

### I.   PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20.  With respect to cases arising under the First Amendment, showing a likelihood of success generally suffices to meet the remaining elements. *E.g.*, *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).

### II.   FIRST AMENDMENT PRINCIPLES

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. Const., amend. I.  But this limitation on government authority is not triggered simply because a law has *some* impact on speech.  *E.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-706 (1986).  Courts "have not traditionally subjected every" law "to 'least restrictive means' scrutiny simply because each particular [law] will have some effect on the First

7

1    Amendment activities of those subject to sanction." *Id.* at 706.  After all, "every civil and

2    criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.*

3         Instead, as the Ninth Circuit has emphasized, "the First Amendment does not prevent

4    restrictions directed at commerce or conduct from imposing incidental burdens on speech."

5    *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell*

6    *v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011)).  Thus, a court must begin its analysis by

7    "determin[ing] whether the First Amendment applies" to the challenged statute.  *Id.*  To do so, the

8    court first asks the "'threshold question'" of "'whether conduct with a significant expressive

9    element drew the legal remedy'" or the law "'has the inevitable effect of 'singling out those

10   engaged in expressive activity.'"  *Id.* (citation omitted).  If the law does neither, it is a regulation

11   of conduct that does not implicate the First Amendment's heightened scrutiny.  *Id.*

12        When a law does regulate expressive activity, the next question is "whether the enactment

13   is content-based or content-neutral."  *United States v. Swisher*, 811 F.3d 299, 311 (9th Cir. 2016)

14   (en banc).  A law is content based when it "'applies to particular speech because of the topic

15   discussed or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l Advertising of*

16   *Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted).  If a law is content based, it is subject to

17   strict scrutiny and "is justified only if the government demonstrates that [the law] is narrowly

18   tailored to serve a compelling state interest."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir.

19   2023).  In contrast, a law that is content neutral is subject to, at most, intermediate scrutiny.

20   *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023).  This requires that the statute: (1) must

21   further "'an important or substantial governmental interest,'" (2) that the interest must be

22   "'unrelated to the suppression of free expression,'" and (3) that the restriction on speech must be

23   "'no greater than is essential to the furtherance of that interest.'"  *Id.* at 443 (citation omitted).

24        This general framework, however, is slightly different with respect to commercial speech.

25   "Such speech is protected by the First Amendment, but to a lesser degree than other types of

26   speech."  *Valle del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013).  Regulations on

27   commercial speech are evaluated using a four-part test: "(1) if the communication is neither

28   misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold

8

matter; in order for the restriction to withstand such scrutiny, (2) [t]he State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest." *Id.* at 820-821 (citation omitted) (alterations in original).

As plaintiff does not dispute (at 10, 14), its claims are properly analyzed under the standard for facial challenges. "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse," and facial challenges are "hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). In the First Amendment context, to prevail on a facial challenge, the plaintiff must establish that the "law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* "As *Moody* clarified, a First Amendment facial challenge has two parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest.'" *NetChoice, LLC v. Bonta*, 114 F.4th 1101, 1115-1116 (9th Cir. 2024) (alteration in original). For the first part, a court determines "[w]hat activities, by what actors, . . . the laws prohibit or otherwise regulate[.]" *Moody*, 144 S. Ct. at 2398. As the Court recognized in *Moody*, "[t]he online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection. Each might (or might not) have to change because of the provisions" challenged. *Id.* For the second part, a court "decide[s] which of the laws' applications violate the First Amendment" and "measure[s] them against the rest." *Id.* Throughout this analysis, a plaintiff must "carry its burden" to establish that the standard for a facial challenge is met. *Id.* at 2409.

## III.    VAGUENESS PRINCIPLES

A statute is impermissibly vague when it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted). But this standard "does not require 'impossible standards of clarity.'" *Id.* (citation omitted). Rather, a statute must simply "give sufficient notice as to what conduct is prohibited." *Id.* Although there may be cases at the margin that can be dreamed up, a statute is not vague when it is "clear what

9

1    the [statute] as a whole prohibits." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted).

2    After all, "because we are '[c]ondemned to the use of words, we can never expect mathematical

3    certainty from our language.'" *Id.* (citation omitted) (alterations in original).

4                                      **ARGUMENT**

5         Plaintiff seeks to enjoin seven challenged subsections "on [their] face . . . either in [their]

6    entirety or as to certain applications." Mot. at 14.  As plaintiff rightly recognizes (at 10, 14), this

7    requires that it meet the standard for a facial challenge as to its First Amendment claims, even if

8    its challenge is confined to only certain applications.  Despite the Ninth Circuit's holding that that

9    standard was not met by the first preliminary injunction motion, plaintiff nonetheless relies

10   almost entirely on this Court's prior ruling in arguing that the challenged provisions are

11   unconstitutional.  *See* Mot. at 14-15 ("This Court has already concluded [the policy enforcement]

12   provision is facially invalid under the First Amendment to the extent applied to content

13   policies."); *id.* at 16 ("The Court previously held [the information use] provisions facially

14   unconstitutional, focusing on precisely the range of applications that NetChoice challenges."); *id.*

15   at 17 ("[This Court] then held each of the [dark patterns restriction] provision's specific

16   prohibitions invalid even under intermediate scrutiny.").

17        But plaintiff cannot short-circuit its burden—and avoid the shortcomings in its prior

18   argument that led to the Ninth Circuit's ruling on appeal—simply by narrowing its challenge to

19   some set of unknown applications that involve content.  As the Ninth Circuit recognized, the

20   relevant provisions, "by their plain language, do not necessarily impact protected speech in all or

21   even most applications."  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024).  And it

22   is plaintiff's burden to establish, via a sufficient factual record, that the challenged provisions in

23   their challenged applications do, in fact, impact protected expression.  Simply pointing to this

24   Court's prior ruling does not meet that burden.

25        Nor can plaintiff meet its burden through some talismanic invocation of "content."  Plaintiff

26   does not provide sufficient evidence to determine what content is affected by the challenged

27   provisions, how that content is affected, and how that effect leads to an impact on a member's

28   protected expression.  And plaintiff does not provide sufficient evidence to determine the

1  applicable legal standard for each application of each provision, let alone whether a particular

2  application fails to meet that standard.  Plaintiff simply fails to meet its burden to succeed on a

3  facial challenge.  Nor has it shown a likelihood of success on its other claims.  Finally, the

4  portions of the Act that remain enjoined are severable from the remainder of the statute.  This

5  Court should therefore deny plaintiff's motion for a second preliminary injunction.

6  **I.     PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON ITS FIRST**
   **AMENDMENT CLAIM**

7

8        **A.     Strict Scrutiny Does Not Apply to the Act as a Whole**

9        As the Ninth Circuit's ruling makes clear, this Court should look to each challenged

10 provision individually—and in the full breadth of its relevant applications—to determine the

11 constitutional or unconstitutional applications of the specific provision.  Plaintiff, however,

12 contends that the entire statute is subject to strict scrutiny because it "target[s] businesses for

13 'differential treatment' based on the 'subject matter' they publish."  Mot. at 11.  This is so, it

14 claims, because the statute applies if a business "publishes content that has [an] appeal to minors

15 and caters to an 'audience' that . . . include[s] a significant number of minors."  Mot. at 12.

16       This argument is unavailing.  The Act's applicability is not based on "'the topic discussed

17 or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596

18 U.S. 61, 73-74 (2022) (citation omitted).  The Act applies to a "business that provides an online

19 service, product, or feature likely to be accessed by children."  Cal. Civ. Code § 1798.99.31(a),

20 (b).  A "business" is a legal, for-profit entity that "collects consumers' personal information" and

21 "determines the purposes and means of the processing of consumers' personal information", "that

22 does business in the State of California," and that meets a threshold for revenue or the number of

23 transactions involving personal information.  *See id.* §§ 1798.99.30(a), 1798.140(d).  None of

24 these criteria depend on the message of any expressive activity.

25       In turn, a business's online service, product, or feature is "likely to be accessed by children"

26 if "it is reasonable to expect, based on [specified] indicators, that the online service, product, or

27 feature would be accessed by children."  Cal. Civ. Code § 1798.99.30(b)(4).  These indicators are

28 that the online service, product, or feature: (1) is "directed to children" as defined by COPPA, (2)

1   "is determined, based on competent and reliable evidence regarding audience composition, to be

2   routinely accessed by a significant number of children," (3) has "advertisements marketed to

3   children," (4) has "design elements that are known to be of interest to children, including, but not

4   limited to, games, cartoons, music, and celebrities who appeal to children," or (5) a "significant

5   amount of the audience" is children "based on internal company research." *Id.* Thus, the

6   determining factor as to whether a business is subject to the Act is whether or not its users are

7   children, not the content of its service, product, or feature.

8        That determining whether a business's users are children may involve looking at the

9   content of a product, service, or feature does not make the Act content based. The U.S. Supreme

10  Court has "consistently recognized that restrictions on speech may require some evaluation of the

11  speech and nonetheless remain content neutral." *City of Austin*, 596 U.S. at 72; *see also Porter v.*

12  *Martinez*, 68 F.4th 429, 442-443 (9th Cir. 2023). For instance, the Court "has treated as content

13  neutral regulations of solicitation . . . even though enforcement requires an examination of the

14  speaker's message." *Porter*, 68 F.4th at 442. Nor does the fact that a regulation "considers

15  function or purpose" mean that the regulation "is *always* content based." *City of Austin*, 596 U.S.

16  at 74 (emphasis in original). Instead, the question is whether the regulation "discriminate[s]

17  based on 'the topic discussed or the idea or message expressed.'" *Id.* at 73-74 (citation omitted).

18  A regulation that requires some evaluation of content but is ultimately "agnostic as to content" is

19  thus still content neutral. *Id.* at 69.

20       That is precisely the case with the Act. If a product, service, or feature has a significant

21  number of child users—regardless of what kind of content is on that product, service, or feature—

22  it is subject to the Act. After all, "even though covered platforms contain some subject matter

23  likely to appeal to children, most also contain subject matter 'as diverse as human thought.'"

24  *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024) (citation omitted). The

25  Legislature's concerns were about harms to *children*. In order to remediate those harms, the

26  Legislature regulated businesses that *serve children*, irrespective of what sort of content they host.

27       This case is thus distinguishable from those cited by plaintiff. In the three district court

28  decisions plaintiff cites, the courts found the challenged statutes were content based because the

statutes "facially distinguishe[d] between 'social' speech and other forms of speech." *NetChoice, LLC v. Reyes*, -- F. Supp. 3d --, 2024 WL 4135626, at *11 (D. Utah Sept. 10, 2024), *appeal docketed* (No. 24-4100); *see also Yost*, 716 F. Supp. 3d at 557; *NetChoice, LLC v. Fitch*, -- F. Supp. 3d --, 2024 WL 3276409, at *9 (S.D. Miss. July 1, 2024), *appeal docketed* (No. 24-60341). The Act makes no such distinction. It applies to *all* businesses whose service, product, or feature is likely to be accessed by children. That is a content-neutral criteria for regulation. Indeed, the court in *Yost* rejected a similar argument about the law challenged there, explaining that that act's "'targets children' or 'reasonably anticipated to be accessed by children' language tailors the Act's applicability to only the platforms that have a chance of attracting the children the Act seeks to protect." 716 F. Supp. at 556. "NetChoice has not shown that this language—'targets children' and 'reasonably anticipated to be accessed by children'—are examples of content-based regulation." *Id.* So, too, with the language here.

Nor is it the case that the Act "cannot be 'justified without reference to the content of the regulated speech.'" *Porter*, 68 F.4th at 439. The Act's findings make clear that the Legislature was motivated by content-neutral concerns, namely protecting the privacy and security of children. *See* 2022 Cal. Stat., ch. 320 (AB 2273), § 1(a)(2), (4), (6), (7), (8), (9). So, too, does the legislative history. *See* Liska Decl., Ex. 1-5. This concern about the privacy and health of children has nothing to do with the type of content that they view. The Act is not a content-based regulation and thus is not subject to strict scrutiny.[1]

### B. Plaintiff Has Not Shown Any Individual Provision Likely Violates the First Amendment

#### 1. Requirement to enforce published terms, policies, and community standards (§ 31(a)(9))

Plaintiff challenges the requirement for companies to enforce their published polices "to the extent applied to content policies." Mot. at 15. It contends that this requirement violates the First

---

[1] Prospective amicus International Center for Law and Economics further contends the Act is subject to strict scrutiny because the Act's restrictions will threaten the economic viability of online companies. But "the First Amendment does not guarantee that speech will be profitable to the speaker." *Wine & Spirit Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 47 (1st Cir. 2005). "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of [the law] upon freedom of expression." *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring).

1  Amendment under the standard for facial challenges and that it is unconstitutionally vague; it has

2  not shown a likelihood of success on either claim.

3                          a.    **First Amendment facial challenge**

4          Plaintiff contends that the policy enforcement requirement violates the First Amendment

5  because it requires its members to "'enforce' to the State's satisfaction their 'published terms,

6  policies, and community standards,'" including content policies.  Mot. at 14.  But the challenged

7  provision requires that a company "[e]nforce published terms, policies, and community standards

8  established by the business, including, but not limited to, privacy policies and those concerning

9  children."  Cal. Civ. Code § 1798.99.31(a)(9).  That is simply a requirement that covered

10  businesses adhere to the contractual agreement they have made with their users.[2]  In requiring that

11  businesses enforce their published policies, including content moderation policies, the Act only

12  requires that a company adhere to the terms of its contract with users, including any promises

13  made regarding what content will be allowed on its products, services, or features.

14          The First Amendment does not preclude a State from "requir[ing] those making promises to

15  keep them."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991).  Where private parties have

16  "determine[d] the scope of their legal obligations, and any restrictions" on their speech "are self-

17  imposed," the First Amendment is not violated by the State enforcing those agreements.  *Id.*; *see*

18  *also, e.g., Belgau v. Inslee*, 975 F.3d 940, 950 (9th Cir. 2020) ("The First Amendment does not

19  support [plaintiff's] right to renege on their promise.").  That is precisely what the policy

20  enforcement requirement does.  It does not obligate businesses to adopt a particular content

21  moderation policy or to enforce their content moderation policies in a particular way.  It simply

22  requires that they adhere to the contract made with users, a private agreement between private

23  parties.  That does not offend the First Amendment.

24          Moreover, plaintiff's argument proceeds from a fundamental misunderstanding of how this

25  provision works.  The provision only requires that companies enforce their terms of service.  It

26  nowhere requires that companies develop content moderation or any other policies, that the

27          [2] *See, e.g.*, Kumar Decl. [ECF No. 29-1], Ex. 5 (users "agree not to" post certain language
   or content as part of terms of service for *New York Times*); *id.*, Ex. 6 (in submitting content to the
28  *Washington Post*, users "are consenting to" the rules regarding content moderation).

                                              14

policies contain any particular provisions, or that enforcement be done *in a particular way*—only that the policies *are enforced*.  Plaintiff thus has not shown that the unconstitutional applications of this provision substantially outweigh the constitutional ones.

### b.    Vagueness challenge

Plaintiff contends that the policy enforcement requirement is unconstitutionally vague because content moderation policies are subjective.  Mot. at 21.  But plaintiff's members are the ones who created their own content moderation policies and the statute, as discussed above, solely requires that the policies be enforced.  Plaintiff's members should understand their own policies well enough to be able to enforce them.  It is not unconstitutionally vague to require companies to follow the policies they have themselves created and that users may have relied on when deciding whether to use their platform, service, or product.

### 2.    Restrictions on the use of childrens' personal information (§ 31(b)(1)-(b)(4))

Plaintiff further challenges four distinct provisions of the Act that regulate the use of a child's personal information: the prohibition on the use of a child's personal information in a manner that the business knows is harmful; the prohibition on profiling a child by default; the prohibition on collecting, selling, sharing, or retaining personal information that is not necessary to provide a service; and the prohibition on using a child end user's personal information for a reason other than it was collected for.  Plaintiff contends that these provisions violate the First Amendment as applied to publishing content or making information available.  Mot. at 15. Plaintiff further argues the provisions are unconstitutionally vague.  These arguments fail.

### a.    First Amendment facial challenge

In its First Amendment challenge to the Act's regulations on using a child's personal information or profiling children, plaintiff primarily relies on this Court's ruling on the prior motion for a preliminary injunction.  Mot. at 16.  Plaintiff appears to contend that by narrowing the range of applications it seeks to enjoin, it can revive this Court's vacated prior ruling.  In so doing, plaintiff fails to grapple with its burden under *Moody*, which the Ninth Circuit held plaintiff failed to meet in its first motion for a preliminary injunction.  Plaintiff still fails to meet

15

1    its burden of establishing the unconstitutional applications of the challenged provisions

2    substantially outweigh the constitutional ones.

3        First and foremost, plaintiff nowhere meets its threshold burden of showing that most, let

4    alone all, relevant applications of the challenged restrictions on data use regulate expressive

5    activity. *See supra* at 7-8 (First Amendment is only implicated by regulations of expressive

6    activity). Plaintiff generally contends that all of these provisions will impact content. But impact

7    *what* content—user-generated content, business-created content, editorial discretion content,

8    webpage layout content? And impact this unspecified content *how*? As the Ninth Circuit

9    recognized, the challenged provisions "by their plain language do not necessarily impact

10   protected speech in all or even most applications." *NetChoice*, 113 F.4th at 1122. For instance,

11   how does the prohibition on profiling a minor by default, *see* Cal. Civ. Code § 1798.99.31(b)(2),

12   have any impact on a business's content or other expressive activity? And two of these

13   provisions allow for a business to use personal information in a way that is necessary to provide

14   the online service, product, or feature. *See id.* § 1798.99.31(b)(2), (b)(3). Plaintiff's declarations

15   indicate that some uses of personal information may be necessary to provide the relevant service.

16   *E.g.*, Cleland Decl., ¶ 15. Such use of personal information would not be impacted by the

17   challenged provisions to begin with. So what uses of personal information are actually impacted

18   by the challenged regulations? Plaintiff has failed to carry its burden of making this showing.

19       Moreover, while some uses of personal information may result in an impact on expressive

20   activity, plaintiff points to no case law establishing that *all* use of personal information or *all*

21   content moderation is categorically or inherently expressive activity. The decision in *Sorrell v.*

22   *IMS Health, Inc.*, 564 U.S. 552 (2011), does not hold that *any and all* use of data is protected

23   expressive activity. Indeed, the Supreme Court expressly declined to address whether the

24   collection of information was speech. *See id.* at 570-571. And it acknowledged that a more

25   comprehensive regulation of data and privacy than the law at issue in *Sorrell*, such as the Health

26   Insurance Portability and Accountability Act of 1996 (HIPAA), would have presented "quite a

27   different case" from the law challenged there, implying that such a law could well have been

28   constitutional. *Id.* at 573. The ruling in *Sorrell* reflects only that *some* uses of information are

16

1    protected speech and that a law that singles out a specific message or viewpoint for less favorable

2    treatment is a content-based law subject to strict scrutiny.  *See*, *e.g.*, *id.* at 567 (statute was

3    "directed at certain content and aimed at certain speakers").  The Act is not such a statute.

4         Even looking solely at content moderation, plaintiff has not established that all content

5    moderation is expressive activity, nor could it.  As *Moody* recognized, some content moderation

6    is expressive activity because it involves the exercise of editorial discretion, such as a company

7    "exercising authority to remove, label, or demote messages they disfavor."  144 S. Ct. at 2404.

8    When a regulation "alters the platforms' choices about the views they will, and will not, convey,"

9    it interferes with protected expression.  *Id.* at 2405.  But *Moody* does not establish that *all* forms

10   of content moderation involve expressive activity or editorial discretion.  The Court expressly

11   stated that even "[f]or the content-moderation provisions" challenged there, the plaintiff still had

12   to show "as to every covered platform or function, whether there is an intrusion on protected

13   editorial discretion."  *Id.* at 2398.  Plaintiff has certainly not made that showing here.

14        Additionally, the *Moody* majority was clear that its discussion about protected expression

15   did not address *all* content, such as "feeds whose algorithms respond solely to how users act

16   online—giving them the content they appear to want, without regard to independent content

17   standards."  144 S. Ct. at 2404 n.5.  For "[a] function qualifies for First Amendment protection

18   only if it is inherently expressive."  *Id.* at 2409 (Barrett, J., concurring) (citing *Hurley v. Irish-

19   American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 568 (1995)); *see also

20   id.* at 2430 (Alito, J., concurring) ("The First Amendment protects only those compilations that

21   are 'inherently expressive' in their own right, meaning that they select and present speech created

22   by other persons in order 'to spread [the compiler's] own message.'" (alteration in original)

23   (citation omitted)).  And "technology may attenuate the connection between content-moderation

24   *actions* (*e.g.*, removing posts) and human beings' constitutionally protected right to '*decide for

25   [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence.'"  *Id.* at

26   2410 (Barrett, J., concurring) (alterations and emphasis in original) (citation omitted).

27        Plaintiff here has entirely failed to explain how every way that each of its members use a

28   child's personal information; profile a child; collect, sell, share, or retain a child's personal

information; and use a child user's personal information for a reason other than it was collected

for is expressive.  Indeed, it is not difficult to imagine situations where the use of a child's

personal information is *not* expressive, even if it may impact content.  For instance, some of

plaintiff's members use algorithms to detect bot and spam activity.  *See* Cleland Decl. ¶ 17.  To

the extent that personal information is used in such a manner, how does limiting the use of a

child's personal information to detect bot or spam activity affect any expressive activity by

plaintiff's members?  Or consider the use of personal information in an algorithm such as that

mentioned in *Moody*, one that "respond[s] solely to how users act online—giving them the

content they appear to want, without any regard to independent content standards."  144 S. Ct. at

2404 n.5.  What expressive message does such an algorithm convey and how would that message

be altered by limiting the use of personal information, especially if decisions are made by

artificial intelligence or machine learning and not a person?  *See* Egelman Decl. ¶ 60 (discussing

algorithms); *cf. Moody*, 144 S. Ct. at 2410 (Barrett, J., concurring).

Plaintiff cannot simply invoke "content" as a talisman to establish that the challenged

regulations *actually impact protected expressive activity*.  It must instead *establish* that the

challenged provisions will lead to changes in how its members use personal information or profile

children and that those changes will impact expressive activity in many, if not all, cases.  For if

most of the applications of the personal information use restrictions do *not* impact expressive

activity, those applications do not trigger First Amendment scrutiny and plaintiff has not shown

that the unconstitutional applications substantially outweigh the constitutional ones.

Moreover, plaintiff has not established that most of these (hypothetical) applications with

(hypothetical) impacts on expressive activity are unconstitutional.  For one, the lack of clarity

regarding how plaintiff's member's activities—let alone their expressive activities—will be

impacted by the challenged provisions makes it difficult to know what level of scrutiny even

applies.  Some of the impacted activities may involve commercial speech—such as the use of

personal information to select advertisements to show a user, *see* Egelman Decl. ¶¶ 15-17.

Applications that impact expressive activities that do not involve commercial speech would be

1   subject to intermediate scrutiny: since restrictions are content neutral because their application

2   does not signal out or depend on any particular message or topic.

3       And at least some, if not most or all, of these theoretical applications that are subject to

4   either standard are likely to meet the applicable standard.  With respect to either intermediate

5   scrutiny or the commercial speech standard, the protections on the use of a minor's personal

6   information further a significant, if not compelling, state interest in protecting children's privacy,

7   health, and safety.  *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 756-757 (1982) ("[A] State's

8   interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'"

9   (citation omitted)); *United States v. Yazzie*, 743 F.3d 1278, 1287 (9th Cir. 2014) (same).  Children

10  (as well as their parents or guardians) clearly have an interest in protecting their own privacy,

11  which is infringed by businesses gathering and retaining their sensitive personal information.  *See*

12  Egelman Decl. ¶¶ 14-17 (discussing sensitive personal information companies collect).  Limiting

13  the collection and use of such data clearly furthers a child's interest in their own privacy.

14  Additionally, aspects of covered businesses clearly pose a risk to children's health and safety.

15  Too much time online is linked to detrimental health and educational outcomes or addiction-like

16  behavior, and evidence show that such harms from problematic use of online services do occur.

17  Second Radesky Decl. ¶¶ 43-52, 78-80.  Limiting the use of personal information in algorithms or

18  other design aspect that are meant to maximize a child's time online—and thereby increase the

19  risk of harm from overuse—clearly furthers the State's interest in a child's well-being.  So, too,

20  does limiting the use of personal information in ways that might: (1) expose a minor to

21  manipulative designs meant to lead them to overspend, *see id.* ¶¶ 54-55, 76; (2) expose a minor to

22  illegal products or harmful activities, *see id.* ¶¶ 66-67 (child sexual material), ¶ 69 (illegal drugs),

23  ¶¶ 72-73 (gambling advertisements), ¶¶ 74-75 (alcohol advertisements); or (3) expose a minor to

24  potential exploitation, including sexual exploitation or abuse, *see id.* ¶¶ 63-67.

25      And the restrictions on the use of personal information—insofar as they even impact

26  expressive activity—further these interests in a properly tailored way.  For one, companies may

27  well be able to engage in the same expressive activity without using personal information.  With

28  respect to advertisements, for instance, companies can switch from using targeted advertisements

that rely on a user's personal information to contextual advertisements that are based on other information about the webpage the user interacts with. *See* Egelman Decl. ¶ 19. And evidence indicates that the current system and existing alternatives—such as industry self-regulation, privacy policies, or blocking cookies—fail to adequately protect privacy. *Id.* ¶¶ 28-38, 40-49. So, too, does the existence of the "privacy paradox"—the fact that users frequently express a desire for greater privacy protection but nonetheless use online services they believe raise privacy concerns. *Id.* ¶¶ 21-27. In any event, it is difficult to analyze more specific alternatives that may be less restrictive without sufficient tangible information from plaintiff on what impact, precisely, there may be on expressive activity from restricting the use of children's personal information. This is especially so given that the Act nowhere directly limits or restricts the message or expression that can be shown to any user, child or adult.

Ultimately, plaintiff has not carried its burden of demonstrating that the unconstitutional applications of the statute substantially outweigh the constitutional ones. It has not established which members are subject to the challenged restrictions or will be imparted by the challenged restrictions. It has not established how limiting profiling or the use of personal information of minors will impact a member's expressive activity—as opposed to economic activity or conduct—let alone that most applications of the challenged restrictions will impact expressive activity. It has not provided sufficient information to determine what level of scrutiny would apply to applications that do affect expressive activity or whether those applications would fail the requisite level of scrutiny. Plaintiff has wholly failed to carry its burden on a facial challenge.

### b.   Vagueness challenge

Plaintiff further contends that the provisions restricting the use of personal information are unconstitutionally vague. Not so. The provisions are all sufficiently clear in what they regulate: a company cannot use a child's personal information if it knows that harm will result, cannot profile a child by default, and cannot use information for purposes not necessary to provide the online service or for purposes other than the reason it was collected for. These provisions are all, on their face, sufficiently clear to provide notice of what conduct is regulated.

1    Instead of focusing on the language of the prohibitions, plaintiff fixates on the language of

2    the carve-outs or exceptions.  Mot. at 21-22.  But a regulated entity need not rely on the carve-

3    outs; it knows it will be in compliance with the law if it adheres to the clear prohibition on the use

4    of data.  In any event, the carve-outs are not unduly vague.  They make reference to the best

5    interests of children, a standard that is a legal term of art with a long pedigree in family law.  It is

6    the standard used in California to determine child custody arrangements, *see, e.g.*, *In re Marriage*

7    *of Vargas & Ross*, 17 Cal. App. 5th 1235, 1243 (2017); to make guardianship decisions, *see, e.g.*,

8    *Petition of Daniels*, 177 Cal. App. 2d 376, 378 (1960); and in delinquency proceedings, *see, e.g.*,

9    *In re Jonathan C.M.*, 91 Cal. App. 5th 1039, 1041 (2023).  Given this history, such a phrase is

10   hardly unconstitutionally vague.

11   Additionally, plaintiff contends that it is unclear "what types of information and ideas are

12   detrimental to a young person's 'best interests' or 'well-being,'" Mot. at 22.  But it provides no

13   factual record establishing that the challenged provisions involve such determinations.  As

14   discussed above, the challenged provisions restrict the *use of information*, not the kind of

15   information or ideas a minor can be shown.  Plaintiff has not brought forth a factual record

16   establishing that it will even need to make such determinations under the law, let alone that most

17   applications involve such determinations.  It thus has not met its burden on a facial challenge.

18              **3.    Restriction on the use of dark patterns (§ 31(b)(7))**

19   Plaintiff next challenges the restriction on the use of dark patterns to lead or encourage a

20   child to provide further personal information, to forego privacy protections, or to take any action

21   that the business knows is detrimental to the child's well-being.  Once more, plaintiff contends

22   that this provision violates the First Amendment and is unconstitutionally vague.  Not so.

23                   **a.    First Amendment challenge**

24   Plaintiff challenges the restriction on the use of dark patterns as a violation of the First

25   Amendment as applied to content moderation.  But this challenge suffers from the same flaw as

26   its challenge to the information use restrictions: plaintiff has not carried its burden of

27   demonstrating that the alleged unconstitutional applications of the dark pattern restriction

28   substantially outweigh the constitutional applications.

As with the information use restrictions, plaintiff has not established at the threshold that the dark pattern restriction will have any impact on expressive activity.  And there is reason to doubt that may be the case.  The definition of a dark pattern is a "user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice."  Cal. Civ. Code § 1798.140(*l*).  A "user interface" is the point of human-computer interaction, such as the interactive parts of a website like click boxes, scrolling bars, or menu items.  Egelman Decl. ¶¶ 51-52.  In other words, the dark pattern restriction regulates design elements, not content.  And it only regulates those design elements that have the effect of subverting or impairing user autonomy, decision, or choice.  Thus design aspects that have *no* connection to a user's autonomy—such as the placement of a scrolling bar or determining how to organize the menu bar—would not even be implicated by the restriction.

Plaintiff provides scarcely any evidence about how this restriction will impact its members.  It does not identify specific design elements its members currently use that could be affected by the regulation.  It does not explain how those design elements involve protected editorial discretion or other expressive activity.  And it does not provide sufficient information to determine which of these design elements might involve commercial speech—many of the recognized examples of dark patterns do, *see* Liska Decl. Ex. 6, at 21-26 (listing examples of dark patterns); Second Radesky Decl. ¶¶ 104-107, Egelman Decl. ¶¶ 56-57—versus other speech.

Without understanding the ways in which plaintiff's members' conduct will be impacted by the dark pattern restriction, defendant and this Court cannot determine which applications of the Act implicate protected speech.  *See NetChoice*, 113 F.4th at 1122-1123 (identifying the dark pattern restriction as a provision that "by [its] plain language, do[es] not necessarily impact protected speech in all or even most applications").  Nor can defendant or the Court know what level of scrutiny is appropriate.  Does the restriction primarily impact expressive activity that constitutes commercial speech?  Does it impact expressive activity that constitutes fraudulent or misleading commercial speech, which can lack First Amendment protection, *see, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003)?  Many examples of dark patterns involve clearly fraudulent or misleading speech.  *See* Liska Decl., Ex. 6, at pp. 21-27.

22

1    Instead, plaintiff again waves a broad brush, contending that the regulation generally

2    impacts expressive activity "by regulating how content may be displayed."  Mot. at 17.  Setting

3    aside the lack of an evidentiary record establishing that fact, simply impacting how content is laid

4    out is not necessarily expressive; some choices about how to organize content may not involve

5    the exercise of editorial discretion or expression and would not implicate the First Amendment.

6    Plaintiff cannot escape its burden on a facial challenge to establish that the challenged sections of

7    the Act impact its regulated members' protected expression, that those applications that impact

8    expression are unconstitutional, and that such unconstitutional applications substantially outweigh

9    the constitutional ones simply by invoking "content."

10               **b.    Vagueness challenge**

11    Plaintiff also contends the dark pattern restriction is unconstitutionally vague.  Not so.

12    California law contains a definition of "dark pattern," as noted above.  *See supra* at 22.  The term

13    also has a well-understood meaning in the industry.  *See* Liska Decl., Ex. 6, at p. 2; Egelman

14    Decl. ¶¶ 50, 55-58.  And it is only if a design feature meets the definition of a dark pattern that a

15    company needs to determine if that particular dark pattern involves privacy-related choices or

16    would knowingly harm a minor user.  Two of the three relevant prohibited uses—to disclose

17    more personal information or to forego privacy protections—are clear in their limits.  The

18    remaining prohibited use requires that the business know or should know that a minor would be

19    harmed.  "[A] person of ordinary intelligence" can therefore "base his behavior on his factual

20    knowledge of the situation at hand and thereby avoid violating the law."  *United States v. Jae Gab*

21    *Kim*, 449 F.3d 933, 943 (9th Cir. 2006).  The requirement is thus not unconstitutionally vague.

22               **4.    Requirement to estimate age (§ 31(a)(5))**

23    Finally, plaintiff challenges the requirement to estimate age to a reasonable degree of

24    certainty, contending this requirement also violates the First Amendment in all applications and is

25    unconstitutionally vague.  It has not shown a likelihood of success on either challenge.

26               **a.    First Amendment challenge**

27    Plaintiff contends the requirement to estimate age facially violates the First Amendment as

28    to all applications.  Not so.  The act of estimating a user's age is conduct, not expressive activity.

1    Instead of contending that there is something expressive about estimating a user's age, plaintiff

2    argues that the age estimation requirement is unconstitutional because it will limit users' access to

3    certain content.  Mot. at 19-20.  Plaintiff again misconstrues how the Act works.  The Act

4    requires businesses to estimate a user's age to determine if they must apply the limitations on the

5    use of personal information and related privacy protections to that user.  Cal. Civ. Code

6    § 1798.99.31(a)(5).  As discussed in detail above, plaintiff has not established that such

7    regulations will have *any* impact on the messages shown to that child.  *See supra* at 16-19.

8         And even if there was an impact, that impact would be the result of the *other substantive*

9    *provisions*, not the age estimation requirement itself.  While age estimation may trigger the

10   applicability of the Act's substantive protections, any impact on content shown to users would

11   flows from the underlying substantive regulations that apply.  After all, plaintiff does not contend

12   that all of the data and policy provisions that would apply to a child user—such as the

13   requirement for a stricter default privacy setting or to notify users if tracking geolocation data—

14   violate the First Amendment.  If the age estimation requirement solely triggered these

15   unchallenged restrictions—or challenged restrictions that are constitutional—then the age

16   estimation requirement would have no constitutionally suspect downstream consequences.  Thus

17   any unconstitutional impact comes from the underlying substantive provision, not the age

18   estimation requirement.  The proper remedy would then be for this Court to enjoin the allegedly

19   unconstitutional substantive regulation, not the age estimation requirement.

20        Finally, the age estimation requirement would meet the standard for intermediate scrutiny—

21   the proper standard for a content-neutral requirement—if subject to it.  As with other provisions,

22   the age estimation requirement furthers the State's substantial interest in protecting the privacy

23   and well-being of children.  *See supra* at 19.  By estimating a user's age, a business will know

24   how it can make use of that user's personal information—thereby ensuring that the Act's

25   substantive protections will be applied to minor users.  The requirement is also sufficiently

26   tailored.  For one, it is necessary for businesses to estimate a user's age to determine if the user is

27   a minor who is protected by the Act or not—the only alternative would be to require protections

28   for *all* users, which would be a less tailored requirement.  There are also ways to estimate age that

24

do not further implicate privacy concerns.  *See* Egelman Decl. ¶ 65.  Finally, the Legislature has taken steps to help protect privacy by requiring that any data collected for age estimation not be retained or used for any other reason.  Cal. Civ. Code § 1798.99.31(b)(8).  Since the only way for a business to determine if a user is a minor protected by the Act's substantive regulations is to estimate the user's age, there is no more tailored way to determine whether the substantive provisions apply.

### b.    Vagueness challenge

Finally, plaintiff contends that the age estimation requirement is unconstitutionally vague. Their argument is not persuasive.  Plaintiff quibbles about the "reasonable degree of certainty" language while ignoring that the law provides them with a clear alternative to age estimation: provide the default privacy and data protections to all users.  It is sufficiently clear for companies to be told to estimate age or to apply protections for all users.

## II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON ITS OTHER CLAIMS

### A.    Preemption

#### 1.    Section 230

First, plaintiff contends that the Act is preempted by Section 230 of the Communications Decency Act.  Section 230 prohibits a "provider or user of an interactive computer service" from being "treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  But section 230 does not create a "blanket" immunity, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024), and preempts only "inconsistent" state laws, 47 U.S.C. § 230(e)(3).  Accordingly, Section 230 does not preempt a state law unless it regulates (1) a provider or user of an interactive computer service by (2) treating it as a publisher or speaker of (3) third-party content.  *E.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Under this framework, Section 230 does not preempt the challenged provisions.  The policy enforcement requirement simply requires platforms to enforce their published terms of use.  *See supra* at 14-15.  The Ninth Circuit has made clear that laws requiring platforms to follow through on their promises are not preempted.  *See, e.g., Est. of Bride by & through Bride v. Yolo Techs.,*

25

1    *Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024); *Calise*, 103 F.4th at 740-741, 743; *Barnes*, 570 F.3d at

2    1107-1108.  Since the policy enforcement mandate only ensures that platforms uphold their

3    promises, it is not preempted by Section 230.  Just as a brick-and-mortar store must comply with

4    its terms of sale, so too must a platform comply with its terms of use.

5            Similarly, plaintiff's two-sentence discussion of the four other provisions fails to establish

6    that they are preempted by Section 230.  Each provision regulates the collection, use, or sale of

7    personal information or the platform's design choices.  *See* Cal. Civ. Code § 1798.99.31(b)(1),

8    (3), (4), (7).  These provisions regulate a platform's own conduct unrelated to publishing choices:

9    a platform is not acting as a publisher of third party content when it collects personal information

10   or creates a feature that subverts user autonomy.  *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085,

11   1092 (9th Cir. 2021) (holding claims not preempted where company could have satisfied a duty

12   "without altering the content that [its] users generate"); *In re Soc. Media Adolescent*

13   *Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 830 (N.D. Cal. 2023) (holding claims

14   not preempted where data was collected by the business but not "published at the request of a

15   third-party").  Accordingly, the challenged provisions are not preempted by Section 230.

16           **2.    COPPA**

17           COPPA sets baseline privacy regulations for businesses that offer online services directed

18   toward children under 13.  *See generally* 15 U.S.C. §§ 6501–6506.  Like Section 230, COPPA

19   preempts only "inconsistent" state laws, 15 U.S.C. § 6502(d), which are those that are

20   "contradictory" or "stand as obstacles to federal objectives," *Jones v. Google LLC*, 73 F.4th 636,

21   642 (9th Cir. 2023) (citations omitted).  In its prior order, the Court expressed skepticism that the

22   Act contradicts or stands as an obstacle to COPPA.  That skepticism was correct.

23           Plaintiff argues that because the Act covers more platforms than COPPA, and because it

24   does not consider parental wishes as COPPA does, the two laws are not "parallel to" each other.

25   *See Jones*, 73 F.4th at 644.  But Plaintiff reads *Jones* too narrowly.  The Ninth Circuit there

26   explained that laws that "supplement" COPPA are not preempted.  *Id.* at 642 (citation omitted).

27   Insofar as the Act merely regulates platforms not covered by COPPA, or actions that COPPA

28   neither prohibits nor requires, it properly supplements COPPA's baseline privacy protections.

1  **B.    Dormant Commerce Clause**

2     The Commerce Clause imposes "a self-executing limitation on the power of States to enact

3  laws imposing substantial burdens" on interstate commerce.  *Ass'n des Eleveurs de Canards et*

4  *d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (citation omitted).  This

5  "dormant" Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic

6  protectionism—that is, regulatory measures designed to benefit in-state economic interests by

7  burdening out-of-state competitors.'"  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369

8  (2023) (citation omitted) (alteration in original).

9     Plaintiff contends that the Act is unconstitutional under the dormant Commerce Clause

10  because it regulates wholly extraterritorial conduct.  Mot. at 29.  Not so.  For one, the Supreme

11  Court recently clarified that the dormant Commerce Clause imposes no per se "extraterritoriality

12  doctrine"—that is, no rule "forbidding enforcement of state laws that have the practical effect of

13  controlling commerce outside the State."  *Nat'l Pork*, 598 U.S. at 371.  Nor are the purported

14  extraterritorial effects of an in-state regulation enough to state a dormant Commerce Clause

15  violation: "[E]ven when state law has significant extraterritorial effects, it passes Commerce

16  Clause muster when, as here, those effects result from the regulation of in-state

17  conduct."  *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015).

18  Finally, plaintiff's argument proceeds from a flawed initial premise: the Act regulates only

19  companies that (1) do business in California and (2) provide an online service likely to be

20  accessed by children residing in California, Cal. Civ. Code § 1798.99.30(a)(1), 1798.140(d), (i),

21  and thus has no impact on transactions wholly outside the State, *see Greater L.A. Agency on*

22  *Deafness, Inc. v. Cable News Network*, 742 F.3d 414, 433 (9th Cir. 2014) (rejecting argument that

23  California law requiring closed captioning on cable company's online videos regulated

24  extraterritorial conduct).  It therefore does not violate the dormant Commerce Clause.

25  **III.    THE REMAINDER OF THE STATUTE IS SEVERABLE FROM ANY INVALID PROVISIONS**

26     Any injunctive relief this Court does grant should be narrowly tailored, because the

27  remainder of the statute is severable—both from the provisions enjoined by the Ninth Circuit and

28  from any other provisions this Court concludes are likely invalid.  Federal courts apply California

27

1  law when analyzing severability.  *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014).

2  California courts apply a three-part test to determine severability: the invalid part of the law

3  "must be grammatically, functionally, and volitionally separable."  *California Redevelopment*

4  *Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted).  "Grammatical separability,

5  also known as mechanical separability, depends on whether the invalid parts 'can be removed as a

6  whole without affecting the wording' or coherence of what remains."  *Id.* (citation omitted).

7  "Functional separability depends on whether 'the remainder of the statute is complete in itself.'"

8  *Id.* (citation omitted).  "Volitional separability depends on whether the remainder 'would have

9  been adopted by the legislative body had the latter foreseen the partial invalidation of the

10  statute.'"  *Id.* (citation omitted).  While the presence of a severability clause "establishes a

11  presumption in favor of severance," *id.* at 270, "the absence of such a clause is not conclusive,"

12  *County of Sonoma v. Superior Court*, 173 Cal. App. 4th 322, 352 (2009); *see also Legislature v.*

13  *Eu*, 54 Cal. 3d 492, 535 (1991) (holding it was "clear that severance of particular provisions is

14  permissible despite the absence of a formal severance clause").

15      Plaintiff does not contend that the portions enjoined by the Ninth Circuit (the requirement

16  to prepare a Data Protection Impact Assessment and the notice and cure provision) are not

17  grammatically separable—and for good reason.  Removing those sections from the statute would

18  not "alter the meaning of the remaining text in any way."  *Vivid Ent.*, 774 F.3d at 575.  So, too,

19  for any other invalid portions of the Act.  Rather, plaintiff focuses on volitional and functional

20  separability, contending the remaining provisions do not meet these requirements.  But the

21  remainder of the statute does meet these requirements.

22      First, the remainder of the statute is functionally separable from the enjoined provisions and

23  any other provisions this Court concludes are invalid.  Functional separability focuses on whether

24  "the remainder after separation of the invalid part" is "'complete in itself' and 'capable of

25  independent application.'"  *Abbot Lab'ys v. Franchise Tax Bd.*, 175 Cal. App. 4th 1346, 1358

26  (2009) (citation omitted).  That is precisely the situation here.  The enjoined DPIA requirement is

27  distinct from the other requirements of the Act, so its invalidity does not impact the application of

28  the Act's remaining substantive requirements.  The same is true as to the enjoined notice and cure

28

1  provision.  While that provision's removal may alter *how* the statute is enforced, it does not alter

2  that the remaining provisions are *capable of being* enforced.  The same holds true as to any other

3  invalid provisions (though defendant contends there are none): each substantive obligation "can

4  operate entirely independently of the invalid" obligations and removal of one obligation does not

5  impact the enforceability or functionality of the remaining obligations.  *Eu*, 54 Cal. 3d at 535.

6      Plaintiff's argument to the contrary is not persuasive.  It contends that removing the notice

7  and cure provision "would mark a foundational shift in the Act's function and focus," making it

8  not functionally separable.  Mot. at 26.  As support, plaintiff cites quotes from the Act's co-author

9  indicating her view of how the notice and cure and DPIA provisions worked within the Act's

10  enforcement scheme.  *Id.*  For one, the views of one legislator rarely speak for the Legislature as a

11  whole.  *E.g.*, *Quintano v. Mercury Cas. Co.*, 11 Cal. 4th 1049, 1062 (1995) ("We have frequently

12  stated, moreover, that the statements of an individual legislator, including the author of a bill, are

13  generally not considered in construing a statute.").  For another, "[s]peculation as to what the

14  Legislature may have expected" regarding the practical implementation of the law "is immaterial

15  here; the issue under this prong is simply whether [the remainder] is complete in itself such that it

16  can be enforced notwithstanding [the other sections'] invalidity."  *Matosantos*, 53 Cal. 4th at 272.

17  The Act retains an independent mechanism for enforcement absent the notice of cure provision.

18  Thus, the requirement for functional separability is met.

19      So, too, is the requirement for volitional separability.  The California Supreme Court has

20  been clear that "[t]he issue, when assessing volitional separability, is not whether a legislative

21  body would have preferred the whole to the part; surely it would have."  *Matosantos*, 53 Cal. 4th

22  at 273.  "Instead, the issue is whether a legislative body, knowing that only part of its enactment

23  would be valid, would have preferred that part to nothing, or would instead have declined to enact

24  the valid without the invalid."  *Id.*  Plaintiff's arguments about the role the notice and cure

25  provision played in the drafting process are thus inapposite.  The Legislature may have viewed

26  the notice and cure provision and the remainder of the act "as a package," and the Court may

27  "accept as self-evident that the Legislature preferred" a version of the Act with the notice and

28  cure provision to one without it.  *Id.* at 272.  But "this evidence goes to answering the wrong

29

1    question." *Id.* at 273.  The question is whether the Legislature would have preferred the Act

2    without the notice and cure and DPIA requirement to *nothing*.

3         Surely, it would have.  The Legislature was clear about its concerns for the privacy and

4    safety of child users.  *See supra* at 4, 13; *see also supra* at 19 (discussing harms to children

5    remediated by Act).  The substantive provisions of the Act directly regulate companies to

6    ameliorate those concerns and thus do not "give the statute a purpose quite different from the one

7    enacted by the legislature," *Abbot Lab'ys*, 175 Cal. App. 4th at 1359.  Nor do they penalize

8    conduct that was never subject to the Act.  *Cf. Cultiva La Salud v. California*, 89 Cal. App. 5th

9    868, 886 (2023) (declining to sever where remainder of law would penalize conduct never subject

10   to regulation).  Given the Legislature's concerns about the safety and privacy of children, as well

11   as the number of different substantive regulations included in the Act, it would be odd for the

12   Legislature to have been so committed to a notice and cure or self-report provision that it would

13   have left the entire arena *unregulated* if it could not have those provisions.  Instead, it is far more

14   likely that the Legislature would have enacted the remaining substantive obligations of the Act

15   and its intact enforcement scheme to protect children to the full extent permissible.[3]

16                                        **CONCLUSION**

17        For the foregoing reasons, the motion for a second preliminary injunction should be denied.

18

19   Dated:  December 6, 2024                    Respectfully submitted,

20                                               ROB BONTA
                                                 Attorney General of California
21                                               ANYA M. BINSACCA
                                                 Supervising Deputy Attorney General
22

23

24                                               */s/ Kristin Liska*

25                                               KRISTIN A. LISKA
                                                 Deputy Attorney General
26                                               *Attorneys for Defendant*

27   _____

28   [3] The Attorney General would like to acknowledge the contribution of law student
     Christopher Nardi (Berkeley '25) to this brief.

                                            30

1

**CERTIFICATE OF SERVICE**

2

Case Name:       ***NetChoice, LLC v. Rob Bonta***

3

Case No.:          **5:22-cv-08861-BLF**

4

     I hereby certify that on <u>December 6, 2024</u>, I electronically filed the following documents

5

with the Clerk of the Court by using the CM/ECF system:

6

     **1.   OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND**

7

         **PRELIMINARY INJUNCTION**

8

     **2.   DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF OPPOSITION**

9

         **TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY**
         **INJUNCTION**

10

     **3.   DECLARATION OF SERGE EGELMAN, PH.D. IN SUPPORT OF**

11

         **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A**
         **SECOND PRELIMINARY INJUNCTION**

12

     **4.   DECLARATION OF JENNY S. RADESKY, MD IN SUPPORT OF**

13

         **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A**
         **SECOND PRELIMINARY INJUNCTION**

14

     I certify that **all** participants in the case are registered CM/ECF users and that service will

15

be accomplished electronically by the CM/ECF system.

16

     I declare under penalty of perjury under the laws of the State of California and the United

17

States of America the foregoing is true and correct.

18

     Executed on <u>December 6, 2024</u>, at San Francisco, California.

19

20

           Vanessa Jordan                     *Vanessa Jordan*

            Declarant                            Signature

21

22

23

24

25

26

27

28

31