1   Jason Harrow (SBN 308560)           Ariel Fox Johnson (*pro hac vice pending*)
2   jason@gerstein-harrow.com           ariel@dslpconsulting.com
    GERSTEIN HARROW, LLP                 DIGITAL SMARTS LAW & POLICY, LLC
3   12100 Wilshire Blvd. Ste. 800       16781 Chagrin Blvd. #536
    Los Angeles, CA 90025               Shaker Heights, OH 44120
4   Tel: (323) 744-5293

5   *Attorneys for Proposed Amicus Curiae*
    *Common Sense Media*
6

7                   UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                        SAN JOSE DIVISION

10  NETCHOICE, LLC, d/b/a NetChoice,         Case No.  5:22-cv-08861-BLF

11                    Plaintiff,             ***AMICUS CURIAE* BRIEF OF
                                             COMMON SENSE MEDIA IN
12       v.                                  SUPPORT OF DEFENDANT**

13  ROB BONTA, ATTORNEY GENERAL OF           Hearing Date:  January 23, 2025
14  THE STATE OF CALIFORNIA, in his official Time:  9:00 a.m.
    capacity,                                Dept: 3
15                                           Judge: Hon. Beth Labson Freeman
                      Defendant.
16                                           Action Filed: December 14, 2022

17

18

19

20

21

22

23

24

25

26

27

1

2

**TABLE OF CONTENTS**

3

INTEREST OF *AMICUS CURIAE* ............................................................................................. 1

INTRODUCTION ............................................................................................................................ 2

ARGUMENT .................................................................................................................................... 3

I.     The Ninth Circuit, following *Moody*, required Plaintiff to develop a factual record before this Court can determine whether age estimation provisions are facially unconstitutional ........... 3

II.    Plaintiff has failed to develop any factual record, let alone a sufficient one, for its facial challenge of the age estimation provisions ..................................................................................... 3

III.   Estimation can occur in a variety of ways, and whether it poses any constitutional concerns is highly dependent on specific facts .............................................................................................. 6

    A.     Age estimation for purposes of protecting privacy does not necessarily implicate speech 6

    B.     Age estimation can occur in a multitude of ways .............................................................. 8

    C.     The only relevant question here is whether services' implementation of age estimation under the CAADCA will substantially deter access, which is impossible to evaluate given the paucity of the record ...................................................................................................................... 10

IV.    Plaintiff has not met its burden to qualify for a preliminary injunction on the age estimation provisions ...................................................................................................................... 12

CONCLUSION ............................................................................................................................... 13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

4

*Ashcroft v. ACLU,* 542 U.S. 656 (2004) ........................................................................ 6

5

*Moody v. Netchoice, LLC*, 144 S. Ct. 2383 (2024) .......................................... 2, 3, 4, 12

6

*Net Choice, LLC v. Bonta,* 113 F.4th 1101 (9th Cir. 2024) ...................................... 3, 6

7

*Reno v. ACLU,* 521 U.S. 844 (1997) ............................................................................ 6

8

*X Corp v. Bonta,* 166 F.4th 888 (9th Cir. 2024) ...................................................... 2, 6

9

**Statutes**

10

11

Cal. Civ. Code § 1798.99.31(a)(5) ...................................................................... passim

12

Cal. Civ. Code § 1798.99.31(b)(8) ................................................................... 10, 13

13

Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09(B)(1) (2023) .. 5

14

Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on

15

    the Protection of Natural Persons with Regard to the Processing of Personal Data and on the

16

    Free Movement of Such Data, and Repealing Directive 95/46/EC (General Data Protection

17

    Regulation), L 119/1 O.J. (2016). .............................................................................. 9

18

Utah Minor Protection in Social Media Act, Utah Code § 13-71-101 – 401 (2024) .................... 5

19

20

**Other Authorities**

21

A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. 2022) (§1). ............................................. 8

22

A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. 2022) (as introduced on Feb. 16, 2022) ............... 13

23

Ariel Fox Johnson, *U.S. Age Assurance Is Beginning to Come of Age: The Long Path Toward*

24

    *Protecting Children Online and Safeguarding Access to the Internet,* Common Sense Media

25

26

    (2024) ................................................................................................ 1, 10, 11

27

28

Brief of Amicus Curiae Electronic Privacy Information Center in Support of Neither Party, Free Speech Coalition, Inc. v. Paxton, No. 23-1122 (Sep. 23, 2024) ................................................ 8

Cal. Sen. Jud. Comm. Analysis, The California Age-Appropriate Design Code Act (2022)......... 2

California Consumer Privacy Act (CCPA), Office of the Att'y Gen., https://oag.ca.gov/privacy/ccpa (Mar. 13, 2024). ..................................................... 8

Kayee Hanaoka et al., *Face Analysis Technology Evaluation: Age Estimation and Verification,* National Institute of Standards and Technology (2024) .......................................... 10

Noah Apthorpe, Brett M. Frischmann & Yan Shvartzshnaider, *Online Age Gating: An Interdisciplinary Evaluation* (Aug. 1, 2024)....................................................... 11

Our Research Program, Common Sense Media, https://www.commonsensemedia.org/research . 1

Sarah Forland, Nat Meysenburg & Erika Solis, *Age Verification: The Complicated Effort to Protect Youth Online,* New America Foundation Open Technology Institute (2024) ............ 11

1

# INTEREST OF *AMICUS CURIAE*[1]

2    Common Sense Media ("Common Sense") is a nonpartisan, nonprofit organization

3   dedicated to improving the lives of kids and families by providing the trustworthy information,

4   education, and independent voice they need to thrive. Common Sense has been studying

5   children and teens' relationships with social media and technology, and the impacts of such

6   relationships, for over a decade. For example, most recently Common Sense has detailed how

7   social media can amplify pressure and stress teens feel along a variety of metrics (e.g.

8   achievement, appearance, friendship),  how children and teens struggle to set healthy boundaries

9   with technology (including missing sleep) given constant notifications from apps and the pull of

10   devices, and how more teens view features like location sharing and public accounts negatively

11   vs. positively. *See* Our Research Program, Common Sense Media,

12   https://www.commonsensemedia.org/research. Common Sense has studied age assessment,

13   publishing a whitepaper this fall considering the current landscape of age assurance,

14   technologically, legislatively, and in industry practice, and examining ways to develop age

15   assurance practices and rules that are privacy protective, proportionate, fair, and equitable—and

16   that satisfy U.S. constitutional concerns. *See* Ariel Fox Johnson, *U.S. Age Assurance Is*

17   *Beginning to Come of Age: The Long Path Toward Protecting Children Online and*

18   *Safeguarding Access to the Internet,* Common Sense Media (2024),

19   https://www.commonsensemedia.org/sites/default/files/featured-content/files/2024-us-age-

20   assurance-white-paper_final.pdf.

21    Common Sense has advocated for policy solutions at the state and federal level that

22   would help enable a digital world where all kids can thrive. Common Sense was a co-sponsor of

23   the California Age-Appropriate Design Code Act (CAADCA). *See* Cal. Sen. Jud. Comm.

24   Analysis, The California Age-Appropriate Design Code Act (2022),

25

---

26   [1] No counsel for a party authored any part of this brief. No entity or person, other than *amicus*, its

27   staff, or its counsel, contributed money to fund the preparation or submission of this brief.

28

1  https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2273.

2  Based on Common Sense's years of experience, both in terms of understanding technology's

3  effects on children and in developing legislative proposals to protect them online, *amicus*

4  believes that design codes like the CAADCA help ensure children are protected in the digital

5  world. And Common Sense believes that these codes, focused on product features and privacy

6  protections, and not on access to content and services, offer protective approaches consistent

7  with the First Amendment. This includes the CAADCA's requirement to "[e]stimate the age of

8  child users with a reasonable level of certainty appropriate to the risks that arise from the data

9  management practices of the business or *apply the privacy and data protections afforded to*

10  *children to all consumers*." Cal. Civ. Code § 1798.99.31(a)(5) (italics added).

11  Ultimately, Common Sense's interest is ensuring that this Court's judgment about the

12  CAADCA, and specifically the age estimation provisions, is based on a thorough understanding

13  of the current landscape of technology, regulation, and children's experiences.

## INTRODUCTION

15      The Supreme Court articulated a high bar for facial challenges under *Moody v.*

16  *Netchoice, LLC*, 144 S. Ct. 2383 (2024). Specifically, it required that courts evaluating facial

17  challenges must consider "a law's full set of applications" which is a rigorous statute- and fact-

18  specific inquiry—especially in the age estimation context. *Id.* at 2394. The Ninth Circuit has

19  found that, "[a]s *Moody* clarified, a First Amendment facial challenge has two parts: first, the

20  courts must "assess the state laws' scope"; and second, the courts must "decide which of the

21  laws' applications violate the First Amendment, and . . . measure them against the rest.'" *X*

22  *Corp v. Bonta,* 166 F.4th 888, 899 (9th Cir. 2024) (internal citations omitted). With respect to

23  age estimation, there must be a detailed record, and this record must address with specificity

24  different age estimation methods permitted or prescribed, the burdens they may impose on

25  users, and whether this would deter access to content and services.

1        Age estimation can take many forms and may be used for many purposes, not all of
2    which include limiting access to content. Age estimation for the purpose of providing higher
3    privacy does not in and of itself regulate speech. Rather, the question is whether going through
4    age estimation will impact speech or otherwise chill access.  Ultimately, only after considering a
5    detailed factual record, can the Court consider whether the CAADCA and specifically its age
6    estimation provision "prohibits a substantial amount of speech relative to its plainly legitimate
7    sweep." *Moody,* 144 S. Ct. at 2409. There is no such record offered here.

8                                    **ARGUMENT**

9    **I.   The Ninth Circuit, following *Moody*, required Plaintiff to develop a factual record**
10   **before this Court can determine whether age estimation provisions are facially**
     **unconstitutional**

11

12       Following *Moody*, the Ninth Circuit held that the record before this Court was
13   insufficient to determine whether the age estimation requirement of the CAADCA facially
14   violated the First Amendment. The Ninth Circuit noted that the age estimation provision, and
15   other provisions "on their face, do not necessarily impact protected speech in all or most
16   applications," and that "[a]s in *Moody,* the record needs further development to allow the
17   district court to determine 'the full range of activities the law covers." *Net Choice, LLC v.*
18   *Bonta*, 113 F.4th 1101, 1122-23 (9th Cir. 2024) (citations omitted).  (Indeed, the Ninth Circuit
19   noted that even for the one remaining provision likely to trigger First Amendment scrutiny in
20   *every* application—providing policies in age-appropriate language—the record was
21   insufficient.) Under *Moody,* the Ninth Circuit found that focusing on only a few applications of
22   statutory provisions to a "subset" of covered businesses improperly "treat[ed] NetChoice's
23   challenges 'more like as-applied claims than like facial ones.'" *Id*. at 1123 (internal citations
24   omitted).

25   **II.  Plaintiff has failed to develop any factual record, let alone a sufficient one, for its**
26   **facial challenge of the age estimation provisions**

27

28

1       As the Ninth Circuit noted, age estimation does not clearly trigger First Amendment

2 scrutiny in all or even most applications. *Id.* at 1222-23. NetChoice once again brings a facial

3 challenge against age estimation, and it once again has not provided any record that would

4 enable a court to properly assess this challenge, offering no specific applications of the standard

5 let alone the full scope of applications.

6       NetChoice asserts that "many… members..." would need to "require[] verification of

7 legal identity before the services can be assessed." Cleland Decl. ¶ 20. This requirement to

8 "verify legal identity" is nowhere in the CAADCA (in contrast, there are numerous statutes

9 where legislatures have specifically required age or identify verification or specific high

10 certainty levels so the California Legislature could have easily written this in). *See*, e.g. Parental

11 Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09(B)(1) (2023); Utah

12 Minor Protection in Social Media Act, Utah Code § 13-71-101 – 401 (2024) .  NetChoice only

13 submits two declarations on behalf of two websites with its current motion. Both offer no new

14 specifics regarding how they may implement age estimation – if they implement age estimation

15 at all.  The declarations merely claim that the CAADCA would require them to "collect far

16 more private data from its readers than it does now" or that the CAADCA would "inevitably

17 require the collection of private information." Masnick Supp. Decl. ¶ 7, Paolucci Supp. Decl. ¶

18 6. Furthermore, past declarations from these companies, and the two others submitted with

19 Netchoice's first preliminary injunction motion, state that they interpret the CAADCA as

20 requiring them to "sign up" users, "verify" users' ages, or implement "account registration"----

21 without reference to any statutory section.  E.g., Masnick Decl. ¶ 12-13, Cairella Decl. ¶ 12, 14,

22 Roin Decl. ¶ 20. Account registration and verification of ages are not requirements in the

23 CAADCA. These declarations failed to provide sufficient specifics before and provide no new

24 specificity now.  Further, even were any of these declarations to offer specifics about their own

25 services and planned age estimation practices—which they do not—these declarations from

26 only a few sites would not be a sufficient record on which to facially invalidate the age

27 estimation provisions in their entirety. *See Moody,* 144 S. Ct.  2397-98 *(*criticizing parties for

28

1    focusing on only a few applications of the statute and ignoring many other sites, services, and

2    applications).

3        Indeed, it is not even clear that the declarants are not already compliant with the

4    CAADCA's alternative to assuring age proportionate to risks—which is to provide a high level

5    of default privacy to all users. Cal. Civ. Code § 1798.99.31(a)(5). For example, both TechDiret

6    and Dreamwidth support "anonymous" users on their sites and Paolucci explains that

7    Dreamwidth is "committed" "to respecting the privacy" of its users. Masnick Supp. Decl. ¶ 7,

8    Paolucci Supp. Decl. ¶ 6. Masnick additionally says Techdirt has a "deliberate practice to

9    minimize how much data we collect and retain about our readers." Masnick Decl. ¶ 13. These

10   companies could already be compliant with CAADCA if they provide a high level of privacy

11   and data protections to all users, with no age assurance actions required.

12       As detailed below in Section III, age estimation may take many technical forms.

13   Multiple of these forms do not require the transmission or collection by a service of "private

14   information." Further, under the CAADCA, age estimation does not on its own implicate

15   speech—it does not require companies who choose to assess age to block access to content or

16   services, for either children or adults. Companies may also choose not to implement age

17   assurance at all and instead might choose to apply strong "privacy and data protections" to

18   everyone—which also does not require blocking access to content or services for either children

19   or adults. Companies could even make strong privacy and data protections the default and then

20   allow adults, or those not estimated to be minors, to turn them off.  Cal. Civ. Code §

21   1798.99.31(a)(5). That adults who receive strong privacy protections—because companies

22   choose to make that the default—are unlikely to access content or services is far from a given.

23   Here, the question is whether specific age estimation practices may deter adults from accessing

24   specific content or services.  NetChoice fails to identify the full scope of specific age assurance

25   practices that sites and services would take. There is no record for this Court to analyze the full

26   scope of age estimation provisions under the CAADCA (step one in a First Amendment facial

27

28

challenge), let alone which applications may violate the First Amendment and how those measure up against the rest (step two). *See X Corp v. Bonta,* 166 F.4th at 899.

### III. Estimation can occur in a variety of ways, and whether it poses any constitutional concerns is highly dependent on specific facts

As the Ninth Circuit noted, the age estimation provisions in the CAADCA do not, on their face, necessarily impact protected speech in all or even most applications. *NetChoice v. Bonta,* 113 F.4th at 1222-24. If a user is determined to be of a certain age range, then certain privacy and data management protections should apply. Age does not trigger a bar to access.

The question, then, is whether undergoing the age estimation method itself will have the effect of substantially deterring access. This is a highly fact-specific question, based on the nature of the age estimation used and the type of service itself. This requires considering the current state of technology and the variety of means of assessing age, as well as the variety of services users are accessing. Plaintiff does not offer evidence in this regard. Plaintiff merely offers speculation that in this instance, going through age estimation will limit privacy and thereby chill access to services. As discussed below, age estimation does not need to be privacy invasive. Without a detailed factual record, it is impossible to evaluate whether age estimation under the CAADCA will substantially deter access.

### A. Age estimation for purposes of protecting privacy does not necessarily implicate speech

The CAADCA is a content-neutral privacy and design law. It is therefore distinct from laws that use age estimation to allow or disallow access to content and services. Most cases involving age estimation have been different—specifically about using age estimation for access to content like social media or pornography. References to *Reno v. ACLU,* 521 U.S. 844 (1997) and *Ashcroft v. ACLU,* 542 U.S. 656 (2004) are not on point, as they do not squarely address or consider whether and when age assurance in a content-neutral law constitutes a constitutional burden. (They were also decided on detailed factual records involving the state of technology over 20 years ago; age assurance technologies, and the internet as a whole, have

changed dramatically since that time.) It is inappropriate and disingenuous for NetChoice to repeatedly use *Reno* and related decisions "to attack content-neutral privacy and design laws that rely on age assurance." Brief of Amicus Curiae Electronic Privacy Information Center in Support of Neither Party, Free Speech Coalition, Inc. v. Paxton, No. 23-1122 (Sep. 23, 2024), https://www.supremecourt.gov/docket/docketfiles/html/public/23-1122.html.

Further, under the CAADCA, if companies do not wish to assess age, they do not need to. The statute requires that sites and services covered must: "Estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." Cal. Civ. Code § 1798.99.31(a)(5). If companies do not wish to assess age, they can afford all users privacy protections. Typically, companies resist protecting privacy for all audiences across the board because they believe that less privacy protective features lead to more profits. It is up to the company.

Giving users privacy and data protection does not require "censoring" content or restricting the availability of information. "Privacy" and "data protections" are widely used terms in law; the CAADCA is itself an effort to further privacy under the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act of 2020. A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. 2022) (§1 (9-10)). Privacy here addresses how businesses collect, use, and share personal information about individuals. California Consumer Privacy Act (CCPA), Office of the Att'y Gen., https://oag.ca.gov/privacy/ccpa (Mar. 13, 2024). The term "data protection", which is used often internationally, encompasses the similar concept about protection of an individuals' "personal data."[2] (That the Ninth Circuit determined one provision

---

[2] The European Union General Data Protection Regulation "lays down rules relating to the protection of natural persons with regard to the processing of personal data." Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the Protection of

of the CAADCA, the Data Protection Impact Assessment (DPIA), should be enjoined, because it required an assessment of certain content, does not mean the other duties under the CAADCA like estimating age or providing privacy by default implicate content.)

## B. Age estimation can occur in a multitude of ways

Age estimation can and will occur in a variety of ways, especially given the variety of sites and services that exist, each with their unique and different data practices. Whether age-based rules for privacy implicate speech is highly dependent on the specific age estimation tools used, the entity doing the age estimation, services' pre-existing data practices and information about their users, and the purpose of age estimation.  The CAADCA is not overly prescriptive in its age assessment requirements.  It states that "[a]ge assurance shall be proportionate to the risks and data practice of an online service, product, or feature" and that companies undertaking it should "estimate the age of child users with a reasonable level of certainty appropriate to the risks." Cal. Civ. Code § 1798.99.31(a)(5), (b)(8).

Current methods of assuring age include attestation (where a user or parent provides their own age or age range), approximating (where companies use data points to approximate a user's age), and age verification (which typically verifies a user's age against an ID or hard identifier). These methods carry different privacy implications and provide different levels of friction. Attestation is well known.  Approximation is in the middle and can be done based on data a service already holds (such as a user's online behavior on the platform, or their social graph on social media) or may be done by cross-referencing other data such as transactional data. Fox Johnson, *supra*, at 7. It may also be done via biometric information, such as facial or voice assessments. Fox Johnson, *supra*, at 8. *See* Kayee Hanaoka et al., *Face Analysis*

---

Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data, and Repealing Directive 95/46/EC (General Data Protection Regulation), L 119/1 O.J. (2016).

1    *Technology Evaluation: Age Estimation and Verification,* National Institute of Standards and

2    Technology 43 (2024), https://nvlpubs.nist.gov/nistpubs/ir/2024/NIST.IR.8525.pdf. Sarah

3    Forland, Nat Meysenburg & Erika Solis, *Age Verification: The Complicated Effort to Protect*

4    *Youth Online,* New America Foundation Open Technology Institute, 10-12 (2024). Techniques

5    like facial scans typically place a user in an approximate age range using their facial features,

6    they do not determine exact age (nor do they typically determine identify or process sufficient

7    information to do so). And verification—which is on a spectrum next to approximation and may

8    also include verification via banking or credit card details—typically uses a hard identifier like a

9    government ID. Fox Johnson, *supra*, at 10.

10        Age assurance, either attestation, approximation, or verification, may make use of a

11    third-party verifier. Using a third-party verifier is a privacy-protective recommendation of

12    France's data protection agency. Egelman Decl. ¶ 53. A third-party verifier could be a private

13    entity, a state or federal entity, or an independent, quasi-governmental, or non-profit

14    organization established for this purpose. It could be a device or app store that has received an

15    attestation of age. Third-party verifiers can pass information on to the site or service that

16    requires age assurance—this information may be very limited, including through "zero

17    knowledge proofs" that do not do anything other than indicate to the service requesting the

18    verification that the user is confirmed to meet or not meet the age criteria. "Zero knowledge

19    proofs" is "a concept of cryptography that has been well-known for almost 40 years." Egelman

20    Decl. ¶ 54.  *See also* Noah Apthorpe, Brett M. Frischmann & Yan Shvartzshnaider, *Online Age*

21    *Gating: An Interdisciplinary Evaluation,* 24-26 (Aug. 1, 2024),

22    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4937328 (discussing how unlinkability is a

23    privacy-preserving feature in third-party age assurance mechanisms). By limiting information

24    passed to companies and websites to just whether a user meets an age criteria or not, such

25    methods minimize the data privacy risk by minimizing the amount of data stored and disclosed.

26

27

28

Another way privacy can be enhanced when conducting age assurance is by having the age assurance take place on-device or in-browser. These methods will not expose users to the same privacy or security risks as assurance that takes place on a vendors' servers.

Ultimately, there are a variety of different ways age assurance can take place. Age assurance methods can be burdensome, or not at all. They could implicate privacy in large ways, or in very little ways. As demonstrated above, it is entirely possible that the service estimating age under the CAADCA receives no information from the user other than that a user's age is ok or not ok; that no "private" information needs to leave a user's device; or that a user can use one third party verifier and never again take another action because that verifier will signal age and nothing more through zero-knowledge proofs, and one age assessment can be used across the web.

### C. The only relevant question here is whether services' implementation of age estimation under the CAADCA will substantially deter access, which is impossible to evaluate given the paucity of the record

NetChoice does not provide any specifics about how any services would implement age estimation under CAADCA, let alone provide a full set of applications of age estimation that would be required for this Court to make a determination about the constitutionality of such measures. Plaintiff simply makes broad, speculative statements – for example that services may respond by "requiring even adults to relinquish personal information." Mot. at 20.

In addition to providing no evidence about what types of age estimations will be used, NetChoice also offers no evidence that going through such unspecified age estimation will chill access to services and implicate the First Amendment. Even if NetChoice were to make an as applied challenge—again, it is not clear what the application would be—there is insufficient evidence in the record.

It is possible to assess age in ways that preserve privacy and minimize data collection. And, with the CAADCA, the Legislature intentionally set up such a privacy-preserving system. First, the CAADCA is explicitly not a statute that requires "age verification" (the word

---

verification does not appear, and "establish," which was in the originally introduced bill was later replaced with "estimate"), rather, it speaks of "estimation" and "assurance." *Compare* A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. 2022) (as introduced on Feb. 16, 2022) with Cal. Civ. Code § 1798.99.31(a)(5).  In addition, it is a proportional rule--tying the certainty of the assessment to the risks inherent in the company's existing data practices. Cal. Civ. Code § 1798.99.31(b)(8). This demonstrates that the Legislature does not want companies to use privacy invading technologies, and that, in the tradeoff between privacy and certainty, the Legislature clearly wants companies to choose privacy at the expense of certainty. Third, the Legislature additionally sought to ensure privacy was respected in the text of the CAADCA, by providing that data collected for age estimation may not be retained any longer than necessary to determine age and may not be used for any other purposes.  Cal. Civ. Code § 1798.99.31(b)(8). Companies should therefore not be subjecting users to privacy risks for age assurance purposes if those risks are beyond the risks companies' data practices already present to users.  If use of an age assurance method presented heightened privacy risks compared to the privacy risks from that companies' existing data practices, in order to be compliant with the CAADCA the company should not be using this age assurance method—the method would not be appropriate considering the baseline level of risk. Many companies already collect a vast amount of data on their users, so if the company can already assess age based on existing data, then that is how the company should assess age. If a company poses extremely low privacy risks, and they know nothing about their users, then they should use an extremely minimal form of age estimation. The fact that the certainty level of estimation should increase with the risk of the underlying data practices shows the Legislature's understanding that the more data a company collects about users, the more likely they are to be able to estimate age to a greater level of certainty based on that data to begin with.  What age assurance method is appropriate is entirely dependent on each company's data practices, and so it is impossible to assess any application of the age assurance provision without information about a specific company's data practices.

1    Lastly, in general and as discussed above, age estimation can be designed in ways such that

2  any personal information remains on a user's device, and that all that is sent to a service like

3  one of NetChoice's members is a signal of an age, or a signal that a user meets a given age

4  threshold. NetChoice's members need not collect any further data about users and can maintain

5  anonymity on those sites that have "anonymous" users. (And NetChoice's social media

6  members can still separately maintain all the other personal information, including age, and

7  sometimes already government ID, that they have about users.)

8

9    **IV. Plaintiff has not met its burden to qualify for a preliminary injunction on the age**
   **estimation provisions**

10

11    The Supreme Court has stated that "claims of facial invalidity often rest on speculation"

12  and cautioned that "facial challenges threaten to short circuit the democratic process by

13  preventing duly enacted laws from being implemented in constitutional ways." *Moody,* 144 S.

14  Ct. at 2397 (internal citations omitted). In an era when parents and caregivers are clamoring for

15  more protections for young people online, the California Legislature duly enacted a law that can

16  be implemented in constitutional ways. NetChoice's speculation should not short circuit this

17  democratic process.

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, Common Sense asks this Court to deny Plaintiff's request for a preliminary injunction.

Dated: December 13, 2024                    Respectfully submitted,

By:    /s/ Jason Harrow

Jason Harrow (SBN 308560)
jason@gerstein-harrow.com
GERSTEIN HARROW, LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
Tel: (323) 744-5293

Ariel Fox Johnson (*pro hac vice pending*)
ariel@dslpconsulting.com
DIGITAL SMARTS LAW & POLICY LLC
16781 Chagrin Blvd., #536
Shaker Heights, OH 44120

*Attorneys for Proposed Amicus Curiae Common Sense Media*