AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
  davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
  bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>   Plaintiff,<br><br>   v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>   Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**REPLY IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Date:  January 23, 2025<br>Time:  9:00 AM<br>Dept.:  Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.     INTRODUCTION ............................................................................................... 1

II.    NETCHOICE IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT
       CLAIMS. ............................................................................................................ 2

       A.    The Act's Content-Based Coverage Definition Renders All The Regulatory
             Provisions Facially Invalid. ....................................................................... 2

             1.    The Regulatory Provisions are subject to strict scrutiny in every
                   case. .................................................................................................. 2

             2.    No application of the Regulatory Provisions survives strict scrutiny. ........... 4

             3.    The overbreadth standard is satisfied. ............................................ 6

       B.    The Individual Provisions, As Challenged, Are Also Facially Invalid. ............. 7

             1.    Policy-enforcement mandate: § 31(a)(9) ...................................... 7

             2.    Information-use restrictions: § 31(b)(1)-(4) .................................. 9

             3.    "Dark pattern" restriction: § 31(b)(7) .......................................... 12

             4.    Age-estimation mandate: § 31(a)(5) ............................................ 13

       C.    The Individual Provisions Are Unconstitutionally Vague. .................................. 13

       D.    The State Does Not Contest NetChoice's As-Applied Claims. ........................... 15

III.   THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT
       SEVERABLE. .................................................................................................... 15

       A.    The DPIA Provisions Are Not Volitionally Severable. ....................................... 15

       B.    The DPIA Provisions Are Not Functionally Severable. ...................................... 16

IV.    NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS. ............................ 16

V.     THE STATE CONCEDES THE OTHER INJUNCTION FACTORS. ............................. 17

VI.    CONCLUSION .................................................................................................. 17

i

**DAVIS WRIGHT TREMAINE** LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abbott Labs. v. FTB*,
   175 Cal. App. 4th 1346 (2009) ............................................................................. 16

5

*ACLU v. Mukasey*,
6   534 F.3d 181 (3d Cir. 2008) ........................................................................... 13, 14

7

*AFSCME Council No. 79 v. Scott*,
   717 F.3d 851 (11th Cir. 2013) ............................................................................... 9

8

9

*Am. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) ........................................................................... 1, 7, 8, 12

10

*Ashcroft v. ACLU*,
11   542 U.S. 656 (2004) ............................................................................................. 13

12

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ............................................................................................... 6

13

14

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ............................................................................................. 10

15

*Boos v. Barry*,
16   485 U.S. 312 (1988) ............................................................................................... 3

17

*Bride v. Yolo Techs., Inc.*,
   112 F.4th 1168 (9th Cir. 2024) ........................................................................... 17

18

*Brockett v. Spokane Arcades, Inc.*,
19   472 U.S. 491 (1985) ............................................................................................... 7

20

*Brown v. Ent. Merchs. Ass'n*,
21   564 U.S. 786 (2011) ................................................................................ 2, 5, 6, 13

22

*Bullfrog Films, Inc. v. Wick*,
   847 F.2d 502 (9th Cir. 1988) ............................................................................... 14

23

*Bursey v. United States*,
24   466 F.2d 1059 (9th Cir. 1972) ............................................................................. 12

25

*Butcher v. Knudsen*,
26   38 F.4th 1163 (9th Cir. 2022) .............................................................................. 15

27

*Butler v. Michigan*,
   352 U.S. 380 (1957) ............................................................................................. 13

28

**DAVIS WRIGHT TREMAINE** LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Cal. Redevelopment Ass'n v. Matosantos,*
    53 Cal. 4th 231 (2011) ........................................................................... 15, 16

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ....................................................................................... 7

*City of Austin v. Reagan Nat'l Advertising of Austin LLC,*
    596 U.S. 61 (2022) ......................................................................................... 3

*City of L.A. v. Patel,*
    576 U.S. 409 (2015) ....................................................................................... 8

*Cody v. Ring LLC,*
    718 F. Supp. 3d 993 (N.D. Cal. 2024) .......................................................... 15

*Corner Computing Sols. v. Google LLC,*
    2024 WL 4290764 (W.D. Wash. 2024) ........................................................... 8

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ......................................................................................... 15

*County of Sonoma v. Superior Ct.,*
    173 Cal. App. 4th 322 (2009) ......................................................................... 15

*Daghlian v. DeVry Univ., Inc.,*
    582 F. Supp. 2d 1231 (C.D. Cal. 2007) ......................................................... 16

*DoorDash, Inc. v. City of N.Y.,*
    2024 WL 4276245 (S.D.N.Y. 2024) ............................................................... 10

*Engdahl v. City of Kenosha,*
    317 F. Supp. 1133 (E.D. Wis. 1970) ............................................................... 8

*Ent. Software Ass'n v. Foti,*
    451 F. Supp. 2d 823 (M.D. La. 2006) ............................................................. 8

*Est. of Sanders,*
    2 Cal. App. 4th 462 (1992) ............................................................................. 16

*Fayetteville Pub. Libr. v. Crawford Cnty.,*
    2024 WL 5202774 (W.D. Ark. 2024) ............................................................. 14

*Foti v. City of Menlo Park,*
    146 F.3d 629 (9th Cir. 1998) ........................................................................... 1

*Garcia v. City of L.A.,*
    11 F.4th 1113 (9th Cir. 2021) ......................................................................... 8

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ....................................................................................... 15

iii

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

**DAVIS WRIGHT TREMAINE** LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Harris v. Quinn*,
    573 U.S. 616 (2014) ........................................................................................... 11

*HERE Int'l Union v. Davis*,
    21 Cal. 4th 585 (1999) ...................................................................................... 16

*IMDB.com Inc. v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) .......................................................................... 11

*In re Matthew B.*,
    232 Cal. App. 3d 1239 (1991) ........................................................................... 14

*Isaacson v. Horne*,
    716 F.3d 1213 (9th Cir. 2013) ............................................................................ 7

*John Doe # 1 v. Reed*,
    561 U.S. 186 (2010) ............................................................................................ 7

*Kasler v. Lungren*,
    72 Cal. Rptr. 2d 260 (1998) ............................................................................... 16

*King v. Facebook, Inc.*,
    2023 WL 5318464 (9th Cir. 2023) ...................................................................... 8

*Kohls v. Bonta*,
    2024 WL 4374134 (E.D. Cal. 2024) .................................................................. 14

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ........................................................................... 17

*Lloyd v. Facebook, Inc.*,
    2024 WL 5121035 (N.D. Cal. 2024) ................................................................... 8

*Matsumoto v. Labrador*,
    122 F.4th 787 (9th Cir. 2024) .................................................................. 1, 4, 7, 8

*Mills v. United States*,
    713 F.2d 1249 (7th Cir. 1983) ........................................................................... 16

*Mont. PIRG v. Jacobsen*,
    2024 WL 4023781 (9th Cir. 2024) ...................................................................... 1

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................................................*passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ............................................................................................ 4

*NAACP v. Button*,
    371 U.S. 415 (1963) .......................................................................................... 14

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*National Pork Producers Council v. Ross*,
　598 U.S. 356 (2023) ................................................................................................. 17

*NetChoice, LLC v. Bonta*,
　113 F.4th 1101 (9th Cir. 2024) ...........................................................................*passim*

*NetChoice, LLC v. Fitch*,
　2024 WL 3276409 (S.D. Miss. 2024) ........................................................................ 3

*NetChoice, LLC v. Paxton*,
　573 F. Supp. 3d 1092 (W.D. Tex. 2021) ................................................................. 10

*NetChoice, LLC v. Reyes*,
　2024 WL 4135626 (D. Utah 2024) ...................................................................... 3, 12

*NetChoice, LLC v. Yost*,
　716 F. Supp. 3d 539 (S.D. Ohio 2024) ...................................................................... 3

*O'Handley v. Padilla*,
　579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd*, 62 F.4th 1145 (9th Cir. 2023) ....................... 10

*People v. Nguyen*,
　222 Cal. App. 4th 1168 (2014) ............................................................................... 16

*PETA, Inc. v. N.C. Farm Bur. Fed'n*,
　60 F.4th 815 (4th Cir. 2023) ..................................................................................... 7

*Porter v. Martinez*,
　68 F.4th 429 (9th Cir. 2023) ............................................................................... 3, 11

*Proj. Veritas Action Fund v. Rollins*,
　982 F.3d 813 (1st Cir. 2020) ..................................................................................... 7

*PSINet, Inc. v. Chapman*,
　362 F.3d 227 (4th Cir. 2004) ................................................................................... 13

*Publius v. Boyer-Vine*,
　237 F. Supp. 3d 997 (E.D. Cal. 2017) ..................................................................... 17

*Quintano v. Mercury Casualty Co.*,
　11 Cal. 4th 1049 (1995) ........................................................................................... 16

*Reed v. Town of Gilbert*,
　576 U.S. 155 (2015) ......................................................................................... 3, 9, 11

*Reno v. ACLU*,
　521 U.S. 844 (1997) ................................................................................................. 13

*Riley v. NFB of N.C., Inc.*,
　487 U.S. 781 (1988) ................................................................................................... 6

*Sam Francis Found. v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) (en banc) ................................................................. 17

*Smith v. Butterworth*,
    866 F.2d 1318 (11th Cir. 1989), *aff'd*, 494 U.S. 624 (1990) ..................................... 7

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................................... 4

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................ 4, 11

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................................................. 11

*United States v. Eichman*,
    496 U.S. 310 (1990) ................................................................................................. 11

*United States v. Grace*,
    461 U.S. 171 (1983) ................................................................................................... 7

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .........................................................................................*passim*

*Video Soft. Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009), *aff'd*, 564 U.S. 786 (2011) .......................................... 5

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) .................................................................................... 8

*Yim v. City of Seattle*,
    63 F.4th 783 (9th Cir. 2023) .......................................................................5, 9, 11, 13

**Statutes**

Children's Online Privacy Protection Act (COPPA),
    15 U.S.C. §§ 6501-05 ........................................................................................ 2, 6, 17

47 U.S.C. § 230 ................................................................................................. 2, 16, 17

Cal. Civil Code
    § 1798.99.29 .................................................................................................... 2, 17
    § 1798.99.30 .............................................................................................. 2, 3, 6, 17
    § 1798.99.31 ...................................................................................................*passim*
    § 1798.99.40 ............................................................................................................ 2

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 .............................................................................................. 17

U.S. Const. amend I ................................................................................................*passim*

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

1

**Other Authorities**

2

Seth F. Kreimer, *Censorship by Proxy*, 155 U. PA. L. REV. 11 (2006) .......................................... 8

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

## I.    INTRODUCTION

The State never seriously disputes that the Regulatory Provisions are intended to, and will dramatically, alter speech published online. The State also essentially ignores NetChoice's narrowed alternate challenges, instead recycling its rejected argument that the Act only concerns privacy, not speech. Its defense of the law on the merits fails, and the remaining preliminary injunction factors are undisputed. A preliminary injunction is warranted.

*First*, the Regulatory Provisions are facially invalid across the board. Strict scrutiny applies because the Act requires services to consider content—whether they publish "cartoons," "games," "celebrities," and other material that "appeal to children"—to decide whether they are covered. The Legislature drew those lines to censor "detrimental material" and reduce minors' engagement with protected expression. Rather than try to satisfy strict scrutiny, the State erroneously reads *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), to stiffen NetChoice's burden in a way that would render facial relief virtually impossible in First Amendment challenges. But *Moody* did not "reformulat[e]" the overbreadth test, *Mont. PIRG v. Jacobsen*, 2024 WL 4023781, at *2 n.2 (9th Cir. 2024), and the Ninth Circuit just applied it to invalidate a law that, like this one, "sweeps in a large swath of expressive activities," *Matsumoto v. Labrador*, 122 F.4th 787, 814 (9th Cir. 2024).

*Second*, the Individual Provisions, as challenged, are also facially invalid. The State does not show otherwise and instead mischaracterizes NetChoice's narrowing of its claims as an effort to "short-circuit" *Moody*. Opp. 10. The State is wrong. Courts routinely analyze the facial validity of statutes in specific applications and regularly invalidate them as to those applications. *See, e.g.*, *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611, 617-18 (2021) ("*AFP*").

*Third*, the Individual Provisions are impermissibly vague. Rather than define the specific activities regulated and harms to be avoided, the Individual Provisions require companies to guess whether their expressive features and content curation practices are "detrimental" or in children's "best interests," and to police themselves accordingly. But it is the State's job to "clearly delineate the conduct it proscribes" and not delegate such "policy matters … for resolution on an ad hoc and subjective basis." *Foti v. City of Menlo Park*, 146 F.3d 629, 638-39 (9th Cir. 1998). Absent relief, services will self-censor to avoid the whims of whatever regulator happens to be in charge.

*Fourth*, the Regulatory Provisions are not volitionally or functionally severable from the already-enjoined DPIA provisions. The State's response ignores the history of the Act and the undeniable fact that enforcing the remainder of the Act fundamentally alters the scheme enacted.

*Finally*, the Regulatory Provisions also violate the Commerce Clause, and certain Individual Provisions violate Section 230 and COPPA.

## II.    NETCHOICE IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT CLAIMS.

### A.    The Act's Content-Based Coverage Definition Renders All The Regulatory Provisions Facially Invalid.

As NetChoice has shown, application of each Regulatory Provision is based on the content a business publishes. As a result, the Regulatory Provisions are subject to strict scrutiny—a standard the State cannot (and does not even try to) satisfy. *See* Mot. 11-14.

#### 1.    The Regulatory Provisions are subject to strict scrutiny in every case.

The State tries to avoid the First Amendment by claiming the "determining factor as to whether a business is subject to the Act is" not content, but "whether or not its users are children." Opp. 12. But the Act uniformly requires considering the *content* of services' online material to decide whether the Regulatory Provisions apply to those services. Services that publish "advertisements," "games," "cartoons," "music," or "celebrities" with "appeal to children" are regulated, § 30(b)(4), but not services used by children that do not publish such content. *See* § 30(b)(5) (exempting services that offer "delivery or use of a physical product"); § 40 (exempting health care providers and researchers). This scheme shows the Legislature was focused on expression, not just the composition of a service's user base. And the Legislature confirmed that focus by twice referring to a service's "audience" (not "users"). § 30(b)(4)(B), (F). Strict scrutiny thus applies to every application of the Regulatory Provisions.

The State cannot deny that this content-based scheme is designed to control the expression that minors access through "features distinctive to the medium" of online communication. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). The Act seeks to suppress those features to the extent they "offer detrimental material," Findings § 1(a)(8), but protects those same features if they deliver content in "the best interests of children," § 29. As the State's expert confirms, the objective is to regulate expressive features that "keep[] users coming back" to allegedly harmful

2

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

speech on services like "Instagram, YouTube, Reddit, Discord and Twitter/X." Radesky ¶¶ 83, 95; *see id.* ¶¶ 86-87, 90, 92 (criticizing "ephemeral designs," content "notifications," expressive engagement such as "likes" and "hearts," and "low-friction" "scrolling"). This "focus on the direct impact of speech on its audience" triggers strict scrutiny. *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see* Mot. 12; Radesky Supp. ¶¶ 22-28.

The State relies on *City of Austin v. Reagan National Advertising of Austin LLC*, 596 U.S. 61 (2022) and *Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023) (Opp. 11-13), but those decisions support NetChoice. *City of Austin* involved an ordinance that regulated advertisements differently depending on whether or not the goods were sold "on premises." 596 U.S. at 73-74. The ordinance discriminated based on where the goods were sold, *not* "the topic discussed or the idea or message expressed," rendering strict scrutiny inapplicable. *Id.* So, too, in *Porter*, the application of a law regulating honking hinged on "traffic circumstances," not "the 'content' of the honk." 68 F.4th at 441-42. Both cases, however, confirmed that laws "singl[ing] out specific subject matter for differential treatment"—like the political sign ordinance in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015)—demand strict scrutiny. *City of Austin*, 596 U.S. at 94; *Porter*, 68 F.4th at 442-43. Here, the Act singles out services with expressive appeal to children and requires them to redesign their offerings in the "best interests of children." That is censorship, and it requires strict scrutiny.

The State also cannot distinguish the trio of recent cases enjoining other online-content restrictions. *See* Mot. 13 (citing *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah 2024), *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. 2024), and *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024)). The State notes those restrictions distinguished between "social speech" and "other forms of speech." Opp. 13. But the Act is even more vulnerable because it targets services based on specific kinds of content, not just general categories of speech. *See Reed*, 576 U.S. at 160-61. Although *Yost* declined to find a law content-based *solely* on the basis that it applied to services "reasonably anticipated to be accessed by children," 716 F. Supp. 3d at 556-57 (Opp. 13), even that (flawed) holding is irrelevant: The Act identifies examples of content that bring a service into its ambit. *See* § 30(b)(4)(E). Like the ordinance in *Reed*, the Act thus "draw[s] facially content-based distinctions between subjects of speech." *Reyes*, 2024 WL 4135626, at *10.

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

The State's empty claim that it seeks to regulate children's "privacy and health," Opp. 13, changes none of this. The State cannot rely on purported privacy interests unless it can show it would have passed the Act "even … absen[t]" its censorial motive. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The record demonstrates the opposite—that the Act is aimed at the "suppression of free expression." *Moody*, 603 U.S. at 742. This is obvious from the Act's stated intent to prevent services from "offer[ing] detrimental material," Findings § 1(a)(8); similar statements from the Act's sponsor, the Governor, and the Attorney General, *see* Mot. 12; and the Ninth Circuit's finding that the State used the term "data management" as a "prox[y] for content." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118, 1121 (9th Cir. 2024). It is similarly obvious from the State's evidence in this litigation. *See* Radesky Supp. ¶¶ 3, 5 (Act targets harms from "media use," "educational content/interactive design," "advertising," "games," "video-sharing platforms like YouTube," and "interactive media"); *id.* ¶¶ 24-26, 29-31, 43, 70-75 (Act targets speech involving "hate and discrimination," "violation of dignity," "problematic/excessive social media use," "bullying/harassment," "negative social media content," "offensive name-calling," "false rumors," "negative things," "explicit images," and age-inappropriate "advertisements"). Even the State's "privacy" harms boil down to a concern that content is too interesting, Opp. 2, 3, 19, and its "financial harms" relate to spending money on "content," Radesky Supp. ¶¶ 54-55. "It is not difficult to conclude from these examples that the statute encompasses, and may realistically be applied to, a substantial amount of protected speech." *Matsumoto*, 122 F.4th at 815.

## 2.    No application of the Regulatory Provisions survives strict scrutiny.

"That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011). The same goes for speech the State believes causes "negative social comparisons" or "displace[s] … healthy activities." Radesky Supp. ¶¶ 26-27. "[S]peech cannot be restricted simply because it is upsetting." *Snyder v. Phelps*, 562 U.S. 443, 450-51, 458 (2011). Since the Act is content-based both by its defined coverage and express purpose, the Regulatory Provisions are "presumptively invalid" and must survive strict scrutiny. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000).

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

The State does not argue that scrutiny is satisfied, nor do its declarations carry that burden.

**No compelling interest.** "[W]hen the government seeks to restrict speech" to protect minors, "it must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Video Soft. Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009), *aff'd*, 564 U.S. 786 (2011). Here, the State has not shown the wide range of maladies it seeks to address—such as depression, anxiety, disrupted sleep, poor academic performance, sedentary habits, and hurt feelings, Radesky Supp. ¶¶ 23-27, 30, 43—is attributable to online services. *See* Ferguson ¶¶ 10-40; Ferguson Supp. ¶¶ 22-47. As before, Dr. Radesky's testimony "do[es] not prove" that online speech "cause[s]" these harms, but "at best" shows "some correlation" between "exposure" and small "effects." *Brown*, 564 U.S. at 800-01; Radesky ¶ 50. Dr. Radesky now claims to have discovered a "causal link" to poorer mental health, Radesky Supp. ¶¶ 52, 96, but the new studies, too, are correlational (*id.* ¶ 52 nn.51 & 52) and methodologically flawed, Ferguson Supp. ¶¶ 10-21, 65-69. Further, Dr. Radesky's testimony does not show how any Regulatory Provision "will in fact alleviate" any targeted harm. *Video Soft. Dealers Ass'n*, 556 F.3d at 962; *see* Ferguson Supp. ¶¶ 22-47, 55-69, 80-81.

**No narrow tailoring.** The State also has not shown that any Regulatory Provision is the least speech-restrictive alternative, *Playboy*, 529 U.S. at 813, or restricts no more speech than necessary, *Yim v. City of Seattle*, 63 F.4th 783, 794 (9th Cir. 2023).

First, the Act is not limited to speech unprotected by the First Amendment, such as child sexual abuse material ("CSAM"), speech promoting illegal drugs and gambling, or deceptive advertising. *Cf.* Radesky Supp. ¶¶ 63-67, 69, 71-75, 106-107(a)-(c). Rather, it regulates any "materially detrimental" information that is not "in the best interests of children." According to the State, this includes any speech that extends minors' time online, *id.* ¶¶ 25-27, 43-52, 78-101, 107(d), promotes "negative social comparison," *id.* ¶¶ 25-26, 29, 53, involves "name-calling," "negative things," or "risky, shocking, or attention-grabbing posts," *id.* ¶¶ 30, 31, 64, or exposes minors to "marketing" and "advertising" that is not "age-appropriate," *id.* ¶¶ 42, 70, 75. The State may not like it, but that speech is constitutionally protected: The government has no "free-floating

1   power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. And the

2   State's alternate argument that protected speech may be regulated to shield minors from conduct

3   like "sexual exploitation" or "grooming," Radesky Supp. ¶¶ 32-36, 63, "turns the First

4   Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

5          Second, the State could accomplish its goals by enforcing existing laws, including COPPA,

6   the CPRA, *see* Mot. 4-5, and laws governing CSAM, sexual abuse, deceptive advertising, and

7   gambling. The State asserts these laws are not adequately enforced, Egelman ¶¶ 19, 24, 37-40;

8   Radesky ¶¶ 31-39, Radesky Supp. ¶ 42, and that is the point: A law is not tailored when "the State

9   may vigorously enforce" less-restrictive rules. *Riley v. NFB of N.C., Inc.*, 487 U.S. 781, 800

10  (1988); *see also NetChoice*, 113 F.4th at 1121 (DPIA requirement invalid partially because State

11  could have "rel[ied] on existing criminal laws that prohibit unlawful conduct").

12         Third, even as to the Act's real but illegitimate purpose—to shield minors from speech—

13  the Regulatory Provisions are not the least restrictive means because they apply a one-size-fits-all

14  instead of a "household-by-household" approach. *Playboy*, 529 U.S. at 816, 818, 823. Dr. Radesky

15  admits some services provide parents tools to limit access to "age-appropriate video content."

16  Radesky ¶ 96(d). The State does not explain why it did not mandate such tools. *See NetChoice*,

17  113 F.4th at 1121 (State could have "easily employed less restrictive means," such as by

18  "incentivizing companies to offer voluntary content filters or application blockers" or "educating

19  children and parents on the importance of using such tools").

20              **3.      The overbreadth standard is satisfied.**

21         This record easily satisfies the facial overbreadth standard. In terms of "[w]hat activities,

22  by what actors" the Act regulates, *Moody*, 603 U.S. at 724, the Act's scoping provisions mean that

23  virtually all (if not all) applications of the Regulatory Provisions burden speech based on content.

24  Indeed, it appears undisputed that the vast majority of services "accessed by children," § 30(b)(4),

25  publish expressive content like videos, games, music, and social media. *See* Gossett Ex. 11 at 2-4,

26  9, 11; Radesky ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98 (focusing on social media, digital

27  media, and interactive gaming); Radesky Supp. ¶¶ 22-55 (same); Ferguson Supp. ¶¶ 10-21 (same).

28  Consequently, the Act's "broad contours … overlap extensively with the First Amendment" and

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

1  unconstitutionally "sweep[] in a large swath of expressive activities" that are "substantial in

2  proportion" to any "plainly legitimate sweep." *Matsumoto*, 122 F.4th at 814-15.

3          **B.      The Individual Provisions, As Challenged, Are Also Facially Invalid.**

4          Each challenged Individual Provision is also facially invalid in the applications NetChoice

5  now challenges. Rather than grapple with the narrowed relief NetChoice seeks, Am. Compl. ¶¶ 84-

6  90, Prayer ¶¶ 1-13, the State faults NetChoice for trying to "short-circuit" its burden under *Moody*.

7  Opp. 10. Not so. NetChoice's burden depends on "the breadth of the remedy" sought, *Citizens*

8  *United v. FEC*, 558 U.S. 310, 331 (2010), and the possibility that an Individual Provision violates

9  the First Amendment "only in some cases" does not foreclose relief; it simply affects "the breadth

10  of the relief to which [NetChoice is] entitled." *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir.

11  2013). Courts routinely consider challenges to laws on their face as to some but not all applications.

12  *See* Mot. 14 (citing cases); *see also, e.g.*, *AFP*, 594 U.S. at 611, 618-19 (granting facial relief as

13  applied to specific tax schedule); *John Doe # 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining

14  nature of challenge with both as-applied and facial aspects); *Brockett v. Spokane Arcades, Inc.*,

15  472 U.S. 491, 503-07 (1985) (facial relief "insofar" as law "reach[ed] protected materials"); *United*

16  *States v. Grace*, 461 U.S. 171, 175, 183 (1983) (facial relief as to law's applications to sidewalks);

17  *PETA, Inc. v. N.C. Farm Bur. Fed'n*, 60 F.4th 815, 835-38 (4th Cir. 2023) (facial relief as "applied"

18  to certain newsgathering activities); *Proj. Veritas Action Fund v. Rollins*, 982 F.3d 813, 826, 840

19  (1st Cir. 2020) (facial relief with "'as-applied' … characteristics") (citing cases); *Smith v.*

20  *Butterworth*, 866 F.2d 1318, 1320-21 (11th Cir. 1989) (facial relief "insofar as [law] applie[d] to"

21  certain witnesses and circumstances), *aff'd*, 494 U.S. 624 (1990). The Court should do so here.

22          **1.      Policy-enforcement mandate: § 31(a)(9)**

23          NetChoice has limited this challenge to the Act's requirement that services enforce their

24  content moderation policies, *not* their privacy policies. *See* Am. Compl. ¶ 5, Prayer ¶ 5. This

25  narrowing is not "amorphous," as the State asserts, Opp. 1, but confined to editorial standards that

26  describe the "subjects or messages the platform prohibits or discourages," and content a service

27  reserves the right to "remove, disfavor, or label." *Moody*, 603 U.S. at 719-20; *see* Roin ¶¶ 11-17;

28  Cairella ¶¶ 15-17; Szabo ¶¶ 8-12; Rumenap ¶ 6. Because telling a publisher what kinds of content

**Davis Wright Tremaine** LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

to moderate would "alter a private speaker's own editorial choices," *Moody*, 603 U.S. at 734, the mandate is invalid "in every [such] case," *AFP*, 594 U.S. at 615.

The State argues that this requirement only compels services to honor their own editorial commitments. Opp. 14. But the same could be said of efforts—held unconstitutional—to supervise theaters that voluntarily adopt MPAA ratings, *Engdahl v. City of Kenosha*, 317 F. Supp. 1133, 1136 (E.D. Wis. 1970), or game distributors that choose to enforce ESRB rules, *Ent. Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 834-35 (M.D. La. 2006). Here, too, as this Court found, applying the policy-enforcement mandate to content policies would "press private companies into service as government censors" and interfere with the exercise of "their editorial judgment." ECF 74 at 14, 27. In fact, the Ninth Circuit just held that even the *prospect* of state-supervised content moderation chills such judgment because it pressures services to block content that some (but not others) might consider problematic. *X Corp. v. Bonta*, 116 F.4th 888, 898-903 (9th Cir. 2024); *see also* Seth F. Kreimer, *Censorship by Proxy*, 155 U. PA. L. REV. 11, 48-50 (2006) (collecting cases).

The State gets nowhere by citing cases that allow enforcement of legally binding promises. *See* Opp. 14. Contracts are already enforceable, rendering such obligations irrelevant "to th[is] law's facial constitutionality." *Garcia v. City of L.A.*, 11 F.4th 1113, 1119 n.7 (9th Cir. 2021); *see also City of L.A. v. Patel*, 576 U.S. 409, 418-19 (2015) (in a facial challenge, courts consider "only applications of the statute in which it actually authorizes or prohibits conduct," not those addressed by existing authority). NetChoice is not asking the Court to void services' contractual obligations, but to enjoin *the State* from second-guessing the way they apply editorial standards. Am. Compl. ¶ 85, Prayer ¶ 5; *see, e.g.*, *Lloyd v. Facebook, Inc.*, 2024 WL 5121035, at *5 (N.D. Cal. 2024) (content policy is not a contract); *Corner Computing Sols. v. Google LLC*, 2024 WL 4290764, at *2 (W.D. Wash. 2024) (same); *King v. Facebook, Inc.*, 2023 WL 5318464, at *2 (9th Cir. 2023) (statements about how a service intends to "exercise … editorial discretion" are unenforceable). In any event, the State's speculation about hypothetical enforceable promises cannot overcome the "substantial" number of concrete unconstitutional applications of § 31(a)(9) to content policies that NetChoice has shown and that the State's expert, Radesky ¶ 72, confirms would result. *Matsumoto*, 122 F.4th at 814; *see* Cairella ¶ 17; Roin ¶ 17; Szabo ¶¶ 8-12; Cleland ¶¶ 8-14. The

8

State does not attempt to justify these applications (Opp. 14-15), and none are tailored to alleviate actual harm, *see Yim*, 63 F.4th at 794-96. *E.g.*, ECF 74 at 26-28.

## 2.    Information-use restrictions: § 31(b)(1)-(4)

The State's arguments on the information-use restrictions fare no better. NetChoice seeks to enjoin those provisions only to the extent they "apply to covered services' use of personal information to publish content or to make information available." Am. Compl., Prayer ¶¶ 6-7. NetChoice has met its burden to show that these applications of § 31(b)(1)-(4) are facially invalid.

The State feigns ignorance as to "what content" will be affected and "how." Opp. 16. It wonders, for example, how the "prohibition on profiling a minor by default," § 31(b)(2), has "any impact on a business's content or other expressive activity." *Id.* But the State's own expert testifies repeatedly that profiling is a problem because it causes services to make editorial decisions to show allegedly harmful content to minors. *See, e.g.*, Radesky ¶ 65 (profiling causes services to receive "detrimental" "material"); *id.* ¶ 78 (users are "profiled" to "predict[] what content" they want to see); ¶ 80 ("behavioral profile[s]" lead to "less extreme" "content"); ¶ 89(a) (profiling enables detrimental "content" to be "amplified or recommended to children"); Radesky Supp. ¶ 70 (profiling leads to "advertising for harmful or illegal activities"); *see also NetChoice*, 113 F.4th at 1118 (discussing "the State's own example" that "data profiling may cause a student who conducts research for a school project about eating disorders to see additional content about eating disorders"). So, too, § 31(b)(1), (3), and (4) regulate speech based on content because they condition the use of data on whether the published material is "materially detrimental" or in a child's "best interests." *See Reed*, 576 U.S. at 163-64, 169.

NetChoice need not show, as the State claims, how the *collection* or *sale* of information is "protected expressive activity." Opp. 16. This challenge is limited to the ways online services *use* information to suggest, target, and personalize the compilations of expression they present to different audiences. *See, e.g.*, Roin ¶¶ 2-6, 10, 13, 22; Cairella ¶¶ 8, 20; Szabo ¶¶ 13-14; Masnick Supp. ¶ 9; Paolucci Supp. ¶ 9; Cleland ¶ 18. The State cannot insulate the applications that NetChoice challenges by pointing (Opp. 18-19) to applications NetChoice does not challenge. *Cf. NetChoice*, 113 F.4th at 1117; *AFSCME Council No. 79 v. Scott*, 717 F.3d 851, 866 n.2 (11th Cir.

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

2013) (rejecting similar attempt to avoid facial challenge); *see also, e.g., DoorDash, Inc. v. City of N.Y.*, 2024 WL 4276245, at *8-9, *13-15 (S.D.N.Y. 2024) (enjoining law that "restricts how [apps] can use the customer data they collect") (Mot. 16).

The State also is wrong that publishing "content" is not "expressive activity." Opp. 17. "[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). *Moody* does not say otherwise. *Moody* concerned statutes aimed at preventing services from "censoring" or disfavoring user content. 603 U.S. at 720-21. The Court had no trouble concluding that some applications of those statutes impinged on editorial discretion. *Id.* at 726-43. But it declined to find the laws facially invalid absent evidence as to what proportion of the regulated entities actually exercised editorial discretion that could be burdened. *Id.* at 725 (querying whether an email provider or online marketplace filters content in an expressive way). Here, in contrast, the information-use restrictions burden the editorial discretion of all covered services (and certainly a substantial number) by requiring them to avoid showing "detrimental" content to children. That is the very exercise the Ninth Circuit already held unconstitutional "in every circumstance." *NetChoice*, 113 F.4th at 1116 (requiring services to "inquire into whether" content is harmful before publishing it is unconstitutional).

In any event, NetChoice challenges the information-use restrictions *only* to the extent they restrict how services decide what speech to publish. Even using information to remove spam—the example the State says is non-expressive, Opp. 18—is a form of editing. *See O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-87 (N.D. Cal. 2022) (First Amendment protects "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote"), *aff'd*, 62 F.4th 1145 (9th Cir. 2023). "[T]hat algorithms do some of the work" changes nothing. *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1108 (W.D. Tex. 2021). What matters is that a "private company exercises editorial discretion" over content, irrespective of "the exact process used." *Id.*; Egelman Supp. ¶¶ 60-61 (algorithms implement "subjective" "content recommendations"); Egelman ¶¶ 48-50.

The State's effort to escape strict scrutiny, Opp. 18-19, fails. The prohibitions regulate the use of data differently on the basis of the content published, such as whether that speech is

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

1    detrimental or in the best interests of children. *See Reed*, 576 U.S. at 163-64, 169; *cf. Sorrell*, 564

2    U.S. at 580 (heightened scrutiny where law restricts information use by some speakers). The

3    prohibitions are not confined to speech that "does no more than propose a commercial transaction."

4    *Harris v. Quinn*, 573 U.S. 616, 648 (2014). They apply to *any* online publication that relies on user

5    data (including just an IP address) to deliver content. *See IMDB.com Inc. v. Becerra*, 962 F.3d

6    1111, 1122 (9th Cir. 2020); *see also NetChoice*, 113 F.4th at 1120 ("There should be no doubt that

7    the speech children might encounter online while using covered businesses' services are not

8    merely commercial speech.").

9        Regardless, the State fails to carry its burden under even intermediate scrutiny, which still

10   demands proof that the prohibitions (1) will in fact directly advance a substantial government

11   interest in addressing a real problem, and (2) suppress no more speech than necessary to serve that

12   interest. *Yim*, 63 F.4th at 794; *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994).

13   The State claims the prohibitions further an interest in "protecting … privacy," but its rationale

14   focuses on the "collection," "gathering," and retention of personal information—not its *use* to

15   inform the publication of personalized content, which is what NetChoice challenges. Opp. 19.

16       The State's only justification for restricting the use of information for publication is to

17   minimize "a child's time online" and reduce "overuse." *Id.* But that justification is not "unrelated

18   to the suppression of free expression," *Porter*, 68 F.4th at 439 (Opp. 8), and thus is constitutionally

19   invalid. *United States v. Eichman*, 496 U.S. 310, 317-18 (1990) (laws suppressing speech "out of

20   concern for its likely communicative impact" are invalid); *see also* Mot. 18-19 (discussing cases).

21   And if this were a valid aim, the evidence does not show these prohibitions will improve mental

22   health, even assuming they actually reduced minors' screentime. *See* Ferguson Supp. ¶¶ 22-29 (no

23   evidence of "correlation between time spent on digital media and youth mental health").

24       Nor has the State shown that these prohibitions suppress no more speech than necessary.

25   The State could pursue its claimed privacy interest by enforcing existing privacy laws. *See supra*

26   p. 6. And it could try to reduce minors' screentime (assuming that were a permissible goal) through

27   tools for families and media literacy efforts. *Id.*; Ferguson Supp. ¶¶ 45, 53-54, 74-75; Radesky

28   ¶¶ 94-95, 96(d), 98. The existence of these "narrower alternatives" is fatal. *Yim*, 63 F.4th at 795-

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

97; *see also, e.g., Playboy*, 529 U.S. at 816, 818, 823; *NetChoice*, 113 F.4th at 1121 (State could have "easily" used less restrictive means, such as by "incentivizing companies to offer voluntary content filters or application blockers," "educating children and parents on the importance of using such tools," and "relying on existing criminal laws that prohibit unlawful conduct").

Since the State has not shown the data use provisions have any "plainly legitimate" applications in the realm NetChoice challenges, and since NetChoice has shown there are a "substantial" number of unconstitutional applications, these provisions are facially invalid as challenged. *See AFP*, 594 U.S. at 618.

### 3. "Dark pattern" restriction: § 31(b)(7)

In defending the "dark patterns" restriction, the State similarly ignores that NetChoice has narrowed its challenge. NetChoice seeks to enjoin this prohibition only to the extent it "applies to covered services' use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize content." Am. Compl., Prayer ¶ 8; *see* Mot. 17. NetChoice has met its burden to show that these applications of § 31(b)(7) are facially invalid.

The State argues that NetChoice has not identified "specific design elements" members use, and so has not shown how this provision affects "expressive activity." Opp. 22. But NetChoice has done just that, identifying features that are used and will be disrupted, such as autoplay, seamless pagination, newsfeeds, recommendation algorithms, and push notifications. Szabo ¶ 13; Cairella ¶¶ 18-19; Roin ¶¶ 11-16; Paolucci ¶¶ 7-9; Cleland ¶¶ 15-17. A court recently held invalid restrictions on these features, *Reyes*, 2024 WL 4135626, at *15, and this Court should, too.

Nor is the State correct that "impacting how content is laid out is not necessarily expressive." Opp. 23. Just as the First Amendment protects a newspaper's decisions about "the placement" of content on its front page, *Bursey v. United States*, 466 F.2d 1059, 1087 (9th Cir. 1972), it protects the subjective decisions services make about where and "how" to display content to users. *See Moody*, 603 U.S. at 718-19, 720, 738; Egelman Supp. ¶¶ 60-61; Egelman ¶¶ 48-50.

In sum, every application of this prohibition within the range NetChoice challenges restricts protected speech, and the State does not even try to defend it under any level of scrutiny. *AFP*, 594 U.S. at 618; Mot. 17-19. An injunction is warranted.

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

#### 4.    Age-estimation mandate: § 31(a)(5)

NetChoice challenges the age-estimation mandate in all its applications because age-estimation requirements tied to content regulations are subject to and fail strict scrutiny. This mandate is functionally identical to the law invalidated in *Ashcroft v. ACLU*, 542 U.S. 656 (2004), which would have required services either to use age-verification or to block content alleged to be harmful to children. *Id.* at 667, 673, 678. So, too, in *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008), the Third Circuit held invalid a similar age-verification requirement, reasoning that because users would hesitate to opt for age-verification, they would be prevented from accessing content. *Id.* at 196-98; *see also PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004).

The State claims that "estimating a user's age is conduct, not expressive activity." Opp. 23. But the question is not whether age-estimation is itself "conduct." The question is whether the State can require age-estimation to stop children from seeing allegedly harmful *content*—whether by cabining them off from such content (which will mean services require even adults to prove their identity before accessing protected speech, Goldman Br. 3-4), or by sanitizing all content (by requiring services to apply uniform "data protections"—i.e., content restrictions). *See* Mot. 19-20 ("data protections" require altering content); Paolucci Supp. ¶¶ 6-8; Masnick Supp. ¶¶ 7-8.

The mandate thus requires strict scrutiny, *Ashcroft*, 542 U.S. at 667, 673, but would fail any level of First Amendment review. The State claims age-estimation protects "privacy and well-being," Opp. 24, but ignores its intrusiveness. *See, e.g.*, Rumenap ¶¶ 7-10; Masnick Supp. ¶ 7; Paolucci Supp. ¶ 6; *see also* Goldman Br. 3-4. A law "cannot meaningfully advance the government's stated interests" if it "counteract[s] those goals." *Yim*, 63 F.4th at 794. Nor is the mandate tailored. The State cannot "reduce the adult population … to reading only what is fit for children," to protect children. *Butler v. Michigan*, 352 U.S. 380, 381, 383 (1957); *see Reno v. ACLU*, 521 U.S. 844, 882 (1997). And the Act denies even minors protected speech, *Brown*, 564 U.S. at 794, rather than giving adults tools to protect minors, *Playboy*, 529 U.S. at 816, 818, 823; *NetChoice*, 113 F.4th at 1121. *See* Paolucci Supp. ¶ 8.

### C.    The Individual Provisions Are Unconstitutionally Vague.

The State brushes aside NetChoice's vagueness challenge and asserts without any

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

reasoning that the Act is "sufficiently clear." Opp. 20. It is not.

**Policy enforcement.** The State argues § 31(a)(9) is not vague because NetChoice's members should "understand their own policies well enough to be able to enforce them." Opp. 15. That is not an answer. The point is that the policies are inherently subjective and thus require the exercise of discretion—which is fine for private companies like NetChoice's members, but not for the government. What one Attorney General might consider to be "in poor taste" the next may consider acceptable. *See* Kumar Ex. 6 (Washington Post). So, too, one Attorney General might consider certain groups "vulnerable" that another does not. *Id.* Ex. 3 (Reddit). This unbridled discretion invites arbitrary and discriminatory enforcement, rendering § 31(a)(9) impermissibly vague. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988).

**Information-use restrictions.** The State declares these provisions "clear," but provides no reason why. The State never attempts to define "detrimental," even though § 31(b)(1) prohibits the use of data that a service "has reason to know" is "materially detrimental" to a child. What is detrimental? Sleep loss? Distraction? Hurt feelings? Dr. Radesky appears to think so. *Cf. Kohls v. Bonta*, 2024 WL 4374134, at *3 (E.D. Cal. 2024) (law penalizing AI content "reasonably likely" to "undermine confidence" lacked "any objective metric," was "difficult to ascertain," implicating "vast amounts" of protected speech). So, too, the term "best interests of children" in § 31(b)(2)-(4) is an "elusive guideline that belies rigid definition." *In re Matthew B.*, 232 Cal. App. 3d 1239, 1263 (1991). That term may pass in family law, where it applies to finite custodial options involving a single child and judicial criteria that do not require moral judgments about speech. But the subjectivity of applying the term to the varied expression viewable by any child in California invites arbitrary enforcement in an area where precision is required. *See NAACP v. Button*, 371 U.S. 415, 438 (1963); *Fayetteville Pub. Libr. v. Crawford Cnty.*, 2024 WL 5202774, at *9-10 (W.D. Ark. 2024) (children's book ban vague). The Legislature had an obligation to say what it meant, not create a high-stakes guessing game that compels self-censorship. *See Mukasey*, 534 F.3d at 185, 205 (vague term unconstitutional even if it appears in an affirmative defense).

**Dark patterns.** The State claims services can tell when they "have reason to know" that dark patterns will "lead or encourage" minors to take actions "materially detrimental" to their well-

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

being. Opp. 5, 23. But again, what is "materially detrimental"? And when does a website have "reason to know" that publication through an algorithm, autoplay feature, or push notification will have such effects? Ferguson Supp. ¶ 77 ("concept of 'dark patterns'" is "diffuse and ill-defined"). The lack of an objective standard chills speech. *See Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023); *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). It is irrelevant that a service might know when a feature leads minors to disclose more information or forego privacy protections, Opp. 23, as NetChoice does not challenge those applications.

**Age estimation.** The State does not dispute that the phrase "to a reasonable degree of certainty appropriate to the risks" is vague. Instead, it claims the provision is permissible because services can opt to apply the privacy and data protections afforded children to all users. Opp. 25. But that option, too, requires restricting speech, *see* Mot. 19-20, impermissibly "lead[ing] citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

### D. The State Does Not Contest NetChoice's As-Applied Claims.

NetChoice is at minimum entitled to as-applied relief because the State does not contest these claims. *See Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1003 n.4 (N.D. Cal. 2024).

## III. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE.

The challenged provisions also must be enjoined because, irrespective of NetChoice's direct challenges to them, they are not severable from the already-enjoined portions of the Act.

### A. The DPIA Provisions Are Not Volitionally Severable.

The State does not dispute the Legislature shelved the Act in a "suspense file," and revived and passed it only upon addition of a cure provision, and even then, only after that cure provision was extended from 45 to 90 days. Mot. 24-25. The State instead claims that addition establishes only that the Legislature preferred a version of the Act with a cure provision to one without it. Opp. 29-30. But "what the Legislature actually *did*" is the best evidence of what it "would have" done. *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 273 (2011)).

The State has no response to NetChoice's other points. It does not dispute the significance of the safe harbor during the floor debate, Mot. 25, or that this counsels against severance. *See County of Sonoma v. Superior Ct.*, 173 Cal. App. 4th 322, 352 (2009) (invalid provision not

severable where bill analysis relied on provision to support legislation). It does not deny that the absence of a severability clause reflects a "presumption of inseverability." *Kasler v. Lungren*, 72 Cal. Rptr. 2d 260, 273 (1998), *rev'd on other grounds*, 23 Cal. 4th 472 (2000). And it does not deny that removing the cure provision prevents the Act from functioning as intended—as primarily compliance-focused. Preserving the Act's remaining substantive obligations without the safe harbor "rewrites the statute" by broadening the scope of liability to reach parties the legislature meant to exclude. *Abbott Labs. v. FTB*, 175 Cal. App. 4th 1346, 1359 (2009); *see Mills v. United States*, 713 F.2d 1249, 1254 (7th Cir. 1983). That would "disrupt the legislature's carefully crafted scheme." *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1260 (C.D. Cal. 2007).

## B. The DPIA Provisions Are Not Functionally Severable.

The State claims the cure provision is functionally severable because the Act's surviving provisions are "capable of independent application." Opp. 28. But that is a necessary, not sufficient, condition for functional severance. Invalid provisions—particularly safe harbors—are not functionally severable if enforcing the remainder would alter the way the statutory scheme operates. In *People v. Nguyen*, 222 Cal. App. 4th 1168, 1172, 1190-92 (2014), for example, the court held that an invalid safe harbor providing would-be violators "permission" to undertake proscribed conduct was not severable because its absence turned the otherwise-valid remainder of the act into a "complete ban." *See also HERE Int'l Union v. Davis*, 21 Cal. 4th 585, 612-13 (1999).

The State's cases do not support a contrary conclusion. *Quintano v. Mercury Casualty Co.*, 11 Cal. 4th 1049 (1995) (Opp. 29), says nothing about severability. The State relies on *Matosantos* to argue that post-enactment statements by the Act's co-author are immaterial. Opp. 29. But *Matosantos* never held that such statements are immaterial—merely that such statements cannot support an interpretation *at odds* with the legislation. 53 Cal. 4th at 273-74. "Statements of authoring legislators that cast light on the history of the measure and the arguments before the Legislature when it considered the matter" are indicia of statutory purpose. *Est. of Sanders*, 2 Cal. App. 4th 462, 474 n.15 (1992); *Abbott Labs.*, 175 Cal. App. 4th at 1361.

## IV. NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS.

***Section 230***. The State again claims that § 31(a)(9) merely requires services to enforce

contracts. Opp. 25-26. But content policies are not contracts, *supra* p. 8, and absent an actionable promise, Section 230 "prohibits holding companies responsible for moderating or failing to moderate content." *Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1182 (9th Cir. 2024). The State claims Section 230 does not preempt § 31(b)(1)-(4), (7) to the extent they have applications "unrelated to publishing." Opp. 26. But NetChoice challenges these prohibitions only insofar as they obligate services to moderate third-party content that is "materially detrimental" or not "in the best interests" of minors. Am. Compl., Prayer ¶ 12; Mot. 28. Thus, unlike in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021)—where the duty had "nothing to do" with "editing, monitoring, or removing" content, *id.* at 1092—the challenged applications fault services for failing to edit content. *See Bride*, 112 F.4th at 1180 (distinguishing *Lemmon*).

**COPPA.** The State claims the Act "supplements" COPPA. Opp. 26. Not so. *See* Mot. 28. *First*, COPPA requires knowledge that a service is "directed to children," whereas the Act applies more broadly. *See* §§ 29, 30(b)(4); Egelman Supp. ¶¶ 45, 48-49. *Second*, COPPA empowers families to make decisions; the Act usurps that power. *See* U.S. Chamber Br. (ECF 33-1) at 12. *Third*, the Act punishes conduct permissible under COPPA, like failing to age estimate with "certainty." § 31(a)(5). A service can thus comply with COPPA but be penalized under the Act.

**Commerce Clause.** The State does not dispute that regulating wholly out-of-state activity violates the Commerce Clause even after *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). Instead, the State claims the Act only applies to California residents using services subject to California law. *See* Opp. 27. But regulating activities having "no necessary connection with the state other than the residency" of a consumer fails this test since a resident could be anywhere. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc); *see Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1023 (E.D. Cal. 2017). California cannot export its laws to regulate wholly out-of-state activity.

## V.   THE STATE CONCEDES THE OTHER INJUNCTION FACTORS.

These elements for an injunction are thus met. *See* Mot. 29-30; Opp. 7.

## VI.   CONCLUSION

NetChoice respectfully requests an order granting its requested relief.

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: January 2, 2025

DAVIS WRIGHT TREMAINE LLP

By: */s/ Ambika Kumar*
     Ambika Kumar

Attorneys for Plaintiff
NetChoice, LLC, d/b/a NetChoice

NETCHOICE'S REPLY ISO SECOND PRELIMINARY INJUNCTION
Case No. 5:22-cv-08861-BLF

DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899