AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
BIANCA CHAMUSCO (*pro hac vice*)
biancachamusco@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**PLAINTIFF'S STATEMENT OF RECENT DECISION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

Pursuant to Local Civil Rule 7-3(d)(2), Plaintiff NetChoice, LLC submits the attached opinion in *M.P. v. Meta Platforms, Inc.*, No. 23-1880 (4th Cir. Feb. 4, 2025), holding that an online service's use of content-recommendation algorithms to increase engagement is publishing activity protected by Section 230. *Id.*, slip op. at 13-15.

DATED: February 7, 2025

DAVIS WRIGHT TREMAINE LLP

By: */s/ Ambika Kumar*
Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

# ATTACHMENT

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1880**

---

M.P., a minor, by and through, Jennifer Pinckney, as Parent, Natural Guardian, and Next Friend,

Plaintiff - Appellant,

v.

META PLATFORMS INC., f/k/a Facebook, Inc.; FACEBOOK PAYMENTS INC.; FACEBOOK TECHNOLOGIES LLC; INSTAGRAM, LLC; SICULUS INC.; FACEBOOK HOLDINGS LLC; INTERNET RESEARCH AGENCY LLC, a/k/a Mediasintez llc, a/k/a Glavset LLC, a/k/a Mixinfo LLC, a/k/a Azimut LLC, a/k/a Novinfo LLC; CONCORD MANAGEMENT AND CONSULTING LLC; CONCORD CATERING; YEVGENIY VIKTOROVICH PRIGOZHIN,

Defendant - Appellee.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:22-cv-03830-RMG)

---

Argued: September 26, 2024 Decided: February 4, 2025

---

Before DIAZ, Chief Judge, RUSHING, Circuit Judge, and KEENAN, Senior Circuit Judge.

---

Affirmed by published opinion. Senior Judge Keenan wrote the opinion, in which Chief Judge Diaz joined. Judge Rushing wrote an opinion concurring in the judgment in part and dissenting in part.

---

**ARGUED:** Marc Joseph Mandich, Francois Michael Blaudeau, SOUTHERN INSTITUTE FOR MEDICAL & LEGAL AFFAIRS LLC, Birmingham, Alabama for Appellant. Jacob Thomas Spencer, GIBSON, DUNN & CRUTCHER LLP., Washington, D.C., for Appellee. **ON BRIEF:** Evan T. Rosemore, SOUTHERN MED LAW, Homewood, Alabama for Appellants. Helgi C. Walker, Jessica L. Wagner, GIBSON, DUNN & CRUTCHER LLP., Washington, D.C., For Appellee.

BARBARA MILANO KEENAN, Senior Circuit Judge:

In 1996, Congress enacted 47 U.S.C. § 230, commonly known as Section 230 of the Communications Decency Act. In Section 230, Congress provided interactive computer services broad immunity from lawsuits seeking to hold those companies liable for publishing information provided by third parties. Plaintiff-Appellant M.P. challenges the breadth of this immunity provision, asserting claims of strict products liability, negligence, and negligent infliction of emotional distress under South Carolina law. In these claims, she seeks to hold Facebook, an interactive computer service, liable for damages allegedly caused by a defective product, namely, Facebook's algorithm that recommends third-party content to users. M.P. contends that Facebook explicitly designed its algorithm to recommend harmful content, a design choice that she alleges led to radicalization and offline violence committed against her father.[1]

The main issue before us is whether M.P.'s state law tort claims are barred by Section 230. The district court below answered this question "yes." We agree. M.P.'s state law tort claims suffer from a fatal flaw; those claims attack the manner in which Facebook's algorithm sorts, arranges, and distributes third-party content. And so the claims are barred by Section 230 because they seek to hold Facebook liable as a publisher of that third-party content. Accordingly, we conclude that the district court did not err in granting Facebook's motion to dismiss.

[1] M.P. also asserts a federal cause of action under 42 U.S.C. § 1985(3), seeking damages for an alleged conspiracy to deprive her of her civil rights. We address that claim and a related argument *infra* Part II.B.

I.

A.

Because this appeal involves the district court's dismissal of M.P.'s complaint under Federal Rule of Civil Procedure 12(b)(6), we take "as true all of the factual allegations contained in the complaint" and state the facts in the light most favorable to the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted). As stated in the complaint, in June 2015, Dylann Roof shot and killed nine people at Mother Emanuel AME Church in Charleston, South Carolina. Among the dead was M.P.'s father, Reverend Clementa Pinckney. M.P. was present when her father was murdered.

M.P. later filed suit against Defendant-Appellee Meta Platforms, Inc. and five of its subsidiaries (collectively, Facebook) asserting that they were civilly liable for damages caused by Roof's crimes.[2] M.P. alleges in her complaint that Roof was "radicalized online by white supremacist propaganda that was directed to him by the Defendants." She also asserts that, in 2012, when Roof "looked to Google in search of answers for 'black on white crime,'" Google directed him "to a website run by a White nationalist group called the Council of Conservative Citizens." M.P. avers that this Google search marked the beginning of Roof's radicalization process.

[2] M.P. also has sued various Russian defendants for "promot[ing] white supremacist theories and plant[ing] hundreds of hate propaganda messages online meant to inspire and grow the white supremacy movement" in the United States. However, because these defendants are not part of this appeal, this opinion focuses solely on M.P.'s allegations against Facebook.

M.P. also alleges in her complaint that Facebook's "design and architecture" played a substantial role in Roof's radicalization. According to M.P., Facebook is optimized to "maximize user engagement" because user "engagement determines [the company's] advertising revenue, which determines [the company's] profits." Citing various studies, M.P. alleges that divisive content, including extremist and racist content, results in the highest level of viewer engagement on Facebook. And so M.P. asserts that to maximize viewer engagement, Facebook, through its content-sorting algorithm, promotes that type of content, particularly to those who express an interest in it. M.P. alleges that "repeated exposure to [such] inflammatory [content] result[s] in emotional desensitization," while "extended" exposure to "extremist content" leads to "radicalization." And M.P. further asserts that Facebook's quest for user engagement and profit has led to multiple instances of offline violence. *See, e.g.*, J.A. 35 (detailing Facebook's alleged role in the Rohingya genocide in Burma).

M.P. alleges that Facebook's algorithm fed Roof content that "nurtured, encouraged, and ultimately served to solidify and affirm" his racist, violent views. She further asserts that Facebook's algorithm recommended extremist groups to Roof and that he "joined [these] extremist groups on Facebook." As evidence of Facebook's role in Roof's radicalization, M.P. points to Roof changing his Facebook "profile photo" to include white supremacist symbols shortly before he murdered M.P.'s father. In sum, M.P. contends that Facebook is partially responsible for Dylann Roof's murder of nine innocent people, including her father.

B.

M.P.'s complaint contains both state and federal law claims against Facebook. As stated above, in her claims under South Carolina law, M.P. alleges strict products liability (Count I), negligence (Count II), and negligent infliction of emotional distress (Count III). All three state law tort claims rely on the contention that Facebook, "as designed, was in a defective condition unreasonably dangerous to the user when it left the control of the defendant." *See* J.A. 63 (strict products liability); J.A. 65 (negligence); J.A. 66 (negligent infliction of emotional distress). In her federal law claim, M.P. alleges that Facebook participated in a civil conspiracy in violation of 42 U.S.C. § 1985(3).

In response to M.P.'s allegations, Facebook filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted Facebook's motion and entered final judgment in favor of Facebook under Federal Rule of Civil Procedure 54(b).[3] The

[3] Rule 54(b) permits a trial court in a case involving multiple parties or multiple claims to enter final judgment with regard to only some of the parties or some of the claims when the court "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). We treat Rule 54(b) issues as jurisdictional, *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1336 (4th Cir. 1993), and we review a district court's Rule 54(b) certification for abuse of discretion, *Kinsale Ins. v. JDBC Holdings, Inc.*, 31 F.4th 870, 874 (4th Cir. 2022). To comply with Rule 54(b), a district court must "first determine that it is dealing with a 'final judgment'" and next decide "whether there is any just reason for delay." *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7–8 (1980). A district court's findings of fact on this issue generally are necessary to enable appellate review of a Rule 54(b) order, and so our usual course when a district judge has failed to engage in such an analysis has been to "vacate the Rule 54(b) certification and remand (with instructions) for a statement of reasons supporting certification." *Braswell Shipyards*, 2 F.3d at 1336.

Here, the district court's Rule 54(b) certification did not provide any specific reasons supporting certification but merely referred in general to the reasoning of the parties. Nevertheless, the parties amply stated their reasons for the court's consideration. We have (Continued)

court held that M.P. failed to state a plausible claim for relief against Facebook. In making this determination, the court first concluded that Section 230 bars M.P.'s state law tort claims. The court then determined that M.P. failed to plausibly allege a claim under 42 U.S.C. § 1985(3). M.P. now appeals from the district court's judgment.

II.

We review de novo the district court's holding granting Facebook's motion to dismiss. *E.I. du Pont de Nemours*, 637 F.3d at 440. To survive a motion to dismiss, a complaint must contain sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In determining whether a plaintiff has stated a plausible claim to relief, we draw all reasonable inferences in favor of the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). "[B]ut we need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotation marks and citation omitted).

A.

We first consider M.P.'s South Carolina claims (state tort claims) of strict products liability, negligence, and negligent infliction of emotional distress. We agree with the district court that Section 230 bars these claims that M.P. asserts against Facebook. But

---

reviewed those reasons, and we find that they justify Rule 54(b) certification. Thus, "although further explanation from the district court undoubtedly would have been helpful, we hold that the [district] court did not abuse its discretion in certifying its judgment as final under Rule 54(b)." *Fox v. Balt. City Police Dep't*, 201 F.3d 526, 532 (4th Cir. 2000).

even apart from any consideration of Section 230, we still would be required to affirm the dismissal of those claims because M.P. has failed to plausibly allege proximate causation under South Carolina law.

1.

We begin with Section 230. As stated above, M.P.'s state tort claims rely on common law theories of strict products liability, negligence, and negligent infliction of emotional distress. Under South Carolina law, there are notable differences between a strict products liability claim and a negligence claim. *See Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995) (explaining that "under a negligence theory, the plaintiff bears the additional burden of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault"). These differences, however, are immaterial to our present analysis, which addresses whether Facebook is immunized by Section 230 from M.P.'s state tort claims because those claims treat Facebook as a publisher of third-party information. Accordingly, we will address M.P.'s state tort claims collectively.

The origins of Section 230 can be traced to a 1995 New York state court case, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished). In that case, a New York court considered a defamation action against an interactive computer service, Prodigy. In doing so, the court confronted the novel question whether to treat Prodigy as (1) a publisher of information, subject to strict liability for defamatory statements, or as (2) a distributor, which could be held liable

under New York common law only if it had knowledge of the defamatory character of the published statements. *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y. 1991) (collecting cases) (explaining the distinction between publishers and distributors under New York law). The New York court determined that Prodigy was more akin to "an original publisher than a distributor both because it advertised its practice of controlling content on its service and *because it actively screened and edited messages posted on its bulletin boards*." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) (emphasis added) (discussing *Stratton Oakmont, Inc.*, 1995 WL 323710). In other words, because Prodigy attempted to regulate the information on its website, the court held that Prodigy had subjected itself to publisher liability.

When presented with this decision, Congress viewed the result as threatening "the vibrant and competitive free market that [existed] for the Internet and other interactive computer services." 47 U.S.C. § 230(b)(2). In Congress' view at the time, "the imposition of tort liability on service providers for the communications of others represented … simply another form of intrusive government regulation of speech." *Zeran*, 129 F.3d at 330. Congress responded to this concern by enacting Section 230. *Id.* at 331; *see also* 47 U.S.C. § 230(b)(4).

Among other things, Section 230 states that "[n]o provider or user of an interactive computer service[4] shall be treated as the publisher or speaker of any information provided

[4] Section 230 defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides (Continued)

by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). We have determined that, taken together, this statutory language establishes broad immunity from "'any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 n.4 (4th Cir. 2009) (quoting *Zeran*, 129 F.3d at 330). The broad immunity conferred by Section 230 thus is restricted to claims that are "based on the interactive computer service provider's *publication of a third party's speech*." *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139 (4th Cir. 2019) (emphasis added) (citing *Zeran*, 129 F.3d at 330).

To establish immunity under Section 230, a defendant must show that "(1) [t]he defendant is a provider or user of an interactive computer service; (2) the plaintiff's claim holds the defendant responsible as the publisher or speaker of any information; and (3) the relevant information[5] was provided by another information content provider." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022) (internal quotation marks and citations omitted). In the present case, the parties do not debate that Facebook is a provider or user of an interactive computer service (element 1). Nor is there any meaningful disagreement between the parties that relevant information "was provided by

---

access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

[5] We treat the terms "information" and "content" as synonymous in this opinion.

another information content provider" (element 3). Instead, the present dispute centers on whether M.P.'s state tort claims seek to hold Facebook responsible as the publisher of third-party information (element 2).

M.P. argues that the district court erred in concluding that her state tort claims treat Facebook as a publisher of third-party content. She contends that those claims are centered on Facebook's "*own design* meant to facilitate radicalization and compulsive use of the platform by driving extreme emotional reactions." M.P. thus characterizes her state tort claims as solely dealing with Facebook's algorithm, which she treats as a "product." We are not persuaded by M.P.'s argument.

Under our precedent, "a claim … treats the defendant 'as the publisher or speaker of any information' under § 230(c)(1) if the claim (1) bases the defendant's liability on the disseminating of information to third parties and (2) imposes liability based on the information's improper content." *Henderson*, 53 F.4th at 123. In making this determination, we do not take a formalistic approach, looking abstractly to the elements of a cause of action. *Id.* at 124. Instead, we conduct a case-specific approach, examining what a plaintiff in a particular case must prove. *Id.* "Our precedent demands that we ask whether the claim 'thrust[s]' the interactive service provider 'into the role of a traditional publisher.'" *Id.* at 121 (quoting *Zeran*, 129 F.3d at 332). That is, we consider whether a plaintiff's allegations seek "to hold a service provider liable for … deciding whether to publish, withdraw, postpone or alter content" provided by third parties. *Zeran*, 129 F.3d at 330.

Our decision in *Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019) serves as a practical example of the analysis that we must conduct. In that case, a plaintiff brought an action against Amazon as the seller of a defective product. *Id.* at 139–40. While Amazon admittedly published third-party speech in marketing the product, we rejected the defendant's immunity claim asserted under Section 230, because the plaintiff's claim was not based on "the *content of [that] speech*" but rested on the characteristics of the product itself. *Id.* (emphasis in original). As we later emphasized in *Henderson*, to trigger the immunity shield of Section 230, the interactive service provider's act of publishing information must be more than a "but-for cause of the harm." 53 F.4th at 122–23.

By contrast, in *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), the plaintiff's claims were based entirely on the defendant's publication of third-party speech. The plaintiff alleged that the defendant negligently and "unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter." *Id.* at 328. Because the plaintiff sought to hold the service provider "liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content," *id.* at 330, we determined that the defendant fell "squarely within th[e] traditional definition of a publisher and, therefore, [was] clearly protected by § 230's immunity," *id.* at 332.

The case before us is more like *Zeran* than like *Erie Ins. Co.* M.P.'s state tort claims are inextricably intertwined with Facebook's role as a publisher of third-party content.

M.P. seeks to hold Facebook liable for disseminating "improper content" on its website. *Henderson*, 53 F.4th at 120–21. Crucially, M.P. cannot show that Facebook's algorithm was designed in a manner that was unreasonably dangerous for viewers' use without also demonstrating that the algorithm prioritizes the dissemination of one type of content over another. Indeed, without directing third-party content to users, Facebook would have little, if any, substantive content. Simply stated, M.P. takes issue with the fact that Facebook allows racist, harmful content to appear on its platform and directs that content to likely receptive users to maximize Facebook's profits.[6]

While there is widespread concern about Facebook's use of its algorithm to arrange and sort racist and hate-driven content, acts of arranging and sorting content are integral to the function of publishing. *See Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) ("[A]rranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media. That is an essential result of publishing."). For instance, newspaper editors choose what articles merit inclusion on their front page and

[6] The dissent makes much of Facebook's "groups you should join" algorithm. *See infra* pp. 24–25. The dissent argues that through this algorithm, Facebook "explicitly communicates" with users by recommending that they join various groups, including extremist groups. Accordingly, the dissent concludes that Facebook can be held liable for this particular conduct. *See infra* pp. 25–26. But the dissent's argument misconstrues M.P.'s complaint. M.P. does not allege that Roof ever saw the words "groups you should join" on Facebook. Nor does she claim that Facebook recommended that Roof join a specific hate group or that Roof actually joined any such group based on a Facebook algorithm referral. So, the dissent ultimately argues a case that M.P. does not make. We thus express no opinion on whether Section 230 immunizes Facebook from liability arising out of that company's "groups you should join" algorithm.

what opinion pieces to place opposite the editorial page. These decisions, like Facebook's decision to recommend certain third-party content to specific users, have as a goal increasing consumer engagement. *See, e.g.*, *Above the Fold*, *Cambridge Business English Dictionary* (2011) (explaining that newspaper editors place the stories they think "will sell the newspaper … above the fold"). But a newspaper company does not cease to be a publisher simply because it prioritizes engagement in sorting its content. And the fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing. Decisions about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task.[7]

In reaching this conclusion, we find persuasive the decisions of our sister circuits holding that an interactive computer service does not lose Section 230 immunity because the company automates its editorial decision-making. *See Force*, 934 F.3d at 67 (noting that "'so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific edit[orial] or selection process'" (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003))); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1270–71 (D.C. Cir. 2019) (explaining that the use of a neutral algorithm "to present … third-party

[7] M.P.'s allegation that Facebook "auto-generated" the Council of Conservative Citizens' Facebook page does not alter this result. M.P. has not alleged that Roof saw this "auto-generated" page, joined the group, or even "followed" that page. Without further factual enhancement, these allegations are insufficient to state a claim. Thus, the fact that Facebook may have contributed to the formation of this Facebook page is not materially significant to our analysis here.

data in a particular format" is protected by Section 230); *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (finding that Google was immunized by Section 230 for performing "some automated editorial acts on the content, such as removing spaces and altering font"). Because Facebook has chosen to automate much of its editorial decision-making, including the publishing of information that forms the basis of M.P.'s state tort claims before us, those claims are barred by the broad immunity conferred by Section 230.

We recognize that there is a growing body of literature exploring the various harms resulting from the ongoing evolution of social media companies, like Facebook, which have expanded their reach under the protective shield of Section 230.[8] But the conclusions reached by these authors cannot serve as a basis for us to restrict the application of Section 230. We are not free to disregard Section 230 or to limit its application based on our own assessment of the merits of its expansive reach. The question whether, and to what extent, Section 230 should be modified is a question for Congress, not for judges.

In sum, we conclude that M.P.'s state tort claims seek to hold Facebook "responsible 'as the publisher or speaker of [third-party] information.'" *Henderson*, 53 F.4th at 119. Accordingly, we hold that the district court did not err in holding that these state tort claims are precluded by Section 230.

---

[8] *See, e.g.*, Adam D. I. Kramer, *et al.*, *Experimental Evidence of Massive-Scale Emotional Contagion Through Social Networks*, 111 PNAS 8788 (2014); Max Fisher & Amanda Taub, *How Everyday Social Media Users Become Real-World Extremists*, N.Y. Times (Apr. 25, 2018), http://www.nytimes.com/2018/04/25/world/asia/facebook-extremism.html [https://perma.cc/VS4J-5CRS] (last visited Oct. 29, 2024).

2.

But even if Section 230 did not immunize Facebook from M.P.'s state tort claims, all her claims under South Carolina law would fail for the additional reason that M.P. did not plausibly allege under South Carolina law the required element of proximate causation. All three state tort claims, namely, strict products liability, negligence, and negligent infliction of emotional distress, require that a plaintiff plausibly allege proximate causation. *Bray v. Marathon Corp.*, 588 S.E.2d 93, 95 (S.C. 2003) (citation omitted) (products liability claims require proof that a defective product was the proximate cause of injury); *Jolly v. Gen. Elec. Co.*, 869 S.E.2d 819, 828 (S.C. Ct. App. 2021) (noting that a plaintiff claiming negligence must show that the defendant's negligence was the proximate cause of her injury); *Kinard v. Augusta Sash and Door Co.*, 336 S.E.2d 465, 467 (S.C. 1985) (for a defendant to be held liable for negligent infliction of emotional distress, a plaintiff must prove, among other things, that the defendant's negligence caused death or serious physical injury to another person). Yet, M.P. has not done so in the present case.[9]

To plausibly allege causation under South Carolina law, a plaintiff must aver "both causation in fact, and legal cause." *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 130 (S.C. 1992). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence." *Whitlaw v. Kroger Co.*, 410 S.E.2d 251, 253 (S.C. 1991) (quoting *Bramlette v. Charter-Med.-Columbia*, 393 S.E.2d 914, 916

[9] Although the district court did not address the issue of causation, the issue was fully briefed by the parties in the district court and in this appeal. So we may consider the issue as a separate basis for affirming the district court's judgment. *See Strickland v. United States*, 32 F.4th 311, 372 n.18 (4th Cir. 2022).

(S.C. 1990)). Meanwhile, "the touchstone of proximate [or legal] cause in South Carolina is foreseeability." *Young v. Tide Craft, Inc.*, 242 S.E.2d 671, 675 (S.C. 1978). To be foreseeable, a plaintiff's injury must be "a natural and probable consequence of [the defendant's negligence]." *Bramlette*, 393 S.E.2d at 916. A defendant "cannot be charged with 'that which is unpredictable or that which could not be expected to happen.'" *Young*, 242 S.E.2d at 676 (quoting *Stone v. Bethea*, 161 S.E.2d 171, 173 (S.C. 1968)). In determining whether a particular injury was foreseeable, the defendant's conduct must be viewed "in the light of attendant circumstances." *Stone*, 161 S.E.2d at 173.

Here, M.P. has not plausibly alleged that Facebook was the proximate cause of her injuries. Her specific allegations involving Roof's use of Facebook are that (1) he viewed extremist content on Facebook; (2) he "joined extremist groups on Facebook;" and (3) shortly before June 2015, he changed his Facebook profile picture to one that included white supremacist symbols. Notably, M.P. does not allege how much time Roof spent on Facebook or how he became radicalized on the platform. Nor does M.P. provide any factual foundation causally linking Roof's Facebook use to his crimes of murder. In short, M.P. does not offer a plausible argument, or otherwise point to supporting allegations, that Roof's horrific acts were a natural and probable consequence of his Facebook use. We therefore conclude that M.P.'s tort claims under South Carolina law are fatally flawed for the additional reason that M.P. failed to plausibly allege that Facebook was the proximate cause of her injuries.

B.

Finally, we address M.P.'s federal claims. M.P. makes two arguments. First, she contends that the district court erred in dismissing her claim for relief under 42 U.S.C. § 1985(3). That section permits an individual to bring a civil action for damages based on a conspiracy to deprive a plaintiff of her civil rights. 42 U.S.C. § 1985(3). In the present case, M.P. contends that she adequately alleged a claim under this statute by asserting that Facebook conspired with others to deprive African Americans of their fundamental right to vote by permitting misinformation and hate speech to exist on Facebook's social media platform.

Second, M.P. submits on appeal that the district court erred by "ignor[ing] entirely" her purported claim under 42 U.S.C. § 1986. Under that statute, an individual may file suit against anyone who has knowledge of a Section 1985 conspiracy and neglects or refuses to prevent it, despite having the power to do so. *Strickland*, 32 F.4th at 360. We examine each argument in turn.

We first address the Section 1985 claim and conclude that M.P. has forfeited any challenge to the district court's dismissal of that claim. The only reference in M.P.'s appellate brief to the district court's alleged error in dismissing this claim appears in the "Statement of the Issues" section of her brief. Previously, we have explained that "'contentions not raised in the argument section of the opening brief are abandoned.'" *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 290 (4th Cir. 2018) (quoting *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004)). Applying this rule here, we affirm the district court's dismissal of M.P.'s Section 1985 claim against Facebook.

We next consider M.P.'s argument that the district court erred by failing to consider her claim under 42 U.S.C. § 1986. We first observe that M.P. does not mention Section 1986 in her complaint and relies almost exclusively on one conclusory allegation in a 68-page complaint to assert her claim. Thus, there is a threshold question whether M.P. put Facebook on notice that she was alleging a claim under Section 1986. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) (citing *Twombly*, 550 U.S. at 555); *but see Stanton v. Elliott*, 25 F.4th 227, 238 (4th Cir. 2022) (explaining that plaintiffs are not required to "put a claim under a special heading, quote the statute, or use magic words to make out a claim"). Nevertheless, we need not resolve the question whether the claim was adequately pleaded because any such claim was untimely made.

Section 1986 provides a one-year limitations period. *See* 42 U.S.C. § 1986 ("But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."). M.P. commenced this action in November 2022. However, M.P.'s Section 1986 claim could not have accrued any later than April 2019, when she alleges that she learned about the purported Section 1985 conspiracy to deprive African Americans of their right to vote. Thus, because M.P. filed her complaint in 2022, more than three years after her Section 1986 claim accrued, that claim is barred by the one-year statute of limitations.[10] We therefore conclude that the

[10] M.P. urges us to consider South Carolina Code § 15-3-40, which tolls personal injury claims advanced by minor plaintiffs until they reach the age of 18. But this state statute is not applicable here. M.P. is asserting a federal claim under a federal statute. In such circumstances, the default federal rule is that "a statute of limitations runs against all persons, even those under a disability, unless the statute expressly provides otherwise." (Continued)

district court did not commit reversible error in failing to address M.P.'s Section 1986 claim. Accordingly, we affirm the district court's dismissal of M.P.'s federal claims.

III.

For these reasons, we affirm the district court's judgment granting Facebook's motion to dismiss.

*AFFIRMED*

*Vogel v. Linde*, 23 F.3d 78, 80 (4th Cir. 1994). Section 1986's text contains no such tolling rule. So South Carolina's tolling provision cannot save M.P.'s untimely Section 1986 claim.

RUSHING, Circuit Judge, concurring in the judgment in part and dissenting in part:

Section 230 of the Communications Decency Act, 47 U.S.C. § 230, as interpreted by this Court, grants broad immunity to interactive computer services for publishing content provided by others. I agree with the majority that we are not free to disregard or modify Section 230 "based on our own assessment of the merits of its expansive reach." *Supra*, at 15. But I disagree with the majority about how far Section 230's protection extends. In her complaint, M.P. alleges that Facebook acted culpably by inundating her father's murderer, Dylann Roof, with violent racist content that radicalized him, resulting in his act of violence. Under our precedent, Section 230 protects Facebook from liability for those editorial decisions, as the majority correctly concludes. But M.P. also alleges that Facebook culpably recommended that Roof join extremist groups on Facebook, where his radical views were cultivated. Recommending that a user join a group, connect with another user, or attend an event is Facebook's own speech, for which it can be held liable, even under this Court's precedent. Unlike the majority, I would reverse the district court's dismissal of M.P. negligence claims on Section 230 grounds and remand her claims regarding Facebook's own conduct, including its group recommendations, for further proceedings.

As for M.P.'s strict products liability claim and federal claims, I would affirm the district court's dismissal. Therefore, I respectfully concur in the judgment in part and dissent in part.

I.

Section 230 preempts any state cause of action that is inconsistent with its prohibition on treating a "provider or user of an interactive computer service . . . as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see id.* § 230(e)(3). Our Court has interpreted Section 230 to grant "broad immunity" to interactive computer services. *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). "But it does not insulate a company from liability for all conduct that happens to be transmitted through the internet." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). Instead, a defendant claiming the protection of Section 230(c)(1) must establish that "(1) [t]he defendant is a 'provider or user of an interactive computer service,'" which the parties agree Facebook is; "(2) the plaintiff's claim holds the defendant responsible 'as the publisher or speaker of any information'; and (3) the relevant information was 'provided by another information content provider.'" *Henderson*, 53 F.4th at 119 (quoting 47 U.S.C. § 230(c)(1)).

A claim treats the defendant as a publisher or speaker of information "when it (1) makes the defendant liable for publishing certain information to third parties, and (2) seeks to impose liability based on that information's improper content." *Henderson*, 53 F.4th at 120–121. A "'but-for' causal relationship between the act of publication and liability" is insufficient for immunity. *Id.* at 122.

Further, the information at issue in the plaintiff's claim must be "provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Section 230(c)(1) does not protect a defendant who "is responsible, in whole or in part, for the

creation or development of [the] information" at issue. *Id.* § 230(f)(3) (defining "information content provider"). In other words, "providers of interactive computer services are liable . . . for speech that is properly attributable to them." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).

M.P. alleges that Facebook designed its system and underlying algorithms to "prioritiz[e] divisive and polarizing content, including hate speech and misinformation about racial groups/minorities, especially when delivering content to users [likely to engage with it] and recommending that [those] users make new connections or join new groups." J.A. 30. These basic allegations underlie all three state-law causes of action M.P. asserts: strict products liability, negligent products liability, and negligent infliction of emotional distress. Her complaint focuses on two categories of allegedly defective products: (1) algorithms that "provide more violent and angry racially based content to those users the algorithm deem[s] likely to engage" with it, for example, by "fill[ing] users' News Feeds with disproportionate amounts of hate speech and misinformation," and (2) algorithms that "recommend that susceptible users join extremist groups." J.A. 34, 39, 58.

Applying our Court's precedent, the majority correctly concludes that Section 230 bars M.P.'s causes of action based on the first category of alleged defects in Facebook's algorithms prioritizing certain kinds of third-party content. Though framed in products liability verbiage, M.P.'s claims undoubtedly seek to hold Facebook liable for disseminating on its platform improper content provided by others. As the majority explains, Facebook's decisions about "whether and how to display certain information

provided by third parties," including which third-party information to prioritize in order to maximize consumer engagement, are akin to "'a publisher's traditional editorial functions.'" *Supra*, at 12–14 (quoting *Zeran*, 129 F.3d at 330). M.P. attempts to characterize the curated collection of negative third-party content Facebook displays on a susceptible user's News Feed as Facebook's own speech. *See*, *e.g.*, *Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024) (holding that TikTok's algorithm—which "'[d]ecid[ed] on the third-party speech that will be included in or excluded from a compilation'" and then "'organiz[ed] and present[ed] the included items'" on users' pages—was TikTok's own speech and not protected by Section 230 (quoting *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2402 (2024))). But as the majority concludes, M.P.'s characterization cannot evade our precedent, which immunizes interactive computer services for publishing third-party content regardless of the services' knowledge or intent. *See Zeran*, 129 F.3d at 332–333; *Anderson*, 116 F.4th at 184 n.13 (noting the conflict between the Third Circuit's decision and *Zeran*). So the majority correctly affirms dismissal of M.P.'s claims based on Facebook publishing and prioritizing hateful third-party content.

I disagree with the majority, however, regarding the second category of allegedly defective products: algorithms that recommend Facebook users join extremist groups. Section 230 does not bar M.P.'s claims based on those defects because recommending a group, person, or event is Facebook's own speech, not that of a third party.

Through features like "Groups You Should Join," Facebook recommends groups, people, and events to its users. *See* J.A. 49, 58. Unlike the implicit recommendation that

attends any editorial decision to feature certain third-party content, Facebook's recommendations of groups, people, and events involve platform-produced text that explicitly communicates to the user. The statement "'You Should Join' this hate group" is Facebook's own speech; it cannot be attributed to any third party. That statement qualifies as "information" created by Facebook itself. 47 U.S.C. § 230(f)(3). When Facebook creates such information and disseminates it on its platform, Facebook is the "information content provider." *Id.* Thus, holding Facebook responsible for its own recommendations is not treating it "as the publisher or speaker of any information provided by another." *Id.* § 230(c)(1). And our precedent leaves ample room for liability when interactive computer services are making recommendations as opposed to merely hosting or arranging third-party content. *See Henderson*, 53 F.4th at 128 (holding that a defendant is an "information content provider" if it "materially contributed" to the "information relevant to liability"); *Nemet Chevrolet*, 591 F.3d at 254 (explaining that interactive computer services are liable "for speech that is properly attributable to them").

M.P. alleges that Facebook's algorithms base its group recommendations in part on analysis of a user's "engagement on the internet (both on and off of Facebook)," and that those algorithms "recommend that susceptible users join extremist groups." J.A. 34. The input of that process is undoubtedly third-party conduct; for example, M.P. alleges that Facebook's algorithms analyzed Roof's online behavior. But the output—Facebook's recommendation that Roof join an extremist group—is just as undoubtedly Facebook's own conduct. True, after Roof joined an extremist group on Facebook, he would have seen information provided by that group, for which Facebook may have acted solely as

publisher. But M.P. seeks to hold Facebook accountable for *recommending that Roof join the group in the first instance*, even if she cannot hold Facebook to account for publishing the group's content on its platform. As the late Judge Katzmann explained, "[t]he fact that Facebook also publishes third-party content should not cause us to conflate its two separate roles with respect to its users and their information." *Force v. Facebook, Inc.*, 934 F.3d 53, 83 (2d Cir. 2019) (Katzmann, J., concurring in part and dissenting in part). In one role, Facebook acts as publisher of its users' content, and Section 230 provides immunity. But in the role relevant here, Facebook is not "also immune when it conducts statistical analyses of that information and delivers a message based on those analyses," like a recommendation to join a particular group. *Id.* That message is Facebook's own and is not encompassed within the traditional editorial functions that Section 230 immunizes.

Because Section 230(c)(1) shields Facebook only from claims holding it liable as a publisher or speaker of information provided by another, it does not bar M.P.'s claims to the extent they seek to hold Facebook accountable for recommending that Roof join extremist groups. Therefore, I would reverse the district court's Section 230 ruling as regards this category of allegations.

II.

The majority affirms dismissal of all M.P.'s state law claims for the additional reason that M.P. failed to plausibly allege proximate causation. The district court did not address causation, and I would remand for it to do so in the first instance with respect to M.P.'s negligence claims about Facebook's own conduct like recommendations. However, one of

M.P.'s state law claims—strict products liability—need not be remanded because it fails for the separate reason that M.P. has not alleged she is a user or consumer of Facebook or its algorithms.[1]

A.

Although causation ultimately may be difficult to prove in this case, M.P. likely has pled enough to nudge her negligence claims over the line of plausibility and earn discovery into whether Roof's violence was a foreseeable consequence of Facebook's conduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Consider her allegations about Facebook's group recommendations. M.P. alleges that Roof "joined extremist groups on Facebook." J.A. 24. She alleges that, "based on . . . Roof's engagement on the internet," Facebook's algorithms directed him "to groups or communities in which his views were cultivated, developed, and made more extreme." J.A. 34. She alleges that "64% of all extremist group joins are due to [Facebook's] recommendation tools." J.A. 58. And she alleges that it was "foreseeable, and indeed known to Facebook," that "by recommending extremist groups to those perceived susceptible to such messaging[,] Facebook would radicalize users like Roof, causing them to support or engage in dangerous or harmful conduct in the offline world." J.A. 34; *see also*, *e.g.*, J.A. 21 ("Facebook/Meta knew at least by 2014 that online radicalization leads to offline violence."); J.A. 51–52 (alleging other instances in which

[1] Facebook contends that M.P. "must satisfy the user-or-consumer element for each claim" she brings, including negligent products liability. Response Br. 56. The cases Facebook cites, however, do not support the proposition that South Carolina law restricts negligent products liability claims to the user or consumer of the defective product.

"Facebook's tendency to cause real-world violence by radicalizing users online has been demonstrated").

"Ordinarily, the question of proximate cause is one of fact for the jury." *Jolly v. Gen. Elec. Co.*, 869 S.E.2d 819, 828 (S.C. Ct. App. 2021), *aff'd sub nom.*, *Jolly v. Fisher Controls Int'l, LLC*, 905 S.E.2d 380 (S.C. 2024) (internal quotation marks omitted); *see also Grooms v. Minute-Maid*, 267 F.2d 541, 546 (4th Cir. 1959); *Padgett v. Colonial Wholesale Distrib. Co.*, 103 S.E.2d 265, 270 (S.C. 1958). Although we can and do affirm dismissals for failure to adequately plead causation, I find the question in this case much closer than the majority does. Because the district court did not address causation and M.P. has had no opportunity to amend her complaint to correct its deficits (if any exist), I would not affirm dismissal of M.P.'s negligence claims on this alternative ground. Instead, I would remand her negligence claims regarding Facebook's own conduct for further proceedings.

B.

M.P.'s strict products liability claim, however, fails for a separate, incurable reason. Under South Carolina law, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm *caused to the ultimate user or consumer*, or to his property," if "[t]he seller is engaged in the business of selling such a product," and "[i]t is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." S.C. Code Ann. § 15-73-10(1) (emphasis added). M.P. alleges that Facebook defectively designed "its system and that system's underlying algorithms" and she was injured as a

result. J.A. 63. But M.P. does not claim that she was a user or consumer of Facebook or its algorithms, as the statute requires. Consequently, she cannot bring a strict products liability claim under South Carolina law.

While M.P. recognizes she is "a step removed from actual 'use' of the product," she argues that "such downstream harms can be remedied" under South Carolina's strict liability statute because they are "foreseeable." Opening Br. 61. The South Carolina Supreme Court, however, has squarely rejected the invitation to "includ[e] a foreseeability analysis in a determination of whether a plaintiff constitutes a 'user' under section 15-73-10." *Lawing v. Univar, USA, Inc.*, 781 S.E.2d 548, 556 (S.C. 2015). As that court has explained, "§ 15-73-10 limits liability to the user or consumer" of the product, *Bray v. Marathon Corp.*, 588 S.E.2d 93, 96 (S.C. 2003), which terms do not include "all persons who could foreseeably come into contact with the dangerous nature of a product," *Lawing*, 781 S.E.2d at 556 (internal quotation marks omitted). Because M.P. does not allege that she was a user or consumer of Facebook or its algorithms, I would affirm the district court's dismissal of her strict products liability claim on this alternative ground.

III.

Finally, as for M.P.'s federal claims, I agree with the majority that we must affirm. M.P. waived any challenge to the district court's dismissal of her 42 U.S.C. § 1985(3) claim by not contesting it in this Court. And the district court did not err in failing to address a purported 42 U.S.C. § 1986 claim that did not appear in her complaint.

* * *

Accordingly, I would affirm dismissal of M.P.'s federal claims and strict products liability claim. I would reverse the district court's Section 230 ruling and remand M.P.'s negligence claims regarding Facebook's own conduct, like group recommendations, for further proceedings. Because the majority reaches a different conclusion regarding M.P.'s negligence claims, I respectfully concur in the judgment in part and dissent in part.