AMBIKA KUMAR (*pro hac vice*)
   ambikakumar@dwt.com
BIANCA CHAMUSCO (*pro hac vice*)
   biancachamusco@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
   adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
   davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
   meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
   bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>  Plaintiff,<br><br>  v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>  Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**PLAINTIFF'S STATEMENT OF RECENT DECISION**<br><br>Date:      January 23, 2025<br>Time:      9:00 a.m.<br>Dept.:     Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

Pursuant to Local Civil Rule 7-3(d)(2), Plaintiff NetChoice, LLC submits the attached opinion in *SEAT v. Paxton*, No. 1:24-cv-00945-RP (W.D. Tex. Feb. 7, 2025), facially enjoining enforcement of a Texas law that sought to prevent minors' exposure to harmful content and targeted advertising on the grounds that the law's threshold coverage definition was content- and speaker-based; the regulated topics were too vague; and the unconstitutional applications of the law substantially outweighed any constitutional applications.

DATED:  February 12, 2025                    DAVIS WRIGHT TREMAINE LLP


By: */s/ Ambika Kumar*
       Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice

DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

# ATTACHMENT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:24-CV-945-RP |
| KEN PAXTON, *in his official capacity as the Texas Attorney General*, | § § § § | |
| Defendant. | § § § | |

## ORDER

Before the Court is Plaintiffs Ampersand Group LLC, Brandon Closson, M.F., and Students Engaged in Advancing Texas's (collectively "Plaintiffs") motion for a preliminary injunction, (Dkt. 17). Defendant Ken Paxton, ("Paxton"), in his official capacity as the Texas Attorney General, filed a response, (Dkt. 35), to which Plaintiffs replied, (Dkt. 37). Having considered the briefing, the evidence, and the relevant law, the Court will grant the motion as to Tex. Bus. & Com. Code §§ 509.052(2)(D), 509.053, 509.055, 509.056(1), and 509.057, and deny it in all other respects.

## I. BACKGROUND

This case concerns Texas House Bill 18, a law that regulates social media websites ("HB 18" or "the Act"). Tex. Bus. & Com. Code §§ 509.001, et seq. The law took effect on September 1, 2024. Before it took effect, the Court enjoined certain aspects of the law in another matter before it, *Computer & Communications Industry Association v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024). The Court begins by describing the parties, then the Act, and then the procedural posture of the case.

### A.  The Parties

Plaintiffs are Texas-based minors, adults who post content on social media geared toward minors, and organizations whose members include minors, who allege that the Act chills their speech. (Mot. Prelim. Inj., Dkt. 17, at 8−9). Plaintiff Students Engaged in Advancing Texas ("SEAT") "represents a coalition of Texas students, from middle-school to college, who seek to increase youth visibility and participation in policymaking, including via social media." (*Id.* at 8). Plaintiff M.F. is "a 16-year-old high school student who uses social media to learn about current events and opportunities, follow the news, discover music, and conduct research for his debate team and other school activities." (*Id.* at 8−9). Plaintiff The Ampersand Group ("Ampersand") is an advertising agency in Austin, Texas which "publishes social-good and public service advertisements on YouTube, Instagram, Facebook, and gaming platforms." (*Id.* at 9). Plaintiff Brandon Closson ("Closson") is an adult resident of Texas who uses his social networks to share content about mental health and bipolar disorder, including to minors. (Compl., Dkt. 1, at 5).

Paxton is the sole Defendant in this suit. He is the Attorney General of Texas, sued in his official capacity. (Compl., Dkt 1, at 5). Paxton and the Consumer Protection Division of the Attorney General's Office have authority to enforce HB 18. *See* § 509.151 ("A violation of this chapter is a deceptive act or practice actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office.").[1]

### B.  HB 18

### 1. Coverage

The Court described the scope of coverage of HB 18 in its order granting a preliminary injunction against the Act in *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *1, and briefly

---

[1] The law also creates a separate private right of action. § 509.152.

reiterates that background here. HB 18 regulates "digital service provider[s]" ("DSPs") that "allow[]

users to socially interact with other users," "allow[] a user to create a public or semi-public profile,"

and "allow[] a user to create or post content." HB 18 §§ 509.001(2), 509.002(a). This definition

includes standard social media platforms such as Facebook and Instagram as well as other "social"

websites such as YouTube and Reddit. HB 18 defines DSPs as any "website," "application,"

"program," or software that "collects or processes personal identifying information" ("PII") "with

Internet connectivity," § 509.001 (1), and:

> (1) "determines" both the "means" and the "purpose of collecting
> and processing the [PII] of users," HB 18 § 509.001(2)(B)−(C);
> (2) "connects users in a manner that allows users to socially interact
> with other users on the digital service," *id.* § 509.002(a)(1);
> (3) "allows a user to create a public or semi-public profile for purposes
> of signing into and using the digital service," *id.* § 509.002(a)(2);
> and
> (4) "allows a user to create or post content that can be viewed by other
> users of the digital service, including sharing content on: (A) a
> message board; (B) a chat room; or (C) a landing page, video
> channel, or main feed that presents to a user content created and
> posted by other users," *id.* § 509.002(a)(3).[2]

Exceptions to the law include: state and local government websites, financial institutions,

medical websites, small businesses, institutions of higher education, employee management software,

school education software, and email services that only provide "social" functions "incidental" to

their main service. *Id.* § 509.002(b). Notably, the law also exempts DSPs that "primarily function[] to

provide a user with access to news, sports, commerce, or content primarily generated or selected by

the [DSP]" and "allow[] chat, comment, or other interactive functionality that is incidental to the

digital service." *Id.*

---

[2] Section 509.057 is not limited to social platforms but otherwise retains the same exceptions. *Id.* § 509.002(a-b).

### 2. Requirements

#### (a) Age Registration and Parental Disputes

With the stated purpose of protecting minors, HB 18 imposes age registration and verification requirements on users. Under HB 18, covered DSPs must make users "register" their age before those users can create an account. *Id.* § 509.051(a) (covered DSPs "may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the [DSP]."). A user cannot change their registered age "unless the alteration process involves a commercially reasonable review process." *Id.* § 509.051(c).

HB 18 also allows parents to dispute the registered age of their child by "notif[ying] a [DSP] that the minor is younger than 18 years of age" or "successfully disput[ing] the registered age of the minor . . . ." *Id.* § 509.051(d)(2).[3] If a parent disputes the age of their child, the DSP "shall treat the user as a known minor." *Id.* § 509.051(e). To ensure parenthood, HB 18 requires DSPs to "verify, using a commercially reasonable method and for each person seeking to perform an action on a digital service as a minor's parent or guardian: (1) the person's identity; and (2) the relationship of the person to the known minor." *Id.* § 509.101(a). When a known minor logs into a covered DSP, HB 18 imposes several new requirements, with the relevant requirements to this case set forth in more detail below.

#### (b) "Monitoring-and-Filtering" Requirements

Plaintiffs challenge Sections 509.053 and 509.056(1) of HB 18, which the Court refers to as the "monitoring-and-filtering" requirements. The Court has previously enjoined the monitoring-

---

[3] The statute also allows parents to dispute the age of a minor if the parent "performs another function of a parent or guardian under this chapter." HB 18 § 509.051(d)(2)(C).

and-filtering requirements with respect to a group of Plaintiff trade associations. *Computer &*

*Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *21.

As this label suggests, these requirements make DSPs monitor certain categories of content

and filter them from being on display to known minors. Specifically, HB 18 requires covered DSPs

to "develop and implement a strategy to prevent [a] known minor's exposure to" defined categories

of prohibited speech. *Id.* § 509.053(a). HB 18 prohibits content "that promotes, glorifies, or

facilitates" the following:

> (A) "suicide, self-harm, or eating disorders";
> (B) "substance abuse";
> (C) "stalking, bullying, or harassment";
> (D) "grooming, trafficking, child pornography, or other sexual exploitation or abuse."

*Id.*

Strategies to prevent minors' exposure to these harmful categories "must include":

> (A) creating and maintaining a comprehensive list of harmful material or other content described [above] to block from display to a known minor;
> (B) using filtering technology and other protocols to enforce the blocking of material or content on the list [above];
> (C) using hash-sharing technology and other protocols to identify recurring harmful material or other content described [above];
> (D) creating and maintaining a database of keywords used for filter evasion, such as identifiable misspellings, hash-tags, or identifiable homoglyphs;
> (E) performing standard human-performed monitoring reviews to ensure efficacy of filtering technology;
> (F) making available to users a comprehensive description of the categories of harmful material or other content described [above] that will be filtered; and
> (G) except as provided by Section 509.058, making available the digital service provider's algorithm code to independent security researchers.

*Id.* § 509.053(b)(1).[4] So too, Section 509.056 requires that DSPs "that use[] algorithms to automate

the suggestion promotion, or ranking of information to known minors" "shall . . . make a

---

[4] In addition to the above mandatory strategies, HB 18 allows DSPs to use other strategies, including:

commercially reasonable effort to ensure that the algorithm does not interfere with the [DSP]'s duties under" the above. *Id.* § 509.056(1).

(c)  Targeted Advertising Requirements

In addition to the monitoring-and-filtering requirements, HB 18 Sections 509.052 and 509.055 impose regulations on how DSPs can display advertisements to known minors. The Plaintiffs challenge Sections 509.052(2)(D) and 509.055, which this Court calls the "targeted advertising requirements."

In the relevant section of the Act, first, the law imposes limits on what kind of data a DSP may collect. Covered DSPs must "limit collection of the known minor's [PII] to information reasonably necessary to provide the digital service" and "limit use of the [PII] to the purpose for which the information was collected . . . ." HB 18 § 509.052(1). In addition, a covered DSP may not: "(A) allow the known minor to make purchases or engage in other financial transactions through the digital service; (B) share, disclose, or sell the known minor's [PII]; (C) use the digital service to collect the known minor's precise geolocation data; or (D) use the digital service to display targeted advertising to the known minor." *Id.* § 509.052(2). Out of this section, Plaintiffs challenge only the last provision—§ 509.052(2)(D)'s restriction on using the DSP to display "targeted advertising" to a minor. In another section Plaintiffs challenge, HB 18 requires DSPs to "make a commercially reasonable effort to prevent advertisers on the digital service provider's [website] from targeting a

---

(A)  engaging a third party to rigorously review the digital service provider's content filtering technology;
(B)  participating in industry-specific partnerships to share best practices in preventing access to harmful material or other content described [above]; or
(C)  conducting periodic independent audits to ensure:
    i.   continued compliance with the digital service provider's strategy; and
    ii.  efficacy of filtering technology and protocols used by the digital service provider.
HB 18 § 509.053(b)(2).

known minor with advertisements that facilitate, promote, or offer a product, service, or activity that is unlawful for a minor in this state to use or engage in." *Id.* § 509.055.

(d)    Content Monitoring and Age-Verification Requirements

Plaintiffs additionally challenge HB 18's provision that requires DSPs to track their overall published material and restrict harmful or obscene material from known minor viewers, which the Court will call the "content monitoring and age-verification requirement." *Id.* § 509.057. This provision provides that "[a] digital service provider . . . that knowingly publishes or distributes material, more than one-third of which is harmful material or obscene as defined by Section 43.21, Penal Code, must use a commercially reasonable age verification method to verify that" any user seeking to access the information is 18 or older. *Id.* § 509.057.

"Obscene" as defined in the Texas Penal Code means material or a performance that:

> (A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;
> (B) depicts or describes: (i) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or (ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and
> (C) taken as a whole, lacks serious literary, artistic, political, and scientific value.

Tex. Penal Code Ann. § 43.21. "Harmful" is not defined in the statute.

(e)    Other Requirements

HB 18 has other requirements, that Plaintiffs do not seek to enjoin, which this Court briefly summarizes by way of background. HB 18 requires DSPs to create and provide parental tools to "supervise . . . [a] known minor's use" of the DSP. *Id.* § 509.054(a). Parents must be able to "control the known minor's privacy and account settings," alter data collection and financial transaction

settings for the minor, and "monitor and limit the amount of time the . . . known minor spends" using the DSP. *Id.* § 509.054(b).

Also, HB 18 requires covered DSPs that "use[] algorithms to automate the suggestion, promotion, or ranking of information to known minors" to "disclose . . . in a clear and accessible manner, an overview of": (1) "the manner in which the digital service uses algorithms to provide information or content"; (2) "the manner in which algorithms promote, rank, or filter information or content"; and (3) "the [PII] used as inputs to provide information or content." *Id.* § 509.056(2). HB 18 contains various other provisions related to the practical enforcement of the law, such as clarifying that DSPs may share known minors' PII to comply with legal investigations, HB 18 § 509.059(1–2); that DSPs need not disclose trade secrets, *id.* § 509.058; and that the Department of Family and Protective Services may designate its staff as a minor's caregiver, if a minor is in the agency's conservatorship, *id.* § 509.104.

## C. Procedural History

Plaintiffs filed suit on August 16, 2024, and filed a motion for a preliminary injunction on August 23, 2024. (Compl., Dkt. 1; Mot. Prelim. Inj., Dkt. 17). Plaintiffs argue that HB 18 §§ 509.001-002, 509.051, 509.052(2)(D), 509.053, 509.055, 509.056(1), 509.057, and 509.101-103 violate the First Amendment because they are content-based laws that do not survive strict or intermediate scrutiny; because they are unconstitutional prior restraints of speech; and because they are facially overbroad, (Compl., Dkt. 1, at 28–35). They also challenge HB 18 §§ 509.002(a)(1), 509.002(a)(2), 509.002(b)(10)(B), 509.053(a), 509.052(2)(D), 509.055, 509.057(a), and 509.101 as unconstitutionally void for vagueness. (*Id.* at 36). Their preliminary injunction motion addresses the monitoring-and-filtering, targeted advertising, and the content monitoring and age-verification requirements. (Mot. Prelim. Inj., Dkt. 17, at 8–27). Plaintiffs seek a preliminary injunction: more specifically, they "request an order enjoining Tex. Bus. & Com. Code §§ 509.001–002, 509.051, 509.052(2)(D),

509.053, 509.055, 509.056(1), 509.057, and 509.101–103 on their face." (Mot. Prelim. Inj., Dkt. 17, at 27).

Paxton filed a response in opposition to the motion. (Dkt. 35). Paxton argues that Plaintiffs lack standing, that strict scrutiny does not apply to the analysis of HB 18, and that Texas has an interest in HB 18 sufficient to satisfy this Court's review under the First Amendment. (*Id.* at 20–42). Paxton also argues that HB 18 is subject to limiting constructions and is not unconstitutionally vague, and that it cannot be called a prior restraint. (*Id.* at 42–46). Plaintiffs filed a reply, (Dkt. 37), two notices of supplemental authority, (Dkts. 38, 39), and two supplements to the motion for preliminary injunction in the form of supplemental Plaintiff declarations, (Dkts. 40, 41).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *See Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050–52 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

As Paxton notes, Plaintiffs' motion turns on the likelihood of success on the merits. (Resp., Dkt. 35, at 47 ("The remaining preliminary injunction factors will not meaningfully impact this case.")). The Court will begin its likelihood of success analysis with the jurisdictional issue of

Plaintiffs' standing to bring suit. Finding that Plaintiffs have standing, the Court will then turn to the merits of Plaintiffs' motion.[5]

A. Standing

First, the Court addresses Plaintiffs' standing to bring suit. Standing requires a plaintiff to show they have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024). Paxton raises several arguments on this point: He argues that Plaintiffs lack a concrete injury; that Plaintiffs did not make a showing that HB 18 injures them as users, who are not directly regulated, as opposed to injuring the DSPs, as third parties which are actually regulated; that SEAT lacks associational standing; and that Plaintiffs' injuries are not ripe. (Resp., Dkt. 35, at 20–28). The Court will address each argument in turn.

For the following reasons, the Court finds that Plaintiffs have standing and agrees with Plaintiffs that First Amendment standing doctrine allows for third parties not directly regulated by a law, but whose speech is prevented or chilled by it, to assert claims for relief. Moreover, due to the penalties and enforcement provisions of HB 18, the Court finds that HB 18 produces a "determinative or coercive effect" on providers, which results in preventing speech and produces Plaintiffs' injuries, as is required to show standing. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (injury may be "produced by determinative or coercive effect upon the action of someone else"). In other words, Plaintiffs have demonstrated that a third party, the DSPs, "will likely react in predictable ways" to the three sets of requirements which include preventing them from viewing or posting

---

[5] The Court addressed sovereign immunity in its *Computer & Comm'ns Indus. Ass'n* preliminary injunction order and found that Paxton has the authority and demonstrated willingness to enforce HB 18, establishing sufficient connection to the law to render him a proper defendant for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). 2024 WL 4051786, at *5–*7. Paxton did not raise the defense of sovereign immunity in this suit, so the Court does not further address it here.

certain types of content, and this confers Plaintiffs with standing to challenge the requirements.
*Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 543 (5th Cir. 2022).

> 1.    Plaintiff internet users have a cognizable First Amendment injury

First, Plaintiffs are users of the Internet—minors and those that engage with them—with
specific, demonstrated interests in sharing and engaging with the types of content that HB 18
prohibits DSPs from showing to known minors. This demonstrates an injury-in-fact. In a pre-
enforcement challenge, Plaintiffs can establish an injury in fact if they show that "(1) they have an
intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their
intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future
enforcement of the challenged policies is substantial." *Book People*, 91 F.4th at 335 (quoting *Speech
First, Incorporated v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (internal quotation marks omitted).

As an initial matter, Plaintiffs have made this showing as to each group of challenged
restrictions. As to the filter-and-monitoring requirements, Plaintiff SEAT's previous and planned
educational Instagram posts concern bullying, sexual assault, and suicide. (Samuels Decl., Dkt. 21, at
2–5). Plaintiffs reasonably understand HB 18 to require social media to prohibit those posts. (*Id.*).
Similarly, Plaintiff Closson fears that HB 18 will lead social media companies to prevent him from
posting about bipolar disorder, eating disorders, substance abuse, and his identity as a member of
the LGBTQ+ community, as he has in the past. (Closson Decl., Dkt. 21, at 1–7). As another
example, Plaintiff M.F. notes that he arguably will not be able to listen to music like The Fray's song
"How to Save a Life" or R.E.M's song "Everybody Hurts" on covered sites because of their
references to suicide. (M.F. Decl., Dkt. 20, at 3).

As to the targeted advertising requirements, Plaintiff Ampersand wishes to share posts that
help teens better understand topics like sex trafficking and substance abuse, and they have done so
in the past. (Janeway Decl., Dkt. 18, at 2–5). Plaintiff Ampersand reasonably believes that the

targeted advertising requirements will restrict digital services providers from allowing such advertising to minors in the future, and moreover, HB 18 will prevent them from distributing planned advertisement campaigns to minors via social media on other topics like vaccines, public health, and census participation. (*Id.*). Plaintiff M.F. testifies that he wants to receive advertisements and that he regularly learns about topics ranging from politics, to local events, to clothing available for purchase, via targeted advertisements. (M.F. Decl., Dkt. 20, at 5).

As to the content monitoring and age-verification requirements, Plaintiffs allege the requirements will prevent them from viewing posts deemed harmful or obscene (for example, content related to sexuality). (*E.g.*, Janeway Decl., Dkt. 18, at 5). And Plaintiff Internet users may be unwilling to submit the personal details required for age verification, which itself creates standing by preventing potential users from accessing the DSP. (*E.g.*, Closson Decl., Dkt. 21, at 6); *cf. Free Speech Coal. v. Knudsen*, No. CV 24-67-M-DWM, 2024 WL 4542260, at *8 (D. Mont. Oct. 22, 2024) (requirement to provide PII to seek to access adult content sufficed to allege standing).

In the ways described above, Plaintiffs have demonstrated that they have an intention to engage in a course of conduct—speaking on social media—affected with their First Amendment interests, and that their intended future conduct—posting or viewing advertisements on any topic and content related to certain topics—is arguably proscribed by the policy in question. *Book People*, 91 F.4th at 335. This type of "chilled speech or self-censorship" "is an injury sufficient to confer standing." *Barilla v. City of Houston, Tex.*, 13 F.4th 427, 431 (5th Cir. 2021) (collecting cases); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (same).

To the third prong of the injury-in-fact test, there exists a threat of enforcement. *Book People*, 91 F.4th at 335. HB 18 includes enforcement provisions. *See* § 509.151 ("A violation of this chapter is a deceptive act or practice actionable . . . solely as an enforcement action by the consumer protection division of the attorney general's office."); § 509.151 (creating private right of action).

Paxton has begun enforcing the Act. Compl., *Texas v. TikTok Ltd.*, No. 24-CV-1763 (56th Dist. Ct., Galveston Cnty., Tex. Oct. 3, 2024) (Dkt. 39, at 15) (Paxton asserting complaint against TikTok for violating the Act, including "Sections 509.052, 509.101, and 509.054."). And, as this Court already found, all indications suggest, in this case as well as *Computer & Comm'ns Indus. Ass'n*, that Paxton wishes to continue enforcing HB 18. Paxton has repeatedly emphasized, including in this case, (Resp., Dkt. 35, at 14–17), that he believes social media is severely harming children. *See also Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *6 (finding same).

    2.  <u>Plaintiffs' injury is fairly traceable to government action and redressable by a judicial order</u>

    The injury-in-fact Plaintiffs attest to is also fairly traceable to government action, and redressable by a judicial order enjoining sections of HB 18. Traceability requires that Plaintiffs show "a causal connection between the injury and the conduct complained of." *Book People*, 91 F.4th at 332 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiffs demonstrate that HB 18 requires DSPs to make certain changes to their policies; this is a causal connection to their injuries-in-fact described above. And redressability requires Plaintiffs show "a favorable decision will relieve a discrete injury" and that it is "likely" to redress the injury. *Id.* (internal quotation marks and citations omitted). The redressability prong is obviously met here—if HB 18's enforcement is enjoined in relevant part, DSPs have no reason to make the policy changes it requires.

    3.  <u>Plaintiffs may assert a challenge as a third party not directly regulated by HB 18</u>

    That HB 18 regulates DSPs—and not Plaintiffs directly—does not negate Plaintiffs' injury-in-fact, nor the traceability or redressability of that injury, as Paxton argues.[6] Each of the three

---

[6] Indeed, Paxton suggested when opposing the motion for preliminary injunction in *Computer & Communications Industry Association*, Case No. 1:24-cv-849-RP, the opposite: that the internet providers could not sue on First Amendment grounds because they are not the users who experience the chilled speech. (Resp., Dkt. 18, at 22 ("[I]ndividual plaintiffs routinely sue on First Amendment grounds to challenge acts that allegedly restrict their use of or access to social media. Nothing prevents [digital services providers plaintiffs'] users from doing the same.").

provisions of HB 18 described above have a "determinative or coercive effect" of the Act on DSPs, and Plaintiffs' injuries result. *Book People*, 91 F.4th at 331. More specifically, HB 18 has enforcement provisions that will predictably prevent DSPs from allowing Plaintiffs to share or view certain content because of the risk that Paxton or a private actor will enforce HB 18 against them.

And Plaintiffs may challenge the regulation of intermediaries (the DSPs) who control their access to the chilled speech, consistent with longstanding First Amendment principles. Plaintiffs' standing is analogous to that in *Bantam Books, Inc. v. Sullivan*, where book publishers had standing to challenge state regulations on bookstores, despite the state not intending to enforce the law as to the publishers themselves. 372 U.S. 58, 64 n.6 (1963). The Fifth Circuit also recently upheld standing when a bookseller brought a challenge to a law restricting school districts' book purchases: the injury "depend[ed] upon the decision of an independent third party," the school district, but booksellers had standing because "the school districts' purchasing decisions" were "coerced by the State" and school districts would "react in predictable ways" that resulted in injury to booksellers. *Book People*, 91 F. 4th 318, at 329–33.[7] The same principle applies here: HB 18 confers standing on Plaintiffs whose speech and listening will be chilled because of DSPs' predictable reactions to the law.[8]

---

[7] As another analogy, courts have also found that news agencies can assert challenges to orders that restrict their information or access to proceedings, even when they are not "restrained directly" by a given order. *See Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926–27 (5th Cir. 1996) (collecting cases).

[8] This case is distinct from *Murthy v. Missouri*, which Paxton describes as having rejected a "right to listen" theory for social media users asserting a First Amendment injury. 603 U.S. 43 (2024); (Resp., Dkt. 35, at 23). In *Murthy*, the Supreme Court found that nothing demonstrated the government had coerced any content moderation policies on the relevant social media platforms; the plaintiffs, rather, based their standing on the fact that federal government officials, as part of an overall focus on COVID-19-related misinformation, had spoken with and met with social media companies about the topic. 603 U.S. at 51–54. The Court concluded that Plaintiffs made no showing of any specific "government-coerced" social media moderation decisions, as opposed to decisions made by the platforms in their own independent judgment. *Id.* at 61. Here, government coercion exists because HB 18 has directly banned certain types of speech among minors on social media, as described above. As in other First Amendment cases, such as *BookPeople*, this Court can logically deduce that the threat of penalties on covered entities would result in changes to their practices. 91 F.4th at 330.

As to the Fourteenth Amendment vagueness challenges, Plaintiffs have standing for the same reasons: the unconstitutional vagueness of the relevant provisions, combined with their coercive effect on DSPs, will predictably result in the DSPs preventing their speech on social media. Plaintiffs have standing as speakers and listeners to challenge an unconstitutionally vague regulation of intermediaries. *See Bantam Books*, 372 U.S. at 64 n.6, 71.

4. <u>SEAT may assert its members' First Amendment rights</u>

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343, (1977)); *see also Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *8.

SEAT meets these requirements. To the first prong, for the same reasons that individual minor Plaintiffs have standing, SEAT's members (who are middle-school to college-aged youths participating in advocacy and civic engagement) would have standing to sue. SEAT asserts that its members receive information via its advertisement campaigns and view its posts about proscribed topics such as the decriminalization of currently illegal activities, sex education, and mental health conditions. (Samuels Decl., Dkt. 21, at 3, 5). HB 18 would likely prevent them from viewing those forms of content on social media.

Paxton does not contest the second or third prongs of associational standing. To the second prong, the Court finds that SEAT's interest in posting content and advertisements on social media is germane to its mission of mobilizing students in Texas. (Compl., Dkt. 1, at 4). And, to the third prong, SEAT's members do not need to participate in this suit. That inquiry does not derive from Article III but is "solely prudential." *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550. There

is no prudential reason why SEAT's members need participate; there are not heavily contested fact issues that would benefit from SEAT's members participating, for example. And member participation "is not normally necessary" in actions for injunctive relief. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citation omitted). As such, SEAT has met its burden at the preliminary injunction stage to show associational standing to challenge the three provisions of HB 18.[9]

### B. Ripeness

The general test for ripeness examines "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Book People*, 91 F.4th at 333. That test is met. Legal issues predominate this challenge and are ready for judicial review, while withholding that review would impose irreparable harm on Plaintiffs and Plaintiffs' members. *See also Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *9 (finding same).

### C. First Amendment Analysis

Having found that Plaintiffs have standing to bring suit, the Court turns its analysis to the merits of the case. "[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,' and 'the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States.'" *NetChoice, LLC v. Fitch*, No. 1:24-CV-170-HSO-BWR, 2024 WL 3276409, at *7 (S.D. Miss. July 1, 2024) (*quoting Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019)). The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). First Amendment protection extends to social media, which "allows users to gain access to information and communicate with one another about it on any

---

[9] SEAT does not assert a theory of organizational standing in its motion or reply, so the Court does not address Paxton's arguments as to organizational standing. (Dkt. 35, at 18).

subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

### 1. Level of Scrutiny

The threshold question is what level of scrutiny applies to HB 18's regulations. *See Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 637 (1994). The Court has previously found that HB 18's threshold coverage definition is a content-based regulation, such that strict scrutiny applies to all regulations in HB 18. *Computer & Comm'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *10 (interpreting HB 18 § 509.002(a)(1)). The Court will briefly reiterate its reasoning here. HB 18 regulates [DSPs] that specifically host or broadcast "social" speech, thereby subjecting "social" content to heightened regulation. HB 18 § 509.002(a)(1). Non-social interactions, such as professional interactions, are not covered, while social interactions are. That is clear in HB 18's content-based exceptions. DSPs that provide "content primarily generated or selected by the" provider or primarily "functions to provide a user with access to news, sports, [or] commerce" are exempted. HB 18 § 509.002(b)(10)(A). This "singles out specific subject matter for differential treatment," by using the "function or purpose" of speech as a stand-in for its content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64, 169 (2015). HB 18 is therefore a content- and speaker-based regulation, targeting DSPs whose primary function is to share and broadcast social speech. "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170. When the government favors some speakers over others for their content, the law must be subject to strict scrutiny. *Barr v. Am. Assn. of Political Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (controlling plurality op.); *Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech because of the topic

discussed or the idea or message expressed."). The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation.

In response, Paxton suggests that these arguments are foreclosed by the Fifth Circuit. (Resp., Dkt. 35, at 28 (citing *NetChoice, LLC v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) ("*NetChoice I*"), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)). In *NetChoice I*, the Fifth Circuit rejected a similar argument brought by Plaintiffs by holding that regulations targeting social media did "not render [the law at issue] content-based because the excluded websites are fundamentally dissimilar mediums." *NetChoice I*, 49 F.4th at 480.

But Paxton fails to recognize that the *NetChoice I* decision does not control the analysis, as the Court held in *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *10. The Court will again reiterate its analysis on this point: The *NetChoice I* ruling is no longer binding because the Supreme Court vacated *NetChoice I*, "void[ing] each of the judgment's holdings." *Doe v. McKesson*, 71 F.4th 278, 286 (5th Cir. 2023); *see also Moody*, 603 U.S. at 745 (vacating judgment). Paxton suggests that *Moody* "effectively confirmed, or at least did not disturb, the Fifth Circuit's analysis" on this point. (Resp. Dkt. 35, at 29). But the Supreme Court "disturbed" the analysis when it vacated the opinion. Paxton suggests that the Supreme Court's own opinion "also rebuffed" Plaintiffs theory—but it is not clear how. (*See id.*). To the contrary, the Supreme Court expressly stated that "there has been enough litigation already to know that the Fifth Circuit, if it had stayed the course, would get wrong at least one significant input . . . ." *Moody*, 603 U.S. at 744. While the Supreme Court did not determine "whether to apply strict or intermediate scrutiny[,]" that was only because "Texas's law [did] not pass" either intermediate or strict scrutiny, at least applied to key respects of the law. *Id.* at 740.

Cutting against the Fifth Circuit's analysis in *NetChoice I*, the Supreme Court noted that "presenting a curated and edited compilation of [third-party] speech is itself protected." *Id.* at 744. (internal citations omitted). It noted that "editorial judgments influencing the content of

[Facebook's News Feed and YouTube's homepage] are, contrary to the Fifth Circuit's view, protected expressive activity." *Id.* If the discretion to favor social content over other messages is protected editorial judgment, then laws like HB 18 are not just targeting "fundamentally dissimilar mediums." Those laws are targeting DSPs based on those protected editorial judgments. So, at the very least, *Moody* calls into serious question *NetChoice I*'s discussion of "content-based" laws.

The district court's reasoning in *NetChoice, LLC v. Yost* is instructive. No. 2:24-CV-00047, 2024 WL 555904, at *8–11 (S.D. Ohio Feb. 12, 2024). There, a district court dealt with a highly similar Ohio law that targeted DSPs hosting "social" speech and excluded sites focused on news and product reviews. *Id.* at *8. The district court grappled with whether the "social" distinction was "content-based" (as would require strict scrutiny) or merely regulated the "manner in which" companies "transmit" the content (which would trigger intermediate scrutiny). *Id.* at *9 (quoting *Turner Broad. Sys.*, 512 U.S. at 645).[10] Although emphasizing that "[i]t is a close call[,]" the court ultimately found that social media DSPs "are not 'mere conduits'" but 'curate both users and content to convey a message about the type of community the platform seeks to foster.'" *Id.* at *11 (quoting *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1107 (W.D. Tex. 2021)).[11]

In an even more similar case, a Mississippi district court found a nearly identical law (H.B. 1126) to be content- and speaker-based:

> In essence, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material that is disseminated, whether it is "social interaction," as opposed to "news, sports,

---

[10] *But see Reed*, 576 U.S. at 163–64 ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.").

[11] In *NetChoice I*, the Fifth Circuit ruled that these editorial decisions fall outside the First Amendment, which in turn allowed the court to consider social media platforms "mere conduits." *NetChoice I*, 49 F.4th at 480. But in reversing *NetChoice I* on the First Amendment value of editorial judgments, *Moody* undercut the premise that had allowed the Fifth Circuit to consider social media regulations content neutral. *Moody*, 603 U.S. 727 ("The Fifth Circuit was wrong in concluding that Texas's restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression.").

> commerce, [or] online video games[.]" [HB 1126] can thus be viewed
> as either drawing a facial distinction based on the message the digital
> service provider conveys (i.e., news and sports), or based on a more
> subtle content-based restriction defining regulated speech by its
> function or purpose (i.e., providing news and sports). Either way,
> [b]oth are distinctions drawn based on the message a speaker conveys.

*Fitch*, 2024 WL 3276409, at *9 (quoting HB 1126) (cleaned up). Most recently, a Montana district

court found a statute nearly identical to the content monitoring and age-verification requirements to

be subject to strict scrutiny because it requires assessing the content of a website to determine

whether it is harmful to minors; the analogous requirements do the same here and are subject to

strict scrutiny for the same reason. *Free Speech Coal.*, 2024 WL 4542260, at *5–*7.

Like the district courts in *Yost*, *Fitch*, and *Free Speech Coalition*, this Court finds that HB 18

discriminates based on the type of content provided on a medium, not just the type of medium. A

DSP that allows users to socially interact with other users but "primarily functions to provide"

access to news or commerce is unregulated. An identical DSP, with the exact same medium of

communication and method of social interaction, but which "primarily functions to provide"

updates on what a user's friends and family are doing (e.g., through Instagram posts and stories), *is*

regulated. If there is a difference between the regulated DSP and unregulated DSP, it is the content

of the speech on the site, not the medium through which that speech is presented. When a site

chooses not to primarily offer news but instead focus on social engagement, it changes from an

uncovered to covered platform. But the type of medium has not changed, only the content primarily

expressed on the platform. In sum, strict scrutiny applies to HB 18's provisions because the law

regulates DSPs based on the content of their speech and the identity of the speaker.

One additional point. Paxton argues that the targeted advertising requirements constitute a

regulation on commercial speech, such that strict scrutiny does not apply. (Resp., Dkt. 35, at 31).

The Court disagrees. The word "advertisement" in the statute could apply to any number of forms

of speech that does not propose a commercial transaction. *Serafine v. Branaman*, 810 F.3d 354, 365

(5th Cir. 2016) ("Commercial speech is speech 'that *proposes* a commercial transaction.'") (quoting *Northern Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, (1989)). Paxton proposes that "[t]he better interpretation is that this statute restricts paid advertising," (Dkt. 35, at 30), but the word "paid" is not in the statute, and this Court cannot "rewrite a . . . law to conform it to constitutional requirements." *Serafine*, 810 F.3d at 369 (citation omitted). If the legislature intended to cover only advertisement proposing a commercial transaction, or "paid announcements," (Dkt. 35, at 21), as Paxton suggests, it could have easily added clarifying language saying as much.[12] "The best course, as always, is to stick with the ordinary meaning of the text that actually applies." *Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 817 (2024). The targeted advertising requirements are not commercial speech; strict scrutiny applies to them equally.

2. <u>HB 18 and Strict Scrutiny</u>

Because strict scrutiny applies, Paxton must therefore prove that HB 18 is "the least restrictive means of achieving a compelling state interest." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citation omitted). As the next step in the analysis, this Court must also determine whether the law is facially invalid. Even if HB 18 is a content-based regulation, it does not follow as a matter of course that the law is facially invalid. In the First Amendment context, facial challenges can only succeed if litigants show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). So, a law regulating First Amendment activity may only be struck down in its

---

[12] Paxton's proposed revision of the statute to cover only "paid" advertising, (Dkt. 35, at 20−21), also ignores the fact that "commercial speech" is not the same thing as "speech for profit," and "indeed, some of our most valued forms of fully protected speech are uttered for a profit." *Serafine*, 810 F.3d 354, at 365. As a result, even if the statute only covered "paid" advertising, strict scrutiny would still apply.

entirely if its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

       *Moody*, including the majority opinion and all four concurrences, emphasized that courts should not treat facial challenges lightly, even in the First Amendment context. It clarified that courts should "address the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications." *Id.* That analysis requires a two-step process. First, courts must "assess the state laws' scope" and ask, "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* Second, a court must "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725. Only after making these inquiries can a court determine if a law's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724.

(a)  <u>The Monitoring-and-Filtering Requirements</u>

       This Court already held that the monitoring-and-filtering requirements likely violate the Constitution. The Court again reiterates its analysis here. These requirements force providers to develop strategies to "prevent [a] known minor's exposure to harmful material and other content that promotes, glorifies, or facilitates: (1) suicide, self-harm, or eating disorders; (2) substance abuse; (3) stalking, bullying, or harassment; or (4) grooming, trafficking, child pornography, or other sexual exploitation or abuse." HB 18 § 509.053. Irrespective of whether HB 18 as a whole is content-based, there can be little dispute that this provision is. The monitoring-and-filtering requirements explicitly identify discrete categories of speech and single them out to be filtered and blocked. That is as content based as it gets.

       It is far from clear that Texas has a compelling interest in preventing minors' access to every single category of information listed above. Some interests are obvious—no reasonable person could dispute that the state has a compelling interest in preventing minors from accessing

22

information that facilitates child pornography or sexual abuse. *See Sable Comm'ns of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."). On the other end, many interests are not compelling, such as regulating content that might advocate for the deregulation of drugs (potentially "promoting" "substance abuse") or defending the morality of physician-assisted suicide (likely "promoting" "suicide"). *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (internal citation omitted). The Supreme Court has repeatedly emphasized that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975). Many of the regulated topics are simply too vague to even tell if they are compelling. Terms like "promoting," "glorifying," "substance abuse," "harassment," and "grooming" are undefined, despite their potential wide breadth and politically charged nature. While these regulations may have some compelling applications, the categories are so exceedingly overbroad that such a showing is unlikely.

Even accepting that Texas has a compelling interest in blocking select categories under HB 18, the law is not narrowly tailored. HB 18 requires DSPs to implement strategies that include: listing harmful material, using filtering technology, using hash-sharing technology to identify recurring material, creating a database of keywords used for filter evasion, performing human-monitoring reviews to ensure the filtering technology works, publishing descriptions of the filtered content, and making the code available to independent researchers. HB 18 § 509.053(b)(1). This broad, multi-faceted approach fails for two reasons: it does not employ the least restrictive means, and it is not narrowly tailored.

As in *Fitch*, Paxton "has not shown that the alternative suggested by [Plaintiffs], a regime of providing parents additional information or mechanisms needed to engage in active supervision over children's internet access would be insufficient to secure the State's objective of protecting children." 2024 WL 3276409, at *12. And Paxton has not shown that methods such as "hash-sharing technology" and publishing depictions of filtered content are necessary to prevent harm to minors. In short, HB 18 does not employ "the least restrictive means" to stop minors from accessing harmful material. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

HB 18 also employs overbroad terminology. Again, the monitoring-and-filtering requirements impose sweeping *ex-ante* speech restrictions, akin to prior restraints, but does little more than vaguely gesture at what speech must be restrained. For example, what does it mean for content to "promote" "grooming?" The law is not clear. So, by requiring filtering as a matter of law with only vague reference to what must be filtered, HB 18 will likely filter out far more material than needed to achieve Texas's goal.

More problematically, the law is underinclusive. That a law "is wildly underinclusive when judged against its asserted justification . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802. Websites that "primarily" produce their own content are exempted, even if they host the same explicitly harmful content such as "promoting" "eating disorders" or "facilitating" "self-harm." The most serious problem with HB 18's under-inclusivity is it threatens to censor social discussions of controversial topics. "[S]ocial media in particular" operates as one of "most important places . . . for the exchange of views . . . ." *Packingham*, 582 U.S. at 104. But HB 18 specifically cuts teenagers off from this critical "democratic forum[] of the Internet" even though the same harmful content is available elsewhere. *Reno v. ACLU*, 521 U.S. 844, 868 (1997). A teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads. In its attempt to

block children from accessing harmful content, Texas also prohibits minors from participating in the democratic exchange of views online. Even accepting that Texas only wishes to prohibit the most harmful pieces of content, a state cannot pick and choose which categories of protected speech it wishes to block teenagers from discussing online. *Brown*, 564 U.S. at 794–95.

Of course, *Moody*'s instruction on facial challenges still applies: the Court must analyze what each provision of the monitoring-and-filtering requirements does and individually assess those provisions' constitutionality. Here, however, the strict scrutiny test parallels the facial challenge framework. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) ("[T]he validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *NetChoice, LLC v. Bonta*, No. 23-2969, 2024 WL 3838423, at *8 (9th Cir. Aug. 16, 2024) (slip op.) (affirming facial challenge where strict scrutiny regulation "raises the same First Amendment issues" "in every application to a covered business"); *Stevens*, 559 U.S. at 473 n.3 (noting that overbroad law was facially invalid).

The monitoring-and-filtering provisions are more restrictive and less tailored than they need to be at the outset. The provisions' facial under-inclusivity also cannot be cured by identifying examples of HB 18's constitutional applications—the point is that HB 18 does *not* regulate the same harmful content elsewhere. The lack of narrow tailoring and use of overly restrictive means apply to all speech regulated under the provision and "raises the same First Amendment issues." *Bonta*, 2024 WL 3838423, at *8. Nor are the monitoring-and-filtering requirements like the laws at issue in *Moody*, where some provisions might restrict protected speech and others do not. 603 U.S. 725–26. Instead, the monitoring-and-filtering requirements exclusively target speech, only a small portion of which

25

falls outside First Amendment coverage.[13] Because the monitoring-and-filtering requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face.[14]

(b) <u>Targeted Advertising Requirements</u>

Turning to the targeted advertising requirements, the Court finds them likely to fail strict scrutiny for similar reasons. First, Paxton specified no compelling state interest. As with the monitoring-and-filtering requirements, there may exist a compelling state interest in promoting teen mental health by limiting teens' exposure to certain advertising, but nowhere does the Court see a specific interest articulated for removing teens' access to targeted advertising of all kinds, much less a compelling one, as is required. *NIFLA*, 585 U.S. at 766. Paxton devotes some briefing to the general harms of social media, citing that teens use it too constantly, that exposure to some types of content may promote suicidality or eating disorders, and that "malicious actors" "target children and adolescents" on social media. (Dkt. 35, at 14−17). The issue, again, is that these purported state interests could, under Paxton's argument, justify restricting any social media for teenagers; why prevent targeted advertising on the covered DSPs toward them, in particular? To that question, Paxton offers no answer. For lacking a compelling state interest alone, the provision fails strict scrutiny. *NIFLA*, 585 U.S. at 766.

So, too, the targeted advertising requirements lack the required narrow tailoring. *Playboy Ent. Grp.*, 529 U.S. at 813. The targeted advertising requirements do nothing to distinguish between potentially harmful advertising and advertising that is not harmful, or that could be beneficial, to

---

[13] For example, child pornography generally does not receive First Amendment protection. *See New York v. Ferber*, 458 U.S. 747, 765 (1982). But the large majority of the proscribed content, such as speech promoting eating disorders, harassment, and bullying, is covered speech, even if highly distasteful. A state may not "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794.

[14] The preliminary injunction will also apply to Section 509.056(1), which requires DSPs to "make a commercially reasonable effort to ensure that [their] algorithm does not interfere with the digital service provider's duties under" the monitoring-and-filtering requirements.

minors. Lacking narrow tailoring is, again, an independent reason that the targeted advertising requirements fail strict scrutiny. *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1119 (9th Cir. 2023) (enjoining advertising ban that was "too broad" because it "effectively constitutes a blanket restriction on firearm-product advertising," where no tailoring existed to ensure it advanced the state's interest of curbing unlawful firearm use or gun violence). Plaintiffs submit evidence of the beneficial aspects of targeted advertising and its positive uses; for example, they show that Plaintiff Ampersand uses advertisements to reach its members with informational campaigns about public health. (Mot. Prelim. Inj., Dkt. 17, at 8−9; Janeway Decl., Dkt. 18, at 2−5). Paxton agrees that advertising can be beneficial to minors in some contexts. Paxton calls some forms of advertising "public service advertising": "speech such as a university's post on its own social media identifying upcoming 'scholarship opportunities' or a nonprofit organization's announcement of an upcoming conference to discuss 'free speech' issues." (Resp., Dkt. 35, at 31). But the statute restricts those forms of advertising. Paxton agrees restricting such content is "absurd," (*id.* at 31), but this results from the statute's plain language, which uses the word "advertising" and creates no caveats to focus on any particularly harmful type of advertising.[15] That the statute includes within its ambit prohibiting speech that Paxton agrees is beneficial only underscores that the statute is over-inclusive.

On the other hand, the targeted advertising requirements are fatally under-inclusive, for similar reasons as the monitoring-and-filtering requirements. *Brown*, 564 U.S. at 802. Why, if the very use of targeted advertising toward minors creates a harm so acute as to create a compelling state interest, can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform? And why may the DSPs allow it so long as one parent logs onto their account and

---

[15] As discussed in Section III(C)(1), Paxton insists that the proper reading would carve-out those "public service" advertisements, because the law has the purpose of "protecting children from abuse and their privacy." (*Id.*). But as explained previously, Paxton offers—and the Court can identify—no basis for that limiting principle within the text of the targeted advertising requirements, and the Court cannot rewrite the statute. *Serafine*, 810 F.3d at 369; *Am. Booksellers*, 484 U.S. at 397.

permits it? *See Brown*, 564 U.S. at 802 (finding that statute which enabled minors to access "dangerous, mind-altering material" to minors "so long as one parent . . . says it's OK" was under-inclusive and failed strict scrutiny). For that third independent reason, the provisions fail strict scrutiny.

As with the monitoring-and-filtering requirements, the statute is invalid on its face. The targeted advertising requirements exclusively target speech, only a small portion of which, such as child pornography or defamation, falls outside First Amendment coverage. *See Brown*, 564 U.S. at 794. In every application, they limit DSPs' editorial "choices about . . . how to display" speech. *Moody*, 603 U.S. at 716. A substantial majority of the prevented speech is protected First Amendment activity, *id.* at 724, including both targeted advertising sharing undisputedly beneficial speech, and targeted advertising on topics that are highly disfavored by the state but retain First Amendment protection, *Brown*, 564 U.S. at 794. The court will facially enjoin the provision.

(c) <u>Content Monitoring and Age-Verification Requirements</u>

The content monitoring and age verification requirements suffer the same flaws. Paxton does not seriously contest that the restriction fails strict scrutiny, instead, he acknowledges that on "the merits, § 509.057 realistically shares the same fate as § 509.053(a)." (Dkt. 35, at 42). The Court agrees and finds that § 509.057 fails strict scrutiny for the same reasons that § 509.053 does.

Nowhere does Paxton make clear what compelling state interest in particular these provisions serve or how they are narrowly tailored to it. Protecting minors against speech the state deems offensive or inappropriate is not by itself a compelling state interest. *Erznoznik*, 422 U.S. at 213–14. Again, Paxton gestures toward mental health impacts of social media use, privacy concerns, and the presence of "predator[s]" on the Internet, (Dkt. 35, at 14−17), but nothing suggests the content monitoring and age-verification requirements would address any of those general problems. *See NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *15 (D. Utah Sept.

10, 2024) (enjoining similar law where Utah failed to "offer any evidence that these specific measures will alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease"); *Brown*, 564 U.S. at 799 (strict scrutiny requires the law "be actually necessary to the solution"). And even if there were a measurable impact of the requirements on mental health for teens, why would nothing less restrictive than the content-monitoring and age-verification requirements suffice? *See Playboy Ent. Grp.*, 529 U.S. at 816, 826. Section 509.057 requires limiting any speech on covered DSPs that Paxton or the DSP deems "harmful" (which is broad and undefined) or "obscene" (which is defined, but still reaches a broad range of speech); Paxton nowhere shows that a more targeted limitation would fail.

And, like the other provisions, the content monitoring and age-verification requirements are also fatally under- and over-inclusive. *Brown*, 564 U.S. at 802. They are under-inclusive, because the requirements would allow teenagers to view the same piece of sexually-oriented material on one DSP but not another, depending on whether it is a sports or shopping platform or not. *See* § 509.002(b)(10) (exempting those platforms). They are over-inclusive, because the content monitoring and age-verification regime also deters adults' access to protected speech, as DSPs have an incentive to limit their overall "harmful" or "obscene" content available. Finally, the content monitoring and age-verification regime denies minors access to DSPs even where most of the content is *not* "harmful" or "obscene." As such, the Court finds at this stage that the content monitoring and age-verification restrictions fail strict scrutiny.

As with the other requirements, the statute is invalid on its face. The content monitoring and age-verification requirements exclusively target speech; they limit DSPs' editorial "choices about . . . how to display" speech in all of their applications, *Moody*, 603 U.S. at 716, and a substantial majority of the prevented speech is protected First Amendment activity, *id.* at 724, even where the state views

certain topics as inappropriate or unseemly for minors, *Brown*, 564 U.S. at 794. The Court will facially enjoin the provision.

### D. Vagueness

In addition to their First Amendment challenge, Plaintiffs argue that the three challenged provisions (monitoring-and-filtering, targeted advertising, and content monitoring and age-verification requirements) are void for vagueness. (Mot. Prelim. Inj., Dkt. 17, at 24–25). As to the monitoring-and-filtering requirements, Plaintiffs argue the terms "promote[]," "glorify," and "facilitate[]" are void for vagueness. (*Id.* at 26–27 (quoting HB 18 § 509.053(a))). As to the targeted advertising requirements, Plaintiffs argue that the term "advertising" is unconstitutionally vague (*id.*, quoting § 509.052(2)(D)), and so are the terms "facilitate" and "promote" when they appear in § 509.055, (*id.*). Finally, they challenge the content monitoring and age-verification requirements, as well as the "verified parent" definition, as unconstitutionally vague due to the term "commercially reasonable method." (*Id.* (quoting §§ 509.057(a), 509.101)).

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied* 144 S. Ct. 348 (2023). "A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). The Supreme Court has "expressed greater tolerance of

enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. However, if "the law interferes with the right of free speech or association, a more stringent vagueness test should apply." *Id.* at 499.

(a) <u>Monitoring-and-Filtering Requirements</u>

This Court has already held that the terms "promote, glorify, and facilitate" are vague within HB 18's monitoring and filtering requirements, and holds the same here. *Computer & Comm'ns Indus. Ass'n*, 2024 WL 4051786, at *16. To reiterate: those provisions require social media DSPs to track, filter, and block material that "promotes," "glorifies," or "facilitates" "suicide, self-harm,[] eating disorders[,] substance abuse[,] stalking, bullying, [] harassment[,] grooming, trafficking, child pornography,[] other sexual exploitation or abuse" and material that is sexually explicit for minors. HB 18 § 509.053. Those provisions are vague because both the verbs (promotes, glorifies, and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined. Especially when put together, the provisions are unconstitutionally vague.

Begin with the verbs: promote, glorify, and facilitate. One of those words—"promote"—has already been held to be vague when regulating First Amendment activity. In *Baggett v. Bullitt*, 377 U.S. 360, 371–72 (1964), the Supreme Court dealt with a regulation that imposed a loyalty oath for teachers to swear that they will "*promote* respect for the flag and the institutions of the United States." (emphasis added). The Supreme Court found that the term "promote" was "very wide indeed" and failed to "provide[] an ascertainable standard of conduct." *Id.*

The problem is even more acute with the term "glorifying." The word encompasses so wide an ambit that people "of common intelligence" can do no more than guess at its application. *McClelland*, 63 F.4th at 1013. To "glorify" potentially includes any content that favorably depicts a prohibited topic, leaving no clear answer on what content must be filtered. Do liquor and beer advertisements "glorify" "substance abuse?" Does *Othello* "glorify" suicide? Given the substantial

liability companies face for failing to comply (to say nothing of the private rights of action), it is reasonable to expect that companies will adopt broad definitions that do encompass such plainly protected speech.

In sum, HB 18 imposes requirements for entire categories of speech to be blocked. If those *ex-ante* restrictions are to be imposed, they cannot arguably cover such broad categories of protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).[16]

Paxton suggests that these terms can be "narrowly construed in a manner that would be constitutional," but he does not explain how. (Resp., Dkt. 35, at 43) (citing *Williams*, 553 U.S. at 290, then quoting *United States v. Hansen*, 599 U.S. 762, 770–73 (2023))). To the extent Paxton suggests those terms can be interpreted to mean "speech integral to unlawful conduct," as in *Hansen*, nowhere did the state make such a caveat explicit from the statute, even though it could have chosen to do so. Instead, the state used terms that reach a broader swath of conduct than criminal assistance or advocacy. And there are good reasons to believe the state deliberately sought a broader definition than criminal assistance or advocacy, because HB 18 also proscribes speech related to lawful conduct, such as having an eating disorder. Indeed, Paxton's brief would suggest that the law intends to prevent certain forms of legal speech because of their negative effects on teens (like access to information about dieting because of its potential to promote eating disorders). (*See* Resp., Dkt. 35, at 14–17). As a result, HB 18 is not "readily susceptible" to a "narrowing construction" to

---

[16] Paxton contends that the monitoring-and-filtering provisions are not vague to Plaintiffs because they "mirror social media companies' own content-moderation policies." (Resp., Dkt. 35, at 24). But a self-policed rule does not suffer the same vagueness problems as a state-backed proscription. Facebook may know their internal definition of "glorify" but the company cannot be assured that Paxton or Texas courts will abide by the same definition.

make it constitutional, as Paxton suggests. *Am. Booksellers*, 484 U.S. at 397 ("[T]he statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements.") (internal quotation omitted).

The final issue for HB 18 is that the law fails to define key categories of prohibited topics, including "grooming," "harassment," and "substance abuse." At what point, for example, does alcohol use become "substance abuse?" When does an extreme diet cross the line into an "eating disorder?" What defines "grooming" and "harassment?" Under these indefinite meanings, it is easy to see how an attorney general could arbitrarily discriminate in his enforcement of the law. *See Smith v. Goguen*, 415 U.S. 566, 575 ("Statutory language of such a standardless sweep allows [] prosecutors[] and juries to pursue their personal predilections."). These fears are not too distant—pro-LGBTQ content might be especially targeted for "grooming." *See Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *2 (W.D. Tex. Mar. 30, 2023) (finding that several books supporting pro-LGBTQ views were removed from library shelves for allegedly promoting "grooming"), *aff'd as modified*, 103 F.4th 1140 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 106 F.4th 426 (5th Cir. 2024). Content related to marijuana use might be prosecuted as "glorifying" "substance abuse," even if cigarette and alcohol use is not. This vast indefinite scope of enforcement would "effectively grant[] [the state] the discretion to [assign liability] selectively on the basis of the content of the speech." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 465 n.15 (1987). Such a sweeping grant of censorial power cannot pass First Amendment scrutiny.

(b) <u>Targeted Advertising Requirements</u>

Plaintiffs argue that the term "advertising" is unconstitutionally vague in § 509.052(2)(D)), and so are the terms "facilitate" and "promote" when they appear in § 509.055. (Mot. Prelim. Inj., Dkt. 17, at 26–27). The Court finds that the words "facilitate" and "promote" also render § 509.055 unconstitutionally vague, for the same reasons as when they appear elsewhere in the statute. As to

the term "advertising," however, at this stage, the Court agrees with Paxton. Several courts have held

that the term "advertising" has a "common understanding" or is otherwise not void for vagueness in

other contexts. *See, e.g.*, *Free Speech Coal., Inc. v. Shurtleff*, No. 2:05CV949DAK, 2007 WL 922247, at

*16 (D. Utah Mar. 23, 2007) ("The term advertises has a common understanding."); *see also*

*StreetMediaGroup, LLC v. Stockinger*, No. 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec.

6, 2021); *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 534 (S.D.N.Y. 2018); *Texans*

*Against Censorship, Inc. v. State Bar of Tex.*, 888 F. Supp. 1328, 1369–71 (E.D. Tex. 1995), *aff'd*, 100 F.3d

953 (5th Cir. 1996). Plaintiffs have not responded to this caselaw, nor provided examples of courts

finding "advertising" to be an unconstitutionally vague term in similar contexts to HB 18. So,

Plaintiffs have not established a substantial likelihood that "advertising" is unconstitutionally vague,

as is their burden at this stage. Regardless, since the Court will enjoin the targeted advertising

requirements because they fail strict scrutiny, it need not reach this issue.

(c)   <u>Content Monitoring and Age-Verification Requirements</u>

Finally, Plaintiffs argue that the content monitoring and age-verification requirements,

(§ 509.057), as well as its "verified parent" definition, is rendered unconstitutionally vague by the

term "commercially reasonable method." (Mot. Prelim. Inj, Dkt. 17, at 27). In turn, Paxton argues

that "commercial reasonableness" is used in many contexts across the Uniform Commercial Code

and federal law. (Resp., Dkt. 35, at 44 (citing 17 U.S.C. § 115, 15 U.S.C. § 7706(f)(3)(D),

U.C.C. § 2614(1), and U.C.C. § 2-402(2)). Plaintiffs do not respond other than to note that none of

Paxton's examples involve protected speech. (Dkt. 37, at 27). While it is true that the standard for

vagueness in a statute is stricter in First Amendment cases, *Vill. of Hoffman Ests.*, 455 U.S. at 498, the

Court still finds it persuasive that numerous other statutes use the same term, and Plaintiffs have not

at this stage provided evidence demonstrating the term's vagueness when it appears in HB 18. Given

34

that the Court has enjoined the statute on the grounds that it fails strict scrutiny, the Court will decline to reach this ground.

### 3.  Prior Restraints

Separate from their other arguments, Plaintiffs argue that the challenged restrictions are unconstitutional because they impose a "system of prior restraint." (Mot. Prelim. Inj., Dkt. 17, at 19–21). Paxton responds that prior restraints must typically come from "administrative and judicial orders," so HB 18 does not qualify. (Resp., Dkt. 35, at 46). Finding the provisions invalid under strict scrutiny, and finding § 509.053 and § 509.055 unconstitutionally vague, the Court need not reach the issue.

### E. Remaining Preliminary Injunction Factors

Paxton does not seriously contest the remining preliminary injunction factors, other than to suggest that Plaintiffs delayed in bringing suit. (Resp., Dkt. 35, at 47). Lengthy delays in filing suit do count against irreparable harm, especially in the context of a temporary restraining order. *See Luckenbach Texas, Inc. v. Skloss*, No. 1:21-CV-871-RP, 2022 WL 5568437, at *4–5 (W.D. Tex. July 8, 2022); *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-CV-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017). That doctrine is less applicable here, where the law created a 14-month gap between enactment and taking effect, and Plaintiffs' delay does not automatically negate a finding of irreparable harm.

Setting aside their delay, Plaintiffs make a clear showing that they will suffer irreparable injury in the absence of an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). As described above in Section III(A)(1), Plaintiffs have submitted declarations attesting to their chilled speech because of HB 18, which suffices to show irreparable harm.

The balance of equities and public interest follow likelihood of success. These last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (internal citation omitted). Because the Court has found that Plaintiffs have shown a substantial likelihood of success on the merits of their First Amendment claims, the Court finds that an injunction is in the public interest. *See id.; see also, e.g., Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.").

## IV. CONCLUSION

Plaintiffs have shown that HB 18 is a content-based statute and is therefore subject to strict scrutiny. As to the monitoring-and-filtering requirements, HB 18 § 509.053 and § 509.056(1), the targeted advertising requirements, § 509.052(2)(D) and § 509.055, and the content monitoring and age-verification requirements, § 509.057, Plaintiffs have carried their burden in showing that the law's restrictions on speech fail strict scrutiny and should be facially invalidated, and in § 509.053 and § 509.055, are unconstitutionally vague. Because Plaintiffs also show that the remaining equitable factors weigh in their favor, the Court preliminarily enjoins Paxton from enforcing those provisions.[17] However, Plaintiffs do not show that the remaining provisions of HB 18 unconstitutionally regulate a meaningful amount of constitutionally protected speech or otherwise

---

[17] Plaintiffs are not required to post a security bond. *See Fitch*, 2024 WL 3276409, at *17.

fail strict scrutiny. Accordingly, the preliminary injunction is limited only to the provisions listed above.[18]

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, (Dkt. 17), is **GRANTED IN PART** and **DENIED IN PART** as set forth in this order.

**IT IS FURTHER ORDERED** that Paxton, his agents, employees, and persons working under his direction or control are **PRELIMINARILY ENJOINED** from enforcing the monitoring-and-filtering requirements, HB 18 § 509.053 and § 509.056(1), the targeted advertising requirements, § 509.052(2)(D) and § 509.055, and the content monitoring and age-verification requirements, § 509.057, pending a final judgment in this case or other modification of this order.

**SIGNED** on February 7, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[18] More specifically, HB 18 Sections 509.001–002 are definitions and applicability provisions, and Plaintiffs do not show that they independently create an injury and likely violate the Constitution. Also, as to Section 509.051, Plaintiffs reference that the Act requires Texans to register their age before accessing a DSP but do not show how age registration alone (without the separate content-monitoring requirements requiring that DSPs bar known minors' access, which this Court will enjoin) independently prohibits speech and likely violates the Constitution. Similarly, as to Sections 509.101–102, Plaintiffs do not show that the process for verifying a parent and the powers of a verified parent under HB 18 independently creates an injury and violates the Constitution when not combined with the targeted advertising requirements, which this Court will enjoin. Accordingly, the Court will deny the motion in all other respects.